QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Sean S. Pak (SBN 219032)
  seanpak@quinnemanuel.com
  Iman Lordgooei (SBN 251320)
  imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

JWC LEGAL
  Jodie W. Cheng (SBN 292330)
  jwcheng@jwc-legal.com
One Market Plaza, Suite 3600
San Francisco, California 94105
Telephone: (415) 293-8308

Attorneys for Plaintiffs,
Proofpoint, Inc. and Cloudmark LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROOFPOINT, INC.; CLOUDMARK LLC<br><br>                Plaintiffs,<br><br>        vs.<br><br>VADE SECURE, INCORPORATED; VADE SECURE SASU; OLIVIER LEMARIÉ<br><br>                Defendants. | CASE NO. 3:19-cv-4238<br><br>**COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA (18 U.S.C. § 1836 *et seq.*); BREACH OF EMPLOYMENT AND CONFIDENTIALITY AGREEMENTS**<br><br>**DEMAND FOR JURY TRIAL** |

Proofpoint, Inc. ("Proofpoint") and its wholly owned subsidiary Cloudmark LLC ("Cloudmark"; collectively with Proofpoint, "Plaintiffs") submit this Complaint against Defendants Vade Secure, Incorporated, Vade Secure SASU (collectively, "Vade"), and Olivier Lemarié (collectively with Vade, "Defendants"), and allege as follows.

## **INTRODUCTION**

1.      This action arises from an unlawful scheme among Defendants to misappropriate Plaintiffs' valuable trade secrets and other confidential information to gain an unfair competitive advantage in the marketplace.  Specifically, this is a lawsuit to end Defendants' ongoing pattern of misappropriating Plaintiffs' trade secrets, and violating contractual obligations in Lemarié's Employment Agreement and Employee Proprietary Information and Invention Agreement ("PIIA") with Cloudmark. Plaintiffs are seeking injunctive relief among other remedies to protect their valuable intellectual property developed through years of research and development, including work conducted by Lemarié as a former employee of Cloudmark.

2.      For over six years, Lemarié was employed by Cloudmark as the Vice President of Gateway Technology, reporting directly to Cloudmark's Chief Executive Officer.  In his role, Lemarié had unfettered access to highly confidential technical information related to the innovations and concepts developed for Cloudmark's products and services.  As such, in the course of his employment, Lemarié entered into several agreements covering, *inter alia*, the scope of his use and disposition of proprietary and confidential information, intellectual property, and Cloudmark resources.

3.      As part of his job responsibilities at Cloudmark from 2010 until 2016, Lemarié, together with Cloudmark's engineering and product development teams, contributed to developing technology for Cloudmark's cybersecurity products, including techniques and methods for identifying and filtering malicious emails, such as spam, phishing, and spear-phishing emails.  As malicious email threats became

more sophisticated, Cloudmark's technical teams developed innovative ways to detect those threats, without disturbing normal email flow, by utilizing proprietary behavioral analysis and applying proprietary statistical analyses against Cloudmark's databases of known threats, in a cloud-based solution that could be quickly integrated and deployed into the customer's existing email infrastructure (e.g., Microsoft Office 365). The powerful email and content filter developed by the Cloudmark team was also flexible and allowed easy integration with customers' Information Technology ("IT") infrastructures and other cybersecurity solutions through the use of Cloudmark's proprietary Message (or Mail) Transfer Agent (or "MTA") technology, for which Lemarié had led the design, development, and implementation.

4.     While Lemarié contributed to the initial development of some of these concepts, Cloudmark's engineering, testing, and product development personnel supported bringing the ideas "to life" by, e.g., researching how to implement the ideas, writing and fixing code, and creating user interfaces and infrastructure, such that they could be incorporated into a complete, "end-to-end" solution.

5.     In late 2016, after Cloudmark had already dedicated several years to develop, test and de-bug its next-generation email security solutions, Lemarié voluntarily terminated his employment with Cloudmark.

6.     Shortly thereafter, Lemarié joined Vade as its Chief Technology Officer. On information and belief, Lemarié planned his departure from Cloudmark to join Vade for several months before he provided his written resignation to Cloudmark on November 11, 2016. Moreover, Lemarié was the last of four other senior-level Cloudmark engineers to join Vade in the span of less than a year. All four engineers had been involved in various aspects of the development and/or implementation of Cloudmark's anti-phishing email solutions and MTA technology. On information and belief, throughout 2016, Vade had aggressively pursued each of the Cloudmark engineers and, in more than one instance, had "hunted" and recruited them even though they had not been seeking other job opportunities.

7.      Vade—like Cloudmark and Proofpoint—develops and markets cyber security products.  Prior to Lemarié joining Vade in early 2017, Vade's email filtering products did not gain much market traction despite having been marketed for over a decade.  For example, in tax documents from 2015–2016, Cloudmark-turned-Vade employees described Vade's email security solution as "us[ing] conventional detection techniques" and "ha[ving] very limited hardware and algorithmic capabilities compared to [Cloudmark's] solution" in 2015–2016.

8.      In contrast, within months after Lemarié joined Vade, Vade filed a U.S. patent application describing new methods of identifying spear-phishing attacks and impostor/spoof emails, and appears to have rapidly developed a product embodying the same.  Indeed, within a year, Vade launched an email security product that, according to Vade's marketing, incorporated a unique combination of technical features in a unified architecture (including behavioral analysis, machine learning and statistical analysis to identify spear-phishing emails in a cloud-based solution that could be quickly integrated and deployed into the customer's existing email infrastructure (e.g., Microsoft Office 365))—all of which were techniques and technology developed previously by Lemarié and his team at Cloudmark.

9.      On information and belief, Vade's new email security product was a dispositive factor in its ability to secure nearly $80 million USD in funding from its investor, General Catalyst.  *See* **Exhibit L**.  On information and belief, this latest funding round—which comes on the heels of Vade's release of its new products—represents nearly 90% of Vade's total funding to date.

10.      Additionally, on information and belief, Vade has been developing an MTA product that it intends to launch by the end of this year and, as explained by Lemarié himself, is intended to displace Cloudmark's MTA, by offering a similarly flexible, cloud-based MTA.  Cloudmark's MTA is still in use and sold today and is incorporated into the Cloudmark Security Platform (or "CSP").

11.    Under the agreements that Lemarié had entered into with Cloudmark, he was subject to contractual obligations regarding (1) the handling of information that is confidential and proprietary to Cloudmark, (2) assignment of intellectual property and innovations to Cloudmark, (3) disclosure and reporting obligations with respect to his inventions, and (4) the return of property and documents upon leaving Cloudmark.  On information and belief, Lemarié violated these obligations in multiple ways, including using Cloudmark's confidential and trade secret information for the development of Vade's email security and MTA products, failing to disclose and report inventions during the required time period, and failing to return Cloudmark's confidential and proprietary documents upon his departure from Cloudmark.

12.    Plaintiffs submit this Complaint seeking injunctive relief, monetary damages and other remedies for Defendants' misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* as well as Lemarié's breaches of contract.

## THE PARTIES

13.    Proofpoint, Inc. is a public corporation organized under the laws of the State of Delaware, with its principal place of business at 892 Ross Drive, Sunnyvale, California 94089.

14.    Cloudmark LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 892 Ross Drive, Sunnyvale, California 94089.

15.    On information and belief, Vade Secure, Incorporated is a corporation organized under the laws of the State of California, with its principal place of business at 100 Pine Street, Suite 1250, San Francisco, California 94111.

16.    On information and belief, Vade Secure SASU is a "société par actions simplifiée unipersonnelle" organized under the laws of France, with its principal place of business at 2 bis avenue Antoine Pinay, Parc d'activites des 4 vents in HEM (59510) France.

17.     On information and belief, Olivier Lemarié is an individual residing at 1230 Sesame Ct., Sunnyvale, California 94087.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839 *et seq.*

19.     This Court has extraterritorial jurisdiction over Plaintiffs' claims against Vade Secure SASU pursuant to 18 U.S.C. § 1837(2).

20.     The Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative fact.

21.     This Court has general personal jurisdiction over Lemarié because, at all relevant times, he was domiciled in California, and thus is a resident of California. Additionally, through his employment agreements with Cloudmark, Lemarié submitted to the personal jurisdiction of the state and federal courts located in San Francisco County, California.

22.     This Court has general personal jurisdiction over Vade Secure, Incorporated because it regularly conducts business within this jurisdiction, by at least operating its registered Principal Executive Office at 100 Pine Street, Suite 1250, San Francisco, California 94111.

23.     This Court has general personal jurisdiction over Vade Secure SASU because it regularly conducts business within this jurisdiction by at least operating an office at 600 California Street, Floor 11, San Francisco, CA 94108, and directing inquiries to that office.

24.     This Court has specific personal jurisdiction over Vade and Lemarié because Lemarié was acting within the scope of his employment at Vade when he intentionally and purposefully misappropriated, used, and/or disclosed Proofpoint's

trade secret information and breached his contractual obligations with Cloudmark to the benefit of Vade.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2) and Local Rule 120(d) because all Defendants are residents of the state of California and at least one Defendant resides in this judicial district, and because a substantial part of the events or omissions giving rise to Proofpoint's claims occurred in this judicial district and, in particular, San Francisco County.

**INTRADISTRICT ASSIGNMENT**

26.     A substantial part of the events giving rise to the claims alleged in this Complaint occurred in the City and County of San Francisco.  For purposes of intradistrict assignment under Civil L.R. 3-2 and 3-5, this action should be assigned to the San Francisco Division or the Oakland Division.

**ALLEGATIONS APPLICABLE TO ALL CLAIMS**

27.     Founded in 2002, Proofpoint is a public U.S. company, headquartered in Sunnyvale, California, that enables organizations worldwide—including over half of the Fortune 100—to protect the way their people work from advanced threats and compliance risks.  Proofpoint's integrated suite of products works together to help organizations build people-centric security and compliance programs.  Proofpoint provides threat protection, information protection, user protection, business ecosystem protection, and compliance solutions to address today's rapidly changing threat and compliance landscape.  Proofpoint's solutions are built on a flexible, cloud-based platform and leverage proprietary technologies including big data analytics, machine learning, deep content inspection, secure storage, advanced encryption, intelligent message routing, dynamic malware analysis, threat correlation, and virtual execution environments.

28.     Proofpoint was founded by notable Silicon Valley technologist and entrepreneur Erich Hahn in a small office on Sand Hill Road and counted Mohr Davidow and Benchmark Capital, as well as Stanford University, among its very first

investors.  Since its founding, Proofpoint has remained an industry leader by offering the most advanced technology and innovations to customers.  As part of developing and providing next-generation cybersecurity solutions, it expends significant resources to develop and implement ideas from its engineers and technical teams, and finds opportunities to engage other companies that may share the same dedication to innovation in cybersecurity.

29.    One of these companies was Cloudmark, which, among other projects, was developing sophisticated techniques to identify targeted phishing email attacks. Moreover, Cloudmark's cybersecurity technology was—and remains—among few in the industry that provide a proprietary way of integrating with customers' existing IT infrastructure through Cloudmark's Message (or Mail) Transfer Agent (or "MTA"), which is still in use today.  In 2017, Proofpoint acquired Cloudmark.

30.    From 2010–2016, Lemarié served as the Vice President of Gateway Technology of Cloudmark and reported directly to the Chief Executive Officer. According to Lemarié, while in this role, he "led the development of new products . . . for the protection against email, mobile and [DNS] based security threats." **Exhibit A**.

31.    In his role as senior management for technical teams, Lemarié was involved in many aspects of Cloudmark's technical development; had unfettered access to Cloudmark's technical documents and source code; and interacted with Cloudmark's engineers, developers, product developers/managers on a day-to-day basis.  In particular, his job responsibilities included "[m]anagement of engineering teams in San Francisco and Paris" and serving as "Managing Director of Cloudmark Labs entity in France."  **Exhibit A**.

32.    Lemarié drove Cloudmark's technical teams to focus on developing solutions to filter malicious content and "designed and developed new solutions to detect spear phishing attacks in real time."  **Exhibit A**.  These proprietary solutions incorporated a combination of technical features in a unified architecture, including:

- behavioral analysis and machine learning,
- heuristic rules,
- statistical models and scoring,
- real-time, cloud-based threat analysis, and
- easy integration and quick deployment into the popular Microsoft Office 365 architecture in a unique and seamless manner using Office 365 journaling, which avoids making complicated modifications to a client's MX records.

33.   As Lemarié explained in 2015 while he was still at Cloudmark, this proprietary combination of techniques differentiated Cloudmark's solution from the existing "simplistic" technology by "leveraging new ways of looking at things" such as "behavioral analysis, leveraging threat intelligence, [and] big data."

34.   Further, Cloudmark's email and content detection technology that Lemarié helped develop was flexibly designed to work with Cloudmark's proprietary MTA technology—which Lemarié had been responsible for developing.   On information and belief, the proprietary MTA was developed and marketed under the product name Intelligent Message Processor ("IMP") by Bizanga, a cybersecurity company founded by Lemarié and acquired by Cloudmark in March 2010.

35.   In addition to founding Bizanga, Lemarié also served as its Chief Technical Officer and was "responsible for the development and direction of Bizanga's [IMP] platform which provided scalable and full-featured email message processing and security for some of the largest messaging operators in the world." **Exhibit B**; *see also* **Exhibit A**.  Specifically, Bizanga's IMP used an operating system known as OvernetOS (or "OOS") and was a scalable SMTP messaging router with a policy engine that could monitor email traffic for threats, as well as pass emails to various content filters for further scanning, such as Cloudmark's anti-spam filter. This MTA is still in use today at Cloudmark, now included as part of CSP.  According

to accounts of Cloudmark management, one of the primary reasons for acquiring Bizanga was the high performance and flexibility of the Bizanga MTA technology.

36.    In 2016, Vade aggressively recruited and "hunted" engineers and technical personnel from Cloudmark—even where the Cloudmark employees were not actively searching for job opportunities—including Lemarié, Alexandre Boussinet, Xavier Delannoy, and Guillaume Séjourné. *See* **Exhibits A, C–E**. Within a six-month period, two of Cloudmark's Senior Software Engineers, its Engineering Product Coordinator and Senior Technical Writer, and Vice President of Gateway Technology all left Cloudmark to join Vade—as Plaintiffs would later discover—to develop a competing solution. *Id.*

37.    While at Cloudmark, these employees had been working alongside and under the direction of Lemarié on Cloudmark's solutions to protect against spear-phishing and impostor/spoof emails, as well as its MTA technology.  In particular, various Cloudmark documentation, including foreign tax filings and internal emails, state that these engineers participated in developing Cloudmark's anti-phishing email security solution—known internally as "Trident."

38.    Lemarié joined Vade as its Chief Technical Officer in February 2017. By then, the three other engineers had already left Cloudmark and joined Vade (in June, July, and December 2016).  On information and belief, Lemarié had accepted an offer to join Vade several months prior to his notice of resignation to Cloudmark.

39.    Prior to Lemarié (and the other former Cloudmark engineers) joining Vade, Cloudmark's foreign filings describe Vade's email security product as a "solution[that] uses conventional detection techniques, adapted to the targeted phishing problem" and "has very limited hardware and algorithmic capabilities compared to [Cloudmark's] solution."

40.    Within months after Lemarié joined Vade, on March 22, 2017, Vade filed U.S. Patent Application 15/466,588, titled "Detection of Email Spoofing and Spear Phishing Attacks," and directed toward methods of detecting spear-phishing

and imposter/spoof emails using statistical analysis and behavioral history of sender and recipient.  **Exhibit F**.

41.    Within roughly one year, Vade began marketing an email security product for Microsoft Office 365, "Vade Secure For Office 365 . . . a fully native cloud solution with AI-based, predictive email defense" that "protects against phishing attempts, spear phishing, [and] business email compromise attacks." **Exhibits H–I**.  According to Vade's marketing and public product reviews, Vade email security solutions provide a combination of:

- "**machine learning** models that perform **real-time behavioral analysis**";
- "**artificial intelligence** and [] **heuristic filter**";
- "[u]nsupervised anomaly detection and natural language processing scan for **patterns, anomalies, and behaviors** common in spear phishing emails";
- "secure **cloud** email system" and "**cloud** platform"; and
- "**Immediate Implementation**" and "**Instant Deployment.**"

**Exhibits H–J**.

42.    An article from SC Magazine describes that Vade Secure For Office 365 "also features behavior-based . . . insider attack protection . . . anti-spear phishing, and protects against CEO fraud." **Exhibit K**.  Moreover, like the proprietary solution developed at Cloudmark, it "leverages Office 365's built-in capability for encryption and backups" and "has no MX redirection." *Id.*  "Activation could not be easier," with only three steps including "activat[ing] journaling." *Id.*

43.    More than a decade after its founding—yet only one year after its patent filing and launch of software products to protect against spear-phishing and imposter/spoof emails—Vade obtained venture capital funding of nearly $80 million USD to continue the growth of its new products.  **Exhibit L**.  News articles report that Vade's email security solutions, particularly the Vade Secure For Office 365, were a

major, if not the sole, factor in securing the funding. *Id.* Indeed, an investor in Vade, Austin McChord, was quoted as touting Vade's new products as a basis for the "immense potential" prompting the investment. *Id.* Another investor, Stephan Dietrich, was quoted as touting Vade's "tremendous growth and technological advances" and desire to "unlock the company's full potential." *Id*. On information and belief, this latest funding round represents nearly 90% of Vade's total funding to date.

44.     Additionally, Vade has been focusing significant resources toward developing an MTA product—which it plans to launch by the end of this year. On information and belief, Lemarié has touted the flexibility of the Vade MTA, similar to a unique advantage of Cloudmark's MTA. In fact, Lemarié has described that Vade's upcoming MTA is intended to displace and directly compete for customers and deployments currently utilizing Cloudmark's MTA.

45.     Finally, on information and belief, sometime in 2018, Lemarié gave a presentation in which he indicated that he and others at Vade were working on transitioning Vade's product architecture to the "Docker" software development platforms utilizing the "Go" (or "Golang") computer programming language. These are the exact software development tools used by Cloudmark to develop its cybersecurity solutions and MTA. In the same presentation, Lemarié stressed the importance of reusing code as much as possible and that it is acceptable for products to be made from copy-pasted bits of existing code with "slight" modifications.

**Proofpoint and Cloudmark Protect Their Confidential and Proprietary, Including Trade Secret, Information**

46.     As part of his employment with Cloudmark, Lemarié entered into agreements governing, *inter alia*, the handling of information that is confidential and proprietary to Cloudmark, assignment of intellectual property and innovations to Cloudmark, disclosure and reporting obligations with respect to their inventions, and the return of property and documents upon leaving Cloudmark.

47.    Specifically, after Cloudmark acquired Bizanga, on February 6, 2010, Lemarié was offered employment with Cloudmark as the Vice President of Gateway Technology.  Lemarié signed and accepted the offer of employment on February 27, 2010, and separately executed an Employee Proprietary Information and Inventions Agreement ("PIIA") with Cloudmark on February 25, 2010.

48.    The PIIA protects Cloudmark's intellectual property and Cloudmark's rights in view of Lemarié's development of, and access to, such confidential intellectual property as an employee of Cloudmark.

49.    In particular, in consideration of his employment and continued employment by Cloudmark, including his compensation thereunder, Lemarié agreed to abide by several provisions in the PIIA.  For example, Lemarié agreed that he would hold in strictest confidence and could not disclose, use, lecture upon or publish any of Cloudmark's Proprietary Information—which is defined to include Cloudmark's trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques, as well as any information regarding Cloudmark's plans for, *inter alia*, research and development of new products—other than as required in connection with his work for Cloudmark or unless an officer of Cloudmark expressly authorized such in writing.

50.    Additionally, Lemarié agreed under the PIIA that, during the period of his employment and for six months after termination thereof, he would promptly disclose to Cloudmark fully and in writing all inventions that he authored, conceived or reduced to practice, either alone or jointly with others, and to otherwise preserve the confidentiality of all such inventions.  Lemarié also agreed to advise Cloudmark in writing of any such invention that he believes qualifies for protection under Cal. Labor Code § 2870, including by providing Cloudmark, in writing, all evidence necessary to substantiate his belief.  At no point did Lemarié ever inform Cloudmark of any invention developed by him, either alone or jointly with others, that he alleged

qualified for protection under § 2870.  Nor did Lemarié disclose to Cloudmark any other inventions that he authored, conceived or reduced to practice, either alone or jointly with others during the six month period following his departure from Cloudmark, despite on information and belief working on Vade solutions that are directly competitive to Cloudmark's offerings and embodying the same combination of features.

51.     Additionally, Lemarié agreed under the PIIA that he would keep and maintain adequate and current records of all Proprietary Information developed by him and all inventions made by him during the period of his employment at Cloudmark, and that all such records would be made available to, and remain the sole property of, Cloudmark at all times.

52.     Additionally, Lemarié agreed under the PIIA that, when leaving the employ of Cloudmark, he would deliver to Cloudmark any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any of Cloudmark's inventions or Proprietary Information.

53.     On or about October 24, 2016, Lemarié provided notice to Cloudmark that he would be leaving the company and, on November 11, 2016, he tendered his formal resignation and left Cloudmark.  On information and belief, Lemarié had already accepted employment with, or was planning on joining, Vade as its Chief Technology Officer when he gave notice to Cloudmark, yet he did not inform Cloudmark that he was leaving the company to join Vade.  On information and belief, Lemarié officially began employment as CTO of Vade sometime in or before February 2017.

## COUNT I – TRADE SECRET MISAPPROPRIATION

**Misappropriation of Trade Secrets under the DTSA, 18 U.S.C. § 1836 *et seq*.**

**(Against all Defendants)**

54.　Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

55.　Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, processes, algorithms, software policies and logic for detecting malicious email such as proprietary combinations of:

- behavioral analysis and machine learning using known legitimate behavioral patterns of sender or recipient;
- heuristic rules based on legitimate behavioral patterns and known malicious emails or threats;
- statistical dispersion models and quantitative scoring;
- comparison or analysis using cloud-based databases;
- real-time threat analysis; and
- integration and deployment into Microsoft Office 365 infrastructure (a) using the "journaling" feature and/or (2) without affecting MX records or (re)direction.

56.　Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of, the confidential, proprietary, and trade secret information referenced in Paragraph 55.

57.　Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods,

processes, algorithms, software policies and logic for transferring electronic mail messages using SMTP that are flexible and scalable.

58. Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of transferring electronic mail messages using SMTP that are flexible and scalable.

59. Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, processes, algorithms, software policies and logic for Bizanga's IMP.

60. Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of Bizanga's IMP.

61. Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, processes, algorithms, software policies and logic for Bizanga's OOS.

62. Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of Bizanga's OOS.

63. Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods,

processes, algorithms, software policies and logic for Cloudmark's MTA, which is incorporated into CSP.

64.    Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of Cloudmark's MTA, which is incorporated into the CSP.

65.    Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, processes, algorithms, software policies and logic for Cloudmark's SMTP Agent or Trident SMTP Agent.

66.    Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of Cloudmark's SMTP Agent or Trident SMTP Agent.

67.    The confidential, proprietary, and trade secret information described in Paragraphs 54 through 66 relate to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and ordered in, interstate commerce, at least in that Plaintiffs' products and technology have been marketed or sold to customers throughout the U.S. and globally, and affect email, which, by nature, often crosses state borders.

68.    Plaintiffs have taken reasonable measures to keep such information secret and confidential by, among other things, limiting access to its trade secret information and entering into confidentiality and non-disclosure agreements with employees as well as customers.

69.   This confidential, proprietary, and trade secret information derives independent economic value, both actual and potential, from not being generally known to other persons or businesses who could obtain economic value from its disclosure or use in that the information is the basis of differentiating Plaintiffs' cybersecurity products in a highly competitive market.

70.   Defendants misappropriated Plaintiffs' trade secret information in the improper and unlawful manner as alleged herein and in the preceding paragraphs, including by using Plaintiffs' trade secret information to develop, market, sell, or offer for sale Vade's email security products and forthcoming MTA product.   On information and belief, Defendants' use of Plaintiffs' trade secret information is ongoing and immediate.

71.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs have suffered damages in an amount to be proven at trial.

72.   Defendants' misappropriation of Plaintiffs' trade secret information was willful and malicious, further entitling Plaintiffs to recover exemplary damages and their attorneys' fees and costs.

73.   On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to Plaintiffs' detriment Plaintiffs' trade secret information—at least because Defendants have developed, continue to develop, sell, and offer to sell email security products using Plaintiffs' trade secret information. Moreover, Defendants intend to publicly launch and offer for sale the MTA product(s) imminently and no later than the end of this year.

74.   Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in addition to damages, preliminary and permanent injunctive relief to recover and protect their confidential, proprietary, and trade secret information and other legitimate business interests.   Injunctive relief is necessary to eliminate the

commercial advantage that otherwise would be derived from Defendants' continued misappropriation of Plaintiffs' trade secret information.

## COUNT II – BREACH OF CONTRACT

**Unauthorized Disclosure and Failure to Maintain Confidentiality of**

**Cloudmark Proprietary Information**

**(Against Lemarié)**

75.     Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

76.     The PIIA is and was a valid, enforceable, and binding contract between Cloudmark and Lemarié.

77.     Cloudmark fully performed its obligations under the terms of the PIIA, including employing Lemarié and providing him with monetary compensation while he was employed by Cloudmark.

78.     Under the terms of the PIIA, in exchange for employment and monetary compensation, Lemarié agreed that he would hold in strictest confidence and would not disclose, use, lecture upon or publish any of Cloudmark's Proprietary Information—which was defined to include Cloudmark's trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques,  as well as any information regarding Cloudmark's plans for, *inter alia*, research and development of new products—other than as required in connection with his work for Cloudmark or unless an officer of Cloudmark expressly authorized such in writing.

79.     On information and belief, Lemarié breached his agreement by failing to honor his obligations under the foregoing terms of the PIIA, including without limitation by:  1) using and disclosing Cloudmark's Proprietary Information relating to the design, development, and operation of the Cloudmark Trident anti-spear phishing and related products to Vade; 2) using Cloudmark's Proprietary Information

in the design and development of Vade's integration with Microsoft Office 365 products; and 3) using and disclosing Cloudmark's Proprietary Information relating to the design, development, and operation of the Cloudmark MTA technology to Vade.  These disclosures and use of Cloudmark's Proprietary Information were not in connection with Lemarié's work for Cloudmark, nor were they authorized by an officer of Cloudmark.

80.    As a result of Lemarié's breach of the PIIA, Plaintiffs have suffered damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees.

81.    Moreover, as specifically set forth in the PIIA, Plaintiffs have the right, and are entitled, to enforce the PIIA and its terms and to therefore remedy the foregoing breach of contract by injunction, specific performance, or other equitable relief, in addition to the foregoing monetary damages.

## COUNT III – BREACH OF CONTRACT

### Failure to Disclosure Inventions

### (Against Lemarié)

82.    Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

83.    The PIIA is and was a valid, enforceable, and binding contract between Cloudmark and Lemarié.

84.    Cloudmark fully performed its obligations under the terms of the PIIA, including employing Lemarié and providing him with monetary compensation while he was employed by Cloudmark.

85.    Under the terms of the PIIA, in exchange for employment and monetary compensation, Lemarié agreed that, during the period of his employment and for six months after termination thereof, he would promptly disclose to Cloudmark fully and in writing all inventions that he authored, conceived or reduced to practice, either alone or jointly with others, and to otherwise preserve the confidentiality of all such

inventions.  Lemarié also agreed to advise Cloudmark in writing of any such invention that he believes qualifies for protection under Cal. Labor Code § 2870, including by providing Cloudmark, in writing, all evidence necessary to substantiate his belief.

86.     At no point did Lemarié ever inform Cloudmark of any invention developed by him, either alone or jointly with others, that he alleged qualified for protection under § 2870.  Nor did Lemarié disclose to Cloudmark any other inventions that he authored, conceived or reduced to practice, either alone or jointly with others during the six month period following his departure from Cloudmark, despite on information and belief working on Vade solutions that are directly competitive to Cloudmark's offerings and embodying the same combination of features.

87.     Moreover, on information and belief, Lemarié also breached the PIIA by failing to honor his obligation to preserve the confidentiality of all such inventions, including without limitation by disclosing Cloudmark's Proprietary Information relating to such inventions to Vade.

88.     As a result of Lemarié's breach of the PIIA, Plaintiffs have suffered damages in an amount to be determined at trial together with interest, costs, and attorneys' fees.

89.     Moreover, as specifically set forth in the PIIA, Plaintiffs have the right, and are entitled, to enforce the PIIA and its terms and to therefore remedy the foregoing breach of contract by injunction, specific performance, or other equitable relief, in addition to the foregoing monetary damages.

## COUNT IV – BREACH OF CONTRACT

### Failure to Maintain and Make Available Cloudmark Company Records
### (Against Lemarié)

90.     Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

91.     The PIIA is and was a valid, enforceable, and binding contract between Cloudmark and Lemarié.

92.     Cloudmark fully performed its obligations under the terms of the PIIA, including employing Lemarié and providing him with monetary compensation while he was employed by Cloudmark.

93.     Under the terms of the PIIA, in exchange for employment and monetary compensation, Lemarié agreed that he would keep and maintain adequate and current records of all Cloudmark Proprietary Information developed by him and all inventions made by him during the period of his employment at Cloudmark, and that all such records would be made available to and remain the sole property of Cloudmark at all times.

94.     On information and belief, Lemarié had and has access to an online file storage account registered through Evernote (http://www.evernote.com) in which Cloudmark Proprietary Information including information relating to a DNS security software product were stored by Lemarié and others on his team at Lemarié's direction.   On June 28, 2019, a Cloudmark employee attempted to access this Evernote account to download the Cloudmark Proprietary Information stored thereon. When said Cloudmark employee logged into the Evernote account, however, at least two folders were visible that related to Cloudmark's DNS security software product, but that were inaccessible to the Cloudmark employee.   Moreover, a few days later, same Cloudmark employee accessed the Evernote account again, but this time the two folders that related to Cloudmark's DNS security software product were no longer visible.

95.     On information and belief, Lemarié was and is the administrator of the Evernote account and improperly, in violation of his obligations under the PIIA, implemented access restrictions to prevent Cloudmark and its employees from accessing the contents of the Evernote account and, later, deleted those contents altogether.   Lemarié's actions constitute a breach of his obligations under the PIIA to make available to Cloudmark all written records relating to Cloudmark Proprietary Information.

96.   As a result of Lemarié's breach of the PIIA, Plaintiffs have suffered damages in an amount to be determined at trial together with interest, costs, and attorneys' fees.

97.   Moreover, as specifically set forth in the PIIA, Plaintiffs have the right, and are entitled, to enforce the PIIA and its terms and to therefore remedy the foregoing breach of contract by injunction, specific performance, or other equitable relief, in addition to the foregoing monetary damages.

## COUNT V – BREACH OF CONTRACT

### Failure to Deliver Materials Containing Cloudmark Proprietary Information
### (Against Lemarié)

98.   Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

99.   The PIIA is and was a valid, enforceable, and binding contract between Cloudmark and Lemarié.

100.   Cloudmark fully performed its obligations under the terms of the PIIA, including employing Lemarié and providing him with monetary compensation while he was employed by Cloudmark.

101.   Under the terms of the PIIA, in exchange for employment and monetary compensation, Lemarié agreed that, when leaving the employ of Cloudmark, he will deliver to Cloudmark any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any of Cloudmark's inventions or Proprietary Information.

102.   On information and belief, Lemarié had access to an online file storage account registered through Evernote (http://www.evernote.com) in which Cloudmark Proprietary Information including information relating to a DNS security software product were stored by Lemarié and others on his team at Lemarié's direction.  Upon leaving the employ of Cloudmark, however, Lemarié did not fulfill his obligation

under the PIIA to deliver and return to Cloudmark all of the materials contained within the Evernote account and therefore breached the PIIA.  Indeed, on information and belief, and as set forth in Paragraphs 90–97 above, Lemarié has actively subverted Cloudmark's efforts to recover its documents contained within the Evernote account.

103.   As a result of Lemarié's breach of the PIIA, Plaintiffs have suffered damages in an amount to be determined at trial together with interest, costs, and attorneys' fees.

104.   Moreover, as specifically set forth in the PIIA, Plaintiffs have the right, and are entitled, to enforce the PIIA and its terms and to therefore remedy the foregoing breach of contract by injunction, specific performance, or other equitable relief, in addition to the foregoing monetary damages.

## VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

105.   Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

106.   Vade is vicariously liable for Lemarié's tortious acts after Lemarié began his employment with Vade because these acts were performed while in the employment of Vade and were within the scope of that employment or within the authority delegated to the employee.

## JOINT AND SEVERAL LIABILITY

107.   Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

108.   At all relevant times, Defendants Vade and Lemarié were jointly engaged in the commission of the aforementioned tortious and unlawful actions.  On information and belief, Vade and Lemarié each acted intentionally and their actions caused a single, indivisible injury to Plaintiffs.  Accordingly, Defendants Vade and Lemarié are jointly and severally liable for all of Plaintiffs' damages as pleaded herein.

## **JURY DEMAND**

109.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Proofpoint and Cloudmark demand a trial by jury on all issues so triable by right.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Proofpoint and Cloudmark respectfully request judgment in its favor and the following relief:

i)   Compensatory damages for actual loss and unjust enrichment caused by the misappropriation of Plaintiffs' trade secret information, or, in the alternative, compensatory damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secret information;

ii)   Exemplary damages equal to two times the amount of the compensatory damages awarded;

iii)   An award of Plaintiffs' reasonable attorneys' fees and costs;

iv)   Compensatory damages arising from the breach of various contractual obligations by Lemarié;

v)   Preliminary and permanent injunctive and other equitable relief, including an order to immediately cease and discontinue importing, making, using, offering for sale, or selling any product or service embodying Proofpoint's trade secrets and/or confidential information; and

vi)   Specific performance and other equitable relief, including directing Lemarié to comply with his contractual obligations to Plaintiffs and directing Vade to assign any intellectual property developed, solely or jointly with others, by Lemarié during the term of his employment at Vade that utilized Plaintiffs' trade secrets and/or confidential information; and

vii)    Pre-judgment and post-judgment interest as well as such other and further relief as the Court deems just and proper.

DATED:  July 23, 2019                     Respectfully Submitted,


                                          By */s/ Sean S. Pak*

                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP
                                          Sean S. Pak (SBN 219032)
                                          seanpak@quinnemanuel.com
                                          Iman Lordgooei (SBN 251320)
                                          imanlordgooei@quinnemanuel.com
                                          50 California Street, 22nd Floor
                                          San Francisco, CA 94111
                                          Telephone: (415) 875-6600
                                          Facsimile: (415) 875-6700

                                          JWC LEGAL
                                          Jodie W. Cheng (SBN 292330)
                                          jwcheng@jwc-legal.com
                                          One Market Street
                                          Spear Tower, 36th Floor
                                          San Francisco, CA 94105
                                          Telephone: (415) 293-8308

                                          *Attorneys for Plaintiffs Proofpoint, Inc. and Cloudmark LLC*