Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Iman Lordgooei (SBN 251320)
imanlordgooei@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Jodie W. Cheng (SBN 292330)
jwcheng@jwc-legal.com
**JWC LEGAL**
One Market Plaza, Suite 3600
San Francisco, California 94105
Telephone: (415) 293-8308

Attorneys for Plaintiffs,
Proofpoint, Inc. and Cloudmark LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PROOFPOINT, INC.; CLOUDMARK LLC<br><br><br>Plaintiffs,<br><br>vs.<br><br>VADE SECURE, INCORPORATED; VADE SECURE SASU; OLIVIER LEMARIÉ<br><br><br>Defendants. | CASE NO. 3:19-cv-04238-MMC<br><br>**PLAINTIFFS PROOFPOINT, INC. AND CLOUDMARK LLC'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>**Hearing**<br>**Date:  November 8, 2019**<br>**Time:  9:00 a.m.**<br>**Judge:  Hon. Maxine M. Chesney**<br>**Courtroom: 7, 19th Floor**<br>**                 450 Golden Gate Avenue**<br>**                 San Francisco, CA 94102** |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 8, 2019 at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Maxine M. Chesney at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs Proofpoint, Inc. and Cloudmark LLC (collectively "Plaintiff") shall move and hereby do move the Court for a preliminary injunction and expedited discovery against Defendants Vade Secure, Incorporated, Vade Secure SASU (collectively, "Vade"), and Olivier Lemarié (together with Vade, "Defendants"), pursuant to Federal Rules of Civil Procedure 65 and 26, and Civil Local Rules 7-2 and 65-2.

As set forth in detail in the Proposed Order submitted with this motion, Plaintiff seeks an order (1) enjoining Defendants from any further use and disclosure of Plaintiff's confidential information, (2) enjoining Defendant Lemarié from further involvement in development of Vade Secure's anti-spear phishing and MTA products until the resolution of this case, (3) compelling Defendants to immediately return Plaintiff's confidential materials, and (4) compelling expedited discovery on the extent and scope of Defendants' use of Plaintiff's confidential materials.

Plaintiff's motion is based on this notice of motion and motion; the following memorandum of points and authorities; the supporting declaration of Jodie W. Cheng and accompanying exhibits; all matters of which the Court may take judicial notice; other pleadings on file in this action; and other written or oral argument that Plaintiff may present to the Court.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS ...................................................................................2

      A.     Plaintiff Develops And Maintains Confidential And Proprietary Information ...............................................................................................2

      B.     Defendant Lemarié, Former Cloudmark Vice President Of Gateway Technology, Had Access To, Developed, And Maintained Plaintiff's Proprietary Information ..................................................................................4

      C.     Cloudmark's Proprietary, Best-of-Class Mail Transfer Agent (MTA) ..........6

      D.     Cloudmark's Proprietary Anti-Spear Phishing Solution, Trident .................8

      E.     After Lemarié Joined, Vade Discloses Similar Anti-Spear Phishing Technology ...............................................................................................10

      F.     Vade's Rapid Development Of An MTA Aimed To "Destroy" Cloudmark .................................................................................................11

      G.     Relevant Materials Were Collected From Vade In Related French Proceeding ..............................................................................................12

III.    LEGAL STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF ...............13

IV.   PRELIMINARY INJUNCTION IS WARRANTED AND NECESSARY ............14

      A.     Plaintiff Is Likely To Succeed On The Trade Secret Claims ......................14

      B.     Plaintiff Is Likely To Succeed On The Breach of Contract Claims ............21

      C.     Plaintiff Will Suffer Irreparable Harm Without An Injunction ...................22

      D.     Balance Of Equities and Public Interest Strongly Favor Injunction Without Bond ...........................................................................................23

V.     THERE IS GOOD CAUSE TO GRANT EXPEDITED DISCOVERY .................24

VI.    CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Alliant Ins. Servs., Inc. v. Gaddy*,
  159 Cal. App. 4th 1292 (2008) ............................................................................... 19

*Alta Devices, Inc. v. LG Elecs., Inc.*,
  343 F. Supp. 3d 868 (N.D. Cal. 2018) ................................................................... 18

*Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*,
  226 Cal. App. 4th 26 (2014) ................................................................................. 17

*Bodylines Inc. v. E. Mishan & Sons Inc.*,
  1997 WL 1045972 (N.D. Cal. May 28, 1997) ...................................................... 25

*Bracco v. Lackner*,
  462 F. Supp. 436 (N.D. Cal. 1978) ....................................................................... 14

*Buschman v. Anestheisa Bus. Consultants LLC*,
  42 F. Supp. 3d 1224 (N.D. Cal. 2014) .................................................................. 22

*Comet Techs. United States of Am. Inc. v. Beauerman*,
  2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ........................................... 16, 24, 25

*DVD Copy Control Assn., Inc. v. Bunner*,
  31 Cal. 4th 864 (2003) .......................................................................................... 15

*Flynt Distrib. Co. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984) ............................................................................... 15

*Gallagher Benefits Servs., Inc. v. De La Torre*,
  No. C 07-5495 VRW, 2007 WL 4106821 (N.D. Cal. Nov. 16, 2007) ..................... 23

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) ........................................................... 15, 24

*Hilderman v. Enea TekSci, Inc.*,
  551 F. Supp. 2d 1183 (S.D. Cal. 2008) ................................................................. 16

*Integral Dev. Corp. v. Tolat*,
  675 F. App'x 700 (9th Cir. 2017) .......................................................................... 18

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ............................................................................... 15

*Netlist Inc. v. Diablo Techs. Inc*,
  2015 WL 153724 (N.D. Cal. Jan. 12, 2015) .......................................................... 21

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) ............................................................................... 15

*Pixon Imaging, Inc. v. Empower Techs. Corp.*,
  2011 WL 3739529 (S.D. Cal. Aug. 24, 2011) ....................................................... 24

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
   208 F.R.D. 273 (N.D. Cal. 2002) ............................................................................ 25

*Teleflora, LLC v. Florists' Transworld Delivery, Inc.*,
   2004 WL 1844847 (N.D. Cal. Aug. 18, 2004) ......................................................... 24

*U.S. Surgical Corp. v. Origin Medsystems, Inc.*,
   1993 WL 379579 (N.D. Cal. Jan. 12, 1993) ............................................................ 18

*University of Texas v. Camenisch*,
   451 U.S. 390 (1981) ................................................................................................. 14

*Vinyl Interactive, LLC v. Guarino*,
   2009 WL 1228695 (N.D. Cal. May 1, 2009) ........................................................... 24

*Volans-I, Inc. v. SpektreWorks, Inc.*,
   2019 WL 2300640 (N.D. Cal. May 30, 2019) ......................................................... 18

*Waymo LLC v. Uber Techs., Inc.*,
   2017 WL 2123560 (N.D. Cal. May 15, 2017) ............................................. 15, 23, 25

*WeRide Corp. v. Kun Huang*,
   379 F. Supp. 3d 834 (N.D. Cal. 2019) ....................................................... 18, 20, 26

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................................... 14

*W. Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945 (N.D. Cal. June
   8, 2009) ..................................................................................................................... 23

## Statutory Authorities

18 U.S.C. § 1836(b)(3)(A) ................................................................................................. 15

18 U.S.C. §§ 1836, 1839(3) ............................................................................................... 15

18 U.S.C. § 1839(3)(B) ................................................................................................ 15, 17

18 U.S.C. § 1839(5)(A) ...................................................................................................... 18

18 U.S.C. § 1839(5)(B) ........................................................................................ 18, 22, 24

## Rules and Regulations

Fed. R. Civ. P. 26(d) .......................................................................................................... 25

Fed. R. Civ. P. 65 ............................................................................................................... 14

## Patents

U.S. Pat. No. 10,284,579 .............................................................................................. 11, 18

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Proofpoint, Inc. and Cloudmark LLC (collectively, "Plaintiff") have led the market in developing best-in-class, leading-edge email security solutions that leverage proprietary technologies including behavioral analytics, machine learning, and intelligent message routing.  As part of its commitment to staying ahead of cybersecurity threats, Plaintiff has invested (and continues to invest) substantial engineering resources for research and development.

In December 2016, Cloudmark's former Vice President of Gateway Technology, Olivier Lemarié abruptly resigned after overseeing the development of its proprietary technologies for over a decade.  In particular, Lemarié was primarily involved with:  (1) Cloudmark Trident, a cutting-edge email filter targeting spear phishing attacks through machine learning and behavioral analysis; and (2) Cloudmark Gateway Mail Transfer Agent ("MTA"), an intelligent message routing platform based on technology acquired from Bizanga Ltd.  At the heart of this dispute are the confidential technologies and technical trade secrets embodied in these two Cloudmark products.

Just a few months after his departure from Cloudmark, Lemarié emerged as the Chief Technology Officer of Vade, a provider of email security solutions.  Lemarié's arrival at Vade was followed by a succession of rapid product announcements and a patent filing that mirror the technologies for which Lemarié was responsible at Cloudmark.  Specifically, Vade filed a patent application and launched an email filter, Vade Secure For Office 365, aimed at detecting spear phishing attacks using techniques strikingly similar to those developed for Cloudmark Trident.  Recently, Vade confirmed the forthcoming release of an intelligent MTA that, according to Vade, is meant to "destroy Cloudmark" and address the deployments "traditionally covered by Cloudmark."   Vade's rapid development of a competitive MTA is suspect and troubling given Lemarié's key role in the development of Cloudmark's MTA—which took years to develop.  Indeed, before Lemarié's arrival, these products and concepts had not been part of Vade's repertoire.

Plaintiff's suspicion of Lemarié is compounded by his failure to comply with his contractual obligations to maintain Cloudmark confidential materials.  For example, when Lemarié left Cloudmark, he failed to return an electronic repository of Cloudmark confidential materials.  Even

after he became Vade's CTO, Lemarié maintained administrative rights to the repository, preventing Cloudmark from revoking his access.  Instead, Lemarié recently revoked **Cloudmark's** access— before ultimately moving the materials out of the repository altogether.

As explained herein, Plaintiff is likely to succeed on its misappropriation and breach of contract claims in view of Lemarié's removal of Cloudmark confidential materials, and the striking similarities between Vade's new products and the Cloudmark products that Lemarié had central role in developing.  It is well established that there is a presumption of irreparable harm by the disclosure of trade secrets; and Vade's continued product development and imminent release will likely further disclose Plaintiff's trade secrets, particularly among Vade's employees, prospective customers, and partners.  Finally, the balance of equities and hardships, and the public interest, militate in favor of granting preliminary relief, particularly in light of Defendants' existing voluntary agreement to comply with some of the injunctive relief Plaintiff seeks, as well as the fact that Defendants would suffer no hardship from simply being required to maintain the status quo and comply with the law.

## II.    STATEMENT OF FACTS

### A.  **Plaintiff Develops And Maintains Confidential And Proprietary Information**

Proofpoint is a cybersecurity company founded and headquartered in Silicon Valley. Proofpoint provides software to protect customers from email and other advanced cyber threats and compliance risks.  Since its founding in 2002, Proofpoint's continued growth and success has largely been due to its commitment to staying ahead of ever-evolving cybersecurity threats.  One way in which Proofpoint accomplishes this is by identifying, engaging, and investing in the development of new technologies, including by sometimes acquiring cutting-edge companies and technologies for integration into Proofpoint's products and solutions.  One such acquisition was of Cloudmark, which Proofpoint acquired in 2017.

Cloudmark develops and provides email security solutions for, *inter alia*, detecting and filtering spam and other sophisticated email attacks.  Among Cloudmark's technologies are its (1) proprietary Message (or Mail) Transfer Agent ("MTA"), which is an intelligent email routing application that also supports content filters, such as for detecting Spam; and (2) Trident anti-spear phishing software, which detects and filters malicious spear phishing attacks in which attackers send

targeted, customized emails in an attempt to induce individuals to reveal sensitive information, like bank account details. *Infra* §§ II.C–D. The development of Plaintiff's email security solutions required substantial engineering, infrastructure, and financial resources. *E.g.*, Ex. 3 at 2; Ex. 2 ¶¶ 91–95, 99–101, 107. For example, the development of Cloudmark's MTA and Trident technologies is evinced by tens of thousands of emails, notes, presentations, and source code changes, reflecting many engineering hours and resources invested over the course of years. *E.g.*, Ex. 3 at 2; Ex. 4 at 1 ███████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████ Ex. 5; Ex. 6 at 1 (referencing Cloudmark's "strong[] financial resources behind the technology"); Ex. 2 ¶¶ 91–95, 99–101, 107. The result of these engineering efforts and investments are technical elements and algorithms critical to the performance of Cloudmark's products. *E.g.*, Ex. 2 ¶¶ 91–107; *see also id.* ¶¶ 80–82.

To protect its innovations, efforts, and investment, Cloudmark requires its employees to preserve the confidentiality of Cloudmark's Proprietary Information[1] and to not improperly use any third party's confidential information. These obligations are set forth in Cloudmark's Employee Proprietary Information and Inventions Agreement ("PIIA") and Employee Agreement. Ex. 7; Ex. 8. For example, in developing Cloudmark's solutions, employees are "expected not to use or disclose any confidential information, including trade secrets, of any former employer or other person to whom [they] have an obligation of confidentiality." Ex. 8 at 1; Ex. 7 ¶ 1.4. Likewise, throughout their employment and continuing thereafter, Cloudmark employees agree, and are obligated, to "hold in strictest confidence" Cloudmark's Proprietary Information, including "trade secrets, inventions," "designs and techniques." Ex. 7 ¶¶ 1.1–1.2. Through the agreements, employees also automatically assign to Cloudmark "any rights [they] may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of

---

[1]  Cloudmark's Proprietary Information includes "any and all confidential and/or proprietary knowledge, data or information of the Company" including "trade secrets, inventions, mask words, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques," as well as "information regarding plans for research, development, [and] new products." Ex. 7 ¶ 1.2.

the Company and its assigns." *Id.* ¶ 1.1.  Similarly, employees agree that all rights and interests in inventions and contributions that are "made or conceived or reduced to practice or learned" while employed by Cloudmark are sole property of Cloudmark.  *Id.* ¶ 2.3.

B. **Defendant Lemarié, Former Cloudmark Vice President Of Gateway Technology, Had Access To, Developed, And Maintained Plaintiff's Proprietary Information**

Defendant Olivier Lemarié ("Lemarié") is a former Cloudmark employee and, like other Cloudmark employees, agreed to the terms set forth in the PIIA and Employment Agreement when he joined Cloudmark as Vice President of Gateway Technology in 2010.  *E.g.*, Ex. 7; Ex. 8.  Prior to joining Cloudmark, Lemarié founded and served as Chief Technology Officer ("CTO") of Bizanga, a technology start-up based in France that provided a specialized MTA product.  Ex. 9 at 1–2.  As CTO of Bizanga, Lemarié was "responsible for the development and direction" of Bizanga's MTA.  Ex. 10 at 1.  In 2010, Cloudmark acquired Bizanga; and Lemarié joined Cloudmark to continue working on the MTA technology, which Cloudmark began marketing as the Cloudmark Gateway product.  *E.g.*, Ex. 11; Ex. 6 at 1.



Ex. 6 at 1

Ex. 12; Ex. 3; Ex. 13

*see also* Ex. 1 ¶¶ 8, 15, 17, 23; Ex. 15 ¶¶2–3.

*E.g.*, Ex. 14; Ex. 15 ¶ 3.  This feature allows the MTA to reject email communications to or from suspicious or known bad domains, thereby preventing attacks.  *See, e.g.*, Ex. 14.

*E.g.*, Ex. 16; Ex. 17; *see also* Ex.1 ¶¶ 15–16.

*E.g.*, Ex. 18; Ex. 2 ¶¶ 92–93, 100–101.

By virtue of ███████████████████████████████ as well as his senior technical position at Cloudmark, Lemarié was exposed and contributed to Cloudmark Proprietary Information—which he was obligated to maintain as confidential. *See, e.g.*, Ex. 7 ¶ 1.2. For example, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████. *E.g.*, Ex. 19 at 1; Ex. 20 at 1 ████████ ████████████████████████████████████████████████████████████ ████████████████████████ Ex. 15 ¶ 3. Moreover, as a senior member of Cloudmark's technical teams, Lemarié had access to Cloudmark's confidential source code, prototypes, plans, and documents for the MTA and Trident, as well as other Cloudmark technologies, including Cloudmark's proprietary anti-Spam filter, Authority. Ex.15 ¶ 1; Ex. 2 ¶¶ 92–93, 101.

In late October 2016, Lemarié abruptly announced his resignation from Cloudmark. Ex. 21. At the time, Lemarié gave no indication that he had already accepted employment with Vade. In December 2016, Lemarié officially left Cloudmark and, in February 2017, joined Vade as Chief Technology Officer. Ex. 9 at 1. Vade provides products and services to protect against email security threats. *See* Ex. 22 at 1. Lemarié was one of several Cloudmark engineers and technical personnel who were poached by Vade.[3] *See* Ex. 23 at 1; Ex. 24 at 2; Ex. 25 at 1–2. Within months after Lemarié joined Vade, in March 2017, Vade filed a patent application disclosing techniques for detecting spear phishing attacks that included aspects of Cloudmark's Trident developed by Lemarié. *See infra* § II.E. Then, in June 2018, Vade rapidly released an anti-spear phishing email filter that appears to function remarkably similarly to Cloudmark's Trident. *E.g.*, Ex. 26; *see infra* § II.E. Now, earlier this month, Vade has confirmed that it is developing a "forthcoming MTA,"

---

[2] Notably, just prior to the filing of this action, Lemarié obstructed Cloudmark's access to the ████████ files by restricting access rights to Cloudmark employees and then ultimately removed the files altogether. *See* Ex. 15 ¶ 4.

[3] Within a six-month period in 2016, two of Cloudmark's Senior Software Engineers, its Engineering Product Coordinator and Senior Technical Writer, and Vice President of Gateway Technology (Lemarié) left Cloudmark and joined Vade. *Id.* These individuals—Defendant Lemarié and Messrs. Alexandre Boussinet, Xavier Delannoy, and Guillaume Séjourné—all had access to Cloudmark's Proprietary Information ████████████████████████████████████████████ ████████████████████████████ Ex. 2 ¶¶ 92–93.

which according to Vade, is meant to "destroy Cloudmark" and replace Cloudmark's MTA in the market.  *See infra* § II.F.

C.  **Cloudmark's Proprietary, Best-of-Class Mail Transfer Agent (MTA)**

Email filtering software, including those offered by Cloudmark and Vade, needs to be integrated with and supported by other software components within the email architecture.  Ex. 2 ¶¶ 52, 53, 71, 73–76.  One of these components is the Message (or Mail) Transfer Agent ("MTA"), at the "gateway" of an email network, which plays a key role in processing and routing emails.  *Id*. Fundamentally, all MTA products, including open-source MTAs, route emails from one computer to another using standardized protocols; though an MTA may perform this function in unique ways or include additional functionalities.  Ex. 2 ¶ 74–76.  For example, unlike open-source MTAs[4], commercial MTAs may be designed to address email security risks and capable of immediately integrating with email filtering applications without adjusting configurations, i.e., "turn key" or "plug-and-play," even in complex, high-traffic environments.  Ex. 2 ¶¶ 75–76, *see also id*. ¶¶ 96– 98.  Commercial MTAs may also incorporate features that enhance the customer experience, such as reducing the need for hardware infrastructure (resulting in cost savings) and advanced, built-in user interfaces.  Ex. 2 ¶ 76, *see also id*. ¶¶ 96–98.  Cloudmark was, and remains, one of the few email security providers to build and offer a commercial, proprietary MTA with advanced email security features and, when combined with its email filters, provides its customers a comprehensive, one-stop solution.  *E.g.*, Ex. 27; Ex. 28; Ex. 29 at 2; Ex. 1 ¶¶ 24–25; *see also* Ex. 2 ¶ 98.

***Bizanga's Intelligent Message Processor MTA.***  Cloudmark's MTA, sometimes referred to as its Gateway product, utilizes technology that was acquired from Bizanga in 2010.  *E.g.*, Ex. 6 at 1 ████████████████████████████████████████████████ Ex. 1 ¶ 23.  Bizanga was founded in 2005 to provide a MTA, which was marketed as Bizanga's "Intelligent Message Processor" or "IMP," that "provided scalable and full-featured email message processing and security" and incorporated Bizanga's operating system, OvernetOS.  Ex. 10 at 1; Ex. 30 at 2.

---

[4]  Open-source MTAs, by default, are not built to effectively or efficiently implement email security or techniques for identifying and filtering malicious emails; nor are they immediately deployable for customers that have complex performance, policy, and usability requirements.  Ex. 2 ¶ 75.

Bizanga's MTA seamlessly integrated with third-party email filtering tools and thus could be used with a customer's choice of one or more specific email filters.  Ex. 30 at 2; Ex. 1 ¶ 7.

***Cloudmark Continued To Develop The MTA After Its Acquisition Of Bizanga.***  After acquiring Bizanga in 2010, Cloudmark continued refining the MTA, which was marketed as Cloudmark's Gateway product, including enhancing the features needed to handle increasing volumes of email traffic and support continuously evolving email filters.  Ex. 2 ¶¶ 86, 91–98; Ex. 6 at 1. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████  Ex. 2 ¶¶ 91–92; *see also id.* ¶¶ 95–96. █

████████████████████████████████████████████████

████████████████████████████████████████████████

Ex. 2 ¶¶ 92–93.  As a result of the enormous efforts, the Cloudmark MTA retains its flexibility to interoperate with increasingly sophisticated email filters, while scaling to process and route massive volumes of email, avoiding disruption to email traffic and reducing the hardware and operational costs traditionally required.  *E.g.*, Ex. 2 ¶¶ 95–98; Ex. 28 at 1; Ex. 6 at 1.  Moreover, Cloudmark's MTA provides these technical features in a customer-friendly format that allows for easy deployment and built-in user interface that provides IT administrators a better system management experience that can be customized to their organization's requirements.  Ex. 2 ¶¶ 98; Ex. 29. Cloudmark also further enhanced the MTA platform by adding complementary features such as the DNS filtering.  Ex. 14 at 2 ███████████████████████████████

███████████████████████████████████  Indeed, the Cloudmark MTA has been extremely well received by customers.  As one customer explains, "[w]ith Cloudmark Gateway, we are able to process the same amount of e-mail using less than 20 per cent of the hardware, compared to our previous setup.  This not only significantly reduces hardware and operational costs, but critically, increases overall energy efficiency."  Ex. 27 at 2.  Today, Cloudmark's MTA, including its expanded features, is part of the Cloudmark Security Platform and is still being sold to and used by customers.  Ex. 31; Ex. 1 ¶¶ 24, 28.

D. **Cloudmark's Proprietary Anti-Spear Phishing Solution, Trident**

███████████████████████████████████████████████████████████

████████████████████   *E.g.*, Ex. 32 at 1; Ex. 17.  At the time, spear phishing attacks presented a new challenge to email security because they are tailored specifically to their victims, unlike traditionally mass Spam-type emails that are non-specific, and easily detected.  Ex. 2 ¶¶ 60–68, 72.

████████████████████████████████████████████████████████████

███████████████████████████████████████████████   *E.g.*, Ex. 33 at 6.  By early to mid-2016, after many engineering hours of research and development, Cloudmark had created Trident, an email filter uniquely addressing spear phishing.  *E.g.*, Ex. 34 at 1; Ex. 35 at 11; Ex. 1 ¶ 29; Ex. 34 at 1.  Trident was welcomed by industry analysts and potential customers, who were eager to try the new email content filter.  *E.g.*, Ex. 36 at 2 ("There is a relative paucity of products that specifically target this type of attack, so Cloudmark's latest offering is a valuable addition to a still emerging market, and will attract considerable attention from both existing and new customers."); Ex. 1 ¶ 29–30; Ex. 37 ¶ 11; Ex. 32 ¶ 7.0;.

*Cloudmark's Anti-Spear Phishing Techniques.*  One of the ways Cloudmark achieved cutting-edge spear phishing detection was by ███████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████   Ex. 4 at 1; *see also* Ex. 34 at 1.  A key aspect of Trident is identifying anomalies between an email-in-question and behavioral patterns from past emails, in order to classify the email as suspicious or malicious (or safe).  *E.g.*, Ex. 35 at 27 ████████████████████████████████████████

██████████████████████   Ex. 39 at 4 ██████████████████████████████████

███████████████████████████████████████████

   █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████   *E.g.*, Ex. 34 at 1; Ex. 2 ¶ 103. ██████████████████████

████████████████████████████████████████████████   *Id.* ██████████

████████████████████████████████████████████████████████████

1 ████████ *Id.* ¶ 104. █████████████████████████████████

2 ████████████████████████████████████████████████ *E.g.*, Ex 40;

3 Ex. 41 at 2; Ex. 33 at 7. ████████████████████████

4 ██████████████████████████████████ Ex. 2 ¶ 104. █████████

5 ████████████████████████████████████████████████████

6 ██████████████████████████████ *Id.* ¶¶ 104, 106–107. ████████

7 ████████████████████████████████████████████████████

8 ████████████████ *Id.* at Ex. 2 ¶ 105.

9 ___*Trident Is Easily Deployable And "Turn Key."*___   Despite Trident's complex analyses,

10 comparisons, and computations, the customer-facing aspects are straightforward and simple to use.

11 ████████████████████████████████████████████████ *E.g.*,

12 Ex. 40 at 1; Ex. 16 at 11 ███████████████████ One way Cloudmark

13 accomplished this was by leveraging existing functions in Microsoft Office 365 platform in an

14 unique way to allow customers to deploy Trident's services without needing to reroute their email

15 for scanning. ██████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████ *E.g.*, Ex. 42; Ex. 43 at 6–7. ██████████████████████

19 █████████████████████████████████ Ex. 43 at 6–7.  Additionally,

20 since Trident's threat analysis is implemented in the cloud, ███████████████

21 █████████████████████████████████ Ex. 44 at 11; *see also* Ex.

22 40 at 1; Ex. 34 at 1. ████████████████████████████

23 █████████████████████████████████████ Ex. 44 at 11.

24 Trident's quick, easy, and non-disruptive deployment made it feasible, and attractive, for potential

25 customers to implement Cloudmark's email security technologies and further enhanced customers'

26 experience.  *E.g.*, Ex. 43.

27

28

E.  **After Lemarié Joined, Vade Discloses Similar Anti-Spear Phishing Technology**

*Vade Files Patent On Similar Technology in 2017.*  In March 2017— ███████████ ████████████████████████████████████████ and mere months after Lemarié joined Vade—Vade filed a patent application describing methods of detecting spear phishing.  Dkt. 1-6 (U.S. Patent Application 15/466,588 filed March 22, 2017); *see also* Dkt. 1-7 at 3:17–20.  The application was granted and issued as U.S. Patent No. 10,284,579 on May 7, 2019. Dkt. 1-7 ("'579 Patent").  The '579 Patent describes ways of using behavior in past email communications to detect future threats, ████████████████████  *E.g.,* '579 Patent at 3:21–31; *see supra* § II.E. Specifically, once a consistent behavioral pattern emerges from past emails between a sender and recipient, the email-in-question is compared to the past behavior and anomalies may be used to classify whether the email is a spear phishing attack.  *E.g.,* '579 Patent at 3:27–31.  The patent discloses exemplary categories of email information that may be extracted and analyzed to determine behavioral patterns and anomalies ████████████████████, including: sender's IP address ('579 Patent at Fig. 4A); email subject (*id.*); type (e.g., language and font) of the content (*id.*); email signature (*id.*); geographic location of the sender (*id.* at Fig. 4A, 6:66–7:3); and the presence of suspicious words or phrases (*id.* at Fig. 4A, 11:37–39).  The '579 Patent also discloses implementing the anti-spear phishing threat analysis in the cloud.  *E.g., id.* at 3:33–37.  At the time of its filing, Vade had no products utilizing behavioral analysis or machine learning, like the concepts disclosed in its patent application.  ██████████████████████████████ ███████████████████████████████████████████  *E.g.,* Ex. 47 at 1 ███████ ███████████████████████████████████████████████████ ; Ex. 48 at 2, 5; *see also* Ex. 1 ¶¶ 32, 35–36.

*Vade Releases Product Containing Similar Technology in 2018.*  Not much later, in June 2018, Vade released a new email filter that incorporates various filtering features, including anti-Spam and anti-spear phishing, and purportedly utilizes the techniques disclosed in Vade's '579 Patent.  Ex. 26; Ex. 22 at 2 ("our patented machine learning models").  The product, Vade Secure For Office 365 ("Vade O365"), includes features and technologies ████████████████ . For example, according to reviews and marketing materials, Vade O365 combines behavioral

analysis and machine learning with real-time, cloud-based threat intelligence.  *E.g.*, Ex. 49 at 2; Ex. 50 at 2.  Also, ████████████, Vade O365 leverages the Microsoft Office 365 message archiving and journaling features.  *E.g.*, *id.*  Since the launch, Vade has continued to market Vade O365, which appears to have led to customer growth and additional funding for Vade.  *E.g.*, Dkt. 1-12 (announcing nearly $80 million investment in Vade).  In a Vade presentation discussing its 2018 year-end performance and plans for 2019, Vade President & CEO, George Lotigier, announced that Vade achieved $2.4 million in bookings in the fourth quarter of 2018, out of a total $4.8 million in bookings in 2018, which, according to Vade, is testament to the continued growth of Vade O365.

### *Vade's Impending Release Of A Product Bundle Featuring Vade O365.*

More recently, Vade announced a partnership with Datto, Inc., a third-party cybersecurity and data backup company, to imminently release a new iteration of Vade O365 that is bundled with Datto's software (the "Datto–Vade Bundle").  *E.g.*, Ex. 51; Ex. 52.  The collaboration and imminent release of the Datto–Vade Bundle is expected to provide more market exposure for Vade and its Vade O365 product.  Ex. 51 at 1; *see also id.* at 2.  For example, Datto has a large market presence and hosts several large conferences (DattoCon) throughout the world every year; it was at one of these conferences that Datto recently announced its collaboration with Vade.  *E.g.*, *id.* at 3.  Professionals in the IT industry have already begun taking notice of the companies' "disconcerting" partnership and the Datto-Vade Bundle.  On Reddit.com, a social website, users commented:  "They are pushing hard at DattoCon from what I can hear . . . .  When I saw that I figured its[sic] only a matter of time before Datto buys Vade."[5]; "Doesn't anyone find the whole Vade thing a little disconcerting?  I'm a mid sized msp . . . .  I was at Dattocon and was shocked at how . . . the new Datto heads were spoon feeding all this Vade rubbish to partners."[6]

### F.  **Vade's Rapid Development Of An MTA Aimed To "Destroy" Cloudmark**

Also concerning are Vade's plans to expand its product lineup with the "forthcoming" release of its first-ever MTA product ("Vade MTA").  *E.g.*, Ex. 53 (confirming Vade's "forthcoming MTA gateway product.").  According to a presentation by Vade's President & CEO, the Vade MTA

---

[5]  https://www.reddit.com/r/msp/comments/bzxwq9/vade_secure_for_office365_anyone_used_it/
[6]  https://www.reddit.com/r/msp/comments/ci5t1u/proofpoint_vs_vadesecure_for_spam_filtering/

1  is meant to "completely destroy Cloudmark"; and, in another Vade presentation, Lemarié explained

2  that the Vade MTA will address deployments "traditionally covered by Cloudmark."[7]  In fact,

3  ████████████████████████████████████████████████████████████

4  ██████████████████████████████████████ just months after Lemarié became Vade's CTO.  *See*

5  Ex. 1 ¶ 33.  █████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ████ *Id.* ¶ 34.  █████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ██████████████████████████████████ *Id.* ¶¶ 34–35; *see also* Ex. 48 at 2.

10  ████████████████████████████████████████████████████████████

11  ██████████████████████████████ *See* Ex. 1 ¶ 33.  The exceptionally fast development of

12  Vade's inaugural MTA is ████████████████████████████████████

13  ████████████████████████████—particularly  because  the  same  person,

14  Lemarié, led the development of both products.  *See* Ex. 1 ¶¶ 8, 15; *supra* § II.C.

15      **G.  Relevant Materials Were Collected From Vade In Related French Proceeding**

16          In separate proceedings before a French court, Proofpoint and Cloudmark requested that

17  documents and materials related to Vade's suspected misappropriation of Plaintiff's trade secrets be

18  collected and seized from the premises of Vade's offices in France.[9]  *See* Article 145 of French Code

19  of Civil Procedure.  █████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████ *See* Article 145; Ex. 55.  ██████████████████

22  _____

23  [7]  These presentations were given in French therefore the quoted aspects represent English
    translations.

24  [8]  Generally, Cloudmark (and Proofpoint) participates in customer trials to enable prospective
    customers to experience the advantages of Cloudmark's email security solutions over alternative

25  offerings.  *Id.* ¶ 31.  ████████████████████████████████████████
    ████████████████████ *Id.* ¶ 32; *see also* Ex. 47.

26  [9]  Defendant Vade Secure SASU has offices in at least Hem, France (outside Lille, France) and
    Paris, France, where the former-Cloudmark engineers now work.  Ex. 54 at 8.

27  [10]  ██████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

1  ██████████████████████████████████████████████████████████

2  ████████████████████████████████████ Ex. 54; Ex. 56. ████████████

3  ██████████████████████████████████████████████████████████

4  ███████████████████████████████████████ Ex. 54 at 10–11.[11] ████████

5  ██████████████████████████████████████████████████████████

6  ████████████████████████████ Ex. 54 at 6. ████████████████████

7  ███ █  However, the exact volume and specific contents of the seized materials are, and will

8  remain, unknown to Plaintiff until a final decision (including appeal) is issued by the French courts.

9  *E.g.*, Article R153-8 of French Commercial Code (providing right of appeal of rulings on document

10  requests and staying any enforcement of document disclosures/productions during pendency of

11  appeal). ██████████████████████████████████████████████████

12  ████████████████████████████ Ex. 57.  Plaintiff has requested that Vade voluntarily

13  produce the collected materials to Plaintiff, but Vade refuses to do so at this time.  Ex. 68, 53.

### III.    LEGAL STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

15  "The purpose of a preliminary injunction [is] to preserve the status quo without adjudicating

16  the merits" and, as such, a court may grant such relief where doing so would "preserve the relative

17  positions of the parties until a trial on the merits can be held." *Bracco v. Lackner*, 462 F. Supp. 436,

18  442 n.3 (N.D. Cal. 1978); *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); FED. R. CIV.

19  P. 65.  When deciding whether a preliminary injunction is appropriate, courts apply a four-factor

20  balancing test that considers whether the movant has shown: "[1] that [it] is likely to succeed on the

21  merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that

22  the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter*

23  *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Henry Schein, Inc. v. Cook*, 191 F.

24  Supp. 3d 1072, 1076 (N.D. Cal. 2016); 18 U.S.C. § 1836(b)(3)(A).  The movant may satisfy the first

26  ███████████████████████████████████████████████████████ *Id.*

27  [11] Pincites of translated French language documents refer to the English translations.

28  [12] ████████████████████████████████████ Ex. 54 at p. 12; Ex. 56 at p. 2.

factor by "demonstrat[ing] a fair chance of success on the merits, or questions serious enough to require litigation." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105–06 (9th Cir. 2012) (internal quotation marks omitted).  Courts may rely on various forms of evidence, including declarations and even inadmissible evidence, to inform their analysis.  *E.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

## IV.   PRELIMINARY INJUNCTION IS WARRANTED AND NECESSARY

Preliminary injunctions are often granted in trade secret cases because, by definition, a trade secret loses value once it is no longer secret.  *See, e.g., DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal. 4th 864, 880 (2003); 18 U.S.C. § 1839(3)(B).  Moreover, a preliminary injunction to enforce existing contractual agreements should be granted to preserve the parties' relative positions during the pendency of litigation.  *See, e.g., Alliant Ins. Servs., Inc. v. Gaddy*, 159 Cal. App. 4th 1292, 1307 (2008) (granting preliminary injunction enforcing contractual obligations of former employees).

### A.  **Plaintiff Is Likely To Succeed On The Trade Secret Claims**

Plaintiff is likely to prevail on its trade secret claims because it can demonstrate that Defendants likely disclosed or used its trade secret information without consent; and at the time knew, or had reason to know, that the trade secret information was acquired under a duty, or derived from a person who had a duty, to maintain the secrecy or limit the use of the trade secret.  18 U.S.C. § 1839(5)(B); *Waymo LLC v. Uber Techs.*, Inc., 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017).

#### 1.   Plaintiff's Asserted Trade Secrets

The owner of a trade secret may assert a claim under the federal Defend Trade Secrets Act for misappropriation of a trade secret that derives independent economic value, whether actual or potential, from being not generally known; and the owner has taken reasonable measures to keep the information secret.  18 U.S.C. §§ 1836, 1839(3).

***Plaintiff Owns The Trade Secrets.***  Here, Plaintiff owns the trade secrets categorically described in the Complaint (Dkt. 1 ¶¶ 55–66) because they were created and developed by the companies and their employees, or were transferred as part of acquisition (e.g., the acquisition of Bizanga by Cloudmark, and the acquisition of Cloudmark by Proofpoint).  *See, e.g.*, Ex. 58; Ex. 59. For example, under his signed PIIA, Lemarié assigned to Cloudmark "all [] right, title and interest

in and to any and all Inventions . . . made or conceived or reduced to practice or learned by [Lemarié], either alone or jointly with others, during the period of [Lemarié's] employment with the Company." *E.g.*, Ex. 7 ¶ 2.3. ***Plaintiff Took Reasonable Measures To Maintain Confidentiality.*** Courts generally find that use of nondisclosure and confidentiality agreements, as well as limiting and controlling access to information, constitute reasonable measures to keep information secret. *See, e.g., Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018) (reasonable efforts included confidentiality agreements, use of passwords, and limits to access based on need)*; Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1201 (S.D. Cal. 2008) (verbally telling employees of secrecy was sufficient).  Parties to the PIIA—including Lemarié—are obligated to maintain the confidentiality of Cloudmark's Proprietary Information, which includes trade secrets, by not using or disclosing the Proprietary Information outside of Cloudmark. Ex. 7 ¶ 1.4.  Plaintiff also implemented measures to restrict access to confidential and trade secret information, including for example, limiting employees' access to source code on an as-needed basis; protecting electronic files and folders containing confidential information with passwords and access credentials; and restricting physical access to Cloudmark's offices using electronically logged keycards and corporate policies. *E.g.*, Ex. 1 ¶¶ 18–21; Ex. 60 at 10, 16. Plaintiff also protects their trade secret information from public disclosure and improper use by third parties by, *inter alia*, entering into nondisclosure agreements with customers and prospective customers to whom Plaintiff provides software trials or access to any confidential technical information. *E.g.*, Ex. 37 ¶ 11; Ex. 38 ¶ 7.0; Ex. 1 ¶ 22. ***Plaintiff's Trade Secret Information Has Independent Economic Value From Being Secret.***  The trade secrets have value by enabling Plaintiff to provide the technologies unique to Cloudmark's MTA and Trident, which are superior to those of alternative solutions for email security.  *See supra* §§ II.C–D; 18 U.S.C. § 1839(3)(B). Indeed, a primary purpose for Vade to release its own MTA is to avoiding having to rely on Cloudmark's MTA, which has garnered industry praise for years. *E.g.,* Ex. 1 ¶ 27; Ex. 27; *see also supra* § II.F.  The first category of trade secret information describes the advanced functionalities and usability of Cloudmark's MTA.  Dkt. 1 ¶¶ 57–66.  This information includes unique implementation details, like source code, that enable the Cloudmark MTA to ████████████

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See, e.g.*, *supra* § II.C;  Ex.  61  ▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮  Ex. 27; Ex. 2 ¶¶ 107, 109–111.  ▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *E.g.*, *id.*; Ex. 2 ¶¶ 76, 96–98;  Ex. 6; Ex. 62.  The second

7    category of trade secret information includes technical information for specific combinations of

8    elements that together form effective techniques for detecting and filtering spear-phishing email

9    attacks.  Dkt. 1 ¶¶ 55–57.  These elements—which include behavioral analysis, machine learning

10   algorithms to detect anomalies, cloud-based threat analysis, and leveraging of Office 365

11   journaling—are the reason that Cloudmark was able to stay ahead of the industry in detecting

12   targeted email attacks.  *See, e.g.*, *supra* § II.D; Ex. 2 ¶¶ 107, 109–110; Dkt. 1.

13          Moreover, substantial human and financial capital went into developing the trade secrets,

14   which are embodied in, among other things, the source code for Cloudmark's MTA and Trident

15   solutions.  *E.g.*, Ex. 2 ¶¶ 91–95, 100–101, 107; *see also id.* at 80–86.  ▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *E.g.*, *id.* ¶ 88,

19   91–92, 101; *supra* § II.D.  Additionally, significant financial resources were expended to acquire

20   certain aspects of the trade secrets through the acquisitions of Bizanga by Cloudmark, and

21   Cloudmark by Proofpoint.  *See, e.g.*, *supra* §§ II.A–C.  Thus, the trade secrets have independent

22   economic value at least by virtue of the substantial engineering and financial resources devoted to

23   creating, acquiring, and developing that information.  *See Altavion, Inc. v. Konica Minolta Sys. Lab.,*

24   *Inc.*, 226 Cal. App. 4th 26, 64 (2014) (software is protectable trade secret where eight to ten software

25   engineers developed it over a period of four to five months); *WeRide Corp. v. Kun Huang*, 379 F.

26   Supp. 3d 834, 847 (N.D. Cal. 2019) ("WeRide represents that many engineers developed the source

27   code over 18 months with investments of over $45 million. . . . The investment and development

28

make the source code confidential and proprietary to WeRide, giving it advantage over competitors."); *Integral Dev. Corp. v. Tolat*, 675 F. App'x 700, 703 (9th Cir. 2017) (similar).

>  2.  Defendants Knowingly Disclosed And Used The Proprietary Information

Defendants knowingly misappropriated, and continue to misappropriate, Plaintiff's technical trade secrets by disclosing and using the information to obtain the '579 Patent, as well as to develop the Vade O365 and Vade MTA products. *See* 18 U.S.C. § 1839(5)(B) (ii)(II).  Further, Lemarié misappropriated trade secrets by improperly taking and refusing to return information stored on Evernote, which was used or created by Cloudmark employees for product development. 18 U.S.C. § 1839(5)(A).

***First***, Defendants Lemarié and Vade's improper disclosure and misuse is evinced by the remarkable similarities between Cloudmark's Trident and Vade's subsequent filing of the '579 Patent and development of Vade O365, particularly when combined with Lemarié's central role in the products' development.  *See supra* § II.B; *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 883 (N.D. Cal. 2018) (similarities in technology and facts showing defendant's access to trade secret information are sufficient basis for misappropriation claims); *U.S. Surgical Corp. v. Origin Medsystems, Inc.*, 1993 WL 379579, at *4 (N.D. Cal. Jan. 12, 1993) (granting preliminary injunction where "significant structural and functional similarities exist between [the products], and their history of creation suggest misappropriation"); *Volans-I, Inc. v. SpektreWorks, Inc.*, 2019 WL 2300640, at *4 (N.D. Cal. May 30, 2019).  Just a few months after Lemarié joined, Vade filed a patent application that eventually issued as the '579 Patent. Dkt. 1-6 (U.S. Pat. No. 10,284,579, filed Mar. 22, 2017).  The '579 Patent describes many of the same concepts in Cloudmark's Trident, which pre-dates the patent filing by at least a year.  Shortly after the patent filing, in June 2018, Vade O365 was launched.  Vade O365, according to marketing, incorporates Vade's "patented machine learning models."  Like the '579 Patent, Vade O365 bears striking similarities to Cloudmark's Trident.  *E.g.*, Ex. 22; *see supra* §§ II.D, II.E.  Indeed, the similarities are evident when comparing Trident's source code and internal documentation with the '579 Patent and Vade O365. *See, e.g.*, *supra* §§ II.D, II.E.

**All attempt to identify email anomalies based on behavioral analysis and past emails**:

| Trident | '579 Patent | Vade O365 |
|---|---|---|
|  | "ESPL may **build a model for every contact** of the organization domain . . . . [W]hen ESPL has enough data to detect an impersonation of the contact, ESPL may switch . . . to the protection phase." | "Vade Secure **builds a technical profile for each individual** with which your employees communicate. Our Identity Match™ system considers hundreds of subtle technical and behavioral factors to determine if the sender is who they claim to be to protect against email imposters. Upon **detecting any anomalies**, the solution displays a banner within the email alerting the user that the message might be malicious." |
| Ex. 33 at 6; Ex. 35 at 27; *see also, e.g.,* Ex. 4 at 1, Ex. 34 at 1. | '579 Patent at 3:21–31 | Ex. 65 at 13 |

**All disclose cloud-based threat analysis and data storage**:

| Trident | '579 Patent | Vade O365 |
|---|---|---|
|  | "The enterprise email filtering described and shown herein may be implemented . . . according to one embodiment, as an email filtering service in the [sic] executing on remote servers (i.e., **the cloud**)." | "Vade Secure for Office 365 is a fully native **cloud solution** with AI-based, predictive email defense." |
| Ex. 34 at 1;*see also* Ex. 2 ¶¶ 100, 102 | '579 Patent at 3:33–37 | Ex. 50 at 2 |

**All disclose using email characteristics to model email behavior**:

| Trident | '579 Patent | Vade O365 |
|---|---|---|
|  | "[T]hese configuration elements can help to assemble a digital **email fingerprint** of the person." | "Vade Secure for Office 365 blocks advanced attacks from the first email using machine learning models that perform real-time **behavioral analysis of the entire email**, including any URLs and attachments." |
| Ex. 63 at 1; *see also id.* at 2; Ex. 2 ¶¶ 100, 102–107 | '579 Patent at 6:11–14 | Ex. 26 at 2 |

**Trident and the '579 Patent disclose using the same email characteristics, such as the sender's geolocation and email's language and tone:**

| Trident | '579 Patent |
|---|---|
|  Ex. 64 at 3; *see also* Ex. 2 ¶ 103 | "ESPL may be also configured to . . . **associate a geolocation to the IP address** by using a local geolocation database.  Geolocation is interesting because it can be less strict than an IP address and still carry a[sic] very relevant information." <br> '579 Patent at 6:66–7:3 |
| Ex. 33 at 7; *see also* Ex. 2 ¶ 103 | "This value may be set to 1 if the email body is determined to contain **language indicative of topics** which are deemed to be of a suspicious nature." <br> '579 Patent at 11:37–39 |

**Trident and Vade O365 leverage Microsoft's journaling rule for quick deployment:**

| Trident | Vade O365 |
|---|---|
| Ex. 42 at 1 | "Activation could not be easier.  All [a] user must do is provide Vade Secure with a tenant ID, get logged in using **Office 365 credentials, and activate journaling**." <br> Ex. 50 at 3 |

***Second***, the "implausibly fast development" of Vade's MTA would likely not have been possible without Plaintiff's trade secret information; this too is circumstantial evidence of Defendants' misappropriation of Plaintiff's trade secrets. *See, e.g.*, *WeRide*, 379 F. Supp. 3d at 849 ("The implausibly fast development of technology can contribute to finding misappropriation."). As described above, by virtue of his responsibilities while employed by Cloudmark and Bizanga, Lemarié was given access to confidential and proprietary technical information, including source code, for Cloudmark and Bizanga's MTA technology. *See supra* § II.B.

*See supra* § II.C.  In contrast, ***within months***, Vade went from

(*see* Ex. 1 ¶¶ 32, 34) to

*See supra* § II.F.  It is implausible that, in such a short

amount of time, Vade was able to develop a fully operational, customer-ready MTA with features that would compete with Cloudmark.  *See* Ex. 2 ¶¶ 91–95, *see also id.* ¶¶ 80–86.  Instead, it is much more than likely that Vade developed its MTA through an improper "head start" provided by its and Lemarié's misappropriation of Plaintiff's trade secrets, which may be ongoing.  *See, e.g.*, *Netlist Inc. v. Diablo Techs. Inc*, 2015 WL 153724, *7 (N.D. Cal. Jan. 12, 2015) (use of trade secrets for "head start" on product development constitutes misappropriation).

> **Third**, Lemarié acquired and took Plaintiff's proprietary and confidential information upon his departure from Cloudmark, and accessed that information after joining Vade as CTO.  As described above, while at Cloudmark, ████████████████████████████ ████████████████████████  *E.g.*, Ex. 15 ¶¶ 2–3; *supra* § II.B.  ████████████ ████████████████████████████████████████ ████████████████████████████████████████

██  *E.g.*, Ex. 15 ¶ 3.  Lemarié was—and still remains—the administrator of the account, even after his departure from Cloudmark.  *E.g.*, Ex. 15 ¶ 4.  Most notably, just before the filing of this action, Lemarié removed Cloudmark's access to the account, and then later ultimately deleted or moved the materials that had been in the ██████ account after a Cloudmark employee tried to access the documents.  Ex. 15 ¶ 4; Ex. 7 ¶ 6.  Not only has Lemarié improperly taken Plaintiff's information, Plaintiff has no knowledge of how that information was, or still is, being used by Defendants or to whom Lemarié may have given access.  Plaintiff therefore respectfully asks that Defendants be ordered to return Plaintiff's information, and provide an accounting and explanation of any and all potential access, use, or disclosure of the information.

### 3.  Plaintiff Did Not Consent To Defendants' Use or Disclosure

> Plaintiff never consented to Defendants' improper disclosure or misuse.  *See* 18 U.S.C. § 1839(5)(B).  To the contrary, Lemarié was given access to Plaintiff's trade secret information on the condition that he was bound by a duty to maintain the secrecy of Plaintiff's information and limit its use to the development of Plaintiff's products and technologies.  *See* Ex. 7 ¶¶ 1.1–1.2; *see also supra* § II.B.  Under the PIIA, which he knowingly and willingly agreed to, Lemarié owed, and continues to owe, a duty to maintain the secrecy and restrict the use of Cloudmark's inventions,

trade secrets, research & development, and confidential product information (e.g., source code).  Ex. 7 ¶¶ 1.1–1.2.  Vade reasonably should have known that Lemarié, its CTO, had a duty to maintain the secrecy of his prior employer's trade secrets.  *See* 18 U.S.C. § 1839(5)(B)(ii)(III).  Because of California's longstanding policies favoring unfettered employment mobility, companies onboarding California employees, like Lemarié, typically guard against new employees using trade secret or confidential information from former employers.  *See, e.g.*, Ex. 66 at 1.  Indeed, Lemarié himself was subject to the same type of policies while he was at Cloudmark.  *E.g.*, Ex. 8 at 1; Ex. 7 ¶ 1.4.  Yet, Vade used, and continues to use, Plaintiff's technical trade secrets, derived from Lemarié, to obtain the '579 Patent and develop its products.

B.  **Plaintiff Is Likely To Succeed On The Breach of Contract Claims**

To prevail on a breach of contract claim, a plaintiff must show:  (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) injury to the plaintiff as a result of defendant's breach.  *E.g., Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014).  Here, Cloudmark and Lemarié entered into agreements concerning, *inter alia*, the scope of Lemarié's employment, his ongoing obligations regarding Plaintiff's confidential and proprietary information, and assignment and ownership of Lemarié's contributions developed while at Cloudmark.  *See supra* § II.B.  Lemarié signed and thereby accepted Cloudmark's Employment Agreement and PIIA.  Ex. 7; Ex. 8 at 3.  The agreements are valid and enforceable contracts between Plaintiff and Lemarié, and set forth the terms of Lemarié's employment, including his compensation.  *Id.*  Cloudmark performed its duties under the contracts, including by employing and compensating Lemarié.  Lemarié, however, breached multiple provisions of the PIIA, including by (1) using and disclosing Plaintiff's confidential Proprietary Information to his subsequent employer, Vade, and to develop Vade products, without Plaintiff's consent; (2) failing to disclose in writing to Plaintiff and preserve the confidentiality of all inventions in which he participated in the conception or development; and (3) failing to maintain, make available, and return Cloudmark materials and records.  Dkt. 1 ¶¶ 75–104.  As described below, Plaintiff has suffered injury, including irreparable harm, as a result of

Lemarié's breaches of his contractual obligations.  Thus, Plaintiff is likely to succeed on its breach of contract claims.

C.  **Plaintiff Will Suffer Irreparable Harm Without An Injunction**

Courts in this District have consistently held that imminent or continued use of another's trade secrets generally constitutes irreparable harm.  *See, e.g.*, *Gallagher Benefits Servs., Inc. v. De La Torre*, 2007 WL 4106821, at *5 (N.D. Cal. Nov. 16, 2007) ("In general, the imminent use of a trade secret constitutes irreparable harm."), *aff'd in relevant part*, 283 F. App'x 543 (9th Cir. 2008); *W. Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945, *6 (N.D. Cal. June 8, 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated.").  This general rule applies equally to the specific circumstances here.

It is undisputed that Lemarié should be immediately prohibited from further work on and involvement with the aspects of Vade O365 and the Vade MTA at issue.  *See* Ex. 53.  Indeed, Defendants claim to have voluntarily suspended Lemarié from further involvement in these products.  *Id.*  Plaintiff asks the Court to enter an Order reflecting Defendants' initiative to reduce further irreparable harm to Plaintiff.  *See, e.g.*, *Waymo*, 2017 WL 2123560, at *13 (ordering injunctive relief that defendant "has very recently implemented of its own initiative").  Lemarié himself expressly agreed that his access to Plaintiff's Proprietary Information presents "unique" circumstances that could call for equitable relief.  Ex. 7 ¶ 7.  Thus, Lemarié's breach of his employment obligations, as well as his misappropriation of Plaintiff's trade secrets, warrant and necessitate equitable relief, including preliminary injunction.  *See, e.g.*, *Henry Schein*, 191 F. Supp. 3d at 1078 (granting preliminary injunction where defendant "agreed, in her employment agreements with [plaintiff], that [plaintiff] may seek injunctive relief").

Finally, Defendants have expressed plans to widely release products that use Plaintiff's trade secret information to the public.  *See supra* §§ II.E, II.F; Ex. 53 (referencing Vade's "forthcoming MTA gateway product"); Ex. 67 (Datto-Vade bundle).  The imminent product releases would further disclose and expose Plaintiff's trade secrets to third parties; and the continuing development of these products will further disseminate and expose Plaintiff's confidential information among the personnel within Vade.  Thus, if Defendants are not enjoined from their continued product

development, including for the imminent product releases, Plaintiff will suffer further irreparable harm from the continuing misappropriation of its trade secrets and exposure of its trade secrets to additional parties. *See, e.g.*, *Teleflora, LLC v. Florists' Transworld Delivery, Inc.*, 2004 WL 1844847, at *6 (N.D. Cal. Aug. 18, 2004) ("Use or disclosure of trade secrets is an irreparable harm which will support the granting of a preliminary injunction."); *Vinyl Interactive, LLC v. Guarino*, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009) (same); *Pixon Imaging, Inc. v. Empower Techs. Corp.*, 2011 WL 3739529, at *6 n.7 (S.D. Cal. Aug. 24, 2011) ( "[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always show irreparable harm.") (citation omitted).

### D. **Balance Of Equities and Public Interest Strongly Favor Injunction Without Bond**

The balance of equities tips in favor of granting Plaintiff's requested relief because it seeks "no more than require[ing] Defendant[s] to comply with . . . laws." *Henry Schein*, 191 F. Supp. 3d at 1077 (citation omitted). The public interest is best served when a "defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with h[is] employer" and by "vindicating intellectual property rights, and in prohibiting unfair competition." *Comet Techs.*, 2018 WL 1990226, at *5; *Waymo LLC*, 2017 WL 2123560, at *11. Defendants have no meritorious basis to argue that equity or public interest should prevent this Court from issuing an order requiring Defendants to comply with the law. In fact, Defendants appear to agree that Lemarié must be prevented from any potential use or disclosure of Plaintiff's confidential information. Ex. 53. As such, Defendants would suffer minimal hardship from entry of an order enjoining Defendants from further use and disclosure of Plaintiff's confidential information. *See, e.g.*, *Waymo*, 2017 WL 2123560, at *13 ("This order mainly prohibits Levandowski from working on Ubers LiDAR—a measure Uber has very recently implemented of its own initiative, so the hardship on defendants will be minimal."); *Bodylines Inc. v. E. Mishan & Sons Inc.*, 1997 WL 1045972, at *3 (N.D. Cal. May 28, 1997) (similar). Finally, Plaintiff should not be required to post a bond for preliminary relief that "simply enjoin[s] Defendant[s] from doing something Defendant[s] never had a right to do in the first place." *Comet Techs.*, 2018 WL 1990226, at *6. In fact, Lemarié expressly agreed that a bond is unnecessary for injunctive relief upon breach of his obligations under

the PIIA.  Ex. 7 ¶ 7 ("[T]he Company shall have the right to enforce this Agreement and any of its provisions by injunction . . . without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.").

## V.   THERE IS GOOD CAUSE TO GRANT EXPEDITED DISCOVERY

Under Federal Rule of Civil Procedure 26(d), expedited discovery before a Rule 26(f) conference may be granted upon a showing of "good cause."  *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).   Good cause exists "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party."  *Id*.   Moreover, "[i]t should be noted that courts have recognized that good cause is frequently found in cases involving claims of infringement and unfair competition."  *Id*.

***Plaintiff Has An Urgent Need For Expedited Discovery.***   As described above, Defendants likely improperly disclosed and misused Plaintiff's trade secrets to obtain the '579 Patent and develop the forthcoming Vade MTA and Vade O365, including the Datto-Vade Bundle (collectively, the "Vade Products").  *Supra* §§ IV.A.2–3.  Expedited discovery relating to the patent and Vade Products, particularly discovery reflecting Lemarié's and other former-Cloudmark employees' involvement in development, is urgently needed so that Plaintiff can assess the extent to which its confidential information, including trade secrets, has already been disclosed within Vade and among third parties, as well as any plans by Vade to do so in the future.  Thus, the discovery sought in Plaintiff's proposed order is critical to determine whether further relief is needed to preserve all parties' positions and prevent further irreparable harm during this case.

***Defendants Would Suffer No Prejudice.***   Expedited discovery of evidence would not cause any prejudice to Defendants that outweighs Plaintiff's urgent need and the good cause for ordering such discovery.  ***First***, a French court has already collected and seized certain evidence relating to Defendants' trade secret misappropriation from Defendants' offices in France as part of a French proceeding.  Ex. 55; *see supra* § II.G.  Defendants retain access to copies of all collected materials

1    and, thus would suffer no prejudice from producing those same materials to Plaintiff.[13]  Ex. 54 at p.

2    12; Ex. 56 at p. 2.  *Second*, there would be no prejudice to Defendants from having to provide early

3    discovery of materials which Defendants will have to produce in this case eventually.  *See, e.g.,*

4    *WeRide*, 379 F. Supp. 3d at 854 (granting discovery where no facts suggest "produc[tion] of source

5    code on an expedited timeline would impose a greater burden than they would face fulfilling their

6    discovery obligations at a later date").  In an effort to avoid motion practice, Plaintiff contacted

7    Defendants in hopes that they would agree to a limited, early production.  Ex. 68.  Defendants

8    responded that, while they intend to eventually provide discovery, they refused to do so now.  Ex.

9    53.  Thus, Defendants only take issue with when, not whether, Defendants will provide discovery.

10   *See id.*  *Third*, an expedited deposition of Lemarié on matters of which he is already intimately

11   familiar will cause minimal, if any, prejudice or burden to Defendants.  Aside from coordinating

12   schedules and logistics[14], there should be no substantive difference to Defendants whether Lemarié

13   is deposed on these topics before or after the Rule 26(f) conference.

14       **VI.    CONCLUSION**

15       For the foregoing reasons, Plaintiff Proofpoint and Cloudmark respectfully requests that the

16   Court grant its Motion for a Preliminary Injunction against Defendants, or in the alternative allow

17   Plaintiff to conduct expedited discovery in advance of a Rule 26(f) conference.

18

19

20

21

22

23

24

25

26

27

28

[13] ██████████████████████████████████████████████  *See* Article R153-8; Ex. 57.

[14] As to scheduling, Plaintiff will accommodate the time, date, and location least burdensome for the witness, so long as Defendants do not use such issues to delay and thwart the very purpose of expedited discovery.

DATED:  September 25, 2019            Respectfully Submitted,


                                     By  /s/Sean S. Pak

                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
                                        Sean S. Pak (SBN 219032)
                                        seanpak@quinnemanuel.com
                                        Iman Lordgooei (SBN 251320)
                                        imanlordgooei@quinnemanuel.com
                                        50 California Street, 22nd Floor
                                        San Francisco, CA 94111
                                        Telephone: (415) 875-6600
                                        Facsimile: (415) 875-6700

                                        JWC LEGAL
                                        Jodie W. Cheng (SBN 292330)
                                        jwcheng@jwc-legal.com
                                        One Market Street
                                        Spear Tower, 36th Floor
                                        San Francisco, CA 94105
                                        Telephone: (415) 293-8308

                                        *Attorneys for Plaintiffs Proofpoint, Inc. and
                                        Cloudmark LLC*