1   Colin H. Murray (SBN 159142)
      colin.murray@bakermckenzie.com
2   **BAKER & McKENZIE LLP**
    Two Embarcadero Center, 11th Floor
3   San Francisco, CA  94111-3802
    Telephone: +1 415 576 3000
4   Facsimile:  +1 415 576 3099

5   Danielle L. Benecke (SBN 314896)
      danielle.benecke@bakermckenzie.com
6   **BAKER & McKENZIE LLP**
    600 Hansen Way
7   Palo Alto, CA  94304
    Telephone: +1 650 856 2400
8   Facsimile:  +1 650 856 9299

9   Attorneys for Defendants
    VADE SECURE, INCORPORATED;
10  VADE SECURE SASU;
    OLIVIER LEMARIÉ
11  [Additional counsel listed on signature page]

12                    UNITED STATES DISTRICT COURT

13         NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

14

15  PROOFPOINT, INC.; CLOUDMARK          **Case No. 3:19-cv-04238-MMC**
    LLC,
16                                       **Date Action Filed: July 23, 2019**
                        Plaintiffs,
17                                       **DEFENDANTS' RESPONSE TO**
              v.                         **PLAINTIFFS' MOTION FOR**
18                                       **PRELIMINARY INJUNCTION AND**
    VADE SECURE, INCORPORATED;           <u>**EXPEDITED DISCOVERY**</u>
19  VADE SECURE SASU; OLIVIER
    LEMARIÉ,                             **JURY TRIAL DEMANDED**
20
                        Defendants.      **REDACTED VERSION**
21
                                         <u>**Hearing**</u>
22                                       **Date:  January 17, 2020**
                                         **Time:  9:00 am**
23                                       **Courtroom: 7, 19th Floor**
                                         **Judge: Maxine M. Chesney**
24
                                         **San Francisco Courthouse**
25                                       **450 Golden Gate Avenue**
                                         **San Francisco, CA 94102**
26

27

28

# TABLE OF CONTENTS

**Page No.**

I.     INTRODUCTION ..........................................................................................................1

II.    RELEVANT FACTUAL BACKGROUND............................................................1

   A.   Plaintiffs' alleged trade secrets are publicly available..........................................1

   B.   Defendants develop and offer e-mail and network security solutions..................2

      1.   Vade's anti-spear phishing solutions are independently developed. ..................3

      2.   Similarly, Vade's MTA products were and are being independently developed. ............6

   C.   Plaintiffs knew the facts allegedly giving rise to this suit for over two years before seeking injunctive relief. .......................................................................................7

III.   ARGUMENT AND AUTHORITIES......................................................................9

      1.   Plaintiffs cannot demonstrate a likelihood of success on the merits of their trade secret misappropriation claim. ...................................................................10

         a.   Plaintiffs failed to show that they own a protectable trade secret..............10

         b.   There is no evidence to support the misappropriation element. ................12

         c.   Plaintiffs have also failed to show how they have been damaged by any alleged misappropriation.........................................................................16

      2.   Plaintiffs have also failed to show a likelihood of success on their breach of contract claim...................................................................................................17

      3.   Plaintiffs will not suffer irreparable harm if their motion is denied. ...............18

      4.   The balance of equities and public interest do not favor an injunction under these circumstances............................................................................................21

      5.   Plaintiffs' proposed injunction is overly broad, impermissibly vague, and would require a significant bond...........................................................................22

      6.   Plaintiffs request for expedited discovery was never supported by good cause and is now moot. ..............................................................................................23

IV.   CONCLUSION AND PRAYER ............................................................................25

i

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

1

# TABLE OF AUTHORITIES

2

**Page No.**

3

**Federal Cases**

4

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ..................................................................................10

5

6

*Arminak Sol., LLC v. 7-Eleven, Inc.*,
No. 2:17-cv-01820-RGK, 2017 U.S. Dist. LEXIS 221900 (C. D. Cal. March 16,
2017) ....................................................................................................................18, 19

7

8

*Bartech Sys. Int'l, Inc. v. Mobile Simple Solutions, Inc.*,
No. 2:15-cv-02422-MMD, 2016 U.S. Dist. LEXIS 68030 (D. Nev. May 24, 2016) ...................18

9

10

*Best Lockers, LLC v. Am. Locker Grp., Inc.*,
No. 12-cv-00403-CJC(ANx), 2012 U.S. Dist. LEXIS 199973 (C.D. Cal. Mar. 30,
2012) ....................................................................................................................13, 14

11

12

*Caribbean Marine Servs. Co. v. Baldridge*,
844 F.2d 668 (9th Cir. 1987) ..................................................................................18

13

14

*Citcon USA, LLC v. RiverPay, Inc.*,
No. 18-cv-02585-NC, 2019 U.S. Dist. LEXIS 106295 (N.D. Cal.
June 25, 2019) ...................................................................................11, 17, 22, 23

15

16

*Cleanfish LLC v. Sims*,
No. 19-cv-03663-HSG, 2019 U.S. Dist. LEXIS 108946 (N.D. Cal.
June 28, 2019) ...............................................................10, 11, 12, 14, 15, 21, 22

17

18

*CyberMedia, Inc. v. Symantec Corp.*,
19 F. Supp. 2d 1070 (N.D. Cal. 1998) ..................................................................23

19

20

*DealDash Ovj v. Contextlogic, Inc.*,
No. 18-cv-02353-MMC, 2018 U.S. Dist. LEXIS 135531 (N.D. Cal. Aug. 10,
2018) (Chesney, J.) .........................................................................9, 10, 19, 22, 23

21

22

*eBay, Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)..................................................................................................18

23

24

*Founder Starcoin, Inc. v. Launch Labs, Inc.*,
No. 18-cv-972 JLS (MDD), 2018 U.S. Dist. LEXIS 113737 (S.D. Cal. Jul. 9,
2018) ....................................................................................................10, 12, 13, 18

25

26

*In re Gen. Capacitor*,
No. 17-cv-00179-HSG, 2017 U.S. Dist. LEXIS 71641.........................................18, 19

27

*Glass Egg Dig. Media v. Gameloft, Inc.*,
No. 17-cv-04165-MMC, 2018 U.S. Dist. LEXIS 35724 (N.D. Cal. Mar. 2, 2018) .................9, 18

28

ii

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) .........................................................................18

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   517 F.3d 873 (9th Cir. 2009) ...........................................................................9

*Nelson v. Levy*,
   No. 16-cv-03797-MMC, 2017 U.S. Dist. LEXIS 79116 (N.D. Cal. May 23, 2017)....................10

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
   16 F.3d 1032 (9th Cir. 1994) ...........................................................................23

*Rovio Entm't Ltd v. Royal Plush Toys, Inc.*,
   907 F. Supp. 2d 1086 (N.D. Cal. 2012) .............................................................24

*Sierra OnLine, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984) .........................................................................10

*Sunbelt Rentals, Inc. v. Victor*,
   No. C 13-4240-SBA, 2014 U.S. Dist. LEXIS 14416 (N.D. Cal. Feb. 4, 2014) ...........................17

*Swarmify, Inc. v. Cloudfare, Inc.*,
   No. C 17-06957-WHA, 2018 U.S. LEXIS 34727 (N.D. Cal. March 2, 2018)................11, 20, 21

*uSens, Inc. v. Shi Chi*,
   No. 18-cv-01959-SVK, 2018 U.S. Dist. LEXIS 175570 (N.D. Cal. Oct. 11, 2018)....................11

*V'Guara, Inc. v. Dec*,
   925 F. Supp. 2d 1120 (D. Nev. 2013) ...............................................................18

*Way.com Inc. v. Singh*,
   No. 3:18-cv-04819-WHO, 2018 U.S. Dist. LEXIS 215243 (N.D. Cal. Dec. 20,
   2018) ....................................................................................................16, 19

*Weride Corp. v. Huang*,
   379 F. Supp. 3d 834 (N.D. Cal. 2019) ..............................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................9, 18, 21

**Federal Statutes**

18 U.S.C. § 1839(3)(B).....................................................................................12

**Rules**

Fed. R. Civ. P. 26(d)(1).....................................................................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

A plaintiff that claims trade secret misappropriation is not entitled to an injunction if its alleged trade secrets are publicly available or if it delays for an unjustifiable period of time before seeking an injunction.  Here, each of Plaintiffs' alleged trade secrets have been publicly available for years from numerous sources.  Further, Plaintiffs, without justification, delayed for years from the time they learned of the facts purportedly giving rise to this suit to the time they filed their belated motion for injunctive relief.  And the alleged harm complained of is not irreparable, but rather, by Plaintiffs' own admission, can be cured monetarily.  Plaintiffs have not cited any facts or authority that would support issuance of injunctive relief on the record before the Court, and as a result, their motion should be denied in its entirety.

### II.   RELEVANT FACTUAL BACKGROUND

#### A.   Plaintiffs' alleged trade secrets are publicly available.

In Plaintiffs' Motion for Preliminary Injunction and Expedited Discovery (the "PI Motion"), they have identified the following techniques used in the development of their Trident product as their trade secrets:  (1) behavioral analysis;  (2) machine learning to detect anomalies;  (3) cloud-based threat analysis;  and (4) integration with Microsoft Office 365 using Microsoft's journaling feature. (Pls.' Mot. 16, ECF No. 30-4.)  Plaintiffs have also identified the following capabilities of their MTA product as their alleged trade secrets:  ████████████████████████████ ████████████████████████████████████████████████  ████████ ████████████████████████████████████████████████ ████████████████████████ (Pls.' Mot. 4, 15-16, ECF No. 30-4.)  To be clear, Plaintiffs have not identified any particular implementation of those techniques or methods for achieving those capabilities as their trade secrets, but rather, simply claim that use of those techniques and inclusion of those capabilities themselves are unique to Plaintiffs.

In fact, in their motion to file under seal submitted with the PI Motion, Plaintiffs requested that the mere mention of many of these techniques and capabilities were considered "Confidential" or "Highly Confidential—Attorneys' Eyes Only" information.  (Pls.' Mot. to File Under Seal at 1-

1

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

5, ECF No. 30.)  As a result, Plaintiffs requested that their identification of these techniques and capabilities be filed under seal such that they would not be publicly disclosed.  (*Id.*)

In stark contrast to those allegations and the positions Plaintiffs take in this litigation, each of the techniques and capabilities that Plaintiffs now claim as proprietary are, and have been, commonly known in the e-mail security industry.  (Decl. of Brad Karp, Ph.D. ¶ 27, attached hereto as **Exhibit 1** ("Karp Decl.");  Decl. of W. Barton Rankin ¶ 3-4, attached hereto as **Exhibit 2** ("Rankin Decl.").)  Plaintiffs have themselves repeatedly identified these same tools and capabilities in publicly available documents.  (Rankin Decl. ¶¶ 3-4.)  For example, in their PI Motion, Plaintiffs redacted the following phrase as being so "Highly Confidential" that it could not be disclosed in a public filing:

████████████████████████████████████████████████████████████████████

(Pls. Mot. 18, ECF No. 30-4.)   Yet, that language was publicly displayed almost verbatim on Cloudmark's website in January 2016.  (Rankin Decl. ¶ 3.)  In truth, each and every high level technique and capability that Plaintiffs identify as proprietary has been publicly disclosed by Plaintiffs and numerous competitors that use the same development techniques and offer the same capabilities in their products.  (Rankin Decl. ¶¶ 3-4;  Karp Decl. ¶¶ 27-29, 32-56.)  Thus, the notion that they are Plaintiffs' closely guarded secrets is demonstrably false.  As Dr. Karp—a Computer Systems and Network Professor at the University College London with degrees from Yale and Harvard and over two decades of experience in the relevant field—confirms in his declaration, each of the techniques and capabilities that Plaintiffs allege to be proprietary are nothing more than standard building blocks commonly used in the development of e-mail and computer security systems.  (Karp Decl. ¶¶ 28, 45.)  Plaintiffs cannot credibly argue that the use of such techniques or the inclusion of such capabilities is misappropriation of anything belonging to Plaintiffs.

**B.    Defendants develop and offer e-mail and network security solutions.**

Like many other competitors, Vade Secure SASU ("Vade SASU") and Vade Secure, Inc. ("Vade Inc.") (collectively "Vade") are in the business of developing and providing e-mail security solutions.  Contrary to Plaintiffs' arguments, Vade has had robust development experience and capabilities since its inception.  Vade SASU was founded in Hem, France over a decade ago.  (*See About Vade Secure*, Vade Secure, https://www.vadesecure.com/en/company (last visited Dec. 2,

2

2019).)  Since that time, Vade has become a "global leader in predictive e-mail defense, protecting 600 million mailboxes in 76 countries."  (*Id.*)  Vade maintains offices in seven different countries, has 1,400 sales partners, and provides defensive solutions to 5,000 customers worldwide.  (*Id.*)  Vade develops and offers products and solutions that address the spectrum of e-mail security threats from spam, phishing attacks, spear phishing attacks, ransomware, and malware.  (*Id.*)  Further, Vade's innovative solutions allow them to monitor and analyze 10 billion e-mails per day, and, in 2018 alone, Vade's technology was used to detect 800 million phishing and 200 million malware attacks. (*Id.*)  Customers and industry publications have recognized Vade for its innovative solutions, which continually outperform Vade's competitors:

> Confronted with a rise of phishing attacks and dissatisfied with Microsoft's anti-spam/anti-phishing capabilities, we did proofs of concept with 20 vendors.  Vade Secure ranked the highest, with the most reliable and effective solution.  The technology is sophisticated, yet easy to use.  Their staff is a pleasure to work with and their technical support is always prompt.

(*Id.* (quoting David Wieda, CEO, Wieda IT Solutions).)

### 1.     Vade's anti-spear phishing solutions are independently developed.

As new e-mail security threats emerge, Vade is on the leading edge of developing solutions. In particular, as it is related to this matter, Vade's Chief Science Officer, Sebastian Goutal, began to develop anti-spear phishing solutions in 2015.  (Decl. of Sebastien Goutal ¶ 3, attached hereto as **Exhibit 3** ("Goutal Decl.").)  In doing so, Mr. Goutal ultimately filed multiple published patent applications on anti-spear phishing technology in September 2015, March 2016, and March 2017, the last of which issued as U.S. Patent No. 10,284,579.  (*Id.* ¶ 4;  *see Detecting and thwarting spear phishing attacks in electronic messages*, U.S. Pat. App. Pub. No. 2017/0085584 (filed Sept. 22, 2015);  *Methods and devices to thwart email display name impersonation*, U.S. Pat. App. Pub. No. 2017/0257395 (filed Mar. 7, 2016);  *Detection of email spoofing and spear phishing attacks*, U.S. Patent No. 10,284,579 (filed Mar. 22, 2017) (the "'579 Patent"), attached hereto as **Exhibit 4**.)  The '579 Patent lists Mr. Goutal as the sole inventor and claims the implementation of, among other things, an anti-spear phishing solution through the use of contact models, statistical dispersion, and a features vector.  (Goutal Decl. ¶ 5;  '579 Patent at (72), Abstract.)  Notably, Goutal conducted significant research and analysis leading to the filing of the '579 Patent in 2016, well before Lemarié

3

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

joined Vade, and in early 2017. (Goutal Decl. ¶¶ 5-8.) This includes the use of behavioral analysis, machine learning, e-mail fingerprinting, confidence scoring, and cloud-based solutions in the context of combatting spear phishing. (Goutal Decl. ¶ 7; '579 Patent at Abstract, 4:44-14:41.)

Vade's development and use of anti-spear phishing technology was no secret and was actually known to both Cloudmark and Proofpoint in 2016. Specifically, in June 2016, well before Lemarié joined Vade, Goutal made a presentation on Vade's anti-spear phishing technology developments at an industry conference, the 37th Edition of the M3AAWG, in Philadelphia. (Goutal Decl. ¶ 10.) During his presentation, Mr. Goutal discussed those developments, including the use of IP addresses and device fingerprinting to detect impersonation (or spear phishing) attacks, which each relate to building a behavioral model for each e-mail sender, related to that described by the '579 Patent.. (*Id*. ¶ 11.) Mike Reading from Cloudmark and David Jevans from Proofpoint participated with Goutal in that very presentation, and, thus, had actual knowledge of Vade's development efforts in connection with anti-spear phishing. (*Id*. ¶ 10.) And so Plaintiffs' allegations that Vade's development work in this regard did not begin until Lemarié's employment at Vade are demonstrably false, as Plaintiffs have known.

Further, in addition to its internal development efforts, Vade also investigated the acquisition of existing anti-spear phishing technologies. For example, Vade engaged in discussions with Astra Identity, Inc. ("AstraID") in April 2016. (*Id*. ¶ 9.) At that time, AstraID had patented a solution directed to spear phishing that specifically referenced the use of behavioral analysis (including

███████████████████████████████████████████████

and machine learning with big data technology—███████████████████████████
Vade ultimately acquired AstraID's patents. (*Id*.; *see, e.g., System and method for electronic message analysis for phishing detection*, U.S. Patent No. 8,566,938 (filed Nov. 5, 2012); *Systems and methods for electronic message analysis*, U.S. Patent No. 9,154,514 (filed Oct. 3, 2013); *Systems and methods for electronic message analysis*, U.S. Patent No. 9,501,746 (Sept. 24, 2015); Rankin Decl. ¶ 3.)

Also, contrary to Plaintiffs' unfounded allegations, Vade was offering anti-spear phishing products using techniques like those at issue here before Lemarié joined Vade. For example, by June

4

2016, Business Wire published an article that recognized Vade as a "leader in anti-phishing, anti-spear phishing and anti-malware *heuristic filtering* . . . ." (*Vade Retro Technology Takes on a New Identity and Becomes Vade Secure*, Business Wire (July 13, 2016), https://www.businesswire.com/news/home/20160713006224/en/Vade-Retro-Technology-Takes-New-Identity-Becomes (emphasis added).)  By October 2016, Vade's Secure Cloud product included anti-spear phishing technology using behavior analysis, heuristic content analysis, and the algorithms necessary to effectively implement those features.  (Declaration of Adrien Gendre ¶ 25, attached hereto as **Exhibit 5** ("Gendre Decl.").)  And by December 2016, Vade's Gateway product also included those features.  (*Id*. ¶ 25.)  Thus, Vade was well aware of both the existence of and how to implement anti-spear phishing solutions, including techniques and capabilities that Plaintiffs claim as trade secrets, all well before Lemarié became a Vade employee.

As for Microsoft Office 365's journaling tool, Vade obtained information on its use from the tool's creator, Microsoft, during development of its product known as Vade Secure for Office 365 ("O365").  (*Id*. ¶ 10.)  Contrary to Plaintiffs' allegation that use of the journaling tool is somehow a "Highly Confidential" trade secret belonging to Cloudmark, Microsoft itself publicly describes that the journaling tool can be, and is, used by third-party software vendors to route Office 365 e-mail traffic to their e-mail security products for purposes of scanning for malicious e-mails.  (Debraj Ghosh, *Be careful of data without context: The case of malware scanning of journaled emails*, Microsoft (Jan. 8, 2019), https://www.microsoft.com/security/blog/2019/01/08/be-careful-of-data-without-context-the-case-of-malware-scanning-of-journaled-emails/;  Rankin Decl. ¶ 3;  Karp Decl. ¶ 56.)  Vade's O365 product development focused on providing a native Outlook integration for its suite of e-mail security solutions.  (Gendre Decl. ¶¶ 6-7.)  And in the context of developing the O365 Outlook integration, in the middle of 2017, Vade communicated with Microsoft directly, and a Microsoft representative suggested that Vade utilize Microsoft's Office 365 journaling tool for that purpose.  (*Id*. ¶ 10.)  Vade's use of that journaling tool is in no way derived from some trade secret possessed by Plaintiffs.

## 2. Similarly, Vade's MTA products were and are being independently developed.

As highlighted above, the purported trade secrets allegedly used by Plaintiffs' MTA product are actually publicly known and available and, thus, cannot constitute trade secrets.  Further, Vade has independently developed its own commercial MTAs for years.  Vade, in fact, started developing its own MTA in 2012, and that product was released in 2013 under the name Mailstro.   (Gendre Decl. ¶¶ 19-20.)  In fact, the Mailstro MTA was Vade's only MTA product available in June 2017. (*Id*. ¶ 21.)  Thus, contrary to Plaintiffs' speculative allegations, any MTA used by Vade ███████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████  Rather, Vade's Mailstro MTA product was developed starting in 2012, which also demonstrates that Vade already had significant experience and independent know-how with respect to MTA coding and development that pre-dated the arrival of Lemarié, Boussinet, Delannoy, and Séjourné.  (*Id*. ¶ 22.)

Separate from the Mailstro product, Vade is presently developing another, next-generation MTA product ("VSS NextGen MTA").  (*Id*. ¶ 15.)  The VSS NextGen MTA's development started in late 2017, and the VSS NextGen MTA is being developed using a distinct architecture and distinct programming language as compared to other commercially available MTAs.  (*Id*. ¶¶ 16-17.)  Specifically, Vade selected Golang for their VSS NextGen MTA, and, at least at the time when Golang was selected, Vade was not aware of any MTA using that programming language.  (*Id*. ¶ 16.)  As such, the initial stages of the development involved solving significant technical challenges with respect to Golang, and Vade spent a significant amount of time validating feasibility of using Golang for this product.  (*Id*.)  Contrary to Plaintiffs' allegations, the VSS NextGen MTA development has not been uncharacteristically quick, and the VSS NextGen MTA is not Vade's inaugural MTA.  (*Id*. ¶¶ 16-19).

Further, the VSS NextGen MTA uses the following design features, which further distinguish Vade's MTA from others available on the market:  a modular approach for native cloud deployment; micro services and standard REST APIs for every component; simple policy abstraction for flexibility; policy real-time testing and deployment; loosely coupled components; and a fully elastic

6

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

system.  (*Id.* ¶ 18.)  Thus, Vade's VSS NextGen MTA is different in kind from other commercial MTAs, and does not incorporate anything that could constitute Plaintiffs' trade secret or confidential information.  And because Vade's VSS NextGen MTA takes a novel approach, its development has not been "exceptionally fast," as alleged.  (Pls.' Mot. 12, ECF No. 30-4.)  Instead, Vade's VSS NextGen MTA has been under development for over two years, and a date for its commercial release has still not been set.

### C.  Plaintiffs knew the facts allegedly giving rise to this suit for over two years before seeking injunctive relief.

Plaintiffs cannot credibly claim that they took prompt action upon learning of the facts that purportedly give rise to this lawsuit that would indicate the need for immediate extraordinary relief. As Plaintiffs' concede, they have had express or constructive knowledge of the alleged facts giving rise to this lawsuit since at least June 2017.  Specifically, Lemarié joined Vade in February 2017, and the other former Cloudmark employees referenced in Plaintiffs' motion had joined before then. (Declaration of Olivier Lemarié ¶ 12, attached hereto as **Exhibit 6** ("Lemarié Decl.");  Declaration of Alexandre Boussinet ¶ 13, attached hereto as **Exhibit 7** ("Boussinet Decl.");  Declaration of Xavier Delannoy ¶ 2, attached hereto as **Exhibit 8** ("Delannoy Decl.");  Declaration of Guillaume Séjourné ¶ 2, attached hereto as **Exhibit 9** ("Séjourné Decl.").)  Those individuals' job status with Vade has never been secret.  Rather, as Plaintiffs' Complaint and the instant motion make clear, their employment status is publicly available through, among other channels, LinkedIn.  (Pls.' Compl. Exs. A, C-E, ECF Nos. 1-1, 1-3 to 1-5.)  Also, Cloudmark expressly released Messrs. Boussinet, Delannoy, and Séjourné from any non-compete obligation, and, thus, they were entirely free, and in fact had Cloudmark's blessing, to work for a competitor.  (Boussinet Decl. ¶ 8;  Delannoy Decl. ¶ 12; Séjourné Decl. ¶ 15.).

With respect to these departures—and with a complete lack of evidentiary support—Plaintiffs represent that Lemarié "had already accepted employment with Vade" when he announced his resignation in October 2016.  (Pls.' Mot. 5, ECF No. 30-4.)  But when Lemarié resigned in October 2016 and when his employment ended in November 2016, he had neither received an offer of employment from Vade nor accepted any such purported offer, and, in fact, had not determined his

7

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

future employment.  (Lemarié Decl. ¶¶ 5-6.)  Instead, he had decided to take a sabbatical, and was indeed on sabbatical until February 2017.  (*Id.*)  As for Boussinet and Séjourné, both had decided to leave Cloudmark several months before resigning due to general job dissatisfaction, had been actively searching for other employment, and had obtained offers of employment from other companies (Boussinet with TEAGS, and Séjourné with a German "localization industry" company) when they resigned.  (Boussinet Decl. ¶¶ 5-6;  Séjourné Decl. ¶¶ 6, 8-11.)  Delannoy also started searching for other employment opportunities with no intention of joining Vade at the time, similarly due to job dissatisfaction.  (Delannoy Decl. ¶¶ 6-7.)  It was the understanding of Séjourné and Delannoy that their job dissatisfaction at Cloudmark was shared by numerous other Cloudmark employees in 2016.  (Séjourné Decl. ¶ 7; Delannoy Decl. ¶ 6.)  Plaintiffs' allegations regarding these departures reflect, at best, a misapprehension of the facts or, at worst, a misrepresentation.

Further, Plaintiffs were also aware of Vade's development of an anti-spear phishing solution and an MTA product years ago.  As noted above, in June 2016, Mr. Goutal participated in a panel presentation with representatives from both Proofpoint and Cloudmark, during which Mr. Goutal described anti-spear phishing development efforts, including the use of e-mail coding and fingerprinting to detect spear phishing attacks—the same type of techniques Plaintiffs now contend to be proprietary.  (Goutal Decl. ¶ 10.)  Consistent with those development efforts, the patent application that resulted in the '579 Patent was published on September 27, 2018.  ('579 Patent at (65).)  With the exception of the use of Microsoft's journaling tool, Plaintiffs reference that public '579 Patent specification as evidence that Vade is using Plaintiffs' alleged trade secrets relating to spear phishing.  (Pls.' Mot. 10, 17-19, ECF No. 30-4.)  And Vade's release of O365 included all of Vade's e-mail security solutions, not just anti-spear phishing, and was publicly announced in June 2018.  (Pls.' Mot. Ex. 26, ECF No. 31-27.)  Plaintiffs also concede, through the declaration of Proofpoint's Senior Data Engineer, Mr. Lee, that ██████████████████████████████ ███████████████████  (Pls.' Mot. Ex. 1 ¶ 33, ECF No. 30-6.)  Yet, upon the public disclosure of each of those facts, Plaintiffs took no action that would indicate emergent circumstances warranting an injunction.  To the contrary, Plaintiffs' knowingly sat idle for years.

Then, on June 12, 2019, Vade announced that it had secured €70 million in a financing agreement that would allow it to further grow its business and invest in developing new innovative technologies. (Pls.' Compl. Ex. L, ECF No. 1-12.)  On the heels of that financing arrangement, Vade announced it had partnered with Datto, a leader in providing IT solutions to Managed Service Providers, to offer Vade's O365 product together with Datto's leading solutions. (Pls.' Mot. Ex. 51, ECF No. 31-50.)  It was only after those announcements and Plaintiffs' subsequent fear of legitimate, innovative competition that Plaintiffs filed this suit.

Over a month after those announcements, Plaintiffs' filed the present lawsuit on July 23, 2019. (Pls.' Compl., ECF No. 1.)  Yet even then, Plaintiffs did not express an immediate need to obtain injunctive relief.  Instead, Plaintiffs waited until September 25, 2019, to seek injunctive relief. As already shown above, Plaintiffs' belated motion is replete with misrepresentations and material factual omissions, and seeks extraordinary relief based largely on unfounded speculation.  Plaintiffs cannot meet their burden, and their PI Motion should be denied in its entirety.

## III.   ARGUMENT AND AUTHORITIES

"A preliminary injunction is an extraordinary remedy never awarded as of right." *DealDash Ovj v. Contextlogic, Inc.*, No. 18-cv-02353-MMC, 2018 U.S. Dist. LEXIS 135531, at *4 (N.D. Cal. Aug. 10, 2018) (Chesney, J.) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Further, an injunction that requires a defendant to take action, such as the one requested here, constitutes a mandatory injunction. *DealDash Ovj*, 2018 U.S. Dist. LEXIS 13551, at *16-17. "Mandatory injunctions are 'particularly disfavored,'" and should be denied absent a showing that "extreme or very serious damage will result." *Id.* at *17 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 517 F.3d 873, 879 (9th Cir. 2009)).  In addition, to be entitled to any preliminary relief, a plaintiff must demonstrate that:  "(1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) 'an injunction is in the public interest.'" *Glass Egg Dig. Media v. Gameloft, Inc.*, No. 17-cv-04165-MMC, 2018 U.S. Dist. LEXIS 35724, at *2-3 (N.D. Cal. Mar. 2, 2018) (quoting *Winter*, 555 U.S. at 20)).

The Ninth Circuit has also approved an alternative "sliding scale" test that requires a plaintiff to establish that "'serious questions going to the merits' exist, that 'there is a likelihood of irreparable injury' in the absence of injunctive relief, that 'the balance of hardships tips sharply in his favor,' and that 'the injunction is in the public interest.'" *DealDash Ovj*, 2018 U.S. Dist. LEXIS 13551, at *5 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)). A "serious question going to the merits" under this test is "one as to which the moving party has a fair chance of success." *Nelson v. Levy*, No. 16-cv-03797-MMC, 2017 U.S. Dist. LEXIS 79116, at *7, *9 (N.D. Cal. May 23, 2017) (quoting *Sierra OnLine, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984)).

Plaintiffs bear the burden of establishing by a clear showing they are entitled to the relief sought. *Founder Starcoin, Inc. v. Launch Labs, Inc.*, No. 18-cv-972 JLS (MDD), 2018 U.S. Dist. LEXIS 113737, at *8-9 (S.D. Cal. Jul. 9, 2018). Such a showing must be made through a presentation of facts and evidence—speculation is insufficient. *Id.* at *9. Plaintiffs have failed to meet their burden on each element, and their motion should be denied in its entirety.

### 1. Plaintiffs cannot demonstrate a likelihood of success on the merits of their trade secret misappropriation claim.

Plaintiffs' motion is premised on a trade secret misappropriation claim under the Defend Trade Secrets Act ("DTSA") against all Defendants and a breach of contract claim against Lemarié. Thus, Plaintiffs have the burden to clearly show that they are likely to succeed on establishing each element of those claims. *Id.* With respect to their DTSA claim, Plaintiffs must establish that, (1) they are the owner of a trade secret, (2) that Defendants misappropriated the trade secret, and (3) that Plaintiffs were damaged by Defendants' actions. *Cleanfish LLC v. Sims*, No. 19-cv-03663-HSG, 2019 U.S. Dist. LEXIS 108946, at *7 (N.D. Cal. June 28, 2019). The record before the Court demonstrates that Plaintiffs cannot meet their burden with respect to any of those elements, one of which is not even addressed in Plaintiffs' motion.

### a. Plaintiffs failed to show that they own a protectable trade secret.

In their motion, Plaintiffs only identify publicly available development tools or product capabilities as their alleged trade secrets. (Karp Decl. ¶¶ 27-29, 32-56; Rankin Decl. ¶¶ 3-4.) To

10

obtain the extraordinary remedy of injunctive relief, it was incumbent on Plaintiffs to identify the purported trade secrets that lie within these generic tools and capabilities.  *See Citcon USA, LLC v. RiverPay, Inc.*, No. 18-cv-02585-NC, 2019 U.S. Dist. LEXIS 106295, at *4 (N.D. Cal. June 25, 2019) (holding that simply referring to source code underlying a product was insufficient to identify a trade secret for purposes of a preliminary injunction request);  *Swarmify, Inc. v. Cloudfare, Inc.*, No. C 17-06957-WHA, 2018 U.S. LEXIS 34727, at *9-10 (N.D. Cal. March 2, 2018);  *uSens, Inc. v. Shi Chi*, No. 18-cv-01959-SVK, 2018 U.S. Dist. LEXIS 175570, at *6-7 (N.D. Cal. Oct. 11, 2018).  Plaintiffs failed to do so, and simply reference marketing-level descriptions of techniques and capabilities that are well-known and used in many different competing products.  (*See supra* § II.A; Karp Decl. ¶¶ 27-29, 32-56.)

Again, with respect to Plaintiffs' purported trade secrets in connection with their MTA product, they highlighted and redacted the following tools used with and capabilities included in their MTA as allegedly constituting their trade secrets:  ███████████████

████████████████████████████████████████████

████████████████████████████████  (Pls.' Mot. 16, ECF No. 30-4.)  The scalability of MTA as alluded to in Plaintiffs' papers is common and has been publicly disclosed.  (Rankin Decl. ¶ 4;  Karp Decl. ¶¶ 32-36.)  The same is true for the other capabilities Plaintiffs erroneously contend set their MTA apart.  (Rankin Decl. ¶ 4;  Karp Decl. ¶¶ 32-41.)  In fact, Plaintiffs' own, undated literature attached to their motion readily acknowledges that "[m]odern secure e-mail gateways, [i.e., MTAs], are very efficient at dispatching with millions of daily volumes of bulk unsolicited email (spam) messages"—one of the features they claim is a trade secret.  (Pls.' Mot. Ex. 33, ECF No. 31-34.)  In other words, Plaintiffs concede that what they claim to be a trade secret is a capability available to and used with other third-party MTAs, which necessarily means that it cannot be a trade secret.  *See Cleanfish, LLC*, 2019 U.S. Dist. LEXIS 108946, at *7-11;  *Citcon USA, LLC*, 2019 U.S. Dist. LEXIS 106295, at *4;  *uSens, Inc.*, 2018 U.S. Dist. LEXIS 175570, at *6-7.  Plaintiffs cannot credibly argue otherwise.

Plaintiffs fair no better with respect to the purported trade secrets related to their Trident product.  Rather, Plaintiffs again simply point to the following publicly available product

11

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

development techniques as constituting their trade secrets, without further explanation:  (1) behavioral analysis;  (2) machine learning to detect anomalies;  (3) cloud-based threat analysis;  and (4) integration with Microsoft Office 365 using Microsoft's journaling feature.  (Pls.' Mot. 16, ECF No. 30-4.)  Again, most e-mail security products on today's market use these techniques (as described at this level of specificity).  These aspects are, in fact, publicly marketed in connection with numerous other competing products.  (*See supra* § II.A;  Karp Decl. ¶¶ 27-29, 42-46, 54-56.)  And contrary to Plaintiffs' representations that the mere mention of these features is "HIGHLY CONFIDENTIAL" and must be sealed by the Court, Plaintiffs themselves publicly disclose use of these tools in their own marketing materials.  (*See supra* § II.A;  Rankin Decl. ¶ 3.)

The techniques and capabilities that Plaintiffs rely on as purported trade secrets are demonstrably in the public domain.  As a result, they fail to satisfy each element of what constitutes a trade secret under the DTSA.  *See Cleanfish, LLC*, 2019 U.S. Dist. LEXIS 108946, at *7-9. Accordingly, Plaintiffs have not presented any facts or evidence that would support the first element of a DTSA claim, much less a clear showing they are likely to succeed.  *See id.*

### b.      There is no evidence to support the misappropriation element.

To establish misappropriation under the DTSA, a plaintiff is required to show that the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means.  *Founder Starcoin, Inc.*, 2018 U.S. Dist. LEXIS 113737, at *10.  If the defendant obtained the alleged trade secret through proper means or independent development, there is no misappropriation under the DTSA.  *Id.* at *24-25;  *see* 18 U.S.C. § 1839(3)(B).  For example, in *Founder Starcoin, Inc.*, the court denied Plaintiffs' motion for preliminary injunction for numerous reasons that are equally applicable to the issues before this Court.  In particular, the court there first held that the plaintiff's idea of using celebrity promotions was a long-standing marketing practice already in the public domain, and thus, could not be a trade secret.  *Id.* at *21-22.  But even if it were, there was no evidence presented that the defendant had used celebrity endorsements solely as a result of receiving the plaintiff's business plan.  Rather, the defendant presented evidence in the form of declarations describing its own independent development and execution of that plan, which actually began before the meeting with the plaintiff.  *Id.* at 23-32.  Under those facts, the court held that the plaintiff had failed to establish

12

a likelihood of success that the defendant misappropriated any alleged trade secret.  *Id.*;  *see Best Lockers, LLC v. Am. Locker Grp., Inc.*, No. 12-cv-00403-CJC(ANx), 2012 U.S. Dist. LEXIS 199973, at *5-7 (C.D. Cal. Mar. 30, 2012) (holding that simply claiming that the defendant must have misappropriated a trade secret because it offers a competing product with similar known features was insufficient to show a likelihood of success on the misappropriation element).

The same result is warranted here.  In their motion, Plaintiffs make three arguments in support of their claim that Defendants have misappropriated their trade secrets:  (1) alleged similarities between Vade's '579 Patent and O365 product, on the one hand, and Cloudmark's Trident product, on the other;  (2) the fact that Vade is developing an MTA product;  and (3) Lemarié's maintenance of an Evernote account with notes concerning the development of a DNS.  With respect to the first argument, Plaintiffs contend that "Defendants Lemarié and Vade's improper disclosure and misuse is evinced by the remarkable similarities between Cloudmark's Trident and Vade's subsequent filing of the '579 Patent and development of Vade O365."  (Pls.' Mot. 17, ECF No. 30-4.)  This statement, however, is conclusory and unsupported by any competent evidence.

Indeed, the "remarkable similarities" referenced by Plaintiffs are nothing more than the use of techniques and product capabilities, described at a marketing level of specificity, that are in no way proprietary to Plaintiffs.  (*See supra* § II.A;  Karp Decl. ¶¶ 45-46, 51-53.)  The fact that Vade uses such techniques and includes such capabilities is wholly unremarkable and insufficient to show misappropriation.  *See Best Lockers, LLC*, 2012 U.S. Dist. LEXIS 199973, at *5-7;  (Karp Decl. ¶ 53.)  Plaintiffs' own expert tellingly has not opined on any such "remarkable similarities."  And, as Dr. Karp makes clear, Plaintiffs' allegations are divorced from the development realities in the e-mail security industry.  (Karp Decl. ¶¶ 27-29, 45-46, 51-53.)  Further, the simple fact that Vade employs former Cloudmark employees is also insignificant and insufficient.  Indeed, Plaintiffs have not argued that Boussinet, Delannoy, and Séjourné worked on their Trident product.  (Pls.' Mot. 5, ECF No. 30-4.)  And they have not done so.  (Boussinet Decl. ¶ 3;  Delannoy Decl. ¶ 5;  Séjourné Decl. ¶ 5.)  And the product features, development techniques, and capabilities that purportedly composed Plaintiffs' trade secrets were largely known to and incorporated into Vade's anti-spear

13

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

phishing solutions and products before Lemarié joined Vade.  (Goutal Decl. ¶¶ 7-8;  Lemarié Decl. ¶ 13.)

Vade, in fact, has been independently developing anti-spear phishing solutions since 2015. (Goutal Decl. ¶ 3.)  As set forth above, by 2016, Vade was already incorporating and offering anti-spear phishing solutions that were cloud-based and that used heuristic content analysis, behavioral analysis of past e-mails, analysis of the sender and the content of an e-mail, and content evaluation to detect language indicative of suspicious e-mails.  (*See* Gendre Decl. ¶ 24; *Vade Retro Technology Takes on a New Identity and Becomes Vade Secure*, Business Wire (July 13, 2016), https://www.businesswire.com/news/home/20160713006224/en/Vade-Retro-Technology-Takes-New-Identity-Becomes.)  Further, in 2016, Vade was investigating acquiring patents relating to an anti-spear phishing solution using behavioral analysis, e-mail fingerprinting, e-mail features selection and weighting, and machine learning with big data technology, which they subsequently acquired.  (Goutal Decl. ¶ 9.)   And between 2015 and early 2017, Goutal—through ongoing development efforts performed wholly independently of Lemarié or any other former Cloudmark employee—had researched and analyzed the anti-spear phishing inventions leading to the '579 Patent.  (*Id.* ¶ 3-8.)

Importantly, rather than simply disclosing the use of high level techniques and capabilities, the '579 Patent also discloses significant detail regarding the patented behavioral analysis, machine learning, e-mail fingerprinting, and cloud-based solutions.  (*See, e.g.*, '579 Patent at 4:44-5:13; 5:45-7:22, and 7:23-8:16.)  Notably, Plaintiffs do not allege that the implementation of Cloudmark's Trident product is the same as the details disclosed in the '579 Patent.  Plaintiffs' PI Motion is, in fact, striking in that they provide no evidence of alleged misappropriation, other than pointing out that competing products use similar techniques and have similar capabilities, all of which they describe with only a marketing level of specificity and all of which are used industry-wide.  *See Cleanfish, LLC*, 2019 U.S. Dist. LEXIS 108946, at *8-9; *Best Lockers, LLC*, 2012 U.S. Dist. LEXIS 199973, at *5-7.  Plaintiffs, through their expert or otherwise, could have compared their product to the details disclosed in the '579 Patent, but tellingly did not do so.  In fact, Plaintiffs' expert provided no opinion regarding any purported comparability between Vade's technology and Plaintiffs'

14

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

technology.  The wholesale lack of evidence of misappropriation in the PI Motion is indicative of the untenable grounds on which the motion was brought in the first instance, which stands in stark contrast to the cases Plaintiffs' rely on.  *See Weride Corp. v. Huang*, 379 F. Supp. 3d 834, 848-49 (N.D. Cal. 2019);  *Cleanfish LLC*, 2019 U.S. Dist. LEXIS 108946, at *9-10.

Plaintiffs' arguments concerning their MTA product also fail to show any misappropriation.  Again, Plaintiffs have not identified anything about their MTA product that would constitute a trade secret, much less one that has been misappropriated.  (*See supra* § III.A.1; Karp Decl. ¶ 32-41, 47-50.)  Further, here, Plaintiffs do not even allege that Vade's MTA shares the same features and capabilities.  Rather, Plaintiffs merely allege, albeit erroneously, that the only way ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ would have been to improperly use Plaintiffs' alleged confidential or trade secret information.  (Pls.' Mot. 12, ECF No. 30-4.)  That allegation is speculative, ignores Vade's independent development and release of its prior Mailstro MTA product in 2013, and contradicts Plaintiffs' other arguments.  For example, Plaintiffs contend that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (*Id.*)  Yet, in purported support of a different argument, Plaintiffs acknowledge that Vade's MTA has not even been introduced to the market, almost three years after Lemarié joined Vade.  (*Id.* at 22.)  These contradictory allegations are indicative of Plaintiffs' misapprehension of the facts.

In truth, Vade independently developed and released its own MTA product, Mailstro, in 2012 and 2013.  (Gendre Decl. ¶¶ 19-20.)  In particular, Vade's Mailstro MTA product was the only MTA product that Vade had in June 2017, (Gendre Decl. ¶ 21), and so the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ would have been Vade's Mailstro MTA.  Contrary to Plaintiffs' conclusory allegations, that product was developed and released well before Lemarié, Boussinet, Delannoy, and Séjourné joined Vade.  (*Id.*)  Further, Vade's VSS NextGen MTA, which has not been released to the market, has been under development since late 2017.  (Gendre Decl. ¶ 15.)  Moreover, that latter product has been and is being designed and developed using an entirely different code base and architecture as compared to other commercially available MTAs.  (Gendre Decl. ¶ 16-17.)  Other key distinguishing features include "that the VSS NextGen MTA does not yet

15

have a user interface ('UI');  the VSS NextGen MTA leverages git; the VSS NextGEN MTA uses a modular approach for native cloud deployment;  the VSS NextGen MTA uses micro services and standard REST APIs for every component;  the VSS NextGen MTA uses simple policy abstraction and policy real time testing and deployment;  and the VSS NextGen MTA includes loosely coupled components and a fully elastic system; among other features." (*Id.* ¶ 18.) In short, Defendants simply have not developed any MTA product that uses any confidential or trade secret information belonging to Plaintiffs, and Plaintiffs have not presented any competent argument or evidence to the contrary.

Lastly, in an effort to manufacture misappropriation, Plaintiffs reference one Evernote account previously maintained by Lemarié while a Cloudmark employee.  Again, Plaintiffs misrepresent the record as it relates to this particular account.  In particular, during his employment with Cloudmark, Lemarié created a notebook on his Evernote account labeled "DNS Security" for the purpose of sharing content with certain Cloudmark personnel involved in Cloudmark's DNS security product development and patent preparation.  (Lemarié Decl. ¶ 8.)  The contents included DNS security policies that were also documented in Cloudmark's DNS security policy code repository and in the patents related to the DNS security product.  (*Id.*)  At some point after leaving Cloudmark, it came to Lemarié's attention that the DNS Security notebook had not been deleted. (*Id.* ¶ 10.)  Once Lemarié learned that the DNS Security notebook had not been deleted, he immediately deleted that notebook and its contents.  (*Id.*)  Lemarié believed at the time and still believes that all the deleted contents were duplicative of the contents of Cloudmark's DNS security policy code repository and/or the related patents.  Moreover, Vade Secure is not developing DNS security technology, and Lemarié has not been personally involved in any projects relating to DNS security technology since leaving Cloudmark.  (*Id.* ¶ 9.)  Accordingly, Plaintiffs' arguments concerning this Evernote account fail to demonstrate any misappropriation.

### c.   Plaintiffs have also failed to show how they have been damaged by any alleged misappropriation.

To succeed on a claim of trade secret misappropriation under the DTSA, the plaintiff must show that he has been damaged by defendants' actions. *Way.com Inc. v. Singh*, No. 3:18-cv-04819-

16

WHO, 2018 U.S. Dist. LEXIS 215243, at *10 (N.D. Cal. Dec. 20, 2018).  Plaintiffs fail to even address this element in their motion.  For example, Plaintiffs do not argue, much less present evidence, that Defendants alleged misappropriation has resulted in any loss of customers, market share, or goodwill to Plaintiffs.  Further, even in the irreparable harm portion of Plaintiffs' motion, Plaintiffs argue, albeit in contravention of Supreme Court authority, that irreparable harm should be presumed.  (Pls.' Mot. 22, ECF No. 30-4.)  In other words, Plaintiffs seek a presumption of harm without presenting any evidence of actual harm resulting from the Defendants' alleged conduct.

In light of the foregoing, Plaintiffs have failed to raise a serious question about or show that they are likely to succeed on any element of their trade secret misappropriation claim against any Defendant.  As a result, Plaintiffs have not shown that they are entitled to injunctive relief.  *See Citcon USA LLC*, 2019 U.S. Dist. LEXIS 106295, at *5-6.

### 2.    Plaintiffs have also failed to show a likelihood of success on their breach of contract claim.

Plaintiffs provide no analysis of their breach of contract claim in the instant motion.  Rather, Plaintiffs simply recite the elements of a breach of contact claim, and then state in conclusory fashion that Lemarié breached provisions of the PIIA "by (1) using and disclosing Plaintiffs confidential Proprietary Information to his subsequent employer Vade, and to develop Vade products, without Plaintiffs' consent;  (2) failing to disclose in writing to Plaintiff and preserve the confidentiality of all inventions in which he participated in the conception or development;  and (3) failing to maintain, make available, and return Cloudmark materials and records."  (Pls.' Mot. 21, ECF No 30-4.)

But Plaintiffs fail to provide any evidence or even explanation of what they contend to be their "confidential Proprietary Information," what "inventions" Lemarié allegedly failed to disclose, or what Cloudmark materials or records were not returned.  And Plaintiffs fail to explain how Lemarié's alleged actions resulted in any injury to Plaintiffs, which is a necessary element of any breach of contact claim.  *See Sunbelt Rentals, Inc. v. Victor*, No. C 13-4240-SBA, 2014 U.S. Dist. LEXIS 14416, at *25-26 (N.D. Cal. Feb. 4, 2014).  To the extent Plaintiffs rely on the arguments related to their trade secret misappropriation claim to support the breach of contract claim, those arguments are equally unavailing here.  Accordingly, Plaintiffs have failed to either raise a serious

17

question concerning the merits or show a likelihood of success on the merits for either claim that is the subject the PI Motion.  As a result, the motion should be denied in its entirety.  *See Founder Starcoin, Inc.*, 2018 U.S. Dist. LEXIS 113737, at *8 (holding that a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits.").

### 3.   Plaintiffs will not suffer irreparable harm if their motion is denied.

Plaintiffs have given short shrift to the irreparable harm element, presumably based on their incorrect assertion that "there is a presumption of irreparable harm by the disclosure of trade secrets." (Pls.' Mot. 2, 22, ECF No. 30-4.)  The Supreme Court has held, however, that irreparable harm *cannot* be presumed when seeking injunctive relief.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008);  *In re Gen. Capacitor*, No. 17-cv-00179-HSG, 2017 U.S. Dist. LEXIS 71641, at *7-9.  For example, in *Winter*, the Supreme Court held that "an injunction is a matter of equitable discretion;  it does not follow from success on the merits as a matter of course."  555 U.S. at 32.  In view of that opinion, as well as the Supreme Court's earlier decision in *eBay Inc. v. MercExchange, L.L.C.*, which similarly held that irreparable harm is not presumed in the patent infringement context, district courts, including those in this district, have routinely held that there is no longer a presumption of irreparable harm in matters involving allegations of trade secret misappropriation. *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 394 (2006);  *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013);  *V'Guara, Inc. v. Dec*, 925 F. Supp. 2d 1120, 1126 (D. Nev. 2013);  *Bartech Sys. Int'l, Inc. v. Mobile Simple Solutions, Inc.*, No. 2:15-cv-02422-MMD, 2016 U.S. Dist. LEXIS 68030, at *8 (D. Nev. May 24, 2016);  *In re Gen Capacitor*, No. 16-cv-02458-HSG, 2017 U.S. Dist. LEXIS 71641, at *8-9;  *Arminak Sol., LLC v. 7-Eleven, Inc.*, No. 2:17-cv-01820-RGK, 2017 U.S. Dist. LEXIS 221900, at *4-5 (C. D. Cal. March 16, 2017) ("Arminak cites pre-Winter case law to argue presumption of irreparable harm in . . . trade secret misappropriation actions.  These cases, however, are no longer good law . . . .")

Thus, irreparable harm cannot be presumed.  Rather, a plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely."  *See Glass Egg Digital Media*, 2018 U.S. Dist. LEXIS 35724, at *3.  That demonstration must be made through a proffer of evidence, as opposed to mere speculation.  *Id.*;  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674

18

(9th Cir. 1987);  *Arminak Sol., LLC*, 2017 U.S. Dist. LEXIS 221900, at *5.  Moreover, the plaintiff must show that a "sufficiently strong nexus" exists between the conduct sought to be enjoined and the claimed irreparable harm.  *DealDash Oyj*, 2018 U.S. Dist. LEXIS 135531, at *10-11.  But Plaintiffs fail to do so here.

Instead, Plaintiffs rely on bad law and speculation, and ignore material dispositive facts.  With respect to the actual facts, Plaintiffs' delay in seeking injunctive relief is fatal to the instant motion.  *See, e.g., In re Gen Capacitor*, 2017 U.S. Dist. LEXIS 71641, at *7 (holding that a long delay before seeking a preliminary injunction implies a lack of irreparable harm);  *Way.com, Inc.*, 2018 U.S. Dist. LEXIS 215243, at *30-31 (holding that a three month delay weighed against a finding of irreparable harm).  Here, as set forth above, Plaintiffs were unquestionably aware for more than two years—from their joint participation the M3AWWG presentation with Vade, the publication of the application leading to the '579 Patent, and Vade's public announcement of the integration of its suite of e-mail security solutions, including anti-spear phishing, with Microsoft Office 365—that Vade was using the vast majority of the product tools and capabilities that Plaintiffs' now allege to be trade secrets.  (*See supra* § II.C;  Goutal Decl. ¶¶ 10-11;  Pls.' Mot. Ex. 26, ECF No. 31-27;  '579 Patent at (65);  Rankin Decl. ¶ 3.)  In response, Plaintiffs did nothing.

Similarly, Plaintiffs' concede that they knew that █████████████████████ ████████████████████████████████████████████████████  (Pls.' Mot. Ex. 1, ¶ 33, ECF No. 30-6.)  If Plaintiffs believed that Vade had developed that MTA from scratch between when Lemarié joined Vade and ████████████████ using Plaintiffs' confidential information, Plaintiffs would have taken action at that time.  Instead, Plaintiffs did nothing.  Plaintiffs continued to knowingly sit idle for over 27 months before finally seeking injunctive relief.  Plaintiffs simply cannot be heard to complain that Defendants' alleged conduct, which Plaintiffs have known about for years, is somehow just now threatening an irreparable harm.  *See In re Gen. Capacitor*, 2017 U.S. Dist. LEXIS 71641, at *7.

Plaintiffs have tellingly failed to present any evidence of any alleged newfound irreparable harm.  Other than improperly relying on a presumption to show irreparable harm, Plaintiffs contend only that they will suffer irreparable harm in view of the partnership announced between Vade and

19

Case No. 3:19-cv-04238-MMC
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

Datto in June 2019—over three months before Plaintiffs sought injunctive relief.  (Pls.' Mot. 22-23, ECF No. 30-4.)   The arrangement between Vade and Datto, however, simply relates to future potential sales of Vade's O365 product together with certain of Datto's offerings.  (*See id.* at Ex. 52, ECF No. 31-51.)   This does not represent a material change in circumstances.   Before the announcement concerning Datto, Vade had been successful in selling its e-mail security offerings, including its anti-spear phishing solution.   (*See About Vade Secure*, Vade Secure, https://www.vadesecure.com/en/company (last visited Dec. 2, 2019); Gendre Decl. ¶¶ 13, 23-25.) Plaintiffs have not come forward with any evidence that those sales have resulted in harm to Plaintiffs, much less the irreparable immediate harm they are claiming now.   The announced arrangement with Datto is merely another mechanism by which Vade will make such sales, and Plaintiffs have not and cannot show that they will now suffer irreparable harm as a result.   In fact, Plaintiffs glaringly omit from their motion the fact that Plaintiffs' Trident product no longer appears to be marketed as a product available for sale on Cloudmark's website.  (Rankin Decl. ¶ 3 (noting that only an archived version of the Trident webpage is accessible).)   It cannot be said that Plaintiffs will suffer irreparable harm by virtue of Vade continuing to sell a product against which Plaintiffs no longer compete.  *See Swarmify, Inc.*, 2018 U.S. Dist. LEXIS 34727, at *14-15.

The same is true for Vade's MTA products.   Despite knowing that Vade developed an MTA at least by June 2017 (which would have been the Mailstro MTA—developed starting in 2012 and released in 2013), Plaintiffs now contend that Vade's future commercial release of another MTA (the VSS NextGen MTA) will somehow cause irreparable harm to Plaintiffs.   Plaintiffs contention is contrary to the record and, not surprisingly, without evidentiary support.   While Plaintiffs allege that Vade's release of the VSS NextGen MTA product is imminent, that is simply not true.   Rather, there has not been a release date set for the VSS NextGen MTA, and, thus, Plaintiffs request would be premature even if it were well founded—which it is not.

Further, in addition to failing to actually identify any irreparable harm that would be suffered by virtue of Vade's selling either MTA product, Plaintiffs have made no effort to show a nexus between Vade's alleged use of purported trade secrets and the requested injunction.   Moreover, it should be noted that Plaintiffs' concede that ████████████████████████████

███████████████████████████████████████████████████

███████ (Pls.' Mot. Ex. 1 ¶ 34, ECF No. 30-6.)  When a monetary remedy is available—as is the case here for each of Plaintiffs' allegations—it counsels heavily against a finding of irreparable harm. *See Swarmify, Inc.*, 2018 U.S. Dist. LEXIS 34727, at *14-15;  *Cleanfish LLC*, 2019 U.S. Dist. LEXIS 108946, at *12.

Plaintiffs have failed to show that they will suffer irreparable harm if an injunction is not granted.  As a result, and for that reason alone, Plaintiffs' motion should be denied in its entirety.  .

### 4.  The balance of equities and public interest do not favor an injunction under these circumstances.

To obtain a preliminary injunction, a plaintiff must demonstrate that the balance of equities tips in his favor.  *Winter*, 555 U.S. at 20.  Further, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24.  Indeed, where there is no showing of likelihood of success or irreparable harm, as is the case here and in contrast to the authorities relied upon by Plaintiffs, these factors weigh against finding injunctive relief. *Cleanfish LLC*, 2019 U.S. Dist. LEXIS 108946, at *13.  This is especially true in suits between competitors, or in matters where a plaintiff seeks to preclude an individual from performing his or her lawful job functions.  *Id.*

For example, in *Cleanfish LLC*, the plaintiff alleged trade secret misappropriation based on the defendant's use of publicly available information.  As a result, the court held that the plaintiff had not shown a likelihood of success on the merits or irreparable harm.  *Id.* at *8-9.  Despite that lack of showing on those dispositive elements, the plaintiff, like Plaintiffs here, sought to enjoin a former employee from competing with the plaintiff.  *Id.* at *13.  But the court held that the former employee "is permitted and encouraged to use his wealth of experience and knowledge to start his own business, especially in light of insufficient evidence establishing that he engaged in any illicit activity." *Id.*  In determining that the balance of equities and public interest weighed against granting injunctive relief, the court further held that "[p]laintiff may not use the extraordinary preliminary relief sought in this motion as a way to preclude competition:  that result plainly conflicts with the public interest in promoting healthy employee mobility and competition." *Id.* at *13-14.

21

The same is true here.  Like the plaintiff in *Cleanfish LLC*, Plaintiffs here cannot show either likelihood of success or irreparable harm.  *Id.* at *8-9.  Despite that, Plaintiffs seek to impose an injunction that, as worded, would require Vade to pull products from the market, cease developing competitive products, and essentially impose a non-compete on Lemarié that does not contractually exist.  (*See* Pls.' Proposed Order, ECF No. 31-68.)  Thus, the injunction sought by Plaintiffs would not serve any legitimate purpose, but would remove products from the marketplace that would otherwise be available to consumers.  To do so would run counter to the public interest in promoting healthy employee mobility and competition.  *Cleanfish*, 2019 U.S. Dist. LEXIS 108946, at *13.  Thus, the balance of equities and public interest tip sharply *against* entering an injunction in this matter.

### 5.     Plaintiffs' proposed injunction is overly broad, impermissibly vague, and would require a significant bond.

A preliminary injunction must be narrowly tailored to address only the alleged unlawful activity, and mandatory injunctions that require the defendant to take affirmative action are particularly disfavored.  *See DealDash Oyj*, 2018 U.S. Dist. LEXIS 135531, at *15-17.  Where a plaintiff's proposed order fails to describe the subject material to be enjoined it is impermissible.  *Id.* For example, in *Citcon USA LLC*, the Court rejected the plaintiff's proposed order because, among other things, it broadly sought to enjoin the defendant from "using, accessing, or copying its trade secrets . . . and other proprietary information from all [plaintiff's] products and projects, such as (but not limited to) source code, schematics, and other business, technical, and financial information." 2019 U.S. Dist. LEXIS 106295, at *5-6.  The Court held that such a request was improper because it was beyond the relief sought in the motion and used impermissibly broad and undefined terms that prevented the "Court and the defendants from understanding what [plaintiff] alleges was misappropriated" or would be subject to the injunction.  *Id.*  Plaintiffs make the same mistake here.

While Plaintiffs are not entitled to any injunctive relief, their proposed order is both vague and overly broad, such that Defendants would not even have an understanding of what would be enjoined.  In particular, Plaintiffs request that all Defendants be "enjoined from each and all of the following:

22

1. Any and all use, disclosure, providing third parties access to, transfer, duplication, reproduction, publication, sale, offering for sale, and marketing of any version of Plaintiffs' Confidential Information whether or not in the United States; including the marketing, release, sale, and offering for sale of the forthcoming Vade Secure MTA product.

2. Confidential Information includes, but is not limited to, trade secrets and other proprietary information from all Plaintiffs' products and projects, such as source code, schematics, and other business, technical, and financial information developed, learned, or obtained by Plaintiff's employee(s).

(Pls.'s Proposed Order, ECF No, 31-68.)

This expansive language is almost identical to the proposed injunction that was rejected in *Citcon*. Under this proposed order, Vade, according to Plaintiff, would be required to at a minimum remove its Office 365 product from the market and cease developing its MTA product. Plaintiffs go even further by stating that the injunction would cover "all Plaintiffs' products and projects," even though they were not in any way discussed in Plaintiffs' motion. *See Citcon USA LLC*, 2019 U.S. Dist. LEXIS 106295, at *5-6. This request for a mandatory injunction is not narrowly tailored as required and should be rejected in its entirety for all of the reasons discussed herein. *See id.*; *DealDash Oyj*, 2018 U.S. Dist. LEXIS 135531, at *15-17.

Further, to the extent any injunction is granted here—which it should not be—Defendants are confident that ultimately it will be found that such an injunction should not have issued in the first instance. An enjoined party is presumptively entitled to recover damages equal to those losses attributable to the injunction "when it turns out the party enjoined had the right all along to do what it was enjoined from doing." *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.,* 16 F.3d 1032, 1036 (9th Cir. 1994). Here, as reflected in Vade's counterclaims, this suit has already damaged Vade, and the injunction sought by Plaintiffs would cause a significant disruption to Vade's business. As a result, Plaintiffs should be required to post a significant bond in the unlikely event they obtain any injunctive relief, despite failing to meet their burden. *See CyberMedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1079-80 (N.D. Cal. 1998).

### 6. Plaintiffs request for expedited discovery was never supported by good cause and is now moot.

At the time that Plaintiffs filed the instant motion, the parties had not conducted a Rule 26(f) conference, and, thus, they were precluded from conducting discovery without leave of court. *See*

23

Fed. R. Civ. P. 26(d)(1).  Accordingly, Plaintiffs moved the Court to conduct expedited discovery, arguing that they had an urgent need for the discovery and that conducting early discovery would not prejudice Defendants.  (Pls.' Mot. 24-25, ECF No. 30-4.)  Plaintiffs, however, did not attach the proposed expedited requests or present any credible argument or evidence establishing requisite good cause.  But the parties have now conducted the Rule 26(f) conference, and Plaintiffs have served requests for production and interrogatories, albeit in contravention of other applicable legal authority.  Thus, while Plaintiffs' request is now moot, Defendants will briefly address Plaintiffs' arguments below in the interest of completeness.

The default rule in federal civil litigation is that no party may seek discovery "from any source" prior to the Rule 26(f) conference.  Fed. R. Civ. P. 26(d)(1).  Plaintiffs therefore bear the burden of showing "good cause" by offering evidence that the need for discovery outweighs the prejudice to Defendants.  *Rovio Entm't Ltd v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1099 (N.D. Cal. 2012).

Plaintiffs do not have an urgent need for discovery.  Plaintiffs have been aware of the facts that purportedly gave rise to an expedited discovery request for years, but did nothing.  Thus, there is no justification for accelerating the discovery process.  Further, during the recent case management conference with the Court, Plaintiffs volunteered that they would file a reply in support of their motion within two weeks of receiving this response.  (Ct.'s Minute Entry, ECF No. 62.)  In other words, by that schedule, Plaintiffs acknowledge that they do not intend to conduct or introduce discovery in support of their briefing.  As a result, this motion does not create a need for expedited discovery.

Contrary to Plaintiffs' contention, expedited discovery would result in prejudice to Defendants for several reasons.  First, Plaintiffs did not actually provide the requests they intended to make, which prevents an adequate assessment of the burden that would have been imposed. Second, Plaintiffs' attempt to take expedited discovery was an effort to circumvent the French discovery proceeding that Plaintiffs instituted.  Specifically, Plaintiffs first improperly sought to obtain documents for use in this matter through the French legal system.  (Pls.' Mot. Ex. 55, ECF No. 54-8.)  The documents that were initially collected by the French authorities have not been

24

disclosed to Plaintiffs, however, and that proceeding is ongoing.  Plaintiffs made the decision to institute a parallel proceeding, and cannot circumvent that court's procedures here.  Third, production of documents and information, such as source code underlying Defendants' products would be highly prejudicial at this stage.  For example, as Plaintiffs are aware, any production of documents and information relating to the design and development of Defendants' anti-spear phishing and MTA products must, at a minimum, comply with the French Blocking Statute and the GDPR.  (*See* Joint Case Management Statement at 8-9, ECF No. 60.)

This opposition is not inconsistent with Defendants letter, sent through counsel, which simply stated that they would "provide responsive, non-privileged documents and information upon receipt of appropriate requests . . . ."  (Pls.' Mot. Ex. 53, ECF No. 31-52.)  No proper requests have been received, and in fact, Defendants risk subjecting themselves to criminal and civil penalties if they produce documents and information as sought by Plaintiffs' expedited discovery request.  (Joint Case Management Statement at Ex. A, ECF No. 60-1.)

Thus, Plaintiffs' expedited discovery request is moot, but, even if it were not, it is not supported by good cause and would unduly prejudice Defendants.

## IV.   CONCLUSION AND PRAYER

For the foregoing reasons, Defendants respectfully request that the Court enter an order denying Plaintiffs' Motion for Preliminary Injunction and Expedited Discovery in its entirety, and grant all other relief to which Defendants are entitled.

1    Dated: December 6, 2019                    **BAKER & McKENZIE LLP**

2

3                                              By: /s/ *Bart Rankin*

4                                              Colin H. Murray (SBN 159142)
                                                 colin.murray@bakermckenzie.com
5                                              **BAKER & McKENZIE LLP**
                                               Two Embarcadero Center, 11th Floor
6                                              San Francisco, CA  94111-3802
                                               Telephone:     +1 415 576 3000
7                                              Facsimile:       +1 415 576 3099

8                                              Danielle L. Benecke (SBN 314896)
                                                 danielle.benecke@bakermckenzie.com
9                                              **BAKER & McKENZIE LLP**
                                               600 Hansen Way
10                                             Palo Alto, CA  94304
                                               Telephone:     +1 650 856 2400
11                                             Facsimile:       +1 650 856 9299

12                                             Jay F. Utley (Admitted *Pro Hac Vice*)
                                                 jay.utley@bakermckenzie.com
13                                             Bart Rankin (Admitted *Pro Hac Vice*)
                                                 bart.rankin@bakermckenzie.com
14                                             Mackenzie M. Martin (Admitted *Pro Hac Vice*)
                                                 mackenzie.martin@bakermckenzie.com
15                                             John G. Flaim (Admitted *Pro Hac Vice*)
                                                 john.flaim@bakermckenzie.com
16                                             Chaoxuan Liu (Admitted *Pro Hac Vice*)
                                                 charles.liu@bakermckenzie.com
17                                             Mark Ratway  (Admitted *Pro Hac Vice*)
                                                 mark.ratway@bakermckenzie.com
18                                             **BAKER & McKENZIE LLP**
                                               1900 North Pearl Street, Suite 1500
19                                             Dallas, Texas 75201
                                               Telephone:     +1 214 978 3000
20                                             Facsimile:       +1 214 978 3099

21                                             *Attorneys for Defendants*
                                               *Vade Secure, Incorporated; Vade Secure SASU;*
22                                             *and Olivier Lemarié*

23

24

25

26

27

28