Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Iman Lordgooei (SBN 251320)
imanlordgooei@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Jodie W. Cheng (SBN 292330)
jwcheng@jwc-legal.com
**JWC LEGAL**
One Market Plaza, Suite 3600
San Francisco, California 94105
Telephone: (415) 293-8308

Attorneys for Plaintiffs,
Proofpoint, Inc. and Cloudmark LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PROOFPOINT, INC.; CLOUDMARK LLC<br><br>Plaintiffs,<br><br>vs.<br><br>VADE SECURE, INCORPORATED; VADE SECURE SASU; OLIVIER LEMARIÉ<br><br>Defendants. | CASE NO. 3:19-cv-04238-MMC<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY (DKT. 31)**<br><br>**REDACTED**<br><br>Hearing<br>Date: January 17, 2020<br>Time: 9:00 a.m.<br>Judge: Hon. Maxine M. Chesney<br>Courtroom: 7, 19th Floor<br>      450 Golden Gate Avenue<br>      San Francisco, CA 94102 |

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT .........................................................................................................................2

    A. Defendants Do Not Dispute Their Voluntary Agreement ............................2

    B. Plaintiffs Trade Secrets Were Not Publicly Known or Independently Developed, and Plaintiffs Have Demonstrated Existence of Protectable Trade Secrets .................................................................................2

        1. Plaintiffs' Anti-Spear Phishing Trade Secrets Were Not Publicly Known or Independently Developed By Vade ..................3

        2. Plaintiffs' MTA Trade Secrets Were Not Publicly Known or Independently Developed By Vade ....................................................5

        3. Defendants Conflate Plaintiffs' Motion to File Under Seal with Confidentiality of Trade Secrets ................................................8

    C. Plaintiffs Are Likely To Prevail On Their Misappropriation And Contract Claims .................................................................................................8

        1. Similarities Between Plaintiffs' Technologies and Vade's Products ...........................................................................................9

        2. Defendants' Access to Plaintiffs' Confidential & Proprietary Trade Secret Information ..............................................10

    D. Plaintiffs Did Not Delay Bringing Their Claims or Seeking Preliminary Injunction, And Will Suffer Irreparable Harm Without Preliminary Relief ...........................................................................................12

        1. Plaintiffs Brought Their Claims and Moved for Preliminary Relief As Soon As Reasonably Practicable ....................12

        2. Plaintiffs Will Suffer Irreparable Harm If Preliminary Relief Is Not Granted ..................................................................13

    E. Plaintiffs' Request for Expedited Discovery Is Supported By Good Cause and Not Moot .............................................................................15

III. CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**CASES**             **PAGE**

*Alta Devices, Inc. v. LG Elecs., Inc.*,
  343 F. Supp. 3d 868 (N.D. Cal. 2018) .................................................................................. 8

*Brocade Comm'cs Sys., Inc. v. A10 Networks, Inc.*,
  2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ..................................................................... 3, 15

*Comet Techs. U.S.A. Inc. v. Beuerman*,
  2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ............................................................ 11, 14, 15

*DVD Copy Control Assn., Inc. v. Bunner*,
  116 Cal. App. 4th 241 (Cal. Ct. App. 2004) ........................................................................ 3

*Eldorado Stone, LLC v. Renaissance Stone, Inc.*,
  2005 WL 5517732 (S.D. Cal. May 31, 2005) ..................................................................... 14

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) .............................................................................. 14

*Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*,
  944 F. Supp. 2d 775 (N.D. Cal. 2013) ................................................................................ 15

*Lillge v. Verity*,
  2007 WL 2900568 (N.D. Cal. Oct. 2, 2007) ....................................................................... 14

*Pretty Punch Shoppettes, Inc. v. Hauk*,
  844 F.2d 782 (Fed. Cir. 1988) ............................................................................................. 15

*U.S. Surgical Corp. v. Origin Medsystems, Inc.*,
  1993 WL 379579 (N.D. Cal. Jan. 12, 1993) ......................................................................... 8

*Volans-I, Inc. v. SpektreWorks, Inc.*,
  2019 WL 2300640 (N.D. Cal. May 30, 2019) ..................................................................... 8

*Waymo LLC v. Uber Techs., Inc.*,
  2017 WL 2123560 (N.D. Cal. May 15, 2017) ................................................................ 2, 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................................ 15

## I. INTRODUCTION

There is no practical reason why Defendants[1] cannot or should not comply with Plaintiffs' requested injunctive relief. The proposed preliminary injunction simply asks that Defendants continue doing what they say they are doing, but also to stop using and disclosing Plaintiffs' confidential information. According to Defendants, they have already voluntarily suspended Defendant Lemarié from working on, participating in, or otherwise being involved with Vade's Office 365 and NextGen MTA products. Defendants have also repeatedly stated that Vade has not determined or announced a release date for its NextGen MTA. Thus, it is not "extraordinary" to ask that Defendants maintain the status quo by continuing to suspend Mr. Lemarié and refrain from releasing the NextGen MTA. The only other injunctive relief Plaintiffs seek is that Defendants comply with the law.

To resist the straightforward injunction, even though it would present no hardship to them, Defendants rely on misstatements of law and fact to argue that Plaintiffs are not entitled to preliminary relief. Specifically, Defendants' Opposition[2] raises two primary arguments: (1) the alleged public availability of Plaintiffs' trade secrets and (2) Plaintiffs' purported delay in bringing suit. But Defendants' arguments are defeated by the very statements in their Opposition and, thus, fail. In fact, Defendants' Opposition *confirms* the novelty and secret nature of Plaintiffs' trade secrets and Vade's use of such secrets in its NextGen MTA, which will cause irreparable harm to Plaintiffs if allowed to be released into the marketplace. At a minimum, Plaintiffs' request for expedited discovery should be granted, because Defendants have thus far (two months into fact discovery) refused to provide any discovery in response to Plaintiffs' requests.

---

[1] Vade Secure, Incorporated ("Vade, Inc."); Vade Secure SASU ("Vade SASU" (collectively with Vade, Inc., "Vade")); and Olivier Lemarié.

[2] Defendants' Response to Plaintiffs' Motion for Preliminary Relief and Expedited Discovery (Dkt. 72 (the "Opposition")).

## II. ARGUMENT

### A. Defendants Do Not Dispute Their Voluntary Agreement

While a preliminary injunction is sometimes an extraordinary remedy, here, the requested relief only seeks to maintain the status quo and stop unlawful conduct. (Dkt. 31-68; P.I. Mot.[3] at 23–24.) Defendants do not dispute that they already "voluntarily" agreed to "suspend[] Mr. Lemarié's work on and involvement with Vade's Office 365 product and forthcoming MTA." (Dkt. 31-52.) Further, Defendants' Opposition and earlier representations have reiterated that the release date of Vade's forthcoming NextGen MTA has not yet been determined or announced. (*E.g.*, Opp. at 7 ("a date for its commercial release has still not been set"), 20 ("there has not been a release date set for the VSS NextGen MTA"); Dkt. 31-52 ("As for Vade's MTA gateway product, no release date has yet been determined or announced.").) As such, Plaintiffs are requesting the Court issue an order simply holding Defendants to their word—to continue the suspension of Mr. Lemarié and refrain from releasing the NextGen MTA. *See, e.g.*, *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *13 (N.D. Cal. May 15, 2017).

The only other injunctive relief requested is that Defendants comply with the law. Specifically, Plaintiffs ask that Defendants stop the use and disclosure of Plaintiffs' confidential information, and return any that has been in their possession. (Dkt. 31-68.) In fact, similar types of preliminary injunctive relief have been granted in other cases involving similar facts. Thus, the requested injunction asks only that Defendants continue to do what they are already doing, but without using, disclosing, or retaining[4] Plaintiffs' confidential information. At bottom, there is nothing controversial or extraordinary about the requested relief; and Defendants have presented no practical reason that they cannot or should not be held to such an injunction.

### B. Plaintiffs Trade Secrets Were Not Publicly Known or Independently Developed, and Plaintiffs Have Demonstrated Existence of Protectable Trade Secrets

Defendants argue that Plaintiffs have not shown the existence of protectable trade secrets

---

[3] Plaintiffs' Motion for Preliminary Injunction and Expedited Discovery (Dkt. 31 (the "P.I. Motion")).

[4] Plaintiffs seek the return of Plaintiffs' confidential information in a manner that would also ensure Defendants' compliance with their document preservation obligations.

and are not entitled to injunctive relief, because the trade secrets have purportedly "been publicly available for years" or were independently developed by Vade.  (Opp. at 10–12, 14–16.)  But Defendants have failed to tie their vague and generalized development efforts to Plaintiffs' trade secret technologies, and have presented no evidence corroborating the alleged public availability of Plaintiffs' trade secrets.[5]  (*See also* P.I. Mot. at 14–16.)

       1. <u>Plaintiffs' Anti-Spear Phishing Trade Secrets Were Not Publicly Known or Independently Developed By Vade</u>

As set forth in the Complaint, Plaintiffs' anti-spear phishing trade secrets involve "a 'combination of technical features[6] in a unified architecture' to 'detect spear phishing attacks in real time . . . .'"  (Dkt. 61 (Order Denying Defendants' Motion to Partially Dismiss Plaintiffs' Complaint) at 1–2 (citing Dkt. 1 ¶ 32.)  There is no evidence that the combination of these features into a unified architecture (or associated technical details) was publicly known or generally used, with the exception of Plaintiffs' confidential Trident project and Vade's products **after** Lemarié's hiring.  Despite arguing that all of the technical features "are used industry-wide" and publicly available, and that their use is "wholly unremarkable," Defendants do not (and cannot) point to **any** public source or third-party product incorporating the technical features combined in a unified architecture.  (Opp. at 12–14; *see also* Dkt. 72-1 ¶¶ 27–29, 42–46, 54–56.)  Defendants' technical expert merely lists, in piecemeal fashion, a number of webpages that each mention only a subset of the technical features, but none comprising the combination of features in unified architecture for protecting against spear phishing attacks.  (Dkt. 72-1 ¶¶ 27–29, 42–46, 54–56.)  In fact, Defendants

---

[5] To the extent Defendants contend that Plaintiffs' trade secrets have become generally known after Lemarié joined Vade, Inc., a preliminary injunction would still be appropriate to remedy Vade's head start and unfair advantage from Plaintiffs' trade secrets.  *See, e.g., Brocade Comm'cs Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *4 (N.D. Cal. Jan. 23, 2013) ("If the trade secrets have become generally known, 'an injunction [still] may be appropriate to remedy any head start or other unfair advantage acquired by the defendant as a result of the appropriation' . . . ." (quoting *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal. App. 4th 241, 253–54 (Cal. Ct. App. 2004) (quoting Rest. 3d Unfair Competition, § 44, comm. c.)).

[6] "The combination of technical features is described as follows:  (1) behavioral analysis and machine learning; (2) heuristic rules; (3) statistical models and scoring; (4) real-time, cloud-based threat analysis; and (5) easy integration and quick deployment into the popular Microsoft Office 365 architecture in a unique and seamless manner using Office 365 journaling, which avoids making complicated modifications to a client's MX records."  (Dkt. 61 (citing Dkt. 1) (internal quotation marks omitted).)

could not even provide any Vade product guide, marketing literature, development document, press release, *or any other document* to corroborate their contention that "Plaintiffs' trade secrets were largely known to and incorporated into Vade's anti-spear phishing solutions and products before Lemarié joined Vade." (*See* Opp. at 13–14.)

Similarly, Defendants have not made any showing that Plaintiffs' trade secrets were independently developed by Vade. (*Cf.* Opp. at 14.) Before Lemarié joined in February 2017, Vade's development activities were not specifically tied to Plaintiffs' combination of technical features and, in any event, is devoid of any corroborating evidence. (Opp. at 14 (*e.g.*, "Vade, in fact, has been independently developing anti-spear solutions since 2015. . . . And between 2015 and early 2017, Goutal—through ongoing development efforts . . . —had researched and analyzed the anti-spear phishing inventions leading to the '579 Patent.").) Moreover, even if Vade's early anti-spear phishing solutions and patents may have incorporated a select few of the technical features, even by Defendants' account, these early products and patents did not incorporate Plaintiffs' *combination* of the technical features in a unified architecture. (Opp. at 4–5, 14.) For example, Defendants reference a presentation at industry conference, M3AAWG, in June 2016. (*Id.* at 4.) But even accepting Defendants' representations as true, the presentation addressed only a small aspect related to one anti-spear phishing technique and did not disclose or even suggest the combination of features comprising Plaintiffs' anti-spear phishing trade secrets. (Dkt. 72-3 ¶¶ 10–11 (describing presentation "on anti-spear phishing technology developments," specifically "using an IP address and device fingerprinting to detect impersonation (i.e., spear phishing) attacks").) This presentation, like Vade's other development efforts prior to 2017, do not show independent development of Plaintiffs' anti-spear phishing trade secrets in a unified fashion.

In fact, by Defendants' own admission, the combination of the technical features ***could not*** have been independently developed by Vade prior to Lemarié's hiring in February 2017. As Defendants concede, Vade did not develop its integration with Microsoft Office 365 (a technical feature that comprises Plaintiffs' trade secret combination[7]) until mid-2017. (Opp. at 5 ("And in

---

[7] (Dkt. 1 ¶ 55 ("integration and deployment into Microsoft Office 365 infrastructure (a) using the 'journaling' feature and/or ([b]) without affecting MX records or (re)direction").)

the context of developing the O365 Outlook integration, in the middle of 2017 . . . a Microsoft representative suggested that Vade utilize Microsoft's Office 365 journaling tool for that purpose.").)[8]  In contrast, Cloudmark had implemented and deployed the Microsoft Office 365 integration and use of the journaling tool ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See, e.g.*, Dkt 31-44 (internal draft of Trident O365 Integration v.0.1 (Jul. 18, 2016)); P.I. Mot. at 9, 16, 19.)

### 2. Plaintiffs' MTA Trade Secrets Were Not Publicly Known or Independently Developed By Vade

Defendants have also failed to show public availability or independent development of Plaintiffs' MTA-related trade secrets.  In fact, Defendants' Opposition *confirms* the novelty and secret nature of Plaintiffs' trade secrets.  As described in Plaintiffs' Complaint and P.I. Motion, these trade secrets relate to the design, architecture, and implementation of software that enables Plaintiffs' MTA to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkt. 31 at 16; Dkt. 1 ¶¶ 35, 63-64.)

Defendants' Opposition enumerates several design features of Vade's new MTA product—developed after Lemarié joined Vade, Inc.—that they contend (1) constitute "a *novel* approach," (2) are "key distinguishing features," (3) are unavailable in other commercial MTAs, and are thus (4) not publicly available.  (*See* Opp. at 6–7 (emphasis added).)  But these very features were developed by Cloudmark reflecting its MTA-related trade secrets, under Lemarié's supervision years before Vade's alleged development.  (*See, e.g.*, Ex. 1 ¶¶ 4–47); Ex. 2.)  As internal product development documents from 2016 show, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*)  As Plaintiffs' technical expert, Dr. Nielson, explains, the incorporation of these design elements in the MTA context contribute to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex. 1, *e.g.*, ¶¶ 5, 10, 17, 25, 27, 29, 33, 37, 42.)  Thus, Plaintiffs'

---

[8] Nor does this indicate independent development by the Microsoft representative, who may have described a Microsoft tool but did not provide the implementation or integration of the feature into the Vade Office 365 architecture.

1  MTA trade secrets cannot have been "available to and used with other third-party MTAs," as
2  Defendants admit that these same design features represent a "novel approach." (*See* Opp. at 6–7.)
3         Specifically, around mid-2016, Cloudmark was designing its MTA (the Cloudmark Security
4  Platform or CSP) to meet the goals of a large, existing customer who was ▅▅▅▅▅▅▅▅▅▅
5  ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
6  ▅▅▅▅▅▅▅▅. (*E.g.*, Ex. 3 (Proposal for CSP Cloud Support, Aug. 18, 2016).)  As part of this
7  project, Cloudmark's engineers, supervised by Lemarié, devised proprietary and novel design
8  features for its MTA, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
9  ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅, which Lemarié also oversaw.[9] (*E.g.*, Ex. 2 (Dec. 14, 2016 eml
10 Subj: ▅▅▅▅▅▅▅▅▅▅) at 1 (*e.g.*, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
11 ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅)
12 (emphasis added).) ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
13 ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
14        Ironically, Vade now claims in its Opposition that these same features are "novel" aspects
15 of its NextGen MTA that it admits was developed to compete directly with Cloudmark: "Further
16 the VSS NextGen MTA uses the following design features, which further distinguish Vade's MTA
17 from others available on the market:  a modular approach for native ***cloud*** deployment; ***micro***
18 ***services*** and standard ***REST*** APIs for every component; simple policy abstraction for flexibility;
19 ***policy*** real-time testing and deployment; loosely coupled components; and a fully ***elastic*** system.").
20 (Opp. at 6–7 (emphases added); P.I. Mot. at 11–12.)  Yet, these very same features appear in
21 ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
22 ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅. (Ex. 1 ¶¶ 4–47.)  As just one example,
23 below are two slides from one of Cloudmark's design documents, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

---

[9] Cloudmark's design and development of these features (including all documents, presentations, and materials reflecting the MTA design for its large customer) are marked as confidential and subject to ongoing confidentiality obligations between Plaintiffs and the customer.



Ex. 3 at 5–6.

In fact, these design features, which Cloudmark developed by mid-2016 for its customer, are the same features Vade now claims it developed in late 2017—after Lemarié joined Vade, Inc.—for its NextGen MTA. (*E.g.*, Ex. 1 ¶¶ 4–47; *compare* Ex. 3 at 5, 10 (*e.g.*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *with* Opp. at 6–7 (*e.g.*, "a fully *elastic* system") (emphases added).)  Thus, instead of showing any public availability of Plaintiffs' MTA-related trade secrets, Defendants' Opposition affirms their general *un*availability and novelty, as well as their unauthorized use in a competing product to be released in the future. The case for a preliminary injunction could not be any more straightforward.

3. <u>Defendants Conflate Plaintiffs' Motion to File Under Seal with Confidentiality of Trade Secrets</u>

Contrary to Defendants' misguided argument, Plaintiffs' request to seal filings (or portions thereof) does not indicate any belief that "that the mere mention" of Plaintiffs' technical features and capabilities is trade secret. (*Cf.* Opp. at 1–2.) That is not, and never has been, Plaintiffs' position in this litigation. In fact, the list of technical features comprising Plaintiffs' anti-spear phishing trade secrets was publicly disclosed in Plaintiffs' very first filing—the Complaint. (*E.g.*, Dkt. 1 ¶ 55.) It should come as no surprise that Plaintiffs possess confidential information that may not constitute the asserted trade secrets; such as, documents containing personal information of individuals/employees and customer agreements. The fallacy of Defendants' argument is apparent in the one example they discuss: the redaction of the phrase, █████████████████ ████████████████████████████████████" (Opp. at 2.) This statement is redacted because it quotes an internal, confidential draft development document from Cloudmark and, which by Defendants' admission, had not been publicly displayed, especially in the context of the underlying exhibit. (*Id.*)

**C. Plaintiffs Are Likely To Prevail On Their Misappropriation And Contract Claims**

Plaintiffs have shown that they are likely to succeed on their misappropriation claims because (1) it is undisputed that there are "significant structural and functional similarities" between Plaintiffs' technologies and Vade's products, and (2) Plaintiffs have demonstrated evidence of Defendants' access to Plaintiffs' trade secret information. *U.S. Surgical Corp. v. Origin Medsystems, Inc.*, 1993 WL 379579, at *4 (N.D. Cal. Jan. 12, 1993) (granting preliminary injunction where "significant structural and functional similarities exist between [the products], and their history of creation suggest misappropriation"); *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 883 (N.D. Cal. 2018) (similarities in technology and facts showing defendant's access to trade secret information are sufficient basis for misappropriation claims); *Volans-I, Inc. v. SpektreWorks, Inc.*, 2019 WL 2300640, at *4 (N.D. Cal. May 30, 2019); (P.I. Mot. at 17–20).

Further, Defendants' misappropriation underscores Plaintiffs' likelihood of success on their contract claims at least because contractual obligations between Defendant Lemarié and Plaintiffs prohibit the improper use of Plaintiffs' confidential and trade secret information. (*Cf.* Opp. at 17–

18; *e.g.*, P.I. Mot. at 21–22.)  Separately, Defendants admit that Lemarié failed to return Cloudmark's confidential information upon his departure, and instead, ***destroyed*** the materials, in clear violation of his contractual obligations. (*E.g.*, Opp. at 16; Dkt. 72-6 ¶ 10 ("At some point after leaving Cloudmark, it came to my attention that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I do not recall exactly when this occurred . . . .").)  The harm resulting from Lemarié's breaches is irreparable. (*See* § II.D.2; P.I. Mot. at 22–23.)

### 1. Similarities Between Plaintiffs' Technologies and Vade's Products

Defendants do not dispute that Vade's products use or incorporate the technologies that comprise Plaintiffs' anti-spear phishing trade secrets. (*See* Opp. at 13 ("The fact that Vade uses such techniques and includes such capabilities is wholly unremarkable . . . .").)  Instead, Defendants contend that such use is common in the industry and "no way proprietary to Plaintiffs." (*Id*. at 13–14.)  Yet notably, Defendants have failed to show even one instance of any other cybersecurity product incorporating the same techniques and product capabilities, despite claiming they "are used industry-wide." (*Id.*)  Defendants could not even provide any documentary support (e.g., product guides, marketing literature, technical documents) that Vade's own products allegedly incorporated the features prior to Lemarié joining Vade. (*Cf.* Opp. at 13.)

To the contrary, the purportedly "novel approach" incorporated in Vade's NextGen MTA since late 2017, is the same approach developed by Cloudmark by mid-2016 under the supervision of Lemarié. (§ II.B.2.)  Because Defendants contend that Vade's "NextGen MTA is different in kind from other commercial MTAs," its similarities to Cloudmark's MTA technologies are particularly significant and ultimately fatal to Defendants' Opposition. (*Cf.* Opp. at 7, 15–16.)  In addition to the examples discussed in § II.B.2 and Dr. Nielson's Declaration (Ex. 1 ¶¶ 4–47), Mr. Séjourné, a former Cloudmark employee now at Vade SASU, described Vade's NextGen MTA as "provid[ing] customers with libraries of functions and features, each of which is ***extensible***. The libraries may be loaded into customers' ***policies***, allowing customers to achieve their specific goals. This also allows customers to implement changes locally and ***flexibly***, without requiring Vade SASU engineers to make those changes in the product upgrade lifecycle." (Dkt. 72-9 ¶ 26 (emphasis added).)  In fact, these design features have been part of Cloudmark's solutions since at least 2011.

(*See*, *e.g.*, Ex. 5 (Cloudmark Gateway Technology Roadmap, Jan. 2011) at 2 (*e.g.*, ███████████████████████████████████████████████████████████) (emphasis added); Ex. 6 (Cloudmark Security Platform for Email:  Administration Guide, Feb. 4, 2014) at 13, 19–20; Ex. 7 (Cloudmark Security Platform for Email:  Administration Guide, May 6, 2015) at 1 ████████████████████████████████████████████████████████████████████████████████████████████████████) (emphases added), 91–92; Ex. 8 (Cloudmark Security Platform for Email:  Administration Guide, Aug. 14, 2018) at 94, 106.)[10]

Moreover, ████████████████████████████████████████████████████████████████████████████████████, which Defendants now claim is "distinct" in the MTA context (*see* Opp. at 6), ██████████████████████████████████████████████. (Ex. 1 ¶¶ 43–44; Ex. 2 (Dec. 14, 2016 eml) at 2 █████████████████████████████████████████████████████████████████████).)  Thus, it is exceedingly likely that now, as Chief Technology Officer, Lemarié assisted Vade in overcoming the "significant technical challenges with respect to Golang[] and . . . validating [the] feasibility of using Golang for" the Vade's NextGen MTA (Opp. at 6) using the know-how and lessons learned from his work on Cloudmark's Trident years earlier.

### 2. Defendants' Access to Plaintiffs' Confidential & Proprietary Trade Secret Information

Defendants do not dispute that Lemarié and the other former Cloudmark employees (Xavier Delannoy, Alexandre Boussinet, and Guillaume Séjourné (collectively, the "Former Cloudmark Employees")) had access to Cloudmark's confidential information, including source code, while at Cloudmark.  It is similarly undisputed that Lemarié and the Former Cloudmark Employees became subsequently employed by Vade.  (Opp. at 7; *see also* Dkts. 72-3, 72-5, 72-6, 72-7, 72-8, 72-9.)  Moreover, Plaintiffs have presented substantial support (including internal documents and source code), that Lemarié and the other Former Cloudmark Employees had access to confidential information regarding the features, capabilities, and design of Cloudmark's Trident and MTA.  (*E.g.*, P.I. Mot. at 20.)  For example, Guillaume Séjourné, who served as Manager of Technical

---

[10] Notably, from 2010 through 2016, Mr. Séjourné's was employed at Cloudmark where his primarily responsible for technical documentation, including the types cited.  (Dkt. 72-9 ¶¶ 4–5.)

Publications at Cloudmark prior to joining Vade, contributed and managed the writing of the technical guides and manuals for Trident and MTA—a role that evinces, and in fact requires, a deep understanding of the features, capabilities, design, and operation of Cloudmark's anti-spear phishing and MTA technologies.  (Dkt. 72-9 ¶¶ 3–4 (*e.g.*, "At both Bizanga and Cloudmark Labs, my job duties focused primarily on documentation for end users and, on occasion, documentation for internal use.  I typically learned about products later in the design cycle . . . .").)  In late September 2016, Lemarié emailed a draft of Cloudmark's Trident Policy document to Mr. Séjourné and suggested that he review the appendices containing detailed technical information about the operation of Cloudmark's Trident solution.  (Ex. 9 (Sept. 27, 2016 Lemarié eml to Séjourné).)  Only a few days earlier, Adrien Gendre, the Chief Solution Architect of Vade SASU and Mr. Séjourné had spoken about job opportunities as a technical writer at Vade.  (Ex. 10 (Sept. 23, 2016 Gendre eml to Séjourné).)  And the very next day after receiving Lemarié's email with Cloudmark's Trident document, Mr. Séjourné was offered a job as Manager of Technical Publications at Vade SASU.  (Ex. 11 (Sept. 28, 2016 Séjourné job offer).)

Defendants' denial that Vade "poached," or otherwise targeted, Cloudmark employees is *contradicted* by the employees' statements, including in exit interviews and emails.  (Dkt. 72-6 ¶ 6 ("Around July 2016, Georges Lotigier [Vade President & CEO] reached out to me, suggesting that I join Vade Secure . . . .  In November 2016 . . . Georges Lotiger reached out to me again."); *cf*. Opp. at 7–8.)  The contradictions not only cast doubt as to Defendants' credibility, but also independently evince the need for immediate injunctive relief.  *E.g.*, *Comet Techs. U.S.A. Inc. v. Beuerman*, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) ("Plaintiff's concerns are justifiably heightened because of Defendant's conduct before his exit interview and Defendant's false representations to Plaintiff during Defendant's exit interview.") (discussing irreparable harm).  For example, Xavier Delannoy's exit interview states, "█████████████████████████████████████."  (Ex. 12 (May 26, 2016 Delannoy Exit Interview) at 1.)  This is consistent with an email he wrote to a colleague a month earlier, in which Mr. Delannoy explains that he was contacted directly by Vade and was not otherwise looking to leave.  (Ex. 13 (Apr. 26, 2016 email).)  A few days later, Alexandre Boussinet received a job offer from Vade.  (Ex. 14 (Apr. 28, 2016 email).)  Mr. Boussinet's exit

interview similarly notes that "███████████████" (Dkt. 30-22.)  Moreover, over a month before Mr. Delannoy left Cloudmark, he offered to introduce Guillaume Séjourné to Vade to explore potential employment opportunities.  (Ex. 15 (Apr. 14, 2016 email).)  Nearly eight months later, Mr. Séjourné left Cloudmark to join Vade SASU, where he immediately began contributing to Vade's relentless efforts to recruit Lemarié.  (*E.g.*, Dkt. 72-6 ¶ 6; Dkt. 72-9 ¶ 2.)

### D. Plaintiffs Did Not Delay Bringing Their Claims or Seeking Preliminary Injunction, And Will Suffer Irreparable Harm Without Preliminary Relief

#### 1. Plaintiffs Brought Their Claims and Moved for Preliminary Relief As Soon As Reasonably Practicable

Defendants also argue that Plaintiffs have no need for immediate relief, and are not entitled to preliminary injunction, because Plaintiffs purportedly delayed bringing suit or moving for preliminary relief.  (Opp. at 7–9, 18–19.)  But Defendants' argument is predicated on an inaccurate or incomplete timeline of precipitating events, and further disregards the time required to diligently investigate suspicion of wrongdoing.  Defendants point to a few early events—the June 2016 M3AWWG presentation, Lemarié's joining Vade, Inc. in February 2017, Vade's MTA used in competitive trials against Cloudmark in June 2017, the September 2018 publication of the application leading to the '579 patent, and Vade's June 2018 announcement of the Office 365 product—as indication of Plaintiffs' purported "unquestionabl[e] aware[ness]" of Vade's use of Plaintiffs' trade secrets.  (Opp. at 19.)  Setting aside that the June 2016 presentation did not address Plaintiffs' trade secrets (§ II.B.1), as a matter of timing, it could not have put Plaintiffs on notice or suspicion of the extent of Defendants' misconduct because it occurred before Lemarié (and Former Cloudmark Employees) joined Vade.  (*See, e.g.*, Dkt. 72-7 ¶ 2; Dkt. 72-8 ¶ 2; Dkt. 72-9 ¶ 2; P.I. Mot. at 15.)  Moreover, without more, Lemarié and other Former Cloudmark Employees' subsequent employment at Vade could not have triggered the discovery of the misappropriation or breach of contract, particularly where the Former Cloudmark Employees were released from non-compete obligations.  Ultimately, it was not, and could not been, a single, early event that caused Plaintiffs to discover the wrongdoing alleged in Plaintiffs' Complaint; instead, it was the unique combination of features and suspicious pattern of unlikely "coincidences" and similarities that reasonably led Plaintiffs to investigate Defendants' conduct, resulting in this suit.

In any event, Defendants' argument that Plaintiffs delayed in seeking preliminary injunction is contradicted by Defendants' own contention that Plaintiffs' request to enjoin Vade from releasing its NextGen MTA is "premature." (Opp. at 1, 19–20.)  They have pointed to no earlier event that could trigger Plaintiffs' awareness of Defendants' forthcoming NextGen MTA product.  After all, according to Defendants themselves, the NextGen MTA product "has not been released to the market" and has only "been under development since late 2017." (*E.g.*, Opp. at 15.)

Given the complexity of the technologies and trade secrets involved, as well as thoroughness of Plaintiffs' diligent inquiry, and even accepting Defendants' timeline—14 months (or fewer) is not unreasonable and does not constitute any delay in bringing suit.  And merely two months after filing their Complaint, Plaintiffs moved for preliminary relief through its detailed and well-supported motion. (*See* Dkt. 49 at 1 (Defendants moved to extend time to respond to Plaintiffs' "lengthy PI Motion . . . consist[ing] of 25 pages of briefing, 68 exhibits, two fact witness declarations totaling nine pages, and a 30-page expert declaration.").)  In fact, Defendants' contention that Plaintiffs delayed is belied by their request for over 100 days, or over 3 months, to simply respond to Plaintiffs' P.I. Motion.  (Dkt. 49; Dkt. 61; Nov. 8, 2019 Case Management Conference Hr'g.)  There is simply no delay by Plaintiffs, particularly considering the diligent investigation into complex technology.  *See, e.g., Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988).

> 2. <u>Plaintiffs Will Suffer Irreparable Harm If Preliminary Relief Is Not Granted</u>

In fact, Plaintiffs expeditiously conducted their pre-suit investigation and moved for preliminary relief as soon as practicable because they will suffer irreparable harm if Defendants' misconduct is allowed to continue. (*See also* P.I. Mot. 22–23.)  For example, Defendants cannot refute, and have offered no contrary argument, that Lemarié agreed his access to Plaintiffs Proprietary Information, including trade secrets, raises "unique" circumstances that call for equitable relief in the event of misuse or breach. (Dkt 31-8 ¶ 7; P.I. Mot. at 22.)

Vade's development and release of its NextGen MTA and partnership with Datto will unfairly increase market presence of Vade and its products that were developed using Plaintiffs' trade secret technologies.  In fact, Defendants concede that the purpose of the Datto partnership is

to increase market share and sales of Vade's Office 365 product.  (*See* Opp. at 20 ("The announced arrangement with Datto is merely another mechanism by which Vade will make such sales . . . .").)  If not enjoined, Vade's new products, partnerships, and sales/distribution channels will lead to irreparable harm to Plaintiffs at least because Vade will gain market exposure.  As a result, Plaintiffs will suffer risk of competitive harm and potential contraction of market share, whether through loss of directly competitive sales or reduced product synergies.  (Ex. 16 ¶¶ 8–15.)  *See, e.g., Comet Techs.*, 2018 WL 1990226, at *5; *Eldorado Stone, LLC v. Renaissance Stone, Inc.*, 2005 WL 5517732, at *4 (S.D. Cal. May 31, 2005).

Particularly because Vade's NextGen MTA shares similar design elements as Plaintiffs' MTA (§§ II.B.2, II.C.1), its release will likely result in potential loss of established and prospective customers, and goodwill.  (Ex. 16 ¶ 15.)  *Comet Techs.*, 2018 WL 1990226, at *5; *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016); *Lillge v. Verity*, 2007 WL 2900568, at *7 (N.D. Cal. Oct. 2, 2007).)  In any event, if Vade's NextGen MTA release were truly not imminent as Defendants claim, then Defendants should suffer absolutely no hardship from entry of the injunction.  (Opp. at 20.)  At the very least, Vade is in the best (and only) position to provide more clarity on the timing of the release.  Yet tellingly, Defendants refuse to do either.  (*See* § II.E.)  The uncertainty and opacity of Vade's NextGen MTA release plans exacerbates the urgency of Plaintiffs' request and need for Court intervention.

Defendants' contention that Plaintiffs "have made no effort to show a nexus" between Defendants' misconduct and the requested injunction is facially untrue.  (*Cf.* Opp. at 20); *see, e.g., Waymo*, 2017 WL 2123560, at *13.  Defendants have already agreed that the activities Plaintiffs seek to enjoin is the wrongful conduct described in Plaintiffs' Complaint.  (*See* Dkt. 31-52; Dkt. 31-68; §§ II.A, II.B.2.)  Defendants' related argument that monetary payment is sufficient is similarly misplaced.  Plaintiffs never licensed their MTA source code and design implementations to Vade.  (*See* Dkt. 30-42.)  Moreover, at the time of the license, Vade was not developing an MTA product intended to supplant Plaintiffs' offering and "destroy Cloudmark," like the situation now.  (P.I. Mot. at 11–12.)  In any event, Defendants' argument is erroneous as a matter of law; the mere ability to

pay money does not preclude a finding of irreparable harm.  *See, e.g., Pretty Punch Shoppettes, Inc. v. Hauk*, 844 F.2d 782, 784–785 (Fed. Cir. 1988).

Finally, Defendants mischaracterize the applicability of *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) to this case or Plaintiffs' arguments.[11] (Opp. at 18.)  Indeed, Plaintiffs never represented that that injunctive relief would or should necessarily follow from success on the merits as a matter of course.[12]  Instead, Plaintiffs' position, which is consistent with *Winter* and *eBay* as well as the cases after it, including in this District, is that further misuse or disclosure of a trade secret constitutes irreparable harm.  *Comet Techs.*, 2018 WL 1990226, at *5; *Brocade Comm'cs Sys.*, 2013 WL 890126, at *4; *Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, 944 F. Supp. 2d 775, 782–83 (N.D. Cal. 2013).  (P.I. Mot. 22–23.)

**E.  Plaintiffs' Request for Expedited Discovery Is Supported By Good Cause and Not Moot**

Contrary to Defendants' arguments, Plaintiffs' request for expedited discovery is not moot.  (*Cf*. Opp. 23–25.)  It is an uncontroverted fact that—**over two months** after the commencement of fact discovery and Plaintiffs' service of discovery requests, with only **44** business days remaining until the parties' Settlement Conference, **86** days after Plaintiffs moved for expedited discovery—Defendants have failed to provide any discovery.  Thus, Plaintiffs' request for expedited discovery is not at all moot and continues to be urgently needed for the reasons explained in Plaintiffs' P.I. Motion.  (P.I. Mot. at 24–25.)  Thus, expedited discovery is supported by good cause, especially in light of Magistrate Judge Kim's Order requiring the parties to complete substantial discovery prior to the Settlement Conference in February 2020.  (Dkt. 69.)

**III.  CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant its Motion for a Preliminary Injunction and Expedited Discovery against Defendants.

---

[11] As this District explained, *eBay* (like *Winter*) held that injunctive relief is not presumed upon a finding of success on the merits.  *Brocade Comm'cs Sys.*, 2013 WL 557102, at *5.

[12] Plaintiffs have shown they would suffer irreparable harm from Vade's new product releases and partnerships, as well as Lemarié's misuse of Plaintiffs' Proprietary Information, which he expressly agreed would call for equitable relief.  (*See also* P.I. Mot. at 22–23; Ex. 16 ¶¶ 12–15.)

DATED: December 20, 2019             Respectfully Submitted,

By /s/Sean S. Pak

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Iman Lordgooei (SBN 251320)
imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

JWC LEGAL
Jodie W. Cheng (SBN 292330)
jwcheng@jwc-legal.com
One Market Street
Spear Tower, 36th Floor
San Francisco, CA 94105
Telephone: (415) 293-8308

*Attorneys for Plaintiffs Proofpoint, Inc. and Cloudmark LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on December 20, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

Executed on December 20, 2019, at San Francisco, California.

            /s/ Jodie W. Cheng
            Jodie W. Cheng