1               UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3       Before The Honorable Robert M. Illman, Magistrate Judge

4

5   PROOFPOINT, INC., et al.,        )
                                     )
6           Plaintiffs,              )
                                     )
7   vs.                              )   No. C 19-04238-MMC
                                     )
8   VADE SECURE, INCORPORATED,       )
    et al.,                          )
9                                    )
            Defendants.              )
10  _____ )

11                                      San Francisco, California
                                        Friday, January 31, 2020
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 10:02 - 11:46 = 104 MINUTES

14

15  APPEARANCES:

    For Plaintiffs:
16                           Quinn, Emanuel, Urquhart
                               & Sullivan, LLP
17                           50 California Street
                             22nd Floor
18                           San Francisco, California
                               94111
19                      BY:  IMAN LORDGOOEI, ESQ.
                             SEAN SANG-CHUL PAK, ESQ.
20
                             JWC Legal
21                           One Market Plaza
                             Spear Tower, 36th Floor
22                           San Francisco, California
                               94105
23                      BY:  JODIE W. CHENG, ESQ.

24

25           (APPEARANCES CONTINUED ON NEXT PAGE)

2

APPEARANCES:  (Cont'd.)

For Defendants:
                              Baker & McKenzie, LLP
                              1900 North Pearl Street
                              Suite 1500
                              Dallas, Texas 75201
                         BY:  MACKENZIE M. MARTIN, ESQ.
                              WELDON B. RANKIN, ESQ.


Transcribed by:               Echo Reporting, Inc.
                              Contracted Court Reporter/
                              Transcriber
                              echoreporting@yahoo.com

3

1 <u>Friday, January 31, 2020</u>                               <u>10:02 a.m.</u>

2                     P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4          THE CLERK:  Court calls Civil Case Number C 19-

5  4238-MMC-RMI, Proofpoint, Incorporated, et al., versus Vade

6  Secure, Incorporated, et al.

7       Parties, please state their appearances for the record.

8          MR. PAK (telephonic):  Good morning, your Honor.

9  You have Sean Pak of Quinn Emanuel, on behalf of the

10 Plaintiffs, and with me is Iman Lordgooei and Jodie Cheng,

11 and from the client we have John Dials.

12         MS. MARTIN (telephonic):  Good morning, your

13 Honor.  This is MacKenzie Martin with the Law Firm Baker

14 McKenzie, and with me is my colleague Bart Rankin on behalf

15 of Defendants.

16         THE COURT:  All right.  Good morning, everyone.

17 We are here on three discovery letter briefs.  91, 92, and

18 93 are the document numbers, and let's get started with

19 document number one.

20      Obviously, the ruling on document number one is going

21 to affect where we go with number two and -- with 92 and 93

22 as well.  So let's get into the -- the issues regarding the

23 French Blocking Statute.

24      I'd like to hear from Defendants as to what of this

25 information originated in France.

4

1          MS. MARTIN:  Your Honor, the vast majority of all
2    of Defendants' documents and information are maintained and
3    stored in France or, to some extent, originated from France.
4    It's certainly true for the documents and information that
5    are sought by Plaintiffs' discovery request that issued
6    today.
7          THE COURT:  But with regard to the information,
8    there's a difference between where it's currently stored and
9    where the information originated, correct?
10          MS. MARTIN:  Correct.
11          THE COURT:  All right.  So with regards to the
12    information that's being requested, most of it is stuff that
13    originated in -- in the United States?
14          MS. MARTIN:  No.  No, your Honor.  Originated in
15    France.
16          THE COURT:  Okay.  And so let me hear from
17    Plaintiffs on that.
18          MR. PAK:  Yes, your Honor.  Sean Pak on behalf of
19    the Plaintiffs.
20       First of all, your Honor, we don't think that the
21    French Blocking Statute applies to situations where
22    everything is available in the United States.  We're talking
23    about a U.S. subsidiary, first of all, Vade, Inc.  We're
24    talking about an employee who is a U.S. resident, Mr.
25    Lemarie, about events that took place largely in the United

5

1 States in terms of his actions in what we believe constitute

2 trade secret misappropriation.  All of that information is

3 available currently in the United States through either

4 electronic access or through physical locations of documents

5 and witnesses in the United States.

6     So, as an initial matter, we don't believe that most --

7 the vast majority of the information will implicate

8 documents or issues that are unique to France.

9        THE COURT:  Because you think that the production

10 of those documents won't involve France?

11        MR. PAK:  That's right, your Honor.  And I think

12 Judge -- many of the jurisdictions that have resolved this

13 issue on behalf of ordering discovery have looked at

14 availability of that information and witnesses through the

15 U.S. channel.  So it's not an extra-territorial act to have

16 U.S. discovery of information that is already present and

17 available in the United States.

18     And so all this, whether we're talking about source

19 code, emails, electronic repositories, those are all

20 available through the Vade, Inc. subsidiary in the United

21 States and would also be available through Mr. Lemarie,

22 who's also a U.S. resident.  We think, first of all, the

23 vast majority of things are already accessible in the United

24 States, not applicable.  But, more importantly, your Honor,

25 if I may just raise one issue, if you read the Defendants'

6

1  statements, they make the statements that a party that

2  produces documents or information in violation of French

3  law, that party exposes itself to both civil and criminal

4  penalties.

5      In this case, in the context of the preliminary

6  injunction motion that we brought, the Defendants have

7  voluntarily submitted six witness declarations, including

8  some four French employees, talking about French documents,

9  French products, events that took place in France.

10      So we believe that this shows that there is no risk of

11  any violation or prosecution of any type of French Blocking

12  Statute because the Defendants have engaged in self-serving

13  one way discovery in this case.  So we think we are already

14  past any concern about the French Blocking Statute because

15  of the actions of the Defendants, and what we're looking at

16  now is by imposing a unilateral process by which only our

17  ability to conduct discovery from the Defendants would be

18  subject to this procedure, we would be adding delay, costs,

19  and even potentially obstacles to our ability to obtain

20  important discovery in this case which would be one way.

21          THE COURT:  Well, let me ask you about that.  So

22  if I determine that the French Blocking Statute is not

23  applicable here or that you've met the factors to -- to

24  essentially override that statute and allow you to receive

25  that information, what about the EU privacy requirements?

7

1  What is it within what Defendants are asking that would

2  cause extra delay or slow down what you're trying to do?

3          MR. PAK:  Yes, your Honor.  So I think that there

4  are a couple of things here.  One is just as a principle

5  overall of GDPR and U.S. -- and the European privacy laws,

6  that issue was resolved in the <u>Sinjin</u> case where the

7  District Court stated that unless you have a very specific

8  issue that implicates those privacy concerns, that in and of

9  itself is not a basis to deny U.S. discovery style rules

10 with respect to a U.S. dispute.

11     If there are truly very specific concerns, for example,

12 we're looking at a very private information that is

13 confidential to a French employee that has nothing to do

14 with his or her employment with the company, there the

15 Defendants concerned move for a protective -- a limited

16 protective order that seeks to protect that type of private

17 confidential information.  They have not sought to do that

18 in this case.  We have not received any type of protective

19 order motions from the other side, and with respect to all

20 the discovery that we have served, we believe that these do

21 not implicate any type of privacy concerns by the European

22 Union or France.

23     So, to the extent that as we go through this case we

24 have any specific privacy issues that arise, we think the

25 proper mechanism is for the Defendants to file a limited

8

1 protective order that seeks to protect that very limited

2 class of information, and then we can deal with that on a

3 case-by-case basis.

4         THE COURT:  Well, let me ask Defendants about

5 that.  So if I determine that the French Blocking Statute's

6 not going to apply in this case and you have put forth in

7 your -- your protective order -- your requested protective

8 order these -- the inclusion of the GDPR language, is there

9 anything in that that would slow down the production or

10 cause it to -- to be unnecessarily delayed, and what are the

11 protections that you're specifically looking for?

12         MS. MARTIN:  Your Honor, the Defendants' requests

13 in this regard are so broad they will necessarily involve

14 getting employees' email and things of that nature from

15 employees from -- who are currently based in France.  And

16 we've already seen this issue arise, for example, with

17 respect to our initial disclosures where we had to be sure

18 that we were properly following protocol with respect to

19 consent from employees to ensure that we could disclose

20 certain information about those employees in the initial

21 disclosures since, yes, we do think that privacy concerns

22 are an issue here, which is why we think it's important for

23 the ESI order and the protective order to at least

24 acknowledge the GDPR and potential privacy laws that apply

25 to make sure that their protection is there.

9

1          THE COURT:  So your ESI proposal and your

2    protective order proposal order, with the exception of like,

3    you know, the 30 days and four days and all that kind of

4    stuff, it's just a couple of lines, correct?

5          MS. MARTIN:  That's correct.

6          THE COURT:  And what are those lines?  What --

7    what does that change by having those lines in there,

8    practically speaking?

9          MS. MARTIN:  I think it provides an acknowledgment

10   that in addition to the orders in this case and the Federal

11   Rules, which we all know govern this case, because there are

12   -- because there's foreign entity at play and its employees

13   at play, it recognizes that other laws are also at issue

14   here, including the GDPR, foreign privacy laws, and the

15   French Blocking Statute.

16         THE COURT:  So let me ask Plaintiffs then, that

17   acknowledgment, what practical effect does that have that

18   concerns you so much?

19         MR. PAK:  Your Honor, I don't think the

20   acknowledgment itself is necessarily problematic.  It's that

21   to the extent that the Defendants are relying on that to

22   prohibit us from obtaining discovery overall with respect to

23   the issues, emails, documents relevant to this case, that's

24   really where the concern is, your Honor.  And the courts --

25   the Northern District of California courts have addressed

1  this issue in the <u>Sinjin v. V. Scaler</u> case that we cited,

2  and it is clear that it is not clear -- this is what the

3  Court found in that case:

4              "It's not clear to what extent the

5              UK's interests in privacy is implicated

6              as Defendant states that GDPR permits

7              the discovery of personal data to that

8              which is objectively relevant to the

9              issues being litigated.  Thus,

10             considering the significant American

11             interest in protecting its patents and

12             the reduced UK interest in protecting

13             the privacy of their citizens, the Court

14             concludes that this factor weighs

15             heavily in favor of disclosure."

16      So even when GDPR as an issue has arisen in the context

17  of some type of blocking statute, the courts have

18  acknowledged that there is a significant overriding American

19  interest in having documents, emails, information relevant

20  to the case being produced.

21      To the extent -- as I indicated, your Honor, to the

22  extent there are issues or documents that need to be

23  protected from discovery because they are completely

24  unrelated to this investigation --

25             THE COURT:  Well, I -- is it your contention -- is

1 it your contention then the additional language that they're

2 requesting would allow them to refuse to turn over documents

3 or delay them in some manner?

4          MR. PAK:  Not with respect to documents that are

5 relevant to the case, your Honor, but I think an

6 acknowledgment that GDPR is something that they could seek

7 protection under for very specific categories of documents

8 that implicate privacy interests which are not related to

9 the issues in this case, we would be okay with that, your

10 Honor, but I -- but I think the concern that we have is that

11 having some language that is untethered to an overriding

12 focus on getting the discovery that we need --

13          THE COURT:  So if we --

14          MR. PAK:  -- could be problematic --

15          THE COURT:  -- if we modified that language --

16          MR. PAK:  -- and we don't want to have, obviously,

17 some --

18          THE COURT:  If we modified that language to -- to

19 exclude the relevant information, then you would be okay

20 with that?

21          MR. PAK:  That's right, your Honor.  That's

22 exactly right.

23          THE COURT:  And what do Defendants think about

24 that?

25          MS. MARTIN:  Your Honor, the suggestion is to

1  modify Defendants' proposed language to exclude information

2  that's relevant in this case?  Do I have that correct?

3          THE COURT:  Yes.

4          MS. MARTIN:  Well, I don't think that completely

5  addresses or concern because information that's relevant in

6  this case may very well be subject to these foreign

7  concerns.

8          THE COURT:  But you --

9          MS. MARTIN:  I mean, as I mentioned earlier --

10          THE COURT:  But you -- if it's relevant, you'd

11  still be required to produce it.  So -- so what -- what

12  difference would that make for you?

13          MS. MARTIN:  Well, with respect to the French

14  Blocking Statute that we -- it provides us with the

15  appropriate procedural mechanism that both France and the

16  United States have signed onto to facilitate that process

17  and make sure that Defendants are not going to be subject to

18  criminal penalties.

19      And I think, going back to Mr. Pak's point earlier, you

20  know, just kind of focusing on the notion that the documents

21  and information requested here do indeed originate in France

22  and we have declarations to support that, although we

23  haven't been able to submit those as of yet, in the

24  practical matter that proceeding under the Hague, under

25  Article 17, imposes no undue delay on the process and,

13

1  therefore, no prejudice.  You know, it's our position,

2  Defendants' position that we should be allowed to proceed

3  under the Hague and the parties should be ordered to proceed

4  under the Hague to ensure that the minimal delay doesn't

5  override the overall pressing issue that we want to avoid

6  potential criminal penalties here.

7          THE COURT:  And so let me ask Plaintiffs on that.

8  Is that your understanding, that the -- proceeding under the

9  Hague would have minimal delay on the production of these

10  documents?

11          MR. PAK:  No.  Absolutely it's the opposite, your

12  Honor, and I think the courts throughout -- throughout the

13  country that have addressed this particular issue have

14  recognized this.  This is the Outer Desk case that we cited,

15  2015 W.L. 1928, 184:

16              "Hague procedures are not an

17              effective alternative because these

18              procedures may limit discovery to

19              exclude relevant information and

20              concerning France in particular, is

21              particularly slow and often the results

22              are unsatisfactory."

23      And one of the major issues of disagreement that we've

24  had in trying to work through this issue, your Honor, with

25  the other side is access to source code.  We know this is a

14

1 trade secret case where at the end of the day we will need

2 access to the source code of the accused products to

3 determine whether trade secret misappropriation has

4 occurred.  And so far, they have not made any assurances

5 that those source code files will be produced under U.S.

6 discovery rules and not subject to some unfettered

7 discretion by some commissioner or appeal process in France.

8 So, just imagine the amount of delay and cost and expense

9 incurred in mitigating over the production of source code

10 under some unspecified French rules when that same source

11 code was -- has been accessible in the United States through

12 the subsidiary, Vade, Inc., was written by Mr. Lemarie as a

13 U.S. resident through electronic access, and then maintained

14 in we believe U.S. servers through various code hosting

15 repository programs.

16     So we think that just -- just the fact that we've

17 engaged in a negotiation process that has taken months to

18 resolve and has not been able to resolve all these issues

19 that we have, furthermore, having a commissioner who's going

20 to be weighing in on various discovery issues alone would

21 impose costs and delay through this process.

22     So I think because of that, various courts, including

23 the Outer Desk court but also another case cite that we

24 provided from the Central District of California, the Connex

25 RR, LLC case, states that:

1              "The standard for discovery in

2          France under the Hague Convention is

3          narrower than that under FRCP."

4      So all the courts have recognized both substantively

5  that the scope of discovery that's available in France is

6  narrower and that going through the Hague Convention process

7  is extremely slow and costly.  And, again, you know, these

8  are factors that we believe strongly suggest that we avoid

9  this process.

10     And -- and, your Honor, I haven't -- we really don't

11 understand the position here because the Defendants have

12 provided written declarations under the penalty of U.S. law

13 from six French employees regarding the subject matter of

14 this case.  So when it comes to discovery that they would

15 like to inject into the case that favors their position,

16 they've given no regard to the French Blocking Statute.

17     So we -- if any kind of Article 17 procedure is used,

18 it would only govern our ability to conduct discovery with

19 respect to our claims, and they have also brought

20 counterclaims against us, which prevent our ability to

21 defend ourselves against their counterclaims will be

22 prohibited or at least restricted through this procedure in

23 a one-way street, and we just don't believe that the French

24 Blocking Statute or the Hague Convention should be used as a

25 sword and a shield.  Clearly, they have disregarded these

1  issues when it favors them, and I've already put in written

2  declarations, which means that if truly there is a -- if

3  it's a violation to provide information or documents

4  relating to French matters in a U.S. proceeding, they've

5  already violated those statutes in this case.  So we -- we

6  think this is -- this is not a legitimate concern.  We -- to

7  the extent there are legitimate concerns down the road where

8  very specific French issues are implicated with respect to

9  documents or information that is not relevant to this

10 investigation or case, then they can seek a limited

11 protective order in those unusual circumstances to deal with

12 that.  We think that's the proper mechanism.

13         THE COURT:  And can you -- could -- if -- if you

14 have any -- if we put it under the GDPR and we have any

15 issues that come up, couldn't we manage those by letter

16 briefs, I mean, in terms of the delay that you describe?

17         MR. PAK:  With respect to very specific issues,

18 your Honor.  But we don't think -- if you look at the cases

19 that we looked at, the V. Scaler case in particular, issues

20 that are relevant to the case, documents that are relevant

21 to the case, the courts have said GDPR is not a concern,

22 that discovery should be continued and that we should have

23 access to relevant documents.

24     What we're talking about, your Honor, is if there is

25 some set of documents that for whatever reason are not

17

1  related to this case that are at issue and they're raising a

2  GDPR concern, then certainly we could deal with that through

3  a letter brief process on a very individualized basis.  But

4  just saying that because these emails were written by French

5  employees and, therefore, raise some GDPR concern, that --

6  that issue has already been resolved by the courts to say

7  that that's not a concern as far as relevant documents and

8  relevant emails.

9        THE COURT:  All right.  Let me hear from

10  Defendants on that.

11        MS. MARTIN:  Thank you, your Honor.  Well, there

12  are a lot of -- there's a lot of ground that's been covered.

13  If I can respond to a few of those points.

14      Mr. Pak raised the Cathode Ray Tube case as an example

15  of the French authorities or the procedure under the Hague

16  taking an inordinate amount of time.  But this case relates

17  to proceeding under the Hague under Chapter 1, not under

18  Chapter 2.  Chapter 1 is what we all kind of traditionally

19  think of as being the letters of request or letters rogatory

20  process that a lot of courts, including the litany of cases

21  cited by Plaintiffs in their briefs all relate to this

22  Chapter 1 proceeding.

23      Chapter 2 is not as well known.  Now, Chapter 2 under

24  Article 17, we can proceed with an independent private

25  commissioner who because they are, you know, a private party

18

1 or a private attorney and not part of the judiciary, they

2 are able to devote the attention and time to these issues,

3 which allows it to proceed much faster.

4      And, specifically, the parties have had quite a bit of

5 back and forth, and at every turn, Defendants have always

6 maintained and it's our understanding that proceeding under

7 Chapter 2 and Article 17 is very flexible.  It provides the

8 parties with substantially equivalent if not equivalent

9 discovery that we would otherwise get under the Federal

10 Rules, and the only delay that we're aware of is the minimal

11 time that it will take for this Court to issue a letter of

12 request or a request to the international authorities to

13 appoint the commissioner.  Once the commissioner is in

14 place, discovery proceeds in the approximate or same time

15 line as what is described under the Federal Rules.  And, in

16 fact, even as recent as this week, the parties have been

17 exchanging letters and potential proposals in this regard,

18 and Plaintiffs sent over a counter-proposal with respect to

19 delays where they said -- and I quote -- "to eliminate the

20 risk of potential delays associated with the commissioner's

21 participation, we propose" -- and they set forth a procedure

22 where the parties would simultaneously serve and exchange

23 requests, objections, responses and production on each

24 other, as well as the commissioner.  Therefore, were able to

25 proceed under the Federal Rules with respect to timing, and

19

1  we can agree to that approach.  And so any -- any indication

2  that we're going to have massive delays due to Article 17

3  and the approach of the commissioner is essentially not

4  true.

5       THE COURT:  Let me ask -- let me -- I'm sorry to

6  interrupt you, but let me ask Plaintiff directly on that,

7  just a short answer.  Do you believe that you'd be entitled

8  -- that you'd be able to get the same stuff that you'd be

9  entitled to under the Federal Rules of Civil Procedure

10  through that procedure, and do you believe that the time --

11  timing of it would involve delay?

12       MR. PAK:  No, your Honor, because, as we indicated

13  in our letter, first of all, that procedure has not been

14  agreed to by the other side.  What we have discovered is

15  that their position has been any -- any issue that

16  implicates French law can be appealed through the French

17  courts.  They have not consented to final resolution of

18  discovery issues in the U.S. courts.

19     With respect to the French commissioner, he or she

20  would have the ability to approve the production of the

21  code, any source code in this investigation.  So what that

22  means is even -- it's a two-month process just to get the

23  commissioner in place.  Once we have the commissioner in

24  place -- and we don't know who that person may be -- if we

25  get into a dispute about whether --

20

1          THE COURT:  All right.  All right.  Hold on.

2          MR. PAK:  -- a particular source code is

3   relevant --

4          THE COURT:  Hold on.  Let me cut you off because

5   we had -- I had cut off Ms. Martin when she was making her

6   arguments, and --

7          MR. PAK:  Oh, sure.  I'm --

8          THE COURT:  -- so your answer is you don't agree

9   with it, and no.  So let me get back to Ms. Martin, and let

10  her finish her argument, please.

11         MR. PAK:  Sure.

12         MS. MARTIN:  Thank you, your Honor.  So I know Mr.

13  Pak indicated that the parties haven't reached agreement on

14  that -- that particular proposal on timing, but, just to be

15  clear, Defendants are willing to agree to that provision on

16  timing.  So hopefully that puts that concern to rest.

17     Mr. Pak also raised concerns about the declarations

18  that have been introduced in the context of the preliminary

19  injunction briefing.  Now, our understanding is under French

20  law, the steps that Defendants have taken are completely

21  appropriate, and we do have a declaration from the French

22  lawyer who's familiar with the French Blocking Statute and

23  the Hague to attest to that very fact.  And so our actions

24  are entirely consistent with French law, which is what --

25  you know, which is the reason we're all here today.

1    Now, going back to the point on source code and scope

2 of discovery, our understanding under the Article 17

3 approach with the commissioner is that as long as the

4 parties reach agreement on production, the commissioner

5 typically, if not always, will approve that approach.  And

6 so we have no indication from anything we've read or

7 anything that we understand to indicate that the

8 commissioner would hold up the production of source code or

9 of any documents that are requested here, and in case I

10 didn't say it earlier, Defendants are more than willing and

11 ready to participate in discovery, and we have fully

12 demonstrated that willingness from the outset of the case.

13 We are simply asking that we proceed under Article 17,

14 which, in our view, imposes a very very small hurdle for the

15 parties to get over.

16    Now, one other point Mr. Pak made, if it's okay, your

17 Honor, is with respect to French appeals.  That is really of

18 no concern here, and here's why.  The reason is Defendants

19 have already agreed that to the extent there's any issue

20 with respect to either party being able to obtain any

21 discovery that's necessary to prove up any of their claims

22 and defenses, that that dispute should be taken to -- to

23 you, your Honor, to the magistrate judge overseeing

24 discovery in this case.  And so that should really be of no

25 moment.

22

1       But on -- with respect to the French judiciary, one
2   point that is worth mentioning is Plaintiffs know that
3   French law governs here.  Plaintiffs themselves already
4   initiated a seizure action in France seeking documents and
5   information that overlap with the request at issue today,
6   and they did so prior to making the request in this case.
7       Now, in initiating the French seizure action, they not
8   only demonstrate their understanding that French law applies
9   to these documents, but they have also submitted this very
10  issue to the jurisdiction of the French judge.  And so
11  Plaintiffs themselves have created a situation where this
12  Court is faced with making a decision that could conflict
13  with the orders of the French judge already overseeing this
14  issue.  Currently, those documents in France are being held
15  in escrow by order of the French judge, and I think another
16  related point is that in all of the authorities that
17  Plaintiffs point to in this case, we're not aware of any
18  involving those kind of circumstances where the French
19  authorities are already focused and, in fact, overseeing the
20  very issue -- or the very documents and seizure or discovery
21  of those documents.
22          THE COURT:  So for Plaintiffs, what about that,
23  the point by Defendants related to, you know, that this
24  Court would be able to resolve any of those issues if you
25  guys were to enter into an agreement as she described?

1          MR. PAK:  I think, your Honor, it's very difficult

2     to know exactly what that means because we have a French

3     commissioner who would be involved.  In all the letter

4     briefs to us, they have indicated that with respect to any

5     particular issue, they reserve the right to seek

6     intervention from French courts.

7          I understand now for the first time that she is willing

8     to state that discovery issues would be litigated here in

9     the U.S., but, again, your Honor, without knowing what the

10    dispute is and, for example, if it involves the discretion

11    of the French commissioner, at this point it's unclear

12    whether they are willing to subject themselves 100 percent

13    to your jurisdiction, and so --

14         THE COURT:  In other words -- in other words, if

15    the French commissioner makes a decision and then you guys

16    disagree with it and you letter briefed it to me and then I

17    reviewed the decision and the -- and the merits of what was

18    brought before them, that would be something that you'd be

19    okay with?

20         MR. PAK:  I'm not sure, your Honor, because we

21    don't really understand what the issue would be by the

22    French commissioner.  It may be that the French commissioner

23    may be raising issues that may not be addressable here.  We

24    don't -- we don't understand what the issues could be.

25         THE COURT:  Well, I mean, if you've got --

24

1          MR. PAK:  But without knowing the contours of

2    that, your Honor --

3          THE COURT:  If you've got -- if you've got an

4    agreement from the other side that the issues would all be

5    reviewable here, I mean, would that -- would that assuage

6    your fears?

7          MR. PAK:  You know, we -- we're really not sure at

8    this point, your Honor, because we don't understand what the

9    role of the French commissioner would be.  And, again, if --

10   if we're taking all these steps to make -- make everything

11   subject to U.S. rules, we don't understand why we need to

12   incur the costs and delays.  You know, if really what --

13   what they're saying is is there's no need to have any type

14   of French review and they're subjecting themselves to 100

15   percent jurisdiction by the U.S. authorities and U.S. court

16   rules, then -- and with respect to we still haven't heard

17   why they were permitted to provided written declarations

18   with respect to the preliminary injunction motion whereas

19   they are refusing to provide any discovery with respect to

20   our discovery request.

21        So we don't understand why we would need to go through

22   this formality of having any of this if, in fact, they've

23   already submitted written declarations in discovery and

24   information in this case that implicate French products,

25   French employees, French events.  This is just a one-way

1  obstacle that we would need to come back to your Honor with

2  respect to regular course of conduct.  It would be no

3  dispute in a normal U.S. proceeding as to the production of

4  source code in a trade secret case.  Yet we would have to

5  incur the delay of having to litigate that issue in front of

6  a French commissioner, have the commissioner -- we'd incur

7  the cost of paying for that commissioner's time, and

8  whatever delay that imposed, then we would have to come back

9  to your Honor and have to provide written submissions and go

10 through potential weeks of delay.  We just don't understand

11 why this is necessary.

12      And so, again, if the -- whatever the blocking statute

13 allowed them to provide written declarations in this case,

14 if that's the scope, then we don't understand why we can't

15 just proceed with the U.S. discovery and allow for in the

16 limited cases where there may be some exceptional situation

17 where -- whether it's GDPR or some very specialized French

18 issue is raised, then we think the appropriate vehicle is

19 for them to file a limited protective order on that

20 particular issue, and then we can go through the letter

21 writing process, your Honor.  But we just think at this

22 point, given everything, if she's truly saying there's no

23 French discretion, no need for the French courts to be

24 involved, the French commissioner really has no discretion

25 over the production of the source code, then why go through

26

1  the formality of that?  That -- that's to us is -- is the

2  basic disagreement that we have with the other side.  If

3  truly what they're offering on the table is complete

4  jurisdiction, oversight by you under U.S. discovery rules,

5  then why proceed with an alternative procedure?

6        THE COURT:  Let me ask Defendants that.  Why

7  proceed with an alternative?  Is that because of your

8  concern regarding the requirements under French law?

9        MS. MARTIN:  Yes, your Honor.  It's simply because

10  we need to comply with French law and not risk the criminal

11  penalties, and on that point, you know, there is increased

12  scrutiny with respect to the French Blocking Statute.  It's

13  getting quite a bit of attention.  And even Plaintiffs' own

14  firm has written articles about that fact.  And so with

15  that, with the increased scrutiny and attention to the

16  statute as well as the fact that distinguishes us from a lot

17  of these other cases in that we are already litigating this

18  case before a French judge, and so the French judiciary and

19  the French authorities are already tuned into this issue, we

20  think that that interest is very great here to ensure,

21  especially given the very minimal imposition that -- that we

22  should proceed under the French Blocking Statute and comply

23  with the law.

24        THE COURT:  Well --

25        MS. MARTIN:  Now --

1          THE COURT:  -- let's talk about the different

2    factors then if -- if -- you know, I'm going to take a look

3    at the different factors that I need to take a look at to

4    determine whether or not French law will supersede the

5    ability to proceed here looking at, for example, the

6    importance of the documents to the litigation and

7    specificity of the request.  Talk about those factors,

8    please.

9          MS. MARTIN:  Sure.  So, your Honor, with respect

10   to the importance of the documents to the litigation and the

11   specificity of requests, if we have broad generalized

12   requests for information, those generally weigh in favor of

13   utilizing Hague procedures, and that's according to the Salt

14   River case as well as Ridgemart's case.

15        If you look at the requests, we have some requests that

16   relate to all documents, communications, and things relating

17   to a product, including all releases of those products,

18   whether or not those releases are at issue here.  And, just

19   to give you some insight into the facts and why that

20   matters, we have products at issue in this case referred to

21   us as NTA in the discovery request, and the request -- for

22   example, request for production number four asking for

23   release notes, instruction manuals, technical spec

24   documents, including all drafts relating to the Vade NTA and

25   source code relating to the Vade NTA from request for

28

1  production number two, including all versions or releases of

2  the Vade NTA, there are different versions of the Vade NTA,

3  and some of those were released before any of the issues in

4  this case arose, and so those -- that source code, I hope

5  Plaintiffs would agree, but is certainly not critical to

6  this case, and I think it's a strong example of how broad

7  these requests for production really are.

8            MR. PAK:  So, your Honor, if I may respond to

9  those points.

10           THE COURT:  Yeah, please respond.  And so what

11  we're talking about right now is sort of like points one and

12  two of the different factors that the Court's --

13           MR. PAK:  Absolutely, your Honor.  So all of our

14  discovery requests are specifically targeted to the

15  technology area's products, employees who have been

16  implicated in the Trade Secret Misappropriation Act.

17  There's no question that source code, technical documents

18  with respect to the accused products are highly relevant and

19  cannot be obtained other than through the discovery process

20  under the U.S. rules.  For example, with respect to the

21  issue that -- this issue raised with respect to older

22  products, in order to ascertain the changes that occurred in

23  the Vade NTA products, we need to look at not only what was

24  added but what existed before these employees were hired

25  away from our company and had access to our information.  So

1  that is normal course of conduct in a trade secret case to
2  look at the delta between what product information existed,
3  source code that existed prior to the acts of
4  misappropriation, and use that as a baseline to compare it
5  against against the new products that were developed.
6       So we think all of the discovery that we've asked for
7  are squarely within the normal course of discovery in a
8  trade secret case, and the importance of this discovery is
9  -- is really at the very essence of our case.  Our case is
10 that they have taken source code level trade secrets from us
11 through the hiring of these employees and the very people
12 that developed these generations of products at our company
13 are now developing these products within the confines of --
14 of Vade.
15      And so when we get to all these issues of looking at
16 where source code is produced, you know, they've -- they've
17 put constraints on where source code could be made
18 available, having this kind of extra-judicial review by the
19 commissioner of whether source code should be produced or
20 not, you know, that is all going to lead to delays and
21 costs, your Honor, that we think is unnecessary in this
22 case.
23      THE COURT:  All right.  Well, let's get to the --
24 let's keep going through the factors.  Let's start with
25 Defendants and talk about number three, the origin of the

30

1  information, location of the information and party.

2          MS. MARTIN:  Oh, sorry, your Honor.  I thought you

3  had asked the Plaintiffs.

4      Well, as I mentioned earlier, it's Defendants' position

5  that all of the documents and information issued here

6  originated in France.

7          THE COURT:  All right.  And let me hear from -- so

8  this is what we're going to do.  We're going to go through

9  those factors.

10         MR. PAK:  Yes.

11         THE COURT:  We're going to hear from each side.

12         MR. PAK:  Yes, your Honor.  So with respect to the

13  third --

14         THE COURT:  That way we --

15         MR. PAK:  -- factor, that's absolutely not true.

16  We know that Mr. Lemarie is a U.S. resident.  We know that

17  his acts of misappropriation occurred while he was domiciled

18  in the United States and had access to the code for both

19  Proofpoint while he was an employee there, but also when he

20  joined Vade, he became an employee of the Vade, Inc. U.S.

21  subsidiary.  So the acts of misappropriation by Mr. Lemarie

22  and his introduction of our trade secret into Vade all

23  occurred in the United States.  He has constantly accessed

24  confidential information of our company while he was here in

25  the United States, which is highly germane to the issues of

1   our trade secret case, and after he joined Vade, he still

2   remained in the United States and conducted business here in

3   the United States.

4        So we think actually the vast majority of documents not

5   only are -- originated in the United States but also are

6   based here.  And also with respect to the origination

7   question, your Honor, as Ms. -- as we've seen in these

8   cases, the question isn't where the information originated.

9   The question is are the information and documents readily

10  available in the United States, and we think that the vast

11  majority of documents, emails, source code are already

12  available in the United States through electronic access at

13  Vade, Inc., which is a U.S. subsidiary that's located here

14  in the Bay Area.

15       So on this issue, there's no question that the -- that

16  this factor weighs heavily in favor of not going through the

17  Hague process.

18           THE COURT:  All right.  Let's talk about the

19  availability of alternative means of securing the

20  information.

21           MS. MARTIN:  Your Honor, if I may briefly respond

22  to some of Mr. Pak's points on -- on the prior factor.

23           THE COURT:  All right.

24           MS. MARTIN:  So we have gone through these

25  requests with our client.  We have talked to French lawyers.

32

1  We have an opinion from a French lawyer who has also

2  reviewed the request and is willing to attest that the

3  documents and information sought here originated in France

4  and are subject to the French Blocking Statute, and we

5  definitely do not agree with Mr. Pak's conclusory statements

6  made just now in regard to accessing Plaintiffs' documents

7  or information.  I mean, there's just not evidence of that

8  in the record, and -- and we dispute those points.

9          THE COURT:  All right.

10         MS. MARTIN:  Now, in regard to the availability of

11 an alternative means of securing information, the Court has

12 little to no reason to require a party to violate foreign

13 law if the information sought can easily be obtained

14 elsewhere.  And as seen in the Salt River case, you know,

15 the -- this alternative under the Article 17 procedure with

16 the commissioner involved is a -- a perfect alternative

17 means of securing the information that is substantially

18 equivalent to what the parties would have under the United

19 States laws.

20         THE COURT:  All right.  I'll hear from the

21 Plaintiffs on that.

22         MR. PAK:  Your Honor, even under the Salt River

23 case, we'll note that the French -- or the Canadian

24 subsidiary of the Defendants was expressly carved out from

25 any type of treatment under the Hague Convention.  And so,

1 just to clarify, we have multiple parties at issue here,

2 your Honor.  So we have Vade SASU, which is the French

3 company.  But we have Vade Secure, Inc., which is resident

4 here in the United States, formed under the laws of the

5 United States, and we have Mr. Lemarie who is a U.S.

6 resident doing work here in the United States.

7     So, at a minimum, we don't think those entities and

8 parties should be subject to any type of alternative

9 proceeding.  But, even with respect to the French company,

10 your Honor, we've gone through now all the potential issues,

11 whether it's the two-month plus delay in selecting a

12 commissioner, having some unfettered discretion by the

13 commissioner with respect to the production of very

14 important discovery in this case, source code, and then

15 having the extra costs and delay associated with resolving

16 those disputes.

17     And, although we've heard for the first time that --

18 that Defendants are willing to subject themselves entirely

19 to U.S. appeal process, we've never seen that in writing

20 before.  We don't understand the contours of that given

21 their reservation of rights in various procedures, and I

22 think that, you know, in the Ridgemart case, we see that the

23 -- it really has to be substantially equivalent to the

24 discovery mechanism process, and if you just think about the

25 process that we've been discussing, the extra costs, the

1   extra delays, the extra injection of this judicial -- or

2   extra-judicial review by the commissioner, that is not an

3   equivalent process.  And so I think all -- you know, given

4   everything that -- that is at issue in this case, we have a

5   preliminary injunction motion where time is of the essence.

6   We also have a settlement conference in front of Judge Kim

7   that's scheduled for March where she has instructed the

8   parties to conduct discovery on an expeditious basis in

9   order to allow for that settlement conference to occur.

10       Given all these factors, your Honor, we're just not

11  looking at the same or equivalent process.  We're looking at

12  a very one-sided process that --

13           THE COURT:  Well, I mean, in terms of the

14  settlement conference and in terms of the motions deadlines,

15  I mean, obviously there may be some delay with that

16  procedure where everything would be subject to my review,

17  but certainly -- certainly there would be an expectation

18  that documents would be forthcoming.  There would be

19  responses made in a fairly quick manner.  I understand you

20  don't know the contours of -- of how all that might operate

21  at this point, but I imagine you can envision a mechanism in

22  which you guys would be getting stuff rolling out pretty

23  immediately, right?

24           MR. PAK:  It's possible, your Honor, but it's also

25  possible that we could end up in, you know, one letter brief

35

1    after another in front of your Honor.

2          THE COURT:  Right.

3          MR. PAK:  And that's the concern that we're having

4    is that we -- we need to move quickly in this case, and I

5    think that --

6          THE COURT:  Well, I mean, what I'm thinking about

7    is, I mean, let's say you did that process, right, and that

8    you guys like within a week or so came up with -- you guys

9    could like meet and confer and figure out a process and come

10   up with that, make a stipulation that you guys are going to

11   go under that and then -- but with the understanding that

12   you're not waiving your rights as to arguing that -- that

13   none of this applies and that we start running that out and

14   then if it becomes an issue where the whole thing is just

15   completely unworkable, then you guys would be free to re-

16   raise the issue in a letter brief before me.

17       I understand your concern with regard to March, and

18   certainly I understand that as well.  So you have my

19   assurance that we would move quickly on -- on figuring out

20   whether or not it would continue under that manner or

21   whether or not you guys would be able to appeal it.  I do --

22   I do have some concerns with regard to an agreement with

23   your argument regarding the added costs.  But I'm not sure

24   if that is -- if you're going to end up with added costs or

25   not because it may be a smooth process that actually helps

36

1  streamline it versus bringing what could be a bunch of

2  letter briefs before me even if I rule that the -- you know,

3  the French Blocking Statute doesn't apply.  I don't know.

4          What do you think about that?

5          MR. PAK:  Your Honor, I really would take you back

6  to what the major concerns are with -- and we've -- just so

7  your Honor knows, we've been trying to resolve these issues

8  for many many weeks now, and on -- and actually months, and

9  it's very very difficult because we're looking at trying to

10  recreate through this procedure something that is equivalent

11  to a U.S. style process.

12          THE COURT:  Right.

13          MR. PAK:  And every time we run into that, there

14  are these corner cases that we can't anticipate.  We're

15  looking at, for example, where the source code would be

16  produced.  You know, the other side has taken the position

17  that source code has to be produced in locations in Europe

18  where their expert is domiciled, and we're looking at --

19          THE COURT:  You're talking about -- you're talking

20  about -- that's in what?  Is that in 92 or 93, that issue?

21          MR. PAK:  Yes.

22          THE COURT:  Well, what if we hammered out those

23  types of things, we hammered out the issue of where it's

24  produced, we hammered out the issue of where it's produced,

25  we hammered out the number of custodians and you guys made

37

1  that part of your agreement?  Would that -- would that -- or

2  are you concerned that they would just keep throwing up

3  other things?

4          MR. PAK:  We just -- we're going to end up in

5  other things, your Honor.

6          THE COURT:  Yeah.  Okay.

7          MR. PAK:  I mean, I -- I honestly have to be very

8  up front with your Honor.  I think that just injecting a

9  commissioner who is not a U.S. expert, not a U.S. litigator,

10 not a U.S. judge, into this process where, again, you know,

11 if the French -- by the way, no one's ever been really

12 produced under French law for this blocking statute except

13 in one instance which involved a French lawyer that

14 misrepresented himself to obtain access to information.  He

15 was fined $10,000.  No company's ever been prosecuted under

16 the --

17         THE COURT:  I understand.  Well --

18         MR. PAK:  And so --

19         THE COURT:  -- let me -- let me continue going

20 through the rest of the factors.  We've got -- we've got the

21 balance of the national interest, the hardship to

22 Defendants, and the likelihood of compliance.  Let me hear

23 from Defendants first, then you can respond.  So let's go

24 through five, six, and seven essentially.

25         MS. MARTIN:  So with respect to the balance of the

38

1  national interests, the Court has to look at the interests

2  of each nation in requiring or prohibiting the disclosure

3  and determining whether the disclosure would affect

4  important substantive policies or interests of either

5  country.  In doing so, the Court can look at its questions

6  of interest by the foreign state or the significance of the

7  disclosure in the activity in question or indications of the

8  foreign state's concern for confidentiality.

9      Here we would argue that the U.S. interests are not

10  going to be impaired because we are wanting to proceed under

11  Chapter 2, Article 17, which we understand is a streamlined,

12  you know, very -- essentially equivalent procedure with

13  respect to the Federal Rules other than we have this

14  commissioner in place who basically allows us to be

15  compliant with French law.

16      Defendants have agreed to produce all information

17  that's required.  And to the extent that Article 17

18  procedures are unsuccessful, this Court retains power to

19  order discovery and, in fact, in the most recent proposals

20  that Defendant sent over to Plaintiffs, we specifically

21  include in the proposed order that each party reserves all

22  rights to seek relief from Magistrate Judge Illman,

23  including modifications of the procedures.

24      So, you know, Defendants are definitely proposing a

25  procedure and a process that does not undermine the

39

interests of the United States.  To the contrary, we have a
letter from the French Ministry of Justice indicating the
scope and the purpose of the French Blocking Statute and
urging that discovery should take place through the Hague,
which is the lawful way to do it.

        And, furthermore, because Plaintiffs initiated the
action in France, putting these very documents and
information at issue before the French judge, we would say
that France has an additional concern there because they are
already deciding that issue.

            MR. PAK:  Your Honor, may I respond?

            THE COURT:  Okay.  Please.

            MR. PAK:  Yeah.  So let's -- let's set the record
straight with respect to the French proceedings, your Honor.
That exact argument was made by the Defendants to the French
courts.  The French courts specifically found that there's
an independent separate potential case in France under
French trade secret laws.  That evidentiary seizure was
conducted under French laws for the purpose of developing
French claims under French laws.  It had nothing to do with
this case, your Honor.

        And so, to the extent that we are debating in France
about getting access to those documents had no bearing on
the issue here, which is with respect to our U.S. claims and
the U.S. discovery that we're entitled to, whether we should

40

1  be going down this alternative process or not.

2      Most importantly, your Honor, all these arguments that

3  counsel has raised have already been considered in every one

4  of the cases that we have cited, and in every one of those

5  cases, there was a French attorney who had submitted some

6  type of declaration saying that there was a French Blocking

7  Statute concern.  And all those cases have said France's

8  interests do not outweigh those of the United States when

9  we're talking about vindicating the rights of American

10 plaintiffs, particularly when we're dealing with a United

11 States company whose trade secrets were taken to develop

12 products overseas.

13     We think that we are -- there's this overriding

14 American interest in having U.S. styled discovery unfettered

15 to allow a U.S. plaintiff the discovery in this type of

16 case.  And I think to create a precedent where --

17         THE COURT:  All right.  I have -- I have that -- I

18 have those cases.  I just -- I want to get on the record

19 each parties' --

20         MR. PAK:  Yes.

21         THE COURT:  -- arguments as to -- as to these

22 different factors because those are the factors that are

23 going to -- that I'm going to be heavily considering in

24 making my decision.  So let's talk about hardship to

25 Defendants and then likelihood of compliance.

41

1        And I'll hear from Defendants on this.

2            MS. MARTIN:  Thank you, your Honor.  So, with

3   respect to the hardship to Defendants, here because the

4   French Blocking Statute creates the possibility of criminal

5   prosecution, this factor should weigh in favor of utilizing

6   the Hague Convention procedures, and as the Salt River case

7   emphasized, since the Article 17 procedure is streamlined

8   and does not impose any kind of prejudice or hardship on

9   Plaintiffs, this factor would weigh in favor of proceeding

10  under the Hague.

11       In addition, because the prosecution has become

12  increasingly likely with respect to the scrutiny of the

13  French Blocking Statute going on in France right now, as

14  well as because Plaintiffs have already made the French

15  authorities aware of the situation by bringing the seizure

16  action in France first, I would say that this factor weighs

17  even more strongly in favor of production under the Hague

18  procedure if compared to Salt River because those types of

19  factors weren't present in that case.

20           THE COURT:  And then tell me about likelihood of

21  compliance.

22           MS. MARTIN:  I'm sorry.  Excuse me.

23           THE COURT:  The final factor, the likelihood of

24  compliance.

25           MS. MARTIN:  Oh, thank you, your Honor.  So, the

42

1 likelihood of compliance, Defendants will comply with an

2 order from this Court requiring the Hague Convention

3 procedures, and so this factor also weighs in favor of

4 utilizing those procedures.  And, in fact, we've provided --

5 we took the laboring oar and -- and provided a proposed

6 order to Plaintiffs to that end.

7          THE COURT:  All right.  Let's hear from Plaintiff

8 on the final two factors -- actually --

9          MR. PAK:  Yes, your Honor.  I think even the

10 newsletter that counsel discussed actually points out that

11 there is no real risk of any type of criminal sanctions in

12 France.  That article is about the potential need for new

13 statutes in the future because not only the French

14 authorities but politicians have recognized that the current

15 laws have not been enforced.  There is no potential threat

16 of criminal prosecution.  It has never been enforced except

17 that one instance that we talked about.

18     So, in terms of hardship to Defendants, particularly

19 given their own actions in this case, where they have -- if

20 they're right, their providing information in this case

21 constitutes a criminal violation.  They've already done that

22 through multiple declarations in support of their positions

23 on the TI motion.  So we think there's absolutely no

24 hardship to the Defendants.  And with respect to the

25 compliance issue, your Honor, this just goes back to some of

the things that we were discussing earlier.  We don't understand the contours of what the commissioner review will be.  While they have not given up all appeal rights with respect to France in the decisions that are made by the Commissioner, in fact, they state that the commissioner would have to comply with the regulations and rules of French law, because obviously he is a -- a French resident and would be a French lawyer.

So we don't know what the boundaries of that would be, and I think if a commissioner makes a certain ruling, it's not clear to us that we or -- or anyone would have the ability to waive the potential French issues that may come out of a French commissioner's rulings.

So, again, I think there is a potential for compliance issues here, and as we noted in the Connex case, which is a case that dealt specifically with these issues, they also consider that, and the Court -- although the Court has authority to order this, the Court also has the authority to move forward without utilizing the alternative means process.  So we think, given the potential compliance issues coming out of the -- the appointment of the commissioner and the lack of any hardship to the Defendants, we believe that there is no need in this case to utilize this alternative procedure.

THE COURT:  All right, Counsel.  Stand by for a

44

1  minute.  All right.

2       MR. PAK:  Thank you.

3    (Pause.)

4       THE COURT:  All right.  Sorry, Counsel.  We had

5  come up to the 11:00 o'clock hour.  I had not allotted -- I

6  didn't realize we were going to go this long.  So there was

7  some business to which I needed to quickly attend.

8    All right.  All right.  Anything further on the issue

9  of whether or not the French Blocking Statute will apply

10 that either party would like to quickly raise?

11      MS. MARTIN:  Your Honor --

12      MR. PAK:  No, your Honor.

13      MS. MARTIN:  Yes, your Honor.  If I may just say,

14 you know, in our view -- in Defendants' view, Plaintiffs'

15 concerns, both in their briefing and on this call, are

16 really hypothetical in nature and are inconsistent with

17 Defendants' understanding of how the procedures under

18 Article 17 work in reality and what Defendants are intending

19 to have happen here.  And additionally, you know, Plaintiffs

20 made a number of representations regarding the

21 correspondence between the parties and also the case law,

22 and, you know, appreciate that the Court has the cases

23 before them, but Defendants are more than happy to provide

24 correspondence to the Court and briefing that is helpful

25 because, in our view, some of the statements that were made

45

1  are inconsistent with the parties' correspondence as well as

2  the cases in the record.

3        THE COURT:  The statements made by Plaintiffs are

4  inconsistent with your correspondence with them is what

5  you're saying?

6        MS. MARTIN:  Yes, your Honor.

7        MR. PAK:  And, your Honor, obviously we disagree

8  with that, and I think that if there's anything

9  hypothetical, it really is this concern about prosecution

10  under the French Blocking Statute.  And I think that we have

11  engaged in numerous correspondence with the Defendants to

12  try to resolve these issues.  It's a very difficult set of

13  issues to resolve, precisely because the injection of a

14  commissioner into the process adds discretion, adds

15  potential French issues that we don't believe is necessary

16  in this case, particularly when the Defendants have taken

17  advantage of the U.S. court system to provide written

18  discovery in this case.

19        THE COURT:  All right.

20        MR. PAK:  So, you know, I think from or

21  perspective, at a minimum, your Honor, the U.S. subsidiary

22  and the U.S. resident, Mr. Lemarie, should be excluded from

23  any type of alternative procedure, but even with respect to

24  the French parent, given that these declarations were

25  submitted by the French parent with French employees signing

46

 1   them under the penalty of U.S. law, we think this issue is

 2   moot.  We should move forward.

 3             THE COURT:  All right.  I understand.  And so the

 4   -- we're getting back to where we sort of started from.  So

 5   what I'm going to rule is based on the -- the different

 6   factors and based on the case law that I reviewed, I believe

 7   that the factors weigh in favor of proceeding under the

 8   Federal Rules of Civil Procedure in this case.  And so I

 9   don't find that the Federal -- or that the French Blocking

10   Statute will apply here.

11        So in turning then to where we're going to go next, I

12   am -- what I do want to discuss is -- is with regard to the

13   protective order and with regard to the ESI, the language

14   that Defendant proposes that would include the -- the --

15   essentially, what is that, the GDPR language in there?  Is

16   that what -- is that what I should call it?

17             MR. PAK:  Yes, your Honor.  And my colleague, Mr.

18   Lordgooei, will be addressing these to issues.  So --

19             MR. LORDGOOEI (telephonic):  Good morning, your

20   Honor.

21             THE COURT:  Good morning.  So, with regard to what

22   Defendants have requested, I don't see that -- that their

23   language that they are requesting in there is going to have

24   any effect detrimental to Plaintiffs.  So provide me with

25   information as to why that would be detrimental to you.

1        MR. LORDGOOEI:  So we -- to be honest, your Honor,

2   we're not really sure what the effect is going to be.  We're

3   just worried about unintended consequences down the line.

4   As with any superfluous language that doesn't really have a

5   purpose within a document, we don't really know what the

6   effects are going to be.  Your Honor --

7        THE COURT:  Well, then, why don't we do this.  Why

8   don't we do this?  The language we'll -- we'll include that

9   in the protective order, and if issues arise, then I'll

10  address them by letter brief.  If it becomes a -- a point

11  where that becomes an ongoing thing, then we can have it

12  excised later if you guys can show me what it is about that

13  language that -- that is leading to a slow down, delay, or

14  blocking of information.

15     So my ruling will be, as far as the protective order is

16  concerned -- well, see, that would apply -- would that apply

17  to the ESI as well?  Let's see here.

18        MR. LORDGOOEI:  I believe so, your Honor.  The

19  same language in the ESI order --

20        THE COURT:  All right.  Same language.  That's

21  issue one of the -- no.  That's issue two of --

22        MR. LORDGOOEI:  Docket 92 and --

23        THE COURT:  -- 92, right.  Yeah.  Okay.  So

24  then --

25        MR. LORDGOOEI:  And, your Honor, if I may, in

48

1  addition to the footnote about GDPR reservation of rights,

2  there is the additional language that Defendants propose

3  adding relating to the contemplation of the separate

4  procedure under the Hague, and nothing in this order is

5  intended to circumvent or supersede any additional

6  requirements included under the Hague.  And so I think,

7  given your Honor's ruling --

8          THE COURT:  Correct.

9          MR. LORDGOOEI:  -- at least that language should

10  be stricken.

11          THE COURT:  That would be correct.  So then let's

12  talk about the -- let's start with 92, and let's start with

13  issue two, and that's going to be the conducting preliminary

14  depositions under FRCP 30(b)(6).

15      Tell me the basis for your request here.

16          MR. LORDGOOEI:  So, your Honor, we have proposed a

17  procedure in terms of the ESI order where the parties will

18  be seeking emails from particular custodians based on

19  particular search terms.  At this point, Defendants have

20  identified 20 individuals on their initial disclosures, 20

21  party witnesses that would have potentially relevant

22  information.

23      And so, although the parties have agreed to two

24  interrogatories directed to the topic of ascertaining

25  appropriate custodian and appropriate search terms for those

49

1  custodians, we believe that an initial deposition would be

2  much more efficient in terms of the parties coming to ground

3  on who the custodian should be at least as a priority

4  matter, who the priority custodian should be to seek

5  discovery from, what the search terms should be for those

6  custodians, and, you know, having a deposition you can have

7  back and forth question and answer in order to come to

8  ground on those issues as opposed to serving an

9  interrogatory and waiting 30 days and potentially getting

10 useful information and potentially not.

11      I will say based on past experiences, parties typically

12 go through this process only to find out that certain

13 custodians who should have been included were not included

14 or certain search terms that were omitted should be

15 included, and it ends up being a mess.  So if we can address

16 some of those issues at the outset with this deposition, we

17 don't understand what the burden would be to Defendants.

18      And, more over, barring this language in the ESI order,

19 we would be entitled to seek a 30(b)(6) deposition on these

20 topics regardless.  The only concern is some courts have

21 held that multiple 30(b)(6) deposition notices require leave

22 of the Court.  Obviously, at this stage of the case, we're

23 not prepared to serve all of our 30(b)(6) topics, and so

24 effectively, what we're asking for is leave to conduct this

25 preliminary 30(b)(6) so that later on when we serve

50

1  additional 30(b)(6) topics, we won't have to seek leave at

2  that point.

3          THE COURT:  Ms. Martin, wouldn't that sort of help

4  streamline this and narrow it so that the 30(b)(6)

5  depositions that take place later would be more focused and

6  -- and be probably less of a burden on the employees and

7  everyone else?

8          MS. MARTIN:  Your Honor, not in our view.  In our

9  view, the two custodial interrogatories where parties have

10 an opportunity to explore custodians and topics and try to

11 figure out applicable search terms should be more than

12 sufficient.  And the deposition would just be an added

13 expense and time on all the parties, and we don't see that

14 there is justification --

15         THE COURT:  Have those interrogatories been issued

16 yet?

17         MS. MARTIN:  They have not.

18         MR. LORDGOOEI:  They have not, your Honor.

19         THE COURT:  They have not.  Okay.  So what I'm

20 going to do is I'm going to deny Plaintiffs' request.  You

21 guys can issue those interrogatories.  If you have reason to

22 believe later that you'd want to try a two-stage process

23 with the 30(b)(6) depositions, you can bring that issue to

24 me at another time.

25     So let's talk about issue number three.  The parties

1 dispute the number of custodians subject to email production

2 requests.

3      Plaintiffs, you guys want 15 Defendant custodians but

4 only providing five of your own.  And Defendants want eight

5 and eight.  I assume that's eight not for each Defendant but

6 just eight for Defendants overall, is that correct?

7           MS. MARTIN:  That's correct.

8           THE COURT:  Okay.  All right.  So, I mean, this is

9 an issue that is rarely raised in Federal Court because

10 usually the parties can sort of get together on this and

11 figure this out.  What's the problem here?

12           MR. LORDGOOEI:  So, your Honor, I think from our

13 perspective, they've identified at this point, as I

14 mentioned, 20 party witnesses with relevant knowledge in

15 their initial disclosures.  At this point we're only aware

16 of two Plaintiff witnesses which we've identified in our

17 initial disclosures.  The bulk of this case, the -- is based

18 on Plaintiffs' claims of trade secret misappropriation.

19 Defendants have asserted counterclaims directed to purported

20 misrepresentations to their customers, but they haven't

21 identified any Plaintiff witnesses associated with those

22 purported misrepresentations.  Certainly none have been

23 identified in their initial disclosures.  And so at this

24 point, there is no parity between custodians with

25 potentially relevant information.

1      And so we don't understand why there would be a need

2   for eight and eight, particularly when they've identified 20

3   witnesses and -- and there's no at this point explanation

4   from them as to why they need eight.  We think essentially

5   it's just a method of imposing additional burden on the

6   Plaintiffs by seeking ESI from our custodians even though

7   they may not be relevant to the case.

8           THE COURT:  So let me ask Defendants, who many

9   have you identified, and why do you come up with eight on

10  your end?

11          MS. MARTIN:  We came up with eight, your Honor,

12  just because that's consistent with, you know, other cases

13  that we've been involved in and cases that have taken place

14  in this court and to try to be equitable to both sides.  In

15  the context of the preliminary injunction briefing, we've

16  identified dozens of potentially relevant custodians for

17  email on behalf of Plaintiffs.  So we're -- we're not sure

18  why Plaintiffs only disclose two in their initial

19  disclosures.  But, you know, even though this case relates

20  to trade secret claims against Defendants, part of any trade

21  secret claim relates to the fact that Plaintiff even

22  possessed the trade secret to begin with, whether they

23  adequately maintained it.  In this case, since there are

24  employees that were initially at Plaintiffs and are now at

25  Defendants, there will be information that will be

53

1  discovered relating to activities that occurred at -- at

2  Plaintiffs, and those -- those types of activities would be

3  in the purview and under control of Plaintiffs and their

4  custodians, and so --

5           THE COURT:  Let me ask you this.

6           MS. MARTIN:  -- it doesn't --

7           THE COURT:  Outside of --

8           MS. MARTIN:  -- we simply --

9           THE COURT:  Outside of how many you have to

10 propose, how many do you think is a reasonable number for

11 Plaintiffs to provide as a custodian, outside of however

12 many you are ordered to provide?

13          MS. MARTIN:  Eight, your Honor.

14          THE COURT:  All right.  And then -- and then,

15 Plaintiffs, you guys have identified more than 20 is what

16 you've said?

17          MR. PAK:  So we -- on our end, in terms of

18 Defendants' witnesses, they've identified 20 in their

19 initial disclosures, and then I'll note that the one case

20 that they cite in the letter brief, the Alta Devices case,

21 there the party sought discovery from 33 custodians, some of

22 which only were tangentially relevant and only had limited

23 involvement with the issues.  Here, Vade itself has

24 identified 20 individuals with relevant knowledge, and even

25 in the Alta Devices case, the party was ordered to provide

54

1  ESI from any of the custodians identified in the parties'

2  initial disclosures.  And so while we've asked for 15, I

3  think we would reasonably be entitled to 20.  We're willing

4  to limit it to 15 at this stage, and if there is a need for

5  additional witnesses, seek leave at that point.  But, you

6  know, at a minimum, I think 15 would be the number for

7  Defendant with --

8          MS. MARTIN:  Your Honor, if I could just clarify

9  Defendants' position here.  The reason that we asked for

10  eight and eight is because we think that's a reasonable

11  number of custodians with respect to the fact that it's an

12  equitable number and -- and not an insignificant number.

13  But to the extent we are looking to go beyond that number

14  for either party, we believe that it should be equitable

15  here, especially given that since Defendants have identified

16  dozens of potentially relevant custodians and -- not

17  potentially relevant but they should be relevant custodians

18  because they were either on emails or relevant disclosures

19  that Plaintiffs have used as exhibits in their preliminary

20  injunction motion or -- or, you know, in that regard, they

21  are highly relevant to the case, and so we certainly --

22          THE COURT:  Have you guys talked about those --

23  have you talked about those dozens that you've -- that

24  you've identified that they didn't?

25          MS. MARTIN:  We have not.  Your Honor, we have --

55

1  I have raised with Mr. Lordgooei on meet and confers

2  Defendants' belief that -- that Plaintiffs have somehow only

3  identified two custodians.  But, you know, we haven't really

4  gotten an adequate explanation for that.

5          MR. LORDGOOEI:  Well, your Honor, what I will say

6  is that this sounds an awful lot like the case that they

7  cited where the parties sought discovery from any custodians

8  that were only tangentially relevant because they only had

9  limited involvement, and it sounds like what Ms. Martin is

10  pointing to are individuals who may have been copied on

11  emails, that may not have had any direct involvement, and to

12  the extent that Defendants believe certain of those

13  individuals were directly relevant, then I would ask that

14  they identify them on their initial disclosures, which they

15  have not done at this point.  So at this point there's no

16  established need for more than maybe even a couple of

17  custodians, at a minimum five, at the most eight custodians

18  on their side.  We don't believe there's any basis for

19  parity between the number of custodians between the parties

20  given that the bulk of the claims asserted in the case are

21  against Defendants and Defendants' conduct, not Plaintiffs'

22  conduct.

23          THE COURT:  And as to -- as to Defendants, why

24  haven't you asked for -- if you've identified dozens, then

25  why haven't you proposed additional custodians on -- for

56

1  Plaintiff?

2       MS. MARTIN:  Well, your Honor, we're in a very

3  early stage in this proceeding, and our understanding of our

4  obligation with the initial disclosures is that we are

5  supposed to identify for the Court or cite for the other

6  side individuals who we intend to rely on once we know that

7  we intend to rely on them.

8      Now, we can see in these emails and correspondence and

9  disclosures and PowerPoints and other things from -- from

10 the preliminary injunction exhibit that some of the folks

11 involved here would be supervisors of the parties -- or

12 supervisors of the employees who have now left, other team

13 members involved in the development of technology that's

14 relevant to this case.

15     And so, you know, we think that those parties likely

16 have information that we need, but we have not had the

17 chance to depose them or glean more information given the

18 early stage here, and so, you know, those parties are not --

19 those employees are not on our initial disclosure at this

20 stage for that -- for that reason.

21      THE COURT:  Well, I mean, you're only proposing

22 eight custodians for each side even though you said that

23 you've identified what you believe to be dozens of potential

24 Plaintiff custodians, correct?

25      MS. MARTIN:  That's correct.  But, your Honor, the

1  reason we proposed eight is just to, you know, recognize

2  that sometimes discovery can get out of hand, and we thought

3  eight was a reasonable number and an equitable number for

4  each side, but to the extent the Court --

5           THE COURT:  All right.  Well, let's -- let's do

6  this.  Why don't we do this.  Why don't we give Plaintiff

7  their request for 15 Defendant custodians and then give

8  Defendant their request for eight of Plaintiff custodians,

9  and then I will grant a party's leave to increase that

10  number if they need to in the future and bring it -- meet

11  and confer and then bring it to me at a later date.  How

12  about that?

13          MR. LORDGOOEI:  That works for us, your Honor.

14  Thank you.

15          THE COURT:  All right.  So let's move to document

16  number 93.  This is the -- the protective order.  So

17  obviously, with regard to the first issue on that, my

18  rulings from -- from before would apply.  So that would be

19  specifically there were two -- two lines, correct, and one

20  would be stricken, and the other would remain in place as

21  Defendants requested.

22      Is that right?

23          MR. LORDGOOEI:  I believe so, your Honor.  The

24  language in the body of the document would be stricken, but

25  the footnote regarding GDPR would -- would remain.

58

1          THE COURT:  Would remain.  That's it.  Okay.  All

2   right.  So let's talk about the source code made available

3   for inspection at the producing party's offices in this

4   district or other mutually agreeable location or must be

5   available at a location that is reasonably convenient for

6   the receiving party and its experts.

7          The issue here I take it is whether or not this is

8   going to be made available in France or here in this

9   District, right?

10          MR. LORDGOOEI:  Well, your Honor, so there are two

11   issues here.  The first is the fact that Defendants proposed

12   the source code in the case be made available to the extent

13   that it's able to be produced in the United States, for

14   example, at a location reasonably convenient to the

15   receiving party and any of its experts.

16          So, for example, to the extent that they want to review

17   Plaintiffs' source code, the fact that they've disclosed to

18   us an expert located in the United Kingdom, potentially they

19   would ask us to then produce our source code for review in

20   the United Kingdom, which I don't think makes -- makes

21   sense, your Honor.  That's why we've proposed that -- to cut

22   across any disputes over where would be -- where the source

23   code would be produced for review.  Counsel for both parties

24   have offices in the Bay Area.  The parties have offices in

25   the Bay Area, and so we believe that the easiest, most

1  equitable, least burdensome outcome would be just to make

2  clear that the parties would provide the source code for

3  review in the Bay Area.

4          THE COURT:  All right.  Let me hear from

5  Defendants.

6          MS. MARTIN:  Your Honor, Defendants' proposal is

7  consistent with the model PO, which recommends using certain

8  language if the producing party or counsel are located in a

9  different jurisdiction than counsel or experts for the

10 receiving party, and here we have counsel in several

11 different districts, and we also have parties in different

12 countries and potentially experts in different countries,

13 although the expert that Mr. Lordgooei referred to has not

14 been disclosed as an expert who will be reviewing source

15 code.  So I'm not sure I understand the issue with respect

16 to England.

17    So we endeavor to follow the language that the model PO

18 suggested to use given the circumstances where we've got

19 relevant parties and counsel and experts located around the

20 globe, just -- and that is that the source code should be

21 produced at a location that is reasonably convenient for the

22 receiving party and any experts to whom the source code may

23 be disclosed.

24          THE COURT:  I mean, the only issue -- the only

25 issue I have with that, and I am more likely to use the

60

1  model PO, is that then we're going to get into an argument

2  about they're reasonably -- I mean, is that -- is it not

3  just easier to say it's either available in this district

4  or, if the parties agree, somewhere else, that it goes

5  somewhere else?  Is that not kind of a reasonable place to

6  put it considering all the different locations that we've

7  got going on?

8           MS. MARTIN:  Well, the -- there -- the language

9  that Plaintiffs have injected that, you know, kind of I

10  gives priority to -- to the Northern District, that is

11  language that they imported into the other proposed language

12  of the model PO, which does not favor any district at all.

13  And I think that Plaintiffs' argument that this district is

14  the single most convenient location for all parties, it just

15  simply isn't the case because Defendants' source code is

16  stored and maintained in France.

17      And so I didn't see, and Defendants -- it's Defendants'

18  position that it wouldn't be appropriate then to favor one

19  district in the protective order provisions but rather just

20  follow the model PO which just more or less requires the

21  parties to work together to find a good and convenient

22  place.

23           THE COURT:  And I assume that, Plaintiffs, you're

24  concerned about fights over this in the future?

25           MR. LORDGOOEI:  Right.  Exactly, your Honor,

1  given, as your Honor noted, the -- all the different

2  jurisdictions at play and, although the Defendant expert in

3  the United Kingdom hasn't been noticed for source code

4  review at this point, that doesn't mean that he won't be in

5  the future.

6      And I will note that given counsel's concern that their

7  source code is located in France, under their own language,

8  we could request -- we would request that that source code

9  be made available in the Bay Area.  So that doesn't really

10 resolve their issue.

11     I think the clearer outcome, as your Honor noted, would

12 be just to note that it can be provided within this district

13 or, as your Honor noted, mutually agreed upon location, and

14 the parties can work out --

15          THE COURT:  Is there going to be any hardship --

16 is there going to be any -- let me ask the Defendants, is

17 there any hardship in producing here in this district?

18          MS. MARTIN:  Your Honor, there could be.  I mean,

19 we don't know who our source code expert will be yet and

20 what his or her travel schedule or, you know, schedule may

21 be.  The technical attorneys for this case are located in

22 Texas, and so, you know, there are a lot of reasons why, you

23 know, favoring the Northern District or kind of imposing

24 that as some kind of default wouldn't be convenient for --

25 for Defendants.

1          THE COURT:  All right.  So I agree with Defendants

2    that at this point I don't see any reason to modify the

3    model protective order.  I understand the concerns, but

4    these are concerns that come up all the time, and that was

5    taken into account in drafting the proposed order.  This

6    isn't the first, you know, multi-defendant, multi-district

7    international case in the Northern District of California.

8    So I -- I think -- so I'm going to order that as far as that

9    is concerned, that Defendants will win that.

10        And then if there are issues that arise, again, there's

11   -- certainly you can request a modification of the

12   protective order.  I get the feeling that, you know, we have

13   learned counsel on both sides, and you guys will be able to

14   work through these issues.

15        All right.  Let's get to issue number three.  The

16   parties dispute whether the producing party must provide

17   certain accommodations to streamline the source code review,

18   including installing review tools and providing a work

19   product folder on the review computer that the receiving

20   party may use to maintain notes and other files relating to

21   its review of the source code.

22        Let me hear from Plaintiffs as to what the issue is

23   here.

24          MR. LORDGOOEI:  So, your Honor, consistent with as

25   is the typical practice in terms of the source code review

63

1  tools, we're just asking that the Defendants at Plaintiffs'

2  cost install certain source code review software that would

3  be used to streamline the review of the code.  This could

4  include things like text editors, specific tools that are

5  used to trace source code, specific tools that are used to

6  view source code in a particular manner with certain color

7  coding that makes it useful and easier to read the code,

8  things like Microsoft Office Suite, Acrobat Reader, so that

9  to the extent that there are any documents within the source

10  code repository that's provided that we're able to review

11  those documents.  And, across the board, Defendants for some

12  reason have objected to that as being burdensome.  They

13  haven't specifically identified to us or in the letter brief

14  I don't believe what that specific burden is given that

15  Plaintiffs have offered to pay for the costs of any of the

16  software that's being installed, and, moreover, the two

17  cases that they cite for the general proposition that

18  providing source code review tools is burdensome don't

19  actually stand for that proposition.

20          THE COURT:  Well, I --

21          MR. LORDGOOEI:  Reading those --

22          THE COURT:  -- I have to say --

23          MR. LORDGOOEI:  --- cases, for example --

24          THE COURT:  Let me interrupt you.  I have to say

25  this is one of the issues, as I was going through this, that

1 I -- I didn't understand at all from Defendants'

2 perspective.  It seemed like what Plaintiffs were offering

3 was fairly reasonable considering the incurrence of the cost

4 of establishing or installing the software, considering that

5 these -- that this source code was going to be coming from,

6 you know, different places in different formats.  I -- I

7 don't understand what you're fighting about here.

8          MS. MARTIN:  Your Honor, the model order already

9 requires the parties to produce source code in discovery in

10 a way that's available for inspection in a format through

11 which it can be reasonably reviewed and searched.  And so,

12 you know, Defendants are already agreeing to that.

13     The issue with Plaintiffs' language that is a departure

14 from the model PO is that it would obligate all parties to

15 -- or it would require the producing party to install a

16 certain tool just upon request of Plaintiffs without really

17 any built-in ability to object to what --

18          THE COURT:  But isn't it --

19          MS. MARTIN:  -- it might --

20          THE COURT:  Isn't the installation of that just

21 like, for example, like what was mentioned to me,

22 essentially, you know, an Adobe Acrobat Reader, it's making

23 sure that the computer has that installed on it so when they

24 show up, they don't have to worry about trying to install

25 whatever reader is necessary to read that certain type of

65

1  source code, in case -- in case it's produced in a manner

2  that's not normal and wouldn't already exist on a -- on a

3  computer?  Are you saying that the model PO in its language

4  requiring it to be available would already take care of that

5  obligation?

6          MS. MARTIN:  Well, I think the -- so the model PO

7  would give the requesting party the ability to request that

8  tools are installed, and typically when those requests are

9  reasonable and they're the usual tools that we're accustomed

10  to seeing, like a tool that will allow the requesting party

11  to do a reasonable search and be able to view the code in an

12  efficient manner, those are not things that we would

13  normally be objecting to in any way.  But because the

14  proposed language that Plaintiffs have here doesn't really

15  identify what kind of software tools they're talking about

16  and it really leaves open the door to any kind of software

17  tool, it's unclear what they would be requiring of the

18  producing party here.

19          THE COURT:  There's a lot of --

20          MS. MARTIN:  When we --

21          THE COURT:  There's a lot of fights in this case

22  about what may or may not happen is -- is what's happening,

23  and so what I'll do is I'll go with Defendants on this one

24  again, and we'll stick with the model PO, and if issues

25  arise where things are produced and there's no way to read

66

1   it or to be able to read it takes too much delay in getting

2   that installed or, you know, sourcing it or it costs a bunch

3   of money, then we'll -- we'll take up this issue again

4   another date.

5        So let's get to issue number four.  The parties dispute

6   whether a producing party shall provide requested source

7   code printouts within four days or 30 days.  What is the

8   deal with the four days?  Why do you need it in four days?

9           MR. LORDGOOEI:  So, your Honor, typically in cases

10  like this where we get into expert discovery or motion

11  practice -- could be during summary judgment phase or

12  earlier -- issues may arise where a party may need to go and

13  inspect source code and request printouts in order to

14  respond to a particular argument or to provide a particular

15  citation or excerpt of source code for an expert report.

16  And a 30-day turnaround is a departure from many if not all

17  other cases where this -- this issue has come up in this

18  district.  We've cited in our letter brief a number of cases

19  where this issue has come up and at most I think the delay

20  was only seven days or -- or less.  And so we don't know

21  what the burden would be on Defendants in agreeing on a four

22  business day turnaround.  And on a case-by-case basis, if

23  they need additional time, they can approach us and ask for

24  that and indicate what the good cause is for the additional

25  time, but --

67

1           THE COURT:  All right.  So I'll hear from the

2   Defendants.  What's the problem with four days?

3           MS. MARTIN:  So, your Honor, the cases that are

4   cited by Plaintiffs in -- in the letter brief, those involve

5   U.S. entities, and with respect to the timing of the source

6   code in those protective orders, those -- the timing was

7   uncontested in those cases.

8       So it, to me, seems like a situation where there wasn't

9   a foreign Plaintiff -- or, sorry -- a foreign party who was

10  producing source code and eventually producing printouts.

11  And so really this comes down to a potential issue with

12  respect to having to turn things around in four days which

13  is, again, a departure from the model order.  You know, if

14  we have some kind of bank holiday or something in France and

15  we're not able to -- to get that turnaround, then, you know,

16  that would be a problem for us, and we're having to, you

17  know, get the court involved, and we would like to avoid

18  that.

19      And so we think that, you know, our -- our 30-day time

20  line is consistent with the model order.  We could be silent

21  on the issue if that -- if that is what the Court would

22  prefer.  But we thought it would be --

23          THE COURT:  You could be -- you could be what on

24  that issue?

25          MS. MARTIN:  If we want to just be silent on the

68

1  issue and go with the model order, your Honor, we -- in our

2  view, that's consistent with the 30-day time line that's

3  provided under Federal Rules.  So it's consistent with

4  Defendants' proposal.  So we'd be happy to revert to the

5  model order language or -- or the proposed 30-day language

6  from Defendants.

7            THE COURT:  Because the model order would be 30

8  days as well, right?

9            MS. MARTIN:  Correct, your Honor.

10            THE COURT:  Well, I'm sorry.  What would the model

11  -- the model language be?  As you --

12            MS. MARTIN:  The model order is --

13            THE COURT:  It would just be silent.  So it would

14  be silent?

15            MS. MARTIN:  It's silent.

16            THE COURT:  Yeah.  Okay.  All right.

17            MR. LORDGOOEI:  And, your Honor, if I may, we're

18  not really sure what the involvement of the French entity

19  would have to do with production of source code printouts.

20  The way that this process would work is that counsel would

21  provide for review a source code review computer which our

22  expert or counsel would review, make certain PDF printouts

23  of portions of the source code for production, and to the

24  extent that opposing counsel has an objection, they would

25  have to provide that objection and indicate what the basis

69

1  is so that then we can seek relief from the Court.  I'm not

2  quite sure why --

3          THE COURT:  Does four days --

4          MR. LORDGOOEI:  -- it would take them --

5          THE COURT:  Does four days give them enough time

6  to do that, if there's a French bank holiday or something?

7          MR. LORDGOOEI:  Well, so, first of all, they have

8  a U.S. entity in the case.  Many of their senior executives

9  are located in the United States, including Mr. Lemarie,

10 who's the chief technical officer, Mr. LePoutre, who is

11 their chief revenue officer, Mr. Goutal, who is their chief

12 science officer.  And so to the extent there's a bank

13 holiday in France, there are individuals in the United

14 States who should be able to authorize production.  And,

15 moreover, I don't think that the clients or the entities --

16 the Vade entities have authority over what -- over

17 ultimately what is decided to be produced or not produced.

18 What we -- for now, the only objections that they can make I

19 believe are either to overburden or requesting too many

20 pages of source code being printed out or too many

21 consecutive pages of source code being printed out, and

22 that's not something that they need to go back to their

23 client for in order to seek consent.

24         THE COURT:  And why do you need -- I mean, why do

25 you need it within those four days?  I mean, what is your --

70

1  I mean, you want this -- to speed this along, right?

2          MR. LORDGOOEI:  Speed it along.  If it's not four

3  days, 10 days I don't think would -- would be the end of the

4  world, but I think when we get into a situation where it's

5  30 days before we even get an indication from them that they

6  object to the production --

7          THE COURT:  Right.

8          MR. LORDGOOEI:  -- so it could be 30 days before

9  they even tell us --

10         THE COURT:  Right.

11         MR. LORDGOOEI:  -- "We're not going to produce

12 this to you.  Go -- go talk to the Court."

13         THE COURT:  Right.

14         MR. LORDGOOEI:  Then that's going to introduce

15 delay upon delay.  So, you know, it's -- if there's --

16         THE COURT:  I agree.  I agree.  But we're not

17 going to go with four days.  That is -- that is going to be

18 too quick.  There are going to be too many -- too many

19 holidays.  So let's -- let's go with -- let's go with 10

20 days, and that will be my -- my ruling on issue number four.

21     All right.  So that brings us to the end.  That brings

22 us to the end, right?

23         MR. LORDGOOEI:  Your Honor, if I may, just a quick

24 point on issue number three that we just talked about, the

25 source code review tools.

1          THE COURT:  Yeah.

2          MR. LORDGOOEI:  We've at this stage already

3    identified -- so this is not some nebulous list of source

4    code review tools that may at some point become an issue.

5    We've already identified a list of tools for installation,

6    and the disputed language -- their disputes to putting in

7    the language that they must install source code review tools

8    is within the context of these specific tools that we've

9    identified.

10         THE COURT:  You guys have already had a fight over

11   what tools need to be installed?

12         MR. LORDGOOEI:  We have, and a lot of the tools

13   are consistent with the tools that were ordered to be

14   installed in some of the cases that they've even cited.  So

15   in, for example, the Calora and Digital Register of Texas

16   cases, the review tools that were found to be burdensome had

17   to do with providing a full build environment in which the

18   entire source code base could be compiled and executed.

19   That's not what we're asking for.

20       What we're asking for are things in the Digital Reg

21   case that were found to be reasonable, things such as search

22   tools, code editor software, tools that are used to trace

23   functions, and we've listed all those out for them.  Again,

24   we're really not sure what the -- what the burden is.

25         THE COURT:  Yeah, but, I mean, if we -- if we're

72

1 including the regular PO, standard PO language and you've

2 listed that for them and then they reject that and you're

3 saying that that is necessary for being able to review it,

4 then you can make an argument that it's not in -- it's not

5 proper under the proposed order, correct, under the -- under

6 the standard PO?

7          MR. LORDGOOEI:  Your Honor, I may be missing it,

8 but I don't see the language in the standard PO that would

9 provide for it.

10          THE COURT:  Let's look at that, page -- what's the

11 paragraph number on that?  That's 14?

12          MR. LORDGOOEI:  The parties disputed language is

13 on page 15.

14          THE COURT:  Fifteen.

15          MR. LORDGOOEI:  On page 15 of the proposed

16 protective order.

17          THE COURT:  Your Honor, on paragraph 14(c), it

18 says:

19               "Any source code produced in

20          discovery shall be made available for

21          inspection in a format in which it can

22          be reasonably viewed and searched."

23          THE COURT:  So that would be your violation.  You

24 would be arguing that that wasn't -- that it wasn't

25 reasonable, correct?

1          MR. LORDGOOEI:  That would be our argument.  We're

2 -- we've -- so, given that we've already identified source

3 code tools for installation and it appears to us that the

4 opposing parties, the Defendants, have refused to install

5 those -- the software as being burdensome, even though

6 they're just search tools, things like --

7          THE COURT:  Well, look, that's -- you know, bring

8 it to them.  Meet and confer.  If it doesn't work out, bring

9 me a letter brief.

10          MR. LORDGOOEI:  Okay.  Will do, your Honor.

11          THE COURT:  You can do that quickly.

12      All right.  All right.  So what do you guys --

13          MR. PAK:  I think that's it on our end, your

14 Honor.

15          THE COURT:  Yes.  Pardon me?  Did somebody say

16 something?

17          MS. MARTIN:  Yes, your Honor.  That's it on our

18 end as well.

19          THE COURT:  Okay.  All right.  All right.  So I

20 want -- what I want you guys to do is I'm going to have

21 Plaintiff draft up the proposed orders in both the -- for

22 the ESI and the -- I want a clean copy of the ESI and the

23 proposed order and then submit it to the other side for

24 review, and then get it to me by, what, Monday afternoon?

25          MR. PAK:  Sure, your Honor.

74

1          THE COURT:  All right.  And then what else do you

2   guys need?  Let's see here.  All right.  And as far as -- so

3   that will cover all that stuff.  Do you guys need anything

4   beyond that?  Are the oral rulings from today sufficient for

5   you guys to move forward?

6          MR. PAK:  Yes, your Honor.

7          THE COURT:  Defendants?

8          MS. MARTIN:  Yes, your Honor.

9          THE COURT:  All right.  So then I'll look for

10  those Monday afternoon, and we'll get them entered in.  In

11  the meantime, I am granting and denying the letter briefs as

12  stated on the record.

13      All right, everyone.  Hope you have a great Friday, and

14  go 49'ers, all right.

15          MR. PAK:  All right.  Thank you, your Honor.

16          MS. MARTIN:  Excuse me?

17          THE COURT:  Yes.

18          MS. MARTIN:  Sorry, your Honor.  I should have

19  actually said that Defendants would prefer a written order

20  on the -- on the French Blocking Statute issue.

21          THE COURT:  Okay.  All right.  So --

22          MS. MARTIN:  If possible.

23          THE COURT:  All right.  So give me some time to

24  get that out, and -- but you guys still operate -- I mean,

25  the oral ruling still, you know, stands obviously, but we'll

75

1 get you a written order on that as well.  Okay.

2          MR. PAK:  Great.

3          MS. MARTIN:  Understood.  Thank you, your Honor.

4          THE COURT:  All right.  Thank you.

5          MR. PAK:  Thank you, your Honor.  Have a great

6 weekend.

7      (Proceedings adjourned at 11:46 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

<u>CERTIFICATE OF TRANSCRIBER</u>

    I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

    I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, February 4, 2020