**Pages 1 - 26**

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Robert M. Illman, Magistrate Judge

PROOFPOINT, INC., et al.,      )
                               )
          Plaintiffs,          )
                               )
   VS.                         )      **NO. C 19-04238 MMC**
                               )
VADE SECURE, INC. et al.,      )
                               )
          Defendants.          )
_____)

                          San Francisco, California
                          Friday, March 20, 2020

**TRANSCRIPT OF TELEPHONIC PROCEEDINGS OF THE OFFICIAL ELECTRONIC
        SOUND RECORDING 10:04 - 10:37 a.m.**

**APPEARANCES** (via Courtcall):

For Plaintiffs:
                    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                    50 California Street - 22nd Floor
                    San Francisco, California  94111
               BY:  **IMAN LORDGOOEI, ATTORNEY AT LAW**
                    **SEAN PAK, ATTORNEY AT LAW**

For Defendants:
                    BAKER & MCKENZIE LLP
                    1900 North Pearl Street - Suite 1500
                    Dallas, Texas  75201
               BY:  **MACKENZIE MARTIN, ATTORNEY AT LAW**
                    **JAY UTLEY, ATTORNEY AT LAW**


Also Present for Plaintiffs - In-house Counsel:

                    **JOHN DIALS, ATTORNEY AT LAW**
                    **MICHAEL YANG, ATTORNEY AT LAW**
                    **JEFF REED, ATTORNEY AT LAW**

Reported By:        Marla F. Knox, RPR, CRR, RMR
                    United States Official Court Reporter

| | |
|---|---|
| 1 | **<u>Friday - March 20, 2020</u>**                          **<u>10:04 a.m.</u>** |

1  <u>**Friday - March 20, 2020**</u>                              <u>**10:04 a.m.**</u>

2                            **<u>P R O C E E D I N G S</u>**

3                                   ---oOo---

4        **THE CLERK:**  Court calls Civil Case Number 19-CV-4238,

5  Proofpoint versus Vade Secure, et al.

6       Parties please state your appearances for the record.

7        **MR. PAK:**  Good morning, you have Sean Pak and Iman

8  Lordgooei on behalf of the Plaintiffs.

9        **MS. MARTIN:**  Good morning, Your Honor, this is

10  Mackenzie Martin and Jay Utley on behalf of Defendants.

11        **THE COURT:**  Good morning, everyone.  So we are here on

12  the motion for consideration of my previous order.

13       And you guys have everything filed that you want to file

14  in this case?

15       We have got responses and replies and sur-replies and

16  sur-sur-replies, and -- we got everything in?

17        **MR. PAK:**  Yes, Your Honor.

18        **MS. MARTIN:**  Yes, Your Honor.

19        **THE COURT:**  All right.  So I got a lot of paper in

20  front of me to read.

21       Is there anything you guys want to add that is outside of

22  what you have already put in front of the Court?

23        **MR. PAK:**  No, Your Honor.

24        **MS. MARTIN:**  No, Your Honor.

25        **THE COURT:**  One thing I wanted to find out from the

1   parties is with the global pandemic happening, what effect

2   would that have practically speaking on following the Hague

3   Convention in this matter?

4        Is there an issue of impossibility that might arise?  As

5   I'm doing my balancing test between essentially, you know, the

6   different factors of the country's -- what is in their

7   interest, being French secrecy versus U.S. fairness -- what

8   effect do you think this is going to have?

9             **MR. PAK:**  Your Honor, may I comment on that?  This is

10  Sean Pak on behalf of the Plaintiff.

11            **THE COURT:**  Please.

12            **MR. PAK:**  Yes.  So what we are hearing, Your Honor, is

13  that there has been a potential slow down in the French

14  judicial system.  There has been court delays and hearings

15  being cancelled.

16       So by even the Defendant's estimates, it would take at

17  least two months -- and that was before the effect of the

18  Coronavirus situation -- to get anything approved by the

19  Ministry of France.

20       And so this goes to our basic point that we filed this

21  case nine months ago.  We have gotten no discovery from Vade

22  including any source code or other important documents that we

23  believe are actually being hosted here in the United States.

24       We would like to move on with the case, and we think that

25  the uncertainty in France in terms of how the Coronavirus

1  situation will affect the hearing and the availability of the

2  courts will further complicate the issues.

3       We, therefore, believe that that is an additional factor

4  that we should take into account in looking at the availability

5  of substitute mechanisms.

6       **THE COURT:**  Well, in regard to that, is there a

7  requirement of -- you know, of having to go to France?  Is

8  there requirements of having to appear in front of

9  commissioner, the availability of commissioners?  Do we know

10  anything about that stuff?

11       **MR. PAK:**  We don't know but what we do know is based

12  on the procedure that was laid out by the Defendants, what

13  would have to happen is any court order in the United States

14  would have to be evaluated and reviewed and approved by the

15  French Ministry; and that's at a minimum a two-month additional

16  delay.

17       What we don't know is whether the additional delay that we

18  are encountering with respect to the Coronavirus would have

19  caused further delay in that process.

20       And with respect to the Commissioner, Your Honor,

21  obviously we would have to coordinate with the Commissioner's

22  availability.  Obviously travel is limited.  And obviously we

23  would have to take into account the availability of the

24  Commissioner, whoever that is appointed, in terms of his

25  ability to review the documents; attend depositions.  So that

1    further complicates the issues.  There is a lot of uncertainty

2    at this point, Your Honor.

3         **THE COURT:**  Let me ask you this:  Does that matter to

4    my legal analysis over which provision should prevail in this

5    matter or what should govern in this matter?  Is that actually

6    part of my decision making process or --

7         **MR. PAK:**  Yeah.

8         **THE COURT:**  And why?

9         **MR. PAK:**  Yes, Your Honor.  I believe, it does.  That

10   is Factor 4, Your Honor.  It is the alternative means analysis.

11   And a lot of the courts -- even in the *Salt River* case, there

12   was an assurance that the delay would be bounded by a very

13   limited amount of time; and we don't have that assurance here.

14   And obviously with the uncertainty around the availability of

15   the French courts and the French Commissioner, we are looking

16   at unbounded delays and complications and costs associated with

17   the attorney and procedure that has been recommended by the

18   Defendants.  We think it is directly relevant to Factor 4.

19        And given that this is a pretty secret case where there is

20   the possibility of irreparable harm in the marketplace that is

21   happening now and given that this is an American plaintiff

22   asserting these claims and that the evidence is available here

23   in the United States through the U.S. subsidiary and the

24   resident, we believe these issues are in favor of going with

25   the U.S. style of discovery.

1      **THE COURT:**  Let me hear from Defendants on this.

2      **MS. MARTIN:**  Thanks, Your Honor.

3      I mean, we have the same uncertainty here in the United

4  States with respect to the courts.  And so, you know, courts

5  all over California have been closing as well or changing

6  hearings or having attorneys go on in different manners.

7      We have yet to see how the Coronavirus will impact us in

8  the United States, the French.  There is a lot of uncertainty

9  that exists on the global basis.  So I don't think that should

10  be a reason to tip the scales here with respect to Factor 4 or

11  otherwise.

12      **MR. PAK:**  Your Honor, just on that point, I think

13  there is a difference between court hearings and discovery.

14      You know, discovery -- and we have many pending cases here

15  in California.  Discovery is proceeding in all the cases that I

16  have been involved in.  We can conduct document production.  We

17  can do depositions by video or in person in certain situations,

18  depending on location.  And what we are finding is that

19  discovery is proceeding.

20      What the problem with injecting the alternative procedure

21  is that we would at a minimum have a two-month delay in

22  starting anything to get authorization from the Ministry.  But

23  after that, we would have to coordinate with the Commissioner,

24  who is located in France.

25      And that is the difference, Your Honor, is that we think

1   the U.S. discovery can begin immediately.  And obviously we can

2   have these kinds of hearings by telephone to deal with any

3   issues, Your Honor, that may come up.

4         **THE COURT:**  Well, that brings me to an important point

5   that you made.  So when -- explain what you mean by you think

6   the evidence is here and -- or it is available here in the

7   United States.  I mean, that's --

8         **MR. PAK:**  Yes, absolutely, Your Honor.  So the other

9   side has submitted a number of declarations.  None of them

10  contest the basic point, Your Honor, that we made all along

11  that there are basically two Defendants.

12        There is Vade Secure SASU, Vade Secure, Inc. and

13  Mr. Lemarie.  Vade Secure, Inc. is a U.S. company.  Mr. Lemarie

14  is a U.S. employee of that U.S. company.

15        Those two parties have access, we believe, to everything

16  that we will -- we have been requesting potentially in this

17  case.  None of the declarations submitted by the other side has

18  rebutted that.

19        Furthermore, Your Honor, we have third-party companies

20  that we received subpoenas from --

21        **THE COURT:**  Let me stop you there.

22        **MR. PAK:**  Yeah.

23        **THE COURT:**  Let me ask Defendants directly:  Is the

24  evidence they have been asking for here available in the United

25  States?

1      **MS. MARTIN:**  Your Honor, if you can retrieve and

2  produce documents outside of the Hague Convention out of

3  necessity, those documents have to be retrieved from servers in

4  France.  We have already been collecting evidence and documents

5  anticipating that Plaintiffs would at some point share the

6  deficiencies in their trade secret allegations and that the

7  Court would eventually allow discovery to proceed.  And all of

8  that work has been done in France on the French servers with

9  our client there out of necessity.

10     **THE COURT:**  So but it's --

11     **MS. MARTIN:**  Because that is where these documents

12 reside.

13     **THE COURT:**  So it has been transmitted to the United

14 States already or not?

15     **MS. MARTIN:**  No, Your Honor.  We have --

16     **THE COURT:**  So --

17     **MS. MARTIN:**  We have a European discovery team who is

18 well versed in privacy laws who is working to collect that

19 information appropriately under those laws.

20     **THE COURT:**  All right.

21     **MS. MARTIN:**  Sorry, I'm not sure if I said a U.S.

22 discovery team.  I meant an EU discovery team.  Apologies if I

23 misspoke.

24     **THE COURT:**  Okay.  All right.

25     **MR. PAK:**  So, Your Honor, on that point, there has

been no -- and I didn't hear this from Counsel for Vade -- all
of the -- we believe that all of the e-mail systems and servers
that she is talking about, the electronic repositories and the
source code, hosting services are all available to Vade Secure,
Inc. because Mr. Lemarie works for Vade Secure, Inc. and he is
based here; and he is the CTO of that company.  It leads me to
believe (inaudible) side of development of all of the projects
and products at issue in this case.

So that doesn't address the question of availability in
the United States.  We would need all the information that she
is talking about in terms of collection of documents.

Whether they are being hosted in France, are available in
the United States, and that's the analysis that the courts have
gone through whether you look at the *Salt River* case or you
look at the *Sun Group* case which Judge Kim handled.  The
question is availability of information here in the United
States, and we believe all that information is available
electronically in the United States.

Furthermore, Your Honor, we have served third-party
subpoenas on Amazon, GitHub, Evernote, as well as other
companies that are all American companies that serve here in
the United States.  And those are important companies because
they are hosting much of the source code at issue as well as,
we believe, documents that relate to the disruption of evidence
relating to Evernote accounts.

1      So that is third-party discovery although here in the

2    United States where it can be obtained through a subpoena

3    process.

4      And that's the reason why, Your Honor, we have always

5    maintained regardless of origin, the vast majority of the

6    documents, source code and evidence in this case will be

7    available and is available now in the United States; and we can

8    proceed with the U.S. discovery without delay.

9           **THE COURT:**  Is there a basis to sort of split the

10   discovery between what is based on U.S. company versus what is

11   going to be in France?

12          **MR. PAK:**  We don't think so, Your Honor, because we

13   are talking -- if you step back and think about the

14   allegations, we are talking about the development of really two

15   classes of products.  We have products that relate to what is

16   called spear phishing that was originally developed by

17   Mr. Lemarie when he joined the company.

18      Then we have another class of products.  That is the MTA

19   class of products that have not yet shipped that is under

20   development now.  Mr. Lemarie oversees that, as the CTO, the

21   development of both sets of projects.

22      So to us when we are looking at the evidence related to

23   our claims and in support of the issues, we are looking at how

24   much of the information did Mr. Lemarie utilize from his work

25   at Cloudmark/Proofpoint to help guide the development.

1        And we know that he wrote code while he was employed by

2   the Plaintiffs.  It is likely that he is also writing code with

3   respect to these projects that he engaged in at Vade.

4        So whether we look at the source code evidence or we look

5   at electronic evidence, which is e-mails, we think this is all

6   commingled.  And that's the reason why we believe that there is

7   no real distinction between the evidence that may be sitting in

8   servers in France, which is evidence that is available here in

9   the United States because all of that evidence -- Mr. Lemarie

10  is based here -- he can access all of that, whether it is

11  source code, whether it is e-mail or a server.

12       So we don't really see a need to distinguish the evidence

13  along those lines; and practically speaking, we believe that

14  all the things that Counsel for Vade talked about, Mr. Lemarie

15  and Mr. Curtil can access and can be ordered to produce now and

16  we --

17            **THE COURT:**  All right.

18            **MR. PAK:**  -- and we have heard nothing about that.

19            **MS. MARTIN:**  If I may respond just briefly,

20  Your Honor.

21            **THE COURT:**  I'm going to give you -- I'm going to give

22  you the last word.  It is your motion so you can speak last.

23  Thank you.

24            **MS. MARTIN:**  Okay.

25            **THE COURT:**  Go ahead.

1            **MS. MARTIN:**  Oh, so, you know -- the fact that

2    Touraille with knowledge has stated with clarity where these

3    documents are located, whether it be the source code, the

4    technical documentation and where those are located, maintained

5    in the ordinary course of business and, therefore, where they

6    need to be retrieved from, he has also stated that those

7    documents originate in France.

8            Now, under the French law, it doesn't -- even if there

9    were documents located or accessible from the United States,

10   that would not really end the inquiry because under French

11   law -- French criminal law, which would still apply, if Vade,

12   Inc. were to try to comply with the discovery order and

13   retrieve documents from France in any way -- it doesn't clear

14   the Defendants of any kind of violation of French law.  And

15   then we are basically in the same position that we are with

16   respect to Vade SASU.

17           And we have Mr. Curtil responding directly to Mr. -- to

18   Plaintiff's expert Boeringer on that point.  And so while

19   Boeringer has opined that French laws don't apply to the U.S.

20   entity or to Mr. Lemarie, Mr. Curtil has clearly rebutted that

21   and said that that's just not the case.

22           So whether those documents are sitting in France, which

23   they are -- and as I mentioned earlier, that is where the

24   collection is under way -- or if there were any opportunity for

25   any accessibility from the U.S., that simply just doesn't end

1    the inquiry from a French law perspective.

2          THE COURT:  All right.  Since I raised the issue and

3    Plaintiff pressed that it was indeed important to my analysis,

4    I would like you guys to file a supplemental statement or,

5    I guess, like a three-page joint letter brief on what type of

6    effect this pandemic has, and you can argue whether or not it

7    is applicable to my reasoning.

8       So I want you to be able to talk with each other but also

9    talk to your counterparts in France and figure out what their

10   situation is and whether or not this will actually have any

11   kind of delay that I should consider.

12      How long will it take you to talk with them and get me

13   something like that?  If I gave you ten days, would that give

14   you enough time?

15         MR. PAK:  Yes, Your Honor, I would --

16         MS. MARTIN:  Sure.

17         MR. PAK:  I would actually, if it is possible to

18   shorten that because we would like resolution on this issue.

19   Would it be possible to get this to you by next Friday?  Would

20   that work for you?

21         THE COURT:  Well, let's find out from Defendant.  What

22   do you think?

23         MS. MARTIN:  I think ten days is reasonable,

24   Your Honor.

25         THE COURT:  My concern is that you have, you know,

1    up-to-date information that is -- that is appropriate; and I

2    think ten days is appropriate.  So let's do ten days.

3        So get it to me by -- what is that -- the 30th?  Is

4    that -- that is not a weekend, is it?  No.  It is a Monday.

5            **MS. MARTIN:**  It is a Monday, Your Honor.

6            **MR. PAK:**  Yeah.

7            **THE COURT:**  So -- and I want it to be a joint letter

8    brief because I kind of want you guys to talk about it because

9    I think it is important that you guys are on the same page

10   because obviously discovery is going to proceed forward in some

11   form or fashion, and I need you guys talking.

12       So just three pages maximum, page and a half each; and

13   just give me something brief on that.  All right.

14           **MR. PAK:**  Yes, Your Honor.

15           **MS. MARTIN:**  Yes, Your Honor.

16           **THE COURT:**  All right.  And then -- so -- let me see

17   this note.  Hang on just a second.

18                       (Pause in proceedings.)

19           **THE COURT:**  Okay.  I need everybody to restate your

20   names for the record for us.  My clerk wasn't able to get them

21   all down.

22       So everybody who is on the line, if you will just restate

23   your name for the record, please.

24           **MR. PAK:**  Sure.  Sean Pak and Iman Lordgooei from

25   Quinn Emanuel for Plaintiffs.

```
 1              MS. MARTIN:  We have Mackenzie Martin -- oh, I'm

 2    sorry.  Go ahead.

 3              MR. DIALS:  No.  You go ahead.

 4              MS. MARTIN:  You have Mackenzie Martin and Jay Utley

 5    on behalf of Defendants.

 6              MR. DIALS:  Yes, Your Honor.  For the Plaintiff

 7    in-house we have John Dials, Michael Yang and Jeff Reed.

 8              THE COURT:  All right.  You got that?

 9                        (No response.)

10              THE COURT:  Are they listed -- all these people are --

11    that's our problem is that we need some spellings for last

12    names because some of the folks -- for in-house counsel because

13    they are not on the docket.  I need the spelling for in-house,

14    counsel.

15              MR. DIALS:  Sure.  It is John Dials, D-I-A-L-S;

16    Michael Yang, Y-A-N-G, and Jeff Reed, R-E-E-D.

17              THE COURT:  One more time on John.

18              MR. DIALS:  Dials, D-I-A-L-S.

19              THE COURT:  Dials.  All right.  We are good.

20    Everybody stay well.  Stay away from each other, and I will

21    look forward to seeing your brief in about ten days.  Okay.

22              MR. PAK:  Thank you, Your Honor.

23              MS. MARTIN:  Excuse me, Your Honor.

24              THE COURT:  Yes.

25              MS. MARTIN:  Just one moment.  I had understood that
```

1    also set for hearing today was Defendant's motion for

2    protection.

3              THE COURT:  Oh, okay.  Hang on just a second.

4                        (Pause in proceedings.)

5              THE COURT:  That's right, we had that too.  You are

6    talking about the protective order, correct?

7              MS. MARTIN:  Correct.

8              THE COURT:  Hang on.  Let me pull that up here.

9                        (Pause in proceedings.)

10             THE COURT:  All right.  Go ahead.

11             MR. PAK:  So, Your Honor --

12             MS. MARTIN:  If it --

13             MR. PAK:  We think --

14             MS. MARTIN:  If it makes sense, I think Defendants

15   should probably go first.

16             MR. PAK:  Of course, yes.

17             MS. MARTIN:  Thank you.  So where we are standing

18   today is with a ruling from Judge Chesney in which after

19   considering Plaintiffs' preliminary injunction briefing and

20   voluminous exhibits, including more than 1,300 pages of

21   technical documents, marketing materials, source code log

22   files, fact witness and expert declarations, Judge Chesney

23   determined that Plaintiffs have not even demonstrated the prima

24   facie case of trade secret misappropriation in nearly nine

25   months of litigation.

1    And, importantly, in that ruling, Judge Chesney determined

2    that the record does not include evidence that sufficiently

3    identifies the claim trade secrets.

4    Now, immediately after Judge Chesney issued that ruling,

5    Defendants demanded that Plaintiffs provide an identification

6    of their alleged trade secrets with reasonable particularity;

7    and Plaintiffs refused and indicated that they would oppose

8    this motion for protection at that stage.

9    And then at nearly midnight central time last night

10   Plaintiffs dumped on us a 70-page interrogatory response and

11   600 pages of documents purporting to identify their alleged

12   trade secrets which, based on the preliminary review, is merely

13   a repeat of what we have seen multiple times in this case

14   already; and it is wholly inadequate for the same reasons that

15   Judge Chesney articulated in her prior ruling.

16   Now, Defendants have complained from the outset of this

17   case through both offensive and defensive motion practice and

18   through a mountain of correspondence that Plaintiffs have

19   failed to identify a trade secret sufficiently specific to

20   allow this case to go forward.  And with this latest attempt,

21   Plaintiffs have shown again that they are not able to do so.

22   Now Plaintiffs nonetheless want to barrel ahead with

23   discovery and try to get Defendants' source code and technical

24   documents when they have not even met the threshold requirement

25   of identifying a trade secret with any reasonable

1  particularity.

2      And so Defendants' motion for protection seeks protection

3  from discovery relating to Plaintiffs' claims unless and until

4  they do.  And Defendants are also prepared to move forward with

5  a motion for summary judgment on the issue of Plaintiffs'

6  failure to identify protectable trade secret.  So we are also

7  asking the Court for protection from discovery while we do so.

8          **THE COURT:**  From all discovery?  All discovery?

9          **MS. MARTIN:**  From discovery -- correct, Your Honor,

10  relating to Plaintiffs' claim.

11          **THE COURT:**  Okay.

12          **MR. LORDGOOEI:**  Your Honor --

13          **THE COURT:**  Go ahead.

14          **MR. PAK:**  Go ahead, Mr. Lordgooei.

15          **MR. LORDGOOEI:**  This is Iman Lordgooei for the

16  Plaintiffs, Your Honor.  Just to clear the record of the

17  factual background relating to this issue, we think Defendants

18  were kind of overstating what actually happened in terms of the

19  timeline here.

20      Discovery has been open since October.  Since October, we

21  haven't received any request for discovery from Defendants.  It

22  was not until just a few weeks ago on March 2nd that Defendants

23  served with an interrogatory at our request seeking an

24  identification of the trade secrets.  And so prior to

25  March 2nd, there was no mechanism for us to provide disclosure

1    of our trade secrets.

2        And when they pointed out that they wanted to file this

3    motion for protective order, we told them we don't object to

4    providing identification of the trade secrets; and we will do

5    so on a timely basis as soon as we receive a request from them.

6        And so when they served the interrogatory on March 2nd, we

7    began to diligently put together that disclosure.  And last

8    night we served it on them, which we had told them we would do

9    when the parties had met and conferred in person in advance of

10   filing the joint letter brief on this issue.

11       So it shouldn't have come as a surprise to them.  I'm

12   actually surprised that it came as a surprise to them.  But, in

13   any event, the allegation that the over 70 pages of trade

14   secret -- detailed trade secret disclosures that we provided

15   are somehow inadequate is completely besotted by the actual

16   details that are provided in that disclosure.

17       We identified specifics, source code functionality, source

18   code routines that constitute the trade secrets.  We identified

19   specific functionality and features that are tied back to

20   features that were disclosed in our complaints which, by the

21   way, when Defendants filed a motion to dismiss our complaint

22   for failure to identify trade secrets, Judge Chesney found,

23   quote, contrary to Defendants' argument, Plaintiffs have

24   sufficiently described the alleged trade secrets.  And she also

25   found that we sufficiently alleged facts from which

1  misappropriation reasonably can be inferred.

2      So when we filed a motion for preliminary injunction and

3  Judge Chesney issued her order denying the preliminary

4  injunction, that wasn't, in our belief, a finding that there is

5  no prima facia case of trade secret misappropriation alleged

6  here.  It was merely that she did not have enough evidence in

7  front of her on the record that was established for the motion

8  for preliminary injunction in order to issue an order for

9  preliminary injunctive relief which, you know, the Court

10  recognizes an extraordinary remedy.

11      And so there are different standards here.  The standard

12  under the trade secret disclosure, I believe, we completely

13  satisfied that with the disclosure that we provided to

14  Defendants last night.  And this is just another attempt at

15  delaying discovery in this case by Defendants.

16          **THE COURT:**  But even --

17      **MR. LORDGOOEI:**  Moreover, we don't believe it applies

18  to all the discovery in this case because, as we noted in the

19  letter brief, we have breach of contract claims that don't

20  relate to misappropriation of the trade secrets.

21      There is definitely some trade secrets -- would be one of

22  the bases for one of those breach of contract claims; but for

23  whether there is a claim for breach related to Mr. Lemarie's

24  failure to return documents to Cloudmark and his subsequent

25  releasing of Cloudmark confidential information, there is a

1   claim for his failure to disclose one of the inventions that he

2   came with or worked on within the six-month period following

3   his departure from Cloudmark.  There is a claim for breach of

4   contract with respect to user disclosure of any confidential

5   information that may -- may not rise to the level of a trade

6   secret; but, nevertheless, is more confidential information.

7   So discovery on all of those claims should have been received.

8        **THE COURT:**  Well, with regard to what you gave them

9   last night, I mean, it details -- you know, it is 70-something

10  pages.  How detailed is it?  How does -- does it directly

11  answer, you know, what they are asking for?  I don't know --

12  you know, I don't have that.  And apparently Defendants have

13  only had time to do a preliminary review.

14      It is a little bit difficult for me to say whether or not,

15  you know, it sends it forth or not; right?

16      **MR. LORDGOOEI:**  Right, Your Honor.  And that's what we

17  explained to them when they wanted to file this -- when they

18  indicated they intended to file this motion for protective

19  order, we informed them that we had no intention of not

20  disclosing our trade secrets and that we would do so.

21      And so that's why we believe from the outset that this

22  motion for protective order was premature.  In any event, the

23  disclosure does contain some highly detailed disclosure of the

24  trade secrets, as I mentioned, that goes through and identifies

25  specific source code files that we believe were

1  misappropriated.  It identifies specific functionality in

2  Plaintiffs' MTA product, in Plaintiff's Trident product.  We

3  tie that functionality back to specific routines that are run

4  in the source code and functionality in the source code.

5      And so even looking at some of the cases that the

6  Defendants have cited in their letter brief in terms of

7  sufficient particularity of trade secret disclosures under

8  2019/210 -- which, by the way, we don't believe applies in this

9  case because we haven't brought any claims of misappropriation

10  under the California Uniform Trade Secrets Act -- but, in any

11  event, we believe that our disclosure even meets that standard

12  and is more detailed than some of the cases -- for example, the

13  *Straight Path* case that found disclosure of the diagram and

14  some additional details relating to how a database was

15  structured constituted trade secrets.

16      Here, we have provided way more detail than that in terms

17  of the actual source code routine and source code functionality

18  that we believe was misappropriated.

19          **THE COURT:**  So --

20          **MS. MARTIN:**  If I may respond to that, Your Honor.

21          **THE COURT:**  Briefly, please.

22          **MS. MARTIN:**  Yes.  I mean, so -- we view this raw

23  response and the pages provided and the documents provided as

24  repetitive of what Plaintiffs have provided in their complaint

25  and at the preliminary injunction stage.  You know, Judge

1   Chesney has already considered more than 1,300 pages of

2   evidence from Plaintiffs in the course of the motion for PI.

3   And if these 600 pages had been added, based on our preliminary

4   review, it would not have changed the outcome.

5       We see repetition in the rog response compared to what is

6   previously alleged and also repetition within the rog itself.

7   As to what we see here is truly kind of a quantity of a quality

8   issue.

9       We also see in the rog response Plaintiffs claiming and

10  pointing to all of their source code for these products at

11  issue including all subdirectories and files.  It is

12  essentially a laundry list of directories of the entirety of

13  their source code for each product including all versions, and

14  they have provided different aggregate lists of directories and

15  subdirectories and files, which appears to be a listing of all

16  of those items for each product.

17      Under *Citcon*, which Judge Chesney cited to in her

18  decision -- in *Citcon* where the Court denied a motion for

19  preliminary injunction in this same type of instance where

20  Plaintiff described categories of code at a high level and just

21  alluded to the source code more generally or in its entirety.

22      And also in *Citcon*, that case, the Judge provided an

23  example of a sufficient disclosure, an identification of ten

24  specific trade secrets that describe the functionality of each

25  along with particular named files from the code that reflect

1    the source code that is specific to each functionality.  And

2    that is just not what is done here.

3        Instead, we are seeing all source code for each product

4    including all versions and these aggregate directories and

5    subdirectories and files which, by the way, we don't have.

6        So, again, we view this as more of the same and quite

7    honestly, the opposite of particularity.

8        **THE COURT:**  So the issue is that normally when this

9    stuff happens, you get your response.  And then if there is a

10   problem with that response and you say there is not enough

11   particularity; there is not enough specifics, and they say,

12   yes, this is responsive to this question -- you know,

13   paragraph 3 of lines -- of page 16 or something like that --

14   and then guys have a little bit of back and forth to be able to

15   figure out whether or not it is specific enough.

16       And then you come to me and then you say:  This is our

17   problem with it and this is why and this is an example of why,

18   and then I can sort of sort it out.  At this point I can't.

19       So you guys will have until March 30th to meet and confer

20   and see if you guys can sort out at least most of it, and then

21   file a joint letter brief letting me know what is left and why.

22       And so I will reserve ruling until I have received that

23   second letter brief.

24       I don't anticipate having to have a hearing on it.  I

25   should be able to take it off the papers.  But if I need some

```
 1   clarification, I will do that.  All right.

 2           MR. PAK:  Thank you, Your Honor.

 3           MS. MARTIN:  Thank you, Your Honor.

 4       Can we confirm the stay remains in place until that

 5   ruling?

 6           THE COURT:  That's correct.

 7           MS. MARTIN:  Okay.  Thank you, Your Honor.

 8           THE COURT:  All right.  Anything further?

 9           MR. PAK:  No, Your Honor.

10           THE COURT:  By the way, those need --

11           MS. MARTIN:  No, Your Honor.

12           THE COURT:  Those need to be separate briefs so that I

13   can have different numbers on them.  Don't file them as one.

14   The two that you guys are going to file, just keep them

15   separated for me.  All right.

16           MR. PAK:  Will do, Your Honor.

17           MS. MARTIN:  Your Honor, what length would you like on

18   the meet-and-confer on the trade secret identification letter

19   brief?  You also want three pages or five for that?

20           THE COURT:  I will give you guys five on that one.

21   But don't take that as an invitation to not get most of it

22   sorted.  All right?

23           MS. MARTIN:  Understood, Your Honor.

24           THE COURT:  Come on, we need to pull together in these

25   times.  We need to work together.
```

 1                          (Laughter)

 2          **THE COURT:**  All right.

 3          **MR. PAK:**  That's right, Your Honor.

 4          **THE COURT:**  All right.  Everyone, have a good weekend.

 5   Take care.

 6          **MS. MARTIN:**  Thank you, Your Honor.

 7          **MR. PAK:**  Thank you.

 8          **MR. LORDGOOEI:**  Thank you.

 9                 (Proceedings adjourned at 10:37 a.m.)

10                         ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the official

5    electronic sound recording provided to me by the U.S. District

6    Court, Northern District of California, of the proceedings

7    taken on the date and time previously stated in the

8    above-entitled matter.

9          I further certify that I am neither counsel for, related

10   to, nor employed by any of the parties to the action in which

11   this proceeding was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15   DATE:   Saturday, March 21, 2020

16

17

18                      *Marla Knox*

19   _____

20            Marla F. Knox, RPR, CRR, RMR
              United States Court Reporter

21

22

23

24

25