UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| PROOFPOINT, INC., *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>VADE SECURE, INCORPORATED, *et al.*,<br><br>    Defendants. | Case No. 19-cv-04238-MMC (RMI)<br><br>**ORDER ON DEFENDANTS' MOTIONS FOR RECONSIDERATION AND MOTION FOR A PROTECTIVE ORDER**<br><br>Re: Dkt. Nos. 121, 128, 145, 146 |

Now pending before the court are Defendants' motion (dkt. 121) for reconsideration of a previous court order (dkt. 112) directing the parties to conduct discovery under the Federal Rules of Civil Procedure, rather than under the evidentiary exchange procedures of the Hague Convention of 1970, as well as Defendants' motion (dkts. 128, 145) for a protective order barring discovery until such time that Plaintiffs have "adequately identified the purported trade secrets that have allegedly been misappropriated." *See* Joint Ltr. Br. of March 30, 2020 (dkt. 145) at 1. For the reasons discussed below, both of Defendants' motions are denied.

**DEFENDANTS' RECONSIDERATION MOTION**

On January 31, 2020, in resolving a series of discovery disputes between the parties, the undersigned found that discovery in this case should be conducted under the Federal Rules of Civil Procedure rather than under the procedures outlined in the Hague Convention of 1970. *See* Order of January 31, 2020 (dkt. 112). Thereafter, on February 14, 2020, Defendants simultaneously moved the undersigned for reconsideration of that order, appealed that order and sought relief from the district judge, and moved for a stay of discovery pending the outcome of the appeal. *See* Defs.' Mots. (dkts. 121, 122, 123). On February 19, 2020, given the fact that

Defendants had attempted to both seek reconsideration by the undersigned and an order from the district judge granting relief, Judge Chesney found Defendants' motion seeking vacatur (dkt. 122) to be premature and denied the same without prejudice to refiling after the resolution of the motion for reconsideration. *See* Order of February 19, 2020 (dkt. 125) at 1. Thereafter, given that Defendants' motion for a stay of discovery (dkt. 123) remained pending, the undersigned construed it as a motion to stay compliance with the discovery order of January 31, 2020 (dkt. 112), until after the resolution of the still-pending reconsideration motion. *See* Order of March 11, 2020 (dkt. 132).

      Defendants' reconsideration motion argues that the undersigned erred by failing to "consider dispositive facts and arguments," which Defendants claim they were previously hindered from submitting due to the fact that a general standing order issued by the undersigned requires discovery disputes to be submitted by letter brief, without exhibits or attachments. *See* Defs.' Mot. (dkt. 121) at 3. While Defendants have now filed a variety of such documents, much of the substance of what Defendants characterize as "dispositive facts and arguments" was in fact proffered by Defendants at the hearing of January 31, 2020 (*see generally* Tr. (dkt. 115)), and subsequently considered by the undersigned. Defendants also assign error to the fact that the undersigned previously found that it was unclear if some or all of the information sought in discovery was simply now stored in France, or if it originated in France. *See* Defs.' Mot. (dkt. 121) at 4. Defendants' portion of the letter brief, through which this dispute was initially presented, explained that "[u]under French law, a party is prohibited from disclosing information *that originated in France* for use in a non-French proceeding . . ." *See* Letter Br. of January 6, 2020 (dkt. 91) at 5 (emphasis added). Of course, the reason that the undersigned previously criticized Defendants' "generalized" assertions and found that they had failed to meet their burden in demonstrating that French law clearly applied to the discovery sought was because Defendants' counsel stated at one point during the hearing of January 31, 2020, that "the vast majority of all of Defendants' documents and information are maintained and stored in France or, *to some extent*, originated from France." *See* Tr. (dkt. 115) at 4 (emphasis added); *see also* Letter Br. of January 6, 2020 (dkt. 91) at 5 ("As a result, with limited exceptions, Defendants' documents and information

2

originate from France, and in most instances, are being stored on servers and equipment located in France."). Since then, Defendants have changed their position on this point several times. *See e.g.,* Tr. (dkt. 115) at 32 ("We have an opinion from a French lawyer who has also reviewed the request and is willing to attest that the documents and information sought here originated in France . . ."); *see also* Seguy Decl., Defs.' Mot. (dkt. 121-10) at 2 (wherein Defendants' Chief Financial Officer declares that "[c]ompany documents and information for VSS and VSI responsive to the Discovery Requests are maintained and stored on servers located in France *and/or* originate from France.") (emphasis added). Thus, because Defendants continue to waffle and hedge as to the question of what portion of the information sought here in discovery has *in fact* originated in France, it is still unclear whether or not French law applies to all of the information subject to the currently pending discovery requests.

In any event, Defendants have now had ample opportunity to present a detailed reconsideration motion (dkt. 121); a declaration from one of their attorneys, Mark Ratway (dkt. 121-1); a highlighted copy of a transcript from the January 31st hearing (dkt. 121-2); a lengthy opinion on the French Blocking Statute authored by Antoine Gaudemet (hereafter, the "Gaudemet Opinion") (dkt. 121-3); certain correspondence between counsel for the parties in this case (dkt. 121-4, 121-6); certain correspondence from the French Ministry of Justice addressed to Defendants' counsel (dkt. 121-5); a series of draft proposed orders providing for discovery under Hague Convention procedures (dkt. 121-7, 121-8); another opinion letter authored by a different French attorney, Jean-Dominique Touraille (hereafter, the "Touraille Declaration") (dkt. 121-9); a declaration from one of Defendants' corporate officers, Romain Seguy (hereafter, the "Seguy Declaration") (dkt. 121-10); a detailed reply brief (dkt. 130); a second declaration authored by Jean-Dominique Touraille (hereafter, the "Second Touraille Declaration") (dkt. 130-1); a colorful 32-page illustrated and highlighted document that is entirely in French (dkt. 130-2); a detailed sur-sur reply brief (dkt. 138); a declaration from a third French attorney, Christian Curtil (hereafter, the "Curtil Declaration") (dkt. 138-1); and, another opinion letter about the French Blocking Statute from Noelle Lenoir, another French attorney (dkt. 138-2). Thereafter, on March 20, 2020, the undersigned conducted a hearing on Defendants' reconsideration motion. *See* Tr. (dkt. 143).

3

1  Following the hearing, the parties presented a jointly-filed post-hearing letter brief through which
2  additional arguments were presented in light of the global pandemic and associated travel
3  restrictions currently in place (dkt. 146), to which Defendants attached yet another declaration
4  from Jean-Dominique Touraille (hereafter, the "Third Touraille Declaration") (dkt. 146-1), as well
5  as certain correspondence which is entirely in French (dkt. 146-3), and, there was also a press
6  release from the French Ministry of Justice dated March 15, 2020 (dkt. 146-4). With the exception
7  of the materials that are not in English, the undersigned has carefully reviewed and considered
8  each of the above-described submissions.

9      When this dispute was originally presented, Defendants' principal argument was that "if a
10 party produces documents or information in violation of French law, that party exposes itself to
11 both civil and criminal penalties." *See* Letter Br. of January 6, 2020 (dkt. 91) at 5. Additionally,
12 with regards to the analysis of the relevant factors to be considered, Defendants relied heavily on
13 *Salt River Project Agric. Improvement & Power Dist. v. Trench Fr. SAS*, 303 F. Supp. 3d 1004,
14 1005 (D. Ariz. 2018). *See* Letter Br. of January 6, 2020 (dkt. 91) at 5-7 nn. 4, 8, 19. Presently,
15 Defendants' reconsideration motion does little more than to repeat – no less than sixteen times –
16 that Defendants were previously prohibited by a general standing order from providing "material
17 facts or dispositive legal arguments" that would have, or should have, tipped the analysis in
18 Defendants' favor. *See generally* Defs.' Mot. (dkt. 121) at 2-9. For the reasons set forth below, the
19 undersigned disagrees.

20     First, Defendants have filed the Ratway Declaration, to which they have attached a
21 highlighted copy of the transcript of the January 31, 2020, hearing before the undersigned, the
22 Gaudamet Opinion, a series of correspondence of little import, and certain draft proposed orders.
23 *See* Ratway Decl. (dkt. 121-1). The Gaudamet Opinion explains that the French Blocking Statute,
24 Article 1 *bis* of Law No. 68-678 of 26 July 1968, provides that "[s]ubject to international treaties
25 or agreements and the laws and regulations in force, all persons are prohibited from requesting,
26 seeking or disclosing, in writing, orally or in any other form, economic, commercial, industrial,
27 financial or technical documents or information with a view to establishing evidence in foreign
28 judicial or administrative proceedings in relation thereto." Gaudamet Op. (dkt. 121-3) at 24.

Further, Article 1 of the same law seeks to preclude disclosure of such information if "the disclosure [] would prejudice the sovereignty, security or essential economic interests of France or public policy, as specified to the extent required by the administrative authority." *Id*. at 26. The Gaudamet Opinion then concluded that "[c]onsequently, the disclosure of documents sought [here] . . . could '*prejudice the sovereignty, security or essential economic interests of France or public policy*' within the meaning of Article 1 of Law No. 68-678 of 26 July 1968." *Id*. at 27 (emphasis in original). Thus, the Gaudamet Opinion provided that if discovery were to proceed under the Federal Rules of Civil Procedure in this case, that the parties in this case, as well as their relevant directors, representatives, agents, and officers "would accordingly be exposed to the risk of the imposition of the penalties provided for by Article 3" of the same law, namely, prison terms of up to six months and fines ranging between 18,000 and 90,000 Euros. *Id*. at 28-29. Regarding the actuality of such prosecutions in France during the more than 50 years of the French Blocking Statute's existence, the Gaudamet Opinion explained that "[a]t the criminal level, prosecutions instigated on the basis of Articles 1 or 1 *bis* and 3 of Law No. 68-678 of July 1968, although probably more numerous, are known mainly through two decisions of the Criminal Division of the Court of Cassation." *Id*. at 31. However, neither of the two cases that were briefly mentioned in the Gaudamet Opinion were described as involving the disclosure of such information as being compelled by the order of a foreign court – instead, one case involved a lawyer who was fined for requesting and seeking information "with a view to establishing evidence in the context of foreign judicial proceedings before a foreign court," and the other case involved an appellate order that "confirmed an order dismissing proceedings" in a case involving "disclosing to foreign public authorities documents the disclosure of which would prejudice the essential economic interests of France." *Id*. Lastly, the Gaudamet Opinion related that "recently this Law has in general been the subject of renewed interest on the part of the French [g]overnment and legislators." *Id*. at 38.

        The first of the three Touraille Declarations is somewhat more informative than the Gaudamet Opinion, where, with refreshing candor it is explained that "France generally considers the breadth of United States discovery procedures to be unnecessarily invasive . . . [and] to protect against the perceived invasiveness of U.S.-style discovery, France has enacted what is known as a

'blocking statute,' which, *inter alia*, criminalizes the act of communicating economic, commercial, industrial, financial, or technical documents or information for the purpose of using the same as evidence in foreign legal proceedings." *See* Touraile Decl. (dkt. 121-9) at 4. The Touraille Declation then ventured to speculate that "[t]o the extent that prosecutions or penalties under the Blocking Statute have not been commonplace, this is because French companies and individuals habitually fail to notify any governmental agency or department in France of receipt of a request to produce documents for use in a foreign judicial proceeding." *Id*. at 6. Thereafter, the Touraille Declaration provides an explanation of the two different modes of supervised evidentiary exchange under Chapters I and II of the Hague Convention (involving the supervision of a French judge with the former, and a private commissioner with the latter). *Id.* at 8-10. Regarding evidentiary exchange under Chapter II of the Hague Convention, the Touraille Declaration noted that the French Ministry of Justice reviews requests for authorization on a case by case basis, and typically grants such requests within two months from the date that a foreign court would appoint a commissioner. *Id*. at 9. Thereafter, evidentiary exchange is "itself subject to certain procedural conditions that are meant to ensure the production of evidence by the producing party is voluntary," such as requiring: that evidence be taken within the precincts of an embassy whenever possible; that the Office for International Judicial Cooperation in Civil and Commercial Matters be given due notice of the date and time at which the evidence is to be taken so that it can make representatives available if necessary; that the evidence be taken in a room to which the public has access whenever possible; and, that persons who are to give evidence must receive due notice in the form of an official summons in French with a copy delivered to the Ministry of Justice. *Id*. at 9-10. Lastly, the Touraille Declaration provided that, "[a]ccording to me, and with the exception of Interrogatory No. 1 to Olivier Lemarie, the Discovery Requests are subject to the French Blocking Statute because they seek documents, communications, and/or information of an economic, commercial, industrial, financial, or technical nature for the purpose of constituting evidence for or in the context of foreign judicial or administrative proceedings." *Id*. at 11.

As to the Supplemental Touraille Declaration, its relevance is limited to the suggestion that some or all of the information sought in discovery is currently located in France, as opposed to

being located in the United States. *See* Defs.' Reply (dkt. 130) at 5-6; *see also* Supp. Touraille Decl. (dkt. 130-1) at 2-3. Defendants' have also filed a Sur-Sur-Reply Brief, in which they reiterate that the information sought by Plaintiffs in discovery is currently located in France, and also that the French Blocking Statute "is a matter of French Law, and it applies to all Defendants – not only [to] Vade SASU . . . [and that] [t]he French Blocking Statute does not prevent French parties from making factual representations and filing declarations in support of their defenses" in foreign litigation. *See* Defs.' Sur-Sur-Reply (dkt. 138) at 3-8. Regarding the Curtil Declaration, Defendants retained a French white collar criminal defense attorney who noted his disagreement with a similar attorney retained by Plaintiffs who had suggested that actions by Vade, Inc. and Olivier Lemarie would not violate the French Blocking Statute, or that there was any likelihood that Vade SASU would be criminally penalized for any violation of that statute. *See* Curtil Decl. (dkt. 138-1) at 3. Furthermore, Defendants have also attached another opinion regarding the French Blocking Statute to their Sur-Sur-Reply Brief which was authored by Noelle Lenoir, and filed originally in an unrelated action in the Eastern District of Pennsylvania. *See* Lenoir Report (dkt. 138-2). Therein, it was reiterated that since the 1950s, governments in Europe had been concerned with "intrusive requests for production of documents by U.S. public authorities at the pre-trial phase of litigation," which caused countries such as France "expressly to limit document requests' extraterritorial effect during investigations of French shipping companies then being conducted by the U.S. DOJ and the Federal Maritime Commission." *Id.* at 16. In essence, "[t]he approach of the U.S. authorities, calling on these companies to disclose information on their strategies and their business relations with third parties, concerned the French government, just as similar requests had concerned other foreign governments." *Id.* at 17. Thereafter, the French Blocking Statute was amended in 1980 to extend to all economic sectors and also "became applicable to the search for evidence by private plaintiffs or their counsel through the pre-trial discovery mechanism." *Id.*

     Regarding the effects of the currently ongoing pandemic and the associated travel restrictions, Defendants submit that similar shelter-in-place orders and work-from-home arrangements are in place in the United States as well as France. *See* Letter Br. of March 30, 2020

7

(dkt. 146) at 3. Defendants contend that "[i]f anything, the pandemic tips several factors *even further* in favor of utilizing Hague Convention procedure." *Id*. at 3-4 (emphasis in original). Attached to this letter brief, Defendants have submitted the Third Touraille Declaration which relates that due to the ongoing health crisis, the relevant bureau within the French Ministry of Justice is currently working remotely and will accept email communications and provide responses via email as soon as possible. *See* Third Touraille Decl. (dkt. 146-1) at 3-4. Lastly, an English language translation from a March 15, 2020, press release from the French Ministry of Justice provides that "[t]he courts will therefore be closed except for those services that will handle essential litigation (urgent criminal hearings, presentations before the examining magistrate and the judge of liberty and detention, urgent hearings of juvenile judges, public prosecutor's offices, urgent procedures before the civil judge, in particular for the eviction of a violent spouse)." *See* Ex. C to Third Touraille Decl. (dkt. 146-4) at 5.

**Discussion**

Both the discovery rules set forth in the Federal Rules of Civil Procedure, and the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (opened for signature, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, hereafter, the "Convention"), are the law of the United States. *See Societe Nationale Industrielle Aerospatiale v. United States Dist. Court*, 482 U.S. 522, 533 (1987). Further, "the Convention was intended as a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad . . . [because] the text [], as well as the history of its proposal and ratification by the United States, unambiguously supports the conclusion that it was intended to establish optional procedures that would facilitate the taking of evidence abroad." *Id*. at 536-38. Accordingly, two things should be noted in this regard. First, it should be noted that the Convention "did not deprive the District Court of the jurisdiction it otherwise possessed to order a foreign national party before it to produce evidence physically located within a signatory nation." *Id*. at 539-40. Second, "when a litigant is subject to the jurisdiction of the district court, arguably the evidence it is required to produce is not 'abroad' within the meaning of the Convention, even though it is in fact located in a foreign country at the time of the discovery request and even though it will have to be gathered or

otherwise prepared abroad." *Id*. at 541. Nevertheless, the Supreme Court has instructed that when supervising pretrial proceedings, district courts should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position; thus, judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. *Id*. at 546. Indeed, in *Aerospatiale*, when the Supreme Court was invited to interpret the Convention as a mandatory first-resort procedure for international evidentiary exchange, the Court declined and explained that, "[i]n many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules . . . [and thus] [a] rule of first resort in all cases would therefore be inconsistent with the overriding interest in the 'just, speedy, and inexpensive determination' of litigation in our courts." *Id*. at 542-43 (quoting Fed. Rule Civ. Proc. 1).

As to the interaction between the French Blocking Statute and a district court's election between conducting discovery under the procedures outlined in the Convention or the Federal Rules of Civil Procedure, "[i]t is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Id*. at 544 n. 29 (citing *Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 204-206 (1958)). It is equally well settled that an enactment such as the French Blocking Statute can neither "require American courts to engraft a rule of first resort onto the Hague Convention, [nor] otherwise [] provide the nationals of such a country with a preferred status in our courts." *Aerospatiale*, 482 U.S. at 544 n. 29. American courts, therefore, are not required to blindly obey the directives of such foreign statutes, given that doing so would appear to manifest an extraordinary exercise of legislative jurisdiction by a foreign government over a United States district court by essentially precluding that court from ordering any discovery from a party of that particular nationality. *Id*. Thus, as the Court in *Aerospatiale* explained: "[w]hile the District Court's discovery orders arguably have some impact in France, the French blocking statute asserts similar authority over acts to take place in this country. The lesson of comity is that neither the discovery order nor the

9

1  blocking statute can have the same omnipresent effect that it would have in a world of only one

2  sovereign . . . and [t]he blocking statute thus is relevant to the court's particularized comity

3  analysis ***only*** to the extent that its terms and its enforcement identify the nature of the sovereign

4  interests in nondisclosure of specific kinds of material." *Id*. (emphasis added).

5        Regarding the comity analysis between proceeding under the Federal Rules or the

6  Convention, district courts have been instructed to consider a list of non-exhaustive factors such

7  as: (1) the importance to the investigation or litigation of the documents or other information

8  requested; (2) the degree of specificity of the request; (3) whether the information originated in the

9  United States; (4) the availability of alternative means of securing the information; (5) the extent

10 to which noncompliance with the request would undermine important interests of the United

11 States, or the extent to which compliance with the request would undermine important interests of

12 the state where the information is located; (6) the extent and the nature of the hardship that

13 inconsistent enforcement would impose upon the person; and, (7) the extent to which enforcement

14 by action of either state can reasonably be expected to achieve compliance with the rule prescribed

15 by that state. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir.

16 1992); *Aerospatiale*, 482 U.S. at 544 n.28; *see also* Restatement (Third) of Foreign Relations Law

17 § 442(1)(c); and, Restatement (Second) of Foreign Relations Law § 40.

18       In the previous order directing discovery to be conducted under the Federal Rules rather

19 than the Convention it was noted that, at the threshold, this court must determine whether French

20 law actually bars the production at issue. *See e.g., Dexia Credit Local v. Rogan*, 231 F.R.D. 538,

21 541 (N.D. Ill. 2004). It is Defendants' burden, as the party relying on foreign law to block

22 production, to "provide the Court with information of sufficient particularity and specificity to

23 allow the Court to determine whether the discovery sought is indeed prohibited by foreign law."

24 *Id*. As mentioned above, Defendants have continuously waffled, hedged, and shifted positions as

25 to whether or not all of the information now sought in discovery is simply located in France, or

26 whether the information in fact *originated* in France. Because Defendants have yet to express a

27 clear and unequivocal position in this regard, this factor weighs against Defendants. Furthermore,

28 Defendants here may be compelled to produce the documents and information physically located

10

in France if the documents are nonetheless within Defendants' "control." Fed. R. Civ. P. 34(a)(1); *see also Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating & Air-Conditioning Engineers, Inc.*, 755 F.3d 832, 838-39 (7th Cir. 2014).

In analyzing the seven factors enumerated above, it should be noted that the French Blocking Statute at issue here "was originally created to block United States antitrust laws and it has not been strictly enforced in France." *In re Aircrash Disaster Near Roselawn, Ind. Oct. 31, 1994*, 172 F.R.D. 295, 310 (N.D. Ill. 1997) (citing *Aerospatiale*, 482 U.S. at 525, 527). The Court of Appeals for the Seventh Circuit found it informative to contrast the French blocking statute with a similar Romanian law that was aimed at protecting Romanian national secrets; thus, while Romania's interest in its national security law may be more compelling than the American interest in enforcing its judicial decisions and implementing fair procedures for the exchange of information in the discovery process, the French blocking statute was not aimed at "protecting [the] state," but at "merely protecting [French] corporations from [the intrusiveness of] foreign discovery requests." *Reinsurance Co. of Am. v. Administratia Asigurarilor de Stat (Admin. of State Ins.)*, 902 F.2d 1275, 1280 (7th Cir. 1990) (comparing the Romanian law with *Compagnie Francaise D'Assurance v. Phillips Petroleum Co.*, 105 F.R.D. 16, 30 (S.D.N.Y. 1984) (stating that the French blocking statute was "never expected nor intended to be enforced against French subjects but was intended rather to provide them with tactical weapons and bargaining chips in foreign courts")); *see also Graco, Inc. v. Kremlin, Inc.*, 101 F.R.D. 503, 508 (N.D. Ill. 1984) (stating that "[t]he Blocking Statute obviously is a manifestation of French displeasure with American pretrial discovery procedures"). Also, quite apart from the fact that France's interest in having its corporations avoid the "intrusiveness" of American pretrial discovery rules is of a lesser quantum of importance than America's judicial interest in providing fairness in the discovery process to litigants in her courts, it should not go without mention that France's interest has even further diminished weight when, as here, one of the parties to the litigation is a subsidiary French corporation that is incorporated and located in the United States. On the other hand, "the courts of the United States undoubtedly have a vital interest in providing a forum for the final resolution of disputes and for enforcing these judgments." *Reinsurance*, 902 F.2d at 1280. Accordingly, because

the United States also "has its own sovereign interest in protecting its citizens" (*In re Aircrash Disaster*, 172 F.R.D. at 309), and for the reasons described above, the interests of the United States outweigh the sovereign interests (if any) that France has in preventing discovery of the documents that are now located on Defendants' servers in France.

While the undersigned has considered all seven of the factors outlined in *Richmark*, finding that they overwhelmingly weigh in favor of proceeding under the Federal Rules both initially and on reconsideration, the undersigned shall focus here on Defendants' primary argument that if discovery were to proceed under the Federal Rules rather than under the Convention, Defendants would be subjected to criminal penalties under the French Blocking Statute. This argument is unpersuasive because, as mentioned above, the French Blocking Statute was "never expected nor intended to be enforced against French subjects but was intended rather to provide them with tactical weapons and bargaining chips in foreign courts." *Compagnie Francaise D'Assurance*, 105 F.R.D. at 30. Further, despite Defendants' contentions about "renewed interest," there is no evidence that France's interest in its blocking statute has changed or that France has become more vigorous in enforcing its blocking statute in recent years. *See e.g. Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 403 (S.D.N.Y. 2014) ("[W]hen a foreign court orders production of French documents even though the producing party has raised the "excuse" of the [French Blocking Statute], the French authorities do not, in fact, prosecute or otherwise punish the producing party."); *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. 833, 849 (D. Del. 2009) ("[T]he chance of prosecution under the French Blocking Statute is minimal."); *Bodner v. Banque Paribas*, 202 F.R.D. 370, 375 (E.D.N.Y. 2000) ("[T]he French Blocking Statute does not subject defendants to a realistic risk of prosecution."); *Valois of America v. Risdon Corp.*, 183 F.R.D. 344 (D. Conn. 1997) (declining to apply French Blocking Statute); *Adidas (Canada) Ltd. v. SS Seatrain Bennington*, 1984 U.S. Dist. LEXIS 16300, 1984 WL 423 (S.D.N.Y. 1984) (declining to apply Hague Convention procedures due to the French Blocking Statute in light of interests it was intended to serve).

Accordingly, for the above-stated reasons, the undersigned finds that the *Richmark* factors weigh overwhelmingly in favor of proceeding under the Federal Rules rather than the under the

terms of the Convention; and, thus, Defendants' Motion for Reconsideration (dkt. 121) is **DENIED** and the stay of discovery previously imposed by the undersigned is **VACATED** such that discovery can proceed under the Federal Rules forthwith.

## DEFENDANTS' MOITON FOR PROTECTIVE ORDER

Defendants also seek to block Plaintiffs from proceeding with discovery on grounds that Plaintiffs have failed to identify, with reasonable particularity, the trade secret at issue here, as is required by Cal. Code Civ. P. § 2019.210. *See* Joint Letter Br. of March 6, 2020 (dkt. 128) at 3-5; *see also* Joint Letter Br. of March 30, 2020 (dkt. 145) at 3-4. In pertinent part, Cal. Code Civ. P. § 2019.210 provides that "[i]n any action alleging the misappropriation of a trade secret under the Uniform Trade Secrets Act [], before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity subject to any orders that may be appropriate under Section 3426.5 of the Civil Code." (internal citation omitted). Defendants complain in general terms that Plaintiffs have provided a "kitchen-sink disclosure" that "while lengthy, fails to adequately identify the trade secrets alleged to be at issue in this case." *See* Letter Br. of March 30, 2020 (dkt. 145) at 3-4. Defendants contend that Plaintiffs' "disclosures of source code are nothing more than listings of whole directories of code, which themselves include any number of source code files," and that "Plaintiffs are attempting to hide their alleged trade secrets in plain sight, such that they can again shift their theory of misappropriation after receiving discovery." *Id*. at 4. Defendants add that the disclosure "also fails because they do not separate their alleged trade secrets from knowledge generally known in the industry." *Id*. However, what Defendants have not explained is *how* Plaintiffs' disclosure is inadequate for the purpose of allowing Defendants to discern the boundaries of Plaintiffs' asserted trade secrets such as to prepare available defenses, or to permit the court to understand the identification such as to craft boundaries relevant to discovery practice. *See generally id*. at 3-4.

On the other hand, Plaintiffs have submitted a declaration from a professor of computer science at the University of Texas at Austin who opined that Plaintiffs' disclosure "enables a person skilled in the field to understand the trade secrets being claimed and to distinguish those trade secrets from information or techniques generally known in the field or known to persons

skilled in the field." *See* Nielsen Decl. (dkt. 144-4 *SEALED*) at 3. Specifically, Professor Nielsen noted that Plaintiffs' trade secrets relate to email security technologies, the understanding of which requires at least a Bachelor's degree in computer science and at least three years of relevant experience in that field – opining that Plaintiffs' disclosure "enables a person with at least this skill level and access to [Plaintiffs'] relevant source code and technical documentation [] to understand what is being claimed as a trade secret, and to distinguish the claimed trade secrets from information or techniques generally known in the [r]elevant [f]ield or known to [s]killed [p]ersons in the [r]elevant [f]ield." *Id*. at 4.

For present purposes, the "reasonable particularity" that is required by § 2019.210 should be viewed in light of four underlying objectives of that provision. First, the requirement promotes well-investigated claims and discourages the filing of meritless trade secret complaints; second, it aims to prevent plaintiffs from using the discovery process as a means to obtain a defendant's trade secrets; third, it assists courts in framing the appropriate scope of discovery and in determining whether a plaintiff's discovery requests fall within that scope; fourth, it enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation. *See Advanced Modular Sputtering, Inc. v. Super. Ct.*, 132 Cal. App. 4th 826, 833-34, 33 Cal. Rptr. 3d 901 (2005) (citations omitted); *see also Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1112 (N.D. Cal. 2016). Thus, plaintiffs bringing such actions are required "to identify or designate the trade secrets at issue with 'sufficient particularity' to limit the permissible scope of discovery by distinguishing the trade secrets 'from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Advanced Modular*, 132 Cal. App. 4th at 835 (quoting *Imax Corp. v. Cinema Techs, Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998)). It should also be noted that compliance with this particularity requirement "does not require the designation itself to detail how the trade secret differs from matters of general knowledge in the trade." *Gatan, Inc. v. Nion Co.*, No. 15-cv-01862-PJH, 2018 U.S. Dist. LEXIS 77735, 2018 WL 2117379, at *2 (N.D Cal., May 8, 2018). "Instead, § 2019.210 'was intended to require the trade secret claimant to identify the alleged trade secret with [sufficiently] adequate detail to allow the defendant to investigate

how it might differ from matters already known and to allow the court to craft relevant discovery.'" *Id.* (quoting *Brescia v. Angelin*, 172 Cal. App. 4th 133, 147, 90 Cal. Rptr. 3d 842 (2009)).

Thus, "reasonable particularity" in this context "does not mean that the party alleging misappropriation has to define every minute detail of its claimed trade secret at the outset of the litigation," as Defendants here seem to suggest. *See Advanced Modular*, 132 Cal. App. 4th at 835. Nor does it require the undersigned to "conduct a miniature trial on the merits of a misappropriation claim before discovery may commence." *Id.* at 835-36. Instead, "reasonable particularity," in this context, means only that a plaintiff must make a showing that is reasonable, fair, proper, just, and rational, under the circumstances, such as to identify its alleged trade secret in a manner that will allow the trial court to control the scope of subsequent discovery, such as to protect all parties' proprietary information, and such as to allow them a fair opportunity to prepare and present their best case or defense at a subsequent trial on the merits. *Id.* at 836 (citing *City of Santa Cruz v. Municipal Court*, 49 Cal. 3d 74, 90, 260 Cal. Rptr. 520, 776 P.2d 222 (1989)).

In different cases, "[t]he degree of 'particularity' that is 'reasonable' will differ, depending on the alleged trade secrets at issue in each case." *Advanced Modular*, 132 Cal. App. 4th at 836. By way of example, in a case where "the alleged trade secrets consist of incremental variations on, or advances in the state of the art in a highly specialized technical field, a more exacting level of particularity may be required to distinguish the alleged trade secrets from matters already known to persons skilled in that field." *Id.* However, it should be noted that "at this very preliminary stage of the litigation, the proponent of the alleged trade secret is not required, on pain of dismissal, to describe it with the greatest degree of particularity possible, or to reach such an exacting level of specificity that even its opponents are forced to agree the designation is adequate." *Id.* Thus, contrary to Defendants' suggestion, "[w]hat is required is not absolute precision, but 'reasonable particularity.'" *Id.*

In assessing the adequacy of a trade secret disclosure, "the designation should be liberally construed, and reasonable doubts about its sufficiency resolved in favor of allowing discovery to go forward." *Brescia*, 172 Cal. App. 4th at 149. Courts are called upon to exercise discretion in

15

"determining how much disclosure is necessary to comply with section 2019.210 under the circumstances of the case." *Perlan Therapeutics, Inc. v. Super Ct.*, 178 Cal. App. 4th 1333, 1349, 101 Cal. Rptr. 3d 211 (2009); *see also Genentech, Inc. v. JHL Biotech, Inc.*, No. C 18-06582 WHA, 2019 U.S. Dist. LEXIS 36140, at *47-48 (N.D. Cal. Mar. 1, 2019). Because Defendants have failed to explain *why* the level of specificity manifested by Plaintiffs' disclosure is not reasonable at this stage, the bare complaints that the disclosure does not separate Plaintiffs' asserted trade secrets from public knowledge does not sufficiently show *how* that hinders Defendants from either crafting a defense or how it would operate to hinder the court from crafting discovery parameters. *See id.*; *see also Brescia*, 172 Cal. App. 4th at 143. Accordingly, Defendants' Motion for a Protective Order (dkts. 128, 145) is **DENIED**.

**IT IS SO ORDERED.**

Dated: April 20, 2020

_____
ROBERT M. ILLMAN
United States Magistrate Judge