QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Sean S. Pak (SBN 219032)
  seanpak@quinnemanuel.com
  Iman Lordgooei (SBN 251320)
  imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

JWC LEGAL
  Jodie W. Cheng (SBN 292330)
  jwcheng@jwc-legal.com
One Market Plaza, Suite 3600
San Francisco, California 94105
Telephone: (415) 293-8308

Attorneys for Plaintiffs,
Proofpoint, Inc. and Cloudmark LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROOFPOINT, INC.; CLOUDMARK LLC<br><br>             Plaintiffs,<br><br>      vs.<br><br>VADE SECURE, INCORPORATED; VADE SECURE SASU; OLIVIER LEMARIÉ<br><br>             Defendants. | CASE NO. 3:19-cv-4238<br><br>**FIRST AMENDED COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA (18 U.S.C. § 1836 *et seq.*); BREACH OF EMPLOYMENT AND CONFIDENTIALITY AGREEMENTS; COPYRIGHT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Proofpoint, Inc. ("Proofpoint") and its wholly owned subsidiary Cloudmark LLC ("Cloudmark"; collectively with Proofpoint, "Plaintiffs") submit this Complaint against Defendants Vade Secure, Incorporated, Vade Secure SASU (collectively, "Vade"), and Olivier Lemarié (collectively with Vade, "Defendants"), and allege as follows.

## INTRODUCTION

1.      This action arises from an unlawful scheme among Defendants to misappropriate, misuse, and copy Plaintiffs' proprietary and confidential information, including valuable trade secrets, to gain an unfair competitive advantage in the marketplace.  Specifically, this is a lawsuit to end Defendants' ongoing pattern of misappropriating Plaintiffs' trade secrets, violating contractual obligations in Lemarié's Employment Agreement and Employee Proprietary Information and Invention Agreement ("PIIA") with Cloudmark, and infringing Proofpoint's copyrights.  Plaintiffs are seeking injunctive relief among other remedies to protect their valuable intellectual property developed through years of research and development, including work conducted by Lemarié as a former employee of Cloudmark.

2.      For over six years, Lemarié was employed by Cloudmark as the Vice President of Gateway Technology, reporting directly to Cloudmark's Chief Executive Officer.  In his role, Lemarié had unfettered access to highly confidential technical information related to the innovations and concepts developed for Cloudmark's products and services.  As such, in the course of his employment, Lemarié entered into several agreements covering, *inter alia*, the scope of his use and disposition of proprietary and confidential information, intellectual property, and Cloudmark resources.

3.      As part of his job responsibilities at Cloudmark from 2010 until 2016, Lemarié, together with Cloudmark's engineering and product development teams, contributed to developing technology for Cloudmark's cybersecurity products,

including techniques and methods for identifying and filtering malicious emails, such as spam, phishing, and spear-phishing emails.  As malicious email threats became more sophisticated, Cloudmark's technical teams developed innovative ways to detect those threats, without disturbing normal email flow, by utilizing proprietary behavioral analysis and applying proprietary statistical analyses against Cloudmark's databases of known threats, in a cloud-based solution that could be quickly integrated and deployed into the customer's existing email infrastructure (e.g., Microsoft Office 365).  The powerful email and content filter developed by the Cloudmark team was also flexible and allowed easy integration with customers' Information Technology ("IT") infrastructures and other cybersecurity solutions through the use of Cloudmark's proprietary Message (or Mail) Transfer Agent (or "MTA") technology, for which Lemarié had led the design, development, and implementation.

4.     While Lemarié contributed to the initial development of some of these concepts, Cloudmark's engineering, testing, and product development personnel supported bringing the ideas "to life" by, e.g., researching how to implement the ideas, writing and fixing code, and creating user interfaces and infrastructure, such that they could be incorporated into a complete, "end-to-end" solution.

5.     In late 2016, after Cloudmark had already dedicated several years to develop, test and de-bug its next-generation email security solutions, Lemarié voluntarily terminated his employment with Cloudmark.

6.     Shortly thereafter, Lemarié joined Vade as its Chief Technology Officer. On information and belief, Lemarié planned his departure from Cloudmark to join Vade for several months before he provided his written resignation to Cloudmark on November 11, 2016.  Moreover, Lemarié was the last of four other senior-level Cloudmark engineers to join Vade in the span of less than a year.  All four engineers had been involved in various aspects of the development and/or implementation of Cloudmark's anti-phishing email solutions and MTA technology.  On information and belief, throughout 2016, Vade had aggressively pursued each of the Cloudmark

1  engineers and, in more than one instance, had "hunted" and recruited them even
2  though they had not been seeking other job opportunities.

3      7.     Vade—like Cloudmark and Proofpoint—develops and markets cyber
4  security products.  Prior to Lemarié joining Vade in early 2017, Vade's email filtering
5  products did not gain much market traction despite having been marketed for over a
6  decade.  For example, in tax documents from 2015–2016, Cloudmark-turned-Vade
7  employees described Vade's email security solution as "us[ing] conventional
8  detection techniques" and "ha[ving] very limited hardware and algorithmic
9  capabilities compared to [Cloudmark's] solution" in 2015–2016.

10      8.     In contrast, within months after Lemarié joined Vade, Vade filed a U.S.
11  patent application describing new methods of identifying spear-phishing attacks and
12  impostor/spoof emails, and appears to have rapidly developed a product embodying
13  the same.  Indeed, within a year, Vade launched an email security product that,
14  according to Vade's marketing, incorporated a unique combination of technical
15  features in a unified architecture (including behavioral analysis, machine learning and
16  statistical analysis to identify spear-phishing emails in a cloud-based solution that
17  could be quickly integrated and deployed into the customer's existing email
18  infrastructure (e.g., Microsoft Office 365))—all of which were techniques and
19  technology developed previously by Lemarié and his team at Cloudmark.

20      9.     On information and belief, Vade's new email security product was a
21  dispositive factor in its ability to secure nearly $80 million USD in funding from its
22  investor, General Catalyst.  *See* **Exhibit L**.  On information and belief, this latest
23  funding round—which comes on the heels of Vade's release of its new products—
24  represents nearly 90% of Vade's total funding to date.

25      10.    Additionally, on information and belief, Vade has been developing an
26  MTA product that it intends to launch by the end of this year and, as explained by
27  Lemarié himself, is intended to displace Cloudmark's MTA, by offering a similarly
28

flexible, cloud-based MTA. Cloudmark's MTA is still in use and sold today and is incorporated into the Cloudmark Security Platform (or "CSP").

11.    Under the agreements that Lemarié had entered into with Cloudmark, he was subject to contractual obligations regarding (1) the handling of information that is confidential and proprietary to Cloudmark, (2) assignment of intellectual property and innovations to Cloudmark, (3) disclosure and reporting obligations with respect to his inventions, and (4) the return of property and documents upon leaving Cloudmark. On information and belief, Lemarié violated these obligations in multiple ways, including using Cloudmark's confidential and trade secret information for the development of Vade's email security and MTA products, failing to disclose and report inventions during the required time period, and failing to return Cloudmark's confidential and proprietary documents upon his departure from Cloudmark.

12.    Plaintiffs submit this Complaint seeking injunctive relief, monetary damages and other remedies for Defendants' misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*. and violation of United States copyright laws, 17 U.S.C. § 101 *et seq.*, as well as Lemarié's breaches of contract.

## **THE PARTIES**

13.    Proofpoint, Inc. is a public corporation organized under the laws of the State of Delaware, with its principal place of business at 892 Ross Drive, Sunnyvale, California 94089.

14.    Cloudmark LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 892 Ross Drive, Sunnyvale, California 94089.

15.    On information and belief, Vade Secure, Incorporated is a corporation organized under the laws of the State of California, with its principal place of business at 100 Pine Street, Suite 1250, San Francisco, California 94111.

16.     On information and belief, Vade Secure SASU is a "société par actions simplifiée unipersonnelle" organized under the laws of France, with its principal place of business at 2 bis avenue Antoine Pinay, Parc d'activites des 4 vents in HEM (59510) France.

17.     On information and belief, Olivier Lemarié is an individual residing at 1230 Sesame Ct., Sunnyvale, California 94087.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1338(a); the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839 *et seq*; and the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*

19.     This Court has extraterritorial jurisdiction over Plaintiffs' claims against Vade Secure SASU pursuant to 18 U.S.C. § 1837(2).

20.     The Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative fact.

21.     This Court has general personal jurisdiction over Lemarié because, at all relevant times, he was domiciled in California, and thus is a resident of California. Additionally, through his employment agreements with Cloudmark, Lemarié submitted to the personal jurisdiction of the state and federal courts located in San Francisco County, California.

22.     This Court has general personal jurisdiction over Vade Secure, Incorporated because it regularly conducts business within this jurisdiction, by at least operating its registered Principal Executive Office at 100 Pine Street, Suite 1250, San Francisco, California 94111.

23.     This Court has general personal jurisdiction over Vade Secure SASU because it regularly conducts business within this jurisdiction by at least operating an

office at 600 California Street, Floor 11, San Francisco, CA 94108, and directing inquiries to that office.

24.    This Court has specific personal jurisdiction over Vade and Lemarié because Lemarié was acting within the scope of his employment at Vade when he intentionally and purposefully misappropriated, used, and/or disclosed Proofpoint's trade secret information and breached his contractual obligations with Cloudmark to the benefit of Vade.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2) and Local Rule 120(d) because all Defendants are residents of the state of California and at least one Defendant resides in this judicial district, and because a substantial part of the events or omissions giving rise to Proofpoint's claims occurred in this judicial district and, in particular, San Francisco County.

## INTRADISTRICT ASSIGNMENT

26.    A substantial part of the events giving rise to the claims alleged in this Complaint occurred in the City and County of San Francisco.  For purposes of intradistrict assignment under Civil L.R. 3-2 and 3-5, this action should be assigned to the San Francisco Division or the Oakland Division.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

27.    Founded in 2002, Proofpoint is a public U.S. company, headquartered in Sunnyvale, California, that enables organizations worldwide—including over half of the Fortune 100—to protect the way their people work from advanced threats and compliance risks.  Proofpoint's integrated suite of products works together to help organizations build people-centric security and compliance programs.  Proofpoint provides threat protection, information protection, user protection, business ecosystem protection, and compliance solutions to address today's rapidly changing threat and compliance landscape.  Proofpoint's solutions are built on a flexible, cloud-based platform and leverage proprietary technologies including big data analytics, machine learning, deep content inspection, secure storage, advanced encryption,

intelligent message routing, dynamic malware analysis, threat correlation, and virtual execution environments.

28.    Proofpoint was founded by notable Silicon Valley technologist and entrepreneur Erich Hahn in a small office on Sand Hill Road and counted Mohr Davidow and Benchmark Capital, as well as Stanford University, among its very first investors.  Since its founding, Proofpoint has remained an industry leader by offering the most advanced technology and innovations to customers.  As part of developing and providing next-generation cybersecurity solutions, it expends significant resources to develop and implement ideas from its engineers and technical teams, and finds opportunities to engage other companies that may share the same dedication to innovation in cybersecurity.

29.    One of these companies was Cloudmark, which, among other projects, was developing sophisticated techniques to identify targeted phishing email attacks. Moreover, Cloudmark's cybersecurity technology was—and remains—among few in the industry that provide a proprietary way of integrating with customers' existing IT infrastructure through Cloudmark's Message (or Mail) Transfer Agent (or "MTA"), which is still in use today.  In 2017, Proofpoint acquired Cloudmark.

30.    From 2010–2016, Lemarié served as the Vice President of Gateway Technology of Cloudmark and reported directly to the Chief Executive Officer. According to Lemarié, while in this role, he "led the development of new products . . . for the protection against email, mobile and [DNS] based security threats."  **Exhibit A**.

31.    In his role as senior management for technical teams, Lemarié was involved in many aspects of Cloudmark's technical development; had unfettered access to Cloudmark's technical documents and source code; and interacted with Cloudmark's engineers, developers, product developers/managers on a day-to-day basis.  In particular, his job responsibilities included "[m]anagement of engineering

teams in San Francisco and Paris" and serving as "Managing Director of Cloudmark Labs entity in France." **Exhibit A**.

32.     Lemarié drove Cloudmark's technical teams to focus on developing solutions to filter malicious content and "designed and developed new solutions to detect spear phishing attacks in real time." **Exhibit A**.  These proprietary solutions incorporated a combination of technical features in a unified architecture, including:

- behavioral analysis and machine learning,
- heuristic rules,
- statistical models and scoring,
- real-time, cloud-based threat analysis, and
- easy integration and quick deployment into the popular Microsoft Office 365 architecture in a unique and seamless manner using Office 365 journaling, which avoids making complicated modifications to a client's MX records.

33.     As Lemarié explained in 2015 while he was still at Cloudmark, this proprietary combination of techniques differentiated Cloudmark's solution from the existing "simplistic" technology by "leveraging new ways of looking at things" such as "behavioral analysis, leveraging threat intelligence, [and] big data."

34.     Further, Cloudmark's email and content detection technology that Lemarié helped develop was flexibly designed to work with Cloudmark's proprietary MTA technology—which Lemarié had been responsible for developing.   On information and belief, the proprietary MTA was developed and marketed under the product name Intelligent Message Processor ("IMP") by Bizanga, a cybersecurity company founded by Lemarié and acquired by Cloudmark in March 2010.

35.     In addition to founding Bizanga, Lemarié also served as its Chief Technical Officer and was "responsible for the development and direction of Bizanga's [IMP] platform which provided scalable and full-featured email message processing and security for some of the largest messaging operators in the world."

**Exhibit B**; *see also* **Exhibit A**.  Specifically, Bizanga's IMP used an operating system known as OvernetOS (or "OOS") and was a scalable SMTP messaging router with a policy engine that could monitor email traffic for threats, as well as pass emails to various content filters for further scanning, such as Cloudmark's anti-spam filter. This MTA is still in use today at Cloudmark, now included as part of CSP.  According to accounts of Cloudmark management, one of the primary reasons for acquiring Bizanga was the high performance and flexibility of the Bizanga MTA technology.

36.     In 2016, Vade aggressively recruited and "hunted" engineers and technical personnel from Cloudmark—even where the Cloudmark employees were not actively searching for job opportunities—including Lemarié, Alexandre Boussinet, Xavier Delannoy, and Guillaume Séjourné.  *See* **Exhibits A, C–E**.  Within a six-month period, two of Cloudmark's Senior Software Engineers, its Engineering Product Coordinator and Senior Technical Writer, and Vice President of Gateway Technology all left Cloudmark to join Vade—as Plaintiffs would later discover—to develop a competing solution.  *Id.*

37.     While at Cloudmark, these employees had been working alongside and under the direction of Lemarié on Cloudmark's solutions to protect against spear-phishing and impostor/spoof emails, as well as its MTA technology.  In particular, various Cloudmark documentation, including foreign tax filings and internal emails, state that these engineers participated in developing Cloudmark's anti-phishing email security solution—known internally as "Trident."

38.     Lemarié joined Vade as its Chief Technical Officer in February 2017. By then, the three other engineers had already left Cloudmark and joined Vade (in June, July, and December 2016).  On information and belief, Lemarié had accepted an offer to join Vade several months prior to his notice of resignation to Cloudmark.

39.     On information and belief, after their employment with Cloudmark ended, Lemarié and/or other former Cloudmark engineers now employed by Vade possessed or still possess one or more unauthorized copies of Plaintiffs' confidential

and proprietary source code, which incorporates and implements Plaintiffs' asserted trade secret and proprietary technology.

40.     Prior to Lemarié (and the other former Cloudmark engineers) joining Vade, Cloudmark's foreign filings describe Vade's email security product as a "solution[that] uses conventional detection techniques, adapted to the targeted phishing problem" and "has very limited hardware and algorithmic capabilities compared to [Cloudmark's] solution."

41.     Within months after Lemarié joined Vade, on March 22, 2017, Vade filed U.S. Patent Application 15/466,588, titled "Detection of Email Spoofing and Spear Phishing Attacks," and directed toward methods of detecting spear-phishing and imposter/spoof emails using statistical analysis and behavioral history of sender and recipient. **Exhibit F**.

42.     Within roughly one year, Vade began marketing an email security product for Microsoft Office 365, "Vade Secure For Office 365 . . . a fully native cloud solution with AI-based, predictive email defense" that "protects against phishing attempts, spear phishing, [and] business email compromise attacks." **Exhibits H–I**.  According to Vade's marketing and public product reviews, Vade email security solutions provide a combination of:

- "**machine learning** models that perform **real-time behavioral analysis**";

- "**artificial intelligence** and [] **heuristic filter**";

- "[u]nsupervised anomaly detection and natural language processing scan for **patterns, anomalies, and behaviors** common in spear phishing emails";

- "secure **cloud** email system" and "**cloud** platform"; and

- "**Immediate Implementation**" and "**Instant Deployment.**" **Exhibits H–J**.

43.     An article from SC Magazine describes that Vade Secure For Office 365 "also features behavior-based . . . insider attack protection . . . anti-spear phishing, and protects against CEO fraud." **Exhibit K**.  Moreover, like the proprietary solution developed at Cloudmark, it "leverages Office 365's built-in capability for encryption and backups" and "has no MX redirection." *Id*.  "Activation could not be easier," with only three steps including "activat[ing] journaling." *Id.*

44.     More than a decade after its founding—yet only one year after its patent filing and launch of software products to protect against spear-phishing and imposter/spoof emails—Vade obtained venture capital funding of nearly $80 million USD to continue the growth of its new products.  **Exhibit L**.  News articles report that Vade's email security solutions, particularly the Vade Secure For Office 365, were a major, if not the sole, factor in securing the funding.  *Id.*  Indeed, an investor in Vade, Austin McChord, was quoted as touting Vade's new products as a basis for the "immense potential" prompting the investment.  *Id.*  Another investor, Stephan Dietrich, was quoted as touting Vade's "tremendous growth and technological advances" and desire to "unlock the company's full potential." *Id*.  On information and belief, this latest funding round represents nearly 90% of Vade's total funding to date.

45.     Additionally, Vade has been focusing significant resources toward developing an MTA product—which it plans to launch by the end of this year.  On information and belief, Lemarié has touted the flexibility of the Vade MTA, similar to a unique advantage of Cloudmark's MTA.  In fact, Lemarié has described that Vade's upcoming MTA is intended to displace and directly compete for customers and deployments currently utilizing Cloudmark's MTA.

46.     Finally, on information and belief, sometime in 2018, Lemarié gave a presentation in which he indicated that he and others at Vade were working on transitioning Vade's product architecture to the "Docker" software development platforms utilizing the "Go" (or "Golang") computer programming language.  These

are the exact software development tools used by Cloudmark to develop its cybersecurity solutions and MTA.  In the same presentation, Lemarié stressed the importance of reusing code as much as possible and that it is acceptable for products to be made from copy-pasted bits of existing code with "slight" modifications.

### Proofpoint and Cloudmark Protect Their Confidential and Proprietary, Including Trade Secret, Information

47.   As part of his employment with Cloudmark, Lemarié entered into agreements governing, *inter alia*, the handling of information that is confidential and proprietary to Cloudmark, assignment of intellectual property and innovations to Cloudmark, disclosure and reporting obligations with respect to their inventions, and the return of property and documents upon leaving Cloudmark.

48.   Specifically, after Cloudmark acquired Bizanga, on February 6, 2010, Lemarié was offered employment with Cloudmark as the Vice President of Gateway Technology.  Lemarié signed and accepted the offer of employment on February 27, 2010, and separately executed an Employee Proprietary Information and Inventions Agreement ("PIIA") with Cloudmark on February 25, 2010.

49.   The PIIA protects Cloudmark's intellectual property and Cloudmark's rights in view of Lemarié's development of, and access to, such confidential intellectual property as an employee of Cloudmark.

50.   In particular, in consideration of his employment and continued employment by Cloudmark, including his compensation thereunder, Lemarié agreed to abide by several provisions in the PIIA.  For example, Lemarié agreed that he would hold in strictest confidence and could not disclose, use, lecture upon or publish any of Cloudmark's Proprietary Information—which is defined to include Cloudmark's trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques, as well as any information regarding Cloudmark's plans for, *inter alia*, research and development of new

products—other than as required in connection with his work for Cloudmark or unless an officer of Cloudmark expressly authorized such in writing.

51. Additionally, Lemarié agreed under the PIIA that, during the period of his employment and for six months after termination thereof, he would promptly disclose to Cloudmark fully and in writing all inventions that he authored, conceived or reduced to practice, either alone or jointly with others, and to otherwise preserve the confidentiality of all such inventions. Lemarié also agreed to advise Cloudmark in writing of any such invention that he believes qualifies for protection under Cal. Labor Code § 2870, including by providing Cloudmark, in writing, all evidence necessary to substantiate his belief. At no point did Lemarié ever inform Cloudmark of any invention developed by him, either alone or jointly with others, that he alleged qualified for protection under § 2870. Nor did Lemarié disclose to Cloudmark any other inventions that he authored, conceived or reduced to practice, either alone or jointly with others during the six month period following his departure from Cloudmark, despite on information and belief working on Vade solutions that are directly competitive to Cloudmark's offerings and embodying the same combination of features.

52. Additionally, Lemarié agreed under the PIIA that he would keep and maintain adequate and current records of all Proprietary Information developed by him and all inventions made by him during the period of his employment at Cloudmark, and that all such records would be made available to, and remain the sole property of, Cloudmark at all times.

53. Additionally, Lemarié agreed under the PIIA that, when leaving the employ of Cloudmark, he would deliver to Cloudmark any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any of Cloudmark's inventions or Proprietary Information.

54.     On or about October 24, 2016, Lemarié provided notice to Cloudmark that he would be leaving the company and, on November 11, 2016, he tendered his formal resignation and left Cloudmark.   On information and belief, Lemarié had already accepted employment with, or was planning on joining, Vade as its Chief Technology Officer when he gave notice to Cloudmark, yet he did not inform Cloudmark that he was leaving the company to join Vade.   On information and belief, Lemarié officially began employment as CTO of Vade sometime in or before February 2017.

**Copyright Protection and Registration for Plaintiffs' Software**

55.     The Cloudmark Trident software, which incorporates and implements Plaintiffs' proprietary anti-spear phishing and email processing technologies, contains a substantial amount of creative and original material that was developed and authored solely by Cloudmark after significant expenditure of time and money.

56.     The computer programs (including their source code) embodied in Cloudmark Trident are original literary works within the meaning of 17 U.S.C. § 101 and copyrightable subject matter under the laws of the United States.

57.     Proofpoint filed for and received copyright registrations for the Cloudmark Trident software with the United States Copyright Office under procedures designed to safeguard the secrecy of any and all trade secrets incorporated into and/or embodied by that software.

58.     Since its creation and until Defendants' unlawful conduct, the copyrighted Cloudmark Trident software has been under Plaintiffs' exclusive control. The registered copyrights, and the exclusive rights conferred under the Copyright Act, associated with Cloudmark Trident belong exclusively to Proofpoint.   As owner of the copyrighted works, Proofpoint has the exclusive rights to, among other things, reproduce, prepare derivative works, and distribute copies, of the copyrighted software and its source code.

## COUNT I – TRADE SECRET MISAPPROPRIATION

**Misappropriation of Trade Secrets under the DTSA, 18 U.S.C. § 1836 *et seq*.**

**(Against all Defendants)**

59.     Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

60.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, processes, algorithms, software policies and logic for detecting malicious email such as proprietary combinations of:

- behavioral analysis and machine learning using known legitimate behavioral patterns of sender or recipient;
- heuristic rules based on legitimate behavioral patterns and known malicious emails or threats;
- statistical dispersion models and quantitative scoring;
- comparison or analysis using cloud-based databases;
- real-time threat analysis; and
- integration and deployment into Microsoft Office 365 infrastructure (a) using the "journaling" feature and/or (2) without affecting MX records or (re)direction.

61.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of, the confidential, proprietary, and trade secret information referenced in Paragraph 60.

62.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods,

processes, algorithms, software policies and logic for transferring electronic mail messages using SMTP that are flexible and scalable.

63.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of transferring electronic mail messages using SMTP that are flexible and scalable.

64.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, processes, algorithms, software policies and logic for Bizanga's IMP.

65.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of Bizanga's IMP.

66.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, processes, algorithms, software policies and logic for Bizanga's OOS.

67.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of Bizanga's OOS.

68.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods,

processes, algorithms, software policies and logic for Cloudmark's MTA, which is incorporated into CSP.

69.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of Cloudmark's MTA, which is incorporated into the CSP.

70.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, processes, algorithms, software policies and logic for Cloudmark's SMTP Agent or Trident SMTP Agent.

71.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information comprising compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain, or reveal the content and operation of Cloudmark's SMTP Agent or Trident SMTP Agent.

72.     The confidential, proprietary, and trade secret information described in Paragraphs 59 through 71 relate to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and ordered in, interstate commerce, at least in that Plaintiffs' products and technology have been marketed or sold to customers throughout the U.S. and globally, and affect email, which, by nature, often crosses state borders.

73.     Plaintiffs have taken reasonable measures to keep such information secret and confidential by, among other things, limiting access to its trade secret information and entering into confidentiality and non-disclosure agreements with employees as well as customers.

74.    This confidential, proprietary, and trade secret information derives independent economic value, both actual and potential, from not being generally known to other persons or businesses who could obtain economic value from its disclosure or use in that the information is the basis of differentiating Plaintiffs' cybersecurity products in a highly competitive market.

75.    Defendants misappropriated Plaintiffs' trade secret information in the improper and unlawful manner as alleged herein and in the preceding paragraphs, including by using Plaintiffs' trade secret information to develop, market, sell, or offer for sale Vade's email security products and forthcoming MTA product.   On information and belief, Defendants' use of Plaintiffs' trade secret information is ongoing and immediate.

76.    As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs have suffered damages in an amount to be proven at trial.

77.    Defendants' misappropriation of Plaintiffs' trade secret information was willful and malicious, further entitling Plaintiffs to recover exemplary damages and their attorneys' fees and costs.

78.    On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to Plaintiffs' detriment Plaintiffs' trade secret information—at least because Defendants have developed, continue to develop, sell, and offer to sell email security products using Plaintiffs' trade secret information. Moreover, Defendants intend to publicly launch and offer for sale the MTA product(s) imminently and no later than the end of this year.

79.    Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in addition to damages, preliminary and permanent injunctive relief to recover and protect their confidential, proprietary, and trade secret information and other legitimate business interests.   Injunctive relief is necessary to eliminate the

commercial advantage that otherwise would be derived from Defendants' continued misappropriation of Plaintiffs' trade secret information.

## <u>COUNT II – BREACH OF CONTRACT</u>

### Unauthorized Disclosure and Failure to Maintain Confidentiality of

### Cloudmark Proprietary Information

### (Against Lemarié)

80.     Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

81.     The PIIA is and was a valid, enforceable, and binding contract between Cloudmark and Lemarié.

82.     Cloudmark fully performed its obligations under the terms of the PIIA, including employing Lemarié and providing him with monetary compensation while he was employed by Cloudmark.

83.     Under the terms of the PIIA, in exchange for employment and monetary compensation, Lemarié agreed that he would hold in strictest confidence and would not disclose, use, lecture upon or publish any of Cloudmark's Proprietary Information—which was defined to include Cloudmark's trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques,  as well as any information regarding Cloudmark's plans for, *inter alia*, research and development of new products—other than as required in connection with his work for Cloudmark or unless an officer of Cloudmark expressly authorized such in writing.

84.     On information and belief, Lemarié breached his agreement by failing to honor his obligations under the foregoing terms of the PIIA, including without limitation by:  1) using and disclosing Cloudmark's Proprietary Information relating to the design, development, and operation of the Cloudmark Trident anti-spear phishing and related products to Vade; 2) using Cloudmark's Proprietary Information

in the design and development of Vade's integration with Microsoft Office 365 products; and 3) using and disclosing Cloudmark's Proprietary Information relating to the design, development, and operation of the Cloudmark MTA technology to Vade. These disclosures and use of Cloudmark's Proprietary Information were not in connection with Lemarié's work for Cloudmark, nor were they authorized by an officer of Cloudmark.

85.     As a result of Lemarié's breach of the PIIA, Plaintiffs have suffered damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees.

86.     Moreover, as specifically set forth in the PIIA, Plaintiffs have the right, and are entitled, to enforce the PIIA and its terms and to therefore remedy the foregoing breach of contract by injunction, specific performance, or other equitable relief, in addition to the foregoing monetary damages.

## COUNT III – BREACH OF CONTRACT

### Failure to Disclosure Inventions

### (Against Lemarié)

87.     Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

88.     The PIIA is and was a valid, enforceable, and binding contract between Cloudmark and Lemarié.

89.     Cloudmark fully performed its obligations under the terms of the PIIA, including employing Lemarié and providing him with monetary compensation while he was employed by Cloudmark.

90.     Under the terms of the PIIA, in exchange for employment and monetary compensation, Lemarié agreed that, during the period of his employment and for six months after termination thereof, he would promptly disclose to Cloudmark fully and in writing all inventions that he authored, conceived or reduced to practice, either alone or jointly with others, and to otherwise preserve the confidentiality of all such

inventions.  Lemarié also agreed to advise Cloudmark in writing of any such invention that he believes qualifies for protection under Cal. Labor Code § 2870, including by providing Cloudmark, in writing, all evidence necessary to substantiate his belief.

91.   At no point did Lemarié ever inform Cloudmark of any invention developed by him, either alone or jointly with others, that he alleged qualified for protection under § 2870.  Nor did Lemarié disclose to Cloudmark any other inventions that he authored, conceived or reduced to practice, either alone or jointly with others during the six month period following his departure from Cloudmark, despite on information and belief working on Vade solutions that are directly competitive to Cloudmark's offerings and embodying the same combination of features.

92.   Moreover, on information and belief, Lemarié also breached the PIIA by failing to honor his obligation to preserve the confidentiality of all such inventions, including without limitation by disclosing Cloudmark's Proprietary Information relating to such inventions to Vade.

93.   As a result of Lemarié's breach of the PIIA, Plaintiffs have suffered damages in an amount to be determined at trial together with interest, costs, and attorneys' fees.

94.   Moreover, as specifically set forth in the PIIA, Plaintiffs have the right, and are entitled, to enforce the PIIA and its terms and to therefore remedy the foregoing breach of contract by injunction, specific performance, or other equitable relief, in addition to the foregoing monetary damages.

## COUNT IV – BREACH OF CONTRACT

### Failure to Maintain and Make Available Cloudmark Company Records

### (Against Lemarié)

95.   Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

96.   The PIIA is and was a valid, enforceable, and binding contract between Cloudmark and Lemarié.

97.     Cloudmark fully performed its obligations under the terms of the PIIA, including employing Lemarié and providing him with monetary compensation while he was employed by Cloudmark.

98.     Under the terms of the PIIA, in exchange for employment and monetary compensation, Lemarié agreed that he would keep and maintain adequate and current records of all Cloudmark Proprietary Information developed by him and all inventions made by him during the period of his employment at Cloudmark, and that all such records would be made available to and remain the sole property of Cloudmark at all times.

99.     On information and belief, Lemarié had and has access to an online file storage account registered through Evernote (http://www.evernote.com) in which Cloudmark Proprietary Information including information relating to a DNS security software product were stored by Lemarié and others on his team at Lemarié's direction.   On June 28, 2019, a Cloudmark employee attempted to access this Evernote account to download the Cloudmark Proprietary Information stored thereon. When said Cloudmark employee logged into the Evernote account, however, at least two folders were visible that related to Cloudmark's DNS security software product, but that were inaccessible to the Cloudmark employee.   Moreover, a few days later, same Cloudmark employee accessed the Evernote account again, but this time the two folders that related to Cloudmark's DNS security software product were no longer visible.

100.   On information and belief, Lemarié was and is the administrator of the Evernote account and improperly, in violation of his obligations under the PIIA, implemented access restrictions to prevent Cloudmark and its employees from accessing the contents of the Evernote account and, later, deleted those contents altogether.   Lemarié's actions constitute a breach of his obligations under the PIIA to make available to Cloudmark all written records relating to Cloudmark Proprietary Information.

101.   As a result of Lemarié's breach of the PIIA, Plaintiffs have suffered damages in an amount to be determined at trial together with interest, costs, and attorneys' fees.

102.   Moreover, as specifically set forth in the PIIA, Plaintiffs have the right, and are entitled, to enforce the PIIA and its terms and to therefore remedy the foregoing breach of contract by injunction, specific performance, or other equitable relief, in addition to the foregoing monetary damages.

## COUNT V – BREACH OF CONTRACT

**Failure to Deliver Materials Containing Cloudmark Proprietary Information**

**(Against Lemarié)**

103.   Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

104.   The PIIA is and was a valid, enforceable, and binding contract between Cloudmark and Lemarié.

105.   Cloudmark fully performed its obligations under the terms of the PIIA, including employing Lemarié and providing him with monetary compensation while he was employed by Cloudmark.

106.   Under the terms of the PIIA, in exchange for employment and monetary compensation, Lemarié agreed that, when leaving the employ of Cloudmark, he will deliver to Cloudmark any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any of Cloudmark's inventions or Proprietary Information.

107.   On information and belief, Lemarié had access to an online file storage account registered through Evernote (http://www.evernote.com) in which Cloudmark Proprietary Information including information relating to a DNS security software product were stored by Lemarié and others on his team at Lemarié's direction.  Upon leaving the employ of Cloudmark, however, Lemarié did not fulfill his obligation

under the PIIA to deliver and return to Cloudmark all of the materials contained within the Evernote account and therefore breached the PIIA.  Indeed, on information and belief, and as set forth in Paragraphs 95–102 above, Lemarié has actively subverted Cloudmark's efforts to recover its documents contained within the Evernote account.

108.   As a result of Lemarié's breach of the PIIA, Plaintiffs have suffered damages in an amount to be determined at trial together with interest, costs, and attorneys' fees.

109.   Moreover, as specifically set forth in the PIIA, Plaintiffs have the right, and are entitled, to enforce the PIIA and its terms and to therefore remedy the foregoing breach of contract by injunction, specific performance, or other equitable relief, in addition to the foregoing monetary damages.

## COUNT VI — COPYRIGHT INFRINGEMENT, 17 U.S.C. § 501, *et seq*.

### Violation of Plaintiffs' Exclusive Copyrights

### (Against all Defendants)

110.   Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

111.   The Cloudmark Trident software, which incorporates and implements Plaintiffs' proprietary anti-spear phishing and email processing technologies, contains a substantial amount of creative and original material that is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 *et seq*.

112.   Plaintiff Proofpoint, Inc. is the owner of the exclusive rights under the United States copyright laws to, *inter alia*, use, license, reproduce, distribute, and prepare derivative works of the Cloudmark Trident software, related source code, and computer programs contained therein (the "Copyrighted Works").

113.   U.S. Copyright Registration Numbers associated with the Copyrighted Works include:

| Work | Registration No. | Effective Date of Registration |
|---|---|---|
| Trident Software Module 1 | TXu 2-211-008 | Aug. 7, 2020 |
| Trident Software Module 2 | TXu 2-210-880 | Aug. 9, 2020 |
| Trident Software Module 3 | TXu 2-210-877 | Aug. 9, 2020 |
| Trident Software | TXu 2-211-639 | Aug. 12, 2020 |

114.   As Plaintiffs recently learned during the course of discovery, Defendants unlawfully copied, used, and distributed Plaintiffs' Copyrighted Works without consent, authorization, approval or license—including by (1) copying portions of the Cloudmark Trident source code into Defendants' anti-spear phishing software; and (2) copying and incorporating the protectable architectural expressions of Cloudmark Trident into Defendants' anti-spear phishing software, including Cloudmark Trident's protectable code sequence, structure, and organization.   Defendants' anti-spear phishing software is included in and incorporated into at least Vade Secure For Office 365.   Defendants have distributed, offered for sale, and sold the Vade Secure For Office 365 software product in the United States (and internationally).

115.   The software code for Vade Secure products, including for Vade Secure For Office 365, is substantially similar to the protectable elements of Plaintiffs' Copyrighted Works.   The substantial similarity is a result of Defendants' copying and use of Plaintiffs' Copyrighted Works.

116.   Plaintiffs have already identified five source code files from Cloudmark Trident that were directly copied—verbatim or in substantial part—into source code used in Defendants' anti-spear phishing software.   The table below lists the files copied from Cloudmark Trident, and the corresponding files Vade source code files

117. Each of the Cloudmark Trident files listed above were authored and incorporated into Cloudmark Trident while Lemarié was an employee of Cloudmark, and at least some of the files were authored by Cloudmark employees other than Lemarié. Each of the corresponding Vade source code files were authored by Lemarié between May 2018 and September 2018. Each of the Vade source code files listed above copy verbatim substantial portions of the corresponding Cloudmark Trident source code files, including copying verbatim human-readable comments describing the operation of the source code. On information and belief, Defendants' copying of Cloudmark Trident source code is not limited to the five source code files listed above.

118. On information and belief, Defendants continue to make unauthorized copies and derivative works of Plaintiffs' Copyrighted Works.

119. By their unlawful copying, use, and distribution, Defendants have violated Plaintiffs' exclusive rights and infringed Proofpoint's copyrights in the Copyrighted Works, as described in 17 U.S.C. § 501.

120. Moreover, Defendants' acts of infringement have been willful, deliberate, or intentional; and with disregard, indifference, or willful blindness to the rights of Plaintiffs.

121. On information and belief, Defendants have realized unjust profits, gains, and advantages as a result of their infringement, and will continue to do so as long as such infringement is permitted to continue. For example, by using Plaintiffs'

copyrighted software code, Defendants were able to bring Vade Secure software products to market more quickly, while avoiding or lowering research and development costs, than would have otherwise been possible; thereby gaining unjust advantages in the marketplace.

122.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and, if Defendants' conduct is not stopped, will continue to suffer, competitive injury, irreparable harm, and significant damages in an amount to be proven at trial.

123.   Remedies in law alone are inadequate to fully compensate Plaintiffs for the injury and harm they suffered at least because Plaintiffs' business operates in a highly competitive and rapidly changing market.   Therefore, in addition to monetary damages and other legal remedies, injunctive relief is warranted and necessary. Plaintiffs seek an injunction restraining Defendants from engaging in any further acts in violation of the United States copyright laws, including distribution of Defendants' infringing software products.   Unless Defendants are enjoined and prohibited from infringing Plaintiffs' copyrights, and unless all infringing products and advertising/promotional materials are seized, Defendants will continue to intentionally infringe Plaintiffs' copyrights and Plaintiffs will continue to suffer irreparable harm.

124.   Pursuant to 17 U.S.C. § 503(a) and (b), and other applicable statutes or laws, all complete or partial copies of the Copyrighted Works in the possession or control of Defendants should be seized, impounded, and/or destroyed.   Plaintiffs are also entitled to a complete disclosure of the location of any such copies, including any incorporated into products sold or distributed by Defendants Vade Secure, Incorporated and Vade Secure SASU.

## VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

125.   Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

126.   Vade is vicariously liable for Lemarié's tortious acts after Lemarié began his employment with Vade because these acts were performed while in the employment of Vade and were within the scope of that employment or within the authority delegated to the employee.

## JOINT AND SEVERAL LIABILITY

127.   Plaintiffs incorporate herein by reference all of the allegations in the preceding paragraphs of this Complaint.

128.   At all relevant times, Defendants Vade and Lemarié were jointly engaged in the commission of the aforementioned tortious and unlawful actions.  On information and belief, Vade and Lemarié each acted intentionally and their actions caused a single, indivisible injury to Plaintiffs.  Accordingly, Defendants Vade and Lemarié are jointly and severally liable for all of Plaintiffs' damages as pleaded herein.

## JURY DEMAND

129.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Proofpoint and Cloudmark demand a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Proofpoint and Cloudmark respectfully request judgment in its favor and the following relief:

i)   Compensatory damages for actual loss and unjust enrichment caused by the misappropriation of Plaintiffs' trade secret information, or, in the alternative, compensatory damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secret information;

ii)   Exemplary damages equal to two times the amount of the compensatory damages awarded;

iii)   An award of Plaintiffs' reasonable attorneys' fees and costs;

iv)   Compensatory damages arising from the breach of various contractual obligations by Lemarié;

v)   Actual damages as a result of Defendants' copyright infringement and any of Defendants' profits that are attributable to the infringement;

vi)   Preliminary and permanent injunctive and other equitable relief, including an order to immediately cease and discontinue:

   (1) Importing, making, using, offering for sale, or selling any product or service embodying Proofpoint's trade secrets and/or confidential information and

   (2) Reproducing, distributing, publishing, placing in the market, or otherwise infringing Proofpoint's copyrighted works, in whole or in part, or any derivative work thereof, in any medium;

vii)   An order, pursuant to 17 U.S.C. § 503(a) and (b), and other applicable statutes or laws, providing for the impoundment, destruction, or other reasonable disposition of all complete or partial copies of Proofpoint's copyrighted works in the possession or control of Defendants, and a complete disclosure of the location of any such copies, including any incorporated into products sold or distributed by Defendants Vade Secure, Incorporated and Vade Secure SASU; and

viii)   Specific performance and other equitable relief, including directing Lemarié to comply with his contractual obligations to Plaintiffs and directing Vade to assign any intellectual property developed, solely or jointly with others, by Lemarié during the term of his employment at Vade that utilized Plaintiffs' trade secrets and/or confidential information; and

ix)   Pre-judgment and post-judgment interest as well as such other and further relief as the Court deems just and proper.

1   DATED: August 13, 2020          Respectfully Submitted,

2

3                                   By /s/ Sean S. Pak

4                                   QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP
5                                   Sean S. Pak (SBN 219032)
                                    seanpak@quinnemanuel.com
6                                   Iman Lordgooei (SBN 251320)
                                    imanlordgooei@quinnemanuel.com
7                                   50 California Street, 22nd Floor
                                    San Francisco, CA 94111
8                                   Telephone: (415) 875-6600
                                    Facsimile: (415) 875-6700
9
                                    JWC LEGAL
10                                  Jodie W. Cheng (SBN 292330)
                                    jwcheng@jwc-legal.com
11                                  One Market Street
                                    Spear Tower, 36th Floor
12                                  San Francisco, CA 94105
                                    Telephone: (415) 293-8308
13

14                                  Attorneys for Plaintiffs Proofpoint, Inc. and
                                    Cloudmark LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## Contact

www.linkedin.com/in/olivier-lemari
%C3%A9-06340 (LinkedIn)

## Top Skills

Cloud Computing
IP
Pre-sales

## Languages

**English** (Full Professional)
**French** (Native or Bilingual)

# Olivier Lemarié

CTO at Vade Secure
San Francisco Bay Area

## Summary

- 20+ years experience in creating technology and building innovative products
- Strong technology leader with track record of pushing innovation and success
- Expertise in architecting and building high-performance software at scale
- Security, messaging, big data, network and cloud computing products
- Entrepreneurial and early/mid-stage start-ups
- Passionate about technology and problem solving
- Highly-motivated, creative, analytical thinker

———

## Experience

**Vade Secure**
CTO
February 2017 - Present
San Francisco Bay Area

**CLOUDMARK**
Vice President, Gateway Technology
March 2010 - December 2016 (6 years 10 months)

Led the development of new products for service providers and for the protection of carriers against email, mobile and dns based security threats. Responsible for company security platform-based products. Designed and developed new solutions to detect spear phishing attacks in real time (geo-distributed threat intelligence graph). Management of engineering teams in San Francisco and Paris. Managing Director of Cloudmark Labs entity in France.

**BIZANGA**
CTO and Founder
January 2004 - March 2010 (6 years 3 months)
San Mateo, CA

Developed a highly scalable SMTP messaging router designed for carriers with policy engine, central reputation framework and anti-spam / anti-virus / anti-phishing applications integration. Drove company technical direction and research activities. Led some key customer deployment activities. Acquired by Cloudmark Inc. in 2010.

## OVERNETWORKS
CEO and Founder
October 2001 - January 2004 (2 years 4 months)

Founded Overnetworks to develop a layer 3 intelligent routing / traffic management technology to optimize performance and cost of internet infrastructure for Fortune 500, service providers and content providers.

## UUNET
2 years 11 months

Chief Technologist EMEA
September 1999 - October 2000 (1 year 2 months)

Built and led a team of technical experts based in different countries and in charge of leveraging innovation, establishing EMEA's technical vision and designing new products.

Deputy Technical Director
December 1997 - August 1999 (1 year 9 months)

Organized and managed the technical department: R&D, Engineering, Internal systems and Database services. Led the development of new services.

## INTERNET-WAY
Director Research & Development and Co-Founder
December 1994 - November 1997 (3 years)
Paris Area, France

Built an engineering team in charge of network and services for what became a major business internet service provider in France. Owned product definition and development. Designed and managed services and platforms for other French ISPs. Acquired by UUNet Technologies in 1997.

_____

# Education

EPITA: Ecole d'Ingénieurs en Informatique

Master's Degree, Computer Science · (1991 - 1994)

Dupuy de Lome, Lorient, France

Superior & Advanced Mathematics, Mathematics · (1989 - 1991)

# EXHIBIT B



# crunchbase

Solutions ⌄   Products ⌄   Pricing

Search Crunchbase

LOG IN   ⚡ TRY PRO FREE

**Olivier Lemarié**

⊕ FOLLOW   ⇄ COMPARE   ✎ EDIT

**Crunchbase Pro**

SEARCH

- Companies
- People
- Investors
- Funding Rounds
- Acquisitions
- Schools
- Events
- Hubs
- My Searches
- My Lists
- Add New Profile

## Power your search with Crunchbase Pro
Target the right companies with unlimited search filters, analysis tools, and automatic alerts.

TRY PRO FREE

Sign up for a free Crunchbase account to follow and track profiles you care about.

SIGN UP

### Overview

| CB Rank (Person) | 19,441 |
| --- | --- |

**Olivier Lemarié**
CTO
Vade Secure

| Location | San Francisco, California, United States |
| --- | --- |
| Regions | San Francisco Bay Area, West Coast, Western US |
| Gender | Male |

| Website | vadesecure.com ↗ |
| --- | --- |

Olivier Lemarié brings to Vade Secure, over 25 years of executive management and network infrastructure development experience to his role as CTO.

Prior to Vade Secure Olivier was Vice President Gateway Technology at Cloudmark (later acquired by Proofpoint). He his also one of the founder of Bizanga with a CTO role and responsible for the development and direction of Bizanga's Intelligent Message Processor (IMP) platform which provided scalable and full-featured email message processing and security for some of the largest messaging operators in the world. Prior to founding Bizanga, Olivier was co-founder of Internet-Way, one of France's first and most successful internet service providers, and played a prominent role in the design and deployment of the technical infrastructure and in the development of value-added services. Internet-Way was subsequently acquired by UUNET, where he served as Chief Technologist for UUNET Europe, Middle East, and Asia and was tasked with defining UUNET Europe's technological direction.

Always looking for better ways to exploit technologies, Olivier founded Overnetworks in 2000 to develop a new scalable technology to intelligently route data on the Internet. Earlier in his career, he also consulted to several start-up organizations helping them define their business models and technological direction.

Read More

Which funding rounds raised the most money?



UNLOCK CHARTS

## Jobs

| Number of Current Jobs | 1 |
| Number of Past Jobs | 4 |

Olivier Lemarié **is the CTO at** Vade Secure. **Additionally,** Olivier Lemarié **has had** 4 **past jobs including Vice President, Gateway Technology at** Cloudmark.

Vade Secure
CTO
2017

| Organization Name | Title At Company | Start Date | End Date |
|---|---|---|---|
| Cloudmark | Vice President, Gateway Technology | 2010 | 2016 |
| Bizanga | CTO | 2004 | 2010 |
| Overnetworks | CEO and founder | 2001 | 2004 |
| UUNET Technologies | Chief Technologist EMEA | 1997 | 2000 |

## Related Hubs

| Hub Name | CB Rank (Hub) |
|---|---|
| Information Technology Companies with Early Stage Venture Funding | 1,967 |
| Startups Founded in 2009 | 2,417 |
| Email Companies | 6,142 |
| Isai Portfolio Companies | 23,159 |
| Information Technology Companies | 19,135 |
| Email Startups | 17,136 |

PDFmyURL easily turns web pages and even entire websites into PDF!   PDFmyURL

| Enterprise Software Companies with early stage venture funding | 1,450 |
| Enterprise Software Startups | 2,150 |
| Information Technology Startups | 515 |
| General Catalyst Portfolio Companies | 4,357 |

pro SHOW MORE

Recent News and Activity

cb crunchbase

**Stay Connected**

Crunchbase News
Subscribe to the Crunchbase Daily

**Who We Are**

Company
Careers
Partners
Advertise
Blog
Contact Us

**What We Do**

Crunchbase Pro
Marketplace
Crunchbase Enterprise
Data Licensing
Customer Stories
Pricing

**Popular Links**

Featured Lists and Searches
The Crunchbase Difference
Knowledge Center
Privacy
Create a Profile

Browse By: Organizations, People, Events

Editorial Partners: Verizon Media Tech

Terms of Service | Privacy Policy | © 2019 Crunchbase Inc. All Rights Reserved.

About • Terms • Careers • Sitemap
© 2019 Crunchbase Inc.
All rights reserved. (e12b37a 155)

PDFmyURL easily turns web pages and even entire websites into PDF!

# EXHIBIT C

## Contacter

www.linkedin.com/in/alexandre-
boussinet-7a28a921 (LinkedIn)

## Principales compétences

Open Source
C
Linux

## Languages

anglais

# Alexandre Boussinet

Lead Technical Architect
Paris Area, France

## Résumé

Specialties: c, go, ada, c++
open source, linux system developer

――――

## Expérience

### VadeSecure
Senior Software Engineer
juillet 2016 - Present
Paris

Lead technical architect on email services.
Technologies: Go, smtp, milter, json, ...

### Cloudmark
Senior Software Engineer
mars 2011 - juillet 2016 (5 ans 5 mois)
Paris, France

Core developer on Gateway technology at the R&D labs in Paris.
Technologies: C, python, xml, smtp, radius, ldap, mysql, ...

### Devoteam
Expert Open Source
janvier 2005 - février 2011 (6 ans 2 mois)

### SFR
Chef de projet Infrastructure
2006 - 2006 (1 an)

Technologies : Novell (SuSE Linux, YaST), RPM, PXE, TFTP, HTTP, Apache,
KSH

Rédaction du plan qualité, des spécifications fonctionnelles et détaillées, notes
techniques.
Responsable de l'équipe infrastructure-sécurité.
Réalisation d'un master permettant la réinstallation de serveurs opérationnels
en moins de 10 minutes.

Construction du socle Linux-Apache en vue de la migration de tous les frontaux web de SFR.

Réalisation d'une matrice de support / compatibilité des versions d'Apache avec les plugins WebSphere, WebLogic, SiteMinder.

Repaquetage des logiciels websphere, weblogic, siteminder, apache, ihs, networker, patrol, sysload.

Documentation pour chaque paquet RPM réalisé.

Construction d'un repository permettant l'installation d'une machine via le réseau.

Documentation sur la création du repository.

Construction d'un CD d'auto-installation à partir du repository.

Documentation sur la création du CD.

Projet noté 16/20 par SFR (arrivée en 3ème position dans leur classement) et élu meilleur partenaire par Novell pour l'année 2006.

## France Telecom
1 an

### Développeur R&D UK
2005 - 2005 (1 an)

Technologies : C, C++, Linux, MP4, Apache, http, XML

Projet de vidéo streaming : conception et développement d'un prototype

Reécriture du client/serveur respectant les nouvelles spécifications (message handling et infrastructure)

Evolution des interfaces pour ajouter une playlist

Développement d'un client C++ pour downloader et parser un fichier XML sur un serveur http Apache / IPv6.

Développement d'outils de mesures réseaux et d'extensions aux drivers WiFi Linux.

Développement d'extensions au lecteur MPEG4 de CISCO (mpeg4ip) afin de pouvoir changer

de flux audio ou vidéo de manière transparente. Cross compilation de la solution sur PDA et ajout d'une interface de pilotage a distance

### Développeur R&D UK
2005 - 2005 (1 an)

Technologies : C++, Linux, MySQL, Seamless Mobility

Projet Seamless mobility manager: conception et développement d'un prototype V0.

Reécriture du client / serveur respectant les nouvelles spécifications (message handling et infrastructure)

Ecriture des spécifications détaillées et du dossier d'implémentation du prototype

Développement en C++ du serveur de mobilité

Rédaction des documents de synthèse, manuels d'utilisation et d'installation

Production d'un rapport d'intégration

Chef de projet technique
2005 - 2005 (1 an)

Technologies : C++, Linux, MySQL, Seamless Mobility

Chef de projet technique pour le prototype V1 du manager réseau de l'architecture seamless mobility. Responsable de l'équipe de développeurs, plannings, livrables, suivi de projet.

SNAISO
Développeur Open Source / Windows
2003 - 2005 (3 ans)

Technologies: C, C++, perl, Windows, Linux

Modélisation et implémentation d'un requêteur permettant la détection d'intrusion ou d'attaque en se basant sur des logs fichiers ou temps réel.
Modélisation d'un module d'alerte permettant la remontée d'alarmes basées sur des règles simples (contraintes sur paramètres) ou complexes (corrélation entre plusieurs sources).
Modélisation et implémentation d'un arbre générique permettant la représentation de données en mémoire et leur sérialisation sur disque (pseudo système de fichier mémoire avec droits d'accès).
Implémentation de divers modules au sein du logiciel (administration de l'état des équipements sur le réseau, visualiseur de logs avec gestion de cache fichier permettant l'affichage de fichiers énormes sans perte de performances, etc.).
Veille technologique et modélisation de la future version du logiciel.

––––––

# Formation

EPITECH - European Institute of Technology

Bac+5, Informatique · (1999 - 2002)

# EXHIBIT D

## Contact

www.linkedin.com/in/
xavierdelannoy (LinkedIn)
github.com/delanne/ (Other)

## Top Skills

Test Automation
Software Quality Assurance
Linux

## Languages

English (Full Professional)
French (Native or Bilingual)

# Xavier Delannoy

VP Engineering at Vade Secure
Paris Area, France

## Experience

**Vade Secure**
3 years 2 months

VP Engineering
October 2016 - Present

QA Manager
June 2016 - October 2016 (5 months)

**Cloudmark**
Senior Software engineer
January 2011 - June 2016 (5 years 6 months)

I'm in charge of the Automated Test environment for the Cloudmark Gateway product:

* develop the test framework from scratch (in python):

* support for various protocol (smtp, http, dns, diameter, cops, MM1 ...)

* virtualisation and test parallelization

* develop a Web frontend for the framework (to give us more visibility):

* django, elasticsearch

* help the engineering team (Dev and QA) about automation

**bizanga**
QA engineer leader
July 2007 - May 2009 (1 year 11 months)

**Netasq**
R&D engineer - NetASQ Shield project manager
March 2002 - June 2007 (5 years 4 months)

———

## Education

Ecole internationale des Sciences du Traitement de l'Information
Bachelor of Science (BS)  · (1999 - 2002)

Prépa Henri Wallon - Valenciennes

# EXHIBIT E

## Contact

www.linkedin.com/in/
guillaumesejourne (LinkedIn)
www.prismadoc.fr (Personal)
abcbluesandsoul.com/default.aspx
(Other)

## Top Skills

Technical Writing
XML
Technical Communication

## Languages

French
English

# Guillaume Séjourné

Manager, Training & Technical Publications at Vade Secure
Paris Area, France

## Summary

Key skills: Documentation Engineering, XML and DITA
Documentation, Continuous Documentation Integration, Big Data
processing, Real-Time Data Analytics, Automation

———

## Experience

Vade Secure
Manager, Technical Publications, Training & Certification
December 2016 - Present
Paris Area, France

Vade Secure
Manager, Technical Publications & Training
December 2016 - Present
Paris Area, France

Vade Secure
Manager, Technical Publications & Training / Product Manager ISP/
MSP
December 2016 - Present
Paris Area, France

Cloudmark
7 years

Manager, Technical Publications
November 2014 - December 2016 (2 years 2 months)
Paris Area, France

Currently working on building a DITA Continuous Integration Platform, and
automating builds through Docker containers.

Deliver technical documents to partners, customers, and internal resources for
various lines of product, license, etc. on time.

Manage availability and verification of materials and prepare necessary documents.

Mentor, coordinate and guide writers and editors, and authorize layouts of documentation.

Mentor and supervise staff, and ensure supply and maintenance of resources and equipment, as well as proper training to the various technical writing technologies used in the company.

Coordinate with different departments to achieve end results, convey these to management, and develop new documentation and distribution ideas and thought processes.

Perform multiple drafting tasks such as writing, proofing, formatting and maintain varied kinds of documentation for serving varied customers.

Ensure compliance with documentation needs through client and research collaboration, assign resources and update management on projects.

Identify and apply new communication trends appropriately to business.

Engineering Product Coordinator / Sr Technical Writer
2010 - November 2014 (4 years 11 months)
Paris Area, France

As an engineering product coordinator, my roles are:
- BigData audit, propose and provide solutions for an efficient use of data, both in terms of storage and usage, (MySQL, Redis, Couchbase)
- Design and Development of Real-Time Analytics platforms, for data analysis, (i.e. real-time being a few seconds at most), based on NodeJS + Socket.IO, REDIS, etc.
- Coordinating development teams and task distribution within the team (in Paris and San Francisco),
- In charge of the "Credit d'Impots Recherche et Innovation" (CIR and CII) files (french tax credit refund for research),
- In charge of developing, maintaining, and enhancing the User Interface (GUI) for Messaging Security products, based on XML-XSL + jQuery.

As a Sr Technical Writer

My contributions to the technical publications team were more engineering oriented, more than writing:

- Audit, migration and unification of 2 distinct documentation systems (one FrameMaker based, and one XML-XSL based) to DITA.
- Customization of a DITA-OT documentation environment;
- Automation of the continuous integration system for the DITA-OT builds.

Bizanga
Senior Technical Writer
September 2008 - February 2010 (1 year 6 months)

Bizanga was purchased by Cloudmark in 2010. (See current position)

Prismadoc / Sherpa-doc
Documentation Engineer
April 2003 - September 2008 (5 years 6 months)

I established as a contractor in early 2003.

- English/French technical writing,
- numerous consultant missions, in charge of providing documentation migration solutions, team organization, recruiting.
- Migration of documentation systems to long-lasting solutions,
- Single-sourcing counsel,
- B.O.X. project (see below)

Specialties:Technical Writing, Documentation Engineering, Word to XML migration, XML writing methods and publication

Université Paris 7, Master CDMM
Teacher
2001 - 2008 (8 years)

In charge of various training to the Technical Communication Master's Degree:

- XML, XSL, XSL-FO
- XHTML, CSS
- Rendering and Publication Tools (RoboHelp, Framemaker, XSL bindings, etc.)

Laboratoires Pierre Fabre
Project Manager
February 2004 - September 2006 (2 years 8 months)

For Pierre Fabre Laboratories, I was in charge of the development of a specific XML writing tool for Clinical Study Protocols. I lead the project and conducted two developpers (for MySQL databses), and partipated in the ergonomy and design development phasis in PHP. This project was very successfull and was later on migrated to a J2EE based application to suit the new architecture; Pierre Fabre Laboratories decided to give me the role of project manager for this migration as well.

62avenue
Project manager
2002 - 2003 (2 years)

In charge of multimedia and websites projects for French public services (Ministère de l'Economie et des Finances), website design and maintenance.

GIEAU
Technical Writer
2001 - 2003 (3 years)

In charge of authoring help contents and automate source conversion.
Also created multimedia content, like interactive application demos.

———

# Education

### Université Denis Diderot (Paris VII)
DESS (Professional master's degree), Rédaction Technique Multilingue Informatisée · (2001 - 2003)

### Université Denis Diderot (Paris VII)
Master's degree in Translation and Contrastive Linguistics, Translation, American English, Contrastive Linguistics · (2000 - 2001)

### Roosevelt High School, Minneapolis, MN, USA
Graduation  · (1996 - 1997)

### Lycee la Tour des Dames
Baccalaureat S Maths, Science-specialized french graduate · (1995 - 1996)

# EXHIBIT F



US 20180278627A1

(19) **United States**

(12) **Patent Application Publication**  (10) Pub. No.: US 2018/0278627 A1

GOUTAL  (43) Pub. Date: **Sep. 27, 2018**

(54) **DETECTION OF EMAIL SPOOFING AND SPEAR PHISHING ATTACKS**

(71) Applicant: **Vade Secure Technology Inc.**, San Francisco, CA (US)

(72) Inventor: **Sebastien GOUTAL**, San Francisco, CA (US)

(21) Appl. No.: **15/466,588**

(22) Filed: **Mar. 22, 2017**

**Publication Classification**

(51) **Int. Cl.**
*H04L 29/06* (2006.01)
(52) **U.S. Cl.**
CPC ...... *H04L 63/1416* (2013.01); *H04L 63/1433* (2013.01)

(57) **ABSTRACT**

A computer-implemented method of detecting an email spoofing and spear phishing attack may comprise generating a contact model of a sender of emails; determining, by a hardware processor, a statistical dispersion of the generated contact model that is indicative of a spread of a distribution of data in the generated model and receiving, over a computer network, an email from the sender. If the determined statistical dispersion is lower than a dispersion threshold, the received email may be evaluated in the processor against a plurality of conditions associated with email spoofing and spear phishing attacks, using the generated contact model, to generate a features vector that is constituted of a plurality of binary values and a plurality of dispersion values between 0 and 1, and using at least the generated features vector to classify with a supervised learning algorithm the received email as a likely legitimate email or as a likely malicious email spear phishing attack; and notifying a recipient of the email when the received email is classified as a likely malicious email spear phishing attack.



Case 3:19-cv-04238-MMC   Document 219   Filed 09/02/20   Page 55 of 125



*FIG. 1*



*FIG. 2A*

*FIG. 2B*



START
B31
PRIORITY EMAIL?
[NO]
[YES]
B32
SPF, DKIM OR DMARC AVAILABLE
[YES]
B33
USE SPF, DKIM OR DMARC TO TAKE DECISION
END
[NO]
B34
EXTRACT EMAIL ADDRESS FROM "FROM" HEADER
B35
CONTACT HAVE MODEL?
[NO]
B36
CREATE MODEL FOR CONTACT SET STATUS OF MODEL TO LEARNING
[YES]
B42
STATUS OF MODEL?
[LEARNING]
B37
ENOUGH EMAILS & SUFFICIENT TIME SPENT TO BUILD THE MODEL?
[NO]
[YES]
B38
COMPUTE DISPERSION OF MODEL
DISPERSION >= DISPERSION Th
DISPERSION < DISPERSION Th
B39
SET MODEL STATUS TO DEACTI-VATED
B40
SET MODEL STATUS TO PROTEC-TION
B41
MOVE EMAIL TO INBOX
END
[PROTECTION]
B43
CLASSIFY EMAIL
[MALICIOUS EMAIL]
B44
[LEGITIMATE EMAIL]
MOVE EMAIL TO INBOX
[RECIPIENT REPORTS MALICIOUS EMAIL]
B49
REPORT FALSE NEGATIVE DELETE MALICIOUS EMAIL
B46
[ELSE]
UPDATE MODEL WITH EMAIL
B45
RAISE ALERT TO RECIPIENT
[RECIPIENT REFUTES ALERT]
[RECIPIENT CONFIRMS ALERT]
B47
REPORT TRUE POSITIVE DELETE MALICIOUS EMAIL
B48
UPDATE MODEL WITH EMAIL REPORT FALSE POSITIVE MOVE EMAIL TO INBOX
END

*FIG. 3*

| Type | Feature | Description |
|------|---------|-------------|
| BIN | *KNOWN_IP_ADDRESS* | The IP address that has initiated the SMTP connection is in KNOWN_IP_ADDRESS_LIST. |
| DISP | *KNOWN_IP_ADDRESS_DISP* | Dispersion of KNOWN_IP_ADDRESS_LIST. |
| BIN | *KNOWN_CITY* | The city associated to the IP address that has initiated the SMTP connection is in KNOWN_CITY_LIST. |
| DISP | *KNOWN_CITY_DISP* | Dispersion of KNOWN_CITY_LIST. |
| BIN | *KNOWN_MUA* | The MUA used to compose the email is in KNOWN_MUA_LIST. We will use the simplified name for the identification of the MUA.<br>Example:<br>`IPHONE_MAIL`<br>`IPAD_MAIL`<br>`OSX_MAIL`<br>`LINUX_THUNDERBIRD` |
| DISP | *KNOWN_MUA_DISP* | Dispersion of KNOWN_MUA_LIST. |
| BIN | *KNOWN_MUA_DISPLAY_NAME* | The display name extracted from *From* header matches the display name of the identified MUA. See KNOWN_MUA. |
| BIN | *KNOWN_MUA_SIGNATURE* | The signature extracted from the body matches the signature of the identified MUA. See KNOWN_MUA. |
| BIN | *KNOWN_MUA_DEFAULT_FONT* | The font extracted from the *text/html* part of the body of the email matches the default font of the identified MUA. See KNOWN_MUA. |
| BIN | *KNOWN_MUA_CONTENT_LANGUAGE* | The language extracted from *Content-Language* header matches the language of the identified MUA. See KNOWN_MUA. |
| BIN | *NEW_MESSAGE* | The email is a newly composed message i.e. the email is neither a reply to a previous message nor a forward of an existing message.<br>In the case of a reply or a forward, the email can take attributes - such as the font and the language - of the existing message. See KNOWN_MUA_DEFAULT_FONT and KNOWN_MUA_CONTENT_LANGUAGE. |

*FIG. 4A*

| BIN | TEXT_HTML_PART | The email body has a *text/html* part. A *text/html* part in the body is required to extract the font. See KNOWN_MUA_DEFAULT_FONT. |
| --- | --- | --- |
| BIN | WHP_IP_ADDRESS | The IP address that has initiated the SMTP connection belongs to a web hosting provider (GoDaddy, OVH, 1&1...). Web hosting providers are often abused by fraudsters to send malicious emails such a spear phishing attacks.<br><br>A web hosting provider IP address can be identified in two different ways:<br>• Analyze and match the reverse DNS of the IP address with a known pattern,<br>• Match the IP address with of list of IP ranges that belong to the web hosting provider. |
| BIN | DIFFERENT_REPLY_TO | The email address in the *Reply-To* header [10] does not match the email address in the *From* header. In the case of a spear phishing, the fraudster often set a different email address in *Reply-To* header : if the victim replies to the email, then its reply will not go to the person whose email has been spoofed. |
| BIN | DIFFERENT_RETURN_PATH | The email address in the *Return-Path* header [10] does not match the email address in the *From* header. The *Return-Path* header contains the email address that will receive a bounce message [13] in the case of a delivery issue. The *Return-Path* header is added to the received email by the MTA and the MTA uses the email address of the *MAIL FROM* SMTP command [2]. In the case of a spear phishing, the fraudster often sets an email address in the *MAIL FROM* SMTP command that is different from the email address in the *From* header: as a consequence, the email addresses in the *Return-Path* and *From* headers are different. |
| BIN | SINGLE_RECIPIENT | There is one recipient in *To* header and no recipient in *Cc* and *Bcc* headers. This recipient is the *main recipient*. In the case of a spear |

*FIG. 4B*

| | | | |
|---|---|---|---|
| | | | phishing attack, it is common that only one person is targeted. If several persons were targeted, they would be more alert and more prone to detect the scam. |
| BIN | *URGENCY_IN_SUBJECT* | | The email *Subject* header contains a keyword that creates a sense of urgency: *urgent*, *important*… A large number of spear phishing attacks create a sense of urgency so that the victim acts immediately. See the *CEO fraud* example. |
| BIN | *SUSPICIOUS_TEXT* | | The email body contains suspicious topics: wire transfer, disclosure of sensitive and/or confidential data (contracts, internal documents, bank account numbers, social security numbers, W-2 tax records, list of logins or passwords…)… |
| BIN | *EXTERNAL_DATA* | | The email body contains at least one *external data*: an email address, a telephone number, an url or a *dynamic file* attached.<br><br>It is important to note that the signature in the body is ignored as it may contain an email address, telephone numbers and urls.<br><br>A *dynamic file* is a file that may contain dynamic content that can be harmful. Examples of *dynamic files* are PE files [14], APK files [15], PDF files, Microsoft Office files or HTML files. Such files will be identified by their media type [16].<br><br>In this case of a spear phishing attack, this *external data* can be the next step of the attack or the payload: a phishing url that will capture the victim credentials, a file that contains a malware… |

*FIG. 4C*

| Threat | Features |
|---|---|
| Features used to detect Email spoofing | KNOWN_IP_ADDRESS<br>KNOWN_IP_ADDRESS_DISP<br>KNOWN_CITY<br>KNOWN_CITY_DISP<br>KNOWN_MUA<br>KNOWN_MUA_DISP<br>KNOWN_MUA_DISPLAY_NAME<br>KNOWN_MUA_SIGNATURE<br>KNOWN_MUA_DEFAULT_FONT<br>KNOWN_MUA_CONTENT_LANGUAGE<br>NEW_MESSAGE<br>TEXT_HTML_PART |
| Features used to detect Spear phishing | WHP_IP_ADDRESS<br>DIFFERENT_REPLY_TO<br>DIFFERENT_RETURN_PATH<br>SINGLE_RECIPIENT<br>URGENCY_IN_SUBJECT<br>SUSPICIOUS_TEXT<br>EXTERNAL_DATA |

*FIG. 5*



*FIG. 6*

US 2018/0278627 A1
Sep. 27, 2018

1

## DETECTION OF EMAIL SPOOFING AND SPEAR PHISHING ATTACKS

### BACKGROUND

[0001] Whereas phishing is now a threat that is well known by the Internet ecosystem and the security industry, a more advanced and pernicious threat has appeared recently, and this threat is known as spear phishing.

[0002] Spear phishing has the following features:

[0003] Spear phishing targets enterprises, and especially small and medium-sized enterprises. The victim targeted is someone who has access to sensitive information, such as a C-level executive or an accountant.

[0004] The attack is prepared meticulously. The attacker performs a thorough study of the enterprise and the victim, drawing from sources of information such as social media (LinkedIn, Facebook, Twitter . . . ), corporate website, blogs and corporate media. Such sources are often a treasure trove of valuable information. The attacker will use this information to build an attack that will make sense and appear legitimate to the victim.

[0005] The email will be send to the victim by an allegedly trusted person. In the case of spear phishing, there is always impersonation of a trusted person. A well-known kind of impersonation by email is called email spoofing.

[0006] The payload of the spear phishing attack can be one of the following:

[0007] A malicious file attached; or

[0008] A malicious Uniform Resource Locator (url).

[0009] The text itself, designed to lead the victim to carry out an action (wire transfer, sending of confidential documents, etc.)

[0010] The spear phishing attack is unique and is tailored specifically to the targeted enterprise and victim. A known example of spear phishing is called CEO fraud. The CEO fraud is a business email scam in which the attacker spoofs an email from the CEO of a company and tricks another person of this company—typically the accountant—to perform an action that will benefit the fraudsters, such as wiring funds or disclosing sensitive information. The CEO fraud is a typical example of a spear phishing attack where the attack is prepared meticulously so that the victim believes that the email originates from the CEO himself. For example, in the case of a wire transfer, the attacker will provide the motivation for the wire transfer. Here is an example:

[0011] From: John Miller <john.miller@company.com>

[0012] To: Jessica Lee <jessica.lee@company.com>

[0013] Subject: Urgent matter

[0014] Jessica,

[0015] I just met one of our provider at the RSA conference. They have a pending invoice from last year that got lost. I have attached the invoice. Can you initiate the wire transfer asap? It is very important.

[0016] Thx

[0017] John

[0018] Sent from my iPhone

[0019] In this example, the attacker knows that John is the CEO and Jessica the accountant. He also knows the email addresses of both. It is quite trivial for the attacker to find this information, as the company website and social media websites such as LinkedIn provide much, if not all, of the needed information. Furthermore, the attacker knows that John Miller is at the RSA conference because this information was posted on the company Twitter account.

[0020] As previously stated, spear phishing attack relies on impersonation. In contrast, email spoofing is the creation of email messages with a forged sender address in the From header of the email. As surprising as it may sound, core email protocols do not provide a mechanism for authentication and thus allow the creation of email messages with a forged sender address.

[0021] To address this critical issue, the software industry has developed technologies such as Sender Policy Framework (SPF), DomainKeys Identified Mail (DKIM) or more recently Domain-based Message Authentication, Reporting and Conformance (DMARC). However, even if the adoption of these technologies is increasing, a vast portion of the email traffic is still not protected. The main reason for the non-adoption of these technologies is due to the large amount of work that is required to properly configure SPF, DKIM and/or DMARC, which typically depends of the complexity of the email provider infrastructure. Moreover, for even modestly complex environments, the cost of deploying these technologies may be considered to be prohibitive for the email provider. For example, Google, AOL and Yahoo! have successfully deployed these technologies. However, other major email providers have not and may never do so. Consequently, an important number of end users remain vulnerable to email spoofing.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0022] FIG. 1 is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

[0023] FIG. 2A is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

[0024] FIG. 2B is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

[0025] FIG. 3 is a flowchart illustrating aspects of a computer-implemented method according to one embodiment.

[0026] FIG. 4A is a table illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

[0027] FIG. 4B is a table illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

[0028] FIG. 4C is a table illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

[0029] FIG. 5 is a table illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

[0030] FIG. 6 is a block diagram of a computing device with which an embodiment may be practiced.

### DETAILED DESCRIPTION

[0031] Herein, computer-implemented methods, devices and systems are presented that will thwart spear phishing attacks and email spoofing. For ease of reference, such

2

methods, devices and systems are collectively referred to herein by the acronym ESPL (Email Spoofing & spear phishing Protection Layer).

### Definitions

[0032]   Organization domain is the email domain of the organization protected by ESPL technology.

[0033]   Contacts are email addresses that exchange priority emails with the organization domain. Contacts are constituted of internal contacts and external contacts. Internal contacts are email addresses that belong to the organization domain. External contacts are email addresses that do not belong to the organization domain.

[0034]   A priority email is an email that has been considered as legitimate by previous email filters and that has not been sent by an automated process. A typical example of priority email is a person-to-person email. All other types of emails will be ignored: spam, advertisements, newsletters, social networks notifications, electronic commerce notifications (such as invoices, booking or purchase confirmation, electronic tickets, parcel tracking). These may be processed using other, existing methods.

[0035]   ESPL

[0036]   Both internal contacts and external contacts can be spoofed by a fraudster. ESPL's purpose includes protecting internal contacts of the organization domain from spear phishing attacks that rely on the spoofing of an internal contact or external contact of the organization domain.

[0037]   To achieve this purpose and according to one embodiment, ESPL may build a model for every contact of the organization domain. This model may be built by analyzing inbound and outbound email traffic of the organization domain. The period of time during which ESPL acquires data from email traffic to build a model of the contact is called learning phase. According to one embodiment, when enough data is acquired to build the model of the contact; that is, when ESPL has enough data to detect an impersonation of the contact, ESPL may switch from the learning phase to a protection phase.

[0038]   Deployment

[0039]   The enterprise email filtering described and shown herein may be implemented, according to one embodiment, as an on-premise email filtering gateway and, according to one embodiment, as an email filtering service in the executing on remote servers (i.e., the cloud).

[0040]   Both implementations include ESPL technology. Herein, the phrase ESPL component denotes each deployment of the ESPL technology. There are as many ESPL components as there are several instances of the gateway and cloud implementations.

[0041]   FIG. 1 is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment. As shown therein, two cloud implementations 102, 104 and one gateway implementation 106 may be coupled, over a computer network (not explicitly shown in FIG. 1, but present), to a centralized ESPL service 108. Both the cloud implementations 102, 104 and the gateway implementation 106 may be configured, according to one embodiment, to include an ESPL component or layer and a Mail Transfer Agent (MTA). Indeed, the cloud implementation 102 may be configured to include ESPL component 110 that communicates with a MTA 112, the gateway implementation 114 may be configured to include an ESPL component 114 that communicates with a MTA 116

and the cloud implementation 104 may be configured to include an ESPL component 118 that communicates with a MTA 120.

[0042]   Each ESPL component 110, 114, 118, depending upon the implementation, may be configured to communicate:

[0043]   with its email server (also known as the MTA) 112, 116 and 120, respectively; and

[0044]   with a centralized ESPL service 108 in the cloud.

[0045]   FIG. 2A is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment. It is useful at this juncture, to set out a few definitions:

[0046]   True Positive (TP): a malicious email that has been classified as malicious by ESPL;

[0047]   False Positive (FP): a legitimate email that has been classified as malicious by ESPL;

[0048]   True Negative (TN): a legitimate email that has been classified as legitimate by ESPL; and

[0049]   False Negative (FN): a malicious email that has been classified as legitimate by ESPL.

[0050]   As shown in FIG. 2A, ESPL component 202 (also shown in FIG. 1 at 110, 114 and 118) is configured, as shown previously, to communicate with the centralized ESPL service 108 over a computer network that may include, for example, the Internet and/or other public or private networks. The ESPL component 202 may be characterized, according to one embodiment, as comprising a processing portion 204 and a data portion 206. The processing portion 204 may comprise structure and functionality to process emails (receive, generate and send emails, among other functionality), as shown at 208 and to categorize email, as shown at 210. The processing portion 204, for example, may be embodied in one or more processors (an exemplar of which is shown at 602 in FIG. 6) configured, according to computer-readable instructions, to carry out the functionality of FIG. 3 described hereunder and described throughout the remaining portion of the present disclosure. As shown at 210, the processing portion 204 may also be configured to classify received email, as described in detail herein. The ESPL component 202 may also be configured to build, maintain and update contact models 212, SVM models 214 and to report FP, TP and FN emails 216 to the centralized ESPL service 108 as shown at 220. During the protection phase, as shown in FIG. 2A, the centralized ESPL service 108, as shown at 218 and 222, may also be configured to update the SVM model 214 and update the code that causes the processing portion 204 to categorize incoming email, as shown at 222 and as described herein below.

[0051]   Therefore, as shown in FIG. 2A, the centralized ESPL service 108, according to one embodiment, may be configured to, among other tasks:

[0052]   to collect FP, FN and TP from all ESPL components to improve ESPL technology, as shown at 220; and

[0053]   to update the ESPL components 110, 114, 120 (Code update 222, update SVM model as shown at 218).

[0054]   Processing of Inbound Email Traffic

[0055]   The terms True Positive (TP), True Negative (TN), False Positive (FP) and False Negative (FN) are widely used in binary classification problems. FN and FP may be detected by ESPL according to one embodiment, through end-user feedback. According to one embodiment, FN, FP

US 2018/0278627 A1

Sep. 27, 2018

3

and TP are reported, as shown at **220**, to the centralized ESPL service **108**. They will be used to improve ESPL technology, and especially the classifier.

[0056] According to one embodiment, TN and FP may be used to update the contact model. There are two significant facts when the contact model is updated during the protection phase:

[0057] A sliding time window may be used in one embodiment. The size of the sliding time window may be greater than the duration of the learning phase. A sliding time window may be used because it allows for old features of the contact model to be forgotten. For example, the user may have switched from an iPhone to an Android phone. For the contact model to remain representative of the user, the iPhone-related features should be forgotten and the Android-related features should be taken into account. Without a sliding time window, both the iPhone-related and Android-related features would be present, which would decrease the degree to which the contact model is representative of the current behavior of the contact (by, according to one embodiment, increasing dispersion and decreasing the stability of the contact model, as described further below). One embodiment, therefore, uses a sliding time window, to render it dynamic and responsive to changing circumstances and to limit the amount of dispersion, which is discussed further below.

[0058] Dispersion may be calculated, according to one embodiment, after the model is updated. If the dispersion is too high, the model may be deactivated.

[0059] FIG. **3** is a flowchart illustrating aspects of a computer-implemented method of classifying and handling inbound emails, according to one embodiment. As shown therein, the computer-implemented method starts with the receipt of an email at a computing device over a computer network. At B**31**, it is determined whether the received email is a priority (i.e., person-to-person) email. If the received email is not a priority email (such as, for example, spam, advertisements, newsletters, social networks notifications, electronic commerce notifications (such as invoices, booking or purchase confirmation, electronic tickets, parcel tracking)), it may be ignored and the method ends. Alternatively, additional processing, classification and handling of such non-priority emails may be carried out, according to other methods. If the received email is, indeed, determined to be a priority email, (YES branch of B**32**), it is determined whether SPF, DKIM and/or DMARC are available. If any of these technologies are implemented on the MTA, they may be deployed at B**33** and the method ends. One embodiment, therefore, applies to received priority emails in installations in which SPF, DKIM and/or DMARC are not available.

[0060] As shown at B**34**, after following the NO branch of B**32**, the email address of the sender of the email is extracted from the From header of the received email, as shown at B**34**. As shown at B**35**, if a contact model for this sender is available, the YES branch is followed and, if no contact model for this sender exists, then the NO branch of B**35** is followed.

[0061] Before continuing with a detailed discussion of blocks B**36** to B**48** of FIG. **3**, it is useful to have an understanding of a number of other aspects of ESPL.

[0062] Model of a Contact

[0063] A contact may be thought of as a person who uses an email address to communicate. This person uses one or several devices (desktop computer, laptop, smartphone, tablet . . . ). For each device, an email application, denoted herein as a Mail User Agent or MUA, may be used to receive, read, compose and send emails. This person also connects from different places. Some of these places can be recurrent (e.g., office, home) or not habitually recurrent (e.g., coffee shop, airport, hotel). All these data may be used, according to one embodiment, to model the contact.

[0064] A MUA, according to one embodiment, may be identified by parsing the email, and especially the X-Mailer and User-Agent headers that typically contains an identifier specific to the MUA. However, ESPL may be configured to translate the raw content of the header to a simplified name. Table 1 below contains examples of such translation. This translation is necessary because the raw content contains the version number of the software, and this version number is subject to change quite often because of the frequent updates of the software during its lifecycle. One embodiment of ESPL uses a stable, simplified version of the identification to more readily model the MUA.

TABLE 1

| Raw content | Simplified name |
| --- | --- |
| X-Mailer: iPhone Mail (14C92) | IPHONE_MAIL |
| X-Mailer: iPhone Mail (14A456) | IPHONE_MAIL |
| X-Mailer: iPhone Mail (13D15) | IPHONE_MAIL |
| X-Mailer: Apple Mail (2.3112) | OSX_MAIL |
| X-Mailer: Apple Mail (2.1283) | OSX_MAIL |

[0065] Every MUA is configured by the person so that it fits his or her needs, and these configuration elements can help to assemble a digital email fingerprint of the person. Some of these elements can be found by parsing the email. Such elements may include, for example:

[0066] the display name;

[0067] the signature in the body of the email;

[0068] the default font in the text/html part of the body of the email; and

[0069] the language.

[0070] The display name is the string that will be inserted in the From header of the composed email, just before the email address of the sender. The display name can be configured in the MUA. It is usually the first name and last name of the sender. ESPL can extract the display name by parsing the From header of the email. Below is an example in which the display name "John Miller" has been extracted by parsing the From header of the email:

[0071] From: John Miller <john.miller@company.com>

[0072] The signature is the signature that will be inserted by default in the body of the email when composing a new message. The signature can contain a great deal of pertinent and useful data, especially in the context of business email: first name, last name, position in the company, address, phone number, and the like. ESPL may be configured to, according to one embodiment, extract the signature by parsing the body of the email. For example:

[0073] John Miller

[0074] CEO

[0075] Company, Inc.

[0076] (415) 123-4567

[0077] The default font is the font that will be selected by default to compose an email. A font is identified by a font

4

name and a font size. ESPL may be configured to, according to one embodiment, extract the default font by parsing the text/html part of the body of the email. For example:

[0078]   ARIAL, 10

[0079]   VERDANA, 11

[0080]   The language is the language that has been configured in the operating system. The language is transmitted by the MUA in the Content-Language header. The language is stored in the <language>-<REGION> format where <language> is compliant to ISO 639-1 and <REGION> is compliant to ISO 3166-1. ESPL may be configured to, according to one embodiment, extract the language by parsing Content-Language header. For example:

[0081]   Content-Language: en-US

[0082]   Content-Language: en-GB

[0083]   Content-Language: fr-BE

[0084]   Content-Language: fr-FR

[0085]   When a MTA receives an email, it adds a Received header in the received email. This Received header will typically contain the time, the source IP address and destination IP address of the SMTP connection. ESPL may be configured to, according to one embodiment, extract the IP address that has initiated the sending of the email by parsing these Received headers. ESPL may be also configured to, according to one embodiment, associate a geolocation to the IP address by using a local geolocation database. Geolocation is interesting because it can be less strict than an IP address and still carry a very relevant information. ESPL may be configured to, according to one embodiment, consider the city associated to the IP address. For example, a person may connect from a large list of IP addresses that will be translated to a much smaller list of cities. This makes the modeling of roaming profiles easier.

[0086]   As a person can use several devices and connect from different places, ESPL may be configured to manage a number of lists for every contact. In one embodiment, ESPL may be configured to maintain three lists for every contact. ESPL, however, may be configured to manage a lesser or greater number of lists. Such lists, for example, may include:

[0087]   A list of MUA called KNOWN_MUA_LIST and with at most KNOWN_MUA_MAX_COUNT elements;

[0088]   A list of IP addresses called KNOWN_IP_ADDRESS_LIST and with at most KNOWN_IP_ADDRESS_MAX_COUNT elements; and

[0089]   A list of cities called KNOWN_CITY_LIST and with at most KNOWN_CITY_MAX_COUNT elements.

[0090]   Dispersion

[0091]   One embodiment uses dispersion as a measure of the compactness or amount of spread of a distribution of behaviors of a contact relative to electronic messaging. Dispersion (which is also called variability, scatter, or spread) may be characterized as the extent to which a distribution is stretched or squeezed. A measure of statistical dispersion is a nonnegative real number that is zero if all the data are the same and increases as the data become more diverse.

[0092]   In the present implementation, dispersion is unitless. Examples of dispersion measures include:

[0093]   Standard deviation;

[0094]   Interquartile range (IQR);

[0095]   Range;

[0096]   Mean absolute difference (also known as Gini mean absolute difference);

[0097]   Median absolute deviation (MAD);

[0098]   Average absolute deviation (or simply called average deviation); and

[0099]   Distance standard deviation.

[0100]   According to one embodiment, a dispersion value may assist in determining when a contact model in the learning phase should be transitioned to the protection phase and may determine or be a factor in a determination of when a contact model may no longer be useful and should be deactivated. According to one embodiment, a value of dispersion may be calculated for each list. Let us define the following data:

| e | An element |
|---|---|
| $m \in \mathbb{N}_*$, $m \geq 2$ | m is a natural number greater or equal to 2 |
| $L_m$ | A list with at least 1 element and at most m elements. |
| M | A model that has one or several lists $L_m$ |
| $disp_{L_m} \in \mathbb{R}_*$, $0 \leq disp_{L_m} \leq 1$ | Dispersion of $L_m$ |
| $disp_M \in \mathbb{R}_*$, $0 \leq disp_M \leq 1$ | Dispersion of M |

Dispersion of $L_m$ is:

[0101]

$$disp_{L_m} = \frac{card(L_m) - 1}{m - 1}$$

. . . where "card" represents the cardinality (number of elements) of Lm.

Dispersion of M is:

[0102]

$$disp_M = \frac{\sum_{L_m \in M} disp_{L_m}}{card(M)}$$

[0103]   A low value of dispersion means that the contact will be easy to model because the contact does not use many devices and/or connection points. Conversely, a high value of dispersion means that the contact will be more difficult to model because the contact uses many devices and/or connection points and, if too high, means that the presently-constructed contact model for this contact may no longer be a useful tool in determining the likelihood of an email spoofing.

[0104]   Learning Phase

[0105]   A learning phase is first required to build the model of a contact. According to one embodiment, ESPL may use:

[0106]   Inbound email traffic to model external contacts; and

[0107]   Inbound and outbound email traffic to model internal contacts.

[0108]   The model of the contact will be considered built once the following conditions are both respected:

[0109]   A condition on the number of emails analyzed; and

[0110]   A condition on the length of the learning phase

[0111]   When the model is built, the dispersion of the model is computed. If the dispersion is too high, the model is deactivated. For example, a determination of whether the dispersion of a model is too high may include comparing the obtained numerical value of the dispersion against a predetermined dispersion threshold value. If, however, the dispersion value of the model is below the predetermined threshold, the contact model may be activated, the learning phase ended and the protection phase begun.

[0112]   Dispersion Example

[0113]   Below is an example of the determination of dispersion, according to one embodiment. In this example, the contact is rebecca.johns@company.com. During the learning phase, it is determined that Rebecca primarily uses Microsoft outlook on her Apple desktop computer. This desktop computer is in her office in San Francisco. Sometimes, however, she uses Mail on her Apple laptop from her home, also in San Francisco. It also happens that she sometimes uses her Apple laptop from her parent's home in San Diego. To sum up:

    [0114]   Rebecca uses two MUA: OSX_OUTLOOK and OSX_MAIL;

    [0115]   Rebecca connects from three different IP addresses: office, home and parent's home; and

    [0116]   Rebecca connects from two different cities: San Francisco and San Diego.

[0117]   The max values may be set as follows (these values may be freely chosen, with the understanding that they will affect the computed dispersion of the contact model):

    [0118]   KNOWN_MUA_MAX_COUNT=4

    [0119]   KNOWN_IP_ADDRESS_MAX_COUNT=32

    [0120]   KNOWN_CITY_MAX_COUNT=8

[0121]   The dispersion values for the lists are the following:

    [0122]   KNOWN_MUA_DISP=(2−1)/(4−1)=0.3333333333

    [0123]   KNOWN_IP_ADDRESS_DISP=(3−1)/(32−1)=0.06435161 2903

    [0124]   KNOWN_CITY_DISP=(2−1)/(8−1)=0.1428571429

[0125]   The dispersion of the contact model, according to one embodiment, may be computed as the average of the three dispersion values, is:

    [0126]   MODEL_DISP=(KNOWN_MUA_DISP+KNOWN_IP_ADDRESS_DISP+KNOWN_CITY_DISP)/3=0.18023553507

[0127]   As can be seen, the dispersion of this model is quite low. It is a steady model, especially because the number of SMTP connection points is very low. Rebecca's range of behaviors, as a contact, are distributed within a quite narrow distribution of such behaviors.

[0128]   The dispersion threshold is set, in this example, at 0.9. That is, MODEL_DISP_THRESHOLD=0.9. The dispersion of the contact model (0.18023553507) is lower than MODEL_DISP_THRESHOLD (0.9). As the dispersion of the contact model is lower than the dispersion threshold, this contact model can be transitioned from the learning phase to the protection phase

[0129]   Protection Phase

[0130]   Returning to FIG. 2A, during the protection phase, contact models 212 are used, in conjunction with the SVM model 214, to categorize received emails as either likely legitimate or likely malicious, as described in detail herein. Both the SVM model 214 and the contact model may be

updated during the protection phase. After the contact model is updated, the dispersion thereof may again be recomputed. If the computed dispersion of the contact model is too high (e.g., higher than a predetermined dispersion threshold), the contact model may be deactivated. If the computed dispersion of the contact model is still lower than the predetermined dispersion threshold, the contact model may be maintained in the protection phase.

[0131]   Classification

[0132]   As alluded to above, one embodiment uses a supervised learning algorithm to make the classification decision. Popular supervised learning algorithms include Support Vector Machine (SVM) and Random Forest. In one implementation, SVM may be used to make the decision on a binary classification problem for the following classes:

[0133]   $C_{malicious}$: the class of email spoofing and spear phishing attacks; and

[0134]   $C_{legitimate}$: the class of legitimate emails.

[0135]   The SVM classifier may be trained with labeled data i.e. emails that have been classified manually. The training process produces a SVM model. This SVM model will then be used by the SVM classifier to classify an unknown email. The SVM classifier returns the probability $P_{malicious}$ that this email belongs to $C_{malicious}$ class.

[0136]   We define:

[0137]   $threshold_{malicious}$:   probability threshold where $0.5 \leq threshold_{malicious} \leq 1$; and

[0138]   $v_{email}$: features vector of the email being analyzed.

[0139]   0.5 is the lower limit for $threshold_{malicious}$ and the threshold default value may be set at 0.95. An email may be considered to be malicious; i.e., is classified to belong to the class $C_{malicious}$ if and only if:

$$P_{malicious}(v_{email}) \geq threshold_{malicious}$$

[0140]   According to one embodiment, the $threshold_{malicious}$ may be configurable.

[0141]   The features vector is a vector of numeric values. As shown in FIG. 2B, this features vector 218, along with the SVM model 214, may be input into the SVM classifier 216, which then outputs a probability 218 that the received email belongs to the malicious class $C_{malicious}$.

[0142]   As shown, each numeric value of the features vector may be resolved to a value of one of these types:

    [0143]   BIN—A binary value i.e. either 0 or 1. The value equals 1 if the condition is respected, 0 otherwise; and

    [0144]   DISP—A dispersion value i.e. a floating number between 0 and 1.

[0145]   Herein, the main recipient is the internal contact email address protected by ESPL. The features vector, according to one embodiment, may comprise one or more of the binary and dispersion values shown in FIGS. 4A, 4B and 4C. Accordingly, the features vector may comprise a binary value KNOWN_IP_ADDRESS, that is set to 1 (true) if the Internet protocol (IP) address that has initiated the Simple Mail transfer Protocol (SMTP) connection is in KNOWN_IP_ADDRESS_LIST, otherwise it is set to 0 (false). The dispersion value KNOWN_IP_ADDRESS_DISP is representative of the dispersion of KNOWN_IP_ADDRESS_LIST. The binary value KNOWN_CITY is set to 1 (true) if the city associated to the IP address that has initiated the SMTP connection is in KNOWN_CITY_LIST, otherwise it is set to 0 (false). The dispersion value KNOWN_CITY_DISP represents the dispersion of KNOWN_CITY_LIST. The binary value KNOWN_MUA is set to 1 (true) if the

6

MUA used to compose the email is in KNOWN_MUA_ LIST, otherwise it is set to 0 (false). One embodiment uses a simplified name for the identification of the MUA. Examples of such simplified MUA names include IPHONE_ MAIL, IPAD_MAIL, OSX_MAIL and LINUX_THUN- DERBIRD. As shown in FIG. **4**A, the dispersion value KNOWN_MUA_DISP is the dispersion of the KNOWN_ MUA_LIST.

[0146] The features vector, according to one embodiment, may also include a binary value KNOWN_MUA_DIS- PLAY_NAME, which is the display name extracted from the From header and matches the display name of the identified MUA. See KNOWN_MUA. The binary value KNOWN_MUA_SIGNATURE is the signature extracted from the body of the email and matches the signature of the identified MUA. See KNOWN_MUA. The binary value KNOWN_MUA_DEFAULT_FONT represents the font extracted from the text/html part of the body of the email and matches the default font of the identified MUA. See KNOWN_MUA. The features vector may also include a binary value for KNOWN_MUA_CONTENT_LAN- GUAGE, which is the language extracted from Content- Language header, which must match the language of the identified MUA. See KNOWN_MUA. The binary value NEW_MESSAGE is set or reset depending upon whether the email is a newly composed message; i.e., the email is neither a reply to a previous message nor a forward of an existing message. In the case of a reply or a forward, the email can take attributes—such as the font and the lan- guage—of the existing message. See KNOWN_MUA_DE- FAULT_FONT and KNOWN_MUA_CONTENT_LAN- GUAGE.

[0147] As shown in FIG. **4**B, the features vector may also include a binary value for TEXT_HTML_PART, which indicates whether the email body has a text/html part. A text/html part in the body is required to extract the font. See KNOWN_MUA_DEFAULT_FONT. The features vector may also include a binary WHP_IP_ADDRESS value, which indicates whether the IP address that has initiated the SMTP connection belongs to a web hosting provider (such as, for example, GoDaddy, OVH, 1&1 and the like). Web hosting providers are often abused by fraudsters to send malicious emails such as spear phishing attacks. A web hosting provider IP address may be identified by, for example, analyzing and matching the reverse DNS of the IP address with a known pattern, and/or by matching the IP address with of list of IP ranges that belong to the web hosting provider. As shown in FIG. **4**B, the features vector may also include a binary value DIFFERENT_REPLY_TO, which is a value that indicates that the email address in the Reply-To header does not match the email address in the From header. In the case of a spear phishing, the fraudster often set a different email address in Reply-To header. If the victim replies to the email, then his or her reply will not go to the person whose email has been spoofed, but to the fraudster instead or to an email address designated by the fraudster.

[0148] A binary value DIFFERENT_RETURN_PATH may also be included in the features vector. The condition that must be satisfied for this binary value is that the email address in the Return-Path header does not match the email address in the From header. The Return-Path header contains the email address that will receive a bounce message in the case of a delivery issue. The Return-Path header is added to

the received email by the MTA and the MTA uses the email address of the MAIL FROM SMTP command. In the case of a spear phishing, the fraudster often sets an email address in the MAIL FROM SMTP command that is different from the email address in the From header, resulting in the email addresses in the Return-Path being different from the From headers. The binary SINGLE_RECIPIENT value indicates that there is one recipient in To header and no recipient in Cc and Bcc headers. This recipient is the main recipient. In the case of a spear phishing attack, it is common that only one person is targeted. If several persons were targeted or otherwise present in the Cc or Bcc headers, the chances of the scam being discovered would increase greatly. Hence, spear phishing attacks often are directed to a single person.

[0149] As shown in FIG. **4**C, the binary URGENCY_IN_ SUBJECT value indicates that the email Subject header contains a keyword that creates a sense of urgency such as, for example, urgent, important, critical and the like. A large number of spear phishing attacks attempt to create a false sense of urgency so that the victim acts immediately, without much aforethought. See the CEO fraud example developed above. A SUSPICIOUS_TEXT binary value may also be included in the features vector. This value may be set to 1 if the email body is determined to contain language indicative of topics which are deemed to be of a suspicious nature. Examples of such may include, for example, wire transfer, disclosure of sensitive and/or confidential data (contracts, internal documents, bank account numbers, social security numbers, W-2 tax records, list of logins or passwords . . . ) and the like.

[0150] The features vector may also include the binary value EXTERNAL_DATA, which may be set to logical 1 if the email body contains at least one external data: an email address, a telephone number, a URL or an attached dynamic file. Significantly, according to one embodiment, the signa- ture in the body may be ignored, as it may contain an email address, telephone numbers and URLs. A dynamic file is a file that may contain dynamic content that can be harmful. Examples of dynamic files are PE files, APK files, Javascript files, PDF files, Microsoft Office files or HTML files. Some dynamic files may be compressed. Indeed, harmful files are frequently hidden in compressed archives (.zip, .rar and the like). Dynamic files may be identified by their media type. In this case of a spear phishing attack, this external data can be the next step of the attack or the payload: a phishing URL that will capture the victim credentials, a file that contains a malware.

[0151] Returning now to FIG. **3**, after extracting the email address from the From header of the received email as shown at B**34**, it is determined at B**35** whether the extracted email address has a corresponding contact model. If no contact model for the extracted email address exists (NO branch of B**35**), a contact model is created for the recipient of the extracted email and the status of the just-created contact model is set at "Learning", according to one embodi- ment and as shown at B**36**. At B**37**, it may be determined, according to one embodiment, whether sufficient emails have been examined and whether sufficient time has elapsed to build the contact model. For example, it may be deter- mined whether a sufficient number of values for some or all of the elements of the features vector have been determined to construct a useful contact model for the extracted email address. If the contact model has not yet been built (NO branch of B**37**), the received email may be simply moved to

US 2018/0278627 A1

Sep. 27, 2018

the recipient's email inbox (or to a special inbox configured for emails that have not been classified), as no spear phishing detection may be carried out without a fully-constructed contact model. If, however, a sufficient number of emails and sufficient time have elapsed to fully build the contact model for the extracted email (YES branch of B**37**), the dispersion of the contact model may be computed, as shown at B**38** and as detailed herein.

[0152] According to one embodiment, if the dispersion of the contact model computed in B**38** is greater or equal to a dispersion threshold block B**39** may be performed. If the computed dispersion threshold is greater to or equal to the dispersion threshold, B**39** may be carried out, and the contact model may be deactivated, meaning that the email recipient is not amenable to being accurately modeled in a manner that will be useful in detecting spear phishing attacks. Such may be the case where the email recipient emails from too many devices, from too many locations, uses different email clients and platforms, for example, such that an accurate contact model cannot be constructed. If, however, the dispersion computed in B**38** is less than the dispersion threshold, the contact model may be transitioned from the "Learning" phase to the "Protection" phase as shown at B**40**, meaning that the contact model becomes operational and may be used to detect spear phishing attacks, according to one embodiment. Whether B**39** or B**40** is carried out, the received email may be moved to the recipient's email inbox, as shown at B**41**, whereupon, at least for this received email, the method ends.

[0153] Returning to block B**35**, if a contact model for the email recipient exists (Yes branch of B**35**), the status of the model is determined at B**42**. If the status of the contact model for the email recipient is still "Learning", the method reverts to B**37** and proceeds as described above. If, however, the contact model for the email recipient has transitioned to the "Protection" phase, block B**43** may be carried out, where the incoming email is classified as likely malicious or likely non-malicious, in the manner described relative to FIG. 2B, for example. If the classification indicates that the received email is likely legitimate, the received email may be moved to the recipient's inbox as shown at B**44**. According to one embodiment, if the user, after having read the email or even without reading the email, reports that the received email is likely malicious, a false negative (FN) may be reported to the centralized ESPL service **108**, the SVM model may be updated, as may be the code that builds the features vector and/or the code that builds the contact model, as generally shown at **222** in FIG. **2**A, and the email deleted as shown at B**49**. The method, at least for this received email, then ends. If the user does not report a false negative for this email, the contact model for this recipient may be updated as shown at B**46** and the method then ends, for this email.

[0154] If the classification at B**43** indicates that the received email is likely malicious, the email recipient may then be alerted as shown at B**45**. If the email recipient agrees with the classification of the received email as likely malicious, B**47** may be carried out, a true positive (TP) is reported to the ESPL service **108**, and the malicious received email may be deleted, as shown at B**47**. Herein, deleting a likely malicious email may also be understood as moving the identified malicious email to a safe location, quarantining the received email or taking other action that sequesters the received email so that it does no harm and is separated from other, legitimate received emails. Following B**47**, the method then ends, at least for this received email. Following a classification of the received email as likely malicious in B**43**, the user may refute the classification, and report instead that the received email is, in fact, legitimate. If the user reports that a received email that has been classified as likely malicious is, in fact, legitimate, the contact model may be updated and the dispersion thereof re-calculated. The SVM model **214** may be periodically updated on the centralized ESPL server, after collecting FP, FN, TP, whereupon the ESPL components may be updated with the new, updated SVN model. The email may then be moved to the recipient's email inbox, whereupon the method ends, for this email. The method shown in FIG. **3** may be repeated, at least in part, upon receipt of each email, to protect the intended recipient from phishing attacks.

[0155] The dispersion threshold, according to one embodiment, may be a static or a dynamic parameter. Setting a higher dispersion threshold will result in fewer contact models being deactivated and fewer emails being classified as likely to be malicious. Conversely, setting a lower dispersion threshold will result in fewer contact models switching from the "learning" status to the "protection" status, and the False Positive (FP) rate may increase.

[0156] FIG. **5** is a table that classifies the constituent elements of the features vector according to one embodiment, according their intended use. The first row of the table of FIG. **5** lists exemplary features vector elements that may be used to detect email spoofing, whereas the second row of the table of FIG. **5** lists features vector elements that may find utility in detecting spear phishing. That is, features vector elements that may be used to detect email spoofing may include:

[0157] KNOWN_IP_ADDRESS;

[0158] KNOWN_IP_ADDRESS_DISP;

[0159] KNOWN_CITY;

[0160] KNOWN_CITY_DISP;

[0161] KNOWN_MUA;

[0162] KNOWN_MUA_DISP;

[0163] KNOWN_MUA_DISPLAY_NAME;

[0164] KNOWN_MUA_SIGNATURE;

[0165] KNOWN_MUA_DEFAULT_FONT;

[0166] KNOWN_MUA_CONTENT_LANGUAGE;

[0167] NEW_MESSAGE; and

[0168] TEXT_HTML_PART

[0169] Features vector elements that may be used to detect spear phishing may include:

[0170] WHP_IP_ADDRESS;

[0171] DIFFERENT_REPLY_TO;

[0172] DIFFERENT_RETURN_PATH;

[0173] SINGLE_RECIPIENT;

[0174] URGENCY_IN_SUBJECT;

[0175] SUSPICIOUS_TEXT; and

[0176] EXTERNAL_DATA

[0177] The above lists are presented herein for exemplary purposes only, it being understood that neither of these lists are presented as exhaustively listing all possible features vector elements, nor must all elements be present to enable the detection of email spoofing and/or a spear phishing attack. Moreover, one or more of the elements listed as being useful in detecting email spoofing may provide additional insight in a spear phishing attack and one or more elements listed as being useful in detecting a spear phishing attack may similarly provide insight into the detection of email spoofing.

[0178] FIG. **6** illustrates a block diagram of a computing device such as client computing device, email (electronic message) server, with which embodiments may be implemented. The computing device of FIG. **6** may include a bus **601** or other communication mechanism for communicating information, and one or more processors **602** coupled with bus **601** for processing information. The computing device may further comprise a random-access memory (RAM) or other dynamic storage device **604** (referred to as main memory), coupled to bus **601** for storing information and instructions to be executed by processor(s) **602**. Main memory (tangible and non-transitory, which terms, herein, exclude signals per se and waveforms) **604** also may be used for storing temporary variables or other intermediate information during execution of instructions by processor **602**. The computing device of FIG. **6** may also include a read only memory (ROM) and/or other static storage device **606** coupled to bus **601** for storing static information and instructions for processor(s) **602**. A data storage device **607**, such as a magnetic disk and/or solid state data storage device may be coupled to bus **601** for storing information and instructions—such as would be required to carry out the functionality shown and disclosed relative to FIGS. **1-5**. The computing device may also be coupled via the bus **601** to a display device **621** for displaying information to a computer user. An alphanumeric input device **622**, including alphanumeric and other keys, may be coupled to bus **601** for communicating information and command selections to processor(s) **602**. Another type of user input device is cursor control **623**, such as a mouse, a trackball, or cursor direction keys for communicating direction information and command selections to processor(s) **602** and for controlling cursor movement on display **621**. The computing device of FIG. **6** may be coupled, via a communication interface (e.g., modem, network interface card or NIC) to the network **626**.

[0179] Embodiments of the present invention are related to the use of computing devices to detect phishing attacks in electronic messages such as emails. According to one embodiment, the methods, devices and systems described herein may be provided by one or more computing devices in response to processor(s) **602** executing sequences of instructions contained in memory **604**. Such instructions may be read into memory **604** from another computer-readable medium, such as data storage device **607**. Execution of the sequences of instructions contained in memory **604** causes processor(s) **602** to perform the steps and have the functionality described herein. In alternative embodiments, hard-wired circuitry may be used in place of or in combination with software instructions to implement the described embodiments. Thus, embodiments are not limited to any specific combination of hardware circuitry and software. Indeed, it should be understood by those skilled in the art that any suitable computer system may implement the functionality described herein. The computing devices may include one or a plurality of microprocessors working to perform the desired functions. In one embodiment, the instructions executed by the microprocessor or microprocessors are operable to cause the microprocessor(s) to perform the steps described herein. In one embodiment, they may be stored on a non-volatile semiconductor memory external to the microprocessor, or integrated with the microprocessor. In another embodiment, the instructions

may be stored on a disk and read into a volatile semiconductor memory before execution by the microprocessor.

[0180] While certain example embodiments have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the embodiments disclosed herein. Thus, nothing in the foregoing description is intended to imply that any particular feature, characteristic, step, module, or block is necessary or indispensable. Indeed, the novel methods and systems described herein may be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein may be made without departing from the spirit of the embodiments disclosed herein.

**1**. A computer-implemented method of detecting an email spear phishing attack, comprising:

generating a contact model of a sender of emails;

determining, by a hardware processor, a statistical dispersion of the generated contact model, the statistical dispersion of the contact model being indicative of a spread of a distribution of data in the generated model;

receiving, over a computer network, an email from the sender;

if the determined statistical dispersion is lower than a dispersion threshold:

evaluating the received email in the processor against a plurality of conditions associated with spear phishing attacks to generate a features vector, the features vector comprising a plurality of binary values and a plurality of dispersion values between 0 and 1;

using at least the generated features vector and the generated contact model to classify the received email as a likely legitimate email or as a likely malicious email spear phishing attack; and

notifying a recipient of the email when the received email is classified as a likely malicious email spear phishing attack.

**2**. The computer-implemented method of claim **1**, wherein the statistical dispersion of the contact model comprises an average of the plurality of dispersion values.

**3**. The computer-implemented method of claim **1**, wherein the generated contact model is not used to classify the received email as likely legitimate or likely malicious if the determined statistical dispersion is greater than or equal to the dispersion threshold.

**4**. The computer-implemented method of claim **1**, wherein generating the contact model comprises building the contact model using received emails from the sender during a learning phase over a period of time and thereafter transitioning the contact model to a protection phase during which the built contact model is used to classify the received email as likely legitimate or likely malicious.

**5**. The computer-implemented method of claim **1**, further comprising updating the contact model using a sliding time window by:

adding thereto data from recent received emails from the sender of the email and

deleting data from emails older than a predetermined period of time.

**6**. The computer-implemented method of claim **1**, further comprising updating the contact model using data from emails received from the sender at are determined to be true negative (TN) email phishing attacks and false positives (FP) email phishing attacks.

US 2018/0278627 A1

**7**. The computer-implemented method of claim **1**, wherein generating the contact model comprises:

extracting an identification of an email application used to send the received email;

simplifying the extracted identification; and

storing the extracted and simplified identification in the contact model.

**8**. The computer-implemented method of claim **7**, wherein simplifying the extracted identification comprises at least stripping a software version number from the extracted identification of the email application used to send the received email.

**9**. The computer-implemented method of claim **1**, wherein the features vector comprises at least one binary value indicative that:

the internet protocol (IP) address that sent the received email belongs to a web hosting provider;

the email address in a Reply-To header of the received email does not match the email address in the From header of the received email;

the email address in a Return-Path header of the received email does not match the email address in the From header of the received email;

there is one recipient in To header and no recipient in Cc and Bcc headers of the received email;

the Subject header of the received email contains a keyword intended to create a sense of urgency;

the received email contains language indicative of topics that are deemed to be of a suspicious nature; and

the received email contains at least one of an email address, a telephone number, a URL and an attached dynamic file.

**10**. A computing device comprising:

at least one processor;

at least one data storage device coupled to the at least one processor;

a network interface coupled to the at least one processor and to a computer network;

a plurality of processes spawned by said at least one processor, the processes including processing logic for:

generating a contact model of a sender of emails;

determining, by a hardware processor, a statistical dispersion of the generated contact model, the statistical dispersion of the contact model being indicative of a spread of a distribution of data in the generated model;

receiving, over a computer network, an email from the sender;

if the determined statistical dispersion lower than a dispersion threshold:

evaluating the received email in the processor against a plurality of conditions associated with spear phishing attacks to generate a features vector, the features vector comprising a plurality of binary values and a plurality of dispersion values between 0 and 1;

using at least the generated features vector and the generated contact model to classify the received email as a likely legitimate email or as a likely malicious email spear phishing attack; and

notifying a recipient of the email when the received email is classified as a likely malicious email spear phishing attack.

**11**. The computing device of claim **10**, wherein the statistical dispersion of the contact model comprises an average of the plurality of dispersion values.

**12**. The computing device of claim **10**, wherein the generated contact model is not used to classify the received email as likely legitimate or likely malicious if the determined statistical dispersion is not at least equal to the dispersion threshold.

**13**. The computing device of claim **10**, wherein the processing logic for generating the contact model comprises processing logic for building the contact model using received emails from the sender during a learning phase over a period of time and thereafter transitioning the contact model to a protection phase during which the built contact model is used to classify the received email as likely legitimate or likely malicious.

**14**. The computing device of claim **10**, further comprising processing logic for updating the contact model using a sliding time window by:

adding thereto data from recent received emails from the sender of the email and

deleting data from emails older than a predetermined period of time.

**15**. The computing device of claim **10**, further comprising processing logic for updating the contact model using data from emails received from the sender that are determined to be true negative (TN) email phishing attacks and false positives (FP) email phishing attacks.

**16**. The computing device of claim **10**, wherein the processing logic for generating the contact model comprises processing logic for:

extracting an identification of an email application used to send the received email;

simplifying the extracted identification; and

storing the extracted and simplified identification in the contact model.

**17**. The computing device of claim **16**, wherein the processing logic for simplifying the extracted identification comprises at least stripping a software version number from the extracted identification of the email application used to send the received email.

**18**. The computing device of claim **10**, wherein the features vector comprises at least one binary value indicative that:

the internet protocol (IP) address that sent the received email belongs to a web hosting provider;

the email address in a Reply-To header of the received email does not match an email address in the From header of the received email;

the email address in a Return-Path header of the received email does not match an email address in the From header of the received email;

there is one recipient in To header and no recipient in Cc and Bcc headers of the received email;

the Subject header of the received email contains a keyword intended to create a sense of urgency;

the received email contains language indicative of topics that are deemed to be of a suspicious nature; and

the received email contains at least one of an email address, a telephone number, a URL and an attached dynamic file.

**19**. The computing device of claim **10**, configured as a local email gateway coupled to the computer network

**20**. The computing device of claim **10**, configured as a remote server accessible over the computer network.

\* \* \* \* \*

# EXHIBIT G

US010284579B2

(12) **United States Patent**
Goutal

(10) Patent No.: **US 10,284,579 B2**
(45) Date of Patent: **May 7, 2019**

(54) **DETECTION OF EMAIL SPOOFING AND SPEAR PHISHING ATTACKS**

(71) Applicant: **Vade Secure Technology Inc.,** San Francisco, CA (US)

(72) Inventor: **Sebastien Goutal**, San Francisco, CA (US)

(73) Assignee: **VADE SECURE, INC.,** San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 65 days.

(21) Appl. No.: **15/466,588**

(22) Filed: **Mar. 22, 2017**

(65) **Prior Publication Data**

US 2018/0278627 A1    Sep. 27, 2018

(51) **Int. Cl.**
**H04L 29/06**        (2006.01)
**H04L 12/58**        (2006.01)

(52) **U.S. Cl.**
CPC .......... **H04L 63/1416** (2013.01); **H04L 51/00** (2013.01); **H04L 63/1483** (2013.01); *H04L 63/1433* (2013.01)

(58) **Field of Classification Search**
CPC ............. H04L 63/1483; H04L 63/1416; H04L 63/1425; H04L 63/1433
USPC ........................................ 726/23
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,271,588 B1 *  9/2012  Bruno ................. G06Q 10/107
                                                      705/318
8,566,938 B1   10/2013  Prakash et al.

9,154,514 B1 *  10/2015  Prakash .............. H04L 63/1483
9,408,143 B2 *   8/2016  Walker .............. H04W 52/0212
9,450,982 B1     9/2016  Meves
9,942,255 B1 *   4/2018  MacDermed ....... H04L 63/1425
2006/0168024 A1 *  7/2006  Mehr ..................... H04L 51/12
                                                      709/206

(Continued)

OTHER PUBLICATIONS

Bergholz, Andre, et al. "Improved Phishing Detection using Model-Based Features." CEAS. 2008 (Year: 2008).*

(Continued)

*Primary Examiner* — Syed A Zaidi
(74) *Attorney, Agent, or Firm* — Young Law Firm, P.C.

(57)    **ABSTRACT**

A computer-implemented method of detecting an email spoofing and spear phishing attack may comprise generating a contact model of a sender of emails; determining, by a hardware processor, a statistical dispersion of the generated contact model that is indicative of a spread of a distribution of data in the generated model and receiving, over a computer network, an email from the sender. If the determined statistical dispersion is lower than a dispersion threshold, the received email may be evaluated in the processor against a plurality of conditions associated with email spoofing and spear phishing attacks, using the generated contact model, to generate a features vector that is constituted of a plurality of binary values and a plurality of dispersion values between 0 and 1, and using at least the generated features vector to classify with a supervised learning algorithm the received email as a likely legitimate email or as a likely malicious email spear phishing attack; and notifying a recipient of the email when the received email is classified as a likely malicious email spear phishing attack.

**20 Claims, 8 Drawing Sheets**



**US 10,284,579 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0143827 A1* | 6/2007 | Nicodemus | G06F 21/6218 726/2 |
| 2007/0143851 A1* | 6/2007 | Nicodemus | G06F 11/3495 726/25 |
| 2010/0211641 A1* | 8/2010 | Yih | G06F 15/16 709/206 |
| 2011/0173142 A1* | 7/2011 | Dasgupta | G06Q 10/107 706/12 |
| 2011/0191847 A1* | 8/2011 | Davis | G06F 15/16 726/22 |
| 2011/0295774 A1* | 12/2011 | Chen | G06K 9/6269 706/12 |
| 2013/0086636 A1* | 4/2013 | Golovanov | G06F 21/56 726/3 |
| 2014/0324741 A1* | 10/2014 | Stewart | G06N 99/005 706/12 |
| 2015/0067833 A1* | 3/2015 | Verma | H04L 63/1483 726/22 |
| 2016/0014151 A1* | 1/2016 | Prakash | H04L 63/1483 726/22 |

OTHER PUBLICATIONS

Email spoofing, downloaded on Mar. 16, 2017 from https://en.wikipedia.org/wiki/Email_spoofing.
J. Klensin—RFC 5321 : Simple Mail Transfer Protocol—2008.
P. Resnick—RFC 5322 : Internet Message Format—2008.
S. Kitterman—RFC 7208: Sender Policy Framework (SPF) for Authorizing Use of Domains in Email—2014.
T. Hansen, D. Crocker, P. Hallam-Baker—RFC 5585: DomainKeys Identified Mail (DKIM) Service Overview—2009.
M. Kucherawy, E. Zwicky—RFC 7489: Domain-based Message Authentication, Reporting, and Conformance (DMARC)—2015.
L. Eggert—SPF Deployment Trends, downloaded on Mar. 16, 2017 from https://eggert.org/meter/spf.
] L. Eggert—Global DKIM Deployment, downloaded on Mar. 16, 2017 from https://eggert.org/meter/dkim.
L. Eggert—Global DMARC Deployment, downloaded on Mar. 16, 2017 from https://eggert.org/meter/dmarc.
J. Palme—RFC 2076: Common Internet Message Headers—1997.
Wikipédia—ISO 639, downloaded on Mar. 16, 2017 from https://en.wikipedia.org/wiki/ISO_639-1.
Wikipédia—ISO 3166-1, downloaded on Mar. 16, 2017 from https://en.wikipedia.org/wiki/ISO_3166-1.
Wikipédia—Bounce Message, downloaded on Mar. 16, 2017 from https://en.wikipedia.org/wiki/Bounce_message.
Wikipédia—Android Application Message, downloaded on Mar. 16, 2017 from https://en.wikipedia.org/wiki/Android_application_package.
IANA—Media Types, downloaded on Mar. 16, 2017 from https://www.iana.org/assignments/media-types/media-types.xhtml.
Wikipédia—Supervised Learning, downloaded on Mar. 16, 2017 from https://en.wikipedia.org/wiki/Supervised_learning.
Wikipédia—Support Vector Machine, downloaded on Mar. 16, 2017 from https://en.wikipedia.org/wiki/Support_vector_machine.
Wikipédia—Portable Executable, downloaded on Mar. 16, 2017 from https://en.wikipedia.org/wiki/Portable_Executable.

* cited by examiner



*FIG. 1*



*FIG. 2A*



*FIG. 2B*



START
B31
PRIORITY EMAIL?
[NO]
[YES]
B32
SPF, DKIM OR DMARC AVAILABLE
[YES]
B33
USE SPF, DKIM OR DMARC TO TAKE DECISION
END
[NO]
B34
EXTRACT EMAIL ADDRESS FROM "FROM" HEADER
B35
CONTACT HAVE MODEL?
[NO]
B36
CREATE MODEL FOR CONTACT SET STATUS OF MODEL TO LEARNING
[YES]
B42
STATUS OF MODEL?
[LEARNING]
B37
ENOUGH EMAILS & SUFFICIENT TIME SPENT TO BUILD THE MODEL?
[NO]
[YES]
B38
COMPUTE DISPERSION OF MODEL
DISPERSION >= DISPERSION Th
DISPERSION < DISPERSION Th
B39
SET MODEL STATUS TO DEACTI-VATED
B40
SET MODEL STATUS TO PROTEC-TION
B41
MOVE EMAIL TO INBOX
END
[PROTECTION]
B43
CLASSIFY EMAIL
[MALICIOUS EMAIL]
[LEGITIMATE EMAIL]
B44
MOVE EMAIL TO INBOX
[RECIPIENT REPORTS MALICIOUS EMAIL]
B49
REPORT FALSE NEGATIVE DELETE MALICIOUS EMAIL
[ELSE]
B46
UPDATE MODEL WITH EMAIL
B45
RAISE ALERT TO RECIPIENT
[RECIPIENT REFUTES ALERT]
[RECIPIENT CONFIRMS ALERT]
B47
REPORT TRUE POSITIVE DELETE MALICIOUS EMAIL
B48
UPDATE MODEL WITH EMAIL REPORT FALSE POSITIVE MOVE EMAIL TO INBOX
END

*FIG. 3*

| Type | Feature | Description |
|------|---------|-------------|
| BIN | *KNOWN_IP_ADDRESS* | The IP address that has initiated the SMTP connection is in KNOWN_IP_ADDRESS_LIST. |
| DISP | *KNOWN_IP_ADDRESS_DISP* | Dispersion of KNOWN_IP_ADDRESS_LIST. |
| BIN | *KNOWN_CITY* | The city associated to the IP address that has initiated the SMTP connection is in KNOWN_CITY_LIST. |
| DISP | *KNOWN_CITY_DISP* | Dispersion of KNOWN_CITY_LIST. |
| BIN | *KNOWN_MUA* | The MUA used to compose the email is in KNOWN_MUA_LIST. We will use the simplified name for the identification of the MUA. Example: IPHONE_MAIL IPAD_MAIL OSX_MAIL LINUX_THUNDERBIRD |
| DISP | *KNOWN_MUA_DISP* | Dispersion of KNOWN_MUA_LIST. |
| BIN | *KNOWN_MUA_DISPLAY_NAME* | The display name extracted from *From* header matches the display name of the identified MUA. See KNOWN_MUA. |
| BIN | *KNOWN_MUA_SIGNATURE* | The signature extracted from the body matches the signature of the identified MUA. See KNOWN_MUA. |
| BIN | *KNOWN_MUA_DEFAULT_FONT* | The font extracted from the *text/html* part of the body of the email matches the default font of the identified MUA. See KNOWN_MUA. |
| BIN | *KNOWN_MUA_CONTENT_LANGUAGE* | The language extracted from *Content-Language* header matches the language of the identified MUA. See KNOWN_MUA. |
| BIN | *NEW_MESSAGE* | The email is a newly composed message i.e. the email is neither a reply to a previous message nor a forward of an existing message. In the case of a reply or a forward, the email can take attributes - such as the font and the language - of the existing message. See KNOWN_MUA_DEFAULT_FONT and KNOWN_MUA_CONTENT_LANGUAGE. |

*FIG. 4A*

| BIN | *TEXT_HTML_PART* | The email body has a *text/html* part. A *text/html* part in the body is required to extract the font. See KNOWN_MUA_DEFAULT_FONT. |
|---|---|---|
| BIN | *WHP_IP_ADDRESS* | The IP address that has initiated the SMTP connection belongs to a web hosting provider {GoDaddy, OVH, 1&1...}. Web hosting providers are often abused by fraudsters to send malicious emails such a spear phishing attacks.<br><br>A web hosting provider IP address can be identified in two different ways:<br>• Analyze and match the reverse DNS of the IP address with a known pattern,<br>• Match the IP address with of list of IP ranges that belong to the web hosting provider. |
| BIN | *DIFFERENT_REPLY_TO* | The email address in the *Reply-To* header [10] does not match the email address in the *From* header. In the case of a spear phishing, the fraudster often set a different email address in *Reply-To* header : if the victim replies to the email, then its reply will not go to the person whose email has been spoofed. |
| BIN | *DIFFERENT_RETURN_PATH* | The email address in the *Return-Path* header [10] does not match the email address in the *From* header. The *Return-Path* header contains the email address that will receive a bounce message [13] in the case of a delivery issue. The *Return-Path* header is added to the received email by the MTA and the MTA uses the email address of the *MAIL FROM* SMTP command [2]. In the case of a spear phishing, the fraudster often sets an email address in the *MAIL FROM* SMTP command that is different from the email address in the *From* header: as a consequence, the email addresses in the *Return-Path* and *From* headers are different. |
| BIN | *SINGLE_RECIPIENT* | There is one recipient in *To* header and no recipient in *Cc* and *Bcc* headers. This recipient is the *main recipient*. In the case of a spear |

*FIG. 4B*

| | | | |
|---|---|---|---|
| | | | phishing attack, it is common that only one person is targeted. If several persons were targeted, they would be more alert and more prone to detect the scam. |
| BIN | | *URGENCY_IN_SUBJECT* | The email *Subject* header contains a keyword that creates a sense of urgency: *urgent*, *important*... A large number of spear phishing attacks create a sense of urgency so that the victim acts immediately. See the *CEO fraud* example. |
| BIN | | *SUSPICIOUS_TEXT* | The email body contains suspicious topics: wire transfer, disclosure of sensitive and/or confidential data (contracts, internal documents, bank account numbers, social security numbers, W-2 tax records, list of logins or passwords...)... |
| BIN | | *EXTERNAL_DATA* | The email body contains at least one *external data*: an email address, a telephone number, an url or a *dynamic file* attached.<br><br>It is important to note that the signature in the body is ignored as it may contain an email address, telephone numbers and urls.<br><br>A *dynamic file* is a file that may contain dynamic content that can be harmful. Examples of *dynamic files* are PE files [14], APK files [15], PDF files, Microsoft Office files or HTML files. Such files will be identified by their media type [16].<br><br>In this case of a spear phishing attack, this *external data* can be the next step of the attack or the payload: a phishing url that will capture the victim credentials, a file that contains a malware... |

*FIG. 4C*

| Threat | Features |
|---|---|
| Features used to detect Email spoofing | KNOWN_IP_ADDRESS<br>KNOWN_IP_ADDRESS_DISP<br>KNOWN_CITY<br>KNOWN_CITY_DISP<br>KNOWN_MUA<br>KNOWN_MUA_DISP<br>KNOWN_MUA_DISPLAY_NAME<br>KNOWN_MUA_SIGNATURE<br>KNOWN_MUA_DEFAULT_FONT<br>KNOWN_MUA_CONTENT_LANGUAGE<br>NEW_MESSAGE<br>TEXT_HTML_PART |
| Features used to detect Spear phishing | WHP_IP_ADDRESS<br>DIFFERENT_REPLY_TO<br>DIFFERENT_RETURN_PATH<br>SINGLE_RECIPIENT<br>URGENCY_IN_SUBJECT<br>SUSPICIOUS_TEXT<br>EXTERNAL_DATA |

*FIG. 5*



*FIG. 6*

US 10,284,579 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# DETECTION OF EMAIL SPOOFING AND SPEAR PHISHING ATTACKS

## BACKGROUND

Whereas phishing is now a threat that is well known by the Internet ecosystem and the security industry, a more advanced and pernicious threat has appeared recently, and this threat is known as spear phishing.

Spear phishing has the following features:

Spear phishing targets enterprises, and especially small and medium-sized enterprises. The victim targeted is someone who has access to sensitive information, such as a C-level executive or an accountant.

The attack is prepared meticulously. The attacker performs a thorough study of the enterprise and the victim, drawing from sources of information such as social media (LinkedIn, Facebook, Twitter . . . ), corporate website, blogs and corporate media. Such sources are often a treasure trove of valuable information. The attacker will use this information to build an attack that will make sense and appear legitimate to the victim.

The email will be send to the victim by an allegedly trusted person. In the case of spear phishing, there is always impersonation of a trusted person. A well-known kind of impersonation by email is called email spoofing.

The payload of the spear phishing attack can be one of the following:

A malicious file attached; or

A malicious Uniform Resource Locator (url).

The text itself, designed to lead the victim to carry out an action (wire transfer, sending of confidential documents, etc.)

The spear phishing attack is unique and is tailored specifically to the targeted enterprise and victim. A known example of spear phishing is called CEO fraud. The CEO fraud is a business email scam in which the attacker spoofs an email from the CEO of a company and tricks another person of this company—typically the accountant—to perform an action that will benefit the fraudsters, such as wiring funds or disclosing sensitive information. The CEO fraud is a typical example of a spear phishing attack where the attack is prepared meticulously so that the victim believes that the email originates from the CEO himself. For example, in the case of a wire transfer, the attacker will provide the motivation for the wire transfer. Here is an example:

From: John Miller <john.miller@company.com>

To: Jessica Lee <jessica.lee@company.com>

Subject: Urgent matter

Jessica,

I just met one of our provider at the RSA conference. They have a pending invoice from last year that got lost. I have attached the invoice. Can you initiate the wire transfer asap? It is very important.

Thx

John

Sent from my iPhone

In this example, the attacker knows that John is the CEO and Jessica the accountant. He also knows the email addresses of both. It is quite trivial for the attacker to find this information, as the company website and social media websites such as LinkedIn provide much, if not all, of the needed information. Furthermore, the attacker knows that John Miller is at the RSA conference because this information was posted on the company Twitter account.

As previously stated, spear phishing attack relies on impersonation. In contrast, email spoofing is the creation of email messages with a forged sender address in the From header of the email. As surprising as it may sound, core email protocols do not provide a mechanism for authentication and thus allow the creation of email messages with a forged sender address.

To address this critical issue, the software industry has developed technologies such as Sender Policy Framework (SPF), DomainKeys Identified Mail (DKIM) or more recently Domain-based Message Authentication, Reporting and Conformance (DMARC). However, even if the adoption of these technologies is increasing, a vast portion of the email traffic is still not protected. The main reason for the non-adoption of these technologies is due to the large amount of work that is required to properly configure SPF, DKIM and/or DMARC, which typically depends of the complexity of the email provider infrastructure. Moreover, for even modestly complex environments, the cost of deploying these technologies may be considered to be prohibitive for the email provider. For example, Google, AOL and Yahoo! have successfully deployed these technologies. However, other major email providers have not and may never do so. Consequently, an important number of end users remain vulnerable to email spoofing.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

FIG. 2A is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

FIG. 2B is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

FIG. 3 is a flowchart illustrating aspects of a computer-implemented method according to one embodiment.

FIG. 4A is a table illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

FIG. 4B is a table illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

FIG. 4C is a table illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

FIG. 5 is a table illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment.

FIG. 6 is a block diagram of a computing device with which an embodiment may be practiced.

## DETAILED DESCRIPTION

Herein, computer-implemented methods, devices and systems are presented that will thwart spear phishing attacks and email spoofing. For ease of reference, such methods, devices and systems are collectively referred to herein by the acronym ESPL (Email Spoofing & spear phishing Protection Layer).

Definitions

Organization domain is the email domain of the organization protected by ESPL technology.

Contacts are email addresses that exchange priority emails with the organization domain. Contacts are consti-

US 10,284,579 B2

3

tuted of internal contacts and external contacts. Internal contacts are email addresses that belong to the organization domain. External contacts are email addresses that do not belong to the organization domain.

A priority email is an email that has been considered as legitimate by previous email filters and that has not been sent by an automated process. A typical example of priority email is a person-to-person email. All other types of emails will be ignored: spam, advertisements, newsletters, social networks notifications, electronic commerce notifications (such as invoices, booking or purchase confirmation, electronic tickets, parcel tracking). These may be processed using other, existing methods.

ESPL

Both internal contacts and external contacts can be spoofed by a fraudster. ESPL's purpose includes protecting internal contacts of the organization domain from spear phishing attacks that rely on the spoofing of an internal contact or external contact of the organization domain.

To achieve this purpose and according to one embodiment, ESPL may build a model for every contact of the organization domain. This model may be built by analyzing inbound and outbound email traffic of the organization domain. The period of time during which ESPL acquires data from email traffic to build a model of the contact is called learning phase. According to one embodiment, when enough data is acquired to build the model of the contact; that is, when ESPL has enough data to detect an impersonation of the contact, ESPL may switch from the learning phase to a protection phase.

Deployment

The enterprise email filtering described and shown herein may be implemented, according to one embodiment, as an on-premise email filtering gateway and, according to one embodiment, as an email filtering service in the executing on remote servers (i.e., the cloud).

Both implementations include ESPL technology. Herein, the phrase ESPL component denotes each deployment of the ESPL technology. There are as many ESPL components as there are several instances of the gateway and cloud implementations.

FIG. 1 is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment. As shown therein, two cloud implementations **102**, **104** and one gateway implementation **106** may be coupled, over a computer network (not explicitly shown in FIG. **1**, but present), to a centralized ESPL service **108**. Both the cloud implementations **102**, **104** and the gateway implementation **106** may be configured, according to one embodiment, to include an ESPL component or layer and a Mail Transfer Agent (MTA). Indeed, the cloud implementation **102** may be configured to include ESPL component **110** that communicates with a MTA **112**, the gateway implementation **114** may be configured to include an ESPL component **114** that communicates with a MTA **116** and the cloud implementation **104** may be configured to include an ESPL component **118** that communicates with a MTA **120**.

Each ESPL component **110**, **114**, **118**, depending upon the implementation, may be configured to communicate:

with its email server (also known as the MTA) **112**, **116** and **120**, respectively; and

with a centralized ESPL service **108** in the cloud.

FIG. **2A** is a block diagram illustrating aspects of computer-implemented methods, devices and systems, according to one embodiment. It is useful at this juncture, to set out a few definitions:

4

True Positive (TP): a malicious email that has been classified as malicious by ESPL;

False Positive (FP): a legitimate email that has been classified as malicious by ESPL;

True Negative (TN): a legitimate email that has been classified as legitimate by ESPL; and

False Negative (FN): a malicious email that has been classified as legitimate by ESPL.

As shown in FIG. 2A, ESPL component **202** (also shown in FIG. **1** at **110**, **114** and **118**) is configured, as shown previously, to communicate with the centralized ESPL service **108** over a computer network that may include, for example, the Internet and/or other public or private networks. The ESPL component **202** may be characterized, according to one embodiment, as comprising a processing portion **204** and a data portion **206**. The processing portion **204** may comprise structure and functionality to process emails (receive, generate and send emails, among other functionality), as shown at **208** and to categorize email, as shown at **210**. The processing portion **204**, for example, may be embodied in one or more processors (an exemplar of which is shown at **602** in FIG. **6**) configured, according to computer-readable instructions, to carry out the functionality of FIG. **3** described hereunder and described throughout the remaining portion of the present disclosure. As shown at **210**, the processing portion **204** may also be configured to classify received email, as described in detail herein. The ESPL component **202** may also be configured to build, maintain and update contact models **212**, SVM models **214** and to report FP, TP and FN emails **216** to the centralized ESPL service **108** as shown at **220**. During the protection phase, as shown in FIG. 2A, the centralized ESPL service **108**, as shown at **218** and **222**, may also be configured to update the SVM model **214** and update the code that causes the processing portion **204** to categorize incoming email, as shown at **222** and as described herein below.

Therefore, as shown in FIG. 2A, the centralized ESPL service **108**, according to one embodiment, may be configured to, among other tasks:

to collect FP, FN and TP from all ESPL components to improve ESPL technology, as shown at **220**; and

to update the ESPL components **110**, **114**, **120** (Code update **222**, update SVM model as shown at **218**).

Processing of Inbound Email Traffic

The terms True Positive (TP), True Negative (TN), False Positive (FP) and False Negative (FN) are widely used in binary classification problems. FN and FP may be detected by ESPL according to one embodiment, through end-user feedback. According to one embodiment, FN, FP and TP are reported, as shown at **220**, to the centralized ESPL service **108**. They will be used to improve ESPL technology, and especially the classifier.

According to one embodiment, TN and FP may be used to update the contact model. There are two significant facts when the contact model is updated during the protection phase:

A sliding time window may be used in one embodiment. The size of the sliding time window may be greater than the duration of the learning phase. A sliding time window may be used because it allows for old features of the contact model to be forgotten. For example, the user may have switched from an iPhone to an Android phone. For the contact model to remain representative of the user, the iPhone-related features should be forgotten and the Android-related features should be taken into account. Without a sliding time window, both the iPhone-related and Android-related features would be

US 10,284,579 B2

5

present, which would decrease the degree to which the contact model is representative of the current behavior of the contact (by, according to one embodiment, increasing dispersion and decreasing the stability of the contact model, as described further below). One embodiment, therefore, uses a sliding time window, to render it dynamic and responsive to changing circumstances and to limit the amount of dispersion, which is discussed further below.

Dispersion may be calculated, according to one embodiment, after the model is updated. If the dispersion is too high, the model may be deactivated.

FIG. 3 is a flowchart illustrating aspects of a computer-implemented method of classifying and handling inbound emails, according to one embodiment. As shown therein, the computer-implemented method starts with the receipt of an email at a computing device over a computer network. At B31, it is determined whether the received email is a priority (i.e., person-to-person) email. If the received email is not a priority email (such as, for example, spam, advertisements, newsletters, social networks notifications, electronic commerce notifications (such as invoices, booking or purchase confirmation, electronic tickets, parcel tracking)), it may be ignored and the method ends. Alternatively, additional processing, classification and handling of such non-priority emails may be carried out, according to other methods. If the received email is, indeed, determined to be a priority email, (YES branch of B32), it is determined whether SPF, DKIM and/or DMARC are available. If any of these technologies are implemented on the MTA, they may be deployed at B33 and the method ends. One embodiment, therefore, applies to received priority emails in installations in which SPF, DKIM and/or DMARC are not available.

As shown at B34, after following the NO branch of B32, the email address of the sender of the email is extracted from the From header of the received email, as shown at B34. As shown at B35, if a contact model for this sender is available, the YES branch is followed and, if no contact model for this sender exists, then the NO branch of B35 is followed.

Before continuing with a detailed discussion of blocks B36 to B48 of FIG. 3, it is useful to have an understanding of a number of other aspects of ESPL.

Model of a Contact

A contact may be thought of as a person who uses an email address to communicate. This person uses one or several devices (desktop computer, laptop, smartphone, tablet . . . ). For each device, an email application, denoted herein as a Mail User Agent or MUA, may be used to receive, read, compose and send emails. This person also connects from different places. Some of these places can be recurrent (e.g., office, home) or not habitually recurrent (e.g., coffee shop, airport, hotel). All these data may be used, according to one embodiment, to model the contact.

A MUA, according to one embodiment, may be identified by parsing the email, and especially the X-Mailer and User-Agent headers that typically contains an identifier specific to the MUA. However, ESPL may be configured to translate the raw content of the header to a simplified name. Table 1 below contains examples of such translation. This translation is necessary because the raw content contains the version number of the software, and this version number is subject to change quite often because of the frequent updates of the software during its lifecycle. One embodiment of ESPL uses a stable, simplified version of the identification to more readily model the MUA.

6

TABLE 1

| Raw content | Simplified name |
| --- | --- |
| X-Mailer: iPhone Mail (14C92) | IPHONE__MAIL |
| X-Mailer: iPhone Mail (14A456) | IPHONE__MAIL |
| X-Mailer: iPhone Mail (13D15) | IPHONE__MAIL |
| X-Mailer: Apple Mail (2.3112) | OSX__MAIL |
| X-Mailer: Apple Mail (2.1283) | OSX__MAIL |

Every MUA is configured by the person so that it fits his or her needs, and these configuration elements can help to assemble a digital email fingerprint of the person. Some of these elements can be found by parsing the email. Such elements may include, for example:

the display name;

the signature in the body of the email;

the default font in the text/html part of the body of the email; and

the language.

The display name is the string that will be inserted in the From header of the composed email, just before the email address of the sender. The display name can be configured in the MUA. It is usually the first name and last name of the sender. ESPL can extract the display name by parsing the From header of the email. Below is an example in which the display name "John Miller" has been extracted by parsing the From header of the email:

From: John Miller <john.miller@company.com>

The signature is the signature that will be inserted by default in the body of the email when composing a new message. The signature can contain a great deal of pertinent and useful data, especially in the context of business email: first name, last name, position in the company, address, phone number, and the like. ESPL may be configured to, according to one embodiment, extract the signature by parsing the body of the email. For example:

John Miller

CEO

Company, Inc.

(415) 123-4567

The default font is the font that will be selected by default to compose an email. A font is identified by a font name and a font size. ESPL may be configured to, according to one embodiment, extract the default font by parsing the text/html part of the body of the email. For example:

ARIAL, 10

VERDANA, 11

The language is the language that has been configured in the operating system. The language is transmitted by the MUA in the Content-Language header. The language is stored in the <language>-<REGION> format where <language> is compliant to ISO 639-1 and <REGION> is compliant to ISO 3166-1. ESPL may be configured to, according to one embodiment, extract the language by parsing Content-Language header. For example:

Content-Language: en-US

Content-Language: en-GB

Content-Language: fr-BE

Content-Language: fr-FR

When a MTA receives an email, it adds a Received header in the received email. This Received header will typically contain the time, the source IP address and destination IP address of the SMTP connection. ESPL may be configured to, according to one embodiment, extract the IP address that has initiated the sending of the email by parsing these Received headers. ESPL may be also configured to, according to one embodiment, associate a geolocation to the IP

US 10,284,579 B2

7

address by using a local geolocation database. Geolocation is interesting because it can be less strict than an IP address and still carry a very relevant information. ESPL may be configured to, according to one embodiment, consider the city associated to the IP address. For example, a person may connect from a large list of IP addresses that will be translated to a much smaller list of cities. This makes the modeling of roaming profiles easier.

As a person can use several devices and connect from different places, ESPL may be configured to manage a number of lists for every contact. In one embodiment, ESPL may be configured to maintain three lists for every contact. ESPL, however, may be configured to manage a lesser or greater number of lists. Such lists, for example, may include:

A list of MUA called KNOWN_MUA_LIST and with at most KNOWN_MUA_MAX_COUNT elements;

A list of IP addresses called KNOWN_IP_ADDRESS_LIST and with at most KNOWN_IP_ADDRESS_MAX_COUNT elements; and

A list of cities called KNOWN_CITY_LIST and with at most KNOWN_CITY_MAX_COUNT elements.

Dispersion

One embodiment uses dispersion as a measure of the compactness or amount of spread of a distribution of behaviors of a contact relative to electronic messaging. Dispersion (which is also called variability, scatter, or spread) may be characterized as the extent to which a distribution is stretched or squeezed. A measure of statistical dispersion is a nonnegative real number that is zero if all the data are the same and increases as the data become more diverse.

In the present implementation, dispersion is unitless. Examples of dispersion measures include:

Standard deviation;

Interquartile range (IQR);

Range;

Mean absolute difference (also known as Gini mean absolute difference);

Median absolute deviation (MAD);

Average absolute deviation (or simply called average deviation); and

Distance standard deviation.

According to one embodiment, a dispersion value may assist in determining when a contact model in the learning phase should be transitioned to the protection phase and may determine or be a factor in a determination of when a contact model may no longer be useful and should be deactivated. According to one embodiment, a value of dispersion may be calculated for each list. Let us define the following data:

| | |
|---|---|
| e | An element |
| $m \in \mathbb{N}_*$, $m \geq 2$ | m is a natural number greater or equal to 2 |
| $L_m$ | A list with at least 1 element and at most m elements. |
| M | A model that has one or several lists $L_m$ |
| $disp_{L_m} \in \mathbb{R}_*$, $0 \leq disp_{L_m} \leq 1$ | Dispersion of $L_m$ |
| $disp_M \in \mathbb{R}_*$, $0 \leq disp_M \leq 1$ | Dispersion of M |

Dispersion of $L_m$ is:

$$disp_{L_m} = \frac{\text{card}(L_m) - 1}{m - 1}$$

. . . where "card" represents the cardinality (number of elements) of Lm.

8

Dispersion of M is:

$$disp_M = \frac{\sum_{L_m \in M} disp_{L_m}}{\text{card}(M)}$$

A low value of dispersion means that the contact will be easy to model because the contact does not use many devices and/or connection points. Conversely, a high value of dispersion means that the contact will be more difficult to model because the contact uses many devices and/or connection points and, if too high, means that the presently-constructed contact model for this contact may no longer be a useful tool in determining the likelihood of an email spoofing.

Learning Phase

A learning phase is first required to build the model of a contact. According to one embodiment, ESPL may use:

Inbound email traffic to model external contacts; and

Inbound and outbound email traffic to model internal contacts.

The model of the contact will be considered built once the following conditions are both respected:

A condition on the number of emails analyzed; and

A condition on the length of the learning phase

When the model is built, the dispersion of the model is computed. If the dispersion is too high, the model is deactivated. For example, a determination of whether the dispersion of a model is too high may include comparing the obtained numerical value of the dispersion against a predetermined dispersion threshold value. If, however, the dispersion value of the model is below the predetermined threshold, the contact model may be activated, the learning phase ended and the protection phase begun.

Dispersion Example

Below is an example of the determination of dispersion, according to one embodiment. In this example, the contact is rebecca.johns@company.com. During the learning phase, it is determined that Rebecca primarily uses Microsoft outlook on her Apple desktop computer. This desktop computer is in her office in San Francisco. Sometimes, however, she uses Mail on her Apple laptop from her home, also in San Francisco. It also happens that she sometimes uses her Apple laptop from her parent's home in San Diego. To sum up:

Rebecca uses two MUA: OSX_OUTLOOK and OSX_MAIL;

Rebecca connects from three different IP addresses: office, home and parent's home; and

Rebecca connects from two different cities: San Francisco and San Diego.

The max values may be set as follows (these values may be freely chosen, with the understanding that they will affect the computed dispersion of the contact model):

KNOWN_MUA_MAX_COUNT=4

KNOWN_IP_ADDRESS_MAX_COUNT=32

KNOWN_CITY_MAX_COUNT=8

The dispersion values for the lists are the following:

KNOWN_MUA_DISP=(2−1)/(4−1)=0.3333333333

KNOWN_IP_ADDRESS_DISP=(3−1)/(32−1)=0.06451612903

KNOWN_CITY_DISP=(2−1)/(8−1)=0.1428571429

The dispersion of the contact model, according to one embodiment, may be computed as the average of the three dispersion values, is:

US 10,284,579 B2

9

MODEL_DISP=(KNOWN_MUA_DISP+KNOWN_I-
P_ADDRESS_DISP+KNOWN_CITY_DISP)/
3=0.18023553507

As can be seen, the dispersion of this model is quite low. It is a steady model, especially because the number of SMTP connection points is very low. Rebecca's range of behaviors, as a contact, are distributed within a quite narrow distribution of such behaviors.

The dispersion threshold is set, in this example, at 0.9. That is, MODEL_DISP_THRESHOLD=0.9. The dispersion of the contact model (0.18023553507) is lower than MODEL_DISP_THRESHOLD (0.9). As the dispersion of the contact model is lower than the dispersion threshold, this contact model can be transitioned from the learning phase to the protection phase.

Protection Phase

Returning to FIG. 2A, during the protection phase, contact models 212 are used, in conjunction with the SVM model 214, to categorize received emails as either likely legitimate or likely malicious, as described in detail herein. Both the SVM model 214 and the contact model may be updated during the protection phase. After the contact model is updated, the dispersion thereof may again be recomputed. If the computed dispersion of the contact model is too high (e.g., higher than a predetermined dispersion threshold), the contact model may be deactivated. If the computed dispersion of the contact model is still lower than the predetermined dispersion threshold, the contact model may be maintained in the protection phase.

Classification

As alluded to above, one embodiment uses a supervised learning algorithm to make the classification decision. Popular supervised learning algorithms include Support Vector Machine (SVM) and Random Forest. In one implementation, SVM may be used to make the decision on a binary classification problem for the following classes:

$C_{malicious}$: the class of email spoofing and spear phishing attacks; and

$C_{legitimate}$: the class of legitimate emails.

The SVM classifier may be trained with labeled data i.e. emails that have been classified manually. The training process produces a SVM model. This SVM model will then be used by the SVM classifier to classify an unknown email. The SVM classifier returns the probability $P_{malicious}$ that this email belongs to $C_{malicious}$ class.

We define:

$threshold_{malicious}$: probability threshold where $0.5 \leq threshold_{malicious} \leq 1$; and

$v_{email}$: features vector of the email being analyzed.

0.5 is the lower limit for $threshold_{malicious}$ and the threshold default value may be set at 0.95. An email may be considered to be malicious; i.e., is classified to belong to the class $C_{malicious}$ if and only if:

$$P_{malicious}(v_{email}) \geq threshold_{malicious}$$

According to one embodiment, the $threshold_{malicious}$ may be configurable.

The features vector is a vector of numeric values. As shown in FIG. 2B, this features vector 218, along with the SVM model 214, may be input into the SVM classifier 216, which then outputs a probability 218 that the received email belongs to the malicious class $C_{malicious}$.

As shown, each numeric value of the features vector may be resolved to a value of one of these types:

BIN—A binary value i.e. either 0 or 1. The value equals 1 if the condition is respected, 0 otherwise; and

10

DISP—A dispersion value i.e. a floating number between 0 and 1.

Herein, the main recipient is the internal contact email address protected by ESPL. The features vector, according to one embodiment, may comprise one or more of the binary and dispersion values shown in FIGS. 4A, 4B and 4C. Accordingly, the features vector may comprise a binary value KNOWN_IP_ADDRESS, that is set to 1 (true) if the Internet protocol (IP) address that has initiated the Simple Mail transfer Protocol (SMTP) connection is in KNOWN_IP_ADDRESS_LIST, otherwise it is set to 0 (false). The dispersion value KNOWN_IP_ADDRESS_DISP is representative of the dispersion of KNOWN_IP_ADDRESS_LIST. The binary value KNOWN_CITY is set to 1 (true) if the city associated to the IP address that has initiated the SMTP connection is in KNOWN_CITY_LIST, otherwise it is set to 0 (false). The dispersion value KNOWN_CITY_DISP represents the dispersion of KNOWN_CITY_LIST. The binary value KNOWN_MUA is set to 1 (true) if the MUA used to compose the email is in KNOWN_MUA_LIST, otherwise it is set to 0 (false). One embodiment uses a simplified name for the identification of the MUA. Examples of such simplified MUA names include IPHONE_MAIL, IPAD_MAIL, OSX_MAIL and LINUX_THUNDERBIRD. As shown in FIG. 4A, the dispersion value KNOWN_MUA_DISP is the dispersion of the KNOWN_MUA_LIST.

The features vector, according to one embodiment, may also include a binary value KNOWN_MUA_DISPLAY_NAME, which is the display name extracted from the From header and matches the display name of the identified MUA. See KNOWN_MUA. The binary value KNOWN_MUA_SIGNATURE is the signature extracted from the body of the email and matches the signature of the identified MUA. See KNOWN_MUA. The binary value KNOWN_MUA_DEFAULT_FONT represents the font extracted from the text/html part of the body of the email and matches the default font of the identified MUA. See KNOWN_MUA. The features vector may also include a binary value for KNOWN_MUA_CONTENT_LANGUAGE, which is the language extracted from Content-Language header, which must match the language of the identified MUA. See KNOWN_MUA. The binary value NEW_MESSAGE is set or reset depending upon whether the email is a newly composed message; i.e., the email is neither a reply to a previous message nor a forward of an existing message. In the case of a reply or a forward, the email can take attributes—such as the font and the language—of the existing message. See KNOWN_MUA_DEFAULT_FONT and KNOWN_MUA_CONTENT_LANGUAGE.

As shown in FIG. 4B, the features vector may also include a binary value for TEXT_HTML_PART, which indicates whether the email body has a text/html part. A text/html part in the body is required to extract the font. See KNOWN_MUA_DEFAULT_FONT. The features vector may also include a binary WHP_IP_ADDRESS value, which indicates whether the IP address that has initiated the SMTP connection belongs to a web hosting provider (such as, for example, GoDaddy, OVH, 1&1 and the like). Web hosting providers are often abused by fraudsters to send malicious emails such a spear phishing attacks. A web hosting provider IP address may be identified by, for example, analyzing and matching the reverse DNS of the IP address with a known pattern, and/or by matching the IP address with of list of IP ranges that belong to the web hosting provider. As shown in FIG. 4B, the features vector may also include a binary value DIFFERENT_REPLY_TO, which is a value that indicates

US 10,284,579 B2

11

that the email address in the Reply-To header does not match the email address in the From header. In the case of a spear phishing, the fraudster often set a different email address in Reply-To header. If the victim replies to the email, then his or her reply will not go to the person whose email has been spoofed, but to the fraudster instead or to an email address designated by the fraudster.

A binary value DIFFERENT_RETURN_PATH may also be included in the features vector. The condition that must be satisfied for this binary value is that the email address in the Return-Path header does not match the email address in the From header. The Return-Path header contains the email address that will receive a bounce message in the case of a delivery issue. The Return-Path header is added to the received email by the MTA and the MTA uses the email address of the MAIL FROM SMTP command. In the case of a spear phishing, the fraudster often sets an email address in the MAIL FROM SMTP command that is different from the email address in the From header, resulting in the email addresses in the Return-Path being different from the From headers. The binary SINGLE_RECIPIENT value indicates that there is one recipient in To header and no recipient in Cc and Bcc headers. This recipient is the main recipient. In the case of a spear phishing attack, it is common that only one person is targeted. If several persons were targeted or otherwise present in the Cc or Bcc headers, the chances of the scam being discovered would increase greatly. Hence, spear phishing attacks often are directed to a single person.

As shown in FIG. **4**C, the binary URGENCY_IN_SUB-JECT value indicates that the email Subject header contains a keyword that creates a sense of urgency such as, for example, urgent, important, critical and the like. A large number of spear phishing attacks attempt to create a false sense of urgency so that the victim acts immediately, without much aforethought. See the CEO fraud example developed above. A SUSPICIOUS_TEXT binary value may also be included in the features vector. This value may be set to 1 if the email body is determined to contain language indicative of topics which are deemed to be of a suspicious nature. Examples of such may include, for example, wire transfer, disclosure of sensitive and/or confidential data (contracts, internal documents, bank account numbers, social security numbers, W-2 tax records, list of logins or passwords . . . ) and the like.

The features vector may also include the binary value EXTERNAL_DATA, which may be set to logical 1 if the email body contains at least one external data: an email address, a telephone number, a URL or an attached dynamic file. Significantly, according to one embodiment, the signature in the body may be ignored, as it may contain an email address, telephone numbers and URLs. A dynamic file is a file that may contain dynamic content that can be harmful. Examples of dynamic files are PE files, APK files, Javascript files, PDF files, Microsoft Office files or HTML files. Some dynamic files may be compressed. Indeed, harmful files are frequently hidden in compressed archives (.zip, .rar and the like). Dynamic files may be identified by their media type. In this case of a spear phishing attack, this external data can be the next step of the attack or the payload: a phishing URL that will capture the victim credentials, a file that contains a malware.

Returning now to FIG. **3**, after extracting the email address from the From header of the received email as shown at B**34**, it is determined at B**35** whether the extracted email address has a corresponding contact model. If no contact model for the extracted email address exists (NO branch of B**35**), a contact model is created for the recipient

12

of the extracted email and the status of the just-created contact model is set at "Learning", according to one embodiment and as shown at B**36**. At B**37**, it may be determined, according to one embodiment, whether sufficient emails have been examined and whether sufficient time has elapsed to build the contact model. For example, it may be determined whether a sufficient number of values for some or all of the elements of the features vector have been determined to construct a useful contact model for the extracted email address. If the contact model has not yet been built (NO branch of B**37**), the received email may be simply moved to the recipient's email inbox (or to a special inbox configured for emails that have not been classified), as no spear phishing detection may be carried out without a fully-constructed contact model. If, however, a sufficient number of emails and sufficient time have elapsed to fully build the contact model for the extracted email (YES branch of B**37**), the dispersion of the contact model may be computed, as shown at B**38** and as detailed herein.

According to one embodiment, if the dispersion of the contact model computed in B**38** is greater or equal to a dispersion threshold block B**39** may be performed. If the computed dispersion threshold is greater to or equal to the dispersion threshold, B**39** may be carried out, and the contact model may be deactivated, meaning that the email recipient is not amenable to being accurately modeled in a manner that will be useful in detecting spear phishing attacks. Such may be the case where the email recipient emails from too many devices, from too many locations, uses different email clients and platforms, for example, such that an accurate contact model cannot be constructed. If, however, the dispersion computed in B**38** is less than the dispersion threshold, the contact model may be transitioned from the "Learning" phase to the "Protection" phase as shown at B**40**, meaning that the contact model becomes operational and may be used to detect spear phishing attacks, according to one embodiment. Whether B**39** or B**40** is carried out, the received email may be moved to the recipient's email inbox, as shown at B**41**, whereupon, at least for this received email, the method ends.

Returning to block B**35**, if a contact model for the email recipient exists (Yes branch of B**35**), the status of the model is determined at B**42**. If the status of the contact model for the email recipient is still "Learning", the method reverts to B**37** and proceeds as described above. If, however, the contact model for the email recipient has transitioned to the "Protection" phase, block B**43** may be carried out, where the incoming email is classified as likely malicious or likely non-malicious, in the manner described relative to FIG. **2**B, for example. If the classification indicates that the received email is likely legitimate, the received email may be moved to the recipient's inbox as shown at B**44**. According to one embodiment, if the user, after having read the email or even without reading the email, reports that the received email is likely malicious, a false negative (FN) may be reported to the centralized ESPL service **108**, the SVM model may be updated, as may be the code that builds the features vector and/or the code that builds the contact model, as generally shown at **222** in FIG. **2**A, and the email deleted as shown at B**49**. The method, at least for this received email, then ends. If the user does not report a false negative for this email, the contact model for this recipient may be updated as shown at B**46** and the method then ends, for this email.

If the classification at B**43** indicates that the received email is likely malicious, the email recipient may then be alerted as shown at B**45**. If the email recipient agrees with the classification of the received email as likely malicious,

US 10,284,579 B2

13

B47 may be carried out, a true positive (TP) is reported to the ESPL service 108, and the malicious received email may be deleted, as shown at B47. Herein, deleting a likely malicious email may also be understood as moving the identified malicious email to a safe location, quarantining the received email or taking other action that sequesters the received email so that it does no harm and is separated from other, legitimate received emails. Following B47, the method then ends, at least for this received email. Following a classification of the received email as likely malicious in B43, the user may refute the classification, and report instead that the received email is, in fact, legitimate. If the user reports that a received email that has been classified as likely malicious is, in fact, legitimate, the contact model may be updated and the dispersion thereof re-calculated. The SVM model 214 may be periodically updated on the centralized ESPL server, after collecting FP, FN, TP, whereupon the ESPL components may be updated with the new, updated SVN model. The email may then be moved to the recipient's email inbox, whereupon the method ends, for this email. The method shown in FIG. 3 may be repeated, at least in part, upon receipt of each email, to protect the intended recipient from phishing attacks.

The dispersion threshold, according to one embodiment, may be a static or a dynamic parameter. Setting a higher dispersion threshold will result in fewer contact models being deactivated and fewer emails being classified as likely to be malicious. Conversely, setting a lower dispersion threshold will result in fewer contact models switching from the "learning" status to the "protection" status, and the False Positive (FP) rate may increase.

FIG. 5 is a table that classifies the constituent elements of the features vector according to one embodiment, according their intended use. The first row of the table of FIG. 5 lists exemplary features vector elements that may be used to detect email spoofing, whereas the second row of the table of FIG. 5 lists features vector elements that may find utility in detecting spear phishing. That is, features vector elements that may be used to detect email spoofing may include:

KNOWN_IP_ADDRESS;
KNOWN_IP_ADDRESS_DISP;
KNOWN_CITY;
KNOWN_CITY_DISP;
KNOWN_MUA;
KNOWN_MUA_DISP;
KNOWN_MUA_DISPLAY_NAME;
KNOWN_MUA_SIGNATURE;
KNOWN_MUA_DEFAULT_FONT;
KNOWN_MUA_CONTENT_LANGUAGE;
NEW_MESSAGE; and
TEXT_HTML_PART

Features vector elements that may be used to detect spear phishing may include:

WHP_IP_ADDRESS;
DIFFERENT_REPLY_TO;
DIFFERENT_RETURN_PATH;
SINGLE_RECIPIENT;
URGENCY_IN_SUBJECT;
SUSPICIOUS_TEXT; and
EXTERNAL_DATA

The above lists are presented herein for exemplary purposes only, it being understood that neither of these lists are presented as exhaustively listing all possible features vector elements, nor must all elements be present to enable the detection of email spoofing and/or a spear phishing attack. Moreover, one or more of the elements listed as being useful in detecting email spoofing may provide additional insight in

14

a spear phishing attack and one or more elements listed as being useful in detecting a spear phishing attack may similarly provide insight into the detection of email spoofing.

FIG. 6 illustrates a block diagram of a computing device such as client computing device, email (electronic message) server, with which embodiments may be implemented. The computing device of FIG. 6 may include a bus 601 or other communication mechanism for communicating information, and one or more processors 602 coupled with bus 601 for processing information. The computing device may further comprise a random-access memory (RAM) or other dynamic storage device 604 (referred to as main memory), coupled to bus 601 for storing information and instructions to be executed by processor(s) 602. Main memory (tangible and non-transitory, which terms, herein, exclude signals per se and waveforms) 604 also may be used for storing temporary variables or other intermediate information during execution of instructions by processor 602. The computing device of FIG. 6 may also include a read only memory (ROM) and/or other static storage device 606 coupled to bus 601 for storing static information and instructions for processor(s) 602. A data storage device 607, such as a magnetic disk and/or solid state data storage device may be coupled to bus 601 for storing information and instructions—such as would be required to carry out the functionality shown and disclosed relative to FIGS. 1-5. The computing device may also be coupled via the bus 601 to a display device 621 for displaying information to a computer user. An alphanumeric input device 622, including alphanumeric and other keys, may be coupled to bus 601 for communicating information and command selections to processor(s) 602. Another type of user input device is cursor control 623, such as a mouse, a trackball, or cursor direction keys for communicating direction information and command selections to processor(s) 602 and for controlling cursor movement on display 621. The computing device of FIG. 6 may be coupled, via a communication interface (e.g., modem, network interface card or NIC) to the network 626.

Embodiments of the present invention are related to the use of computing devices to detect phishing attacks in electronic messages such as emails. According to one embodiment, the methods, devices and systems described herein may be provided by one or more computing devices in response to processor(s) 602 executing sequences of instructions contained in memory 604. Such instructions may be read into memory 604 from another computer-readable medium, such as data storage device 607. Execution of the sequences of instructions contained in memory 604 causes processor(s) 602 to perform the steps and have the functionality described herein. In alternative embodiments, hard-wired circuitry may be used in place of or in combination with software instructions to implement the described embodiments. Thus, embodiments are not limited to any specific combination of hardware circuitry and software. Indeed, it should be understood by those skilled in the art that any suitable computer system may implement the functionality described herein. The computing devices may include one or a plurality of microprocessors working to perform the desired functions. In one embodiment, the instructions executed by the microprocessor or microprocessors are operable to cause the microprocessor(s) to perform the steps described herein. The instructions may be stored in any computer-readable medium. In one embodiment, they may be stored on a non-volatile semiconductor memory external to the microprocessor, or integrated with the microprocessor. In another embodiment, the instructions

US 10,284,579 B2

15 | 16

may be stored on a disk and read into a volatile semiconductor memory before execution by the microprocessor.

While certain example embodiments have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the embodiments disclosed herein. Thus, nothing in the foregoing description is intended to imply that any particular feature, characteristic, step, module, or block is necessary or indispensable. Indeed, the novel methods and systems described herein may be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein may be made without departing from the spirit of the embodiments disclosed herein.

The invention claimed is:

1. A computer-implemented method of detecting an email spear phishing attack, comprising:

generating a contact model of a sender of emails;

determining, by a hardware processor, a statistical dispersion of the generated contact model, the statistical dispersion of the contact model being indicative of a spread of a distribution of data in the generated model;

receiving, over a computer network, an email from the sender;

when the determined statistical dispersion is lower than a dispersion threshold:

evaluating the received email in the processor against a plurality of conditions associated with spear phishing attacks to generate a features vector, the features vector comprising a plurality of binary values and a plurality of dispersion values between 0 and 1;

using at least the generated features vector and the generated contact model to classify the received email as a likely legitimate email or as a likely malicious email spear phishing attack; and

notifying a recipient of the email when the received email is classified as a likely malicious email spear phishing attack.

2. The computer-implemented method of claim 1, wherein the statistical dispersion of the contact model comprises an average of the plurality of dispersion values.

3. The computer-implemented method of claim 1, wherein the generated contact model is not used to classify the received email as likely legitimate or likely malicious if the determined statistical dispersion is greater than or equal to the dispersion threshold.

4. The computer-implemented method of claim 1, wherein generating the contact model comprises building the contact model using received emails from the sender during a learning phase over a period of time and thereafter transitioning the contact model to a protection phase during which the built contact model is used to classify the received email as likely legitimate or likely malicious.

5. The computer-implemented method of claim 1, further comprising updating the contact model using a sliding time window by:

adding thereto data from recent received emails from the sender of the email and

deleting data from emails older than a predetermined period of time.

6. The computer-implemented method of claim 1, further comprising updating the contact model using data from emails received from the sender at are determined to be true negative (TN) email phishing attacks and false positives (FP) email phishing attacks.

7. The computer-implemented method of claim 1, wherein generating the contact model comprises:

extracting an identification of an email application used to send the received email;

simplifying the extracted identification; and

storing the extracted and simplified identification in the contact model.

8. The computer-implemented method of claim 7, wherein simplifying the extracted identification comprises at least stripping a software version number from the extracted identification of the email application used to send the received email.

9. The computer-implemented method of claim 1, wherein the features vector comprises at least one binary value indicative that:

the internet protocol (IP) address that sent the received email belongs to a web hosting provider;

the email address in a Reply-To header of the received email does not match the email address in the From header of the received email;

the email address in a Return-Path header of the received email does not match the email address in the From header of the received email;

there is one recipient in To header and no recipient in Cc and Bcc headers of the received email;

the Subject header of the received email contains a keyword intended to create a sense of urgency;

the received email contains language indicative of topics that are deemed to be of a suspicious nature; and

the received email contains at least one of an email address, a telephone number, a URL and an attached dynamic file.

10. A computing device comprising:

at least one processor;

at least one data storage device coupled to the at least one processor;

a network interface coupled to the at least one processor and to a computer network;

a plurality of processes spawned by said at least one processor, the processes including processing logic for:

generating a contact model of a sender of emails;

determining, by a hardware processor, a statistical dispersion of the generated contact model, the statistical dispersion of the contact model being indicative of a spread of a distribution of data in the generated model;

receiving, over a computer network, an email from the sender;

when the determined statistical dispersion lower than a dispersion threshold:

evaluating the received email in the processor against a plurality of conditions associated with spear phishing attacks to generate a features vector, the features vector comprising a plurality of binary values and a plurality of dispersion values between 0 and 1;

using at least the generated features vector and the generated contact model to classify the received email as a likely legitimate email or as a likely malicious email spear phishing attack; and

notifying a recipient of the email when the received email is classified as a likely malicious email spear phishing attack.

11. The computing device of claim 10, wherein the statistical dispersion of the contact model comprises an average of the plurality of dispersion values.

12. The computing device of claim 10, wherein the generated contact model is not used to classify the received email as likely legitimate or likely malicious if the determined statistical dispersion is not at least equal to the dispersion threshold.

US 10,284,579 B2

17 18

**13**. The computing device of claim **10**, wherein the processing logic for generating the contact model comprises processing logic for building the contact model using received emails from the sender during a learning phase over a period of time and thereafter transitioning the contact model to a protection phase during which the built contact model is used to classify the received email as likely legitimate or likely malicious.

**14**. The computing device of claim **10**, further comprising processing logic for updating the contact model using a sliding time window by:

adding thereto data from recent received emails from the sender of the email and

deleting data from emails older than a predetermined period of time.

**15**. The computing device of claim **10**, further comprising processing logic for updating the contact model using data from emails received from the sender at are determined to be true negative (TN) email phishing attacks and false positives (FP) email phishing attacks.

**16**. The computing device of claim **10**, wherein the processing logic for generating the contact model comprises processing logic for:

extracting an identification of an email application used to send the received email;

simplifying the extracted identification; and

storing the extracted and simplified identification in the contact model.

**17**. The computing device of claim **16**, wherein the processing logic for simplifying the extracted identification comprises at least stripping a software version number from the extracted identification of the email application used to send the received email.

**18**. The computing device of claim **10**, wherein the features vector comprises at least one binary value indicative that:

the internet protocol (IP) address that sent the received email belongs to a web hosting provider;

the email address in a Reply-To header of the received email does not match an email address in the From header of the received email;

the email address in a Return-Path header of the received email does not match an email address in the From header of the received email;

there is one recipient in To header and no recipient in Cc and Bcc headers of the received email;

the Subject header of the received email contains a keyword intended to create a sense of urgency;

the received email contains language indicative of topics that are deemed to be of a suspicious nature; and

the received email contains at least one of an email address, a telephone number, a URL and an attached dynamic file.

**19**. The computing device of claim **10**, configured as a local email gateway coupled to the computer network.

**20**. The computing device of claim **10**, configured as a remote server accessible over the computer network.

\* \* \* \* \*

# EXHIBIT H



☐                                                    **Send a Release**          ☐          ☐

# Vade Secure Launches the First Native, AI-Based Email Security Add-On for Office 365



Solution delivers best-in-class protection against phishing, spear phishing and malware; provides Microsoft partners with a value-added, high-margin solution for Office 365 clients

---

NEWS PROVIDED BY                                    SHARE THIS ARTICLE

**Vade Secure** ☐                                   🔵 🔵 🔵 🔴 ⚪ ⚪

Jun 21, 2018, 08:00 ET

---

SAN FRANCISCO, June 21, 2018 /PRNewswire/ -- Today, Vade Secure, the global leader in predictive email defense, announced a new offering for Office 365 customers looking to enhance protection against advanced phishing, spear phishing, and malware attacks. Vade Secure for Office 365 is the only email security solution that's fully integrated into Office 365, offering a native user experience and best-in-class filtering accuracy powered by artificial intelligence.

**Value-Added Cloud Service for Microsoft Partners and MSPs**
Vade Secure for Office 365 is closely aligned with Microsoft's partner-first, cloud-first strategy. Built from the ground up with a cloud-native, API-based architecture, the new offering natively integrates with Office 365 and runs on Microsoft Azure, providing Microsoft Partners, Cloud Solution Providers (CSPs), and Managed Service Providers (MSPs) with a complementary, high-margin solution for their Office 365 customers.

"As one of the largest global Microsoft CSPs, Crayon is at the forefront of helping clients realize the benefits of Microsoft Office 365. At the same time, we recognize that Office 365's dominant market share has made it a popular target for cybercriminals," said Nabil Chebbi, Vice President Cloud Sales and Marketing Enablement, Crayon Group. "We're impressed with Vade Secure's track record of blocking advanced threats, and we're excited to add their solution for Office 365 to our portfolio so that we can offer our clients an easy, transparent, and effective way to enhance their email protection."

**Fully API-Based for a Native Office 365 User Experience**

Gartner estimates that by 2020, 50 percent of Office 365 clients will use third-party security solutions. Many traditional email security products are based on legacy gateway architectures that render certain Office 365 security features ineffective, but Vade Secure's new, API-based solution integrates seamlessly with Office 365, allowing organizations to augment native Office 365 security features, rather than displace them.

Specific benefits of Vade Secure's API-based architecture include:

- **Ease of deployment:** With a few clicks, admins can authorize Vade Secure to access their email flow and configure their filtering policies—no MX record changes required.
- **Native user experience:** The solution is fully transparent, allowing end users to continue using the familiar Office 365 interface, without a separate quarantine.
- **Insider threat protection:** Vade Secure scans internal messages sent between employees to protect against attacks originating within the organization.

**Predictive Defense Powered by Artificial Intelligence**

Vade Secure for Office 365 blocks advanced attacks from the first email using machine learning models that perform real-time behavioral analysis of the entire email, including any URLs and attachments. Vade Secure leverages data from

more than 500 million inboxes around the world to feed its machine learning models and ensure a best-in-class catch rate.

Specific AI and machine learning benefits include:

- **Anti-phishing:** Vade Secure crawls suspicious URLs and pages in real time, following any redirections to determine whether the final page is fraudulent. The solution performs this analysis both when the message is received and any time a user clicks.
- **Anti-spear phishing:** Vade Secure builds an anonymous profile that establishes employees' normal communication patterns. Upon detecting spoofing attempts, a fully customizable banner is displayed within the email alerting the user.
- **Anti-malware and ransomware:** Going beyond simply scanning attachments, machine learning algorithms perform a comprehensive analysis of the origin, content, and context of emails and their attachments to block unknown, polymorphic malware.

"Hackers are increasingly targeting Office 365 users with email-based attacks as an entry point to exploit data, files, and contacts from other Office 365 apps," said Adrien Gendre, Chief Solution Architect, Vade Secure. "While native Office 365 security catches most spam and known threats, many organizations are strengthening their defenses with a layered approach. Vade Secure for Office 365 complements tools like Exchange Online Protection, leveraging artificial intelligence to block advanced phishing, spear phishing, and malware attacks."

**Experience the Power of Vade Secure for Office 365 at Microsoft Inspire**

Vade Secure for Office 365 will be on display at Microsoft Inspire, which will take place July 15-19, 2018 in Las Vegas, NV.  Microsoft partners are encouraged to stop by booth #1729 to see a demonstration of the new solution, as well as learn about the benefits of joining the Vade Secure Partner Program.

**Additional Resources**

- Learn more about Vade Secure for Office 365
- Request a free trial of Vade Secure for Office 365
- Download the Vade Secure Partner Program Guide

**About Vade Secure**

Vade Secure is on a mission to make email safe, simple, and convenient. We provide predictive email defense to more than 500 million inboxes worldwide utilizing artificial intelligence, machine learning, and data from our 24/7 global threat centers. Vade Secure provides advanced protection against the most sophisticated email scams such as phishing and spear phishing, malware and ransomware, and is used by major ISPs, OEMs, SMBs, and enterprises worldwide. Vade Secure continues to develop unique, patented technologies, emerging today as the only Advanced Email Protection vendor.

To learn about Vade Secure's predictive email security solutions, visit www.vadesecure.com.

**Press Contact**

SHIFT Communications for Vade Secure

Jenna Finn, Account Manager

T: (617) 779-1875

E: jfinn@shiftcomm.com

SOURCE Vade Secure

Related Links

https://www.vadesecure.com

You just read:

# Vade Secure Launches the First Native, AI-Based Email Security Add-On for Office 365

NEWS PROVIDED BY

**Vade Secure**

Jun 21, 2018, 08:00 ET

SHARE THIS ARTICLE



Contact PR Newswire

888-776-0942
from 8 AM - 10 PM ET
Contact Us

**Products**

Cision Communication
Cloud®
For Marketers
For Public Relations
For IR & Compliance
For Agency
For Small Business
All Products

**About**

About PR Newswire
About Cision
Become a Publishing Partner
Become a Channel Partner
Careers

Global Sites

**My Services**

All New Releases
Online Member Center
ProfNet

Terms of Use | Privacy Policy | Information Security Policy
Site Map | RSS | Cookie Settings

Copyright © 2019 PR Newswire Association LLC. All Rights Reserved. A Cision company.

# EXHIBIT I

News   Support   Resources   search   English ⌄

**V**ade Secure
Predictive Email Defense

Solutions ⌄   Products ⌄   Partners ⌄   Company ⌄   Blog        Start FREE Trial

# AI-based Email Security for Office 365

Data-rich applications like OneDrive and SharePoint have made Office 365 the most lucrative target for cybercriminals. Vade Secure for Office 365 is the only native email security solution for Office 365, combining powerful, AI-based threat detection and remediation with simple, set-it-and-forget-it configuration for MSPs.

START YOUR FREE TRIAL   ›

## Vade Secure for Office 365

**Vade Secure for Office 365** offers a native user experience and best-in-class protection powered by artificial intelligence. Vade Secure integrates seamlessly with Office 365 via an API-based architecture, with no disruption to your customers' email flow. As a result, MSPs are able to **augment Office 365 security** with a complementary layer of AI-based threat detection.

ASK FOR A DEMO   ›



# AI-based Threat Detection

Vade Secure for Office 365 blocks advanced attacks from the first email thanks to machine learning models that perform real-time behavioral analysis of the entire email, including any URLs and attachments. Leveraging data from more than 600 million inboxes, our AI-based threat detection stops threats before, during, and even after attacks.



*Vade Secure for Office 365 Dashboard*

⊘ **Time-of-Click Anti-Phishing** – Crawls the URL and page in real time, following any redirections and analyzing the content and context of the URL/page- when the message is received and any time a user clicks.

⊘ **Banner-Based Anti-Spear Phishing** – Unsupervised anomaly detection and natural language processing scan for patterns, anomalies, and behaviors common in spear phishing emails. If spear phishing is suspected, a customizable banner is displayed within the email alerting the user.

⊘ **Behavioral-Based Anti-Malware** – Performs comprehensive analysis of the origin, content, and context of emails and attachments to identify unknown, polymorphic malware-without the long delays required by sandboxing technologies.

⊘ **Auto and Manual Remediation:** Vade Secure augments threat detection with post-delivery threat remediation. With a real-time view of global threats, the engine is continuously learning and will automatically remove any threats from user inboxes. Admins can also manually remediate messages with one click.

**Real-time Phishing Detection**



**Spear Phishing Detection**



**Phishing Remediation**



READ THE REVIEW ❯

*Vade Secure for Office 365 receives*
*5-stars from SC Magazine*

## Easy Set Up and Maintenance for Busy MSPs

Vade Secure for Office 365 is easy to activate, requiring only a few clicks and no MX record changes. It's a low maintenance solution that requires no end user training and no complex configurations, allowing MSPs to spend less time administering and more time focusing on core objectives.

⊘ **Instant Deployment** — Get up and running in just a few clicks, without the hassle of changing your customers' MX records.

⊘ **Native User Experience** — Allow end users to continue working in Office 365, without requiring a separate quarantine or daily digest.

⊘ **Insider Threat Protection** — Scan internal email traffic to protect against insider attacks coming from compromised O365 accounts.

⊘ **Scalability and Security** — Hosted on Microsoft Azure, you'll benefit from the cloud platform's scalability and added security capabilities.

START YOUR FREE TRIAL ❯

## Success Stories

Vade Secure protects more than 5,000 customers in 76 countries. See what our customers and partners have to say about Vade Secure for Office 365.

BECAME A PARTNER  ›

"

*Confronted with a rise of phishing attacks and dissatisfied with Microsoft's anti-spam/anti-phishing capabilities, we d proofs of concept with 20 vendors. Vade Secure ranked t highest, with the most reliable and effective solution. The technology is sophisticated, yet easy to use. Their staff is*

# Email Security Resources

### Email Security for Office 365
White paper

### Vade Secure for Office 365
Data Sheet

### Case Study
Boys and Girls Clubs of Puerto Rico protects Office 365 users from targeted attacks while improving IT efficiency.

ALL RESOURCES

### Phishers' Favorites: It's Lonely at the Top: Microsoft Remains the #1 Impersonated Brand in Phishing Attacks

ALL BLOG POSTS

| SOLUTIONS | PRODUCTS | PARTNERS | COMPANY | MORE INFOS | |
|-----------|----------|----------|---------|------------|---|
| Anti Phishing | Vade Secure for Office 365 | Become a Partner | About | Blog | Artificial Intelligence and Predictive Technologies to protect your email. |

Anti Spear
Phishing & BEC

Anti Malware &
Ransomware

Anti Spam &
Graymail

IsItPhishing
Threat Detection
for SOC

Products for ISP,
telecom
providers, SOC

Vade Secure
Partner Portal

Contact

Career

Upcoming
Events

News

Resources

IsItphishing.ai

Vade Secure © 2019

 English ^

Sitemap    Privacy    Legal Notice    Cookies Policy    Conditions of use         

# EXHIBIT J

Go to...


Predictive Email Defense

Go to...

# Cloud Email Security Protect your messages efficiently with complete ease

The Vade Secure Cloud product protects your email system against all types of cyberattacks.
It is easy to implement, requiring very little setup to achieve maximum protection.
Thanks to artificial intelligence and the heuristic filter,
Vade Secure Cloud provides efficient protection, updated in real-time.

## Protect your email system against phishing, malware, ransomware and targeted attacks

**Ask for a demo**



# A high-performance and secure cloud email system

**360° protection of emails**

The email system is protected against malware, phishing, spearphishing and spam attacks. Non-priority emails are automatically classified with the ability to unsubscribe with one click for complete security.

**Incoming and outgoing filters**

In addition to incoming emails, outgoing emails are also analyzed in order to block spam and identify botnet infections, which helps maintain a healthy IP reputation.

**Predictive technologies**

Multi-layer analyses focuses consecutively on the origins, contents and contexts of emails. Known, unknown and multi-form threats are stopped at the first email version, or the "zero hour" email.

**Continuous protection**

The filter is updated every minute and the cloud platform updates do not impact email flows.

**Guarantee of service continuity and high availability**

Information flows are safeguarded and protected in the Cloud. Vade Secure Cloud guarantees, among other things, high availability of your email system (SLA 99.99% – 24/7; GTR 2H; support with guaranteed response in 1 hour) and 5 days of SMTP retention in the case of network cuts.

**Premium 24/7 support**

All Vade Secure users benefit from the same premium service level with 24/7 availability of our experts by telephone, web and email.

# An innovative messaging protection system

## Analysis of the origin

The first technique to thwart malicious emails is to filter emails by their origin using logged analysis of the emails and information contained in the header. This first analysis can rapidly eliminate a large number of threats, especially mass attacks.

## Analyze the contents

To identify more advanced attacks, the filter searches the content of all URLs and all attachments in order to find malicious code which could, for example, install malware or uncover personal data. This technology is independent of language, using the behavior of URLs and attachments.

## Analyze context

In addition to classic techniques for protection, and contrary to other solutions on the market, Vade Secure analyzes the complete behavior and context of emails.

With a complete understanding of each email and identifying anomalies, our solutions blocks threats in a predictive way, which is a key competitive differentiator for Vade Secure.

# Email system secured in the Cloud

- **Immediate implementation and protection** – ready to use, the Vade Secure cloud solution instantly protects the company and needs no complex settings.
- **Better employee productivity** – users receive non-priority emails (advertising, newsletters, social networks, etc.) and those that are suspicious are placed in a personal quarantine area that allows users the ability to release them.
- **Reduced administration time** – administration console that is intuitive and high-performance. No backup or updates need to be planned (or managed by the Cloud platform).
- **Auto-learning method** – new users' email boxes are taken into account and automatically set before the first legitimate email is sent.
- **Attack reports in real time** – summary view of attack attempts, as well as valid, suspect or rejected messages in real-time.
- **A la carte Cloud service** -budget management is a function of the number of protected email boxes and adaptable volume, which is dependent on how your needs evolve.
- **Reduce costs** – no infrastructure or maintenance costs to manage.



# Start a POC in your company

**Contact us**

# Attacks blocked from the first email forward

The filter, which comes from Vade Secure R&D, uses a heuristic approach connected with behavior analysis technologies for each email, as well as machine learning and artificial intelligence. The filter is automatically improved in real-time, with daily analysis of billions of data points from the total flow of analyzed emails. These technologies allow implementation of predictive defense and stop known and unknown threats, including multi-form malware at "zero-hour".

# Our customers are talking about Vade Secure Cloud

The Fire **Brigade of Paris** chose the Vade Secure Cloud solution to strengthen its email protection, especially since it included a communication and management tool for traceability of exchanges especially targeted by cyberattacks.

DOWNLOAD THE CASE STUDY

# Protect your company from cyberattacks

# Use predictive defense with our Cloud solution

**Start a free trial**

## SOLUTIONS

Anti Phishing

Anti Spear Phishing & BEC

Anti Malware & Ransomware

Anti Spam & Graymail

## PRODUCTS

Vade Secure for Office 365

IsItPhishing Threat Detection for SOC

Products for ISP, telecom providers, SOC

## PARTNERS

Become a Partner

Vade Secure Partner Portal

## COMPANY

About

Contact

Career

Upcoming Events

## MORE INFOS

Blog

News

Resources

Isitphishing.ai

Vade Secure logo

Artificial Intelligence and Predictive Technologies to protect your email.

Vade Secure © 2019

☐  English ☐

Sitemap    Privacy    Legal Notice    Cookies Policy    Conditions of use

# EXHIBIT K



NEWS    REVIEWS    IN DEPTH    EVENTS    TECHSCAPE    RESOURCE LIBRARY    SC SECURITY OPS CENTER    SC UK

Home > Reviews

April 02, 2019

<span style="color:red">PRODUCT INFORMATION</span>

# Vade Secure for Office 365



Vendor: Vade Secure

Price: Starts at $30 per user/year, with discounts available based on certain user thresholds as well as multi-year agreements

Contact: vadesecure.com

<div style="border:1px solid #ccc;padding:10px;">
<span style="background:red;color:white;">NEXT HM-PRODUCT-REVIEW IN REVIEWS</span>



## ZixProtect
</div>

## QUICK READ

STRENGTHS:  Combines AI with heuristic rules to block malware, ransomware, spam, and all variations of phishing.

WEAKNESS:  None that we found.

VERDICT:  If you are in the market for an email security solution that seamlessly integrates with Office 365, then look no further. Vade Secure protects an organization against malware and other threats with their native, API-based platform. The familiarity of Office 365 makes it easy for administrators to implement and the end-user experience is virtually unchanged.

## RATING BREAKDOWN

### SC Labs Reviews

*Reviews from our expert team*

Features:

Documentation:

Value for Money:

Performance:

Support:

Ease of Use:

## 5.00/5

SUMMARY

Vade Secure for Office 365 is a fully native cloud solution with AI-based, predictive email defense. It protects against phishing attempts, spear phishing, business email compromise attacks, malware, ransomware, spam, and GreyMail. It also features behavior-based anti-malware, insider attack protection, anti-phishing, anti-spear phishing, and protects against CEO fraud.

This product leverages Office 365's built-in capabilities for encryption and backups. You can layer it on top of Exchange Online Protection and/or ATP, which is not possible for gateway-based security products that require MX record exchanges as they render EOP/ATP reputation-based defenses useless.

The filter engine uses heuristics for behavior analysis and machine learning models fed by data from 550 million mailboxes to train the technology. It has realtime URL exploration, in-message spear phishing banners, and a real-time attachment code interpreter.

MX records are complex for end users and difficult to add and filter this type of solution. For those reasons, Vade has no MX redirection, and instead filters internal email flow to remove quarantined emails from the inside with no training necessary thanks to

their native Office 365 interface.

Activation could not be easier. All user must do is provide Vade Secure with a tenant ID, get logged in using Office 365 credentials, and activate journaling. Vade will then begin populating. The dashboard displays threats detected, classification types for each threat detected, a graph for trend visibility, and information surrounding the last targeted attacks with data and time, who they were from, who they were sent to, what the subject was, and the classification.

From what we saw of the administrator interface, it is customizable, featuring compliance management with auditing, retention policies, tags, journal rules, etc. The journals are used to record all communication in support of an organization's email retention or archival strategy.

The user interface uses the junk email folder to dump spam and phishing emails instead of a quarantine method. The dashboard shows recommended actions, customizable folders Vade Secure automatically deposits messages into according to type and categorizes spam. It will check every time a user clicks an email and redirect them to Vade Secure to detect any spam or phishing attempts.

This is an intuitive solution, fully transparent to users, and is thoroughly customizable for administrators. With email encryption, spam filtering, and virus/malware protections, it is worthy for anyone looking to protect on-premises email or cloud email, guard against email fraud protection and obtain added assurance with email backup.

Vade Secure is offered in three forms: 1) Vade Secure Office 365 is a native, API-based solution for Office 365, 2) Vade Secure Cloud is a cloud-based solution for G-Suite, Exchange, etc., and 3) Vade Secure Gateway is an on-premise, virtual appliance. 24/7 technical support is available by phone, email, and web channels. It also includes a website support feature, knowledgebase, and FAQ list.

Pricing is $30 per user, per year but is discounted based on volume and multi-year commitments. For example, 500 users would be $18 per user, per year. The on-premises virtual appliance option is the same price.

*Tested by Matthew McMurray*


# TOPICS:   | EMAIL SECURITY |


**MOST POPULAR**

| Popular | Emailed |

| Recent |

Huawei products riddled with backdoors, zero days and critical vulnerabilities

Why infosec vendors can't sell to most CISOs

Data management firm exposed client info on open Amazon S3 buckets: researchers

Article 29 Working Party still not happy with Windows 10 privacy controls

Career advice for current and future CISOs

COMPANY INFO

Back to Top

About Us

SC Corporate News

Meet the Team

Advisory Board

Contact Us

PRODUCT REVIEW

About Product Review

Group Tests

FAQ

USER CENTER

Videos

Executive Insight
Guidelines

Subscribe

OTHER SC SITES

RiskSec Conference

SC Resource Library

SC Online Events

SC Awards

Copyright © 2019 Haymarket Media, Inc. All Rights Reserved
This material may not be published, broadcast, rewritten or redistributed in any form without prior authorization.
Your use of this website constitutes acceptance of Haymarket Media's Privacy Policy and Terms & Conditions.

# EXHIBIT L



Send a Release

# Vade Secure Enters €70M Financing Agreement with General Catalyst



Vade Secure will use the new funding for heavy investment in machine learning-based email security and to accelerate growth by focusing on the MSP channel

NEWS PROVIDED BY

**Vade Secure**

Jun 12, 2019, 09:00 ET

SHARE THIS ARTICLE



BOSTON and HEM, France, June 12, 2019 /PRNewswire/ -- **Vade Secure**, the global leader in predictive email defense, announced that it has entered a €70M financing agreement with General Catalyst. Vade Secure plans to use the new funding to accelerate its growth and global expansion, with a focus on building out a go-to-market strategy focused on servicing business customers through Managed Service Providers (MSPs). The company will also invest heavily in advancing the platform's core machine learning-based threat detection capabilities as well as its native email security solution for Office 365.

The investment builds upon Vade Secure's track record of hypergrowth and international expansion over the last four years, with major deals across North America, Europe, and Japan. It follows on the heels of a flurry of industry awards and recognitions that Vade Secure has earned for its *Vade Secure for Office 365* product. Recent accolades include Cyber Defense Magazine's *2019 InfoSec Award*

*for Most Innovative Anti-Phishing Solution,* CSO Magazine's *Hottest New Cybersecurity Products at RSA 2019*, and a perfect 5.0/5.0 score product review from SC Magazine.

Email continues to be the #1 attack vector, resulting in a proliferation of targeted phishing, spear phishing, malware, and ransomware attacks globally. According to Accenture, the total economic value at risk of cybercrime attacks is $5.2 trillion over the next five years. Vade Secure protects enterprises and small-medium businesses (SMBs) against email-borne cyber threats targeting their employees. Today, the company's technologies protect more than half a billion inboxes across 5,000+ global customers, including major ISPs, OEMs, and enterprises, such as Comcast, British Telecom, Orange, Softbank, Fujitsu Cloud Services, NTT Comm, Telstra and Cisco.

"Since implementing Vade Secure we have gone from spam being a number one problem to having it well under control. Previously, we had daily calls to discuss unwanted and malicious emails, whereas we now have just one weekly of which this is just one part of the agenda," said Simon Dawes, Head of Email, Identity & Customer Data Security, BT. "The visibility delivered by Vade Secure's email categorization is providing powerful insight into what kind of threats are targeting our customers' inboxes. This intelligence helps to inform our overall security strategy as it continues to evolve."

Looking ahead, Vade Secure will continue to serve the enterprise and OEM markets. In addition, Georges Lotigier, Vade Secure's CEO, and his team intend to greatly expand on *Vade Secure for Office 365* with a go-to-market strategy focused on selling through MSPs and aggregators to service SMBs across North America, Europe, and Japan.

Compared to its competitors, *Vade Secure for Office 365* provides superior detection of targeted email attacks and unknown, signature-less threats. The company leverages threat intelligence from its half a billion protected mailboxes globally to train and continually refine highly accurate machine learning models, resulting in far lower false positive/false negative rates and unique graymail

classification capabilities. Moreover, due to its native integration with Office 365, *Vade Secure for Office 365* is easy to deploy (no MX changes), easy to use (no external quarantine), and easy to manage, making it attractive to both MSPs and their SMB clients.

"I am truly excited about this investment from General Catalyst. It validates our strategy and, more importantly, allows us to accelerate our goal to revolutionize the email security market through the application of machine learning and a comprehensive view of threats as they emerge in real-time worldwide," said Georges Lotigier, Vade Secure's CEO. "With the funding, we will continue to invest in our AI-based threat detection engine and build on Vade's leadership in email security for ISPs. In addition, we have a unique opportunity to capitalize on the market disruption caused by the industry shift from on-premise hosted email to the adoption of cloud-based email platforms. With a significant advantage in our core technology and easy-to-implement solution, we plan to rapidly become the de facto standard for Office 365 email protection, in a complement of the platform's own security."

As part of the financing agreement, General Catalyst investors, Paul Sagan (Former CEO of Akamai Technologies) and  Matthew Brennan, will join Vade Secure's Board. General Catalyst has invested heavily into the cybersecurity category over the years, including Ping Identity (acquired by Vista Equity Partners in 2016) and Imprivata (which went public and was subsequently purchased by Thoma Bravo).

Austin McChord, Founder/Former CEO of Datto and General Catalyst investor, will also join Vade Secure's Board. Austin founded Datto in 2007 and sold the company to Vista Equity Partners in 2017. Austin's involvement on Vade Secure's Board will be instrumental as the company pushes heavily into the MSP channel.

"As an entrepreneur who built Datto from the ground up into a multi-billion dollar business, I lived and breathed MSPs. From the moment I first saw Vade Secure, I realized the company's immense potential to be an essential piece of solving cybersecurity for MSPs. The instantly deployable O365 protection is the perfect mix

of enterprise-grade security and total automation that today's MSPs need."

Stephan Dietrich, General Catalyst Executive-In-Residence, Co-Founder/CEO of Neolane, Inc. (acquired by Adobe), and current Vade Secure Board Director, will co-invest alongside General Catalyst and remain on the company's Board to serve as Chairman.

"As a Board Member over the past two years, I witnessed Vade Secure's tremendous growth and technological advances first-hand," said Stephan Dietrich, General Catalyst Executive-In-Residence (XIR). "I knew that it was the right time to unlock the company's full potential by assembling the right growth equity partner and a 'dream team' of talent. I am happy to serve as Chairman of the Board, and I look forward to taking Vade Secure to the next level by further contributing with my Europe-to-US expansion expertise."

Vade Secure and General Catalyst are thrilled to forge this new partnership to fulfill Vade Secure's mission to keep businesses around the world safe from email-based cyber attacks.

*Vade Secure's financing agreement with General Catalyst is currently pending regulatory approval by French authorities.*

**About Vade Secure**

Vade Secure helps SMBs, enterprises, ISPs and OEMs protect their users from advanced cyberthreats, such as phishing, spear phishing, malware, and ransomware. The company's predictive email defense solutions leverage artificial intelligence, fed by data from 600 million mailboxes, to block targeted threats and new attacks from the first wave. In addition, real-time threat detection capabilities enable SOCs to instantly identify new threats and orchestrate coordinated responses. Vade Secure's technology is available as a native, API-based offering for Office 365; as cloud-based solutions; or as lightweight, extensible APIs for enterprise SOCs.

For more information, visit www.VadeSecure.com and follow the company on Twitter @VadeSecure or on LinkedIn at https://www.linkedin.com/company/vade-secure/.

**About General Catalyst**

General Catalyst is a venture capital firm with approximately $5B in total capital raised that makes seed through growth-stage investments. We back fearless entrepreneurs with the potential to build foundational enterprise technologies and ubiquitous consumer brands. With offices in San Francisco, Palo Alto, New York City, and Boston, our portfolio companies benefit from a bicoastal network of talent, customers, and opportunity. For more: www.generalcatalyst.com.

SOURCE Vade Secure

Related Links

https://www.vadesecure.com

# Also from this source

**Vade Secure Advances Low-Touch Email Security for MSPs with New...**



**Vade Secure and Datto Unveil Joint Bundle for MSPs that Combines...**



# Explore

More news releases in similar topics

High Tech Security

Computer & Electronics

Computer Software

Financing Agreements

Venture Capital

You just read:

# Vade Secure Enters €70M Financing Agreement with General Catalyst

NEWS PROVIDED BY

**Vade Secure**

Jun 12, 2019, 09:00 ET

SHARE THIS ARTICLE



Contact PR Newswire

☐ 888-776-0942
   from 8 AM - 10 PM ET
Contact Us

**Products**

Cision Communication
Cloud®
For Marketers
For Public Relations
For IR & Compliance
For Agency
For Small Business
All Products

**About**

About PR Newswire
About Cision
Become a Publishing Partner
Become a Channel Partner
Careers

Global Sites

**My Services**

All New Releases
Online Member Center
ProfNet

Terms of Use  |  Privacy Policy  |  Information Security Policy
Site Map  |  RSS  |  Cookie Settings

Copyright © 2019 PR Newswire Association LLC. All Rights Reserved. A
Cision company.