Colin H. Murray (SBN 159142)
  colin.murray@bakermckenzie.com
**BAKER & McKENZIE LLP**
Two Embarcadero Center, 11th Floor
San Francisco, CA  94111-3802
Telephone:  +1 415 576 3000
Facsimile:   +1 415 576 3099

Danielle L. Benecke (SBN 314896)
  danielle.benecke@bakermckenzie.com
**BAKER & McKENZIE LLP**
600 Hansen Way
Palo Alto, CA  94304
Telephone:  +1 650 856 2400
Facsimile:   +1 650 856 9299

Attorneys for Defendants,
VADE SECURE, INCORPORATED;  and
VADE SECURE SASU.
[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| PROOFPOINT, INC.; CLOUDMARK LLC,<br><br>                          Plaintiffs,<br><br>          v.<br><br>VADE SECURE, INCORPORATED; VADE SECURE SASU; OLIVIER LEMARIÉ,<br><br>                          Defendants. | **Case No. 3:19-cv-04238-MMC**<br><br>**Date Action Filed: July 23, 2019**<br><br>**DEFENDANTS VADE SECURE, INCORPORATED AND VADE SECURE SASU'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**<br><br>**JURY TRIAL DEMANDED**<br><br>**Original Complaint Filed: July 23, 2019**<br><br>**Courtroom: 7, 19th Floor**<br>**Judge: Maxine M. Chesney**<br><br>**San Francisco Courthouse**<br>**450 Golden Gate Avenue**<br>**San Francisco, California 94102** |

Defendants Vade Secure, Incorporated ("Vade Inc.") and Vade Secure SASU ("Vade SASU") (collectively "Vade Defendants" or "Vade"), by and through their counsel, file this Third Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiffs Proofpoint, Inc. ("Proofpoint") and Cloudmark, LLC's ("Cloudmark"; collectively with Proofpoint, "Plaintiffs") First Amended Complaint ("Complaint"):

Vade Defendants deny each and every matter, allegation, or thing in the Complaint except as may be affirmatively admitted or alleged herein.  Moreover, to the extent any of the headings used by Plaintiffs in the Complaint constitute allegations of fact to which a response is required, Vade Defendants deny all the allegations contained in those headings.

## **RESPONDING TO THE ALLEGATIONS IN THE COMPLAINT**

Subject to and without waiving any of the affirmative defenses or available remedies set forth in this Answer or otherwise available at law or equity, Vade Defendants respond to the separate, numbered paragraphs of Plaintiffs' Complaint as follows:

1.      Vade Defendants deny the allegations in paragraph 1.

2.      Vade Defendants admit that at one time Lemarié was a Cloudmark employee.  Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 2 and therefore deny them.

3.      Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 3 and therefore deny them.

4.      Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 4 and therefore deny them.

5.      Vade Defendants admit that Lemarié is no longer a Cloudmark employee.  Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 5 and therefore deny them.

6.      Vade Defendants admit that Lemarié is now a Vade Inc. employee.  Vade Defendants deny the remaining allegations in paragraph 6.

7.      Vade Defendants admit that they develop and market cybersecurity products.  Vade Defendants deny the remaining allegations in paragraph 7.

1

8.      The patent application and marketing materials referenced in paragraph 8 speak for themselves.  Vade Defendants deny the remaining allegations in paragraph 8.

9.      Vade Defendants admit that Plaintiffs filed an "Exhibit L" with the Complaint, and that document speaks for itself.  Defendants deny the allegations in paragraph 9.

10.     Vade Defendants deny the allegations in paragraph 10.

11.     Paragraph 11 states legal conclusions to which no response is required.  Vade Defendants deny the remaining allegations in paragraph 11.

12.     Vade Defendants admit that Plaintiffs filed a Complaint initiating this lawsuit.  Vade Defendants deny that Plaintiffs are entitled to any remedy or relief as a result of bringing this action.  Vade Defendants deny the remaining allegations in paragraph 12.

## THE PARTIES

13.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 13 and therefore deny them.

14.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 14 and therefore deny them.

15.     Vade Defendants admit the allegations in paragraph 15.

16.     Vade Defendants admit the allegations in paragraph 16.

17.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 17 and therefore deny them.

## JURISDICTION AND VENUE

18.     Paragraph 18 states legal conclusions to which no response is required.  Vade Defendants deny the remaining allegations in paragraph 18.

19.     Paragraph 19 states legal conclusions to which no response is required.  Vade Defendants deny the remaining allegations in paragraph 19.

20.     Paragraph 20 states legal conclusions to which no response is required.  Vade Defendants deny the remaining allegations in paragraph 20.

21.     Paragraph 21 states legal conclusions to which no response is required.  Vade Defendants deny the remaining allegations in paragraph 21.

2

22.     Paragraph 22 states legal conclusions to which no response is required.   Vade Defendants deny the remaining allegations in paragraph 22.

23.     Paragraph 23 states legal conclusions to which no response is required.   Vade Defendants deny the remaining allegations in paragraph 23.

24.     Paragraph 24 states legal conclusions to which no response is required.   Vade Defendants deny the remaining allegations in paragraph 24.

25.     Paragraph 25 states legal conclusions to which no response is required.   Vade Defendants deny the remaining allegations in paragraph 25.

**INTRADISTRICT ASSIGNMENT**

26.     The first sentence of paragraph 26 states legal conclusions to which no response is required.   Because this action has already been assigned to the San Francisco Division of the Northern District of California, Vade Defendants need not respond to the remaining allegations pertaining to intradistrict assignment.   Vade Defendants deny the remaining allegations in paragraph 26.

**ALLEGATIONS APPLICABLE TO ALL CLAIMS**

27.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 27 and therefore deny them.

28.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 28 and therefore deny them.

29.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 29 and therefore deny them.

30.     Vade Defendants admit that Plaintiffs filed an exhibit titled "Exhibit A" with the Complaint, and that document speaks for itself.   Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 30 and therefore deny them.

31.     Vade Defendants admit that Plaintiffs filed an exhibit titled "Exhibit A" with the Complaint, and that document speaks for itself.   Vade Defendants lack sufficient knowledge or

3

Case No. 3:19-cv-04238-MMC
DEFENDANTS VADE SECURE, INCORPORATED AND VADE SECURE SASU'S
THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

information to form a belief as to the truth of the remaining allegations in paragraph 31 and therefore deny them.

32.     Vade Defendants admit that Plaintiffs filed an exhibit titled "Exhibit A" with the Complaint, and that document speaks for itself.   Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 32 and therefore deny them.

33.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 33 and therefore deny them.

34.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 34 and therefore deny them.

35.     Vade Defendants admit that Plaintiffs filed exhibits titled "Exhibit A" and "Exhibit B" with the Complaint, and those documents speak for themselves.   Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore deny them.

36.     Vade Defendants admit that Plaintiffs filed exhibits titled "Exhibit A," "Exhibit C," "Exhibit D," and "Exhibit E" with the Complaint, and those documents speak for themselves.   Vade Defendants also admit that Olivier Lemarié is now a Vade Inc. employee, and that Alexandre Boussinet, Xavier Delannoy, and Guillaume Séjourné are now Vade SASU employees.   Vade Defendants deny the remaining allegations in paragraph 36.

37.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 37 and therefore deny them.

38.     Vade Defendants admit that Olivier Lemarié is currently Vade Inc.'s Chief Technical Officer.   Vade Defendants also admit that Alexandre Boussinet, Xavier Delannoy, and Guillaume Séjourné are now Vade SASU employees.   Vade Defendants deny the remaining allegations in paragraph 38.

39.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 39 and therefore deny them.

4

40.     Vade Defendants admit that Plaintiffs filed an exhibit titled "Exhibit F" with the Complaint, and that document speaks for itself.  Vade Defendants deny the remaining allegations in paragraph 40.

41.     Vade Defendants admit that Plaintiffs filed exhibits titled "Exhibit H," "Exhibit I," and "Exhibit J" with the Complaint, and those documents speak for themselves.  Vade Defendants deny the remaining allegations in paragraph 41.

42.     Vade Defendants admit that Plaintiffs filed an exhibit titled "Exhibit K" with the Complaint, and that document speaks for itself.  Vade Defendants deny the remaining allegations in paragraph 42.

43.     Vade Defendants admit that Plaintiffs filed an exhibit titled "Exhibit L" with the Complaint, and that document speaks for itself.  Vade Defendants deny the remaining allegations in paragraph 43.

44.     Vade Defendants admits that they are developing an MTA product.  Vade Defendants deny the remaining allegations in paragraph 44.

45.     Vade Defendants admit that Lemarié gave a presentation in 2018.  Vade Defendants deny the remaining allegations in paragraph 45.

**Proofpoint and Cloudmark Protect Their Confidential and Proprietary, Including Trade Secret, Information**

46.     Paragraph 46 states legal conclusions to which no response is required.  Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 46 and therefore deny them.

47.     Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 47 and therefore deny them.

48.     Paragraph 48 states legal conclusions to which no response is required.  Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 48 and therefore deny them.

49.     Paragraph 49 states legal conclusions to which no response is required.   Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 49 and therefore deny them.

50.     Paragraph 50 states legal conclusions to which no response is required.   Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 50 and therefore deny them.

51.     Paragraph 51 states legal conclusions to which no response is required.   Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 51 and therefore deny them.

52.     Paragraph 52 states legal conclusions to which no response is required.   Vade Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 52 and therefore deny them.

53.     Vade Defendants admit that Lemarié is now a Vade Inc. employee.  Vade Defendants deny the remaining allegations in paragraph 53.

## COUNT I – TRADE SECRET MISAPPROPRIATION

### Misappropriation of Trade Secrets under the DTSA, 18 U.S.C. § 1836 et seq.

### (Against all Defendants)

54.     With respect to Plaintiffs' statement purporting to incorporate their foregoing allegations into their cause of action, no admission or denial is required.   Vade Defendants incorporate their responses above to paragraphs 1 through 53 of the Complaint by this reference as if set forth in their entirety here.

55.     Vade Defendants deny the allegations in paragraph 55.

56.     Vade Defendants deny the allegations in paragraph 56.

57.     Vade Defendants deny the allegations in paragraph 57.

58.     Vade Defendants deny the allegations in paragraph 58.

59.     Vade Defendants deny the allegations in paragraph 59.

60.     Vade Defendants deny the allegations in paragraph 60.

61.     Vade Defendants deny the allegations in paragraph 61.

6

62.     Vade Defendants deny the allegations in paragraph 62.

63.     Vade Defendants deny the allegations in paragraph 63.

64.     Vade Defendants deny the allegations in paragraph 64.

65.     Vade Defendants deny the allegations in paragraph 65.

66.     Vade Defendants deny the allegations in paragraph 66.

67.     Vade Defendants deny the allegations in paragraph 67.

68.     Vade Defendants deny the allegations in paragraph 68.

69.     Vade Defendants deny the allegations in paragraph 69.

70.     Vade Defendants deny the allegations in paragraph 70.

71.     Vade Defendants deny the allegations in paragraph 71.

72.     Vade Defendants deny the allegations in paragraph 72.

73.     Vade Defendants deny the allegations in paragraph 73.

74.     Vade Defendants deny the allegations in paragraph 74.

## <u>COUNT II – BREACH OF CONTRACT</u>

**Unauthorized Disclosure and Failure to Maintain Confidentiality of**

**Cloudmark Proprietary Information**

**(Against Lemarié)**

75.     With respect to Plaintiffs' statement purporting to incorporate their foregoing allegations into their cause of action, no admission or denial is required.   Vade Defendants incorporate their responses above to paragraphs 1 through 74 of the Complaint by this reference as if set forth in their entirety here.

76.     Paragraph 76 states legal conclusions to which no response is required.   Vade Defendants deny any and all interpretations or characterizations of the PIIA in paragraph 76.  Vade Defendants deny the remaining allegations in paragraph 76.

77.     Paragraph 77 states legal conclusions to which no response is required.   Vade Defendants deny any and all interpretations or characterizations of the PIIA in paragraph 77.  Vade Defendants deny the remaining allegations in paragraph 77.

78.   Paragraph 78 states legal conclusions to which no response is required.   Vade Defendants deny any and all interpretations or characterizations of the PIIA in paragraph 78.   Vade Defendants deny the remaining allegations in paragraph 78.

79.   Vade Defendants deny the allegations in paragraph 79.

80.   Vade Defendants deny the allegations in paragraph 80.

81.   Vade Defendants deny the allegations in paragraph 81.

## COUNT III – BREACH OF CONTRACT

### Failure to Disclose Inventions

### (Against Lemarié)

82.   With respect to Plaintiffs' statement purporting to incorporate their foregoing allegations into their cause of action, no admission or denial is required.   Vade Defendants incorporate their responses above to paragraphs 1 through 81 of the Complaint by this reference as if set forth in their entirety here.

83.   Paragraph 83 states legal conclusions to which no response is required.   Vade Defendants deny the remaining allegations in paragraph 83.

84.   Paragraph 84 states legal conclusions to which no response is required.   Vade Defendants deny any and all interpretations or characterizations of the PIIA in paragraph 84.   Vade Defendants deny the remaining allegations in paragraph 84.

85.   Paragraph 85 states legal conclusions to which no response is required.   Vade Defendants deny any and all interpretations or characterizations of the PIIA in paragraph 85.   Vade Defendants deny the remaining allegations in paragraph 85.

86.   Vade Defendants deny the allegations in paragraph 86.

87.   Vade Defendants deny the allegations in paragraph 87.

88.   Vade Defendants deny the allegations in paragraph 88.

89.   Vade Defendants deny the allegations in paragraph 89.

## COUNT IV – BREACH OF CONTRACT

### Failure to Maintain and Make Available Cloudmark Company Records

### (Against Lemarié)

90.     With respect to Plaintiffs' statement purporting to incorporate their foregoing allegations into their cause of action, no admission or denial is required.   Vade Defendants incorporate their responses above to paragraphs 1 through 89 of the Complaint by this reference as if set forth in their entirety here.

91.     Paragraph 91 states legal conclusions to which no response is required.   Vade Defendants deny the remaining allegations in paragraph 91.

92.     Paragraph 92 states legal conclusions to which no response is required.   Vade Defendants deny any and all interpretations or characterizations of the PIIA in paragraph 92.   Vade Defendants deny the remaining allegations in paragraph 92.

93.     Paragraph 93 states a legal conclusion to which no response is required.   Vade Defendants deny the remaining allegations in paragraph 93.

94.     Vade Defendants deny the allegations in paragraph 94.

95.     Vade Defendants deny the allegations in paragraph 95.

96.     Vade Defendants deny the allegations in paragraph 96.

97.     Vade Defendants deny the allegations in paragraph 97.

## COUNT V – BREACH OF CONTRACT

### Failure to Deliver Materials Containing Cloudmark Proprietary Information

### (Against Lemarié)

98.     With respect to Plaintiffs' statement purporting to incorporate their foregoing allegations into their cause of action, no admission or denial is required.   Vade Defendants incorporate their responses above to paragraphs 1 through 97 of the Complaint by this reference as if set forth in their entirety here.

99.     Paragraph 99 states a legal conclusion to which no response is required.   Vade Defendants deny the remaining allegations in paragraph 99.

100.     Vade Defendants deny the allegations in paragraph 100.

9

101.   Vade Defendants deny the allegations in paragraph 101.

102.   Vade Defendants deny the allegations in paragraph 102.

103.   Vade Defendants deny the allegations in paragraph 103.

104.   Vade Defendants deny the allegations in paragraph 104.

### VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

105.   With respect to Plaintiffs' statement purporting to incorporate their foregoing allegations into their cause of action, no admission or denial is required. Vade Defendants incorporate their responses above to paragraphs 1 through 104 of the Complaint by this reference as if set forth in their entirety here.

106.   Vade Defendants deny the allegations in paragraph 106.

### JOINT AND SEVERAL LIABILITY

107.   With respect to Plaintiffs' statement purporting to incorporate their foregoing allegations into their cause of action, no admission or denial is required.   Vade Defendants incorporate their responses above to paragraphs 1 through 106 of the Complaint by this reference as if set forth in their entirety here.

108.   Vade Defendants deny the allegations in paragraph 108.

### JURY DEMAND

109.   Vade Defendants need not respond to Plaintiffs' jury demand and any allegations relating thereto.

### PLAINTIFFS' PRAYER FOR RELIEF

Vade Defendants deny that Plaintiffs are entitled to any relief whatsoever, either as requested in the Complaint or otherwise.

### VADE DEFENDANTS' AFFIRMATIVE DEFENSES

110.   By alleging the Affirmative Defenses set forth below, Vade Defendants do not admit or concede liability on any claim brought by Plaintiffs, nor do Vade Defendants concede that they bear the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

**FIRST DEFENSE**

**(Failure to State a Claim)**

111.    Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to state a claim(s) upon which relief can be granted.

**SECOND DEFENSE**

**(Independent Invention)**

112.    Plaintiffs' trade secret claim is barred, in whole or in part, by the doctrine of independent invention.

**THIRD DEFENSE**

**(Readily Ascertainable Through Proper Means)**

113.    Plaintiffs' trade secret misappropriation claim(s) is barred, in whole or in part, because Plaintiff(s) alleged trade secrets are readily ascertainable through proper means.

**FOURTH DEFENSE**

**(Estoppel)**

114.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of express and/or implied estoppel.

**FIFTH DEFENSE**

**(Unclean Hands)**

115.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

**SIXTH DEFENSE**

**(Waiver)**

116.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of express and/or implied waiver.

**<u>RESERVATION OF RIGHTS</u>**

Vade Defendants reserve the right to raise additional affirmative and other defenses as they are discovered or become available.

**AMENDED COUNTERCLAIMS**

Vade Defendants further submit the following Amended Counterclaims and allege as follows:

**Jurisdiction and Venue**

1.      This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367 because these Counterclaims are so related to Plaintiffs' claims in the above-captioned lawsuit, which are within the Court's original jurisdiction, that these Counterclaims form part of the same case or controversy.   This Court further has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 15 and 15 U.S.C. §26 because they arise, in part, under the laws of the United States.

2.      This Court has general and specific personal jurisdiction over Proofpoint, Inc. because it regularly conducts business within this jurisdiction by at least operating its principal place of business at 892 Ross Drive, Sunnyvale, California 94089.   Further, Proofpoint's unlawful actions giving rise the Vade Defendants' Counterclaims occurred in the State of California.   Indeed, Proofpoint has voluntarily submitted to this Court's jurisdiction by instituting this action in the first instance.

3.      This Court has general and specific personal jurisdiction over Cloudmark LLC because it regularly conducts business within this jurisdiction, by at least operating its principal place of business at 892 Ross Drive, Sunnyvale, California 94089.   Further, Cloudmark's unlawful actions giving rise the Vade Defendants' Counterclaims occurred in the State of California.   Indeed, Cloudmark has voluntarily submitted to this Court's jurisdiction by instituting this action in the first instance.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all Plaintiffs are residents of the State of California and reside in this judicial district.

**The Parties**

5.     Vade Secure, Incorporated ("Vade Inc.") is a corporation organized under the laws of the State of California, with its principal place of business at 100 Pine Street, Suite 1250, San Francisco, California 94111.

6.     Vade Secure SASU ("Vade SASU") is a "société par actions simplifiée unipersonnelle" organized under the laws of France, with its principal place of business at 2 bis avenue Antoine Pinay, Parc d'activites des 4 vents in HEM (59510) France.

7.     On information and belief, Proofpoint, Inc. is a public corporation organized under the laws of the State of Delaware, with its principal place of business at 892 Ross Drive, Sunnyvale, California 94089.

8.     On information and belief, Cloudmark LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 892 Ross Drive, Sunnyvale, California 94089.

**The Vade Defendants**

9.     Vade SASU was founded in 2008, in Hem France.  From its inception, Vade SASU's singular focus has been developing and offering email security solutions to protect customers' email boxes from a variety of malicious attacks.  One of the first products developed and offered by Vade was its Email Content Filter (the "Content Filter"), which has been publicly advertised by Vade since 2008.  The Content Filter was developed to detect and filter out email attacks, regardless of their sophistication or complexity.  Vade's Content Filter is designed to block, among other things, phishing attacks, polymorphic and zero day attacks, spam, and gray mail.  As one customer has said, "[s]ince implementing Vade Secure, we have gone from spam being a number one problem to having it well under control."

10.    Vade's Content Filter is proprietary to and developed independently by Vade.  With the Content Filter as its flagship product for many years, Vade has consistently, since its founding in 2008, publicly advertised the Content Filter and its features.  Competitors that also offer email security products, like Cloudmark and Proofpoint, have been aware of Vade's Content Filter and its features well before this lawsuit was filed.  Yet, at the time this lawsuit was filed, Plaintiffs did not

13

allege that the Content Filter used any allegedly misappropriated trade secrets belonging to Plaintiffs. Further, this lawsuit has now been pending for over 16 months, and Plaintiffs have failed to provide any evidence of or allegation that the Content Filter was developed with or is using Plaintiffs' alleged trade secrets.

11.   In addition to the Content Filter, Vade, over the years, has continued to develop products focused on email security, the vast majority of which have not been accused in this lawsuit. A summary of the development and features for some of those products is provided as follows:

- **IsItPhishing** - IsItPhishing was created between 2012 and 2015 and was provided at isitphishing.org (a publicly-accessible website for the Vade Retro project) since at least March 2014.  Notably, since March 2014, the IsItPhishing service has been described publicly as follows:  "Email is the only communication tool that is as free as it is independent, universal and official. However, it has been endangered by security attacks. In order to protect it, Vade Retro Technology [n/k/a Vade Inc.] is providing the free service **isitphishing.org** to the community with the purpose of combating phishing."

  Also, as early as March 2014, Vade made public that IsItPhishing combatted phishing with several types of analyses, including "analysis of the URL's characteristics," "analysis of possible redirections to the final page," "analysis of the final page."  Vade further made public that IsItPhishing made decisions based on several mechanisms, including, "comparison against a signature database of phishing pages updated daily," and "machine learning."  Moreover, a Vade patent disclosing isitphishing.org was filed as early as June 2016, and Vade also made IsItPhishing available as an API and product offering at least by 2016.  As described by Vade at isitphishing.org/how-it-works and isitphishing.ai:  "ISITPHISHING is an automatic website exploration engine which, based on the community feeds & data, qualifies the phishing content websites.  Based on a heuristic technology coupled with a machine learning, ISITPHISHING is efficient against agile and small waves that contain shortened dynamic links. The webpage exploration is a unique technology made in 1.8 seconds at the time-of-click. Users are protected and brands are alerted during and after the phishing wave."

14

- **Filterd** – Vade Secure Filterd is a daemon that provides a REST API-based connector to Vade Secure's content filter.  Filterd is meant to work in most environments with little integration work needed.  In addition to the REST API connector, Filterd also provides a Milter connector, a raw HTTP connector, and an SMTP connector.  Vade Secure Filterd has been on the market since at least 2017.

- **Mailstro** – Vade Secure Mailstro is a daemon that works on and as a mail transfer agent ("MTA").  Mailstro provides a milter integration for the Content Filter and it also provides a LUA-based scripting engine that allows customers to write specific filtering rules and to interact with SMTP sessions in the protocol layer.  Mailstro also runs several modules that can be called by the scripts.  Vade Secure Mailstro has been on the market since at least 2013 and was initially developed in 2012-2013.

- **Global Threat Intelligence** – Vade Secure Global Threat Intelligence provides predictive defense powered by artificial intelligence.  Protecting over 400 million mailboxes, Vade analyzes hundreds of millions of emails every day, and can quickly identify both domestic and worldwide threats—whether they are new ransomwares, phishing attempts, spam waves, etc.  Global Threat Intelligence gathers information on each malicious email Vade receives, including information on its contents and attachments.  Vade Secure Global Threat Intelligence has been in commercial production since at least 2015.

12.     By 2016, Vade SASU was offering products and solutions directed to, among numerous other threats, anti-phishing, anti-spear phishing, and anti-malware, using techniques such as heuristic filtering, machine learning, and behavioral analysis.  Indeed, as of February 2016, Vade SASU had obtained numerous patents in the email security space, including "Identity Match," which detects when a hacker mimics the message of a trusted source by studying the trusted sender to detect small variations in their day-to-day communications.  By having a singular focus on email security and dedicated to continued innovation, Vade SASU became a leader in email security solutions outside of the U.S.  Vade SASU was also poised to become a leader in the U.S. through its subsidiary Vade Inc.

15

13.     Consistent with their pattern of innovation, in June 2018, Vade released Vade Secure for Office 365.  This product was designed to integrate with Microsoft Office 365 and provides email protection features, such as multi-faceted anti-phishing, banner-based anti-spear phishing, behavioral-based anti-malware, auto and one-click remediation, and Vade Threat Coach.  That solution has received critical acclaim.  As one customer said:  "The catch rate for Vade Secure for Microsoft 365 is a 15%, if not higher, improvement from any email filter I've seen.  Vade catches what Microsoft misses."

14.     Indeed, Vade's successes around the globe have made Vade a successful and financially stable entity for over a decade.  Vade has, in fact, repeatedly secured multiple funding and strategic partners, given the strength of the company and its management.  The strength of Vade's financial condition had been repeatedly publicized and was well known to other providers in the industry.  In June 2019, Vade SASU announced that it had arranged a funding deal worth 70 million Euros for the purpose of expanding its business into the United States.  This additional funding was widely published, and it is undisputed that Plaintiffs were well aware of Vade's secure financial condition at the time this lawsuit was filed.

## **Relevant U.S. Product Market**

15.     In the United States, a unique product market exists for email filter solutions that can scale to service a million or more email accounts at a given time.  Vade's email filter solution, such as its Content Filter, is designed to meet such a heavy traffic load.  While there are numerous entities that offer email filtering solutions in the U.S., the vast majority of those vendors do not have products that are capable of the scale necessary to service a million or more email boxes at a given time.  Accordingly, those email solutions and products lack the ability to handle the minimum traffic load and are not substitutes for email filtering products, such as Vade's Content Filter, that are designed for larger scale email filtering.

16.     Thus, a relevant product market exists for Email Filtering Products that have the capacity and scalability to filer a million or more email boxes or accounts at a given time (the "Market").  The geographic market is the United States.

16

## **Monopoly Power and Significant Barriers to Market Entry**

17.     Plaintiff Proofpoint describes itself as an enterprise security company founded in 2002.  Proofpoint has been funded by multiple venture investors and has been publicly traded since 2012.  As of 2019, Proofpoint had over 3,000 employees and revenues of close to a billion dollars.  To reach that size, Proofpoint has employed an aggressive acquisition strategy aimed at dominating the Market.  Since 2008, Proofpoint has spent hundreds of millions of dollars acquiring email security companies, including purchases of entities such as Secure Data in Motion, Abaca Technology Corporation, Sendmail, Inc., Return Path, and many others.   With each acquisition, Proofpoint removed an existing or potential competitor from the Market.   Indeed, by 2017, Proofpoint had succeeded in squeezing out the competition, leaving, upon information and belief, one main competitor, Cloudmark.  Rather than continuing to compete with Cloudmark, however, in the fourth quarter of 2017, Proofpoint acquired Cloudmark, resulting in the combination of two principal competitors in the Market.   Proofpoint has affirmatively stated that at least one purpose of the acquisition was to obtain Cloudmark's market share, and Plaintiffs have since touted themselves the "leader" in the Market.  Upon information and belief, Plaintiffs have, in fact, held a controlling share of the Market between 62% to over 80% since that acquisition.

18.     With their dominant market position and anticompetitive conduct, Plaintiffs have erected significant barriers to new competitors attempting to enter the Market.  For reasons discussed in more detail below, customers only use one email filter provider at a time, and ███████████ ████████████████████████████████████████████████████████████████████████████ ██████████████.  As just one example, Proofpoint licenses its email filter solution, which is a product offered within the Market to ███████  The contract with ██████ was entered into over a decade ago and was for an █████████████████████████████████  That contractual arrangement still exists today.  Because of the █████████████████████████████ has been using Proofpoint's email filter, to the exclusion of competition, for over a decade, even though Proofpoint's filter is a more expensive and inferior production, at least compared to Vade's Content Filter.  Thus, when an entity is contemplating whether to enter the Market, they are faced with the reality that Plaintiffs have already locked up a substantial portion of the customer base.  This represents a significant barrier to

17

entry, especially when coupled with the significant investment required of a new Market entrant to develop and bring a competing product to the Market.

19.     Plaintiffs also take advantage of Market realities that contribute to these barriers.  In particular, it typically takes customers at least four months, if not longer, to implement a new email filter in the relevant product Market.  For example, bringing on a new supplier requires, at a minimum, testing the new filter, negotiating a services agreement, as well as actually implementing the software and performing customizations such that it is compatible with the particular customer's system.  This process can take many months and significant employee time to accomplish.  It is also costly to implement a new email filter, and as a result, customers are reluctant to switch providers, even if the current filter being used is inferior.  In fact, Plaintiffs have openly acknowledged in their correspondence produced in this lawsuit that their ███████████████████ and these market realities allow them to overcharge their customers in the Market.  Thus, a potential new Market entrant is faced with the reality that Plaintiffs have ██████████████████████████, and that customers in the Market are reluctant to remove Plaintiffs' entrenched email filter, even if the new entrant could offer a superior and more cost effective product.  Again, these are significant barriers that any company faces when seeking to enter the Market.  In fact, as a result of those barriers, since 2017, despite the growing need for email filter solutions in the Market, there has not been a single new competitor enter the Market.

20.     The same realities also make it impossible for existing competitors to simply ramp up their production in the short run.  As pleaded above, it typically takes at least four months, if not longer, for a new email filter in the Market to be implemented, and the process is costly.  Further, the email filters in the Market are protecting a million or more email accounts, and thus, these filters cannot go down for months at a time, while a new filter is being installed.  The damage created by such downtime would be catastrophic.  Accordingly, Plaintiffs have positioned themselves in the Market as the dominant power and have taken advantage of ████████████████████ to

18

Case No. 3:19-cv-04238-MMC
DEFENDANTS VADE SECURE, INCORPORATED AND VADE SECURE SASU'S
THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

1  erect barriers to new market entrants, and prevent an existing competitor, like Vade, from stepping

2  in and filling a void in the short run.

3  **Plaintiffs engaged in anticompetitive conduct that caused anti-trust injury to Vade**

4        21.    Plaintiffs actively maintain their dominant market share through anti-competitive

5  conduct.  Plaintiffs conduct is, in fact, anti-competitive in three independent respects, any one of

6  which support the Sherman Act claims asserted herein.

7        22.    First, Plaintiffs have acted in an anti-competitive manner through the use of ▬▬▬

8  ▬▬▬▬▬▬▬▬▬▬.  Plaintiffs control anywhere from 62% - 80% of the Market.  They

9  are able to do so, in whole or in part, through the use of ▬▬▬▬▬▬▬▬▬▬▬▬▬

10 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬.  Indeed, customers in the

11 Market only license one email filtering solution at a time.  These customers are looking for uniform

12 filtering across the a million or more email accounts they protect, and it would be impractical and

13 unworkable to have multiple email filtering solutions operating at the same time, providing different

14 results across the managed email accounts.  As a result, when Plaintiffs enter into a contract with a

15 customer in the Market, those are ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

16       23.    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬.    For example, as plead above,

17 Plaintiffs first entered into a contract to license their email filter solution, a product offered in the

18 Market, to ▬▬▬▬▬▬.  That contract included an ▬▬▬▬▬▬▬▬▬▬▬

19 ▬▬▬.  Thus, through the use of these arrangements, Plaintiffs ▬▬▬▬▬▬▬▬▬

20 ▬▬▬▬▬▬▬▬▬▬, while they entrench their inferior email filter solution with

21 that customer.  Once Plaintiffs' inferior and costly email filter solution is in place, it becomes very

22 difficult for customers to switch providers.  In particular, as pleaded above, to move to a different

23 email filter provider, customers in the Market must spend the time and resources to, among other

24 things, test the new filter and determine whether it is a superior product, negotiate a license and

25 services agreement with the new vendor, and then actually implement the new email filter to replace

26 the incumbent.  This process is costly and takes months to accomplish.  As a result, customers in the

27 Market are reluctant to go through that process and instead, permit the ▬▬▬▬▬▬▬▬▬

28 ▬▬▬▬▬▬▬▬▬ to take effect.  Plaintiffs manipulate these Market realities and

19

use ████████████████████████████████████████████████████
████████████████████████████ That has been the case for ██████ as an example, and Plaintiffs, upon information and belief, use the same anticompetitive, ██████████████████████ ████████████ for all of their customers in the Market. Given their market position, Plaintiffs foreclose a substantial share of the Market by engaging in these improper practices.

24. This anticompetitive conduct of engaging in ██████████████████████ ████████████ further causes anti-trust injury. In particular, Plaintiffs have not gained their dominant market share through innovation, superior products, or superior customer service. Rather, Plaintiffs have taken control of the Market through Proofpoint's aggressive multi-decade acquisition strategy, in which it has, armed with deep pockets, acquired email security firms year-after-year. With each acquisition, Proofpoint both gained Market share and removed an existing or potential competitor from the Market. Perhaps the most egregious example came with Proofpoint's acquisition of its principal competitor in the Market, Cloudmark. Thus, Plaintiffs strategy has been clear—buy up the competition in the Market, and then tie up a substantial portion of the Market through ████████ ████████████████████████. Notably, Plaintiffs have acknowledged in their own correspondence produced in this lawsuit that by implementing this scheme, they have been able to overcharge customers in the Market for Plaintiffs' email filter solutions, despite that those solutions are inferior products. Indeed, ████████████████████████████████████████████████ ████████████████████████████. But because of Plaintiffs' conduct, entry into the Market is exceedingly difficult, and customers in the majority of the Market are left paying too much for inferior goods.

25. Second, in addition to Plaintiffs' anti-competitive contractual arrangements, Plaintiffs have engaged in a campaign of making knowingly false and disparaging statements about Vade— perhaps Plaintiffs' only true competitive threat—for the purpose of keeping Vade out of the Market.

26. In the years preceding the filing of this lawsuit, Vade had indeed sought to enter the Market and compete against Plaintiffs. Vade's efforts to interject competition in the Market met with initial promise. For example, ████████████████████████████████████████████ which previously contracted with Cloudmark for the provision of its email filtering solution, was,

20

upon information and belief, not satisfied with Cloudmark as a supplier.  Accordingly, █████

invited Vade Inc. to participate in a proof-of-concept ("POC"), in which Vade Inc.'s Content Filter

was compared to Cloudmark's filter.  Vade outperformed Cloudmark by a wide margin.

27.     As a result, in October 2018, Vade Inc. entered into an agreement with █████ to

provide Vade Inc.'s Content Filter for use across the millions of email accounts provided by

█████.  This agreement was significant for multiple reasons.  First, as a provider of the email filter

solution, Vade Inc. would have access to all consumer usage data, which Vade Inc. could then use

to "educate" its Content Filter, making it "smarter" and more efficient.  Conversely, without the

benefit of that data, Cloudmark's email filter would become "dumber" and less effective.  Second,

█████ is viewed as a ████████████████████.  Accordingly, when █████ switched to

Vade Inc.'s Content Filter, upon information and belief, other Market participants took notice that

new competition was finally arriving to the Market.

28.     Plaintiffs similarly took notice of Vade's entry into the Market.  Indeed, as early as

September 2018, before the █████ agreement was even executed, Plaintiffs, upon information and

belief, began to implement a calculated plan to prevent competition from encroaching into Plaintiffs'

dominant market share.  At that time, Plaintiffs, upon information and belief, began to communicate

to Market participants that they intended to bring a lawsuit against Vade for the illegitimate purpose

of requiring Vade to divert its resources to defending against such an action with the goal of

destroying Vade as a business and preventing it from entering the Market.  In furtherance of that

plan, Cloudmark has made demonstrably false statements to Vade's existing and potential Market

customers, including █████.

29.     For example, upon information and belief, Cloudmark met with █████

representatives in August 2019, approximately one month after this lawsuit was filed.  During that

meeting, Cloudmark, upon information and belief, stated that the Vade Defendants had

misappropriated Plaintiffs' alleged trade secrets and incorporated those into *all of Vade's products*.

This was a knowingly false statement.

30.     In particular, at the time those statements were made in August 2019, Plaintiffs were

required to have performed a diligent pre-suit investigation before they filed this lawsuit.  Plaintiffs'

21

allegations against Vade in this lawsuit, however, have been limited in scope.  For instance, Plaintiffs have only alleged (a) Vade's Secure for Office 365 product and (b) a mail transfer agent being developed by Vade, known as its NextGenMTA, as allegedly incorporating Plaintiffs' purported trade secrets.  While those claims are themselves baseless, Vade offers many other products that Plaintiffs were unquestionably aware of when making these false statements to ███████, but those additional products have never been put at issue in this lawsuit.  Indeed, as pleaded above, Vade's Content Filter, IsItPhishing, Filterd, Mailstro, and Global Threat Intelligence product and solution offerings were developed before any of the alleged wrongdoing occurred in this lawsuit.  Further, despite that this lawsuit has been ongoing now for over 16 months, Plaintiffs have not proffered any evidence that these other Vade products are in any way using Plaintiffs' alleged trade secrets, and no such allegations have been made.  Again, Vade marketed these products along with their features long before this lawsuit was filed, and Plaintiffs were unquestionably aware of them before bringing this action and certainly in August 2019.  Accordingly, Plaintiffs' statements that ***all of Vade's products*** had incorporated and were using Plaintiffs' alleged trade secrets, and were accused in this lawsuit, were knowingly false statements of fact at the time they were made, and they remain so today.

31.    Additionally, in a desperate attempt to win back ███████ business, Plaintiffs also, upon information and belief, falsely stated to ██████ in August 2019 that Vade was, at that point, not financially stable, that it could not afford to defend against this lawsuit, and that it would be bankrupt in the near term.  At the time those statements were made, however, Plaintiffs had become aware just one month prior that Vade had announced a funding arrangement worth 70 million Euros, and that Vade had entered into a strategic partnership agreement with a company called Datto that would allow Vade's business to further expand.  Plaintiffs were further aware that Vade had been highly successful in markets outside the U.S., and that in August 2019, Vade was secure financially and its business was thriving.  Indeed, Vade has been defending this lawsuit for close to two years, and as it was when filed, Vade remains more than financially stable.  Thus, Plaintiffs were factually aware at the time this lawsuit was brought that Vade was financially strong.  Plaintiffs' statements to ██████ that Vade, in August 2019, was financially unstable and would be shortly filing for

22

bankruptcy were not mere statements of opinion, but were knowing misrepresentations of fact about the current state of Vade's financial condition. These false statements serve no legitimate purpose and were made solely for the purpose of decreasing competition in the Market, limiting the number of email filter products available to the Market, and maintaining Plaintiffs' dominant market share. Upon information and belief, Plaintiffs' factual misrepresentations to ▇▇▇▇ were not isolated, but have continued consistent with Plaintiffs' campaign to disparage Vade in the Market.

32.     Plaintiffs' scheme to drive out competition, as well as superior products in the Market, has been successful.  For example, Vade Inc.'s agreement with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as a replacement for the MTA provided to ▇▇▇▇ by Cloudmark.  Thus, had ▇▇▇▇▇▇▇▇ Cloudmark would have been entirely excluded from the ▇▇▇▇ relationship. Rather than permit that to happen, Plaintiffs hatched their plan to bring this lawsuit and make, upon information and belief, demonstrably false statements to ▇▇▇▇, and other Market participants, that (1) all of Vade's products are accused in this suit, (2) that Vade will not be able to provide products or services to ▇▇▇▇ going forward, and that (3) Vade was not financially stable.  When asked about these allegations by ▇▇▇▇, Vade explained that they were false, and that there would be no material impact of the sham litigation on its business.  This, of course, put ▇▇▇▇ in the middle of a dispute between two vendors, and ▇▇▇▇ was not able to resolve the disputes or ascertain the veracity of the serious misrepresentations being improperly made by Plaintiffs. As result, ▇▇▇▇, upon information and belief, determined to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ with Vade Inc.—the exact result improperly sought by Plaintiffs.

33.     Plaintiffs' improper conduct was not an isolated incident.  Plaintiffs also similarly interfered with Vade Inc.'s potential relationship with ▇▇▇▇▇▇▇▇▇▇.  In particular, Vade Inc. began discussions with ▇▇▇▇ in early 2019 to provide Vade's Content Filter.  At that time, ▇▇▇▇ was using Proofpoint, but like ▇▇▇▇▇▇▇▇ upon information and belief, was not pleased with Proofpoint as a vendor.  Accordingly, in approximately March 2019, Vade Inc. participated in a POC against Proofpoint's product, and, once again, Vade Inc.'s Content Filter outperformed Proofpoint's.  As a result, by June 2019, ▇▇▇▇ and Vade had been in engaged in many months of

23

contract negotiations and exchanged numerous draft agreements.  Indeed, only a few relatively minor deal points remained to be negotiated, and ████ representative handling the negotiations stated that ████ was ready to finalize the agreement and to replace Proofpoint's inferior email filter with Vade.

34.    Desperate to prevent that from happening, Plaintiffs again implemented their scheme to prevent competition from encroaching on their market share through false statements rather than through price and quality competition on the merits.  While Vade Inc. and ████ were on the doorstep of entering into an agreement that would replace Proofpoint, Proofpoint, upon information and belief, shortly after this lawsuit was filed communicated to ████ that this action had been brought against Vade, and that all of Vade's products were developed using Plaintiffs' alleged trade secrets, which would preclude Vade from offering any products going forward.  Again, this was a knowingly false misrepresentation.  Vade's Content Filter, which was the only product being offered to ████, has never been accused of being developed with or using at any time Plaintiffs' alleged trade secrets.  The Content Filter was, in fact, developed well before any allegation of wrongdoing, and Plaintiffs were aware of its existence and features at the time this suit was initiated.  Yet, Plaintiffs never accused the Content Filter of using Plaintiffs' alleged trade secrets, and Plaintiffs have not proffered any evidence to the contrary.  The same is true for the vast majority of Vade's other products, such as IsItPhishing, Global Threat Intelligence, Filterd, and Mailstro.  Again, Plaintiffs have been aware of these other products since before lawsuit was filed, and have at no point alleged that they were developed with or are using Plaintiffs' alleged trade secrets.  Accordingly, Plaintiffs' statements to ████ to the contrary were knowingly false misrepresentations of fact at the time they were made that were designed to harm competition. Moreover, ████ was at no point negotiating to license any product from Vade that has been accused in this lawsuit, and thus, Plaintiffs' false and improper statements to ████ were not in any way related or incidental to Plaintiffs' bringing this action.

35.    Plaintiffs also, upon information and belief, falsely communicated to ████ that Vade was not financially stable, and that defending this lawsuit would easily bankrupt Vade.  For the same reasons explained above, these were not mere statements of opinion, but statements of fact concerning Vade's current financial condition.  These false statements had no legitimate purpose,

24

1  and they were made to ███, who has no interest in the outcome of this litigation.  The only plausible

2  explanation for these communications to ███, and other Market participants, is that they were

3  made in an effort to prevent Vade from further competing in the Market.  And while Vade tried to

4  explain to ███ that such statements were demonstrably untrue, ███ senior executives decided

5  to stop negotiations with Vade Inc. and maintain its relationship with Proofpoint, despite that

6  Proofpoint's product was clearly inferior.

7        36.    Thus, for now close to two years, Plaintiffs have been, upon information and belief,

8  actively disparaging the Vade Defendants in the Market to prevent the Vade Defendants from

9  reducing Plaintiffs' dominant market share.  In the process, Plaintiffs have been able to further ███

10  ███ in the Market into ██████████████ that would not have

11  otherwise been acceptable, but for Plaintiffs' improper conduct.  Accordingly, Plaintiffs' campaign

12  of false and disparaging misrepresentations constitute anti-competitive activity and has caused anti-

13  trust injury to Vade.

14        37.    Third, Plaintiffs' anti-competitive conduct also includes bringing this objectively and

15  subjectively baseless lawsuit for the sole purpose of harming competition in the short- and long-term,

16  as opposed to addressing any legitimate legal concern.  In particular, there was no objectively

17  reasonable basis for bringing this suit against the Vade Defendants at the time it was filed.  The

18  objectively baseless nature of this lawsuit was, in fact, borne out during the briefing to this Court on

19  Plaintiffs' motion for preliminary injunction.  To succeed on that motion, Plaintiffs were required to,

20  among other things, establish a likelihood of success on the merits of their trade misappropriation

21  claim—the only claim asserted against the Vade Defendants.  Thus, it was incumbent on Plaintiffs

22  to come forward and present evidence establishing what its trade secrets were and how they were

23  misappropriated by the Defendants.  If Plaintiffs had any proof to support those allegations, it would

24  have appeared during the course of the parties' briefing on that motion.  But Plaintiffs failed to

25  present any such evidence.  In fact, after considering all of Plaintiffs' briefing, which included

26  multiple expert declarations, the Court held that, "the Court finds the evidence plaintiffs offer by

27  way of elaboration is not sufficiently specific to make out a prima facie case of trade secret

28  misappropriation and, consequently, is insufficient to satisfy the first requirement for a preliminary

25

injunction." (Ct.'s Order 4, ECF No. 126.)  There was simply no objective basis for bringing this suit.

38.     There was similarly no good-faith subjective basis for filing this action.  To the contrary, for reasons explained above, Plaintiffs only brought this lawsuit to interfere with the Vade Defendants' ability to enter the Market.  Indeed, upon information and belief, Plaintiffs, again, made knowing misrepresentations to the Vade Defendants' existing and potential customers about the subject matter and effect of this lawsuit, despite that the products being offered to ███, for example, was not even accused in this action.  This lawsuit was brought by Plaintiffs, not to cure a legitimate legal harm, but rather, to prevent a new player from entering the Market.

39.     Plaintiffs' improper conduct has thus harmed not only the Vade Defendants, but also competition in the Market, and the counterclaims asserted below are being brought accordingly.

**FIRST CAUSE OF ACTION**

**(Defamation)**

40.     Vade Defendants reallege and incorporate herein by reference all of the allegations in the preceding paragraphs as if fully set forth in support of this cause of action.

41.     At all relevant times alleged herein, all of Plaintiffs' employees were acting in their official capacity as Plaintiffs' employees and, therefore, their actions are attributable to Plaintiffs.

42.     Plaintiffs, upon information and belief, have made false and misleading representations to Vade Defendants' customers and potential customers including at least that:

       a.  Vade Defendants are not financially stable;

       b.  Vade Defendants will soon be bankrupt;

       c.  The present lawsuit by Plaintiffs will "easily bankrupt" Vade Defendants;

       d.  All of Vade's products were developed using Plaintiffs' alleged trade secrets;

       e.  The lawsuit is against all of Vade Defendants' products;  and/or

       f.  The Vade Defendants will not be able to provide any products to their existing or potential customers.

43.     Upon information and belief, Plaintiffs have made these statements about the Vade Defendants to existing and potential customers on numerous occasions.  Plaintiffs have, upon

26

information and belief, employed this strategy to maintain pressure on these third parties and to reinforce the damaging nature of these false statements.  Indeed, these statements have adversely affected Vade Defendants' business and reputation and are defamatory without necessity of explanatory matter.  These statements were made to Vade Defendants' customers and potential customers with whom Vade Defendants had agreements in principle to provide products and services.

44.     For example, Plaintiffs made the statements in paragraph 42 a.–f. to Vade's potential customer ▮▮▮ .  In particular, very soon after this lawsuit was filed, Plaintiffs stated to ▮▮▮ , who was close to licensing Vade's Content Filter, that *all* of Vade's products were developed using Plaintiffs' trade secrets, that all of Vade's products were at issue in this lawsuit, and that Vade would not be able to provide any of its products going forward as a result.  Plaintiffs' own Complaint that initiated this suit, however, does not support those demonstrably false statements.  In particular, in this lawsuit, and at the time these false statements were made to ▮▮▮ , Plaintiffs have only ever alleged that Vade's Secure for Office 365 product and a mail transfer agent being developed by Vade, known as its NextGenMTA, as allegedly incorporating Plaintiffs' purported trade secrets.  While those claims are themselves baseless, Vade offers many other products that Plaintiffs were unquestionably aware of when making these false statements.  Indeed, as plead above, Vade's Content Filter, IsItPhishing, Filterd, Mailstro, and Global Threat Intelligence product and solution offerings were developed before any of the alleged wrongdoing occurred in this lawsuit.  Further, despite that this lawsuit has been ongoing now for over 16 months, Plaintiffs have not uncovered any evidence that these other Vade products are in any way using Plaintiffs' alleged trade secrets, and no such allegations have been made.  Again, Vade has marketed these products along with their features long before this lawsuit was filed, and Plaintiffs were unquestionably aware of them before bringing this action.  Accordingly, Plaintiffs' statements that ***all of Vade's products*** had incorporated and were using Plaintiffs' alleged trade secrets, that *all* of Vade's products were at issue in this lawsuit, and that Vade would not be able to provide any products going forward as a result were knowingly false statements of fact, and they remain so today.

27

45.     Plaintiffs also, upon information and belief, falsely stated to ▮ at the same time that at the time this lawsuit was filed Vade was financially unstable, it would soon be filing bankruptcy, and that it could not afford to defend this lawsuit.   At the time those statements were made, however, Plaintiffs had become aware just one month prior that Vade had announced a funding arrangement worth 70 million Euros, and that Vade had entered into a strategic partnership agreement with a company called Datto that would allow Vade's business to further expand. Plaintiffs were further aware that Vade had been highly successful in markets outside the U.S., and that in August 2019, Vade was very secure financially and its business was thriving.  Indeed, Vade has been defending this lawsuit for close to two years, and as it was when filed, Vade remains more than financially stable.  Thus, Plaintiffs were factually aware at the time this lawsuit was brought that Vade was financially strong.  Plaintiffs' statements to ▮ that Vade, at the time this lawsuit was filed, was financially unstable and would be shortly filing for bankruptcy were not mere statements of opinion, but were knowing misrepresentations of fact about the current state of Vade's financial condition.

46.     These statements, by imputing at least the items at paragraphs 42 a. through f. above, also tend to directly injure Vade Defendants in respect of their trade or business by having a natural tendency to lessen their profits.  Further, as a natural consequence and a direct and proximate result of Plaintiffs' knowingly false statements, Vade Defendants lost the business and economic relationships with those customers and potential customers.

47.     Plaintiffs' statements establish a prima facie case of actionable defamation because they involve Vade Defendants' business, were published, were and are false, and were made with the knowledge that they were false, and with spite, hatred, and ill will toward Vade Defendants. Plaintiffs had no reasonable grounds to believe the statements were true, and acted with reckless disregard for ascertaining the truth.  Thus, Plaintiffs' statements are actionable, and actionable per se, and Vade Defendants are entitled to damages in an amount to be proven at trial.

48.     As a natural consequence and proximate result of Plaintiffs' defamatory statements, Vade Defendants have suffered actual damages in the form of loss of customers and harm to their

reputation, and were exposed to contempt. Vade Defendants therefore suffered specific and general damages, and are entitled to punitive damages, in an amount to be proven at trial.

49.     As a proximate result of Plaintiffs' defamatory statements, Vade Defendants have suffered and will continue to suffer irreparable harm unless Plaintiffs cease making the statements alleged herein. Vade Defendants have no adequate remedy at law and are entitled to preliminary and permanent injunctive relief.

## SECOND CAUSE OF ACTION

### (Commercial Disparagement)

50.     Vade Defendants reallege and incorporate herein by reference all of the allegations in the preceding paragraphs as if fully set forth in support of this cause of action.

51.     At all relevant times alleged herein, all of Plaintiffs' employees were acting in their official capacity as Plaintiffs' employees and, therefore, their actions are attributable to Plaintiffs.

52.     Plaintiffs have made false and misleading representations to Vade Defendants' customers and potential customers regarding the Vade Defendants products and business including at least that:

a.     Vade Defendants are not financially stable;

b.     Vade Defendants will soon be bankrupt;

c.     The present lawsuit by Plaintiffs will "easily bankrupt" Vade Defendants;

d.     All of Vade's products were developed using Plaintiffs' alleged trade secrets;

e.     The lawsuit is against all of Vade Defendants' products; and/or

f.     The Vade Defendants will not be able to provide any products to their existing or potential customers.

53.     In each instance in which Plaintiffs have, upon information and belief, made these statements, Plaintiffs made them with knowledge of their falsity, or acted with reckless disregard for their falsity. Plaintiffs, upon information and belief, made these statements with the intent to harm the Vade Defendants' interests. Plaintiffs, upon information and belief, made these statements to ▮▮▮ for the sole purpose of wrongfully disparaging the Vade Defendants' products and business such that it could improperly maintain ▮▮▮ business.

29

54.     For example, Plaintiffs made the statements in paragraph 53 a.-f. to Vade's potential customer ███.  In particular, very soon after this lawsuit was filed, Plaintiffs stated to ███, who was close to licensing Vade's Content Filter, that **all** of Vade's products were developed using Plaintiffs' trade secrets, that all of Vade's products were at issue in this lawsuit, and that Vade would not be able to provide any of its products going forward as a result.  Plaintiffs' own Complaint that initiated this suit, however, does not support those demonstrably false statements.  In particular, in this lawsuit, and at the time these false statements were made to ███, Plaintiffs have only ever alleged that Vade's Secure for Office 365 product and a mail transfer agent being developed by Vade, known as its NextGenMTA, as allegedly incorporating Plaintiffs' purported trade secrets.  While those claims are themselves baseless, Vade offers many other products that Plaintiffs were unquestionably aware of when making these false statements.  Indeed, as pleaded above, Vade's Content Filter, IsItPhishing, Filterd, Mailstro, and Global Threat Intelligence product and solution offerings were developed before any of the alleged wrongdoing occurred in this lawsuit.  Further, despite that this lawsuit has been ongoing now for over 16 months, Plaintiffs have not uncovered any evidence that these other Vade products are in any way using Plaintiffs' alleged trade secrets, and no such allegations have been made.  Again, Vade has marketed these products along with their features long before this lawsuit was filed, and Plaintiffs were unquestionably aware of them before bringing this action.  Accordingly, Plaintiffs' statements that **all of Vade's products** had incorporated and were using Plaintiffs' alleged trade secrets, that **all** of Vade's products were at issue in this lawsuit, and that Vade would not be able to provide any products going forward as a result were knowingly false statements of fact, and they remain so today.

55.     Plaintiffs also, upon information and belief, falsely stated to ███ at the same time that at the time this lawsuit was filed Vade was financially unstable, it would soon be filing bankruptcy, and that it could not afford to defend this lawsuit.   At the time those statements were made, however, Plaintiffs had become aware just one month prior that Vade had announced a funding arrangement worth 70 million Euros, and that Vade had entered into a strategic partnership agreement with a company called Datto that would allow Vade's business to further expand. Plaintiffs were further aware that Vade had been highly successful in markets outside the U.S., and

30

that in August 2019, Vade was very secure financially and its business was thriving.  Indeed, Vade has been defending this lawsuit for close to two years, and as it was when filed, Vade remains more than financially stable.  Thus, Plaintiffs were factually aware at the time this lawsuit was brought that Vade was financially strong.  Plaintiffs' statements to ▮▮▮▮ that Vade, at the time this lawsuit was filed, was financially unstable and would be shortly filing for bankruptcy were not mere statements of opinion, but were knowing misrepresentations of fact about the current state of Vade's financial condition.

56.    Plaintiffs' statements have caused specific pecuniary damage to the Vade Defendants by causing the Vade Defendants to lose the opportunity to license their Content Filter product to ▮▮▮▮ .

57.    As a natural consequence and proximate result of Plaintiffs' commercially disparaging statements, Vade Defendants have suffered actual damages in the form of loss of at least ▮▮▮▮ business, which would have resulted in millions of dollars in ▮▮▮▮ to the Vade Defendants.  Further, Plaintiffs' actions have been both oppressive and malicious with intent to cause injury to Vade Defendants and with conscious disregard of the rights of others.  Accordingly, Vade Defendants are entitled to exemplary damages, in addition to compensatory damages, as permitted by law and to be proven at trial.

58.    As a proximate result of Plaintiffs' ongoing commercially disparaging statements, Vade Defendants have suffered and will continue to suffer irreparable harm unless Plaintiffs cease making the statements alleged herein.  Vade Defendants have no adequate remedy at law and are entitled to preliminary and permanent injunctive relief.

## THIRD CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

59.    Vade Defendants reallege and incorporate herein by reference all of the allegations in the preceding paragraphs as if fully set forth in support of this cause of action.

60.    At all relevant times alleged herein, all of Plaintiffs' employees were acting in their official capacity as Plaintiffs' employees and, therefore, their actions are attributable to Plaintiffs.

31

61.     Plaintiffs deliberately interfered with Vade Defendants' prospective economic advantage.  Vade Defendants have enjoyed prospective economic relationships with their customers and prospective customers that were of substantial economic benefit to Vade Defendants.  With knowledge of Vade Defendants' valuable relationships with their customers and prospective customers, Plaintiffs' false and misleading statements and other acts alleged in paragraphs above were knowingly designed to interfere with and disrupt those relationships.  Plaintiffs' actions were independently wrongful as they violated California law as alleged herein.

62.     For example, as alleged above, Plaintiffs interfered with the Defendants' prospective economic relationship with ███.  In particular, Vade Inc. began discussions with ███ in early 2019 to provide its email filter solution.  At that time, ███ was using Proofpoint to provide its email filtering solution.  Upon information and belief, however, ███ considered Proofpoint to be a difficult vendor to work with.  Accordingly, in approximately March 2019, Vade Inc. participated in a POC against Proofpoint's product, and once again, Vade Inc.'s product outperformed Proofpoint.  As a result, by June of 2019, ███ and Vade had been in engaged in many months of contract negotiations and exchanged numerous draft agreements.  Indeed, only a few relatively minor deal points remained to be negotiated, and ███ representative handling the negotiations stated that ███ was ready to finalize the agreement that would replace Proofpoint's inferior email filter with Vade Inc.'s product Filterd.

63.     Desperate to prevent that from happening, Proofpoint, upon information and belief, began to make knowingly false statements of fact to ███.  In particular, very soon after this lawsuit was filed, Plaintiffs stated to ███, who was close to licensing Vade's Content Filter, that *all* of Vade's products were developed using Plaintiffs' trade secrets, that all of Vade's products were at issue in this lawsuit, and that Vade would not be able to provide any of its products going forward as a result.  Plaintiffs' own Complaint that initiated this suit, however, does not support those demonstrably false statements.  In particular, in this lawsuit, and at the time these false statements were made to ███, Plaintiffs have only ever alleged that Vade's Secure for Office 365 product and a mail transfer agent being developed by Vade, known as its NextGenMTA, as allegedly incorporating Plaintiffs' purported trade secrets.  While those claims are themselves baseless, Vade

32

offers many other products that Plaintiffs were unquestionably aware of when making these false statements.  Indeed, as plead above, Vade's Content Filter, IsItPhishing, Filterd, Mailstro, and Global Threat Intelligence product and solution offerings were developed before any of the alleged wrongdoing occurred in this lawsuit.  Further, despite that this lawsuit has been ongoing now for over 16 months, Plaintiffs have not uncovered any evidence that these other Vade products are in any way using Plaintiffs' alleged trade secrets, and no such allegations have been made.  Again, Vade has marketed these products along with their features long before this lawsuit was filed, and Plaintiffs were unquestionably aware of them before bringing this action.  Accordingly, Plaintiffs' statements that ***all of Vade's products*** had incorporated and were using Plaintiffs' alleged trade secrets, that ***all*** of Vade's products were at issue in this lawsuit, and that Vade would not be able to provide any products going forward as a result were knowingly false statements of fact, and they remain so today.

64.    Plaintiffs also, upon information and belief, falsely stated to ███ at the same time that at the time this lawsuit was filed Vade was financially unstable, it would soon be filing bankruptcy, and that it could not afford to defend this lawsuit.   At the time those statements were made, however, Plaintiffs had become aware just one month prior that Vade had announced a funding arrangement worth 70 million Euros, and that Vade had entered into a strategic partnership agreement with a company called Datto that would allow Vade's business to further expand.  Plaintiffs were further aware that Vade had been highly successful in markets outside the U.S., and that in August 2019, Vade was very secure financially and its business was thriving.  Indeed, Vade has been defending this lawsuit for close to two years, and as it was when filed, Vade remains more than financially stable.  Thus, Plaintiffs were factually aware at the time this lawsuit was brought that Vade was financially strong.  Plaintiffs' statements to ███ that Vade, at the time this lawsuit was filed, was financially unstable and would be shortly filing for bankruptcy were not mere statements of opinion, but were knowing misrepresentations of fact about the current state of Vade's financial condition.

65.    But for these false statements to ███ would have licensed Vade's Content Filter.  Plaintiffs unlawful conduct was the directly interfered with Vade's prospective economic

33

relationship with ███. As a natural consequence and proximate result of Plaintiffs' commercially disparaging statements, Vade Defendants have suffered actual damages in the form of loss of at least ███ business, which would have resulted in millions of dollars in ███████ to the Vade Defendants.

66.     Plaintiffs' actions have been both oppressive and malicious with intent to cause injury to Vade Defendants and with conscious disregard of the rights of others.  Accordingly, Vade Defendants are entitled to exemplary damages, in addition to compensatory damages, as permitted by law.

## FOURTH CAUSE OF ACTION

### (Unfair Competition Under California Business and Professions Code § 17200)

67.     Vade Defendants reallege and incorporate herein by reference all of the allegations in the preceding paragraphs as if fully set forth in support of this cause of action.

68.     Plaintiffs' acts as alleged in the paragraphs above constitute "unlawful, unfair, or fraudulent business act[s] or practice[s]" within the meaning of California Business and Professions Code § 17200 *et seq.*

69.     As a direct and proximate result of Plaintiffs' wrongful conduct, Vade Defendants have been and will continue to be harmed, and Plaintiffs have been and will continue to be unjustly enriched.

70.     As a direct and proximate result of Plaintiffs' wrongful conduct, Vade Defendants are entitled to injunctive relief, restitution, and an order of disgorgement of all of Plaintiffs' ill-gotten gains from their unlawful, unfair, or fraudulent business acts or practices.

## FIFTH CAUSE OF ACTION

### (Monopolization – Section 2 of the Sherman Act – 15 U.S.C. § 2)

71.     Vade Defendants reallege and incorporate herein by reference all of the allegations in the preceding paragraphs as if fully set forth in support of this cause of action.

### Relevant U.S. Product Market

72.     In the United States, a unique product market exists for email filter solutions that can scale to service a million or more email accounts at a given time.  Vade's email filter solution, such

34

as its Content Filter, is designed to meet such a heavy traffic load. While there are numerous entities that offer email filtering solutions in the U.S., the vast majority of those vendors do not have products that are capable of the scale necessary to service a million or more email boxes at a given time. Accordingly, those email solutions and products lack the ability to handle the minimum traffic load and are not substitutes for email filtering products, such as Vade's Content Filter, that are designed for larger scale email filtering.

73.     Thus, a relevant product market exists for Email Filtering Products that have the capacity and scalability to filer a million or more email boxes or accounts at a given time (the "Market"). The geographic market is the United States.

## Monopoly Power and Significant Barriers to Market Entry

74.     Plaintiff Proofpoint describes itself as an enterprise security company founded in 2002. Proofpoint has been funded by multiple venture investors and has been publicly traded since 2012. As of 2019, Proofpoint had over 3,000 employees and revenues of close to a billion dollars. To reach that size, Proofpoint has employed an aggressive acquisition strategy aimed at dominating the Market. Since 2008, Proofpoint has spent hundreds of millions of dollars acquiring email security companies, including purchases of entities such as Secure Data in Motion, Abaca Technology Corporation, Sendmail, Inc., Return Path, and many others. With each acquisition, Proofpoint removed an existing or potential competitor from the Market. Indeed, by 2017, Proofpoint had succeeded in squeezing out the competition, leaving, upon information and belief, one main competitor, Cloudmark. Rather than continuing to compete with Cloudmark, however, in the fourth quarter of 2017, Proofpoint acquired Cloudmark, resulting in the combination of two principal competitors in the Market. Proofpoint has affirmatively stated that at least one purpose of the acquisition was to obtain Cloudmark's market share, and Plaintiffs have since touted themselves the "leader" in the Market. Upon information and belief, Plaintiffs have, in fact, held a controlling share of the Market between 62% to over 80% since that acquisition.

75.     With their dominant market position and anticompetitive conduct, Plaintiffs have erected significant barriers to new competitors attempting to enter the Market. For reasons discussed in more detail below, customers only use one email filter provider at a time, and the contractual

35

1  arrangements Plaintiffs enter into, upon information and belief, ███████████████

2  ████████████.  As just one example, Proofpoint licenses its email filter solution, which is a product

3  offered within the Market to █████.  The contract with █████ was entered into over a decade ago and

4  was ██████████████████████████  That contractual arrangement still exists

5  today.  Because of ████████████████████ has been using Proofpoint's email

6  filter, to the exclusion of competition, ████████████ even though Proofpoint's filter is a more

7  expensive and inferior production, at least compared to Vade's Content Filter.  Thus, when an entity

8  is contemplating whether to enter the Market, they are faced with the reality that Plaintiffs have

9  already ████████████████████.  This represents a significant barrier to

10 entry, especially when coupled with the significant investment required of a new Market entrant to

11 develop and bring a competing product to the Market.

12      76.      Plaintiffs also take advantage of Market realities that contribute to these barriers.  In

13 particular, it typically takes customers at least four months, if not longer, to implement a new email

14 filter in the relevant product Market.  For example, bringing on a new supplier requires, at a

15 minimum, testing the new filter, negotiating a services agreement, as well as actually implementing

16 the software and performing customizations such that it is compatible with the particular customer's

17 system.  This process can take many months and significant employee time to accomplish.  It is also

18 costly to implement a new email filter, and as a result, customers are reluctant to switch providers,

19 even if the current filter being used is inferior.  In fact, Plaintiffs have openly acknowledged in their

20 correspondence produced in this lawsuit that their ████████████████ and these market

21 realities allow them ████████████████ Thus, a potential new Market

22 entrant is faced with the reality that Plaintiffs have ████████████████████, and

23 that customers in the Market are reluctant to remove Plaintiffs' entrenched email filter, even if the

24 new entrant could offer a superior and more cost effective product.  Again, these are significant

25 barriers that any company faces when seeking to enter the Market.  In fact, as a result of those

26 barriers, since 2017, despite the growing need for email filter solutions in the Market, there has not

27 been a single new competitor enter the Market.

28

77.     The same realities also make it impossible for existing competitors to simply ramp up their production in the short run.  As plead above, it typically takes at least four months, if not longer, for a new email filter in the Market to be implemented, and the process is costly.  Further, the email filters in the Market are protecting a million or more email accounts, and thus, these filters cannot go down for months at a time, while a new filter is being installed.  The damage created by such downtime would be catastrophic.  Accordingly, Plaintiffs have positioned themselves in the Market as the dominant power and have taken advantage of ███████████████████ to erect barriers to new market entrants, and prevent an existing competitor, like Vade, from stepping in and filling a void in the short run.

**Plaintiffs engaged in anticompetitive conduct that caused anti-trust injury to Vade**

78.     Plaintiffs actively maintain their dominant market share through anti-competitive conduct.  Plaintiffs conduct is, in fact, anti-competitive in three independent respects, any one of which support the Sherman Act claims asserted herein.

79.     First, Plaintiffs have acted in an anti-competitive manner through the use of ███ ███████████████.  Plaintiffs control anywhere from 62% - 80% of the Market.  They are able to do so, in whole or in part, through the use of ███████████████████ ███████████████████.  Indeed, customers in the Market only license one email filtering solution at a time.  These customers are looking for uniform filtering across the a million or more email accounts they protect, and it would be impractical and unworkable to have multiple email filtering solutions operating at the same time, providing different results across the managed email accounts.  As a result, when Plaintiffs enter into a contract with a customer in the Market, those are ███████████████████.

80.     ███████████████████.  For example, as plead above, Plaintiffs first entered into a contract to license their email filter solution, a product offered in the Market, to ███████████ That contract included an ███████████████████ ████.  Thus, through the use of these arrangements, Plaintiffs ███████████████ ███████████████, while they entrench their inferior email filter solution with that customer.  Once Plaintiffs' inferior and costly email filter solution is in place, it becomes very

37

difficult for customers to switch providers.  In particular, as pleaded above, to move to a different email filter provider, customers in the Market must spend the time and resources to, among other things, test the new filter and determine whether it is a superior product, negotiate a license and services agreement with the new vendor, and then actually implement the new email filter to replace the incumbent.  This process is costly and takes months to accomplish.  As a result, customers in the Market are reluctant to go through that process and instead, permit the ███████████████ ███████████████████████  Plaintiffs manipulate these Market realities and use ██████████████████████ that allow them to ███████████████████████████████ ████████████████████  That has been the case for ██████ as an example, and Plaintiffs, upon information and belief, use the same ████████████████████████████████████ ████████████████████████████████  Given their market position, Plaintiffs foreclose a substantial share of the Market by engaging in these improper practices.

81.    This anticompetitive conduct of engaging in ███████████████████████ ███████████████  further causes anti-trust injury.  In particular, Plaintiffs have not gained their dominant market share through innovation, superior products, or superior customer service.  Rather, Plaintiffs have taken control of the Market through Proofpoint's aggressive multi-decade acquisition strategy, in which it has, armed with deep pockets, acquired email security firms year-after-year.  With each acquisition, Proofpoint both gained Market share and removed an existing or potential competitor from the Market.  Perhaps the most egregious example came with Proofpoint's acquisition of its principal competitor in the Market, Cloudmark.  Thus, Plaintiffs strategy has been clear—buy up the competition in the Market, and then tie up a substantial portion of the Market through ███████ ██████████████████████.  Notably, Plaintiffs have acknowledged in their own correspondence produced in this lawsuit that by implementing this scheme, they have been able to █████████ ████████████████████████████████████  despite that those solutions are inferior products.  Indeed, Vade's Content Filter, for example, has repeatedly outperformed Plaintiffs' email filter in head-to-head proofs-of-concept.  But because of Plaintiffs' conduct, entry into the Market is exceedingly difficult, and customers in the majority of the Market are left paying too much for inferior goods.

38

82.     Second, in addition to Plaintiffs' anti-competitive ████████████, Plaintiffs have engaged in a campaign of making knowingly false and disparaging statements about Vade—perhaps Plaintiffs' only true competitive threat—for the purpose of keeping Vade out of the Market.

83.     In the years preceding the filing of this lawsuit, Vade had indeed sought to enter the Market and compete against Plaintiffs.  Vade's efforts to interject competition in the Market met with initial promise.  For example, ██████████████████████████████████, which previously contracted with Cloudmark for the provision of its email filtering solution, was, upon information and belief, not satisfied with Cloudmark as a supplier.  Accordingly, ████████ invited Vade Inc. to participate in a proof-of-concept ("POC"), in which Vade Inc.'s Content Filter was compared to Cloudmark's filter.  Vade outperformed Cloudmark by a wide margin.

84.     As a result, in October 2018, Vade Inc. entered into an agreement with ████████ to provide Vade Inc.'s Content Filter for use across the ████████████████████████████ ████████.  This agreement was significant for multiple reasons.  First, as a provider of the email filter solution, Vade Inc. would have access to all consumer usage data, which Vade Inc. could then use to "educate" its Content Filter, making it "smarter" and more efficient.  Conversely, without the benefit of that data, Cloudmark's email filter would become "dumber" and less effective.  Second, ████████████████████████████████████████████.  Accordingly, when ████████ switched to Vade Inc.'s Content Filter, upon information and belief, other Market participants took notice that new competition was finally arriving to the Market.

85.     Plaintiffs similarly took notice of Vade's entry into the Market.  Indeed, as early as September 2018, before the ████████ agreement was even executed, Plaintiffs, upon information and belief, began to implement a calculated plan to prevent competition from encroaching into Plaintiffs' dominant market share.  At that time, Plaintiffs, upon information and belief, began to communicate to Market participants that they intended to bring a lawsuit against Vade for the illegitimate purpose of requiring Vade to divert its resources to defending against such an action with the goal of destroying Vade as a business and preventing it from entering the Market.  In furtherance of that plan, Cloudmark has made demonstrably false statements to Vade's existing and potential Market customers, including ████████.

39

86.   For example, upon information and belief, Cloudmark met with ████ representatives in August 2019, approximately one month after this lawsuit was filed.  During that meeting, Cloudmark, upon information and belief, stated that the Vade Defendants had misappropriated Plaintiffs' alleged trade secrets and incorporated those into ***all of Vade's products***. This was a knowingly false statement.

87.   In particular, at the time those statements were made in August 2019, Plaintiffs were required to have performed a diligent pre-suit investigation before they filed this lawsuit.  Plaintiffs' allegations against Vade in this lawsuit, however, have been limited in scope.  For instance, Plaintiffs have only alleged (a) Vade's Secure for Office 365 product and (b) a mail transfer agent being developed by Vade, known as its NextGenMTA, as allegedly incorporating Plaintiffs' purported trade secrets.  While those claims are themselves baseless, Vade offers many other products that Plaintiffs were unquestionably aware of when making these false statements to ████, but those additional products have never been put at issue in this lawsuit.  Indeed, as pleaded above, Vade's Content Filter, IsItPhishing, Filterd, Mailstro, and Global Threat Intelligence product and solution offerings were developed before any of the alleged wrongdoing occurred in this lawsuit.  Further, despite that this lawsuit has been ongoing now for over 16 months, Plaintiffs have not proffered any evidence that these other Vade products are in any way using Plaintiffs' alleged trade secrets, and no such allegations have been made.  Again, Vade marketed these products along with their features long before this lawsuit was filed, and Plaintiffs were unquestionably aware of them before bringing this action and certainly in August 2019.  Accordingly, Plaintiffs' statements that ***all of Vade's products*** had incorporated and were using Plaintiffs' alleged trade secrets, and were accused in this lawsuit, were knowingly false statements of fact at the time they were made, and they remain so today.

88.   Additionally, in a desperate attempt to win back ████ business, Plaintiffs also, upon information and belief, falsely stated to ████ in August 2019 that Vade was, at that point, not financially stable, that it could not afford to defend against this lawsuit, and that it would be bankrupt in the near term.  At the time those statements were made, however, Plaintiffs had become aware just one month prior that Vade had announced a funding arrangement worth 70 million Euros,

40

and that Vade had entered into a strategic partnership agreement with a company called Datto that would allow Vade's business to further expand. Plaintiffs were further aware that Vade had been highly successful in markets outside the U.S., and that in August 2019, Vade was secure financially and its business was thriving. Indeed, Vade has been defending this lawsuit for close to two years, and as it was when filed, Vade remains more than financially stable. Thus, Plaintiffs were factually aware at the time this lawsuit was brought that Vade was financially strong. Plaintiffs' statements to ▮▮▮ that Vade, in August 2019, was financially unstable and would be shortly filing for bankruptcy were not mere statements of opinion, but were knowing misrepresentations of fact about the current state of Vade's financial condition. These false statements serve no legitimate purpose and were made solely for the purpose of decreasing competition in the Market, limiting the number of email filter products available to the Market, and maintaining Plaintiffs' dominant market share. Upon information and belief, Plaintiffs' factual misrepresentations to ▮▮▮ were not isolated, but have continued consistent with Plaintiffs' campaign to disparage Vade in the Market.

89. Plaintiffs' scheme to drive out competition, as well as superior products in the Market, has been successful. For example, Vade Inc.'s agreement with ▮▮▮ included an ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Thus, had ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Rather than permit that to happen, Plaintiffs hatched their plan to bring this lawsuit and make, upon information and belief, demonstrably false statements to ▮▮▮, and other Market participants, that (1) all of Vade's products are accused in this suit, (2) that Vade will not be able to provide products or services to ▮▮▮ going forward, and that (3) Vade was not financially stable. When asked about these allegations by ▮▮▮, Vade explained that they were false, and that there would be no material impact of the sham litigation on its business. This, of course, put ▮▮▮ in the middle of a dispute between two vendors, and ▮▮▮ was not able to resolve the disputes or ascertain the veracity of the serious misrepresentations being improperly made by Plaintiffs. As result, ▮▮▮, upon information and belief, determined to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ with Vade Inc.—the exact result improperly sought by Plaintiffs.

41

90.     Plaintiffs' improper conduct was not an isolated incident.  Plaintiffs also similarly interfered with Vade Inc.'s potential relationship with ███████████ .  In particular, Vade Inc. began discussions with ████ in early 2019 to provide Vade's Content Filter.  At that time, ████ was using Proofpoint, but like ███████████ upon information and belief, was not pleased with Proofpoint as a vendor.  Accordingly, in approximately March 2019, Vade Inc. participated in a POC against Proofpoint's product, and, once again, Vade Inc.'s Content Filter outperformed Proofpoint's.  As a result, by June 2019, ████ and Vade had been in engaged in many months of contract negotiations and exchanged numerous draft agreements.  Indeed, only a few relatively minor deal points remained to be negotiated, and ████ representative handling the negotiations stated that ████ was ready to finalize the agreement and to replace Proofpoint's inferior email filter with Vade.

91.     Desperate to prevent that from happening, Plaintiffs again implemented their scheme to prevent competition from encroaching on their market share through false statements rather than through price and quality competition on the merits.  While Vade Inc. and ████ were on the doorstep of entering into an agreement that would replace Proofpoint, Proofpoint, upon information and belief, shortly after this lawsuit was filed communicated to ████ that this action had been brought against Vade, and that all of Vade's products were developed using Plaintiffs' alleged trade secrets, which would preclude Vade from offering any products going forward.  Again, this was a knowingly false misrepresentation.  Vade's Content Filter, which was the only product being offered to ████ , has never been accused of being developed with or using at any time Plaintiffs' alleged trade secrets.  The Content Filter was, in fact, developed well before any allegation of wrongdoing, and Plaintiffs were aware of its existence and features at the time this suit was initiated.  Yet, Plaintiffs never accused the Content Filter of using Plaintiffs' alleged trade secrets, and Plaintiffs have not proffered any evidence to the contrary.  The same is true for the vast majority of Vade's other products, such as IsItPhishing, Global Threat Intelligence, Filterd, and Mailstro.  Again, Plaintiffs have been aware of these other products since before lawsuit was filed, and have at no point alleged that they were developed with or are using Plaintiffs' alleged trade secrets.  Accordingly, Plaintiffs' statements to ████ to the contrary were knowingly false misrepresentations of fact at the time they were made

42

that were designed to harm competition. Moreover, ▮▮▮ was at no point negotiating to license any product from Vade that has been accused in this lawsuit, and thus, Plaintiffs' false and improper statements to ▮▮▮ were not in any way related or incidental to Plaintiffs' bringing this action.

92.     Plaintiffs also, upon information and belief, falsely communicated to ▮▮▮ that Vade was not financially stable, and that defending this lawsuit would easily bankrupt Vade.  For the same reasons explained above, these were not mere statements of opinion, but statements of fact concerning Vade's current financial condition.  These false statements had no legitimate purpose, and they were made to ▮▮▮, who has no interest in the outcome of this litigation.  The only plausible explanation for these communications to ▮▮▮, and other Market participants, is that they were made in an effort to prevent Vade from further competing in the Market.  And while Vade tried to explain to ▮▮▮ that such statements were demonstrably untrue, ▮▮▮ senior executives decided to stop negotiations with Vade Inc. and maintain its relationship with Proofpoint, despite that Proofpoint's product was clearly inferior.

93.     Thus, for now close to two years, Plaintiffs have been, upon information and belief, actively disparaging the Vade Defendants in the Market to prevent the Vade Defendants from reducing Plaintiffs' dominant market share.  In the process, Plaintiffs have been able ▮▮▮▮▮ ▮▮▮ in the Market into ▮▮▮▮▮▮▮▮ that would not have otherwise been acceptable, but for Plaintiffs' improper conduct.  Accordingly, Plaintiffs campaign of false and disparaging misrepresentations constitute anti-competitive activity and has caused anti-trust injury to Vade.

94.     Third, Plaintiffs anti-competitive conduct also includes bringing this objectively and subjectively baseless lawsuit for the sole purpose of harming competition in the short- and long-term, as opposed to addressing any legitimate legal concern.  In particular, there was no objectively reasonable basis for bringing this suit against the Vade Defendants at the time it was filed.  The objectively baseless nature of this lawsuit was, in fact, borne out during the briefing to this Court on Plaintiffs' motion for preliminary injunction.  To succeed on that motion, Plaintiffs were required to, among other things, establish a likelihood of success on the merits of their trade misappropriation claim—the only claim asserted against the Vade Defendants.  Thus, it was incumbent on Plaintiffs

43

to come forward and present evidence establishing what its trade secrets were and how they were misappropriated by the Defendants.  If Plaintiffs had any proof to support those allegations, it would have appeared during the course of the parties' briefing on that motion.  But Plaintiffs failed to present any such evidence.  In fact, after considering all of Plaintiffs' briefing, which included multiple expert declarations, the Court held that, "the Court finds the evidence plaintiffs offer by way of elaboration is not sufficiently specific to make out a prima facie case of trade secret misappropriation and, consequently, is insufficient to satisfy the first requirement for a preliminary injunction."  (Ct.'s Order 4, ECF No. 126.)  There was simply no objective basis for bringing this suit.

95.     There was similarly no good-faith subjective basis for filing this action.  To the contrary, for reasons explained above, Plaintiffs only brought this lawsuit to interfere with the Vade Defendants' ability to enter the Market.  Indeed, upon information and belief, Plaintiffs, again, made knowing misrepresentations to the Vade Defendants' existing and potential customers about the subject matter and effect of this lawsuit, despite that the products being offered to ███, for example, were not even accused in this action.  This lawsuit was brought by Plaintiffs, not to cure a legitimate legal harm, but rather, to prevent a new player from entering the Market.

96.     Plaintiffs' improper conduct has, thus, harmed not only the Vade Defendants, but also competition in the Market, and the counterclaims asserted below are being brought accordingly.

97.     Plaintiffs have, thus, acted with the intent to maintain and perpetuate its monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

98.     As a direct and proximate result of Plaintiffs' unlawful conduct in the Relevant Market, the Vade Defendants' business has suffered, and will continue to suffer harm, unless Plaintiffs are restrained.  The Vade Defendants are therefore entitled to injunctive relief, as well as their costs of suit, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 26.

99.     Further, pursuant to 15 U.S.C. § 15, the Vade Defendants are entitled to recover threefold the damages they have sustained and continue to sustain, in an amount to be determined at trial, including pre- and post-judgment interest thereon, and their costs of suit, including reasonable attorneys' fees.

44

Case No. 3:19-cv-04238-MMC
DEFENDANTS VADE SECURE, INCORPORATED AND VADE SECURE SASU'S
THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

**SIXTH CAUSE OF ACTION**

**(Attempted Monopolization – Section 2 of the Sherman Act – 15 U.S.C. § 2)**

100.     Vade Defendants reallege and incorporate herein by reference all of the allegations in the preceding paragraphs as if fully set forth in support of this cause of action.

101.     Plaintiffs have willfully engaged in the predatory and anti-competitive practices described above in an effort to improperly raise barriers to the entry and expansion with the specific intent of monopolizing the Market.   Accordingly, there is a dangerous probability that, unless restrained, Plaintiffs will succeed in monopolizing the Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

102.     As a direct and proximate result of Plaintiffs' unlawful conduct in furtherance of their attempt to monopolize the Market, the Vade Defendants' business has suffered, and will continue to suffer harm, unless Plaintiffs are restrained.  The Vade Defendants are therefore entitled to injunctive relief, as well as their costs of suit, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 26.

103.     Further, pursuant to 15 U.S.C. § 15, the Vade Defendants are entitled to recover threefold the damages they have sustained and continue to sustain, in an amount to be determined at trial, including pre- and post-judgment interest thereon, and their costs of suit, including reasonable attorneys' fees.

**<u>VADE DEFENDANTS' PRAYER FOR RELIEF</u>**

The Vade Defendants respectfully pray that:

i.     The Court enter judgment on Plaintiffs' Complaint against Plaintiffs and in favor of Defendants;

ii.     The Court enter judgment that Plaintiffs defamed the Vade Defendants, collectively or individually;

iii.     The Court enter judgment that Plaintiffs' commercially disparaged the Vade Defendants, collectively or individually;

iv.     The Court enter judgment that Plaintiffs have engaged in intentional interference with the Vade Defendants' prospective economic advantage, collectively or individually;

45

v.      The Court enter judgment that Plaintiffs have engaged in unfair competition under California Business and Professions Code § 17200;

vi.     The Court enter judgment that Plaintiffs have violated 15 U.S.C. § 2;

vii.    The Court enter judgment for preliminary and permanent injunctive relief enjoining the wrongful and unfair acts by Plaintiffs alleged herein, and by those persons acting in concert with Plaintiffs, including related individuals, entities, agents, or representatives;

viii.   The Court award the Vade Defendants actual damages sustained as a result of the acts alleged herein, together with prejudgment interest, according to proof;

ix.     The Court order disgorgement of the Plaintiffs' profits resulting from the acts alleged herein;

x.      The Court award the Vade Defendants restitution of any profits resulting from the acts alleged herein;

xi.     The Court award the Vade Defendants punitive and/or treble damages as permitted by law;

xii.    The Court award the Vade Defendants their attorneys' fees as permitted by law;

xiii.   The Court award the Vade Defendants their costs of suit, including reasonable litigation expenses, as permitted by law; and

xiv.    The Court award the Vade Defendants any additional relief the Court deems just and proper.

1  Dated: December 4, 2020

**BAKER & McKENZIE LLP**

2

By: /s/ *Bart Rankin*

3
4  Colin H. Murray (SBN 159142)
   colin.murray@bakermckenzie.com
   **BAKER & McKENZIE LLP**
5  Two Embarcadero Center, 11th Floor
   San Francisco, CA  94111-3802
6  Telephone:   +1 415 576 3000
   Facsimile:   +1 415 576 3099
7
   Danielle L. Benecke (SBN 314896)
8  danielle.benecke@bakermckenzie.com
   **BAKER & McKENZIE LLP**
9  600 Hansen Way
   Palo Alto, CA  94304
10 Telephone:   +1 650 856 2400
   Facsimile:   +1 650 856 9299
11
   Jay F. Utley (Admitted *Pro Hac Vice*)
12 jay.utley@bakermckenzie.com
   Bart Rankin (Admitted *Pro Hac Vice*)
13 bart.rankin@bakermckenzie.com
   Mackenzie M. Rankin (Admitted *Pro Hac Vice*)
14 mackenzie.Rankin@bakermckenzie.com
   John G. Flaim (Admitted *Pro Hac Vice*)
15 john.flaim@bakermckenzie.com
   Chaoxuan Liu (Admitted *Pro Hac Vice*)
16 charles.liu@bakermckenzie.com
   Mark Ratway  (Admitted *Pro Hac Vice*)
17 mark.ratway@bakermckenzie.com
   **BAKER & McKENZIE LLP**
18 1900 North Pearl Street, Suite 1500
   Dallas, Texas 75201
19 Telephone:   +1 214 978 3000
   Facsimile:   +1 214 978 3099
20
   Shima S. Roy
21 shima.roy@bakermckenzie.com
   **BAKER & McKENZIE LLP**
22 300 East Randolph Street, Suite 5000
   Chicago, Illinois  60601
23 Telephone:   +1 312 861 8000
   Facsimile:   +1 312 861 2899
24
25
26
27
28

47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Alexander Brauer (appearance pro hac vice)
TX SBN 24038780
abrauer@baileybrauer.com
**BAILEY BRAUER PLLC**
8350 N. Central Expressway
Suite 650
Dallas, Texas 75206
Telephone: (214) 360-7433
Facsimile: (214) 360-7435

*Attorneys for Defendants,*
*Vade Secure, Incorporated and Vade Secure SASU*