UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| PROOFPOINT, INC., *et al.*,<br>Plaintiffs,<br>v.<br>VADE SECURE, INCORPORATED, *et al.*,<br>Defendants. | Case No. 19-cv-04238-MMC (RMI)<br><br>**ORDER**<br>Re: Dkt. Nos. 446, 448 |

Now pending before the court are a pair of discovery dispute letter briefs.[1] In one letter brief, Defendants seek an order compelling Plaintiffs to produce "Proofpoint third-party materials" despite the fact that the period for permissible fact discovery closed several months ago. *See* Ltr. Br. (dkt.) 448) at 2. In the other letter brief, Plaintiffs seek to file supplemental expert reports, due to Defendants' discovery misconduct, while asking the court to strike portions of Defendants' rebuttal reports for the same reason; at the same time, Defendants ask the court to strike portions of Plaintiffs' opening reports, and an order striking Plaintiffs' supplemental reports in their entirety, characterizing them as unauthorized "reply reports." *See* Ltr. Br. (dkt. 446) at 2. For the reasons stated below, Plaintiffs' requests are granted, and Defendants' request are denied.

**BACKGROUND**

Before delving into the substance of the latest in what has been an unduly long series of discovery disputes in this case, it would be beneficial to narrate some pertinent details about the tortured path through which the discovery process in this case has meandered. In December of

---

[1] Pursuant to Civil Local R. 7-1(b), the court finds that these matters are suitable for disposition without oral argument.

1    2019, this case was referred to the undersigned for the resolution of any and all discovery disputes
2    that may arise. (dkt. 79). Since then, one thing has been clear – Defendants have gone to great
3    lengths to stymie the discovery process at every turn. For nearly 18 months, this court has been
4    bombarded with a nearly constant stream of discovery disputes, the upshot of which demonstrates
5    Defendants' unwillingness to voluntarily discharge their discovery obligations. It is important for
6    this background and this context to be clearly set forth before proceeding to a discussion of the
7    merits of the latest in this series of disputes.

8    Two months into the period during which fact discovery was permissible in this case, and
9    well after having received a number of requests for production and interrogatories, Defendants had
10   reportedly refused to provide any of the requested documents while refusing to answer any of the
11   interrogatories on grounds that French law precluded them from discharging their discovery
12   obligations in this case – consequently, Plaintiffs were put to the expense of filing a motion to
13   compel. (dkt. 78). A few weeks later, in early January of 2020, the Parties presented three
14   discovery disputes in the form of three jointly-filed letter briefs (as required by the General
15   Standing Order of the undersigned). The first of these letter briefs (dkt. 91) represented the
16   briefing of each party's position regarding the effect of a particular French statute (hereafter, the
17   "French Blocking Statute"), a law which had been promulgated with the specific intention of
18   frustrating the discovery process in American courts. The second letter brief (dkt. 92) presented a
19   dispute regarding, *inter alia*, the effect of EU privacy law as well as the French Blocking Statute,
20   on the discovery process in this case. The third letter brief (dkt. 93) presented disputes about
21   provisions in a proposed protective order pertaining to: (1) the applicability of EU privacy law and
22   the French Blocking Statute to this case; (2) the location for inspecting source code produced
23   pursuant to the proposed protective order; (3) the accommodations (code viewing software, etc.)
24   that should or should not be provided for the streamlining of source code review; and (4) whether
25   or not a producing party shall be required to produce source code printouts upon request within 4
26   business days or within 30 business days. The undersigned conducted a hearing on January 31,
27   2020 (dkt. 110), and rendered a decision on all of these disputes which, *inter alia*, rejected
28   Defendants' foreign law objections to discharging their discovery obligations in this case (dkt.

112). A few days later, the court resolved the Parties' disputes about the form and content of the proposed protective order and the form and content of the order on producing electronically stored information (dkts. 117, 118).

Thereafter, in mid-February of 2020, Defendants' counsel undertook a course of action that in retrospect appears to have been clearly designed to run additional time off the clock as part of an overarching campaign to frustrate and obstruct the discovery process in this case. In what seemed at the time to be either a bizarre tactic or mistake, Defendants simultaneously sought reconsideration from the undersigned (dkt. 121) while also seeking *de novo* review and an order staying discovery from the presiding judge (dkts. 122, 123). For this reason, within a day of the filing of Plaintiffs' response in opposition, the presiding judge denied the motion for *de novo* review without prejudice (*see* dkt. 125) such that the undersigned could consider and decide the reconsideration motion which had, among a myriad of complaints, faulted the General Standing Order of the undersigned for supposedly obstructing Defendants' ability to develop a record on the applicability of the French Blocking Statute by filing numerous repetitive declarations and exhibits which Defendants had extensively described in their letter brief but which the undersigned had found unpersuasive. The undersigned then scheduled Defendants' motion to reconsider for what would be a second hearing (on March 20, 2020) about the effect of French law in this case (*see* dkt. entry of 02/20/20).

Before what would be the second hearing relating to the exact same argument about the French Blocking Statute that the undersigned had already once entertained, between late February and mid-March of 2020, the court was flooded with a barrage of new filings in this regard. First, due to Defendants' continued refusal to provide discovery, a new joint letter brief was submitted regarding the enforcement of the order (dkt. 112) through which the undersigned had previously rejected Defendants' objections to providing discovery notwithstanding the provisions of the French Blocking Statute. *See* Ltr. Br. of February 25, 2020 (dkt. 127). Then, on March 6, 2020, through another letter brief, Defendants presented (for the first time) a new reason why they believed that they should not be made to discharge their discovery obligations – this time, asserting that Plaintiffs had failed to adequately identify (as required by California law) the trade

3

1    secret the alleged theft of which formed the basis of this case. (dkt. 128). Defendants then

2    submitted two more filings on March 6, 2020 (dkts. 129, 130), related to their reconsideration

3    motion (dkt. 122) and their motion seeking a stay as to discovery (dkt. 123). On March 11, 2020,

4    the undersigned entered an order (dkt. 132) granting Defendants' motion to stay discovery

5    pending a ruling on their reconsideration motion. Thereafter, the undersigned entered orders (dkts.

6    135, 139) granting Plaintiffs' and Defendants' respective requests to file sur-reply (134) and sur-

7    sur-reply (dkt. 138) briefs. In the course of this extensive reconsideration briefing, Defendants

8    were granted leave to file, without any limitation, as many declarations and exhibits as they

9    wished. At the hearing on March 20, 2020, the parties requested leave (*see* dkt. 140) to file still

10   more briefing on the effect of COVID-19 as it related to conducting discovery in this case, as well

11   as even more briefing relating to the trade secret identification issues that Defendants had chosen

12   to raise in a piecemeal fashion *after* the court had previously overruled their objections to

13   producing discovery based on the French Blocking Statute. Then, on March 30, 2020, two

14   additional letter briefs and numerous exhibits (dkts. 144, 145, 146) were added to rapidly

15   deepening record on these relatively straightforward issues. On April 20, 2020, the undersigned

16   entered an order (dkt. 149) denying Defendants' request for reconsideration on the issue pertaining

17   to the applicability of the French Blocking Statute, as well as denying Defendants' request to be

18   absolved from its discovery obligations based on the notion that Plaintiffs had supposedly failed to

19   comply with California law in adequately identifying the trade secrets that were allegedly stolen in

20   this case. In seeking *de novo* review of this order, however, Defendants surprisingly decided to

21   abandon their stridently asserted argument (along with the attendant exhibits about which there

22   had been such consternation) pertaining to the French Blocking Statute, and Defendants chose to

23   only focus on their later-presented objections under California law regarding the adequacy of

24   Plaintiffs' identification of the trade secret at issue (*see* dkt. 152). Once again, Defendants

25   requested (dkt. 154) an order staying discovery pending a ruling on their motion seeking *de novo*

26   review. On May 12, 2020, Defendants' motion for review was denied, and their motion to stay

27   discovery was denied as moot (dkt. 159).

28          About two week later, the Parties presented yet another discovery dispute (dkt. 167)

wherein Defendants sought to quash a number of third party subpoenas which Plaintiff had served on various entities with whom Defendants conduct business. The undersigned conducted a hearing on this dispute on June 5, 2020 (dkt. 175), and because it seemed as though this dispute might be amenable to resolution, the Parties were ordered to meet and confer further to that end. However, on June 11, 2020, the Parties filed another letter brief (dkt. 178) through which they clarified that they remained at an impasse, because of which they filed competing proposed orders. Five days later, the undersigned conducted yet another hearing, as a result of which, the Parties finally came to an agreement regarding the dispute pertaining to the third party subpoenas served by Plaintiffs – resulting in a stipulation on which the court entered an order on June 19, 2020 (dkt. 188).

After a short respite, on September 15, 2020, the Parties filed another letter brief (dkt. 228), this time setting forth a dispute regarding production from Defendant Lemarie's personal electronic storage devices and online data storage accounts. Once again, the undersigned set the matter for a hearing on September 24, 2020 (dkt. 229), following which, and pursuant to a ruling to this effect (dkt. 275), the Parties agreed to a protocol for the preservation and production of the information that was the subject of this dispute. Meanwhile, in mid-September of 2020, Plaintiffs filed a motion to compel production of Defendants' source code printouts (dkt. 237) and a motion for sanctions (dkt. 239) that also sought an order enforcing the court's previous discovery orders. A few weeks later, the Parties submitted a stipulation seeking the termination of the motion to compel and the sanctions motion without prejudice due to the statement that the Parties had reached an agreement that had resolved the issues – the court accepted this stipulation which became the subject of yet another order (dkt. 273). However, before the proverbial ink on this agreement had dried, Defendants experienced a change of heart which forced Plaintiffs to renew their motion seeking enforcement of the court's previous discovery orders and for sanctions (dkt. 287). This time, Defendants also filed their own motion to compel, seeking to force the production of Plaintiffs' source code for review outside the United States by a foreign-based expert (dkt. 292). The undersigned scheduled this batch of motions (which were coupled with a flurry of administrative motions to expedite their respective briefing schedules, and so on) for a hearing on October 27, 2020 (dkt. 297). The day before the hearing, yet another discovery dispute was

5

1  percolating; however, Plaintiffs were forced to file a unilateral letter in order to complain about

2  Defendants' refusal to participate in the joint filing process for presenting discovery disputes (dkt.

3  299). Following the hearing of October 27, 2020 (dkt. 308), the undersigned entered an order (dkt.

4  309) setting forth a briefing schedule for the ever increasing motions that were beginning to pile

5  up – in essence, Plaintiffs' motions seeking enforcement of the court's previous discovery orders

6  and for sanctions; Defendants' motion seeking to compel the transmission of Plaintiffs' source

7  code for review by a foreign-based expert outside the United States (and beyond the reach of the

8  protections offered by the protective order on file in the case); and, the usual number of associated

9  administrative motions. All of these matters were then scheduled for yet another hearing on

10 November 5, 2020 (dkt. 331). It should not go without mention that at this point, nearly a year of

11 the period of time that had been allotted for conducting fact discovery had been extinguished

12 unproductively by Defendants' maneuvering.

13 Following the hearing of November 5, 2020, the undersigned entered an order (dkt. 334)

14 summarily denying Defendants' motion to compel the transmission of Plaintiffs' source code

15 outside the United States, as well as setting forth a regime of coercive sanctions designed to force

16 Defendants to *finally* discharge their discovery obligations and obey the previous orders of the

17 court to that effect. All seemed well, until Vade decided to pull a relevance objection out of its

18 pocket, not unleashing this objection until after a year of fighting about various meritless

19 justifications for refusing to provide its source code in discovery (the French Blocking Statute, EU

20 privacy laws, and the subsequently presented arguments about the supposed inadequacy of the

21 trade secret identification, etc.). Because this objection had so clearly been abandoned long ago,

22 and because the trade secret identification objection had also been raised piecemeal to the foreign

23 law objections, the undersigned found that "it appears likely . . . that Vade's purpose for

24 presenting its objections in the piecemeal fashion describe above has been to delay and frustrate

25 the discovery process in this case . . ." *Id*. at 9. Pursuant to the sanctions regime that was designed

26 to soften Defendants' recalcitrance and to coerce their compliance with long-past court orders that

27 had granted Plaintiffs' motions to compel the production of Defendants' source code – Defendants

28 and their counsel finally submitted declarations indicating their compliance (dkts. 337, 338, 343,

344) but only after being forced to pay $43,500 into the Court's registry, a sum reflecting the accrued amount of daily fines imposed (dkt. 343). Then, after copious additional briefing (*see* dkts. 348, 350, 351, 352, 354) and another hearing on December 16, 2020 (dkt. 372), the undersigned entered an order (dkt. 376) awarding Plaintiffs attorneys' fees in the amount of $95,785.74 such as to compensate them for what was surely a mere fraction of the wastages of time and effort caused by Defendants' year-long obstinacy.

Less than a month later, Plaintiffs were forced to file yet another motion seeking enforcement of a prior court order – this time, Plaintiffs sought an order seeking enforcement of the previously mandated protocol for the forensic imaging and production of data contained on Defendant Lemarie's electronic devices and online accounts (dkt. 401). Once again, the undersigned scheduled this matter for a hearing (dkt. 404) set to take place on January 21, 2021. However, on the eve of this hearing, in what has now become a familiar tactic, Defendant Lemarie provided Plaintiffs some assurances of his intention to comply, which caused Plaintiffs to withdraw their motion (*see* dkt. 411). Several weeks later, the Parties filed the pair of currently pending discovery dispute letter briefs (dkts. 446, 448).

## DISCUSSION

The above-described maneuvering by Defendants has managed to quite effectively cause the wasting and destroying of the overwhelming majority of the period of time allotted for conducting fact discovery in this case. In light of which, Defendants display remarkable temerity when protesting the temperature of a fire that they themselves have started – Defendants complain that "[a]t the stroke of midnight[,] the morning of February 13, 2021 – the very instant that fact discovery closed – Plaintiffs began to identify for the first time the alleged trade secrets they are actually pursuing in this case." *See* Ltr. Br. (dkt. 446) at 5. Putting aside its incorrectness, the sheer obliviousness of such a statement, under these circumstances, is striking.

### *Fact Discovery Dispute (dkt. 448)*

As Defendants themselves point out, the cut-off date for fact discovery was February 13, 2021. Now, more than three months after that cut-off date, Defendants seek to compel: (1) all documents that establish past and present pricing for Proofpoint products, including all agreements

7

and communications with Proofpoint customers (before September 25, 2019) about pricing and other contract terms for the Proofpoint software modules and other products included in the contract with one particular Proofpoint customer on which Plaintiffs reportedly rely for their price erosion theory; and (2) any other agreements and communications with their customers and prospective customers about any Proofpoint product for which Plaintiffs contend there is an impact based on Defendants' alleged misappropriation and infringement. Ltr. Br. (dkt. 448) at 3. Defendants premise the bringing of their motion to compel this fact discovery, so many months after the cut-off date, on two points: (A) Defendants contend that Plaintiffs price erosion damages theory (accusing Defendants of causing a lowering of market prices for Proofpoint products, as shown by a renewal contract for the Proofpoint customer in question) was advanced for the first time in an expert report that was served after the close of fact discovery, before which Plaintiffs had "limited their price erosion theory only to Cloudmark Products"; and (B) that Plaintiffs had previously "agreed to produce [these] materials, but then did not." *Id*. at 3, 4. Plaintiffs deny any notion that they had ever agreed to produce the disputed material. *Id*. at 7. More importantly, Plaintiffs submit that their sole price erosion quantification in this case, pertaining to one specific deal, namely the 2019 contract renewal for that one particular customer in question, "relates only to already-produced documents – including documentation produced by [that customer] in response to Vade's subpoena – that demonstrate Plaintiffs offered deep discounts due to competition from Defendants' misappropriation." *Id*. at 6. In short, Plaintiffs submit that despite their disagreement with Defendants about need and relevance, and in addition to producing over 650 third-party customer contracts in this regard, Plaintiffs "have also produced other discovery that provides Defendants with the pricing information they purportedly need while avoiding unnecessary disclosure of third-party confidential information, such as historical and current price lists for Proofpoint's products . . ." *Id*. at 6-7. Indeed, Defendants admit – by implication – that <u>some</u> of the 650 customer agreements already produced in discovery do in fact relate to Proofpoint products. *See id*. at 3 n.2 (wherein Defendants complain that "Plaintiffs' own discovery responses confirm . . . [that] the overwhelming majority of the 'over 650' customer agreements relate to Cloudmark products.").

8

There are a number of reasons that Defendants' motion to compel this information is due to be denied. First, Defendants' request is rendered meritless by Plaintiffs' submission that their price erosion quantification in this case is solely based on documents already produced – a representation that the undersigned credits as true. Second, because the undersigned finds that Defendants have done everything in their power during the course of fact discovery in the case to delay and frustrate the discovery process, the undersigned is unsympathetic to Defendants' complaints about how they were left with insufficient time to conduct fact discovery in the manner they wished. Lastly, the request is untimely because the undersigned gives great weight to the statements by Plaintiffs that they "provided timely written responses, which objected to, *inter alia*, the purported relevance, burden, and breadth of the requests and, at most, promised only a narrowed production subject to objections (which has already been produced) . . . [and] [a]t no time did Plaintiffs waive their objections and, instead, reiterated them in correspondence" dated November 20, 2020. *See id*. at 7. Therefore, there is no merit to Defendants' contention that their motion to compel this information could not have been timely filed. Fact discovery closed months ago and any motion to compel must have been filed no later than seven days after the cut-off. *See* Civil L.R. 37-3. Accordingly, for the above-stated reasons, Defendants' motion to compel the production of the requested materials is **DENIED**.

### *Expert Discovery Dispute (dkt. 446)*

Plaintiffs seek leave to file certain supplemental expert reports, while also seeking to strike portions of Defendants' rebuttal reports. *See* Ltr. Br. (dkt. 446) at 2. Meanwhile, Defendants request that Plaintiffs' supplemental reports (which Defendants prefer to call "reply reports") be stricken in their entirety while also seeking to strike portions of Plaintiffs' principal expert reports pertaining to Vade's content filter. *Id*. at 2, 5. Plaintiffs submit that they should be permitted to enter supplemental expert reports by Drs. Black, Nielson, and Arnold, in order to address new allegations in Defendants' rebuttal reports that rely on evidence identified in Defendants' interrogatory responses when those discovery responses cited a research paper as being relevant to one trade secret but the rebuttal reports relied on the research paper in connection with another trade secret. *Id*. at 3. Plaintiffs contend that their supplemental reports address only these

allegations, which were inadequately disclosed. *Id*.

Defendants' responses in this regard are limited to some hyperbole, various tangential remarks, and a single conclusory statement. First, Defendants once again incorrectly state (despite the previous rejection of this line of argument, *see* dkt. 149 at 13-16) that it was only "[a]t the stroke of midnight on the morning of February 13, 2021, that Plaintiffs began to identify for the first time the alleged trade secrets they are actually pursuing in this case." *Ltr. Br.* (dkt. 446) at 5. In addition to being incorrect, this assertion is unresponsive to Plaintiffs' specific justification for seeking leave to file supplemental expert reports. Second, Defendants contend that "by using Vade Secure's experts' rebuttal of Plaintiffs' untimely asserted trade secrets as an excuse to serve reply expert reports, which Judge Chesney expressly disallowed . . . Plaintiffs attempted to justify this disregard for the Court's order by styling the reports 'supplemental' and claiming that they respond to untimely contentions by Vade Secure's experts." *Id*. at 5, 6. Lastly, Defendants offer up a conclusory statement proclaiming that "Defendants' reports properly respond to Plaintiffs' reports and discuss documents and information that Vade Secure disclosed during discovery." *Id*. at 6. Because Defendants' opposition to Plaintiffs' stated justification for seeking leave to file their supplemental expert reports are collectively unpersuasive, Plaintiffs' request to file the supplemental reports in question is **GRANTED**; consequently, Defendants' request to strike Plaintiffs' supplemental reports is **DENIED**.

Plaintiffs also seek to strike certain portions of Defendants' rebuttal reports because they raise new allegations and new evidence. *Id*. at 3. Specifically, Plaintiffs' argue that in September of 2020, Defendants were served with interrogatories that sought a detailed description of the factual and legal bases for Defendants' defenses, including the reasons why Defendants believe Plaintiffs' claims should fail. *Id*. When Vade supplemented their responses on the last day permitted for supplementation, Vade reportedly provided a string citation addressing "thousands of documents without any explanation" and Plaintiffs contend that the new allegations and evidence in Vade's rebuttal reports "were either not disclosed in the interrogatory responses, or were concealed within the voluminous [] string citation." *Id*. Plaintiffs submit that the upshot of Defendants' lack of proper disclosure is that "[s]ince no factual (or any) underpinnings of the

10

expert opinions at issue were disclosed in response to Plaintiffs' interrogatories, they should be excluded under FRCP 37(c)(1)." *Id*. In short, Plaintiffs submit that Defendants' untimely disclosure – that is, in their experts' rebuttal reports – made it impossible for Plaintiffs' experts to respond, or for Plaintiffs to develop the factual record needed to respond to these theories. *Id*.

As for details, Plaintiffs contend that Dr. Clark's Report contains new allegations and evidence in the nature of: the alleged prior public availability of some or all of the trade secrets in question; the possession of Plaintiffs' implementation of these trade secrets; the derivation of Vade's implementations; certain assertions to the effect that Plaintiffs' trade secrets are "straightforward" and "made sense to implement"; new characterizations of the testimony of Plaintiffs' witnesses and related documents; and, "Dr. Black reviewed and provided opinions based on the allegations and evidence Vade had identified in its final supplementation, which did not include the new evidence regarding SpamAssassin (i.e., a textbook) that Dr. Clark raised for the first time on rebuttal." *Id*. at 4. Regarding Dr. Striegel's report, Plaintiffs contend that it raises new allegations and evidence in the nature of: purportedly known techniques and "best practices"; the use of certain code and software architecture; the use of open source code; the incorporation of certain code into products; certain code being purportedly dictated by external considerations; certain portions of code that were not copied; alleged differences between implementations of the trade secrets in question; and, new characterizations of Plaintiffs' testimony. *Id*. Regarding the reports of Mr. Ferrante and Mr. Pooley, Plaintiffs submit they contain new allegations and evidence pertaining to Plaintiffs' efforts to maintain the secrecy of their trade secrets, including allegations related to previously-unidentified documents, such as third-party vendor assessments; purported "best practices"; new allegations regarding Lemarie's employment position; allegations regarding purported differences in Proofpoint's and Cloudmark's policies and deficiencies in training; and, information pertaining to data synchronization between Lemarie's laptop and Cloudmark's computer systems. *Id*. Lastly, regarding Mr. Blackwell's report, Plaintiffs submit that it contains opinions based on: (1) Vade's financial data that Vade refused to produce until after Plaintiffs had served their opening expert reports (despite Vade's confirmation of the availability of this data during fact discovery and Plaintiffs' repeated requests for the data since at

11

1  least December 2020); and, (2) newly formed factual foundations regarding the public availability
2  and value of the trade secrets in question. *Id*. at 4-5. Additionally, through Mr. Blackwell's report,
3  Plaintiffs also contend that Vade also sets forth opinions regarding an alternative measure of
4  damages in the form of a lump-sum royalty, exceeding the scope of the rebuttal report because
5  Plaintiffs' opening reports did not advance a royalty opinion or forward-looking measure of
6  monetary damages. *Id*. at 5. At bottom, Plaintiffs submit that the specifically enumerated and
7  identified paragraphs of the above-described reports – listed in the instant letter brief (*see* dkt. 446
8  at 2) – should be stricken from the record because they raise new allegations and evidence that
9  were not disclosed during fact discovery. *Id*. at 3-5.

10  Defendants' responses to Plaintiffs' arguments in this regard are unpersuasive. In part,
11  Defendants respond to Plaintiffs' fact-lace allegations through a series of bare conclusory
12  statements; beyond that, Defendants seem to avoid Plaintiffs' specific contentions by advancing a
13  number of suggestions that appear to be of questionable relevance or that seem calculated to
14  deflect or avoid, rather than address, Plaintiffs' arguments. For example, when Defendants
15  contend that "Dr. Clark's and Dr. Striegel's reports [] properly rebutted affirmative theories and
16  facts advanced in Plaintiffs opening reports," Defendants provide a few nebulous examples that
17  seek to justify unspecified portions of these reports while veering away from the specific
18  arguments advanced in Plaintiffs' portion of the letter brief. *See id*. at 6-7. This approach leaves
19  the undersigned at a loss when attempting to match each of Plaintiffs' arguments with each of
20  Defendants counter-arguments. It appears to the undersigned that Defendants have no legally
21  sound justification for their position. Thus, the undersigned is not persuaded by generalized and
22  conclusory statements such as Defendants' contention that: "Dr. Striegel's discussion of how
23  Defendants' products, implementations, and source code differ from Plaintiffs' is classic rebuttal
24  testimony, and merely responds to Plaintiffs' eleventh hour misappropriation theories served the
25  instant discovery closed or explained for the first time in Dr. Nielson's report." *Id*. at 7. As
26  described in some detail above, and in the many orders on discovery disputes in this case over the
27  preceding year, Defendants have done everything in their power, at every turn, to delay and
28  obstruct the discovery process in this case; and, of course, having done so necessarily undermines

any argument that rests on the supposed lateness of "Plaintiffs' eleventh hour misappropriation theories served the instant discovery closed . . ." *Id*.

In similar fashion, as to the reports submitted by Mr. Ferrante and Mr. Pooley, Defendants attempt to camouflage the issues raised by Plaintiffs by suggesting, for instance, that these reports included the identification of certain examples that were taken from Plaintiffs' "own documents" and which "showed Plaintiff Cloudmark failed to take reasonable measures to protect its trade secrets." *Id*. However, this is no answer. Simply because Defendants' rebuttal reports included some "examples" that were purportedly taken from "Plaintiffs' own documents" does not necessarily mean that during the course of fact discovery, Defendants appropriately put Plaintiffs on notice that they intended to pursue such a theory of defense. Defendants then complain again about the problem of their own making by contending: "Plaintiffs' claim [that] they are prejudiced by Defendants' experts' reliance on Plaintiffs' own documents rings hollow, especially when Plaintiffs buried those documents within a production of nearly one million pages dropped on Defendants in the last 10 days of discovery." *Id*. Then, Defendants claim that one reason that the Ferrante and Pooley reports did not contain allegations and facts not disclosed in Defendants' responses is that "Vade Secure's response to Interrogatory No. 10 identified Plaintiffs' failures with respect to Cloudmark's personal device policies." *Id*. This is yet another example of a response that does not properly address Plaintiff's argument. Defendants' defense of the contents of the Pooley report ends with a generalized statement to the effect that Mr. Pooley's observations about Defendant Lemarie's status as a "high ranking executive" collectively respond to Plaintiffs' expert's opinion that managerial and executive employees are expected to be aware of and adhere to their confidentiality obligations. *Id*. This statement alone begs a series of rhetorical questions: Observations? Which observations? Aside from the fact that these observations supposedly respond to a statement by one of Plaintiffs' experts, on what factual foundation were these observations based? Was that factual foundation inquired about and revealed during fact discovery such that Plaintiffs' could develop the record on it or not? These and other pertinent answers are avoided by Defendants' responses.

Lastly, Defendants use similar tactics in defending the pertinent portions of Mr.

13

Blackwell's rebuttal report. Defendants suggest that Plaintiffs incorrectly contend that this report presented affirmative opinions about the value of the trade secrets alleged to have been stolen in this case, about the measure of damages, as well as presenting new opinions about competition. *Id*. Defendants then appear to contradict themselves in the very next sentence by stating that their expert identified calculations and considered factors that should have been, but were not, considered by Plaintiffs' expert. *Id*. This pair of statements begs a similar series of rhetorical questions: What exactly is the nature of these "calculations" and "factors" that should have been but were not considered by Plaintiffs' expert? What constitutes their factual foundations? Were these foundations inquired about and revealed during fact discovery such that Plaintiffs could fairly develop a record relating to them or not? Once again, these answers have been avoided by Defendants. The remainder of Defendants contentions in defense of the pertinent portions of Mr. Blackwell's report amount to little more than unhelpful finger-pointing that is of questionable relevance. While avoiding the subject of whether or not Mr. Blackwell's rebuttal report contained new allegations of fact or new evidence, Defendants focus their defense of the rebuttal report on the originating source of the allegations and evidence it discussed – which is irrelevant to whether or not Defendants' had timely disclosed their intention to rely on this information in one regard or another when asked. Defendants close by contending that "Plaintiffs cannot complain that Mr. Blackwell interviewed Vade Secure witnesses [that] Plaintiffs had the opportunity to depose . . . [and] Plaintiffs' own experts relied on witness interviews, including witnesses not identified in Plaintiffs' Rule 26 disclosures." *Id*. At bottom, the undersigned finds each and every one of Defendants' arguments to be unpersuasive.

To recapitulate, Plaintiffs seek to strike portions of Defendants' expert rebuttal reports based on evidence and theories not disclosed during fact discovery pursuant to Federal Rules of Civil Procedure 26(e) and 37(c)(1). *See* Ltr. Br. (dkt. 446) at 3. Rule 26(e)(1) requires all parties to supplement or correct their initial disclosures, expert disclosures, pretrial disclosures, and responses to discovery requests "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process

14

or in writing." Fed. R. Civ. P. 26(e)(1)(A). Supplementing or correcting these disclosures promptly is therefore required under that Rule without the need for a request from the opposing party or an order from the court. *See e.g. Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 U.S. Dist. LEXIS 108648, at *22 (N.D. Cal. Aug. 2, 2012) (citing *Oracle USA, Inc., et al. v. SAP AG, et al.*, 264 F.R.D. 541, 544 (N.D. Cal. 2009)). Furthermore, as noted by Plaintiffs, Rule 37 provides that a party's failure to comply with its Rule 26(e)(1) obligation must result in that party being precluded from the "use [of] that information . . . to supply evidence on a motion, at a hearing or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Once non-compliance is shown, the burden is on the party who failed to comply to demonstrate that it meets one of the two exceptions to mandatory sanctions. *See Apple*, 2012 U.S. Dist. LEXIS 108648, at *22 (citing *Oracle USA*, 264 F.R.D. at 545; and, *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001)). It should also be noted that a finding of bad faith is not a necessary prerequisite to imposing sanctions for violations of Rule 37(c)(1). *See Yeti by Molly*, Ltd., 259 F.3d at 1106.

Accordingly, based on the Parties' submissions, the undersigned finds that Plaintiffs are correct in that Defendants failed to disclose the above-mentioned allegations, evidence, and theories during fact discovery. Further, as discussed above, the undersigned also finds that Defendants have failed to establish substantial justification or harmlessness stemming from their failure to disclose this information until it appeared in the rebuttal reports of their expert witnesses. Because Defendants needed to formulate and disclose their theories and contentions in a timely manner, their failure to do so until after the close of fact discovery impeded Plaintiffs' ability to conduct fact discovery on the undisclosed theories, allegations, and evidence. Accordingly, Plaintiffs' request to strike the offending portions of Defendants' rebuttal reports that have been identified by paragraph numbers in the joint letter brief (*see* Ltr. Br. (dkt. 446) at 2) (enumerating the list of guilty paragraphs in each of Defendants' rebuttal reports) is **GRANTED** and those portions of Defendants' rebuttal reports are herewith **STRICKEN**. *See Apple*, 2012 U.S. Dist. LEXIS 108648, at *26; *see also Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1003-05 (N.D. Cal. 2019) ("[T]he rules were designed to require parties to

1  crystallize their theories of the case early in the litigation and to adhere to those theories once they
2  have been disclosed — not defer the disclosure of those theories until the expert rebuttal stage.")
3  (internal quotation marks and citations omitted).

4  Finally, the undersigned will address Defendants' request to strike portions of Plaintiffs'
5  opening reports which address claims against Vade Secure's content filter – namely, certain
6  paragraphs of Dr. Arnold's supplemental report, and certain paragraphs of Dr. Nielson's report.
7  *See* Ltr. Br. (dkt. 446) at 2. In this regard, Defendants incorrectly state that Plaintiffs are
8  "ambushing Vade Secure with expert opinions accusing Content Filter for the first time in their
9  expert reports and building the bulk of their damages theory on the shoulders of that undisclosed
10  contention." *Id*. at 5. It should be noted, however, that Defendants have been repeatedly
11  complaining, since the beginning of this case, that their content filter has not been property
12  accused or implicated among Plaintiffs' contentions. As noted by Plaintiffs, Defendants raised and
13  lost this argument in the context of Plaintiffs' many motions to compel the production of **all** of
14  Defendants' source code (from which Defendants unsuccessfully tried to distinguish their content
15  filter), which of course undermines Defendants' suggestion that its content filter was accused for
16  the first time Plaintiffs' expert reports. *See id*. (citing Dkt. 286-4 at 13-14; and, Dkt. 315-3 at 3-5,
17  8-12 (explaining Content Filter "contains the code for detecting malware, phishing, spam, and
18  spear-phishing" and "the same filter engine is used … for all Vade products"). Therefore, as
19  Plaintiffs put it, "Vade was aware [that its] Content Filter is accused at least in view of motion
20  practice." *See* Ltr. Br. (dkt. 446) at 5 (citing FRCP 26(e)(1)(A) (parties need not supplement when
21  "additional or corrective information" has "otherwise been made known to the other parties during
22  the discovery process or in writing").

23  Beyond this, Plaintiffs also note that their theories relating to Defendants' content filter
24  "were also identified in discovery responses explaining that [their] misappropriated code was
25  implemented 'within other areas and aspects of Vade's source code, such as Vade's filter
26  component,' and the accused identitymatch software was developed once and used in 'all
27  products' including Vade's 'filter as one such 'core component.'" *See id*. (citing the Dec. 11, 2020
28  Resp. to Rog. 10 at 12, 29-30 (referencing documents regarding Content Filter); also citing the

16

Feb. 12, 2021 Resp. to Rog. 13 at 36 (accusing Vade Secure Cloud (VSC), which the Vade designee explained is "one and the same" as Content Filter — e.g., Peck Tr. 29:24-30:8); also citing Compl. (Dkt. 1, Exh. J) (VSC marketing attached to Complaint as basis for claims). Plaintiffs then add that Defendants' claim of surprise is also undermined by "its own responses that identify the accused identitymatch module as part of Content Filter." Ltr. Br. (dkt. 446) at 5 (citing Dec. 7, 2020 Resp. to Rog. 6 at 26-27). Accordingly, Defendants' request to strike the portions of Plaintiffs' expert opinions regarding Defendants' Content Filter is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 1, 2021

ROBERT M. ILLMAN
United States Magistrate Judge