UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| PROOFPOINT, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>VADE SECURE, INCORPORATED, et al.,<br><br>    Defendants. | Case No. 19-cv-04238-MMC   (RMI)<br><br>**REPORT AND RECOMMENDATION RE: MOTION FOR SANCTIONS**<br><br>Re: Dkt. No. 457 |

Now pending before the court is a motion for evidentiary sanctions filed by Plaintiffs against their former employee, Defendant Olivier Lemarié (hereafter, "Lemarié") who left his job at Plaintiff Cloudmark (hereafter "Cloudmark") in 2016 and subsequently became an employee of Defendant Vade Secure (hereafter, "Vade"). *See generally* Pl.'s Mot. (dkt. 457). The motion has been fully briefed and came on for a hearing before the undersigned on May 26, 2021. For the reasons stated below, the undersigned recommends that Plaintiffs' motion be granted.

## BACKGROUND

In November of 2016, Lemarié resigned from his position as Cloudmark's Vice President of Gateway Technology where he had been employed since 2010. *Id*. at 7. Due to the sensitive nature of his employment, Lemarié had executed various agreements relating to the proper handling of Plaintiffs' confidential and proprietary information. *Id*. During the course of this employment, Lemarié was heavily involved in the development of Cloudmark's Trident product, as well as the Gateway Mail Transfer Agent ("MTA") as well as the next evolution of MTA, which would be a cloud-based version. *Id*. Just a few months after leaving his position at Cloudmark, Lemarié was retained as Vade's Chief Technology Officer, a similar position to the

1   one he occupied at Cloudmark and in which he "immediately began work on developing the same
2   technologies for Vade that he had developed as part of his work at Cloudmark." *Id*. Despite
3   admitting that he was contractually bound to delete all proprietary information from his electronic
4   devices upon leaving his employment at Cloudmark, Lemarié failed to delete certain quantities of
5   confidential and proprietary source code that were stored on his laptop computer and on a server at
6   his home. *Id*. at 8. Plaintiffs contend that – in addition to Lemarié's admissions to this effect –
7   evidence that was recently uncovered by Plaintiffs' forensic expert indicates that Lemarié is still in
8   possession of some quantity of Cloudmarks' confidential and proprietary source code. *Id.* Between
9   2016 and 2018, Lemarié reportedly copied, used and incorporated Plaintiffs' proprietary source
10  code into the corresponding source code for Vade's products. *Id*. In this regard, Lemarié declared
11  – under oath – that it was in, or around, September of 2018 when he retrieved his unauthorized
12  copies of Cloudmark's source code from his personal server and that he used portions of this
13  source code to implement one of Vade's products, but that he then promptly deleted the
14  Cloudmark source code. *Id*. However, at his deposition – once confronted with evidence of earlier
15  misappropriation – Lemarié was forced to admit that he may have started accessing and copying
16  from his secret stash of Cloudmark's source code months earlier, at least as early as May of 2018.
17  *Id*.
18       Plaintiffs filed this case – accusing Defendants, *inter alia*, of trade secret misappropriation
19  on July 23, 2019. *See generally* Compl. (dkt. 1). The following day, on July 24, 2019, Plaintiffs'
20  counsel sent Defendants a letter informing them of their obligations to preserve all relevant
21  evidence in their possession, custody or control. Pls.' Mot. (dkt. 457) at 9. Further, Defendants
22  were specifically informed that they were responsible for communicating their evidence
23  preservation obligations to any person, employee, or agent who may be positioned to discard or
24  destroy evidence, wherever it may be kept, including at any off-site repositories. *See* Ltr. (Dkt.
25  457-10) at 2, 7. Two days later, on July 26, 2019, a similar letter was served on Lemarié at his
26  residence. Pls.' Mot. (dkt. 457) at 9. In the course of his deposition on February 10, 2021, Lemarié
27  admitted that, sometime in August of 2019, – he told Vade's CEO about his intentional copying
28  and use of Cloudmark source code from his secret stash into Vade's products. *Id*. As Plaintiffs

point out, this testimony reveals the falsity of Lemarié's previously-filed sworn declaration from January 17, 2020, wherein he claimed – under penalty of perjury – that upon leaving his employment at Cloudmark, he had deleted all Cloudmark files, documents, and information from his personal computers. *Id.*[1] Tellingly, none of Lemarié's demonstrably false statements or representations were ever voluntarily corrected by Lemarié himself, or by Vade, or by any of their counsel during the entire period wherein Defendants' were struggling mightily against producing their source code pursuant to this court's several orders repeatedly directing them to do so. The truth began to trickle out more than a year after the commencement of discovery, and just a few months before the fact discovery cut-off deadline, when Vade was finally forced to produce its source code on November 30, 2020, as a result of a coercive regime of punitive fines, and the threat of an adverse inference instruction. Pls.' Mot. (dkt. 457) at 9-10. As it turns out, even the certifications filed late last year by Vade's counsel and its CEO purporting to certify that they had tendered *all* of their source code in discovery may have been false or incorrect because late discovery from Lemarié would show that some quantity of Vade source code was in Lemarié's possession that still has not been tendered in discovery. *Id*. at 9-10, 28-29 ("Vade has never produced these [1,500 source code files] from Lemarié's laptop or the [laptop's] backups, despite that Plaintiffs' Request No. 7 [] seeks Lemarié source code and was one of the requests for which Vade was ordered to produce and [was] subsequently sanctioned.").

        In any event, as the fog of Defendants' obfuscations begins to clear – it is becoming increasingly apparent to the undersigned that all of the delays in discovery and Defendants' maneuvering have been part of a concerted effort by Vade, Lemarié, and their counsel to conceal Lemarié's evidentiary spoliation such as to conceal what is emerging to appear as each Defendants' role in the accused misappropriation of Plaintiffs' trade secrets. Aside from never correcting the above-mentioned false declarations by Lemarié, there is another potential indication of Defendants' counsel's involvement in all this maneuvering. In October of 2019, during

---

[1] Indeed, Plaintiffs have identified so many of Lemarié's contradicted, or demonstrably false, statements throughout this litigation that they have assembled them into a chart. *See* Reply Br. (dkt. 541) at 6-7 (hereafter referred to as "false statement chart").

discussion about "the status of Defendants' efforts to preserve, collect, and produce from Lemarié's electronic devices and accounts to ensure no evidence was lost for discovery in this action . . . Defendants' counsel assured Plaintiffs that they were taking reasonable efforts to preserve evidence." *Id*. at 10. Counsel's assurance was likely a hollow gesture because, a few months later, on June 18, 2020, Lemarié declined to provide descriptive information called for by interrogatories served on him to describe or identify steps taken to preserve relevant information. *Id*. at 11. In the weeks that followed, Plaintiffs learned two things: (1) that there had not been any forensic preservation of the contents of Lemarié's devices and accounts; and (2) the general message from the attorneys then-representing Vade and Lemarié (both have since retained new counsel) "was that they had relied entirely on Lemarié himself to preserve and identify relevant and responsive materials for production in this case, and that they believed this constituted reasonable efforts." *Id*. Following Defendants' prior counsel's well-documented resistance to the production of any evidence in this case, "it was not until late September 2020 that any effort was made to collect and forensically preserve Lemarié's devices and repositories." *Id*. Ultimately, it was not until this issue was brought before the undersigned, at a hearing on September 24, 2020, that Lemarié's then-new counsel represented that the devices in question were being forensically imaged. *Id*. This change in direction – no doubt occasioned by the appearance of new counsel for Lemarié – was followed by a stipulated protocol for forensic discovery into Lemarié's devices and accounts which became the subject of a court order (dkt. 275) entered on October 5, 2020.

Plaintiffs submit that "[e]ven under the Protocol, Lemarié continued to drag out the process and produce information in a piecemeal fashion." Pls.' Mot. (dkt. 457) at 12. First, in late October, Lemarié produced two sets of non-content forensic metadata that Plaintiffs' expert deemed to be incomplete. *Id*. Then, in late November, Lemarié made another production that he suggested had cured the issues; however, this production was also incomplete because it failed to provide any forensic metadata for two servers that Lemarié had identified as having hosted unauthorized backups of Cloudmark's source code that Lemarié had admitted to accessing and copying from in 2018 – despite the fact that these servers were expressly identified in the stipulated protocol. *Id*. These seemingly never-ending failures in production, and this protracted

4

campaign of foot-dragging caused Plaintiffs to file yet another motion to compel on January 11, 2021, which caused Lemarié to relent, resulting in Plaintiffs' withdrawal of the motion (dkt. 410) before the undersigned heard the dispute. When Lemarié finally produced this material on January 21, 2021, "the produced metadata [from these two servers] revealed the presence of files corresponding to several backups of Lemarié's laptop computer" that Plaintiffs believe "have never been collected or examined by Defendants as part of discovery in this case." Pls.' Mot. (dkt. 457) at 12. Plaintiffs' forensic examination of this data reveals that "Lemarié generated the [] backups of his laptop starting on July 27, 2019 and through July 29, 2019, but never disclosed or shared the backups (or his laptop) through discovery in this case, and continued to use his laptops without any forensic preservation until more than a year had passed in September [of] 2020." *Id*. at 12-13. On January 29, 2021, when Plaintiffs finally learned about these backups, they served discovery requests pertaining to that information. *Id*. at 13. Given that the proverbial cat was out of the bag, Lemarié's deposition testimony of February 10, 2021, maintained that he had caused the creation of these backups specifically to comply with his evidence preservation obligations for this litigation. *Id*. Despite this contention, Lemarié's new counsel continued to refuse to produce this information until March 12, 2021 – that is, after the close of fact discovery, and after the due date for Plaintiffs' opening expert reports. *Id*. In fact, on March 22, 2021, Lemarié served his own expert report for a forensic expert who relied heavily on these backups to suggest that despite Defendants' failure to forensically image Lemarié's devices for more than 1 year after the case was filed, there was supposedly no spoliation concern here because of the assertion that Lemarié had "preserved" all files using this backup method. *Id*.

However, Plaintiffs' own forensic examination revealed this too to be false in that the backups in question were in fact not a complete backup of Lemarié's laptop. *Id*. This forced Plaintiffs to bring this matter to the attention of Lemarié's counsel on March 29, 2021 – and it was not until April 5, 2021, that Lemarié's counsel responded with the now-familiar tactic of admitting that the previous production had not "properly" or "fully" captured the files contained in these backups. *Id*. Thus, well after the relevant deadlines, and with superlative obstructionism, in April of 2021, Defendants produced 30 gigabytes of previously unproduced data. *Id*. at 13-14. Plaintiffs'

5

forensic examination of this tardily produced data – at long last – demonstrated that "the file lists and forensic artifacts from this belated discovery reveal the destruction and suppression of significant amounts of evidence by Defendants during the pendency of this case, due in no small part to their failure to even attempt to forensically image the devices of Lemarié . . . until more than one year into [the] litigation." *Id*. at 14.

The first backup of Lemarié's laptop computer was generated on July 27, 2019, three days after he became aware of this case on the date of its filing (as discussed below), and one day after one had been served with a copy of the complaint and Plaintiffs' evidence preservation letter. *Id*. at 16. Plaintiffs' forensic examination of "some of the limited forensic metadata that managed to survive shows that Lemarié intentionally deleted specific, relevant documents after he was on notice of this case, but before" he generated any of these backups that he claims were effected for the "preservation" of evidence. *Id*. at 15. In any event, as Plaintiffs' expert has pointed out, unlike a forensic imaging of a device, generating the sort of backup involved in this case does not capture a complete and accurate image of a computer as of a certain moment in time. *Id*. at 16. Thus, if Lemarié had actively deleted files from his laptop between the time he learned of this litigation and the time that he created a backup, those deleted files would not be captured by the backup "unless, by chance, certain metadata that reflects the existence of [the deleted] files happened to be saved." *Id*. However, as pointed out by Plaintiffs' forensic expert, the operating system of the laptop in question would in fact create certain registry files that contain limited data pertaining to facts such as when a particular file was accessed (along with the file path, file name, and the date and time it was accessed – and, while this registry type of data would not show whether a file was deleted, copied, or moved (let alone the time and date of such action, and certainly not its content), it would suffice to identify files accessed through Microsoft Office (as opposed to other file types such as .pdf files, images, and so on). *Id*. Plaintiffs' forensic examination of such a registry file revealed that on July 24, 2019 – one day after this case was filed – Lemarié created and accessed two Microsoft Office documents of unknown size and content with the file names, "Trade Secret Notes," and "Trade Secret Notes Olivier Lemarie," however, no actual documents with either of these names, or any similar names, appear within the backups that Lemarié created starting on July

6

27, 2019, or anywhere in the forensic image of his laptop that was captured in September of 2020. *Id*. at 17. The clear implication if this chain of events – as Plaintiffs put it – is that Lemarié created, accessed, and then deleted these files after learning of the institution of this lawsuit but before generating his first backup on July 27, 2019. *Id*. Plaintiffs add that these acts, occurring on July 24, 2019, contradict the contention by Lemarié that he only learned of this litigation on or about July 26, 2019 when an unknown attorney contacted him through LinkedIn, the professional networking website, in order to offer to represent Lemarié in litigation of which he claimed to be previously unaware. *Id*. at 17-18. In short, Plaintiffs submit that (1) Lemarié was aware of this litigation no later than the day after it was filed, July 24, 2019; (2) that he created, accessed, and then deleted at least two Microsoft Office files of unknown size and content pertaining to the trade secrets at the heart of this case; and, (3) that after deleting what incriminating material he could find on his laptop, he began to create some self-serving backups on July 27, 2019, to make it appear as though he had not intentionally destroyed relevant evidence when he had. *Id*. at 18-19. In short, while Plaintiffs' forensic examination has found direct evidence that at least these two named files that were deleted on July 24, 2019, such is only the case because these files were associated with an automated registry function due to being Microsoft Office files, Plaintiffs suspect – but cannot prove (due to this spoliation) – that Lemarié in fact deleted significant amounts of Plaintiffs' proprietary data from his laptop during this period as well, specifically, the very same data which he admitted having told Vade's CEO that he had copied and incorporated into Vade's products. *Id*. at 19-21. Plaintiffs also note that Vade's complicity in this chain of events is manifest because of "Defendants' [collective] attempt to mislead the Court through false declarations regarding Lemarié's copying of source code at the outset of the case, [their] protracted resistance to providing any discovery, and failing to timely preserve devices that Defendants knew contained Cloudmark confidential information at one point in time," which, as Plaintiffs see it, indicates that "Defendants allowed this information to be lost [specifically] so that it could not be used in [this] litigation." *Id*. at 21. As to the remoteness of the possibility that it was only these two Microsoft Office files that Lemarié deleted before creating his backups on and after July 27, 2019, Plaintiffs argue that "the Court should not accept or assume that the pre-backup

deletions of user files stopped at just the two "Trade Secret Notes" documents . . . [because] Defendants lost the benefit of the doubt when they failed to timely preserve the very devices that Lemarié himself admits contained" Plaintiffs' confidential and proprietary trade secret data. *Id*.

To make matters worse, Plaintiffs contend that additional relevant evidence was spoliated from Lemarié's laptop computer after July of 2019. *Id*. Plaintiffs submit that "[l]arge tranches of additional relevant documents" were deleted from Lemarié's laptop after the aforementioned backups were created because Lemarié "installed and ran a file shredding program to periodically 'clean' his computer during the pendency of this case." *Id*. While the backups contain a list of certain files that existed on the laptop as of July 27, 2019 (not including whatever files Lemarié had deleted the between July 24th and July 27th), this list shows that more than one hundred thousand files from Lemarié's Cloudmark work email account had been retained on the laptop even after this case was filed, and while these lists (contained in the backups) do not show the subject of these emails, the names of certain attachments (such as three documents entitled "Trident Product Architecture") were present on Lemarié's laptop when it was first backed up but have since been destroyed by Lemarié's periodic use of the file-shredding functions on an application called, "CleanMyMac X," such as to remove this data from his laptop. *Id*. at 22-24. According to Plaintiffs' forensic expert, the lost evidence cannot be recovered, restored, or replaced through additional discovery; and, even if the backups were recoverable, Defendants' subsequent deletions from the laptop through the use of this file shredding program has resulted in the loss of "important forensic metadata" that would have indicated when Lemarié accessed each file – instead, all of the "last accessed" dates now merely reflect the dates and times for the backup process rather than reflecting the last access by a user of the file. *Id*. at 23. As described by Plaintiffs' forensic expert, when Lemarié installed the "CleanMyMax X" program on his laptop on February 28, 2020 – eight months into this case – through the use of the program's file shredding function which permanently deletes files without leaving a trace, more than 60 gigabytes of data were deleted from the laptop that Lemarié was using at the beginning of this case, and another 30 gigabytes of data were deleted from a new laptop to which Lemarié had switched during the pendency of this case. *Id*. at 24. In response to Lemarié's contention that he only used

"CleanMyMax X" to address slowed performance issues with his devices, Plaintiffs contend that he continued to use the program even after "switching to a brand-new laptop in February of 2020 and proceeded to irrecoverably delete at least 30 additional gigabytes' worth of data using the program." *Id*. at 26. Importantly, Plaintiffs add that Lemarié's sham backups are of little to no use "as the last of those backups is dated July 29, 2019, and thus does not capture any of the files or activity on Lemarié's laptop during the period that CleanMyMac X was installed and in use . . . [thus] the full extent of this spoliation cannot be known because CleanMyMac X has functionality that permanently deletes files without a trace." *Id*. at 26.

Additionally, Plaintiffs submit a series of additional reasons why the requested spoliation sanctions should apply with equal force to all Defendants. First, Plaintiffs note that as Vade's Chief Technical Officer, Vade's duty to preserve evidence extends to those employees likely to have relevant information – that is, the "key players" in the case. Second, Plaintiffs add that during the period of spoliation, Vade and Lemarié shared the same counsel at Baker & McKenzie, "the very counsel who failed to forensically preserve Lemarié's devices for over a year into the litigation, or to search and collect from those devices despite constant requests from Plaintiffs to do so, and despite Defendants joint representations in interrogatory responses that they had 'taken reasonable steps to preserve documents and information,'" all of which took place during an extended period of time during which these same attorneys did everything in their power to frustrate and impede the discovery process. *Id*. at 27. Third, Plaintiffs note the coordination between Vade and Lemarié in both obstructing the discovery process as a whole (such that, *inter alia*, these acts of spoliation might remain undiscovered) as well as Vade's "involvement in seeking and filing Lemarié's misleading declaration in opposition to Plaintiffs' motion for preliminary injunction," which Plaintiffs argue was all part of a concerted effort to deprive them access to relevant, if not crucial, evidence. *Id*. Fourth, Plaintiffs submit that Vade should be made to suffer its share of consequences under principles of equity as well as agency law in that a large quantity of potentially relevant evidence was intentionally destroyed by Vade's agent (meaning that Vade should be liable under the doctrine of *respondeat superior*) and that the prime beneficiary of this misconduct is undoubtedly Vade (meaning that the misconduct must be

imputed to Vade such as "to ensure fairness is done at trial."). *Id*. at 28.

## LEGAL STANDARD

There are two sources of authority under which a district court can sanction a party who has destroyed evidence. *See generally Leon v. IDX Systems Corp.*, 464 F.3d 951, 958-599 (9th Cir. 2006). First, under the rules-based approach, Rule 37(e)(1) provides that in cases where electronically stored information ("ESI") should have been preserved but is lost because a party has failed to take reasonable steps to preserve it, and the ESI cannot be restored or replaced through additional discovery, upon finding prejudice to another party from the loss, a court may order measures no greater than necessary to cure the prejudice – alternatively, under Rule 37(e)(2), if there is a finding that the party acted with the intent to deprive another party of the information's use in the litigation, a court may impose a presumption that the lost information was unfavorable to the culprit, instruct the jury that it may or must presume the information was unfavorable to the culprit, or dismiss the action or enter a default judgment. Second, it is well established that federal courts "have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983).

## DISCUSSION

Without mincing words, and without repeating the many criticisms that the undersigned has leveled at Defendants' handling of this case in prior orders, the undersigned will begin by observing that these Defendants have been playing a dangerous game since the outset of this litigation and the time has now come for them to take their seat at the banquet of consequences that they have invited upon themselves. The record of this misconduct – as described above and as narrated in the many discovery orders issued over the last year – speaks for itself and does not require reiteration. As was the case on each of the numerous prior occasions that Defendants' misbehavior has been brought before this court for review, their explanations are little more than deflections and further obfuscation. As for their opposition to the instant motion, the undersigned finds that Defendants' key representations and assertions are simply not credible, and therefore their arguments are not persuasive.

It should first be noted that Defendants now admit that "[o]n the day the lawsuit was filed, Mr. Lemarié and several Vade Secure executives met with counsel and began to respond to the issues raised by Plaintiffs' claims and to preserve their documents." *See* Defs.' Opp. (dkt. 508) at 7. This seems to be the third version of this story advanced by Defendants. First, Defendants contended that "Lemarié learned of this litigation on or about July 26, 2019, when a previously unknown attorney contacted him via LinkedIn and offered to represent him in the litigation." *See* Lemarié's Rog. Resp. (dkt. 399-13 *SEALED*) at 17. Then, quite some time later, Defendants adjusted the operative date through a declaration submitted by Lemarié: "I first learned of the above-captioned litigation when I saw, on the morning of July 24, 2019, a message via LinkedIn, dated July 23, 2019 11:45 pm from an attorney offering to represent me in this litigation." *See* Lemarié Decl. (dkt. 506-8 *SEALED*) at 3. Lastly, the story may have shifted for a third time to reflect that Lemarié was aware of this lawsuit on the day it was filed (July 23, 2019) because he and other Vade executives now claim that they met "on the day the lawsuit was filed" to discuss the case. *See* Defs.' Opp. (dkt. 508) at 7. Of course, the date on which Lemarié became aware of the existence of this lawsuit is important because it may be used to determine the trigger point for his obligation to preserve potentially relevant evidence.[2]

The duty to preserve evidence is triggered once a potential claim is identified; at that point, a litigant is under a duty to preserve evidence which he or she knows, or reasonably should know, is relevant to the potential litigation. *See Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 991 (N.D. Cal. 2012); *UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc. Copyright Litig.)*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006) ("As soon as a

---

[2] Defendants then make yet another shift – later in the same document – and contend that Lemarié "first learned about the lawsuit on the morning of July 24, 2019 (Paris time) . . ." *Id*. at 9. Defendants argue that none of these conflicting dates show an effort to deceive because Lemarié's interrogatory response hedged about the precision of the July 26, 2019 date by claiming that it was "on or about" that date when he learned about the litigation. *Id*. at 9 n.2. However, the undersigned finds any reliance on this hedge to be unavailing and non-credible as it fails to account for the other somewhat specific detail of Lemarié's recollection; namely, that it was through being contacted by an unknown attorney through the internet that informed Lemarié about the existence of this lawsuit. Thus, the use of "on or about" does not reconcile Lemarié's recollection about learning about this case from an unknown attorney contacting him through the internet, and Defendants' new admission that various Vade officers, including Lemarié, were aware of the lawsuit the day it was filed and met together with counsel to discuss the case that day.

potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action."); *Hynix Semiconductor, Inc. v. Rambus Inc.*, 591 F. Supp. 2d 1038, 1061 (N.D. Cal. 2006) (duty to preserve is triggered when it becomes apparent that litigation is more than a mere possibility); *see also Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (reasonable foreseeability of litigation is a flexible, fact-specific, and objectively-determined inquiry that allows a court to exercise the discretion necessary to navigate the multitude of factual circumstances that can arise in the context of a spoliation inquiry; and, while the standard does not automatically impose the duty to preserve documents whenever there exists a distant or remote possibility of litigation, it is also not so inflexible as to require that litigation be imminent, or even probable without significant contingencies). While it could be reasonably contended under these standards that this litigation was reasonably foreseeable to at least Lemarié long before the case was actually filed, the undersigned finds that Lemarié has been aware of this lawsuit <u>at least</u> since July 23, 2019, "the day the lawsuit was filed," to put it in Defendants' words.

Defendants then advance an unpersuasive excuse for Lemarié's deleting of the two above-discussed documents entitled "Trade Secret Notes," and "Trade Secret Notes Olivier Lemarié" – which came to light as a result of Plaintiffs' forensic examination which was greatly delayed by Defendnats' year-long maneuvers calculated to obstructing discovery in this case – namely, Defendants contend that these were "notes reflecting the privileged and work product communications he and Vade Secure had with their lawyers . . ." *Id*. at 10. Thus, in self-serving fashion, Defendants contend that "[t]hese documents did not include, as Plaintiffs imagine, some confessional list of stolen trade secrets or any other fantastical inculpatory evidence – they were simply notes of privileged conversations held with the Baker firm on the first day of the lawsuit." *Id*. (citing only to Lemarié's own declaration). However, as Plaintiffs point out, and as Judge Illston has observed in a similar context: "the proper procedure for privileged documents is to assert that privilege, not to destroy the evidence. It was not up to [the spoliator] to determine what documents were privileged." *Moore v. Gilead Scis., Inc.*, No. C 07-03850 SI, 2012 U.S. Dist. LEXIS 26156, at *10-11 (N.D. Cal. Feb. 29, 2012) (citing *Leon*, 464 F.3d at 959 ("[B]ecause the

12

relevance of destroyed documents cannot be clearly ascertained because the documents no longer exist, a [spoliating] party can hardly assert any presumption of irrelevance as to the destroyed documents."). Therefore, this self-serving explanation is ineffective and the undersigned finds that Defendants are in no position to credibly inform the court or Plaintiffs as to the contents of documents that Lemarié has admitted to destroying after being on notice of his duty to preserve.

      Likewise, the undersigned can lend no credence whatsoever to Defendants' contentions that attempt to place the shroud of innocence around Lemarié's use of CleanMyMac X to do what Plaintiffs' contend was wholesale evidentiary destruction, but which Defendants contend to have been nothing more than the innocent effort "to clean up clutter from his laptops and improve their performance." *Id*. at 21 (citing only to Lemarié's own declaration). Defendants then add that "even if one credited Plaintiffs' baseless speculation that Mr. Lemarié later used CleanMyMac X to destroy documents during this lawsuit, all of the documents from his laptop are still preserved in the initial backups." *Id*. at 22 (citing only to Lemarié's own declaration). Defendants then dismiss the above-described concerns expressed by Plaintiffs' forensic expert pertaining to exactly how the "backups" created by Lemarié were rendered ineffective by his subsequent use of CleanMyMac X – however, the undersigned finds all of Defendants contentions in this regard (*see id*. at 21-23) to be unpersuasive and, frankly, self-serving. The undersigned finds that Vade and Lemarié, acting in concert, set out from the outset of this case to deny Plaintiffs access to whatever quantum of evidence they possibly could, and by any means necessary, ranging from obstructing the discovery process itself to destroying evidence and everything in between. Then there is also the matter of the still unproduced Vade source code that has been discovered to exist on the backups created by Lemarié on his personal servers. *See* Pls.' Reply (dkt. 541) at 16. Defendants spend very little time or energy addressing this issue. *See* Defs. Opp. (dkt. 508) at 29-30. Vade simply contends in this regard that "Vade Secure has never had possession, custody, or control over Mr. Lemarié's personal devices, has no basis to know what documents were on his personal laptop or backup servers, and has fully complied with its own discovery obligations in this case." *Id*. at 39. The undersigned finds this distinction – between Vade the employer and Lemarié, Vade's Chief Technology Officer – to be immaterial in the present context. Frankly, the

13

undersigned sees the assertion of this distinction as little more than another example of Defendants' artifice that is calculated to (yet again) avoid compliance with the previously issued discovery orders of this court. After all, if there were any merit to Defendants' suggestion, then any employer or principal in any case could always avoid producing any physical or data evidence by simply asking an employee or agent to hold it for them until after the discovery cut-off date. In this regard, it is important to note that the undersigned clearly warned Vade in November of 2020 (*see* Order (dkt. 334) at 10) that the consequence of continuing to play these games with the court would result in findings and a recommendation for an adverse inference instruction at trial if Vade continued to fail to comply with court orders directing it to produce <u>all</u> of its source code in discovery. Contrary to Vade's self-serving contentions that it had no control over its *own* source code simply because it was reposed on the personal computers of its *own* agent, the undersigned simply does not believe the suggestion that Vade was unable to direct its agent to produce Vade's source code in compliance with the court's order of November 11, 2020. Accordingly, the undersigned finds that Vade has been in violation of that order for the entire time between its issuance and the present, and that Vade should now reap the consequence of that intransigence. The only remaining question, as the undersigned sees it, is selecting the appropriate remedy to recommend to the presiding judge – an adverse inference instruction, or the ultimate sanction of default judgment. While the undersigned struggled with this question, due to the fact that the above-discussed chain of events could very well support the entry of a default judgment, for the reasons set forth below, the undersigned will recommend the issuance of an adverse inference instruction at trial pertaining to: (1) the two documents of unknown size or content that Defendants have admitted to destroying but which they now claim were privileged; (2) the entirety of the portions of Vade untendered source code that were discovered to exist due to Lemarié's backup and that have not been tendered in discovery by Vade in violation of the Order of November 11, 2020; and, (3) the entirety of the many gigabytes of data that Plaintiffs have identified as being destroyed by Lemarié's use of the file shredding program called CleanMyMac X.

In this circuit, destruction of evidence is considered willful spoliation when a party has

1    some notice that documents were potentially relevant to litigation before they were destroyed.
2    *Leon*, 464 F.3d at 959 (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th
3    Cir. 2002). Also, because of the difficulty in clearly ascertaining the details regarding the
4    relevance of documents or information that no longer exist, Defendants are in no position to argue
5    for a presumption of irrelevance or privilege to documents that they destroyed (or withheld in
6    violation of this court's previously issued orders) while on full notice of their potential relevance
7    to Plaintiffs claims in this case. *See id*. (citing *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173,
8    1205 (8th Cir. 1982)). Thus, for the reasons discussed herein, the undersigned finds that
9    Defendants' destruction and withholding of the three categories of evidence discussed above
10   qualifies as willful spoliation because Defendants knew they were under a duty to preserve all of
11   this evidence, but instead they intentionally destroyed, concealed, and withheld it while doing
12   everything possible to cover their tracks and hide the acts of concealment and destruction.

13         Having found bad faith and willful spoliation, the undersigned must now evaluate how
14   Defendants' actions have impaired Plaintiffs' ability to have a fair trial, and to what degree the
15   spoliation has threatened to interfere with the rightful decision of the case. *See Leon*, 464 F.3d at
16   959. If spoliation requires a party to go to trial and rely on "incomplete and spotty" evidence, this
17   has been held to constitute a sufficient showing of prejudice. *Id*.; *see also Anheuser-Busch, Inc. v.*
18   *Nat. Beverage Distribs.*, 69 F.3d 337, 354 (9th Cir. 1995). For the reasons discussed herein, the
19   undersigned finds that Plaintiffs have shown the requisite degree of prejudice in that Defendants'
20   maneuvering has in fact forced Plaintiffs to proceed to trial on spotty and incomplete evidence
21   because Defendants have effectively deprived Plaintiffs' of the use of the three categories of
22   evidence mentioned above.

23         As to the suitability of lesser sanctions, Defendants contend that "[m]yriad lesser sanctions
24   are available here without imposing the death penalty sanctions Plaintiffs ask for in the form of
25   default or an adverse inference instruction . . . the Court could require a monetary payment,
26   exclude documents from evidence, permit additional discovery to Plaintiffs, or grant extra time at
27   trial to Plaintiffs." *See* Defs. Opp. (dkt. 508) at 28. These suggestions are all unpersuasive. No
28   amount of extra time granted to Plaintiffs at trial could cure the fact that Defendants have deleted

documents based on their usurpation of the judicial function of rendering rulings as to assertions of privilege, nor could a cure be found through the giving of a monetary award of any sum (unless of course that sum is equal to or greater than the full amount of damages to which Plaintiffs can establish an entitlement in this case, but, then again, such a monetary award would be the substantial equivalent of entering a default judgment). Likewise, excluding *other* documents from evidence would not have the effect of undeleting the files and data that Defendants have deleted. Lastly, granting Plaintiffs leave to conduct extra discovery would amount to overlooking Defendants' misconduct while, at the same time, overlooking and ignoring the prejudice to Plaintiffs' case caused by the destruction of data described above. In short, none of Defendants' suggested lesser sanctions could cure the prejudice to Plaintiffs' case caused by the combination of Defendants willful destruction and withholding of evidence.

Nevertheless, the undersigned must still address the suitability of the lesser sanction of an adverse inference instruction, as compared to the alternative of entering a default judgment as suggested by Plaintiffs. In deciding on the propriety of the harsh sanction of default, this court must weigh five factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to effectively and fairly manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *See Anheuser-Busch, Inc.*, 69 F.3d at 348. Also, in certain cases (not applicable in the present context) there should be an inquiry as to whether the district court warned the party of the possibility of dismissal before ordering dismissal, in essence, this is part of the "consideration of alternatives" requirement. *See Malone v. United States Postal Serv.*, 833 F.2d 128, 132 (9th Cir. 1987).

As to the propriety of entering a default, while it appears that a majority of the five factors mentioned above would counsel the entry of default, the undersigned is of the opinion that such a sanction is better reserved for circumstances under which there is no conceivable way to allow for a fair trial on the merits through issuing an adverse inference instruction. Given Plaintiffs' impressive efforts in overcoming Defendants' campaign to deprive Plaintiffs of such an opportunity, and given the quantity and quality of evidence that Plaintiffs seem to have been able

16

to gather (as described in the papers attending this sanctions motion) it appears to the undersigned that what evidence has been gathered, if coupled with an instruction wherein the jury must presume that the destroyed and withheld evidence was favorable to Plaintiffs and probative of their claims, it appears to the undersigned that such an instruction would effectively cure the prejudice created by Defendants' misconduct.

As to Plaintiffs' request for an adverse inference jury instruction, the undersigned will note that courts can take the drastic measure of instructing the jury to entertain such a presumption if the court finds that the culpable party "acted with the intent to deprive another party of the information's use in the litigation." See Fed. R. Civ. P. 37(e)(2). Intent may be shown "when the evidence shows or it is reasonable to infer, that . . . a party purposefully destroyed evidence to avoid its litigation obligations." *See Porter v. City & Cty. of San Francisco*, Case No. 16-cv-03771-CW(DMR), 2018 U.S. Dist. LEXIS 151349, 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018); *see also First Fin. Sec., Inc. v. Freedom Equity Grp.*, LLC, No. 15-cv-1893-HRL, 2016 U.S. Dist. LEXIS 140087, 2016 WL 5870218, at *3 (N.D. Cal. Oct. 7, 2016) (finding that the defendant's agents acted with intent in deleting text messages based on evidence of an "explicit agreement to avoid communicating electronically," which "suggest[ed] a shared intent to keep incriminating facts out of evidence"); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 501 (S.D.N.Y. 2016) (the plaintiff's conduct was intentional under Rule 37(e) because, absent "any other credible explanation for [plaintiff's alteration of] the email addresses, it is more than reasonable to infer that the intention was to manipulate the digital information specifically for purposes of this litigation"); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (the plaintiff's conduct was intentional under Rule 37(e) where the evidence showed that the plaintiff either purposefully deleted e-mails that showed she might have fabricated the existence of a report that was critical to her lawsuit or purposefully failed to take any steps to preserve the e-mails); *Brown Jordan Int'l, Inc. v. Carmicle*, No. 14-cv-60629, 2016 U.S. Dist. LEXIS 25879, 2016 WL 815827, at *37 (S.D. Fla. Mar. 2, 2016) (imposing adverse inference sanctions against defendant for spoliation of evidence because the court found that defendant failed to take reasonable steps to preserve electronically stored information on his personal and

17

company-owned devices); *see also Internmatch, Inc. v. Nxtbigthing*, LLC, No. 14-cv-5438, 2016 U.S. Dist. LEXIS 15831, 2016 WL 491483, at *4-5, *12-14 (N.D. Cal. Feb. 8, 2016) (granting plaintiff a preclusion order, an adverse inference instruction, and attorneys' fees as sanctions because defendants willfully spoliated evidence by intentionally discarding devices that contained the electronic versions of the evidence despite having a duty to preserve relevant evidence). In these regards, the undersigned finds that Defendants have acted (in destroying and withholding evidence) with the specific intent of depriving Plaintiffs' use of the information in the litigation (*see* Fed. R. Civ. P. 37(e)(2)), and that it is beyond question at this point that the missing evidence was destroyed or withheld specifically such that Defendants could avoid their litigation obligations.

Thus, when intent is found, as is the case here, the court may impose a presumption that the lost information was unfavorable to the party that lost or destroyed it, and therefore, the court may issue an adverse inference instruction to the jury. *See* Fed. R. Civ. P. 37(e)(2)(A)-(C). While the Advisory Committee Notes for Rule 37 stress that the sanctions available under (e)(2) are not to be used unless a party intentionally destroyed evidence (*see* Fed. R. Civ. P. 37(e)(2), Advisory Committee's notes to 2015 Amendment), the undersigned has found that Defendants acted with the intent to deprive Plaintiffs of the destroyed information's use in this litigation – to wit: (1) the two documents that Defendants have admitted to destroying but which they now claim were privileged; (2) the entirety of the portions of Vade source code that were discovered to exist due to Lemarié's backup but that were not tendered in discovery by Vade in violation of the Order of November 11, 2020; and, (3) the entirety of the many gigabytes of data that Plaintiffs have identified as being destroyed by Lemarié's use of the file shredding program called CleanMyMac X.

//
//
//
//
//

**CONCLUSION**

Regarding this destroyed or otherwise missing information, the undersigned herewith **RECOMMENDS** that, pursuant to Fed. R. Civ. P. 37(e)(2)(A) & (B), the court presume it is unfavorable to Defendants, and further, the undersigned **RECOMMENDS** that the court instruct the jury in this case that it must presume that the lost or withheld information was unfavorable to Defendants and that it was probative of Plaintiffs' claims.

Any party may file objections to this Report and Recommendation with the district court within fourteen (14) days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B) & (C); Fed. R. Civ. P. 72(b); Civil Local Rule 72-3. Failure to file objections within the specified time may waive the right to appeal the district court's order.

**IT IS SO ORDERED.**

Dated: June 1, 2021

_____
ROBERT M. ILLMAN
United States Magistrate Judge