Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Iman Lordgooei (SBN 251320)
imanlordgooei@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Jodie W. Cheng (SBN 292330)
jwcheng@jwc-legal.com
**JWC LEGAL**
One Market Plaza, Suite 3600
San Francisco, California 94105
Telephone: (415) 293-8308

Attorneys for Plaintiffs,
Proofpoint, Inc. and Cloudmark LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PROOFPOINT, INC.; CLOUDMARK LLC | CASE NO. 3:19-cv-04238-MMC |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO VADE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| v. | |
| VADE SECURE, INCORPORATED; VADE SECURE SASU; OLIVIER LEMARIÉ | Judge: Hon. Maxine M. Chesney |
| Defendants. | Trial Date: July 26, 2021 |
| | Time: 8:30 a.m. |

# TABLE OF CONTENTS

I.     LEGAL STANDARD ...........................................................................................1

II.    ARGUMENT .......................................................................................................1

    A.    Plaintiffs Presented Substantial Evidence of Misappropriation &
        Infringement ...........................................................................................1

        1.    Vade for Office 365: Zenika Spear Phishing Module .....................1

        2.    Vade for Office 365: Identitymatch Spear Phishing Module.........2

        3.    Content Filter..................................................................................3

        4.    Vade for O365: Microsoft Office 365 Integration .........................6

        5.    MTA Builder ...................................................................................6

    B.    There is Substantial Evidence Showing Plaintiffs Had Protectable Trade
        Secrets ....................................................................................................7

        1.    Plaintiffs Identified the Trade Secrets with Sufficient Particularity ..............7

        2.    There is Substantial Evidence That Cloudmark's Trade Secrets
            Derive Independent Economic Value from Being Secret ..............................9

        3.    There Is Ample Evidence Showing Plaintiffs Took Reasonable
            Measures to Protect the Trade Secrets .........................................13

    C.    Defendants Failed to Provide Any Evidence that Plaintiffs' Copyright
        Registrations Are Invalid ......................................................................16

    D.    There is Substantial Evidence Vade Is Liable for Lemarié's Acts of
        Misappropriation and Copyright Infringement Under Respondeat Superior...........18

    E.    Witness Testimony and Documents Reflect Vade Willfully Misappropriated
        Plaintiffs' Trade Secret and Infringed Plaintiffs' Copyrights ................................19

    F.    Substantial Evidence Supports Plaintiffs' Damages ................................20

        1.    Unjust Enrichment........................................................................20

        2.    Actual Loss....................................................................................22

        3.    Copyright Damages.......................................................................23

    G.    Plaintiffs Are Entitled to Injunctive Relief ...........................................24

III.   CONCLUSION .................................................................................................25

PLAINTIFFS' OPPOSITION TO VADE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

1

## **TABLE OF AUTHORITIES**

2

3

### **Cases**

4   *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1089-90 (N.D.
        Cal. 2006) ............................................................................................................... 9

5

6   *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446,
        1452 (9th Cir. 1991) ............................................................................................. 17

7   *Archie MD, Inc. v. Elsevier, Inc.*, 261 F. Supp. 3d 512, 520 (S.D.N.Y. 2017) .............................. 17

8   *Asfall v. Los Angeles Unified Sch. Dist.*, No. CV 18-00505 CBM, 2020 WL 2951920, at
        *2 (C.D. Cal. Feb. 11, 2020) ................................................................................ 24

9

10  *BladeRoom Group Ltd. v. Facebook, Inc.*, 2018 WL 514923, at *7 (N.D. Cal. Jan. 23,
        2018) ...................................................................................................................... 6

11  *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 1611835, at *3 (N.D. Cal. Apr. 3,
        2018) .................................................................................................................... 22

12

13  *Brocade Commc'n Sys, Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 121 (N.D. Cal.
        2012) ...................................................................................................................... 6

14  *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 557102, at *7 (N.D. Cal.
        Feb. 12, 2013) ...................................................................................................... 25

15

16  *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-3428 PSG, 2013 WL
        890126, at *9 (N.D. Cal. Jan. 23, 2013) ........................................................ 24, 25

17  *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 662–63 (9th Cir. 2015) ............................................ 1

18  *Citcon USA, LLC v. RiverPay Inc.*, 2018 WL 6813211, at *5 (N.D. Cal. Dec. 27, 2018) ............. 15

19  *DBT Grp., Inc. v. FMC Corp.*, 2001 WL 1105077, at *3 (N.D. Ill. Sept. 19, 2001) ...................... 16

20  *ELT Sight, Inc. v. EyeLight, Inc.*, 2020 WL 7862134, at *22 (C.D. Cal. Aug. 28, 2020)........... 8, 12

21  *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000) ................................................ 3

22  *Fonovisa, Inc. v. Cherry Auction Inc.*, 76 F.3d 259, 262 (9th Cir. 1996) ....................................... 18

23  *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1147 (9th Cir.
        2019)...................................................................................................................... 17

24

25  *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658-59 (9th Cir. 2020)............ 8, 16

    *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517-519 (9th Cir. 1993) ............................ 3

26

27  *Mobile Storage Grp., Inc. v. Fleet Trailer Leasing*, LLC, No. EP-08-CA-185-FM, 2008
        WL 11334007, at *12 (W.D. Tex. Oct. 31, 2008) ............................................... 14

28

PLAINTIFFS' OPPOSITION TO VADE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

*Navigation Holdings, LLC v. Molavi*, No. 19-2644, 2020 WL 5074307, at *3 (N.D. Cal. Aug. 25, 2020) ................................................................................................. 18

*Palmer/Kane LLC v. Gareth Stevens Publ'g*, 2017 WL 3973957, at *10-13 (S.D.N.Y. Sept. 7, 2017) ..................................................................................................... 17

*Paradigm Hosp. Grp., LLC v. Crossroads Program Mgmt., LLC*, No. CV-10-1010-PHX-GMS, 2010 WL 9485972, at *9 (D. Ariz. July 28, 2010) ................................... 12

*Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004), *as amended on denial of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended on denial of reh'g*, No. 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25, 2004) ............................... 23, 24

*Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ............................................. 6

*SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016) ........... 18

*Sony Computer Ent., Inc. v. Connectix Corp.*, 48 F. Supp. 2d 1212, 1217 (N.D. Cal. 1999) .......... 3

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2021 WL 1553926, at *13 (S.D.N.Y. Apr. 20, 2021) ................................................................................. 25

*TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 WL 1028254, at *4 (N.D. Cal. Mar. 18, 2010) ........................................................................................................... 16

*Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995) .................... 3

*Volterra Semiconductor Corp. v. Primarion, Inc.,* 799 F. Supp. 2d 1092, 1098 (N.D. Cal. 2011) ...................................................................................................................... 1

*WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019*), modified in part*, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) ........................................................ 25

### Statutes

17 U.S.C. § 101 ............................................................................................................. 16

17 U.S.C. § 411(b)(1) ................................................................................................... 17

17 U.S.C. § 504(b) ................................................................................................. 23, 24

18 U.S.C. § 1839 ........................................................................................................... 7

18 U.S.C. § 1839(3) ....................................................................................................... 8

### Other Authorities

*Compendium of U.S. Copyright Office Practices, Third Edition* (2021) ......................... 17

1

## **Rules**

2   Fed. R. Civ. P. 50(a)........................................................................................................... 1

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Over the course of nearly eight days of trial, which included testimony from 18 witnesses

2  and the introduction of substantial documentary evidence, Plaintiffs have proffered ample evidence

3  supporting the conclusions that Defendants Vade Secure, Inc., and Vade Secure SASU (collectively,

4  "Defendants" or "Vade") misappropriated Plaintiffs' trade secrets and infringed Plaintiffs' properly-

5  registered copyright.   Unable to disregard the extensive amount of evidence, Vade moves for

6  judgment as a matter law not based on the sufficiency of the evidence, but its strength and weight.

7  Because these inquiries are more properly for the jury to determine, Vade's motion for judgment as

8  a matter of law must be denied.[1]

9  **I.    LEGAL STANDARD**

10    A court may grant a motion for judgment as a matter of law ("JMOL") against a party on a claim

11  or issue where the party "has been fully heard on [that] issue during a jury trial" and "the court finds that

12  a reasonable jury would not have a legally sufficient evidentiary basis for find for a party."  Fed. R. Civ.

13  P. 50(a).  In making such a determination, the court "does not weigh evidence" but instead must "view

14  all the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the

15  favor of the nonmover, and disregard all evidence favorable to the moving party that the jury is not

16  required to believe."  *Volterra Semiconductor Corp. v. Primarion, Inc.,* 799 F. Supp. 2d 1092, 1098

17  (N.D. Cal. 2011); *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 662–63 (9th Cir. 2015).

18  **II.    ARGUMENT**

19        **A.    Plaintiffs Presented Substantial Evidence of Misappropriation & Infringement**

20            **1.    Vade for Office 365: Zenika Spear Phishing Module**

21    Plaintiffs have presented ample evidence that the Zenika spear phishing module, chiefly

22  designed by Sebastien Goutal, did not constitute a proper clean room development and was tainted

23  by his knowledge of Plaintiffs' trade secrets.[2] Day 6 Trial Tr. (Nielson) 1348:8-18, 1352:14-1361:4;

24

25  [1]  Given the joint stipulation entered into by the parties stating that presentation of source code
    material during trial proceedings "does not constitute a waiver of that material's confidentiality or
26  secrecy" (Dkt. 746), Plaintiffs do not seek to file this opposition under seal.  *See infra* § II.B.2.

27  [2]   Plaintiffs do not advance a copyright infringement theory regarding the Zenika spear phishing
    module.  However, Plaintiffs have presented evidence that the identitymatch spear phishing module
28  remained in use in the Vade for Office 365 product until January 2021, and was not removed in June
    2020, as Defendants contend.  Day 6 Trial Tr. (Nielson) 1358:21-1361:4.

Day 7 Trial Tr. (Black) 1628:23-1629:14.  Dr. Nielson presented evidence that Mr. Goutal was familiar with the source code and functionality of the identitymatch spear phishing module containing Plaintiffs' trade secrets, and that he used this understanding to make design choices for the Zenika module.  Day 6 Trial Tr. (Nielson) 1352:16-1357:6; PX2276.  Mr. Lemarié similarly testified about an e-mail sent to Mr. Goutal and others describing the spear phishing algorithm he had designed for the Cloudmark Trident product.  Day 3 Trial Tr. (Lemarié) 672:23-686:25; PX2146.  In that e-mail, Mr. Lemarié reveals trade secrets developed during his work "at Cloudmark for 18 months with Trident," including "the only way of approaching [spear phishing] emails (the needle in the haystack)" by "[d]etecting identity theft, and correlating it with a call-to-action." PX2146.5.  Vade's Motion is premised entirely on the fact that Dr. Nielson did not identify any asserted trade secrets *in* the Zenika source code (Mot. 4-6); however, misappropriation only requires *use* of a trade secret, not copying of source code.  Here, Dr. Nielson has shown that Mr. Goutal used the spear phishing trade secrets to design and improve the Zenika module, including by leveraging his understanding of which classifiers generated higher false positives in the identitymatch implementation (*see* PX2276), and that Mr. Goutal was tainted by his extensive exposure to the spear phishing trade secrets (*e.g.*, PX2146); Day 7 Trial Tr. (Black) 1628:22-1629:14.

### 2.   Vade for Office 365: Identitymatch Spear Phishing Module

Dr. Nielson provided extensive testimony regarding use of Plaintiffs' spear phishing trade secrets in the identitymatch module created by Mr. Lemarié, which was used in Vade for O365.  Day 6 Trial Tr. (Nielson) 1212:12-1253:23.  Dr. Nielson's opinions regarding misappropriation by identitymach were not limited to verbatim copying of source code files, as Defendants contend.  Instead, Dr. Nielson demonstrated with citation to technical documents and source code, identitymatch detects spear phishing emails using the same exact classifiers, calls to action, and exceptions as the Cloudmark spear phishing trade secrets.  *Id.* 1225:16-1246:20; PX1-4; PX45.  Dr. Nielson confirmed—and Vade has not disputed—that this functionality remained in the identitymatch source code and Vade for O365 even after Mr. Lemarié removed the copied source code files—constituting a continuing misappropriation.  Day 6 Trial Tr. (Nielson) 1267:10-1268:2.

With respect to copied source code files, Dr. Nielson testified, and technical documents

1   confirm, that the specific lines of copied source code were ***not*** publicly available—rather, they

2   reflected Cloudmark's research and development for the Trident product. Day 6 Trial Tr. (Nielson)

3   1237:7-1239:22; 1241:1-1244:2; PX1; PX448. Mr. Lemarié admitted he did not know what the

4   Cloudmark source code files contain, and thus could not deny they included proprietary information.

5   Day 3 Trial Tr. (Lemarié) 696:10-702:23. Dr. Nielson further testified that the copied source code

6   files provide creative and original expressions of the functions contained therein, which could be

7   written in any number of different ways. Day 6 Trial Tr. (Nielson) 1249:3-19, 1296:5-1298:21. Dr.

8   Nielson was not required to perform an "abstraction, filtration, and comparison" test where, as here,

9   there is direct evidence of verbatim copying, as admitted by Mr. Lemarié himself. Day 3 Trial Tr.

10  (Lemarié) 630:8-634:15; Day 6 Trial Tr. (Nielson) 1232:8-1233:3, 1238:24-1239:22, 1241:12-

11  1244:2, 1247:7-1248:22, 1260:3-1262:25, 1264:25-1267:81268:19-1270:10; PX2726.12; *MAI Sys.*

12  *Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517-519 (9th Cir. 1993); *Triad Sys. Corp. v.*

13  *Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995); *Sony Computer Ent., Inc. v.*

14  *Connectix Corp.*, 48 F. Supp. 2d 1212, 1217 (N.D. Cal. 1999) ("In the wholesale copying of a

15  copyrighted operating system, a filtration analysis is not necessary.") (citing *Triad*), *rev'd on other*

16  *grounds*, 203 F.3d 596 (9th Cir. 2000). With respect to Defendants' "merger" argument, this is an

17  affirmative defense that Defendants must raise and prove in the first instance. *See Ets-Hokin v. Skyy*

18  *Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000) (merger is a defense in the Ninth Circuit).

19              **3.    Content Filter**

20          Plaintiffs' allegations of trade secret misappropriation and copyright infringement against

21  Vade's Content Filter product are predicated on facts demonstrating that Content Filter uses the

22  "identitymatch" and/or "Zenika" spear phishing modules. The jury may reasonably rely on the facts

23  adduced at trial to find Content Filter's use of identitymatch and/or Zenika constitutes trade secret

24  misappropriation and copyright infringement. In particular, Plaintiffs presented four theories, each

25  of which independently demonstrates that Content Filter uses Plaintiffs' asserted trade secrets.

26          First, Dr. Nielson testified that Vade advertises Content Filter as including AI-based spear

27  phishing protection, citing Vade's own website for the Content Filter product as of March 22, 2021.

28  Day 6 Trial Tr. (Nielson) 1345:6-1346:25. The website states, under the heading "The Vade Secure

Email Content Filter," that Content Filter includes "Artificial Intelligence," which "[a]nalyzes emails, webpages, attachments, and images with machine learning and deep learning algorithms that are trained to detect behaviors and anomalies common to phishing, *spear phishing*, malware, and ransomware attacks." PX-2443 (emphasis added). Defendants' argument that Dr. Nielson may not rely on these statements are belied by the subsequent testimony of Mr. Lotigier, who confirmed that Vade "would not put false information about features and technologies in the advertisement for [its] products that [it] show[s] to customers." Day 8 Trial Tr. (Lotigier) 1871:13-19.

Dr. Nielson also testified as to how he determined, based on hundreds of hours of review of the Vade source code, that Vade possesses only three spear phishing technologies: a dictionary-based approach that does not use artificial intelligence; and identitymatch and Zenika—both of which are AI-based approaches and accused of misappropriation. Day 6 Trial Tr. (Nielson) 1346:18-1348:22. Dr. Nielson's testimony on this issue is presently undisputed. In his video deposition testimony, Mr. Lotigier further testified that Vade Secure Cloud uses "the third spear phishing module developed by Mr. Goutal and the third-party engineering company," *i.e.*, Zenika, consistent with Dr. Nielson's expert opinions. G. Lotigier Dep. Designations 203:20-204:3. Vade Secure Cloud is a service offered by Vade that includes MTA Builder and Content Filter. H. Peck Dep. Designation 34:15-20, 34:22-24. Further, Mr. Lotigier testified that the Zenika module was provided as "an update to replace the second spear phishing module [identitymatch]" for existing customers—thus confirming that identitymatch was included with Content Filter before it was replaced with the Zenika module. G. Lotigier Dep. Designations 208:15-208:21. Either way, Mr. Lotigier's testimony confirms Dr. Nielson's analysis that either identitymatch or Zenika are used by Content Filter to provide protection against spear phishing attacks.

Second, Dr. Nielson testified about the modularity of Vade's products, including Content Filter. For example, Dr. Nielson explained that in modular designs such as Vade's, "pieces are split off and it's like they're just part of the program that run separately. They're like their own self-contained piece. And then what happens is the different pieces communicate with each other over a network to do the combined program." Day 6 Trial Tr. (Nielson) 1323:12-1324:9; *see also id.* 1348:24-1349:13. In particular, Dr. Nielson explained that Content Filter uses a module called

filter-d, which functions as a "wrapper" that modularizes Vade's filtering engine as a microservice and enables the antispam and antivirus filtering modules to be connected to other modules.  *Id.* 1349:15-1351:12.  Dr. Nielson's testimony is confirmed by multiple admitted exhibits, all of which expressly refer to Content Filter and/or filter-d, notwithstanding Defendants' assertion to the contrary (*see* Mot. 2).  *See, e.g.*, *id.* at 1447:10-1448:24; PX1887.4-5; PX1892.9.; PX2100.8.  Dr. Nielson further testified that identitymatch is also provided as a microservice for spear phishing, that identitymatch and filter-d are designed to work together, and that they do in fact work together in Vade products.  Day 6 Trial Tr. (Nielson) 1349:15-1351:12.  For example, Dr. Nielson testified that Vade's products, including Content Filter, are modular.  *Id.* 1348:24-1349:13.  Dr. Nielson's testimony on this issue stands unrebutted; indeed, Mr. Lotigier confirmed that "Content Filter alone is ***built with several modules***."  Day 8 Trial Tr. (Lotigier) 1815:15-23 (emphasis added).

Third, Vade's interrogatory responses, verified by Mr. Lotigier, identify the identitymatch spear phishing module as "contain[ing] source code ***relating to Vade's content filter, content filtering engine***," and other filtering solutions.  PX2525.27.  The interrogatory response identifies source code modules that are ***related to*** Content Filter, and thus is fully consistent with Dr. Nielson's testimony regarding the modularity of Content Filter and the use of different modules that call each other.  Mr. Lotigier similarly confirmed that Vade's modular products are able to "call" external modules to perform a certain functionality.  *See* Day 8 Trial Tr. (Lotigier) 1830:21-1832:10, 1872:22-1873:1.  A reasonable factfinder may infer from Vade's interrogatory response, alone or in combination with the evidence above, that the identitymatch source code is either included in the Content Filter product directly or is called by Content Filter as an external module.  Either way, Content Filter uses, and thus misappropriates, Plaintiffs' trade secrets embodied in identitymatch.

Finally, Dr. Nielson testified that Content Filter, as part of Vade's unified architecture using the Vade Retro Global Network Intelligence (VRGNI), is continuously updated and improved using e-mail threat data acquired by using Plaintiffs' trade secrets, including spear phishing threat intelligence derived from the misappropriated identitymatch spear phishing module, and IsItPhishing threat information that incorporates source code written by Mr. Lemarié.  *See* Day 6 Trial Tr. (Nielson) 1300:24-1309:22; PX1852.22; PX1887.21.  Mr. Lemarié and Mr. Lotigier both

1  further testified that Content Filter uses information from VRGNI.  Day 3 Trial Tr. (Lemarié) 656:2-

2  666:3; Day 8 Trial Tr. (Lotigier) 1870:19-1871:12.

3      Defendants' assertion that Dr. Nielson did not point to identitymatch or Zenika source code

4  *in* the Content Filter source code is a red herring—the Court already rejected this argument at

5  summary judgment.  Dkt. 631 at 2-3; *see also BladeRoom Group Ltd. v. Facebook, Inc.*, 2018 WL

6  514923, at *7 (N.D. Cal. Jan. 23, 2018) (misappropriation may be proven through circumstantial

7  evidence); *Brocade Commc'n Sys, Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 121 (N.D. Cal.

8  2012) (same).  Plaintiffs have presented sufficient circumstantial evidence for a reasonable juror to

9  find misappropriation either because (1) identitymatch and/or Zenika are included and used in

10  Content Filter, or (2) identitymatch and/or Zenika are modules that are called by Content Filter

11      Defendants' remaining arguments go to the weight of the evidence and do not support JMOL

12  on Plaintiffs' claims against Content Filter.  That Content Filter "has existed since at least 2008"

13  (Mot. 2) is irrelevant, since Mr. Lotigier admitted that the product has changed over time, including

14  since 2015.  Day 8 Trial Tr. (Lotigier) 1867:19-1869:19.  Similarly, that Dr. Nielson testified as to

15  what is "most likely" does not render his opinion improper, particularly where Plaintiffs need only

16  meet the preponderance of the evidence standard.  *See Primiano v. Cook*, 598 F.3d 558, 565 (9th

17  Cir. 2010) ("Lack of certainty is not, for a qualified expert, the same thing as guesswork.").

18      **4.    Vade for O365: Microsoft Office 365 Integration**

19      Dr. Nielson testified at length regarding the use of Plaintiffs' Trade Secret No. 8 in the Vade

20  for O365 product.  Day 6 Trial Tr. (Nielson) 1254:5-1268:6.  For example, he testified that Mr.

21  Lemarié copied substantial portions of Plaintiffs' trade secret source code for journal extraction into

22  Vade for O365.  *Id.* 1257:20-1262:25; PX3 (exchange_journal_report.go); PX4 (smtppolicy.go).

23  Dr. Nielson further testified that the copied journaling code has not been removed from any version

24  of the Vade for O365 product.  Day 6 Trial Tr. (Nielson) 1267:24-1268:6.  Defendants do not address

25  this testimony and evidence in their Motion, and merely offer a conclusory assertion that "Plaintiffs

26  failed to meet their burden."  Mot. 7-8.

27      **5.    MTA Builder**

28

PLAINTIFFS' OPPOSITION TO VADE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiffs presented video testimony from Xavier Delannoy demonstrating that Vade disclosed and used Plaintiffs' Gateway Daily Licensing Report trade secrets. It is undisputed that Mr. Delannoy improperly retained copies of the Reports after leaving Cloudmark and forwarded the Reports to Mr. Lotigier with the express purpose of using the information therein to advocate for development of a new Vade MTA. Delannoy Dep. Designation. 111:1-119:15, 137:20-150:3. Mr. Lotigier further testified by video deposition that he had not intended to develop a new MTA before Mr. Delannoy disclosed the Reports containing Plaintiffs' trade secrets. Lotigier Tr. 162:2-4, 162:8-17. A reasonable juror could conclude from these admissions that Vade used the trade secret Reports to incentivize development of MTA Builder. Day 6 Trial Tr. (Nielson) 1314:18-1315:15. Defendants offer no legal support for their assertion that this "is not a legally cognizable form of use sufficient to establish misappropriation." Mot. 8. It is certainly the use of a trade secret.

Dr. Nielson also testified in detail as to the architectural elements recited in the Cloud CSP Trade Secrets Nos. 17-20, which are found in Cloudmark confidential technical documents, and about evidence that former Cloudmark employees, including Messrs. Lemarié and Delannoy, used and developed the same architecture as the Cloud CSP trade secrets after beginning at Vade. Day 6 Trial Tr. (Nielson) 1315:17-1342:16; PX34; PX36; PX57; PX747; PX1099; PX1122; PX1769; PX1852; PX1897; PX2090; PX2102; PX2217; PX2314; Boussinet Dep. Designation at 120-129 (explaining implementation of certain solutions he and others at Cloudmark had developed for improving ***Cloudmark's*** MTA into Vade's MTA Builder). Thus, contrary to Defendants' assertion, Dr. Nielson's testimony comprises far more than a mere *ipse dixit* statement. Mot. at 8.

**B.      There is Substantial Evidence Showing Plaintiffs Had Protectable Trade Secrets**

Plaintiffs have provided ample documentary and testimonial evidence through four fact witnesses and two experts that establish the existence of Plaintiffs' trade secrets, including because they (1) derived actual and potential independent economic value from being secret, and (2) were subject to reasonable efforts under the circumstances to maintain their secrecy. 18 U.S.C. § 1839.

**1.      Plaintiffs Identified the Trade Secrets with Sufficient Particularity**

Plaintiffs identified their trade secrets with the requisite specificity from the outset of this case, and even more so now at trial. Indeed, this Court already twice rejected Defendants' argument

1   on this issue, holding on summary judgment that "plaintiffs' technical experts have described in

2   detail the five categories of technical trade secrets."  Dkt. 631 at 2; Dkt. 145.  Defendants' attempt

3   to rehash their failed argument ***a third time*** should be denied, particularly given the substantial

4   evidence Plaintiffs' experts and witnesses provided with respect to each of the trade secrets.[3]

5          Plaintiffs' trade secrets are not "mere ideas" or "conceptual notions," as Defendants contend,

6   but rather—as explained by numerous witnesses and experts—20 trade secrets comprising source

7   code, algorithms, software architectures, and improvements related to Cloudmark's Authority,

8   Trident, and CSP products.  *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658-59

9   (9th Cir. 2020); *ELT Sight, Inc. v. EyeLight, Inc*., 2020 WL 7862134, at *22 (C.D. Cal. Aug. 28,

10  2020) (holding that "strategic plans … can constitute trade secrets").  Technical documentation

11  confirms these trade secrets existed, and that Cloudmark developed and possessed them.  *E.g.*, PX34

12  (Proposal for CSP Cloud Support); PX45 (Trident Policy Enhancements Document); PX57

13  (Compiled Workflows Presentation); PX469 (JIRA ticket re "[a]bility to process Microsoft

14  Exchange journaling reports"); PX733 (Trident Product Architecture, Draft Version 0.1).

15         During a full day of testimony, Dr. Nielson walked through each asserted trade secret,

16  describing its elements and corresponding Cloudmark technology, code, and documents.  For

17  example, Dr. Nielson testified that Trade Secret Nos. 1-7 encompassed "algorithms that Cloudmark

18  used to detect spear phishing attacks," discussed each element of the trade secrets, and explained

19  how Cloudmark's technology and source code executed each element.  Day 5-6 Trial Tr. (Nielson)

20  1161:1-1246:13.  Further, Ms. Knox confirmed the propriety nature of the trade secrets, testifying

21  that Cloudmark achieved a balance between filtering bad emails and avoiding false positives by

22  "constantly looking at" the algorithms to detect "new techniques that bad actors are coming up with

23  to try and get past the systems."  Day 2 Trial Tr. (Knox) 306:24-307:5.  Dr. Nielson (as well as fact

24  witnesses) provided the same detailed explanations for the three other categories of trade secrets.

25  Day 6 Trial Tr. (Nielson) 1254:5-1262:25 (testimony and evidence re TS 8); *id.* 1299:24-1303:1,

26

27  [3]  A trade secret can include "all forms and types of financial, business, scientific, technical,
28  economic, or engineering information . . . ."  18 U.S.C. § 1839(3).  This clearly encompasses
    Plaintiffs' proprietary algorithms, architectures, implementations, and proposed improvements.

1   1307:22-1308:11 (testimony and evidence re TS 9-15); *id.* at 1314:18-1326:7 (testimony and

2   evidence re TS 16-20); *see also* Day 4 Trial Tr. (San Diego) 985:2-993:2 (TS 8), 1000:17-1004:7

3   (TS 17-20); PX469; PX1107; PX36; Day 2-3 Trial Tr. (Roualland) 466:15-489:20, 512:3-527:14;

4   PX727; PX735; PX686; PX58; PX57; PX34.

5          Defendants' assertion Plaintiffs' trade secrets are invalid because they use other companies'

6   technology is misguided.  Mot. 10.  For example, Cloudmark does not consider O365 journaling

7   ***itself*** to be a trade secret, but rather "the implementation and use of the journal archiving capability

8   ***for a message security purpose***," a concept developed by Mr. San Diego that was "novel and

9   something that hadn't been done before."  Day 5 Trial Tr. (San Diego) 988:24-989:7, 991:85-

10  992:15.  Additionally, the CSP trade secrets contain proprietary software architectures incorporating

11  a novel combination of elements.  Even if some or all of these elements are known individually, as

12  Defendants contend (Mot. 10), testimony and evidence show that the ***combinations*** are secret.  Day

13  6 Trial Tr. (Nielson) 1315:20-1319:13; PX57; PX747; *see 02 Micro Int'l Ltd. v. Monolithic Power*

14  *Sys., Inc.*, 420 F. Supp. 2d 1070, 1089-90 (N.D. Cal. 2006) ("It does not matter if a portion of the

15  trade secret is generally known, or even that every individual portion of the trade secret is generally

16  known, as long as the combination of all such information is not generally known.").

17          **2.      There is Substantial Evidence That Cloudmark's Trade Secrets Derive
                        Independent Economic Value from Being Secret**

18

19          Substantial trial testimony and evidence demonstrate that Cloudmark's trade secrets derive

20  independent economic value from being kept secret.  Preliminarily, Defendants' contention that

21  Plaintiffs failed to satisfy this element because Plaintiffs "chose to disclose many of their so-called

22  trade secrets in open court" is wholly disingenuous.  Mot. 10.  Defendants conveniently omit any

23  mention of the ***four*** requests Plaintiffs made to seal the courtroom during testimony regarding

24  Cloudmark's proprietary source code and information, all of which were denied.  Day 2 Trial Tr.

25  456:16-461:8; Day 5 Trial Tr. 1169:2-17; Day 6 Trial Tr. 1212:22-22; Day 7 Trial Tr. 1551:8-

26  1552:4.  But more significantly, the Court's rulings were based in part on the parties' joint

27  stipulation expressly agreeing that "[t]he presentation of material designated 'HIGHLY

28  CONFIDENTIAL – SOURCE CODE' does not constitute a waiver of that material's confidentiality

1   or secrecy."  Dkt. 747.  Faced with an extensive record regarding the value of Plaintiffs' trade

2   secrets, Defendants now resort to violating the stipulation's explicit term that "[n]o party shall argue

3   that the presentation of such material has any effect on its confidentiality or secrecy."  *Id.*

4                    (a)      Trade Secret Nos. 1-15

5            Multiple fact and expert witnesses and significant documentary evidence demonstrate that a

6   reasonable jury would likely conclude Plaintiffs' spear phishing trade secrets have independent

7   economic value from their secrecy.  First, Dr. Black noted that he reviewed a substantial amount of

8   public art but did not find any suggesting that these trade secrets were generally known or readily

9   ascertainable.  While Defendants suggest otherwise because "checking for confusables" and various

10  other individual elements are purportedly found in public sources (Mot. 12), Plaintiffs' trade secrets

11  consist of specific ***combinations*** of these steps, which Dr. Black testified "weren't found in anything

12  [he] looked at."  Day 7 Trial Tr. (Black) 1552:7-1555:11, 1560:20-1561:4; Day 2 Trial Tr. (Knox)

13  345:9-346:3 (testifying Trident's "ideas and algorithms" were confidential).

14          Trade Secret Nos. 1-7 have actual or potential economic value because "Trident attempts to

15  strike this delicate balance between getting an accurate catch rate and not having a high level of

16  false positives," a solution which itself "already provides an economic advantage."  *Id.* 1562:5-19;

17  Day 5 Trial Tr. (Nielson) 1162:4-1167:8 (describing challenges Trident was developed to solve).

18  Moreover, Dr. Black testified that Trident was an effective solution against spear phishing attacks

19  using methods that were different from other programs that purported to have a spear-phishing

20  function, and any relevant patents.  Day 7 Trial Tr. (Black) 1553:23-1555:5; 1560:20-1561:3.  Even

21  Mr. Lemarié conceded he developed "new ideas" for combatting spear phishing in his work on

22  Trident "compared to what's in the market."  Day 4 Trial Tr. (Lemarié) 823:14-825:19; PX4616.3

23  ("We have some ***new ideas*** to explore and which we are looking to prototype") (emphasis added).

24          That Trident was discontinued for business reasons is irrelevant, as multiple Cloudmark

25  employees testified there was "a lot of value in the things we had done and changes we had made,"

26  and that Cloudmark would "continu[e] to reuse parts of Trident" by "identify[ing] pieces of Trident

27  that might be of use in other areas of the Cloudmark business."  Day 2 Trial Tr. (Knox) 353:2-13;

28  PX4419 ("This effort is not wasted as we plan to take many parts of the code, a number of concepts,

1   and leverage the learnings in other places.").  Far from being "vague" (Mot. 11), witnesses such as

2   Ms. Knox testified about specific components and algorithms from Trident that were and still are

3   used by Cloudmark.  *Id.* 354:25-356:9; Day 4 Trial Tr. (Cho) 883:22-885:9.

4           A reasonable jury could also find that Trade Secret Nos. 8-15, relating to Plaintiffs'

5   implementations and improvements on Office 365 integration using journal extraction and a unified

6   architecture combining spear phishing functionality with such integration, were not generally known

7   and derived economic value from being secret.  As Dr. Black testified, he looked for these trade

8   secrets in public sources "but did not find any disclosure of Trident's implementation of this feature

9   disclosed in public art" and thus concluded that the Office 365 integration using journaling

10  extraction trade secrets were not generally known or readily ascertainable.  Day 7 Trial Tr. (Black)

11  1562-21:1563:7, 1564:12-16.  This is consistent with Mr. San Diego's testimony that he "came up

12  with the idea of using journaling to integrate with Trident" when attempting to "find an option for

13  both Microsoft Exchange users as well as Microsoft Office 365 users" that would be able to integrate

14  Trident with those programs and avoid needing to install any external software.  Day 5 Trial Tr.

15  (San Diego) 986:23-989:1; PX469.  As Mr. San Diego noted, no other company was using

16  journaling in this way.  Day 5 Trial Tr. (San Diego) 992:22-993:2.  These trade secrets derived value

17  from this secrecy, as Dr. Black explained, because "if a competitor learned Trident's implementation

18  of this trade secret, they could just readily use it and gain a head-start, avoiding several months of

19  prototyping and R&D."  Day 7 Trial. Tr. (Black) 1564:25-1565:7; Day 5 Trial Tr. (San Diego)

20  991:25-992:4 (testifying it took "several months" to get the journaling solution).  Defendants' JMOL

21  should be denied with respect to Trade Secret Nos. 1-15.

22                          (b)      Trade Secret No. 16

23          Multiple witnesses provided testimonial evidence from which a reasonable jury could

24  conclude that Cloudmark's Gateway Licensing Reports were secret and derive independent

25  economic value as a result.  Mr. Roualland testified he was not aware of Cloudmark ever making

26  the Reports publicly available because they "contain[] confidential information" that is "sent

27  internally to Cloudmark."  Day 2 Trial Tr. (Roualland) 484:7-17, 484:24-485:10.  As Mr. San Diego

28  stated, these reports contain detailed confidential information about Cloudmark customers beyond

PLAINTIFFS' OPPOSITION TO VADE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

1    their identities, including their "number of servers, connections, messages, [and] transactions per

2    second."[4]  Day 5 Trial Tr. (San Diego) 1073:12-1074:17; Day 3 Trial Tr. (Roualland) 484:24-

3    485:10.  Both Cloudmark employees stressed these Reports maintain value from secrecy because

4    they contain information about customer requirements that would allow a competitor to approach

5    them.  Day 3 Trial Tr. (Roualland) 484:24-585:10; Day 5 Trial Tr. (San Diego) 1074:6-14 ("If you're

6    trying to understand how big of a messaging system a particular service provider maintains and how

7    much throughput you need to be able to maintain from a performance perspective, there's ***absolutely***

8    ***value*** in understanding what your skilling requirements are for a particular service provider.")

9    (emphasis added).  Defendants' JMOL should be denied with respect to Trade Secret No. 16.

10                              (c)      Trade Secret Nos. 17-20

11          Plaintiffs' Cloud CSP trade secrets relate contain proprietary software architecture

12   incorporating a combination of elements.  Contrary to Defendants' assertion, the trade secrets are

13   not disqualified from protection merely because they were not implemented.  *E.g., ELT Sight, Inc.*,

14   2020 WL 7862134, at *22 (holding "strategic ***plans*** … can constitute trade secrets") (emphasis

15   added).  As Mr. Roualland testified, Cloudmark has plans to implement the workflow language and

16   other improvements (which Cloudmark considers confidential) to its future products.  Day 3 Trial

17   Tr. (Roualland) 517:18-21; 527:1-14; Day 5 Trial Tr. (San Diego) 1000:17-1001:3.  Even if some

18   or all of these elements individually comprise public information, as Defendants contend (Mot. 10,

19   13), Plaintiffs have introduced testimony and evidence that the specific unique combinations are

20   novel and derive independent value from being kept secret.  *See Paradigm Hosp. Grp., LLC v.*

21   *Crossroads Program Mgmt., LLC*, No. CV-10-1010-PHX-GMS, 2010 WL 9485972, at *9 (D. Ariz.

22   July 28, 2010) ("[A] trade secret can exist in a combination of characteristics and components each

23   of which, by itself, is in the public domain, but the unified process, design and operation of which,

24   in unique combination, ***affords a competitive advantage*** and is a protectable secret.") (emphasis

25   added).  As Dr. Black testified, he was "unable to find [Cloudmark's] combination anywhere" in

26

27   _____

[4]  Defendants' assertion that information in the Reports belongs to Plaintiffs' customers is wrong.

28   Cloudmark collects and ***compiles*** the information in the Reports, which are sent by Cloudmark's
     products.  Day 3 Trial Tr. (Roualland) 574:243-575:3.  No customer could possess the ***compilation***.

the public art.  Day 7 Trial. Tr. (Black)  1568:21-1969:20.  Moreover, he testified the CSP trade secrets involving "an MTA that is being designed to be deployed in a cloud environment" would "make it much more amenable to scaling," such that "there would be value to a competitor who obtained the design blueprints" because they would be "provid[ed] . . . with a way to short-circuit all the R&D costs and jump straight into the market."  *Id.* 1573:14-1574:13.  Defendants' JMOL should be denied with respect to Trade Secret Nos. 17-20.

### 3.    There Is Ample Evidence Showing Plaintiffs Took Reasonable Measures to Protect the Trade Secrets

Plaintiffs provided substantial evidence that Cloudmark took reasonable measures to maintain secrecy of its trade secrets.  It is undisputed that every Cloudmark employee—including Mr. Lemarié—signed a Proprietary Information and Inventions Agreement ("PIIA") requiring them to "hold in strict confidence" and "not disclose, use, lecture upon or publish any of [Cloudmark's] Proprietary Information."  PX0606 § 1.1; Day 4 Trial Tr. (Cho) 861:5-862:6. Such "Proprietary Information" includes the precise types of information asserted in Plaintiffs' trade secrets.  PX0606. § 1.2; Day 4 Trial Tr. (Cho) 862:7-863:4.  Employees were also contractually obligated to return all such information upon departure from the company.  *Id.* § 6.  Cloudmark's Employee Handbook provided additional guidance and policies regarding use of equipment and technology, including only accessing files or documents they have permission to enter and using such resources only for "legitimate business reasons."  PX771.12; Day 4 Trial Tr. (Cho) 875:9-877:21.  That Cloudmark permitted employees to use personal devices and third-party applications is inapposite, as Ms. Cho confirmed even in these instances the obligations of the PIIA governed.[5]  Day 4 Trial Tr. (Cho) 877:2-21, 899:11-15, 909:9-21.  In addition to signing an offer letter confirming they would abide by the PIIA and handbook (PX636.1), these requirements were discussed at the outset during "a one-on-one with [a new employee's] manager."  Day 4 Trial Tr. (Cho) 877:22-24.  Moreover, there is no evidence that any of the trade secrets were ever disclosed through any such third party applications or on anyone's personal device other than Mr. Lemarie—the accused misappropriator.

---

[5]  Ms. Cho and Dr. Black both also noted that third-party applications such as Google Docs, Dropbox, and Evernote have their own controls and security measures, including access credentials. Day 4 Trial Tr. (Cho) 909:9-21; Day 7 Trial Tr. (Black) 1579:19-1580:22

It strains credulity to suggest that employees of Cloudmark—a cybersecurity company—were not knowledgeable enough to determine what company information should be kept secret.  It is unsurprising that employees could not identify specific trade secrets and that documents were not specifically labeled as such, given that what constitutes a **trade secret** is a legal inquiry.  *See Mobile Storage Grp., Inc. v. Fleet Trailer Leasing*, LLC, No. EP-08-CA-185-FM, 2008 WL 11334007, at *12 (W.D. Tex. Oct. 31, 2008) ("Trade secret is a legal term of art, for the purpose of establishing a misappropriation of trade secrets claim.").   As Mr. Roualland testified, employees treated Cloudmark's documents and information as confidential and proprietary, and knew all such information—including daily licensing reports—should be kept confidential.   Day 2 Trial Tr. (Roualland) 473:5-11.  Cloudmark employees considered all documents and information relating to their employment as confidential.  *Id*. 573:22-574:15; Day 4 Trial Tr. (Cho) 894:9-17, 896:2-9.

Plaintiffs further protected their information by requiring non-disclosure agreements with customers prior to sharing confidential information.  *E.g.*, PX0394 PX0395; PX0401; PX0403-PX0405; PX0407-PX0410; PX0412; PX0413; PX0416; PX0418; PX0419; PX1163; PX1181, PX3014-PX3018; PX3020; Day 5 Trial Tr. (San Diego) 993:8-999:3.  For example, Cloudmark's Mutual Nondisclosure Agreement with Avanan, Inc. contained a robust confidentiality provision, consistent with all Cloudmark agreements.  PX403.1.  In Trident agreements, *e.g.*, with Bank of Hawaii, Cloudmark imposed explicit restrictions on use and distribution on top of confidentiality obligations.  PX404 § 1.4(a); Day 5 Trial Tr. (San Diego) 995:7-996:24, 998:17-999:3 (explaining it was Cloudmark's practice to enter into such agreements even though no source code was being shared with customers); *see also id*. 999:4-1000:6 (Mr. San Diego, a 20-year veteran of the cybersecurity industry, explaining that Cloudmark's measures to preserve secrecy were standard).

Ample evidence also reflects Cloudmark's heightened protection for its source code.  As Ms. Cho and Mr. San Diego testified, access to Cloudmark's source code was only given to certain employees on an as-needed basis.  Day 4 Trial Tr. (Cho) 854:12-855:14; Day 5 Trial Tr. (San Diego) 999:4-12.  Different levels of protection could also be applied for different codes in the GIT system that housed Cloudmark source code.  Day 3 Trial Tr. (Roualland) 565:5-8.  Defendants' reference to Mr. Lemarié storing source code on his personal computer does not render Cloudmark's measures

-14-

PLAINTIFFS' OPPOSITION TO VADE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

1   unreasonable, as Ms. Cho also noted it was normal practice for engineers to work on code in a local

2   copy to avoid version control issues, but the expectation was that employees would delete that

3   source code when they were finished editing—and certainly before they left the company.  Day 4

4   Trial Tr. (Cho) 910:12-911:18.  Moreover, Cloudmark did not share source code with customers or

5   anyone outside of Cloudmark to avoid "algorithms getting in the hands of bad actors."  Day 2 Trial

6   Tr. (Knox) 334:6-19, 431:18-24.  In fact, when a prospective customer requested a copy of

7   Cloudmark's source code as a prerequisite to becoming a customer, Cloudmark responded that it

8   "does not provide access to source code."  DX4106.12; *see* Day 2 Trial Tr. (Knox) 435:14-437:1.

9           Plaintiffs also employed a number of other security measures that rendered Cloudmark's

10   efforts reasonable, including requiring that employees access Cloudmark's corporate network

11   through a two-step VPN,  securing offices with key cards, and storing all source code and

12   confidential information in secure data centers.  Day 2 Trial Tr. (Knox) 296:6-297:5; Day 4 Trial

13   Tr. (Cho) 855:16-857:13, 857:14-858:13; Day 5 Trial Tr. (San Diego) 999:4-12.   Defendants'

14   reference alleged security concerns in an "internal Confluence communications" is inapposite.  As

15   Ms. Knox testified, that document reflected a list of "thoughts" regarding matters that some

16   employees surmised were issues, but did not necessarily reflect actual security concerns.  Day 2

17   Trial Tr. (Knox) 415:25-417:10.  Rather, it demonstrated efforts by Cloudmark to identify and plug

18   any security holes—an exercise only a company that cared about security would engage in.

19           Finally, Cloudmark maintained specific procedures to ensure confidentiality was protected

20   when employees left the company.  The Human Resources department would walk employees

21   through a checklist of items, including providing a copy of their "Confidentiality Agreement" (or

22   PIIA) and confirming obligations to comply with the terms therein.  *See* PX783 (Lemarié's Exit

23   Checklist); PX1128; PX1130; Day 4 Trial Tr. (Cho) 881:3-882:6.  Also, IT recovers departing

24   employees' work equipment and keycards and disables their accounts such that there is no longer

25   access to the VPN or Cloudmark's corporate network.  Day 4 Trial Tr. (Cho) 878:7-14; PX1092.

26           It is well established that the measures Plaintiffs undertook are "reasonable" under the

27   circumstances.  *See Citcon USA, LLC v. RiverPay Inc.*, 2018 WL 6813211, at *5 (N.D. Cal. Dec.

28   27, 2018) (noting "examples" of reasonable efforts include "limiting access to [the secret] to a 'need

to know basis,' requiring confidentiality agreements, or keeping information under lock" and prohibiting clients from "reverse-engineering the device" via agreement); *TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 WL 1028254, at *4 (N.D. Cal. Mar. 18, 2010) (implementing proprietary information and confidentiality policies and agreements and password-protecting access to computers and networks satisfied reasonable efforts). Courts have held "[c]onfidentiality provisions constitute reasonable steps to maintain secrecy." *InteliClear*, 978 F.3d at 660–61. Given Plaintiffs implemented not only confidentiality agreements with employees and customers, but also a host of other measures, Defendants' argument with respect to reasonable efforts fails.

### C. Defendants Failed to Provide Any Evidence that Plaintiffs' Copyright Registrations Are Invalid

Defendants argue that Plaintiffs' Trident copyright registrations are invalid, but as the record demonstrates, the information included in Plaintiffs' registrations was accurate. Specifically, Trident was never published within the meaning of 17 U.S.C. § 101, which defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." As explained by one court, "'the public' are 'persons under no explicit or implicit restrictions with respect to the disclosure' of the distributed material." *DBT Grp., Inc. v. FMC Corp.*, 2001 WL 1105077, at *3 (N.D. Ill. Sept. 19, 2001) (quoting H.R. Rep. No. 94-1476, at 138 (1976)). Trident was not distributed to "the public."

As Mr. San Diego explained, Trident customers "were using that product for evaluation and production purposes" only. Day 5 Tr. (San Diego) 993:3-7. And the agreements entered into with those customers included explicit restrictions on disclosure and use. The agreement with Bank of Hawaii is exemplary and includes restrictions on disassembling, distribution, modifying the software, or disseminating performance information. PX404 §1.4. The agreement also requires confidentiality, restricting all "use or disclos[ure] of any and all code, and business, technical, and financial information." *Id.* §11. Mr. San Diego confirmed that each such agreement had "similar provisions." Day 5 Tr. (San Diego) 997:20-24; PX403, PX405, PX408-10, PX412, PX413, PX415-17, PX419, PX1606, PX3015-18, PX3020. It was "Cloudmark's practice to enter into these types of agreements" "in every case." Day 5 Trial Tr. (San Diego) 998:17-20. Accordingly, the trial

1   record establishes that Trident's customers were under explicit restrictions with respect to disclosure

2   of any copyrighted works.  The works were therefore properly identified as unpublished.

3        Defendants' effort to invalidate the copyrights are premised on a misapprehension of the

4   law, as they erroneously assert distribution of program code, on its own, constitutes publication.

5   Mot. 17.  But the *Compendium of U.S. Copyright Office Practices, Third Edition* (2021)

6   ("*Compendium*") makes clear "a work is published if one or more copies or phonorecords

7   embodying [the work] are distributed to the public *with no explicit or implicit restrictions* with

8   respect to [the] disclosure of [the] contents [of that work]." *Compendium* § 1902.[6]  By eliding this

9   critical aspect of publication, Defendants would render any distribution a "publication," rather than

10  just distributions *to the public*, as is required by the statute.  Accordingly, because Cloudmark

11  Trident was not published, Defendants' motion should be denied.

12       Moreover, even if the works were published, Defendants have not attempted to establish that

13  "the inaccurate information . . . [was] included in the application for copyright registration 'with

14  knowledge that it was inaccurate.'"  *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925

15  F.3d 1140, 1147 (9th Cir. 2019) (quoting 17 U.S.C. § 411(b)(1)).  This is important, as a claimant's

16  "good faith or inadvertent mistake" does "not constitute a knowing inaccuracy." *Id.*; *see also Archie*

17  *MD, Inc. v. Elsevier, Inc.*, 261 F. Supp. 3d 512, 520 (S.D.N.Y. 2017) (concluding claimant had no

18  knowledge of inaccuracy because whether licensing the work constituted publication was an

19  "unsettled legal question").  Here, Defendants simply assert that Ms. Knox and Mr. San Diego were

20  employees of Proofpoint in 2020, and that Ms. Knox was involved in helping prepare the registration

21  application. Mot. 19.  Without establishing intent, Defendants' motion fails.[7]

22

---

23  [6]  Defendants also incorrectly assert that the Court resolved summary judgment on the grounds of

24  limited publication.  But the Court's order neither mentions limited publication nor applies the
    doctrine. Dkt. 631 at 4-6.  The Court need not address limited publication, but even if it did, the

25  evidence cited herein establishes that copies of Trident were distributed to (1) a "definitely selected
    group"—i.e., trial customers; and (2) "for a limited purpose"—i.e., internal trials.  *Acad. of Motion*

26  *Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1452 (9th Cir. 1991).

27  [7]  Defendants request that the Court send a request to the Register of Copyrights pursuant to §
    411(b).  However, the failure to establish this prong renders such a request unnecessary.

28  *Palmer/Kane LLC v. Gareth Stevens Publ'g*, 2017 WL 3973957, at *10-13 (S.D.N.Y. Sept. 7, 2017)
    (citations omitted).  Moreover, Defendants' request is long overdue and should be deemed a waiver

1    Defendants separately argue in passing that Plaintiffs have advanced no evidence that

2  "module 4" was copied by Vade.  But as Defendants admit, the undisputed testimony at trial was

3  that Mr. Lemarié copied module 4—the entire Trident software code.  And since Mr. Lemarié did

4  so within the scope of his employment, that liability extends to Vade.  *See, e.g.*, *Fonovisa, Inc. v.*

5  *Cherry Auction Inc.*, 76 F.3d 259, 262 (9th Cir. 1996) (noting "the normal agency rule of respondeat

6  superior imposes liability on an employer for copyright infringements by an employee").

7    **D.    There is Substantial Evidence Vade Is Liable for Lemarié's Acts of**
       **Misappropriation and Copyright Infringement Under Respondeat Superior**

8
9    Substantial evidence presented at trial shows that Vade should be held liable for Lemarié's

10  misappropriation of Cloudmark's trade secrets and copyright infringement.  Lemarié has been

11  Vade's CTO since February 2017 and holds that position to this day.  Day 3 Trial Tr. (Lemarié)

12  601:7-602:1.  All of the unauthorized use of Cloudmark's trade secrets by Lemarié at issue in this

13  case has been in his role as CTO of Vade and for Vade's benefit, and thus Vade is liable under

14  *respondeat superior.*  For example, the evidence shows Lemarié was working on a "filtering product

15  for Office365" for Vade in July 2017 when he decided to use the same journaling solution developed

16  at Cloudmark (PX2112; Day 3 Trial Tr. (Lemarié) 639:24-640:22, 645:9-22), and then in August

17  2017 he "exactly or with minor modifications" copied source code relating to that functionality from

18  Cloudmark.  Day 6 Trial Tr. (Nielson) 1259:23-1260:8, 1265:12-16.  As another example, by his

19  own admission, Lemarié "utilized" Cloudmark source code in May 2018 and September 2018 for

20  Vade's benefit, after he was "tasked to work on ***Vade's*** spear phishing product."   Day 3 Trial Tr.

21  (Lemarié) 634:6-635:17; PX2726; Day 6 Trial Tr. (Nielson) 1265:18-22.  Indeed, every act of

22  misuse and copying committed by Lemarié has similarly occurred while he was CTO of Vade and

23  for its benefit.  Vade is thus equally liable.  *Navigation Holdings, LLC v. Molavi*, No. 19-2644, 2020

24  WL 5074307, at *3 (N.D. Cal. Aug. 25, 2020) ("[M]isappropriation is 'within the scope of

25  employment when it is performed, at least in part, to benefit the employer, though the employer may

26  forbid it.'"); *SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016)

27

28  of the invalidity argument, as Defendants have known about this argument for nearly a year, yet
    waited until the absolute last moment to ask that the Court submit its § 411(b) request.

1   (vicarious liability applies "even if the employer has not authorized the employee to perform the

2   tortious activity, so long as there is a 'causal nexus' between the activity and the employee's work").

3          Moreover, Vade was well aware of, and has endorsed, Lemarié's copying and misuse of

4   Cloudmark's trade secrets and copyrights.  For example, Lemarié told Vade's CEO, Mr. Lotigier,

5   and others that he would use Cloudmark's spear phishing solution for Vade.  PX2146; Day 3 Trial

6   Tr. (Lemarié) 678:2-679:5.  Even after Vade's CEO learned of Lemarié's copying in August 2019,

7   Lemarié continued to actively work as Vade's CTO and have access to its source code.  Day 3 Trial

8   Tr. (Lemarié) 655:2-19, 806:1-5.  This included code used by the accused products.  *Id.* 657:24-

9   658:14.  Vade finally placed Lemarié on administrative leave only after the allegations ***by Plaintiffs***

10  became more serious, yet continues to hold Lemarié out to potential investors as its CTO and pay

11  Lemarié his full salary.  Day 4 Trial Tr. (Lemarié) 796:9-13; Day 8 Trial Tr. (Lotigier) 1858:18-23.

12  Vade has benefitted from and endorsed Lemarié's conduct and is liable for it.

13      **E.     Witness Testimony and Documents Reflect Vade Willfully Misappropriated
                 Plaintiffs' Trade Secret and Infringed Plaintiffs' Copyrights**

14

15          Vade's sole argument against Plaintiffs' willfulness claims is that Defendants "remov[ed]

16  the accused code," but this attempted inoculation fails on multiple fronts.  First, it is not accurate,

17  as the journaling code literally copied by Lemarié has never been removed.  *See supra* § II.A.4; Day

18  6 Trial Tr. (Nielson) 1268:3-6.  The "new design" that replaced some of the code related to spear

19  phishing also misappropriates, as it was not developed in a "clean room" but instead used Mr.

20  Goutal's knowledge of the trade secrets.  Day 6 Trial Tr. (Nielson) 1352:16-1357:3; PX2273;

21  PX2276; *supra* § II.A.1.  In addition, Defendants' deceptive conduct during this litigation evidences

22  knowledge of wrongdoing and willfulness.  For example, Defendants filed a declaration by Lemarié

23  stating he "deleted copies of Cloudmark files, documents, and information" from his personal

24  computer and personal accounts when leaving Cloudmark, yet both Lemarie and Lotigier knew he

25  had retained a trove of Cloudmark information in a laptop backup from which he copied source

26  code.  Day 3 Trial Tr. (Lemarié) 624:12-625:22.  After learning of this suit, Lemarié deleted relevant

27  "Trade Secrets Notes" and then lied about knowing about the existence of this lawsuit at the time

28  he made the "Notes"—until he was confronted with evidence of their existence.  Day 7 Trial Tr.

(Moore) 1501:11-22, 1512:20-1513:11; Day 3 Trial Tr. (Lemarié) 712:18-713:18.  Later in the suit, Lemarié installed a file deletion program on his laptop and deleted 90 GB of data over seven months before the laptops were forensically imaged.  Day 7 Trial Tr. (Moore) 1496:25-1497:22.  Vade endorsed Lemarié's intentional copying and misappropriation of Cloudmark's source code and trade secrets—never terminating him or reducing his compensation—and only belatedly put him on leave despite **knowing** he had used Cloudmark source code.  Day 3 Trial Tr. (Lemarié) 601:7-602:4. Moreover, ample evidence has been presented to the jury showing Vade's actions are malicious and intended to harm Cloudmark.  *E.g.*, PX2040.4 ("Worst case scenario, [Proofpoint] wins and [the customer] would access our source code and [Proofpoint] would be [f***ed] with a free proven solution from us . . . killing any [Proofpoint] possible success."); PX100.3 ("we have a new MTA for telecom operators, which will allow us to completely destroy Cloudmark.").

### F.    Substantial Evidence Supports Plaintiffs' Damages[8]

#### 1.    Unjust Enrichment

Defendants' strained challenges to Plaintiffs' unjust enrichment claim falls far short of the high standard for judgment as a matter of law.  Specifically, Defendants argue that Plaintiffs have not proven a "causal nexus" between misappropriation or infringement and "any harm to Plaintiffs." Plaintiffs have presented ample evidence demonstrating that Vade's sales of certain products were caused (and enabled) by Defendants' misappropriation of Plaintiffs' trade secrets, as is required under the DTSA.  18 U.S.C. § 1836(b)(3)(B)(i)(II) ("[A] court may award damages . . . for any unjust enrichment caused by the misappropriation of the trade secret . . . .").

As the evidence shows, Plaintiffs' trade secrets were integral in enlarging and enhancing Vade's Global Network Intelligence database ("VRGNI"), at least in that they were used to create entire Vade products (Vade O365 and Vade MTA Builder) and advanced functionalities (Vade Content Filter). Trial Tr. 1646:5-12.  For example, Dr. Nielson testified that Vade's products use

---

[8]   Defendants' contention that their misappropriation and copying only supports nominal damages is farfetched.  Mot. 24-25.  As previously discussed, Trident had value even after it was discontinued (*see supra* § II.B.2(a), Plaintiffs' journaling code has never been removed from Vade's products (*see supra* § II.A.4), and the Zenika spear phishing module was not developed in a proper clean room and still misappropriates Plaintiffs' trade secrets (*see supra* § II.A.2).

PLAINTIFFS' OPPOSITION TO VADE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

1   and benefit from Plaintiffs' trade secrets, including VRGNI which is a fundamental element of

2   Plaintiffs' "unified architecture" trade secret.  Day 6 Trial Tr. (Nielson) 1303:6-1397:4.[9]

3          Plaintiffs' damages expert further explained that the creation of VRGNI before the

4   misappropriation occurred does not negate or otherwise contradict the fact that Vade obtained unfair

5   benefits and improvements to VRGNI through the use of Plaintiffs' trade secrets.  Day 7 Trial Tr.

6   (Arnold) 1661:22-1662:5, 1663:5-12.  Importantly, the volume of data feeding VRGNI ***more than***

7   ***tripled*** after Defendants' misappropriation.  *See id.* 1660:23-1661:9.  Such an increase inevitably

8   improves performance of Vade products, including Vade Content Filter, and gives Vade a

9   competitive advantage it would not otherwise have.  *See id.* 1661:2-1662:5, 1663:5-12.  Indeed,

10  Vade's Director of ISP Sales testified that Vade "of course" leveraged the data it obtained after the

11  misappropriation to break into the U.S. market.  H. Peck Dep. Designation 181:14-182:6.

12         Then, through Vade's "feedback loop," the enlargement and enhancement of VRGNI was

13  used to improve the accuracy and performance of ***all*** Vade products, including Vade Content Filter.

14  *E.g.,* Day 7 Trial Tr. (Arnold) 1648:7-22, 1653:20-1654:17; Day 8 Trial Tr. (Arnold) 1749:5-1750:5;

15  Gendre Dep. Designation 161:4-10, 13-22, 161:25-164:17, 164:19-25, 165:03-08; PX1904.0008;

16  PX1863.0010; PX1863.0012 (Vade presentation stating that "#1 priority is to collect more data

17  points; feedback loop is central").  Indeed, Vade's Chief Product Officer testified that VRGNI

18  collects data from Vade O365 customer email traffic to trigger blocking decisions and load updates

19  into the filter engine, which is a core component used across all Vade products.  *See* Gendre Dep.

20  Designation 161:4-10, 13-22, 161:25-164:17, 164:19-25, 165:03-08; PX1816PX1892.0009 (slide

21  stating Vade has "[s]ame core components for all products"); PX1816.0012 (showing graphic of

22  three Vade products pulling information from a central data repository).  As Plaintiffs' damages

23  expert testified, the improved accuracy and performance (which was enabled by the use of the trade

24  secrets) allowed Vade to sell more products and obtain more customers—the exact result that Vade

25

26         [9]   Also, information contained in the Gateway Licensing Reports (trade secret 16) enabled the
    entire idea and development for Vade's MTA Builder product.  *See* Delannoy Dep. Designation.
27  111:1-119:15, 137:20-150:3; Lotigier Tr. 162:2-4, 162:8-17.  Plaintiffs are thus entitled to
    damages for MTA Builder sales—which are reflected in the Vade Secure Cloud line item.
28

1    intended and sought. *See* Day 7 Trial Tr. (Arnold) 1650:11-16, 1653:13-17, PX-1863.0010;

2    PX1755.0013 (customer review stating that "quality of filtering is critical," and that "[t]oday, Vade

3    is the best in class and so we would not switch[,] [b]ut if the quality of filtering decreased, then we

4    would switch off to a competitor").  Vade's Director of ISP Sales also testified to the importance of

5    Vade's data set (which makes up VGRNI) in gaining large, market-leading customers, which drives

6    further sales of Vade products.  H. Peck Dep. Designations 153:04-14, 153:18-21, 181;14-182:6,

7    257:23-258:6; PX1863.0013 (2019 plan to "[l]everage Comcast across the market").

8           Despite the clear record that unfair benefits obtained by Vade were fed into its feedback

9    loop, further unjustly benefiting the entirety of Vade's products (of which only a percentage of sales

10   is conservatively claimed by Plaintiffs), Defendants erroneously suggest it was Plaintiffs' burden to

11   reduce or deduct expenses not attributable to the trade secrets.  As a matter of proof, however, "[t]he

12   plaintiff has the burden of establishing the defendant's sales," whereas "the defendant has the burden

13   of establishing any portion of the sales not attributable to the trade secret and any expenses to be

14   deducted in determining net profits." *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 1611835,

15   at *3 (N.D. Cal. Apr. 3, 2018) (citing Restatement (Third) of Unfair Competition § 45 cmt. f (1995)).

16   Plaintiffs have presented evidence to sufficiently establish Defendants' sales of products that use

17   and benefit from Plaintiffs' trade secrets. *E.g.*, PX2438.  To the extent Vade has evidence of reliable,

18   reasonably certain, and non-speculative calculations of deductions to Vade's accused sales revenue

19   that are not attributable to Plaintiffs' trade secrets, the jury may consider such evidence.

20          **2.      Actual Loss**

21          Defendants' challenge to Plaintiffs' actual loss claim similarly fails.  Specifically, Plaintiffs

22   have presented ample evidence that "other causes did not cause Proofpoint to lower its prices."  Mot.

23   23.  Vade gained an unfair advantage from its misappropriation (*see supra* § III.B.F.1), which forced

24   Proofpoint to discount its prices—for the first time in the customer relationship—and offer multi-

25   million-dollar products and services for free in 2019. *E.g.,* Day 7 Trial Tr. (Arnold) 1672:18-1677:4;

26   PX0518; PX1636; PX1638-PX1640.  Evidence shows that the price on Proofpoint's Apple contracts

27   had increased every year since 2009, and the only new factor in the 2019 contract negotiations was

28   Vade's offering of a misappropriating product. *See* Day 8 Trial Tr. (Arnold) 1758:16-1759:18; *see*

1    *also* PX1636; PX1637; PX1638; PX1639; PX1640.  Cloudmark employees also expressed that "the

2    threat was from Vade" when explaining the discounts and free products offered to Apple.  PX0716.

3    The discount was clearly a direct consequence of Vade's misappropriation, given that Vade's earlier

4    efforts to pursue Apple—with products that *did not* contain Plaintiffs' trade secrets—fell flat and

5    actually resulted in a price *increase* for Proofpoint.  Day 8 Trial Tr. (Arnold) 1754:20-1765:10,

6    1769:7-14.   The evidence presented supports a finding that Vade's misappropriation caused

7    Plaintiffs' actual loss on the Apple contract.  Defendants motion should fail.

8                    **3.      Copyright Damages**

9         Preliminarily, Defendants misrepresent the requisite standard for monetary recovery for

10   copyright infringement.   The recoverable profits need not be narrowly tied specifically to the

11   "protected expression" (Mot. 21), but instead need only to have a "causal connection" to the

12   infringement.   *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004), *as

13   amended on denial of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended on denial of reh'g*,

14   No. 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25, 2004).  This is consistent with the language if

15   the Copyright Act, which simply requires actual damages to be suffered "*as a result of* infringement"

16   and profits to be "*attributable to* the infringement." 17 U.S.C. § 504(b) (emphasis added).

17        Furthermore, Defendants' assertion that Plaintiffs failed to provide a damages theory or

18   supporting evidence for its copyright claim is plainly incorrect.  Mot. 20.  As Dr. Arnold explained,

19   he did fact conclude that Plaintiffs incurred damages for Vade's copyright infringement, but they

20   were subsumed in the damages for misappropriation of Plaintiffs' trade secrets given the

21   interconnectedness of Vade's accused products: "[I]f the jury accepts that there was code that was

22   copied and put into Vade's overall system, and combined with the fact that . . . we have . . . a

23   feedback loop and . . . all these components are connected to each other, that means the . . .

24   copyrighted material itself is embedded in the system with a feedback loop."  Day 7 Trial Tr.

25   (Arnold) 1671:20-1672:14; Day 8 Trial Tr. (Arnold) 1745:5-10).  As discussed above (*see supra* §

26   III.B.F.1), Vade's copyright infringement enabled the enhancement and improvement of VRGNI—

27   which, through the feedback loop of customer data being filtered and the subsequent machine

28   learning from the filtering of those messages, caused Vade to unjustly obtain more profits from all

1   of its products.  Day 7 Trial Tr. (Arnold) 1671:15-1672:14.  Dr. Arnold's analysis was not "limited

2   to Vade's O365 product," as this "causal connection" is sufficient to link  all the three components

3   of revenue identified by Dr. Arnold to Vade's copyright infringement.  *Id.*

4          Finally, as with the damages analysis for Vade's trade secret misappropriation, any

5   "deductible expenses" or "elements of profit attribute to factors other than the copyrighted work"

6   that Vade contends should be accounted for are *Vade's* burden—as the infringer—to prove.  *Polar*

7   *Bear Prods.*, 384 F.3d at 707; 17 U.S.C. § 504(b).

8          **G.      Plaintiffs Are Entitled to Injunctive Relief**

9          Notwithstanding that requests for injunctive relief are "not a jury issue,"  Defendants are not

10  entitled to judgment as a matter of law with respect to Plaintiffs' prayer for equitable relief.  *Asfall*

11  *v. Los Angeles Unified Sch. Dist.*, No. CV 18-00505 CBM, 2020 WL 2951920, at *2 (C.D. Cal. Feb.

12  11, 2020).  First, the evidence proffered thus far demonstrates that Plaintiffs will continue to suffer

13  irreparable harm resulting from Vade's misappropriation[10] and copyright infringement.  Dr. Nielson

14  testified Plaintiffs' trade secret code remains present in various versions of Defendants' products—

15  which Vade fails to address—continuing to cause irreparable competitive harm.  Day 6 Trial Tr.

16  (Nielson) 1267:24-1268:6; PX3; PX4.  "Money damages alone cannot protect against . . .

17  dissolution" of "the trade secret status" of Plaintiffs' features.  *Brocade Commc'ns Sys., Inc. v. A10*

18  *Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013).

19         The harm caused by continued sales of software containing Plaintiffs' trade secrets will be

20  further compounded by the expanded commercialization and wider dissemination of infringing

21  products.  As Vade's sales director Helen Peck testified, "[Vade] has significant opportunities in the

22  pipeline . . . on the Office 365 side with our distributor model."  H. Peck Dep. Designation. 133:3-

23  14; *see Brocade*, 2013 WL 890126, at *9 (finding "[c]ommercial advantage is grounds for finding

24  irreparable harm" and "continued use of the four trade secrets additionally cause ongoing injury by

25

26  _____

   [10]  As previously discussed, Defendants' contention that Plaintiffs made the "decision to publicly
27  reveal their trade secrets at trial" is deceptive given the parties' joint stipulation on this precise issue,
   does not bear upon the issue of irreparable harm, and should be rejected.  *See supra* § IV.B.2.
28  Regardless, the fact that *one* member of the public was privy to Plaintiffs' trade secrets for a limited
   portion of the trial in open court does not equate to "publicly reveal[ing]" them.  Mot. 25.

1    dissolving the trade secret status of Brocade's features").

2         The irreparable competitive harm caused by Vade may be most significant in relation to the

3    improvement that Plaintiffs' trade secrets provide to Vade's products.  As Dr. Arnold testified, the

4    trade secrets allow Vade's global information database, VRGNI, to "possess[] a lot more capability

5    than it otherwise would" because its accuracy and performance is enhanced by customer data.  Day

6    8 Trial Tr. (Arnold) 1646:21-1647:2; Day 6 Trial Tr. (Nielson) 1301:16-1303:7; Day 2 Trial Tr.

7    (Knox) 305:9-306:9).  A "positive feedback loop" is created, whereby additional mailboxes gained

8    by Vade (and lost by Proofpoint) leads to more data that results in "the improvement of [Vade's]

9    filter," "superior performance," and "more customers, which in turn . . . generates more emails that

10   improves the brain, VRGNI."  Day 8 Trial Tr. (Arnold) 1647:5-21.  This leads to ever-increasing

11   competitive harm to Plaintiffs, who continue to lose out on the benefit and improvements created

12   by this "loop." *Id.* 1648:7-1648.  The evidence that Plaintiffs' "trade secrets improve performance

13   of [Vade's] product[s] and aid in [Vade's] pursuit of sales to customers" is sufficient to show that

14   Plaintiffs suffer from irreparable harm.  *Brocade Commc'ns Sys., Inc*., 2013 WL 890126, at *9.

15        Second, contrary to Defendants' assertions, the public interest would be served by enjoining

16   the sales of Vade's tainted products because "the public has a strong interest in protecting

17   intellectual property rights."  *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal.

18   2019*), modified in part*, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019).  The public would benefit

19   from the products developed by innovative, forward-thinking technology companies, and

20   "uphold[ing] the law that protects [Plaintiffs'] trade secrets . . . encourages future investment in

21   innovation."  *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2021 WL 1553926,

22   at *13 (S.D.N.Y. Apr. 20, 2021) ("An injunction is also in the public interest because it upholds the

23   law that protects TriZetto's trade secrets and intellectual property rights, and thus encourages future

24   investment in innovation.").  An injunction would also have an important deterrent effect.  *Brocade*

25   *Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 557102, at *7 (N.D. Cal. Feb. 12, 2013).

26   **III.    CONCLUSION**

27        For the foregoing reasons, Plaintiffs request that the Court deny Defendants' motion for

28   judgment as a matter of law and allow the jury to weigh the evidence to make a determination.

1

2    DATED:  August 9, 2021                    Respectfully Submitted,

3                                              By  */s/ Sean S. Pak*

4                                                   Sean S. Pak (SBN 219032)
                                                    seanpak@quinnemanuel.com
5                                                   Iman Lordgooei (SBN 251320)
                                                    imanlordgooei@quinnemanuel.com
6                                                   QUINN EMANUEL URQUHART &
                                                    SULLIVAN, LLP
7                                                   50 California Street, 22nd Floor
                                                    San Francisco, CA 94111
8                                                   Telephone: (415) 875-6600
                                                    Facsimile: (415) 875-6700
9
10                                                  Jodie W. Cheng (SBN 292330)
                                                    jwcheng@jwc-legal.com
11                                                  JWC LEGAL
                                                    One Market Street
12                                                  Spear Tower, 36th Floor
                                                    San Francisco, CA 94105
13                                                  Telephone: (415) 293-8308

14                                                  *Attorneys for Plaintiffs Proofpoint, Inc. and*
                                                    *Cloudmark LLC*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO VADE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW