Sean S. Pak (SBN 219032)
  seanpak@quinnemanuel.com
Iman Lordgooei (SBN 251320)
  imanlordgooei@quinnemanuel.com
Jodie W. Cheng (SBN 292330)
  jodiecheng@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Plaintiffs,*
*Proofpoint, Inc. and Cloudmark LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PROOFPOINT, INC.; CLOUDMARK LLC<br><br>Plaintiffs,<br><br>v.<br><br>VADE SECURE, INCORPORATED; VADE SECURE SASU; OLIVIER LEMARIÉ<br><br>Defendants. | CASE NO. 3:19-cv-04238-MMC<br><br>**PLAINTIFFS' MOTION FOR EXEMPLARY DAMAGES IN RE VADE'S WILLFUL & MALICIOUS TRADE SECRET MISAPPROPRIATION**<br><br>**Judge:  Hon. Maxine M. Chesney**<br><br><u>Hearing</u><br>**Date:**  Oct. 29, 2021<br>**Time:**  9:00 a.m.<br>**Courtroom:**  7, 19th Floor<br>            450 Golden Gate Avenue<br>            San Francisco, CA 94102 |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 29, 2021 at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Maxine M. Chesney at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs Proofpoint, Inc. and Cloudmark LLC (collectively, "Plaintiffs") will and hereby do move the Court to award exemplary damages against Defendants Vade Secure, Incorporated and Vade Secure SASU (collectively, "Vade") for willful and malicious trade secret misappropriation pursuant to 18 U.S.C. § 1836(b)(3)(C).

Plaintiffs' motion is based on this Notice of Motion and Motion; the following memorandum of points and authorities; the supporting declaration of Jodie W. Cheng ("Cheng Decl."), all matters of which the Court may take judicial notice; other pleadings on file in this action; and other written or oral argument that Plaintiffs may present to the Court.

## RELIEF REQUESTED

Plaintiffs respectfully request the Court award exemplary damages against Vade in an amount equal to $26,991,318, which is two times the amount of compensatory damages awarded by the jury in this action (*see* 18 U.S.C. § 1836(b)(3)(C)), pursuant to the jury's determination that Plaintiffs' trade secrets were willfully and maliciously misappropriated by Vade. The full amount of exemplary damages awardable under the law is warranted under the circumstances, particularly to deter similar misconduct by Vade and others.

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................1

II.   SUMMARY OF VADE'S ACTIONS .................................................................3

      A.   Discovery and Pre-Trial Conduct..............................................................3

      B.   Evidence Presented at Trial .......................................................................5

      C.   Jury Verdict and Vade's Post-Trial Conduct ............................................8

III.  LEGAL STANDARDS ......................................................................................8

IV.   ARGUMENT .....................................................................................................9

      A.   Vade's Continued Refusal to Acknowledge Wrongdoing Necessitates the
           Need For Maximum Exemplary Damages..................................................9

      B.   Vade's Public Statements Indicate that the $13.5 Million Jury Award Is
           Insufficient to Deter Future Misconduct ................................................11

      C.   The Evidentiary Record and Jury Finding Supports and Calls For Maximum
           Exemplary Damages ................................................................................12

      D.   Maximum Exemplary Damages Are a Necessary Deterrence, as Future and
           Continued Misappropriation May Be Difficult to Detect and Prove ......14

      E.   Vade's Pattern of Misconduct Establishes the Need for Maximum
           Exemplary Damages to Deter Similar Misconduct..................................16

V.    CONCLUSION .................................................................................................18

1

## **TABLE OF AUTHORITIES**

2

3

### **Cases**

4   *ATA Airlines, Inc. v. Federal Express Corp.*, 665 F.3d 882 (7th Cir. 2011)................................... 11

5   *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)............................................................. 9, 16, 18

6   *DiscoverOrg Data, LLC v. Bitnine Global, Inc.*, No. 19-cv-08098-LHK, 2020 WL
       6562333 (N.D. Cal. Nov. 9, 2020) .......................................................................... 9, 14, 15

7

    *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 495 F. Supp. 3d 687 (N.D. Ill. 2020)......... 8, 9, 14

8

9   *ResMan, LLC v. Karya Prop. Mgmt*, LLC, No. 4:19-cv-402, 2021 WL 3403935 (E.D.
       Tex. Aug. 4, 2021) .......................................................................................................... 8, 9, 13

10  *ResMan, LLC v. Karya Property Management, LLC*, No. 4:19-cv-00402, ECF No. 343
       (E.D. Tex. Aug. 12, 2021)..................................................................................................... 9, 13

11

12  *Syntel Sterling Best Shores Mauritius Ltd. v. The Trizetto Group, Inc.*, No. 1:15-cv-00211,
       ECF No. 931 (S.D.N.Y. Oct. 27, 2020) .............................................................................. 13

13

14

### **Statutes**

15  18 U.S.C. § 1836(b)(3)(C) ................................................................................................................. 8

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     INTRODUCTION**

After hearing and assessing the evidence for four weeks, including five days of deliberations, the jury unanimously concluded that Vade willfully and maliciously misappropriated fifteen of Plaintiffs' twenty asserted trade secrets relating to email and cyber security technology.  The Court therefore may and should "award exemplary damages in an amount not more than 2 times the amount of the damages" pursuant to the Defend Trade Secrets Act ("DTSA").  As explained herein, the jury's finding of willfulness, Vade's conduct throughout this case, as well as Vade's conduct and statements to the media immediately after the jury's finding of willful misappropriation all weigh in favor of awarding the full extent of exemplary damages available under the law: $26,991,318.  Anything less would fail to deter future and ongoing misconduct by Vade and others.

Throughout this case, including at trial, Vade has waved off Plaintiffs' now-proven claims of misappropriation as a "joke."  (*E.g.*, Dkt. 785-1 (Lotigier Dep. Designations) 358:18–359:2, 359:24–362:16 (*e.g.*, "I'm just joking with the fact that this guy is not discrete.").)  Vade's attitude was no different at trial, where Vade's CEO and majority shareholder, Mr. Georges Lotigier, scoffed that, in his view, Plaintiffs' claims are merely "pretend."  (Trial Tr. (Lotigier) 1864:5–1865:1.)  As such, Plaintiffs and the Court were subjected to repeated attempts by Vade throughout this case to obfuscate and frustrate the proceedings and, concomitantly, avoid responsibility for its misconduct—all part of the same pattern and practice that originated with its willful and malicious misappropriation of Plaintiffs' trade secrets.  Indeed, based on the evidence and Vade's conduct throughout this case, Magistrate Judge Illman reached the conclusion that Vade "intentionally destroyed, concealed, and withheld [evidence] while doing everything possible to cover their tracks and hide the acts of concealment and destruction."  (Dkt. 566 at 15.)  Having suffered through Vade's discovery misconduct, he wrote: "[w]ithout mincing words, and without repeating the many criticisms that the undersigned has leveled at Defendants' handling of this case in prior order, the undersigned will begin by observing that these Defendants have been playing a dangerous game since the outset of this litigation and the time has now come for them to take their seat at the banquet of consequences that they have invited upon themselves."  (*Id*. at 10.)

But Vade still has not incurred the consequences it invited upon itself.  The record is replete with Vade's admissions that it knowingly used Plaintiffs' protectable trade secrets without authorization to compete against and, explicitly, harm Plaintiffs.  Yet, days after Vade was first confronted with evidence of its verbatim copying of Cloudmark source code (*e.g.*, Dkt. 198), Mr. Lotigier told major French media outlets that Vade was "100% clean" and this litigation was nothing more than "legal harassment" and "a sign of recognition of **his** technology." (*E.g.*, PX-675, Trial Tr. (Lotigier) 1865:22–1866:25.)  Rather than objectively assessing the allegations and evidence, or acknowledging its own wrongdoing, or simply staying silent, Vade chose to publicly blame the purported "great legal violence . . . inherent in American culture" as the basis for this lawsuit.  (PX-675.)  As the evidence revealed, Vade made these statements despite having known, for over a year, that its CTO, Defendant Olivier Lemarié, had used Plaintiffs' technology to develop Vade's products, including specific functions copied directly from Cloudmark's source code.

And even after the jury's verdict, Vade still refuses to acknowledge its wrongdoing and pay due respect to the determinations of the U.S. judicial system.  In the weeks following the verdict, Vade has made numerous statements rejecting the jury's liability finding and scoffing at the jury's compensatory damages award.  At trial, Vade presented damages opinions of questionable reliability and methodology, escaping exclusion under *Daubert* only by misrepresenting its expert's opinions, thereby allowing him to present faulty and impermissible cost deductions to the jury.  Critical to the present issue, Vade now publicly boasts that it is "pleased" with the jury's damages award of approximately $13.5 million.  In other words, the jury's compensatory damages award was not sufficient either as a punishment or disincentive to deter ongoing and future misconduct by Vade.

Unless the Court awards the full extent of exemplary damages under the DTSA, a strong signal will be sent to unscrupulous actors in the tech industry and beyond:  that they may lie, steal, cheat, and even destroy documents, all in the interest of preserving their willful and malicious theft of a competitor's trade secrets, and with only the risk of a manageable damages award hanging over their heads.  Accordingly, an award of $26,991,318 in exemplary damages is necessary to effectuate the purpose and intent of exemplary damages under the DTSA—*i.e.*, to deter misconduct and demand respect of U.S. intellectual property rights.

## II.   SUMMARY OF VADE'S ACTIONS

### A.   Discovery and Pre-Trial Conduct

On July 23, 2019, Plaintiffs filed the instant lawsuit, alleging, *inter alia*, that Defendants Vade and Olivier Lemarié (collectively, "Defendants") had misappropriated Plaintiffs' asserted trade secrets relating to email and cyber security algorithms and architecture, under the DTSA. (Dkt. 1.)  Discovery proceeded under the supervision of Magistrate Judge Illman, who, over the course of one year, reviewed over a dozen discovery briefs, conducted nine discovery hearings, and issued over twenty orders, including orders compelling Defendants to produce discovery and sanctioning Defendants for their failure to do so.  In his last opinion in this case, issued June 1, 2021, Magistrate Judge Illman wrote:

> "Without mincing words, and without repeating the many criticisms that the undersigned has leveled at Defendants' handling of this case in prior order, the undersigned will begin by observing that these Defendants have been playing a dangerous game since the outset of this litigation and the time has now come for them to take their seat at the banquet of consequences that they have invited upon themselves.  The record of this misconduct—as described above and as narrated in the many discovery orders issued over the last year— speaks for itself and does not require reiteration.  As was the case on each of the numerous prior occasions that Defendants' misbehavior has been brought before this court for review, their explanations are little more than deflections and further obfuscation."

(Dkt. 566 at 10 (recommending adverse inference instruction).)  In view of Vade's pattern of "deflections" and "obfuscation" throughout the course of litigation, he reached the inescapable conclusion that Defendants had intentionally destroyed documents and evidence.  (*Id*. at 15 ("Defendants knew they were under a duty to preserve all of this evidence, but instead they intentionally destroyed, concealed, and withheld it while doing everything possible to cover their tracks and hide the acts of concealment and destruction.").)

As this opinion stated, ample warnings, and benefit of doubt, had been given to Defendants throughout this case.  For example, six months earlier, a different order had cautioned:

> "[T]he court will note that due to the sophistication and reputation of Vade's counsel, it appears likely to the undersigned that Vade's purpose of presenting its objections in the piecemeal fashion described above has been to delay and frustrate the discovery process in this case, however, the undersigned cannot completely discount the possibility that Vade's counsel simply did not know the

> law and that there may remain some chance of misapprehending Vade's mistakes for misdeeds.  Accordingly, to fairly account for that possibility, while at the same time leaving no room for doubt that the well of patience has run dry, the court will fashion the following remedy in an effort to avoid unduly punishing Vade where it may be undeserved while at the same time ensuring that [] the court's prior orders granting Plaintiffs' motion to compel will be duly respected and enforced without **any** further delay."

(Dkt. 334 at 9 (imposing daily monetary sanctions until Vade certified compliance with discovery order) (emphasis original).)

On August 16, 2020, Plaintiffs moved to amend their original complaint to include a claim for copyright infringement, citing specific evidence of Defendants' verbatim copying of Plaintiffs' copyrighted source code into Vade's products.  (Dkt. 198.)  Less than two weeks later, French news outlets reported statements from Vade's CEO asserting that Vade was "100% clean"; and the litigation against Vade was "a sign of recognition of *his* technology," a product of "the 'great legal violence' . . . inherent in American culture," and a "technique of legal harassment."  (Trial Tr. (Lotigier) 1866:5–8; PX-675 (emphasis added).)  But sworn testimony revealed that Vade had known—for at least a year, since August 2019—that Vade's CTO, Defendant Lemarié, used Cloudmark's anti-spear phishing technology, including specific source code functions, in developing Vade's products.  (*E.g.*, PX-2146; Trial Tr. (Lemarié) 653:7–21, 654:13–17, 655:2–6, 678:2–679:5; *see also* Trial Tr. (Lotigier) 1865:22–1866:25.)

Thereafter, and leading up to trial, the parties filed various summary judgment and *Daubert* motions, as well as Motions *in Limine* and other pre-trial motions.  Among these was Plaintiffs' motion to exclude opinions of Vade's damages expert, Mr. Christopher Bakewell, relating to cost deductions intended to offset Plaintiffs' calculation of unjust enrichment obtained by Vade from its misappropriation.  (Dkt. 462.)  The Court granted Plaintiffs' motion and issued a protective order prohibiting Mr. Bakewell's cost deductions until such time that Vade sufficiently demonstrated they were reliable.  (Dkt. 592 at 4–5 ("Accordingly, to the extent plaintiffs seek to exclude Bakewell's opinion as to the amount of deductible costs, the Court will issue a protective order precluding defendants from referring to such opinion, in opening statement or otherwise, or calling Bakewell to offer it, until such time as defendants have made a showing that such opinion meets the

requirements of Rule 702 and <u>Daubert</u>.").)  Plaintiffs' trade secret claims survived Defendants'
summary judgment challenges and proceeded to trial, along with the protective order barring
mention of Mr. Bakewell's cost deductions.

**B.**      **Evidence Presented at Trial**

On July 26, 2021, a four-week jury trial in this case commenced in which the jury was
presented with overwhelming evidence of willful and malicious misappropriation of Plaintiffs' trade
secrets by Vade, including without limitation testimony and documents that showed:

- Vade's goal to "destroy," "carpet bomb," "completely push back Cloudmark in the
  market" using products that Vade developed with Plaintiffs' misappropriated trade
  secrets.  (*E.g.*, PX100.3 ("we have a new MTA . . . , which will allow us to completely
  destroy Cloudmark."); PX-1863.0016 ("Carpet Bomb Cloudmark; a $35M ARR new
  opportunities"); Dkt. 785-1 (Lotigier Dep. Designations) 350:19–351:24, 354:21–
  355:4, 355:25–356:22, 356:24–356:24, 358:18–358:22, 375:3–10.)

- Vade's improvement of all its products using data generated by products that Vade
  developed with Plaintiffs' misappropriated trade secrets.  (*E.g.*, PX-1904.08; PX-
  1863.10, -.12; Dkt. 785-1 (Gendre Dep. Designations) 161:05–161:10, 161:13–
  161:22, 161:25–162:10, 164:11–164:17, 164:19–164:25, 165:03–165:08.)

- Vade's concerted effort to take Plaintiffs' largest customers and prevent those
  customers from returning to Plaintiffs.  (*E.g.*, Dkt. 785-1 (Peck Dep. Designations)
  181:14–182:6,  218:17–219:5,  220:17–23,  220:24–221:8;  *id*. (Lotigier Dep.
  Designations) 373:22–374:5; PX-2040.0003 (*e.g.*, "We have to be very assertive and
  strong on these points in order to generate a Perception that the risk for them is higher
  to keep [Proofpoint] rather to buy Vade"), -0004.)

- Vade's targeting and hiring of Cloudmark employees to work on similar technologies
  at Vade and to harm Cloudmark.  (*E.g.*, PX-2288.0002 ("we've talked quite a bit
  with Mario ex cloudmark . . . He's also worked on spear phishing ;-)") ("Alexandre
  Boussinet was initially recruited to work on spear phishing."); PX-2257 ("since he

comes from cloud/Mark I would do whatever to weaken them ;-)"); Dkt. 785-1 (Lotigier Dep. Designation) 251:4–251:12, 255:9–17.)

- Testimony and documents from Vade's CEO forwarding hundreds of pages of confidential Cloudmark trade secret documents internally at Vade, telling the recipient "discrete with that ;-)" while knowing Vade "should not have this kind of document" (i.e., the Cloudmark trade secret information) and that his conduct was "wrong." (*E.g.*, PX-2254; Dkt. 785-1 (Lotigier Dep. Designations) 356:19–24, 358:18–22, 366:4–9; *id*. (Delannoy Dep. Designations) 140:16–24, 141:6–10.)

- Vade's flippant and joking attitude toward its knowing and willful theft of Plaintiffs' confidential information and misappropriation of trade secrets. (*E.g.*, PX-2254 ("discrete with that ;-)" and "Clearly, I haven't given you anything :)"); Dkt. 785-1 (Lotigier Dep. Designations) 358:18–359:2, 359:24–362:16 (*e.g.*, "I'm just joking with the fact that this guy is not discrete."); *id*. (Delannoy Dep. Designations) 142:17–143:25, 145:19–146:7.)

- Vade's knowledge since at least August 2019 that its CTO, Defendant Lemarié, had used Cloudmark's confidential information and source code to develop Vade's products. (*E.g.*, PX-2146; Trial Tr. (Lemarié) 653:7–21, 654:13–17, 655:2–6, 678:2–679:5; *see also* Trial Tr. (Lotigier) 1865:22–1866:25.)

- Former Cloudmark employees knowingly took and used Plaintiffs' confidential trade secret information and documents at Vade yet are ***still*** employed to this day in various high-level positions. (*E.g.*, *id*.; Trial Tr. (Lemarié) 601:7–17, 602:2–4, 602:7–16; Dkt. 785-1 (Delannoy Dep. Designation) 140:16–24, 141:6–10, 145:19–146:7, 174:20–175:2 (*e.g.*, "I benefitted from a salary increase. I don't know if it was in October or November, but within two months I did benefit from a salary increase."); PX-2254.)

- Internal communications suggesting giving the accused technology and source code away for free if Plaintiffs were to win this lawsuit for the purpose of "killing any [Proofpoint] possible success." (*E.g.*, PX-2040.0004 ("Georges asked to throw all

we have into the deal . . . .  Worst case scenario, PPT wins and Apple would access our source code and PPT would be f[***]ed with a free proven solution from us. Also this is helping their in-house strategy and killing any PPT possible success."); Dkt. 785-1 (Peck Dep. Designations) 268:23–269:18.)

- Testimony that, after the filing of this action, Vade's CTO installed a file deletion application with file "Shredder" function on his laptop and deleted at least 90 GB of data over seven months, as well as deleted clearly relevant evidence (including a document titled "Trade Secrets Notes" created shortly after he became aware of this lawsuit).  (*E.g.*, Trial Tr. (Moore) 1494:10–1496:15, 1496:25–1497:22, 1501:11–22, 1512:20–1513:11; Trial Tr. (Lemarié) 712:18-713:18.)

- Despite all the evidence presented against Vade, that its CEO and majority shareholder, Mr. Lotigier, still held the view that Plaintiffs' allegations and claims are "pretend."  (Trial Tr. (Lotigier) 1864:5–1865:1.)

Additionally, at trial, Vade's damages expert, Mr. Bakewell, made certain representations to the Court **under oath** in order to overcome Plaintiffs' *Daubert* challenge and the Court's protective order regarding his calculations of costs to deduct and offset Vade's accused revenues.  Notably, during his *voir dire*, Mr. Bakewell testified under oath that (1) he had not merely applied a pro-rata allocation of Vade's costs to the accused revenue (Trial Tr. (Bakewell) 2270:11–22, 2272:1–7, 2273:5–16; *but see id.* at 2273:17–2274:8, 2303:17–2304:8, 2305:7–25), and (2) his cost deductions did not include certain items, such as taxes and fixed costs (*id*. at 2307:21–2308:10).  Thus, the Court allowed him to present his theories to the jury.  However, Mr. Bakewell was confronted by uncontested evidence on cross examination of the exact opposite—that he had in fact (1) merely applied a pro-rata allocation of Vade's costs to the accused revenue, and (2) failed to exclude items such as taxes or fixed costs from his cost deductions.  (*E.g.*, *id*. at 2663:12–2665:13, 2665:22–2666:5, 2666:10–2668:5; *see also id*. at 2305:7–25.)  These points and inconsistencies were never addressed or explained by Mr. Bakewell or Vade.

### C.   Jury Verdict and Vade's Post-Trial Conduct

Following five days of deliberation, the jury returned its verdict on August 20, 2021.  (Dkt. 795.)  The jury found that: nineteen of the twenty asserted trade secrets qualified as protectable trade secrets, Vade had misappropriated fifteen of Plaintiffs' protectable trade secrets, and Vade had done so willfully and maliciously.  (*Id*.)  The jury then awarded $13,495,659 of compensatory damages based on the unjust enrichment obtained by Vade as a result of the trade secret misappropriation. (*Id*.)  Following briefing and oral arguments presented by both parties (including as part of deliberations regarding jury instructions), the Court determined the amount of exemplary damages would be decided by the Court rather than the jury.[1]  (*See* Dkts. 758, 759.)

In the weeks after the jury's verdict, Vade issued several statements to media and news outlets expressing that it was "pleased" with the jury's compensatory damages award.  (*E.g.*, Ex. 1; Ex. 2 (translated); Ex. 3 (translated).)  In fact, Vade's CEO assured the public that the multi-million-dollar award had little impact on Vade, explaining "[t]he 13.5 million is much less than the annual value of [Vade's] recurring contracts" and that Vade's continues to achieve 30% to 40% growth, year-over-year.  (*E.g.*, Ex. 2 (translated).)  Ignoring the jury's finding of willful and malicious misappropriation, Vade has telegraphed to the world that, in its view, the compensatory damages award shows Plaintiffs' claims were an "overreach" and "excessive," and that "Proofpoint / Cloudmark has not sufficiently demonstrated the validity of its claims."  (*E.g.*, Ex. 1; Ex. 3 (translated).)

## III.   LEGAL STANDARDS

Under the DTSA, 18 U.S.C. § 1836, *et seq*., "if the trade secret is willfully and maliciously misappropriated," the court may "award exemplary damages in an amount not more than 2 times the amount of" compensatory/actual damages.  18 U.S.C. § 1836(b)(3)(C).  Courts have found that,

---

[1]  Under the DTSA, the amount of exemplary damages has consistently been decided by the jury.  *See, e.g., Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 495 F. Supp. 3d 687, 711 (N.D. Ill. 2020) ("For the reasons in the record set out in Motorola's briefing on this first issue, it was proper for the issue of exemplary damages to go to the jury."); *ResMan, LLC v. Karya Prop. Mgmt*, LLC, No. 4:19-cv-402, 2021 WL 3403935, at **1, 13–14, n.2 (E.D. Tex. Aug. 4, 2021); *see also* Dkt. 759.

upon a reasoned determination of willful and malicious misappropriation, the trade secret owner is entitled to exemplary damages. *E.g.*, *ResMan, LLC v. Karya Prop. Mgmt*, LLC, No. 4:19-cv-402, 2021 WL 3403935, at *14 (E.D. Tex. Aug. 4, 2021) ("The testimony and documents introduced by ResMan certainly would allow a jury to reasonably determine willful and malicious misappropriation.  As such, ResMan has shown an entitlement to exemplary damages, and the jury verdict should remain unbothered."); *ResMan, LLC v. Karya Property Management, LLC*, No. 4:19-cv-00402, ECF No. 343 (E.D. Tex. Aug. 12, 2021) (entering final judgement including exemplary damages in the amount of 2x actual/compensatory damages); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 495 F. Supp. 3d 687, 711–12 (N.D. Ill. 2020) (rejecting defendant's argument that jury award of $418,800,000 of exemplary damages was unsupported and "monstrously excessive.").

The purpose of exemplary damages under the DTSA is to deter repetition of wrongdoing. *E.g.*, *DiscoverOrg Data, LLC v. Bitnine Global, Inc.*, No. 19-cv-08098-LHK, 2020 WL 6562333, *10 (N.D. Cal. Nov. 9, 2020).  Thus, a court should award the amount of exemplary damages necessary to deter and prevent similar misconduct in the future.  *Id.* ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.") (citations omitted).

In circumstances where some instances of unauthorized use may go undetected or are difficult to prove, "a higher amount of damages is necessary to deter similar misconduct." *Id.* Similarly, a pattern of wrongdoing and disregard for the law also calls for larger exemplary damages; repeated misconduct indicates a need for the wrongdoer to "be punished more severely," as "repeated misconduct is more reprehensible than an individual instance of malfeasance." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996).

## IV.    ARGUMENT

### A.    Vade's Continued Refusal to Acknowledge Wrongdoing Necessitates the Need For Maximum Exemplary Damages

Even now after the jury has returned its verdict, Vade has refused and continues to refuse to acknowledge any wrongdoing, thus necessitating a substantial award of exemplary damages.  After hearing the evidence presented during Plaintiffs' case-in-chief at trial—including uncontested

1  evidence of Vade's verbatim copying—Vade's CEO adamantly maintained that Plaintiffs' claims

2  were nothing but "pretend."  (Trial Tr. (Lotigier) 1864:5–1865:1.)

3    Just a year earlier, in August 2020, Mr. Lotigier spoke to several news outlets regarding the

4  Plaintiffs' allegations and asserted that Vade is "100% clean"; and the litigation is nothing but "legal

5  harassment" and "a sign of recognition of his technology."  (Trial Tr. (Lotigier) 1866:5–8; PX-675.)

6  But, as presented at trial, Vade had known about the unauthorized use of Plaintiffs' source code for

7  the development Vade's products for over a year prior to these public denials, *i.e.*, since at least

8  August 2019.  (*E.g.*, PX-2146; Trial Tr. (Lemarié) 653:7–21, 654:13–17, 655:2–6, 678:2–679:5.)

9    Consistent with Vade's longstanding refusal to take accountability, not even the jury's

10  verdict and the award of $13.5 million of compensatory damages appears to have given Vade or Mr.

11  Lotigier any pause.  In the days since the jury returned its verdict, Vade has issued public statements

12  rejecting the evidence and jury's findings.  (*E.g.*, Ex. 1 (presenting Vade's public comments that

13  they "are pleased that the jury saw that Proofpoint and Cloudmark's claims were an overreach");

14  Ex. 3 (same, including a statement from Mr. Lotigier that he and Vade "consider that Proofpoint /

15  Cloudmark has not sufficiently demonstrated the validity of its claims") (translated).)  In fact, Vade

16  is quoted in many news articles, expressing that it is "pleased" with the jury's damages award.  (*Id.*)

17  According to Vade, the $13.5 million award shows Plaintiffs' claims were an "overreach" and

18  "excessive," and that "Proofpoint / Cloudmark has not sufficiently demonstrated the validity of its

19  claims."  (*Id.*)

20    Most importantly, despite the clear evidence presented at trial and the jury verdict finding

21  willful and malicious misappropriation, Vade has yet to acknowledge any wrongdoing or express

22  any remorse, let alone indicate any willingness to impose remedial measures to address the

23  misappropriation and any ongoing or future misappropriation—which continues to this day through

24  Vade's continued use of technologies and products that have been implicated in its misappropriation

25  of Plaintiffs' trade secrets.  This continued lack of acknowledgment and accountability by Vade, as

26  evidenced by Vade and Mr. Lotigier's statements to the press, necessitates that the full amount of

27  exemplary damages available under the DTSA be awarded as a deterrence to disincentivize

28  continued misconduct by Vade.

### B.   Vade's Public Statements Indicate that the $13.5 Million Jury Award Is Insufficient to Deter Future Misconduct

Vade's post-verdict statements expressing satisfaction with the jury's $13.5 million compensatory damages award also indicate that Vade does not believe this award will have significant impact on its business and, as such, is insufficient deterrence against future misconduct. (*E.g.*, Ex. 1; Ex. 2 (translated); Ex. 3 (translated).)  Instead of expressing remorse or announcing remedial measures, Vade told the world that it was "pleased" by the verdict.  (*E.g.*, *id.*).  In fact, Vade recently assured the public that the multi-million-dollar award poses no threat to Vade, explaining, "[t]he 13.5 million is **much less** than the annual value of [Vade's] recurring contracts" and that Vade's continues to achieve **30% to 40% growth**, year-over-year.  (*E.g.*, Ex. 2 (translated) (emphases added).)

Yet Vade's recent public admissions are contrary to the financial picture it painted for the jury.  Specifically, at trial, Vade presented testimony from its damages expert, Mr. Bakewell, that **Vade's profit margin is "about 10%"**—and, according to Mr. Bakewell, that does not even take into account 55 other categories of costs or any fixed costs.  (Trial Tr. (Bakewell) 2638:13–16, 2662:18–23.)  That is, according to Vade's expert, for **$46.6 million of sales revenue**, Vade incurred nearly **$42 million of costs**—just for variable COGs, Research & Development, and Sales & Marketing.  (Trial Tr. (Bakewell) 2637:13–2638:16.)  Mr. Bakewell left no room for ambiguity when he told the jury, under oath, "[r]emember, **the bottom line is the company is unprofitable**." (Trial Tr. (Bakewell) 2638:13.)  Although his opinions and questionable methodology (which had been rejected by other courts[2]) were initially excluded, Mr. Bakewell evaded *Daubert* by testifying under oath during *voir dire* that his deductions took into account product-specific factors—such as Vade's admitted reinvestment into development of future, unaccused products—and omitted fixed costs, such as taxes.  (Trial Tr. (Bakewell) 2270:11–22, 2272:1–7, 2273:5–16, 2307:21–2308:10; *but see id.* at 2273:17–2274:8, 2303:17–2304:8, 2305:7–25.)  However, the theories advanced by Mr. Bakewell and Vade were unsupported by the evidence and his own analysis in his expert report.

---

[2] *See* Dkt. 462 at 10–11; Dkt. 543 at 6–9; *ATA Airlines, Inc. v. Federal Express Corp.*, 665 F.3d 882, 889–896 (7th Cir. 2011) (Posner, J.).

All of this came to light during Mr. Bakewell's cross-examination, where his testimony made clear he had in fact failed to omit or adjust any items from the three cost categories he deducted from the accused revenue.  (*Id.* at 2663:12–2665:13, 2665:22–2666:5, 2666:10–2668:5; *see also id*. at 2305:7–25.)  This testimony was uncontested.  (*Id.*)  Yet now Vade publicly boasts high revenues, and that the $13.5 million jury award is neither significant to its business nor poses any threat to its survival.  (*E.g.*, Ex. 3 ("The young French start-up has assured that the large sum to be paid does not call into question its survival.  'The 13.5 million is much less than the annual value of our recurring contracts' Georges Lotigier, CEO and majority shareholder of Vade Secure, told 'Les Echos.'") (translated).)

Accordingly, Plaintiffs respectfully request that meaningful exemplary damages be levied against Vade so that it will perhaps finally take accountability and be deterred from its ongoing and future misconduct.

### C.   The Evidentiary Record and Jury Finding Supports and Calls For Maximum Exemplary Damages

Ample evidence presented at trial supports the jury's finding that Vade willfully and maliciously misappropriated Plaintiffs' protectable trade secrets, and that Vade's misconduct warrants the maximum amount of exemplary damages under the DTSA.  The evidence includes, but is not limited to, Vade's testimony and internal emails acknowledging it had accessed and used Plaintiffs' confidential information, knowingly without authorization, in order to develop products to compete against Plaintiffs.  (*Supra*, section II.B.)  The evidence also establishes that Vade's motivations for its knowingly unauthorized conduct were to "destroy," "carpet bomb," and "completely push back" Plaintiffs in the marketplace, and had furthered that plan by at least hiring away key engineers from Cloudmark.  (*E.g.*, PX100.3 ("we have a new MTA . . . , which will allow us to completely destroy Cloudmark."); PX-1863.0016 ("Carpet Bomb Cloudmark; a $35M ARR new opportunities"); PX2288.0002 ("we've talked quite a bit with Mario ex cloudmark . . . He's also worked on spear phishing ;-)"); PX2257 ("since he comes from cloud/Mark I would do whatever to weaken them ;-)").)  Moreover, Vade's internal emails show that former Cloudmark employee, Mr. Xavier Delannoy, had forwarded Cloudmark **hundreds** of pages of trade secret

1   documents to Vade's CEO, Mr. Lotigier, who in turn forwarded the documents to another Vade

2   executive.  (*E.g.*, PX-2254; Dkt. 785-1 (Delannoy Dep. Designations) 140:16–24, 141:6–10.)  The

3   jury heard Mr. Lotigier admit that it was "wrong" that Vade had the Cloudmark documents and it

4   "should not have this kind of document" (Dkt. 785-1 (Lotigier Dep. Designations) 356:19–24,

5   358:18–22, 366:4–9); and the jury saw Mr. Lotigier's words "discrete with that ;-)" when forwarding

6   the documents.  (PX-2254.)  The evidence shows that, not only did Vade know its conduct is wrong,

7   Vade attempted to hide its wrongdoing and did so for competitive advantage.  (*E.g.*, Trial Tr.

8   (Moore) 1494:10–1496:15, 1496:25–1497:22, 1501:11–22, 1512:20–1513:11; Trial Tr. (Lemarié)

9   712:18-713:18.)

10      Courts have routinely awarded and upheld exceptionally large (often statutory-maximum)

11  exemplary damages under the DTSA on similar evidentiary records of wanton misappropriation.

12  *E.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. The Trizetto Group, Inc.*, No. 1:15-cv-00211,

13  ECF No. 931 (S.D.N.Y. Oct. 27, 2020).  For example, when reviewing the jury's finding of willful

14  and malicious misappropriation under the DTSA, the court in *ResMan, LLC v. Karya Property*

15  *Management*, described exemplary evidence that would support the finding.  2021 WL 3403935.

16  Specifically, the court noted evidence showing defendant Karya did not want the trade secret owner

17  and competitor, ResMan, to know it was developing competing products.  2021 WL 3403935 at

18  *14.  Similar to Vade's conduct here, Karya had shared, without authorization, access to ResMan's

19  trade secret information through email, along with the warning "please be careful."  *Id.*  Like Vade's

20  executives, the jury in ResMan heard testimony from the defendants admitting that accessing the

21  protected information "was wrong and 'unethical.'"  *Id.*  In sum, the *ResMan* court found "[t]he

22  testimony and documents introduced by ResMan certainly would allow a jury to reasonably

23  determine willful and malicious misappropriation.  As such, ResMan has shown an entitlement to

24  exemplary damages" under the DTSA.  *Id.*  The jury had awarded exemplary damages against the

25  two defendants that were over 4 times the amount of unjust enrichment; but the final judgement

26  against the defendants awarded the statutory-maximum exemplary damages of 2 times the unjust

27  enrichment award.  (*Id.* at *1; *ResMan, LLC v. Karya Property Management, LLC*, No. 4:19-cv-

28  00402, ECF No. 343 (E.D. Tex. Aug. 12, 2021).)

Similarly, in *Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.*, plaintiff Motorola had alleged that its competitor, defendant Hytera, had misappropriated 21 of its trade secrets, which "dealt with highly complex and technical specifications, circuit diagrams, testing plans, and product source code." 495 F. Supp. 3d at 699; *see also id*. ("Motorola illustrated at trial that the stolen confidential materials were the compilation of decades of engineering work that laid out the specific specifications as to how Motorola implemented types of functions"). Evidence established that Hytera had hired away senior managers from Motorola to develop Hytera's accused competing technology, just as Vade did in this case. *Id*. at 700. Like in this case, there was also email correspondence suggesting that Hytera's CEO and Vice President of R&D knew of the theft. *Id*. Moreover, the jury was presented with evidence that Hytera had "deleted evidence of misappropriation to conceal their theft," as well as evidence of Hytera's intent to hide and obfuscate its conduct. *Id*. at 707; *see also id*. ("Evidence in the record supports such a bad faith finding . . . . In June 2008, for example, G.S. Kok wrote to Sam Chia that they 'needed to re-write softwares[sic] to look different from Motorola' in order to 'protect the company from impending lawsuits.'"). The jury awarded $418.8 million in exemplary damages, in addition to over $345.7 million of actual/compensatory damages. *Id*. at 695. In upholding the jury's exemplary damages award, the court rejected Hytera's argument that the award is "monstrously excessive" and unsupported because it was within the DTSA statutory maximum and the evidence presented at trial supported the finding that competitor Hytera had willfully and maliciously misappropriated Motorola's trade secrets. *Id*. at 711–712. Thus, the statutory maximum award of exemplary damages here is warranted.

### D.    Maximum Exemplary Damages Are a Necessary Deterrence, as Future and Continued Misappropriation May Be Difficult to Detect and Prove

The difficulty in detecting and proving future misconduct, including obtaining evidence of future misappropriation, necessitates an award of the maximum exemplary damages allowed under the DTSA. *See, e.g.*, *DiscoverOrg Data, LLC*, 2020 WL 6562333 at *10 ("Some unauthorized use of Plaintiff's database goes undetected, and some instances of unauthorized use are too difficult to prove. Because of the probability of non-detection, a higher amount of damages is necessary to

1    deter similar conduct.") (internal citation omitted).  To reach its finding of willfulness and malice,

2    the jury first evaluated and weighed the evidence regarding Vade's unauthorized use.  (*See* Dkt. 795

3    at Questions 2 and 3.)  This evidence was highly technical, often involving multiple versions of

4    source code and Vade's internal communications regarding complex software design; and expert

5    witnesses were necessary to help the jury parse the evidence and determine if and to what extent

6    misappropriation occurred.  (*E.g.*, Trial Tr. (Nielson) 1153:10–1361:13; PX-1–PX-4, PX-35, PX-

7    46, PX-476, PX-726, PX-745, PX-1099, PX-1109, PX-1122, PX-1123, PX-1175, PX-1852, PX-

8    1887, PX-2090, PX-2100, PX-2102, PX-2217, PX-2273, PX-2276, PX-2283, PX-2314, PX-2443,

9    PX-2840, PX-2841; *see also* Dkt. 806.)  Given the highly technical and hidden nature of the

10   evidence of Vade's unauthorized use, at least some instances of any further misconduct may be

11   impossible or difficult to prove.  (*See id.*)  And even much of this evidence was uncovered only after

12   months of discovery, numerous motions, court orders, and coercive sanctions.  (*See, e.g.*, Dkt. 334.)

13   This problem is exacerbated by the undisputed fact that Vade, through its CTO Mr. Lemarié, had—

14   unknown to Plaintiffs—used unauthorized copies of Cloudmark's source code to develop Vade

15   products; there remains the possibility that other Cloudmark files among this database may be

16   restored and accessed by Vade unbeknownst to Plaintiffs.  (*See, e.g.*, Trial Tr. (Lemarié) 629:13–

17   23; *see also id.* at 625:18–626:6, 262:16–21, 627:1–5, 628:14–629:2.)  Finally, future similar acts

18   of misappropriation and unlawful conduct will be especially difficult to prove when, as here, the

19   wrongdoer has been found to have "intentionally destroyed, concealed, and withheld [evidence]

20   while doing everything possible to cover their tracks and hide the acts of concealment and

21   destruction."  (Dkt. 566 at 15.)

22         Therefore, because of the probability of undetectable or difficult-to-prove future

23   unauthorized use, a large award of exemplary damages is a necessary deterrence.  *See DiscoverOrg*

24   *Data, LLC*, 2020 WL 6562333 at *10 (*e.g.*, "Because of the probability of non-detection, a higher

25   amount of damages is necessary to deter similar conduct.").

26

27

28

**E.     Vade's Pattern of Misconduct Establishes the Need for Maximum Exemplary Damages to Deter Similar Misconduct**

Vade's misappropriation was not limited to a single instance but, instead, evinces a widespread pattern and culture of disregard for the intellectual property rights of others and the U.S. judicial system.   Based on the evidence, the jury found Vade had willfully and maliciously misappropriated 15 trade secrets that related to different types of information and applications, were used across multiple Vade products, and implicated Vade's top executives, including its CEO and CTO, over the course of several years.  (*Supra*, section II.B.)  As the Supreme Court explained, "[o]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance."  *BMW of N. Am.*, 517 U.S. at 577 (citation omitted).

Vade's misconduct also reveals a general disregard for the law and judicial procedure.  Less than two weeks after being confronted with uncontested evidence of Vade's verbatim copying and Plaintiffs' copyright infringement claim, Vade's CEO made public comments to the press that this litigation was nothing more than a "technique of legal harassment" and part of "the 'great legal violence' . . . inherent in American culture."  (PX-675.)  Mr. Lotigier made these statements knowing full well that his CTO, Mr. Lemarié, had in fact used Plaintiffs' technology to develop Vade's products.  He did not attempt to contact Plaintiffs to express remorse, return Plaintiffs' misappropriated trade secrets, or propose a plan for remediation.  Instead, he expressed his belief that this lawsuit was nothing more than an attempt to "harass[]" Vade.

Even during this litigation, Vade was given myriad opportunities to course correct  but stubbornly refused to do so.  Beginning at the outset of this case, Plaintiffs reached out to Defendants to propose early discovery in hopes that the dispute (and Plaintiffs' concerns regarding misappropriation of their trade secrets) could be expeditiously resolved on the merits.  (Ex. 5 ("However, to the extent that Vade and Mr. Lemarié deny trade secret misappropriation, we would like to provide them with an opportunity to provide expedited discovery to prove their claims.").)  The offer for expedited discovery was rejected by Defendants.  (Ex. 6.)  Indeed, Vade even refused to participate in normal discovery proceedings and instead chose to raise unmeritorious objections

to discovery *ad seriatum*, unnecessarily multiplying disputes and delaying discovery for over nine months. (*E.g.*, Dkt. 334 at 1 ("The underlying problem attending Plaintiffs' need to file their motion for enforcement and sanctions has been Vade's mistaken contention that they can keep a bevy of discovery objections in their pocket, raising them in a piecemeal fashion whenever they chose to do so, such as to draw out the course of discovery in this case over a large period of time while requiring this court to entertain and adjudicate multiple motions to compel the same discovery requests."), 2–6.) Yet, Vade was again afforded opportunities to correct its conduct. Although it appeared likely to Magistrate Judge Illman that Vade intended "to delay and frustrate the discovery process in this case," the Court nevertheless gave Vade the benefit of the doubt that its "counsel simply did not know the law and that there may remain some chance of misapprehending Vade's mistakes for misdeeds." (*Id*. at 9.) As such, the Court took efforts to "fashion [a] remedy in an effort to avoid unduly punishing Vade where it may be undeserved while . . . ensuring . . . the court's prior orders . . . will be duly respected . . . ." (*Id*.)

But again, Vade declined the opportunity to stop its "deflections and further obfuscation." (*See id*.) As discovery proceeded, forensic imaging of Vade's CTO's laptop showed that a massive amount, over 90 GB, of evidence had been deleted well after the filing of this lawsuit, including a clearly relevant document titled "Trade Secret Notes." (*See* Dkt. 556 at 5–8.) Based on the evidence and conduct observed by the Court, Magistrate Judge Illman reached the undisputed finding that Defendants had willfully destroyed relevant evidence during the course of this litigation. (*Id*. at 15 ("Thus, for the reasons discussed herein, the undersigned finds that Defendants' destruction and withholding of the three categories of evidence discussed above qualifies as willful spoliation because Defendants knew they were under a duty to preserve all of this evidence, but instead they intentionally destroyed, concealed, and withheld it while doing everything possible to cover their tracks and hide the acts of concealment and destruction.").) This misconduct culminated in an order from Magistrate Judge Illman recommending an adverse inference instruction be given for Vade's destruction of and failure to produce evidence, and explaining "that these Defendants have been playing a dangerous game since the outset of this litigation and the time has now come for them to take their seat at the banquet of consequences that they have invited upon themselves."

1    (*Id*. at 10, 19.)   Despite this stark admonition, Vade continued to push past the boundaries of

2    reasonable, proper conduct.   At trial, Vade continued to advance unmeritorious arguments and

3    positions, many of which had already been decided.  (*E.g.*, Trial Tr. 2548:12–2549:10.)

4         In light of the jury's factual determination that all of Vade's misappropriation was willful

5    and malicious, and Vade's pattern of disregard for the law and judicial process, the maximum

6    exemplary damages permitted under the DTSA is necessary to deter similar conduct in the future.

7    Indeed, even after the jury's findings, Vade has not taken any accountability, let alone taken any

8    measures to stop its willful misconduct, which is likely ongoing to this day.  "Certainly, evidence

9    that a defendant has repeatedly engaged in prohibited conduct while knowing or suspected that it

10   was unlawful would provide relevant support for an argument that strong medicine is required to

11   cure the defendant's disrespect for the law."  *BMW of N. Am.*, 517 U.S. at 577.

12   **V.    CONCLUSION**

13        For the foregoing reasons, Plaintiffs Proofpoint and Cloudmark respectfully request that the

14   Court award exemplary damages in the amount of $26,991,318 in order to deter similar willful and

15   malicious disregard of intellectual property rights by Vade and other potential misappropriators.

16

17   DATED:  September 10, 2021                    Respectfully Submitted,

18                                                By */s/ Sean S. Pak*

19                                                     Sean S. Pak (SBN 219032)
20                                                     seanpak@quinnemanuel.com
                                                       Iman Lordgooei (SBN 251320)
21                                                     imanlordgooei@quinnemanuel.com
                                                       QUINN EMANUEL URQUHART &
22                                                     SULLIVAN, LLP
                                                       50 California Street, 22nd Floor
23                                                     San Francisco, CA 94111
                                                       Telephone: (415) 875-6600
24                                                     Facsimile: (415) 875-6700

25                                                     Jodie W. Cheng (SBN 292330)
                                                       jwcheng@jwc-legal.com
26                                                     JWC LEGAL
                                                       One Market Street
27                                                     Spear Tower, 36th Floor
                                                       San Francisco, CA 94105
28                                                     Telephone: (415) 293-8308

*Attorneys for Plaintiffs Proofpoint, Inc. and Cloudmark LLC*

## <u>ATTESTATION OF CONCURRENCE</u>

I, Jodie W. Cheng, am the ECF user whose ID and password are being used to file this **PLAINTIFFS' MOTION FOR EXEMPLARY DAMAGES IN RE VADE'S WILLFUL & MALICIOUS TRADE SECRET MISAPPROPRIATION**.

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that the signatory identified above has concurred in the filing of this document.


Dated: September 10, 2021                           */s/ Jodie W. Cheng*
                                                                        Jodie W. Cheng